Receipt # 003714

ORIGINAL

FILED
JAN 4 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAI

LAUDES CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 07-4 C

**COMPLAINT**

Plaintiff Laudes Corporation ("Laudes") complains of defendant the United States of America and for its claims for relief against defendant states as follows:

## I. Parties

1. Plaintiff is Laudes, a Delaware corporation with its principal place of business in North Carolina.

2. Defendant is the United States, acting by and through its authorized agents.

## II. Jurisdiction and Venue

3. The Court has jurisdiction over this action and venue is proper in this Court pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601-613 and the Tucker Act, 28 U.S.C. § 1491.

## III. Background

4. Saddam Hussein was removed from power in Iraq on April 9, 2003 and the Iraqi security forces, including its police forces, largely disintegrated by mid-April, 2003.

5. Recognizing the need for Iraqi police, on May 2, 2003, the United States Office for Reconstruction and Humanitarian Assistance (ORHA) called for the police in Baghdad to return to work. The ORHA was established by President George W. Bush and placed under the operational control of the Commander, US Central Command to provide reconstruction and humanitarian assistance after the fall of the Iraqi government.

6. On May 8, 2003, the United States announced the creation of the Coalition Provisional Authority (CPA). According to President Bush, the CPA was created under the law of war to exercise powers of the Iraqi government temporarily and to provide for security in Iraq. The next day, President Bush, in an executive action, appointed Ambassador L. Paul Bremer to serve as the Presidential Envoy to Iraq and directed that Ambassador Bremer report to Secretary of Defense Donald Rumsfeld.

7. According to Ambassador Bremer's letter of appointment:

> Subject to the authority, direction, and control of the Secretary of Defense, you are authorized to oversee, direct, and coordinate all United States Government (USG) programs and activities in Iraq, except those under the command of the Commander, U.S. Central Command.

8. On May 13, 2003, Secretary Rumsfeld designated Ambassador Bremer to head the CPA. Thus, not only was Ambassador Bremer the Presidential Envoy in Iraq,

he was the Administrator of the entity established by the US to exercise government power in Iraq.

9. The Development Fund for Iraq (DFI) was established by the United Nations and the CPA to fund relief and reconstruction efforts in Iraq. The DFI consists of (a) deposits from surplus funds in the United Nations "oil for food" program, (b) revenues from the export sales of Iraq's oil and natural gas, (c) international donations and (d) repatriated Iraqi assets seized by the United States and other nations.

10. On May 17, 2003, at Ambassador Bremer's request, the DFI bank account was established.

11. On May 22, 2003, in Resolution 1483, the United Nations formally recognized the CPA and the creation of the DFI and stated that the fund should be "disbursed at the direction" of the CPA. UN Resolution 1483 also provided that the DFI was immune from suits or claims against it.

12. That same day, May 22, 2003, President Bush issued Executive Order 13303, stating that, as against the DFI:

> Unless licensed or otherwise authorized pursuant to this order, any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is prohibited, and shall be deemed null and void....

13. The protections set forth in Executive Order 13303 for the DFI remain in effect.

14. On June 10, 2003, the Administrator of the CPA issued Regulation Number 2, "Development Fund for Iraq." Under Section 2, at paragraph 1, the regulation states that Ambassador Bremer, as Administrator of the CPA:

> Oversees and controls the establishment, administration and use of the [DFI] for and on behalf of the Iraqi people, and directs disbursements from the [DFI] for those purposes he determines to be for the benefit of the people of Iraq.

15. Regulation Number 2 goes on to state that "the [DFI] shall be controlled by the Administrator of the CPA."

16. The CPA was (a) created by the United States, (b) lead by an individual appointed to the position by the Secretary of Defense and (c) principally staffed by US military, civilian employees and contractors. For all of these reasons, and others, the CPA was an agent or instrumentality of the United States Government (USG).

17. In June 2003, recognizing that the security situation in Iraq was deteriorating, the CPA and Iraqi Ministry of Interior issued a directive that all police officers return to work by July 3. 2003, or face immediate termination.

18. The deteriorating security situation was largely the result of an insurgency and from the summer of 2003 onward the insurgency in Iraq continued to grow. By early 2004 there was a growing unease within the USG about the slow build-up of Iraqi Police Service (IPS) capability. The view was that the IPS had been neglected and there was a gradual realization that this neglect could not continue.

19. On August 20, 2003, Ambassador Bremer, as Administrator of the CPA, issued CPA Memorandum Number 4, Contract and Grant Procedures Applicable to Vested and Seized Property and the Development Fund for Iraq (Memo No. 4). Appendix B to Memo No. 4 contains "Standard Terms and Conditions for Solicitations and Contracts in Excess of $5,000."

20. According to Memo No. 4, the term "contracting officer" is defined as "an individual who has been authorized by the Administrator, CPA...to enter into Contracts or Grants using Iraqi funds."

21. The contracting officers appointed pursuant to Memo No. 4 were members of the United States armed forces and agents of the USG.

22. In January 2004 the USG sent Major General Karl W. Eikenberry to examine the problem with the IPS and make recommendations. That month he published a report stating that a coherent organizational model was required if the IPS was to be properly developed. He recommended that a police equivalent to the then-existing Coalition Military Assistance Training Team (CMATT) be created and that it be set up under command of the military, not the CPA. The police equivalent to the CMATT he recommended was the Civilian Police Assistance Training Team (CPATT).

23. Formal USG direction regarding the Eikenberry Report came in February 2004, with a memorandum from Secretary Rumsfeld directing the US Central Command to take on the mission to organize, train, equip, and mentor the IPS and Border Police.

24. In anticipation of the formal establishment of CPATT (which at this point had not yet been directed), the Commanding General of the Combined Joint Task Force 7 (CJTF-7), Lieutenant General Ricardo Sanchez, set up a Police Working Group. Brigadier Andrew Mackay OBE of the United Kingdom's Armed Forces was asked to lead the Police Working Group.

25. Among the conclusions and recommendations of the Police Working Group were that there was a strategic failure in delivering an effective police force, the situation needed to be reversed in time for Iraqi elections in 2004, a broad range of policing capability/specialist courses were needed and the capacity of the Baghdad Police Academy needed to be quickly doubled from 1,000 to 2,000. In essence, a comprehensive reform process was required.

26. CPATT was formally established on March 9, 2004. The following weeks were extremely challenging. The insurgency was beginning to take serious hold. CPATT had to turn a dysfunctional, incoherent, and badly managed training approach into one that had organizational structure, coherence, and most importantly of all, would start to deliver genuine capability to the IPS.

27. A key component to the success of CPATT was to dramatically improve, in short order, the infrastructure, capacity, and resourcing of the Baghdad Police Service Academy (BPSA). Initially it was perceived that BPSA's capacity had to be doubled, from 1,000 to 2,000. The BPSA was perhaps a small part in the overall security effort in Iraq, but was key to Brigadier Mackay's plans. According to Brigadier Mackay, he

wanted to demonstrate success at the BPSA in order to "send a very clear signal to the IPS that we were serious and totally committed to assisting them."

28. The existing BPSA facility then had the capacity to house and train approximately 1,000 students. As part of the plan to increase the capacity of the BPSA, on March 26, 2004 the CPA awarded contract number W914NS-04-D-0009 to Parsons Delaware, Inc. This was a cost-reimbursable indefinite delivery, indefinite quantity contract. Task Order No. 0006 under that contract was issued to Parsons by the CPA to design, renovate and construct the Baghdad Police College, to include classrooms, dormitories, dining, administrative offices and firing ranges with the ultimate goal, according the to Task Order Statement of Work, to provide housing and training facilities for approximately 4,000 cadets and 500 instructors.

29. However, the CPATT wanted the BPSA to have some sort of increased student resident capacity faster than the Parson's contract would provide.

30. As a result, Lawrence M. Underwood of Laudes Corporation was contacted in late spring 2004 by officers at the CMATT (engineering group C7). Because of his substantial connections with Iraqi suppliers and construction workers, Mr. Underwood was asked to provide a bid (as sole-source provider) for the "virtually overnight" construction of a tent city at BPSA to accommodate 1,000 students, including housing, classrooms, and kitchen and dining "DFAC" facilities (Dining Facilities Administration Center).

31. Laudes had already been providing similar services in Iraq and was well known and well regarded by the CPA. An April 2004 e-mail by the commanding officer of the US forces managing the services at Kirkush Military Training Base (KMTB) is evidence of not only that high regard for Laudes but also of the manner in which the USG contracted for support under these conditions:

> Laudes Corporation has been our ace in the hole- they continue to support us when all others here fail, with no requests or disputes about whether or not it is in their SOW. Currently they have rigged our generator and electrical grid for E1 because Al Monsoor who is responsible has not been here the last two days. In addition they roll with the punches and WORK WITH US AS OPPOSED TO AGAINST US- as some of our American company's have done in the past.
>
> * * *
>
> They have my absolute backing to remain here with the additional year option!!!

32. In response to the USG's request, Laudes submitted a price of approximately $4.8 million, based on 12 hours of market research, for available tents and other necessary equipment for the tent city project at the BPSA.

33. Ultimately, the USG determined that the tent city contract could not be a sole source award and that the contact should contain requirements to provide life support, given that such services would be necessary at the completion of construction. As a result, on April 22, 2004, the CPA issued Solicitation No. DABV01-O4-R-0047, for BPSA Life Support.

34. According to the Statement of Objectives (SOO) for the BPSA Life Support solicitation, life support services included a variety of tasks, including fire protection services, motor pool operations, facilities management, food service, clothing issue, billeting management, an anti-terrorism plan (with a fixed price option to provide security upgrades), visitor support, communications and information technology, latrine and shower facilities, electrical maintenance, barber services and medical support, and grounds and road maintenance. The solicitation asked for prices for several different student loads for one year, including student numbers in the ranges of "1-1500, 1501-2500, 2500-4500 [sic] and 4500-6000 [sic]."

35. In addition, the solicitation asked for offers on several optional items, including temporary academy life support at Arbil, Iraq, temporary and limited life support services at the Baghdad International Airport staging area, and in ¶ 3.29 of the SOO, life support services at a proposed "semi-permanent" academy at an as yet undetermined location in southern Iraq for approximately 2,000 students.

36. The solicitation did not require a bid on any construction services. Nor did the solicitation discuss, mention or require a bid for erecting a "temporary tent city," the task Laudes had previously been asked to bid on a sole source basis.

37. Laudes submitted an offer in response to the BPSA Life Support solicitation. It offered to provide the basic life support services for 1-1500 students for one year for $14,190,049 and for 1501-2500 students for $17,719,594. Laudes also provided prices on all the optional items, including $18,000,000 to provide the life

support services for the "semi-permanent" academy once that facility was erected. The CPA did not accept Laudes' offer.

38. The contract was instead awarded to Balloch and Roe Services. Brigadier Mackay asked the head of that company, Mr. Brent Balloch, to meet with him. Brigadier Mackay wanted to impress upon Mr. Balloch the urgency of the task and the tight deadlines. The general needed to know of any disruptions to the deadlines and told Mr. Balloch about the complicated process of getting police recruits from around Iraq.

39. During the procurement process for the award of the BPSA Life Support contract, the transition from the CPA to a newly established Interim Iraqi Government (IIG) was drawing

near. On May 11, 2004, President Bush signed National Security Policy Directive 36 (NSPD-36). The directive provided, in pertinent part:

> When the CPA is terminated, the United States will be represented in Iraq by a Chief of Mission, who on my behalf and under the guidance of the Secretary of State, shall be responsible for the direction, coordination and supervision of all United States Government employees, policies, and activities in country, except those under the command of an area military commander, and employees seconded to an International Organization.
>
> Commander, USCENTCOM [US Central Command], under the authority, direction, and control of the Secretary of Defense, shall continue to be responsible for U.S. efforts with respect to security and military operations in Iraq. . . .
>
> Commander, USCENTCOM, with the policy guidance of the Chief of Mission, shall direct all United States Government efforts and coordinate international efforts in

> support of organizing, equipping, and training all Iraqi security forces.
>
> * * *
>
> I also establish . . . a temporary organization within the Department of Defense to be called the Project and Contracting office (PCO) to provide acquisition and project management support with respect to activities in Iraq, as requested by the Secretary of State and heads of other Departments and agencies. The Secretary of Defense in consultation with the Secretary of State shall select a Director for PCO. PCO personnel in Iraq shall be permanently or temporarily assigned under Chief of Mission authority. PCO shall provide acquisition and project management support to the Chief of Mission. . . . The Director of the Office of Management and Budget shall ensure that future budget submissions request the funding and authorities I determine necessary to support the U.S. Mission in Iraq.

40. The PCO (now Joint Contracting Command for Afghanistan and Iraq (JCC)) in Baghdad was (and is) an office of the U.S. Embassy, Baghdad, Iraq. The PCO/JCC was (and is) staffed by U.S. Government officials, both military and civilian. The contracting officers within both the PCO and the JCC are authorized agents of the defendant.

41. In order to implement NSPD-36, the US Department of Defense created the Multinational Security Transition Command-Iraq (MNSTC-I) under the overall direction of Commander, Multinational Force-Iraq (MNF-I). MNF-I's Civilian Military Assistance Training Team (CMATT) was assigned the responsibility of managing the Iraqi Army training program, which included Special Forces, the Navy, and the Air

Force. As discussed above, the MNF-I's Civilian Police Assistance Training Team (CPATT), commanded by Brigadier Mackay until early October 2004, had the responsibility of managing the Iraqi Police Service training program.

42. As NSPD-36 was being implemented, the CPA and Ballach and Roe (to whom the CPA had originally awarded the BPSA Life Support contract) agreed to an additional scope of work under that contract. Specifically, the CPA and Balloch and Roe agreed that the contractor would provide design and construction services to provide an "expedient camp" of 1,250 students and 50 instructors on the BPSA site in Baghdad and to provide life support services for those personnel when the new camp was finished and occupied. Ballach and Roe attempted to provide this camp by erecting a tent city. In essence, this additional scope of work was the exercise by the CPA of the option to provide life support services to the additional students at the "Semi-Permanent Facility" referenced in ¶ 3.29 of the original SOO, but with the additional task of first actually designing and constructing that facility—a task not mentioned in the original SOO.

43. However, Balloch and Roe was unfortunately missing contract deadlines. As a result, Brigadier Mackay initiated a meeting with his staff and the contracting officers at CPA to identify options if Balloch and Roe continued to default on delivery.

44. Balloch and Roe was unable to cure its nonperformance. Major M. Lloyd Blackmon, the contracting officer at the CPA responsible for the BPSA Life Support contract, along with others at the CPA, determined that Balloch and Roe did not have the ability to perform and was in default.

45. At that time, Major Blackmon asked Laudes to assess the situation at BPSA. The requested assessment was to include determining a solution for the failed tent city that had been erected by Balloch and Roe and what needed to be done to provide proper life support, i.e., food, water, electricity and other services, for the students currently staying in the permanent facilities at BPSA, as well as non-resident students. A key question for Mr. Underwood was when Laudes would be able to take over the BPSA Life Support contract if the CPA terminated the original award to Balloch and Roe. Mr. Underwood said Laudes could mobilize the life support functions immediately, within 24 hours.

46. In response to Major Blackmon's request, Laudes recommended the CPA remove the tent city and construct semi-permanent student quarters, classrooms, kitchen, dinning, and toilet and shower facilities. Laudes provided no price or estimate to the PCO for the construction of these facilities, nor was he asked to provide one.

47. Later that month, Major Blackmon summoned Mr. Underwood to his office at the CPA to inform Mr. Underwood that the original BPSA Life Support contract would be terminated and asked that Laudes be prepared immediately to assume all responsibilities at BPSA, including building the semi-permanent facilities.

48. As he had done with Brent Balloch, Brigadier Mackay asked to meet with Mr. Underwood to emphasize the importance and urgency of the effort and that there could not be a repeat of the Balloch and Roe non-performance.

49. On June 20, 2004, Major Blackmon awarded Laudes letter contract DABV01-04-C-9001 ("Contract 9001" or the "Phase I Contract") directing Laudes to:

> perform Life Support services for the Baghdad Public Service Academy (BPSA) training site located at Bagdad, Iraq in accordance with [the] attached Statement of Work (SOW). Additionally, [Laudes Corporation was] responsible to provide armory, ammunition and armor support, portable sewage services, ensure quality construction of a Semi-Permanent Academy, internet cafes and security upgrades.

50. The contract was signed for the United States of America by Major M. Lloyd Blackmon Jr., USAF, and on behalf of Laudes by Lawrence M. Underwood, Jr.

51. The SOW to which the Phase I Contract refers in the award letter itself did not identify the number of students or cadre for which Laudes was to provide life support.

52. The Phase I Contract stated that "costs associated with this effort shall not exceed $26,000,000 for performance 20 Jun 04 - 15 May 05" and requested a proposal to definitize the contract no later than June 27, 2004. There was no discussion between Major Blackmon and Mr. Underwood about the $26,000,000 not to exceed (NTE) price set forth in the contract except that the parties agreed that $26,000,000 was insufficient to accomplish the SOW. Laudes does not know the origin or basis of that number.

53. However, if the CPA were following standard procedures set forth in the Federal Acquisition Regulations (FAR), the NTE price set forth in the Phase I Contract would have been one-half of the CPA's estimated cost of the definitive contract. Thus, if the CPA were following standard FAR procedures (which it did in many cases

notwithstanding that the FAR were not necessarily applicable), the ceiling price on of the Phase I Contract would have been $52,000,000. (In fact, this was the approach followed by the USG in awarding the Phase II Contract 45 days later.)

54. Prior to award of the Phase I Contract, Laudes had never submitted a price to the CPA to design and construct the Semi-Permanent Academy ordered by the CPA in the Phase I Contract.

55. Using the prices submitted by Laudes in response to the original BPSA Life Support solicitation, the work ordered by CPA—exclusive of the design/build services—under the Phase I Contract was priced by Laudes at $33,946,449, assuming a student load of no more than 1500.

56. The Phase I Contract was funded with DFI funds, not funds appropriated by the USG, and incorporated the standard terms and conditions set forth in Appendix B to Memo No. 4. As a result, the Phase I Contract stated that the Contract Disputes Act did not apply. The contract did not include or incorporate by reference any FAR clauses, with the exception of FAR 52.233-1, Disputes, which was made applicable in a modified form. As a result, none of the FAR clauses pertaining to contract definitization, limitation of government obligation, limitation of cost, etc., were made part of the contract. The contract did not give Laudes the right to stop work upon approaching or reaching the NTE value of $26,000,000.

57. The schedule for completing the Semi-Permanent Academy was accelerated, requiring Laudes to design and build the facilities to house and train over 1,000 students, who were arriving from locations throughout Iraq, by the second or third week in July, 2004. Laudes met the accelerated schedule.

58. On June 20, 2004, when they were signing the Phase I Contract, the contracting officer, Major Blackmon, told Mr. Underwood that the contract would be modified at the time of definitization to increase funding and to modify the statement of work so as to include contract coverage for construction and other support requirements. On this and later occasions, Major Blackmon assured Mr. Underwood that additional funding would be provided to cover undefinitized areas, including construction.

59. Michael LeMaster was a CACI employee under contract with the US Army as a contract specialist and was present during this and subsequent meetings and conversations regarding the BPSA life support work.

60. The parties to the Phase I Contract knew, at the time of award and thereafter, that the NTE price set forth in the letter contract was insufficient to perform all of the work demanded by the Phase I Contract SOW. Moreover, as work under the contract progressed, the parties knew—because of additional and changed work required by the USG—that the funding shortfall on the contract was increasing.

61. The Phase I Contract stated that Laudes was to provide a proposal to definitize the contract by June 27, 2004. However, at the time the parties executed the

Phase I Contract, they knew that Laudes would not be able to provide a definitization proposal by June 27, 2004 for a variety of reasons, including that: (a) Laudes was taking over a contract that had been terminated and it would take time to assess the value of goods and services already performed, if any, and what needed to be re-done; (b) Laudes had not previously submitted a bid for the design and construction of the semi-permanent facility and, as a result, had no cost data on which to rely for the purpose of preparing even a NTE proposal, much less a definitization proposal; (c) given the extremely tight construction deadlines (made more difficult as a result of the termination), Laudes was required to focus on accomplishing the work, not preparing a price proposal; (d) a seven day period within which to prepare a definitization proposal was virtually impossible under the best of circumstances, and even more difficult given the exigent circumstances under which Laudes was working.

62. Consistent with that understanding, Major Blackmon did not ask Laudes to provide a definitization proposal between June 20, 2004 and June 28, 2004 or thereafter.

63. On June 28, 2004, eight days after the award of the Phase I Contract to Laudes, the IIG accepted sovereignty and, pursuant to NSPD-36, the CPA disbanded and the Project and Contracting Office (CPO) took over contracting duties for the USG. With the transition of sovereignty, CPA also transferred responsibility for the unobligated DFI funds to the IIG, specifically to the Iraqi Ministry of Finance (MOF).

64. Earlier, on June 15, 2004, in anticipation of that transfer of sovereignty and responsibility for DFI funds, the MOF, the US Chief of Mission and the Commander, MNF-I entered into an agreement pertaining to then on-going contracts which were using DFI funds. Pursuant to that agreement, the successors to the CPA (i.e., the PCO) were to continue administering the DFI-funded contracts. The US Chief of Mission and the Commander, MNF-I had no authority to enter into any new contracts with DFI funds. In addition, according to the agreement, the US Chief of Mission and Commander, MNF-I were not authorized to "terminate, amend or novate any contracts or grants" funded with DFI funds.

65. The MOF agreement limiting the authority of the US Chief of Mission and the Commander, MNF-I (and, by extension, all the contracting officers at the PCO), was executed before the CPA awarded Laudes the Phase I Contract. On June 20, 2004, when it issued the undefinitized Phase I Contract to Laudes, the CPA knew that the PCO (which would assume the CPA's contracting duties after transfer of sovereignty) would not have the authority to modify the Phase I Contract.

66. The CPA knew at the time it awarded that Phase I Contract to Laudes that: (a) the NTE price of the contract was insufficient to accomplish the work required by the SOW; (b) the PCO would not have authority to modify the Phase I Contract by adding additional DFI funds to the contract after June 28, 2004; (c) Laudes would be unable to provide a definitization proposal to the CPA before the CPA lost authority to modify the

contract and place additional DFI funds on contract; and (d) the Phase I Contract did not permit Laudes to stop work.

67. Nonetheless, at all times the parties to the Phase I Contract intended that Laudes be paid for all of the work performed by Laudes that was ordered and received by BPSA personnel.

68. By late July and very early August 2004, efforts by the US-led multinational forces were proceeding to significantly increase the training capacity of the BPSA. However, the transfer of sovereignty to the IIG made contract actions to provide services for the additional students more difficult.

69. As one senior Department of Defense contracting official told investigators from the Government Accountability Office, "nobody was sure of the legal consequences for contracting during or after the transition." This problem was obvious in an attempt to modify the Phase I Contract to increase the student head count for life support when in an internal e-mail a US lieutenant colonel wrote that "we still have to get through legal for the change in funds," referring to the use of USG appropriated funds in lieu of DFI funds.

70. Nonetheless, the PCO continued to work on expanding the scope of the Phase I Contract. Believing that it was not yet possible to formally modify the Phase I Contract—but recognizing the need to move quickly—US Navy Captain Phil H. Dalby suggested that "since there is uncertainty regarding our ability to legally place the

requirement to expand the Baghdad Police Academy by an additional 2000 students on our current contract with Laudes[,] MNSTC-1 Request[s] that a Sole Source letter contract be issued to Laudes today 2 August 2004 to increase the bed down and classroom capacity at Baghdad Police Academy by 2000 with the following schedule: 4 Oct 2004 Increase by 500 for a total increase of 500; 15 Oct 2004 increase by 500 for a total increase of 1000; 1 Nov 2004 increase by 500 for a total increase of 1500; 15 Nov 200[4] complete 500 for a total increase of 2000."

71. Captain Dalby's email also provided the justification for the sole source award he recommended be made to Laudes, stating that there was an "URGENT AND COMPELLING requirement to increase the student population at Baghdad Police Academy immediately by 2000 students" and that "Laudes is the only known contractor in this theater that has the PROVEN CAPABILITY to accomplish the expedient bed down of 2000 additional students in the timeframe that is required." This proposed sole source justification was sent to, among others, Lieutenant General David Petraeus, Brigadier Mackay, Brigadier General Stephen Seay, Brigadier General Nigel Aylwin-Foster, and the contracting officer, Major Blackmon.

72. Three days later, on August 5, 2004, the PCO awarded Laudes a second contract for construction at the BPSA, contract number W914NS-04-C-9032 (Phase II Contract).

73. In some ways, the Phase I and the Phase II Contracts were remarkably similar. Both called for the design and construction of semi-permanent facilities at the BPSA. Neither contract contained any provision that permitted or required Laudes to either provide notice or stop work when it approached either the not-to-exceed or ceiling price. Although the Phase II Contract was subject to both the FAR and the Contract Dispute Act, it did not contain or incorporate by reference any FAR clause limiting the government's liability or obligation under the contract, nor did it include or incorporate by reference either FAR 52.216-24, Limitation of Government Liability or FAR 52.216-25, Contract Definitization.

74. However, there were also significant differences between the two contracts. While the Phase I Contract was funded with DFI funds, the Phase II Contract was funded with USG appropriated funds (although the contract itself provided no accounting or appropriation data). Further, as mentioned above, the Phase II Contract was subject to the Contract Disputes Act and the FAR, while the Phase I Contract was subject to neither.

75. The parties understood and intended the Phase II Contract to be, in fact, merely a modification of the Phase I Contract using a different source of funds.

76. This intent and understanding was expressed, in part, by the manner in which invoices were prepared and submitted by Laudes and approved by the PCO. The amounts charged the PCO by Laudes were allocated between the two contracts based on

average student headcount. That is, student headcounts were provided by the BPSA each day for life support services to be performed the following day. Invoices were based upon these BPSA-provided figures.

77. Although neither the PCO nor the BPSA provided any direction regarding the allocation of charges between DFI funds and USG appropriated funds, Laudes allocated life support charges between the Phase I and Phase II Contracts by charging the Phase I Contract for life support services for student headcounts of 2,500 and below and charging the Phase II Contract for life support services for student headcounts of 2,501 and above.

78. Neither the PCO nor the BPSA personnel ever questioned or rejected an invoice prepared by Laudes using this allocation because neither the PCO nor the BPSA personnel cared.

79. The statements of work relating to both of these contracts were orally revised numerous times but never finalized. In each instance in which the statements of work were revised to include additional or changed work, Laudes was assured by authorized representatives of the USG that additional funds would be made available to fairly compensate Laudes for the additional work. Neither contract was ever modified to reflect the agreed changes in required work or to provide specifications, drawings, or other aspects to describe the required construction. The only written contract

amendments (discussed below) were single-page, unilateral amendments purporting to "definitize" the contracts.

80. Laudes' work on these two letter contracts began as soon as they were executed. For example, and as stated above, the Phase I Contract was awarded the afternoon of June 20, 2004 and by that evening Laudes had personnel on site performing the contract.

81. The operating conditions in Iraq during 2004 were extremely difficult. For example, upon Laudes employees first arriving at BPSA to assume responsibility for the contract, mortars were fired and landed inside BPSA. In addition, requirements changed almost daily as BPSA's mission, policies and security status changed and evolved—but the contracts were never formally changed or expressly modified.

82. Instead, Laudes continued to receive assurances from authorized representatives of the USG working at the PCO that Laudes would be fairly compensated for the additional and changed work requested by the US and performed by Laudes.

83. Security for the BPSA site was problematic and Laudes responded on several different instances to BPSA/PCO concerns about student and staff safety. These responses caused Laudes to incur costs that it was led to believe, by BPSA officers such as Ted Nordgaarden, the Chief of Logistics for the BPSA, Mel Goudie, the BPSA Director, and several others (who repeatedly and routinely asked Laudes for additional support and stated that they would handle contracting issues) that Laudes would be paid.

These individuals had the authority to request work from Laudes. Alternatively, the contracting officer was aware of these requests and directions and never objected to them, never directed these individuals to stop requesting services from Laudes and never directed Laudes to stop responding to such requests.

84. In each case, there was an implied agreement in which the parties understood the need to accomplish the additional and changed work and agreed that Laudes would perform that work, that the contract would be modified to reflect the additional scope of work performed by Laudes by equitably adjusting the contract funds to fairly compensate Laudes, or that a new contract would be awarded. In each case, such agreement was entered into by authorized representatives of the USG and/or with the actual or constructive knowledge of authorized representatives who permitted Laudes to perform as requested.

85. There were no provisions for Laudes to provide security in either contract, nor were there contingencies for insurgent attack, student theft and vandalism, or the rapid deterioration of the situation in Iraq and the escalating costs related to that deterioration. Yet each circumstance presented itself on numerous occasions and on each occasion Laudes was asked to perform extra work, not originally within the scope of the contracts. These requests were made by PCO or BPSA personnel with authority. The contracting officer either participated in such requests, or had actual or constructive

knowledge of the requests and accepted those requests, and failed to take any action to negate such requests or stop Laudes from performing in reliance on them.

86. The PCO contracted out some of the USG's contract administration responsibilities to CACI International, Inc. (CACI). On August 21, 2004, Laudes was contacted by CACI's Tim McLaren regarding definitization for the two contracts. This was the first time a representative of the PCO had raised definitization proposals with Laudes. Mr. McLaren visited the sites and requested that both definitization proposals be submitted to him by August 28, 2004.

87. Though Mr. McLaren intended negotiations regarding the definitization to begin on September 1, 2004, within a few days after his request that plan was overcome by other tasks for PCO and the issue was not brought up again for several months. This delay occurred, in part, because the level of detail demanded by Mr. McLaren was far greater than demanded by the USG on previous or subsequent contracts Laudes had with the USG. Neither contract required Laudes to submit cost or pricing data under the Truth in Negotiations Act, 10 U.S.C. § 2306a. Moreover, Laudes was unable to provide this detail (even if required by the contracts), in part because of the chaotic conflict environment in which it was operating, and in part because of its reliance upon local subcontractors who, by nature, did not have pricing and supply information available in advance. The delay also occurred because Mr. McLaren was quickly overwhelmed with other tasks as he attempted to continue organizing operations in a conflict zone.

88. In addition, on September 14, 2004, the BPSA suffered an extensive mortar and rocket attack. Several new buildings were damaged and some students and workers were injured. Laudes, as requested by authorized representatives of the USG, repaired the damaged buildings and invoiced for that effort on the same basis as the original construction. Of course, this additional work was not originally within the scope of work of either contract. However, there was an implied contract that Laudes would be fairly compensated for performing this additional work.

89. After the attack, BPSA decided to move student billeting and training units to safer existing permanent/hardstand buildings. Contracting officers Major Greer and Major Creamer and BPSA officer Colonel George Biszak spoke with Laudes about this process multiple times. Laudes was directed to repair the existing air conditioners and provide equipment, wiring, and generator power for these new buildings.

90. Neither contract was ever expressly or formally modified to cover these expensive operational changes. However, there was an implied contract that Laudes would be fairly compensated for performing this additional work.

91. Laudes made multiple attempts to get written modifications covering this scope change. Understandably, the contingencies of war prevented contracting officers from giving this contract modification their highest priority and neither contract ever explicitly reflected these understandings, expectations, and activities, though there

existed a clear agreement between the parties that Laudes was to perform this work and would be paid for it.

92. BPSA was regularly mortared, requiring a change in the specification of some of the buildings Laudes was constructing. CPATT wanted a stand off capability on the roofs of buildings which necessitated a second skin being built on top of the existing roofs. As Brigadier Mackay later noted, "This was not in the original requirement but [Laudes] agreed to get on with the work and allow the necessary changes to the contract to follow on." This additional scope of work was either requested by authorized USG representatives or requested and performed with the actual or constructive knowledge of the contracting officer, who consented to Laudes' efforts.

93. In fact, on September 6, 2004, Mr. Jeff Stackow, in the contracting office at the PCO, summarized a meeting between USAF personnel and Laudes personnel and acknowledged the increased costs Laudes was incurring, stating:

> Due to increased [insurgent] activity life support costs are running higher than expected. Laudes will give CPATT a cost estimate on installing protection from mortars over the expedient camp structures. In the meantime, installation of the expedient camp will continue as originally anticipated.

94. BPSA staff, with the actual or constructive knowledge and approval of the contracting officer, explicitly requested that Laudes prioritize student and staff safety. On September 20, 2004, Laudes began providing and emplacing T-walls and U-bunkers to ensure such safety, at a tremendous cost to Laudes—more than $2 million over the two

contracts. However, no written modification of either contract was ever executed to incorporate these changes in scope. Authorized BPSA staff, following one of CPATT's weekly meetings at Adnon Palace, directed that Laudes arrange and pay for these services and goods. The contracting officer had actual or constructive knowledge of this change in scope ordered by BPSA staff, did not countermand the request and permitted Laudes to continue performing as requested by BPSA staff. There existed an implied agreement that Laudes would be fairly compensated for this work.

95. After emplacing the T-walls and U-bunkers, Laudes was directed by BPSA staff to manage the additional clean-up issues that arose because students used the new facilities as latrines. Laudes was forced to incur additional costs for labor to effect cleanup. This request was made by authorized representatives of the USG. In addition, the contracting officer had actual or constructive knowledge of this change in scope ordered by BPSA staff, did not countermand the request and permitted Laudes to continue performing as requested by BPSA staff. Again, there existed an implied contract that Laudes would be fairly compensated for this additional work.

96. The existence of the implied contract between Laudes and the PCO was well known. For example, on October 1, 2004, Melvin Goudie, Director of BPSA, explained that Laudes was conducting operations without a written contract because of extenuating circumstances, stating that "Due to the unexpected activity surrounding the

Academy and the way in which we had to terminate one contract and hire Laudes, contracting and Laudes have not fully implemented a paper agreement."

97. Several e-mails on October 6, 2004 again discussed the matter of overhead cover for BPSA buildings, including exchanges among Major Creamer to Major Greer, Major Greer to Mr. Underwood, and a response from Mr. Underwood to Major Greer. Major Creamer had learned from Colonel Biszak that Laudes had nothing in place to start this project, and also did not have materials. Laudes responded that several possible solutions had been reviewed, but no one had given Laudes authority to proceed, stating that "no one has ever given Laudes Corporation any authority to move forward . . . We cannot move on this until a contracting officer gives his permission."

98. Separate and apart from the BPSA work, in mid-October CACI's T. J. McLaren requested Laudes' proposal to provide tents and related infrastructure and life support services, (i.e., food, water, etc.), to support the Iraqi Army's participation in clearing out the insurgents from the city of Fallujah. Laudes had declined to submit a proposal earlier in the bid process because it felt that the dangers of such a contract outweighed the benefits. However, Mr. McLaren and Lieutenant Colonel Mark Hobson, both of the PCO, persuaded Laudes to submit a proposal, stating that the Fallujah contract would be the USG's highest priority at the time and should take precedence over other matters, including Laudes' performance at the BPSA.

99. On October 21, 2004, Laudes agreed to a 60-day contract to provide the tents and all related activity for the support of the Iraqi Army in clearing insurgents out of Fallujah.

100. Shortly after agreeing to the Fallujah tent city contract, a Laudes subcontractor declined to provide services because of concerns about the publicity and security surrounding the Fallujah project. Shortly thereafter, a replacement subcontractor began working for Laudes, and its owner's son was kidnapped. As a result, that subcontractor stopped performing in Fallujah and the subcontract was terminated. A third company was hired, and subsequently terminated because of substandard performance. A fourth company was hired, at the request of PCO (CACI's Mr. McLaren), and was eventually was able to perform with intense guidance and direction from Laudes' personnel.

101. Laudes was forced to hire a security company to protect workers at Fallujah from the customers on site, i.e., the police and soldiers, who routinely threatened, harassed, and attacked Laudes workers. One incident occurred while Mr. Underwood and Lieutenant Colonel Hobson were on site doing a walk-through. Some of the Iraqi police had attacked some of the Laudes workers. One worker had his arm broken and another was forced to the ground with a weapon to his head. As a result, PCO made clear that this added security expense would be covered by contract modification, but never was.

102. The camp site also was repeatedly attacked by insurgents. On the initial convoy to Camp Fallujah by the security company, which had combined with the latest contractor for convoy purposes, the convoy was attacked and engaged in a prolonged firefight, resulting in two American and one third country national contractors killed, and many more injuries. In addition, many vehicles (one brand new Hummer, just purchased for this mission) and a great deal of equipment were damaged.

103. Operations surrounding the Fallujah project were very costly and time-consuming. Nearly half of every day was wasted trying to get through checkpoints, even though the distance was only about 70 kilometers from Baghdad. Even with a contract negotiated and administered by the PCO, there is still an outstanding balance of $10 million on that $18 million contract.

104. In November of 2004, Laudes began to have serious problems at BPSA with student vandalism. In addition to the "graduation ritual" of destroying the barracks nearly in their entirety, locks on the doors were destroyed on a daily basis. These losses were not risks allocated to Laudes under either contract. Nonetheless, Laudes was routinely requested by authorized BPSA personnel to replace the locks and repair the periodic destruction that occurred after graduation.

105. At about this same time, BPSA converted from non-resident to resident training. However, because the students had too much free time and not enough supervision, vandalism and thefts began to significantly increase. Again, Laudes was

routinely requested by authorized BPSA personnel to repair and replace goods and facilities damaged or lost by vandalism. Laudes complied with these authorized requests.

106. Hiring doctors for locations outside the BPSA compound was outside the scope of Laudes' contracts. However, on September 25, 2004, the USG asked Laudes to help BPSA by hiring additional doctors and procuring additional furniture. Laudes responded that it would help with these tasks once additional funding had been allocated to the contract.

107. On November 25, 2004, Major Creamer informed Mr. Underwood via e-mail that funding had been approved to support the project to hire extra doctors. Laudes had hired doctors under the Phase I Contract to staff the BPSA medical clinic on site. However, though Laudes did not recognize it at the time, Major Creamer's request was not intended for the BPSA, but was a request for support of doctors that would be stationed and used elsewhere. In fact, the doctors Major Creamer asked Laudes to hire using the BPSA Life Support contract were for use at remote recruiting locations around Iraq.

108. Mr. Underwood responded that he did not believe these funds were best included in the life support contract because Laudes was, at that time, inadequately staffed under that contract to handle the additional responsibilities. Major Creamer informed Mr. Underwood that "the Army will keep track of the details but there is no other way for the funds to be *paid,* we cannot legally pay the doctors . . . . Unfortunately,

the law says the only place the money CAN go is the Life Support contract at the Academy."

109. Despite repeated promises that the USG would ensure this project went smoothly, Laudes was not paid for these activities. At no point—on any of the BPSA contracts—did any of the additional verbal requirements become funded and formally written into either of the BPSA contracts. However, there did exist an implied agreement that Laudes would be fairly compensated for this additional work.

110. In early December 2004, BPSA staff decided to billet at the BPSA an Iraqi commando unit that was not covered in the original BPSA contract. This unit then burned down a building and destroyed four others, as well as the furniture and equipment inside. Because this unit was not covered by Laudes' contract, Laudes declined to replace or repair the loss and damage. Additional funding was later provided for repair of the four damaged buildings.

111. On December 18, 2004, Laudes incurred costs for repairs resulting from an electrical fire in the dining facility. Again, these costs were outside the scope of its contracts at the BPSA, yet Laudes performed the work as requested by authorized representatives of the USG with the understanding that the USG would provide an equitable adjustment to Laudes' contract or issue a new contract for the additional work.

112. On January 11, 2005, the USG again raised the issue of hiring extra doctors. A BPSA staffer, John Bozicevich, informed Major Creamer, Colonel Biszak and

Colonel Kenneth S. Plato that Mr. Underwood and Stan Ellis, on behalf of Laudes, had declined to hire the additional doctors because the provisions of their contract did not cover this activity. The following day, January 12, 2005, Major Creamer responded to this e-mail by saying that:

> They aren't supposed to hire the doctors . . . they are suppose [sic] to pay the doctors that work for 1CD . . . 1CD will provide them the names . . . all they have to do is give the money to the doctors. It's all legal mumbo jumbo . . . I cannot hire doctors, nor can 1CD . . . however, they can get doctors to work and have Laudes cut them a check. That's all we are asking them to do. This is getting harder than it has to. They were provided with an additional 25K for this reason . . . have them give 1CD the money and let them pay the doctors . . . that way they have no contractual obligation. We have to get the doctors and Laudes has the money, all Laudes has to do is keep a record of how much money they give 1CD to pay for the services provided.

In this e-mail, Major Creamer makes it clear that the requests being made of Laudes were not contained in the contract, as was the case with many tasks imposed by the Government on Laudes.

113. On January 13, 2005, Major Creamer indicated to Laudes that $25,000 had been allocated to BPSA to hire additional doctors for a related program. This funding never materialized, despite Sandy Ellis's January 15, 2005 request for its status. The funds were never provided to Laudes.

114. In mid-January 2005 CACI's Marcus Overbay, another civilian contractor supporting the PCO, sent an e-mail to Laudes addressing (for the first time since mid-August 2004) the subject of contract definitization:

> On to BPSA, we are getting a lot of heat here to definitize the BPSA contracts. A proposal is due within 30 days after the letter contract. Currently no proposals have been submitted and these are now 7 months old. I've been told for a while that these would be coming. I need a date on which I can expect the proposal, believe me it's to your advantage as well to get these, this has to happen this week.

115. Laudes' Ms. Sandy Ellis raised questions concerning the basis for a separate proposal, to which Mr. Overbay responded:

> I've told Larry [Underwood] to propose as defined in the SOW. Awaiting that and the BPSA definitization proposals. These proposals are really serious now and I need them from you guys in the next day or two. Larry was to give them to me before he left [Iraq] and then told me you'd be by to drop off the proposals.

116. Unfortunately, neither SOW had been modified to reflect the actual work being performed by Laudes as requested by the USG. As a result, there wasn't a SOW that incorporated the many directed and constructive changes affecting Laudes' scopes of work; nor had the USG provided a SOW to incorporate the changes into a new contract. The parties needed fully integrated statements of work. Although the USG had repeatedly modified the scope of work, it never provided a written modification to either SOW.

117. On February 13, 2005, without any advance warning, Laudes received a unilateral modification of the Phase I Contract, signed by Kenneth R. Caryer as the contracting officer, stating:

> The purpose of this modification is to unilaterally definitize the contract. The contract amount is hereby definitized in a firm fixed price amount of $21,271,764. The contract amount is decreased by $4,728,236 from $26,000,000 to $21,271,764. The contractor may dispute this unilateral definitization in accordance with the procedures set forth in clause 16. Disputes of the contract.

118. By February 13, 2005, the USG had already certified, as accepted and received, and had paid a total value of goods, services, and construction under Phase I of $24,699,852.46. Moreover, as the PCO undoubtedly knew when it executed this unilateral modification, no payments had been made to Laudes for Phase I life support that had already been provided by Laudes and accepted by the USG during January and February.

119. Notwithstanding this unilateral modification, the PCO did not tell Laudes to stop performance. To the contrary, Laudes was directed to continue performance.

120. This unilateral modification, coupled with the USG's direction to continue performance of the modified Phase I Contract, further demonstrate the existence of an implied agreement that the USG would either add USG appropriations to the contract or issue a new contract funded by USG appropriations to fairly compensate Laudes for the

balance of the performance required of it, because the contracting officer had authority to obligate USG appropriations, not DFI funds.

121. On February 21, 2005 there was an exchange of e-mails between Laudes and Captain Maurice G. Cullen (of the Multi-National Security Transition Command Iraq) regarding the processing of recently-submitted Laudes invoices. Captain Cullen informed Laudes that it had already received $24,699,852.58 of the $26 million contract and, according to Captain Cullen, was thus only eligible to receive $1,300,147.42 in addition to already paid amounts, "unless you have a modification that I do not have record of."

122. Laudes responded that it was "in the process of definitizing the contract, which will add the remainder of the funds to the contract," and asked whether Laudes could collect "a partial payment up to the current funding." Captain Cullen responded that he would process those funds immediately and did so. Payment for about half of the life support provided for Phase I for January 2005 was made on March 6, 2005.

123. In March of 2005, heavy rains caused the BPSA compound to flood. Laudes bought pumps and hundreds of feet of hose to drain the grounds. Although not specifically required by the BPSA Life Support contract, without draining the BPSA compound of water, Laudes' performance of the BPSA Life Support Contract would have been rendered impossible. Moreover, the water had to be removed as it was also a

safety and health hazard for Laudes workers as well as staff and students. As a result, Laudes performed this work.

124. Throughout the course of its work in Iraq, Laudes was repeatedly asked to perform tasks and procure products outside of what was contained in the original contracts. One e-mail sent by Russ Williams of CPATT to Laudes on March 7, 2005, illustrates this point:

> My question is basically this, Can you help me squeeze $100,000 - $150,000 out of the life support contract to be used to purchase 10 small pick up trucks locally in Iraq? We need these cars pretty quick, and if there is some area we can find it, I would like to.

125. These items were included in the Laudes 25 March 2005 definitization proposal.

126. On March 21, 2005, CACI's Marcus Overbay again contacted Laudes and requested definitization of both BPSA contracts, apparently discounting the February 13, 2005 unilateral definitization signed by Mr. Caryer.

127. In an e-mail the following day, Mr. Overbay, on behalf of the PCO and the USG, told Laudes that the "Although the [Phase I ] contract was for $26,000,000 the contract forbid you to bid over the 50% rate until you submit a proposal then you can invoice up to the 75% mark." He also said that "regulations" required contract definitization within 180 days of letter contract issuance.

128. The Phase I Contract contained no such requirements.

129. When asked by Laudes where it could find the referenced spending restrictions, since they weren't in the contract, Mr. Overbay referred to the FAR and to "common contracting."

130. The FAR clauses on which Mr. Overbay relied were not a part of the Phase I contract and the situation in Iraq in which Laudes was operating was hardly "common contracting."

131. Concerned with Mr. Overbay's reading of the situation, both Ms. Ellis and Mr. Underwood attempted to meet with him to clarify any confusion regarding the status and price of the contract and to arrive at an acceptable solution for all parties, particularly given the efforts and money spent by Laudes while working in Iraq and the parties' implied agreements regarding increased contract funding and modifications to the statements of work.

132. On March 23, 2005, Laudes was asked to support K-9 animals billeted and trained in the BPSA compound that were not covered under the contract. Marcus Overbay responded to Laudes' subsequent request for modification that he would modify the contract once he received funding. This never occurred. Laudes supported the team with food and billeting to ensure safety and health of the dogs and their handlers.

133. On March 25, 2005, Ms. Ellis submitted the requested definitization proposals to Marcus Overbay.

134. The definitization proposal for the Phase I Contract totaled $45,087,632.41, including a construction price of $19,954,600.00 and life support price of $25,133,032.

135. The definitization proposal for the Phase II Contract asked that the contract price be established as $25,156,033.72. The definitization proposal for this Phase II Contract separately identified $5,923,434 for life support and $19,232,000.00 for construction.

136. With these two contracts, the total for life support was $31,056,466.13 and for construction was $39,187,200.00.

137. These definitization proposals were dismissed by CACI without discussion. According to Mr. Overbay:

> Sandy, based on your proposal and the lack of certified cost and pricing data . . . this is required for a sole source action over $550,000. The [sic] Government is going to unilaterally definitize at the $16,800,000 amount. There's a clause in your contract that spells out the process for filing a claim, which I'm sure you'll want to do.

138. On April 7, 2005, two weeks after Laudes' March 25, 2005 submission of definitization proposals and the same day as Mr. Overbay's e-mail to Ms. Ellis of Laudes, Major Carol M. Fields issued a unilateral modification of the Phase II Contract to definitize the contract at $16,800,000. At that time she knew or should have known that the Government already had accepted $38,887,814.47 in contract performance by Laudes under Phases I and II and yet had significant performance obligations both for life

support and construction. Her modification said, "The contractor may dispute this unilateral definitization in accordance with the procedures set forth in clause 52.233-1 of the contract." To the extent she intended to inform Laudes that it was free to file a claim and request a final decision in response to her unilateral decision, her advice was accurate. However, to the extent she intended her unilateral definitization to itself be a final decision, she was incorrect. No claim was pending before her. In addition, she did not comply with the actions required by FAR 33.211 prior to issuance of a final decision, nor did the modification include the advisement of rights paragraph mandated by FAR 33.211(a)(4)(v).

139. In the context of other contract issues swirling around the Baghdad Police College at the time, Major Fields—undoubtedly aware of the need for ratification of other contract performance issues—instead chose unilaterally, with regard to the Phase II unfunded requirements, to ignore the parties' implied agreements to compensate Laudes and to avoid paying Laudes for work performed on Phase II.

140. On April 27, 2005, Mr. Overbay communicated to Ms. Ellis and Mr. Underwood that "the Government is requesting that Laudes continue services at BPC . . . as a sole source definitized contract for one month of service." The following day, Mr. Underwood replied that Laudes was "willing to accept a 30 day extension at BPC to assist in any way the PCO needs."

141. On April 30, 2005, Marcus Overbay submitted a cost proposal to Larry Underwood and Sandy Ellis, offering to pay Laudes $4,000,000 for 30 days of life support service. Mr. Overbay explained that he arrived at this price based upon what he believed was the definitization price of $39 million for 10 months that Laudes had submitted in the spring of 2005, from which he determined a monthly rate. Mr. Underwood agreed to the price the following day.

142. The Phase II Contract was merely a supplementation of what had begun with Phase I and for life support invoicing purposes the parties settled on treating the Phase II effort as simply more of the same—without regard to the funding source. Similarly, this 30-day extension also was treated as simply more of the same, for which $4 million per month was deemed by the Government to be a fair price for life support.

143. As of May 10, 2005 the Government had certified receipt and acceptance of $34,495,414.82 in goods, services, and construction for Phase I of support for BPSA and $12,711,245.22 in goods, services, and construction for Phase II of support for BPSA. Life support under Phase I and Phase II was still being performed (until 15 May 2005) and final invoices for construction had yet to be submitted.

144. On May 11, 2005, one of Laudes' interpreters was murdered by insurgents on his way to work, leaving behind a wife and a child. Tragic events like this were daily reminders of the extreme nature of the dangers and difficulties facing contractors trying to provide services during this period. Understandably, security issues sometimes forced

simple contract administration issues to become secondary for both parties. On May 18, 2005, the main electrical distribution box at BPSA was vandalized, as were the air conditioners and computers and two generators.

145. On May 16, 2005 Laudes received an e-mail from Marcus Overbay stating:

> With regards to the [February 13, 2004] definitization of the DFI contract [the Phase I Contract], if you wish to file a claim you will need to do so with the Armed Services Board of Contract Appeals (ASBCA). The contract and modification tells you that this is your process. The Contracting Officer's decision is final. Laudes did not submit a proposal for definitization when required and when you did so, you did at a price over $13,000,000 more than what was authorized by the letter contract. Additionally, there was no authorization to exceed given to you to exceed [sic] $26,000,000. Based upon all of this the letter contract was definitized unilaterally. I consider this matter closed and I will not engage Laudes in any more conversations with regard to this. As is noted in the contract definitization modification you can file a dispute with the ASBCA. It is Laudes responsibility, if they wish to dispute this, to go to the ASBCA. JCC-1 Contracting is not a resource for filing your dispute.

146. Mr. Underwood, not then in Iraq, on May 19, 2005 sent an e-mail to the Contracting Officer, Major Fields, asking for assistance in definitizing the contracts so that Laudes could be paid for work already performed and accepted by the Government. He noted that if Laudes had stopped work when the amount of the Baghdad Police College letter contract was reached, that would have stopped the life support and construction, which were ongoing under very adverse conditions. He also noted that the

Baghdad Police College contract was priced with consideration only for the life support requirements, leaving the required construction work to be priced later. Other additional efforts also were noted that had been undertaken based upon promises that funding would be provided.

147. The Phase I Contract did not permit Laudes to stop work if Laudes reached the NTE price. Accordingly, neither the PCO nor the CPATT would have permitted Laudes to stop performance when the artificial NTE price was reached. That would have been dramatically inconsistent with the creation in early 2004 of the Police Working Group, then CPATT, with Secretary of Defense direction and the NSPD-36, all of which were designed to move police training away from the Coalition Provisional Authority structure (which had not been up to the task) to the US military, to develop a trained Iraqi police force to deal with potential threats to Iraq's first free election in almost three decades.

148. It took Major Fields only two hours to dismiss Mr. Underwood's request for assistance. The basis for her denial was that the work that had been accepted by the Government exceeded the contractual statements of not-to-exceed funding of $26 million. Her brief response closed with the following second paragraph:

> There is no requirement for the Government to meet with Laudes and find a solution to definitize the contracts as they have already been definitized. It is Laudes' right to file a claim with the Armed Services Board of Contract Appeals (ASBCA). The contract and modification tells

> you that this is your process. This is the Contracting Officer's final decision.

149. Again, Major Fields did not comply with the actions required by FAR 33.211 prior to issuance of a final decision, nor did she provide the advisement of rights paragraph mandated by FAR 33.211(a)(4)(v).

150. On or after May 19, 2005, Mr. Underwood received a letter from Captain Jason D. Voorheis rejecting Laudes' request for payment on four invoices totaling well over $8 million on the Phase I Contract. In this letter, Captain Voorheis explained that

> the Contracting Officer issued a final decision not to pay these invoices 19 May 2005 [sic], and informed you of your right to appeal directly with the ASBCA. We cannot and will not entertain any further action on these invoices. There is no authority for the USG to pay these invoices absent an order from the ASBCA.

151. During the period of June 11-19, 2005, Government officials certified, using DD Forms 250, acceptance and receipt of Phase I and II life support for the period 1-15 May 2005, totaling $1,159,163.52 and $652,389.97, respectively. During the period of June 16-19, 2005 Government officials also certified acceptance and receipt of the balance of the construction under Phases I and II, for additional amounts of $308,906.25 and $6,507,475.00, respectively.

152. On November 12, 2005 Mr. Underwood resubmitted six invoices under the Phase I Contract, together with DD 250s demonstrating acceptance by the USG of those goods and services, totaling $9,963,485 of work unpaid, including life support

provided in January, February, March, April, and May 2005, plus the final bill for construction performed under the Phase I Contract.

153. Although Mr. Underwood's request for payment did not demand a final decision of a contracting officer, he did include a certification using the language required for a formal claim.

154. On November 20, 2005, Ms. Ellis and Captain Voorheis corresponded in several e-mails regarding Laudes' request for payment of the January 2005 invoices relating to the Phase I Contract. Ms. Ellis explained that, while the contract was nearly fully disbursed, several invoices totaling more than $11 million were unpaid. When Captain Voorheis expressed concern about this sum given that Ms. Ellis had previously stated that the contract was nearly fully disbursed, Ms. Ellis explained that:

> the problem on this contract is that the requirements exceeded the funding by the amount previously stated. There were many issues that contributed to this situation, from both PCO and Laudes. But the bottom line was that funding was not updated to cover the construction costs in addition to the life support.

155. After Ms. Ellis submitted the invoices and receiving reports substantiating these additional charges, Captain Voorheis responded that

> It's great to have the invoices, but the question still remains: Who directed you to execute requirements that weren't funded? I can't get you paid for something without a contractual vehicle signed by a contracting officer that requests such services. Were you doing this work "at risk" thinking there would be a modification to the contract at a later date to add funding? Do you have any objective

evidence that a Government contracting officer gave you this impression?

156. Throughout performance of both contracts, there existed an implied contract that the USG would either modify the contracts by adding additional funds or issue a new contract with additional funds to fairly compensate Laudes for the work requested and accepted by authorized representatives of the USG and performed by Laudes. Moreover, in either case, the parties understood that the additional funds would be from USG appropriations, as the PCO no longer had authority to obligate DFI funds.

157. Mr. Underwood and Ms. Ellis traveled to Baghdad just before Thanksgiving 2005 to meet with the PCO's Lieutenant Colonel Popsisil and Major Bailey to discuss payment for goods, services, weapons and ammunition for the operation in Fallujah (arrangements made by MNSTC), generators for different locations in Iraq, life support activities (in excess of $23 million), provided by Laudes to MNSTC for Najah, Samara, and other different locations in Iraq. The PCO was provided with hard copies and supporting documentation for all outstanding invoices, including those from the BPSA work.

158. Mr. Underwood and Ms. Ellis also met with Captain Voorheis at that time, and Mr. Underwood met with U.S. Army Major General John M. Urias, the Commanding General, Joint Contracting Command, Afghanistan and Iraq (JCC). Mr. Underwood was led to believe and did believe, based upon those conversations, that Major General Urias understood and appreciated Mr. Underwood's position regarding the contracts and the

need to be paid for work done and would attempt to have the matter settled and agreed upon prior to his leaving Iraq in a couple of months after the meeting on Thanksgiving day.

159. On November 30, 2005, Captain Voorheis indicated that he had submitted the requests for legal review, with the notation that "there is no physical evidence found that directs the Contractor to perform effort above the contractual NTE." Captain Voorheis recognized the problem, and apparently also recognized the inequity, of receiving performance—in a war zone—but declining to pay for what was received, as he said:

> efforts were performed within the contractual period of performance and were *accepted* via DD250 by various Baghdad Public Service Academy Logistics officials – bonafide Government representatives . . . The fact that the Government accepted the invoiced effort via multiple DD250s may establish an implied contract, or at the very least, establish consideration for effort expended by the Contractor and accepted by the Government.

160. He was, of course, correct. There did exist an implied contract to fairly compensate Laudes.

161. Powerful explosions from a pair of suicide bombs ripped through Baghdad's main police academy on December 6, 2005, killing 36 police officers and wounding 72 people, including an American contractor.

162. On December 8, 2005, Mr. Underwood learned from Captain Voorheis that Major Carol Fields was the contracting officer that had rejected Laudes' earlier

payment requests. Prior to that time there had been no discussion with Laudes concerning the processing of invoices.

163. On December 31, 2005, Lieutenant Colonel Charles Hurry rejected Laudes' claim for $1,468,069.77 of unpaid Phase I Contract invoices that had been submitted six and a half months earlier, on June 11, 2005. Lieutenant Colonel Hurry's reasoning was that "Laudes was never authorized to perform work beyond the original NTE $26,000,000 contract amount and no payments in excess of the $26,000,000 can be authorized." Lieutenant Colonel Hurry coupled his rejection with a threat, stating that "The Government may, in fact, seek to recover the $4,728,236 overpayment beyond the definitized price." He also stated, incorrectly, that Laudes had "the right to appeal this final decision to the U.S. Armed Services Board of Contract Appeals within ninety days," but did not provide further guidance on how to do that.

164. On January 6, 2006, Lieutenant Colonel Charles Hurry also rejected Laudes' claim for $3,193,954.61 for the additional unpaid invoices remaining under the Phase II Contract. He sidestepped the fact that the work had been accepted by the Government, stating that "the claim, as submitted, contains no information, documentation or allegation that you were authorized to exceed the NTE limit of $8,400,000 of the letter contract." Furthermore, he stated that:

> This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise

> furnish written notice to the agency board of contact appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. . . . Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

165. Laudes operated successfully in the stressful and chaotic Iraqi environment for several years. It established strong relationships with USG contracting officers, as evidenced through multiple e-mails praising the company for "rolling with the punches," and "support[ing] [the Government] when all others here fail, with no requests or disputes about whether or not it is in their SOW." In the interest of working well with its clients and supporting the mission, Laudes hesitated to delay process on day-to-day operations to complete SOWs—a practice that earned them "absolute backing" and strong commendations from Government officials.

166. Laudes did so, however, after establishing with USG authorized representatives that it would be fairly compensated for its efforts by the USG when the circumstances permitted the parties to focus attention on that.

167. In its course of dealing with the government, Laudes was asked repeatedly to perform activities that were not covered by the various contracts under which it operated.

168. Of course, consistent with its agreements, written and verbal, express and implied, with the USG, Laudes was routinely and reliably paid for such activities.

169. Over a period of time at the direction of C-4 of MNSTC, Laudes provided and invoiced for $24,311,769 in goods, services, life support activities, generators, etc., to a number of places in Iraq, including Najaf, Samara, Fallujah, Taji, and different facilities in and around Baghdad. Laudes did this in good faith at the direction of MNSTC C-4 without any written document or contract. In December 2005, having received the attention of Lieutenant General Petraeus and Major General Urias, the USG agreed to a negotiated amount to be paid to Laudes Corporation for the goods and services rendered, by issuing a retroactive Contract No. W91GY0-06-C-0012 ratifying the commitments by the United States.

170. Even officers working in the PCO recognized the irony in the Government's failure to pay Laudes in full for the goods and services it provided. One contracting officer stated, "It is a sad state of affairs when our life support contractor agrees to help a US Military unit on the grounds of soldier welfare and moral [sic], and is then expected to meet the cost after being promised compensation, what is going to happen in the future in similar circumstances, in this environment we need to be able to help and assist each other in a climate of trust and appreciation."

171. On October 11, 2006, Laudes submitted a certified claim to the contracting officer and requested a final decision covering both the Phase I and Phase II Contracts. The contracting officer responded on November 29, 2006, denying the claim.

## IV. Causes of Action

### Count 1—Breach of Implied in Fact Contract to Modify the Phase I Contract

172. Plaintiff incorporates by reference paragraphs 1 through 171 as if fully set forth herein.

173. Before, during and after June 28, 2004, plaintiff and defendant had a mutual intent to contract for the life support and construction services required to complete the work originally required by the Phase I Contract SOW, and the Phase I Contract SOW as frequently and routinely modified by defendant during performance.

174. Defendant knew at the time it awarded that Phase I Contract to Laudes that: (a) the NTE price of the contract was insufficient to accomplish the work required by the SOW; (b) it would not have authority to modify the Phase I Contract by adding additional DFI funds to the contract after June 28, 2004; (c) Laudes would be unable to provide a definitization proposal to the CPA before the CPA lost authority to modify the contract by placing additional DFI funds on contract; (d) the Phase I Contract did not permit Laudes to stop work upon reaching the NTE price; and (e) it wanted Laudes to continue performing notwithstanding the NTE price.

175. Nonetheless, at all times the parties to the Phase I Contract intended that Laudes be paid a reasonable price for all of the work performed by Laudes that was ordered and received by defendant.

176. Before and after June 28, 2004, the parties agreed and understood that defendant would issue a written modification formally memorializing the changes to the scope of work of the Phase I Contract.

177. After June 28, 2004, the parties agreed and understood that defendant would also place additional USG appropriated funds on the Phase I Contract sufficient to fairly compensate Laudes for the work requested and accepted by defendant and performed by Laudes.

178. Thus, there existed an implied in fact contract between parties that defendant would formally and expressly modify the Phase I Contract SOW and place USG appropriated funds on the contract sufficient to fairly compensate Laudes.

179. Notwithstanding the agreements between the parties, the defendant refused and failed to either formally amend the statement of work or modify the contract by adding USG appropriated funds to the contract as promised, both such failures constituting a breach of an implied in fact contract.

180. As a result of defendant's breach, plaintiff has been damaged in an amount not less than $10,000,000, the exact amount to be proven at trial.

**<u>Count 2—Breach of the Implied in Fact Contract</u>**

181. Plaintiff incorporates by reference paragraphs 1 through 171 as if fully set forth herein.

182. Plaintiff and defendant had a mutual intent to contract for the life support and construction services required to complete the scope of work required by defendant under the Phase I Contract.

183. At all times after June 28, 2004, defendant knew that: (a) the NTE price of the Phase I Contract was insufficient to accomplish the work required by defendant under the Phase I Contract; (b) defendant did not have authority to modify the Phase I Contract by adding additional DFI funds; (c) the Phase I Contract did not permit Laudes to stop work; and (d) defendant wanted Laudes to continue performing notwithstanding the NTE price.

184. Recognizing these facts, plaintiff and defendant agreed and intended that Laudes be paid a reasonable price for all of the work performed by Laudes that was ordered and received by defendant.

185. As a result, the parties understood and agreed that defendant would issue a separate contract for construction services originally requested by defendant under the Phase I Contract, that said contract would necessarily be funded using USG appropriated funds and that said funds would be sufficient to reasonably compensate Laudes for the costs of the construction, plus a reasonable profit.

186. Notwithstanding the agreements between the parties, the defendant refused and failed to so issue a separate contract.

187. As a result of defendant's breach, plaintiff has been damaged in an amount not less than $10,000,000, the exact amount to be proven at trial.

**Count 3—Fraud in the Inducement**

188. Plaintiff incorporates by reference paragraphs 1 through 171 as if fully set forth herein.

189. The CPA was, at the time it entered into the Phase I Contract with Laudes, an agent or instrumentality of the United States.

190. At the time defendant entered into the Phase I Contract with Laudes, defendant knew: (a) the NTE price of the contract was insufficient to accomplish the work required by the SOW; (b) it would not have authority to modify the Phase I Contract by adding additional DFI funds to the contract after June 28, 2004; (c) Laudes would be unable to provide a definitization proposal to defendant before defendant lost authority to modify the contract by placing additional DFI funds on contract; (d) the Phase I Contract did not permit Laudes to stop work upon reaching the NTE price; and (e) it wanted Laudes to continue performing notwithstanding the NTE price.

191. Defendant, by entering into a letter contract with Laudes implied it did have and would continue to have the ability to later modify the Phase I Contract by adding sufficient DFI funds to fully compensate Laudes for the performance of the contract. Moreover, defendant expressly stated to Laudes that it would add additional funds to the contract.

192. However, both when it implied it would have the authority and when it expressly stated to Laudes that it would add additional funds to the contract, defendant knew that it would not have and, after June 28, 2004, did not have, authority to add sufficient DFI funds to fairly compensate Laudes for the work required by the Phase I Contract.

193. But for the fraudulent representations of the defendant, Laudes would not have entered into the Phase I Contract and/or would have not continued performance of the Phase I Contract.

194. Such fraud by defendant renders the Phase I Contract void *ab initio*.

195. As a result, plaintiff is entitled to recover an amount not less than $10,000,000 on a *quantum meruit* basis, the exact amount to be proven at trial.

**Count 4—Estoppel (Phase I Contract)**

196. Plaintiff incorporates herein by reference paragraphs 1 through 171 as if fully set forth herein.

197. Defendant knew at the time it awarded the Phase I Contract: (a) the NTE price of the contract was insufficient to accomplish the work required by the SOW; (b) it would not have authority to modify the Phase I Contract by adding additional DFI funds to the contract after June 28, 2004; (c) Laudes would be unable to provide a definitization proposal to defendant before defendant lost authority to modify the contract by placing additional DFI funds on contract; (d) the Phase I

Contract did not permit Laudes to stop work upon reaching the NTE price; and (e) it wanted Laudes to continue performing notwithstanding the NTE price.

198. Notwithstanding that knowledge, defendant expressly and by implication represented to Laudes that it would add additional funds to the Phase I Contract to fairly compensate Laudes for the work it performed under the contract, intended that Laudes rely on those representations and, further, defendant acted in a manner consistent with those representations.

199. Moreover, defendant engaged in affirmative misconduct by not only withholding and misrepresenting the true nature of its authority after June 28, 2004, but also by continuing to entreat Laudes' performance, continuing to promise additional funds on the contract and continuing to increase the scope of Laudes' performance by adding additional work to the contract.

200. Laudes, upon execution of the Phase I Contract, did not know that defendant, as of June 28, 2004, would no longer have the authority to modify the Phase I Contract by adding additional DFI funds to the contract.

201. Laudes detrimentally relied upon defendant's representations by entering into and continuing performance of the Phase I Contract.

202. As a result, defendant is estopped from refusing to add additional funds to the Phase I Contract to fairly compensate Laudes.

**Count 5—Breach of Contract/Duty of Good Faith and Fair Dealing for the Phase I Contract**

203. Plaintiff incorporates by reference paragraphs 1 through 171 as if fully set forth herein.

204. The CPA was, at the time it entered into the Phase I Contract with Laudes, an agent or instrumentality of the United States.

205. Defendant owed Laudes the implied duty of good faith and fair dealing.

206. The covenant imposed obligations on defendant that included the duty not to interfere with Laudes' performance and not to act so as to destroy the reasonable expectations of Laudes regarding the fruits of the Phase I Contract.

207. Defendant materially breached that duty by, among other things, transferring to the Interim Iraqi Government the authority to modify the Phase I Contract by increasing the contract's value with DFI funds with the knowledge that the NTE price unilaterally established by defendant was insufficient to compensate Laudes for the work required of Laudes by the contract.

208. As a result of defendant's material breach of contract, Laudes is excused of further performance of the contract and is entitled to damages of not less than $10,000,000, the exact amount to be established at trial.

**Count 6—Repudiation of the Phase I Contract**

209. Plaintiff incorporates by reference paragraphs 1 through 171 as if fully set forth herein.

210. Plaintiff and defendant had a mutual intent to contract for the life support and construction services required to complete the scope of work required by defendant under the Phase I Contract.

211. At all times after June 28, 2004, authorized representatives of defendant knew that: (a) the NTE price of the Phase I Contract was insufficient to accomplish the work required by defendant under the Phase I Contract; (b) the PCO did not have authority to modify the Phase I Contract by adding additional DFI funds; (c) the Phase I Contract did not permit Laudes to stop work; and (d) the defendant wanted Laudes to continue performing notwithstanding the NTE price.

212. Recognizing these facts, plaintiff and defendant agreed and intended that Laudes be paid a reasonable price for all of the work performed by Laudes that was ordered and received by BPSA personnel.

213. As a result, the parties understood and agreed that defendant would issue a separate contract for construction services originally requested by defendant under the Phase I Contract, which contract would necessarily be funded using USG appropriated funds and that said funds would be sufficient to reasonably compensate Laudes for the costs of the construction, plus a reasonable profit.

214. On February 13, 2004, defendant issued a unilateral modification to the Phase I Contract definitizing the price of the Phase I Contract at $26,000,000.

215. Such conduct by defendant was a repudiation of the implied in fact contract to modify the contract to fully and fairly compensation Laudes for performing the Phase I Contract SOW, as modified by defendant.

216. As a result of defendant's repudiation of the implied in fact contract to modify the Phase I Contract, Laudes is entitled to restitution of the benefit conferred on defendant by virtue of Laudes' performance.

217. The amount of restitution to which Laudes is entitled is not less than $10,000,000, the exact amount to be proven at trial.

**Count 7—Breach of the Phase II Contract**

218. Plaintiff incorporates herein by reference paragraphs 1 through 171 as if fully set forth herein.

219. Pursuant to the Phase II Contract, plaintiff was obligated to design and construct certain semi-permanent facilities at the BPSA and to provide life support services for the students occupying those constructed facilities.

220. The Phase II Contract did not permit plaintiff to stop work upon reaching either the NTE price or the ceiling price of the contract. Nor did the Phase II Contract require plaintiff to provide any notice to defendant upon approaching or reaching either the NTE or ceiling price of the contract.

221. The Phase II Contract obligated defendant to modify the contract by adjusting the price to compensate fairly compensate for the performance of the Phase II SOW, including all reasonable, allowable and allocable costs incurred by plaintiff in the performance of the contract, plus a reasonable profit.

222. Defendant breached its obligations under the Phase II Contract by failing to so modify the contract.

223. As a result of defendant's breach of contract, plaintiff has been damaged in amount not less than $3,000,000, the exact amount to be proven at trial.

**Count 8—Abuse of Discretion in Definitizing the Phase II Contract**

224. Plaintiff incorporates herein by reference paragraphs 1 through 171 as if fully set forth herein.

225. Pursuant to the Phase II Contract, plaintiff was obligated to design and construct certain semi-permanent facilities at the BPSA and to provide life support services for the students occupying those constructed facilities.

226. The Phase II Contract did not permit plaintiff to stop work upon reaching either the NTE price or the ceiling price of the contract. Nor did the Phase II Contract require plaintiff to provide notice to defendant upon approaching or reaching either the NTE or ceiling price of the contract.

227. The United States owed Laudes the implied duty of good faith and fair dealing.

228. The covenant of good faith and fair dealing imposed obligations on the United States that included the duty, when permitted by the contract to exercise discretion, to exercise its discretion reasonably so as not to interfere with Laudes' performance and not to act so as to destroy the reasonable expectations of Laudes regarding the fruits of the Phase II Contract.

229. To the extent the Phase II Contract granted defendant discretion regarding the definitization of the Phase II contract, defendant abused that discretion by, for example: (a) its failure to consider the changes directed and requested by authorized representatives of the defendant; (b) its failure to consider the constructive changes to the contract as the result of direct insurgent attacks at the project site, student vandalism and theft, and the increased costs of performing generally resulting from increased insurgent activity, among other things; (c) its failure to consider the actual costs incurred by Laudes; (d) its failure to consider that the contract did not permit Laudes to stop work upon reaching the NTE price established by the letter contract; and (e) its improper demand for cost or pricing data.

230. As a result of defendant's breach of contract by its abuse of discretion, plaintiff has been damaged in amount not less than $3,000,000, the exact amount to be proven at trial.

**Count 9—Breach of the Implied in Fact Contract to Modify the Phase II Contract**

231. Plaintiff incorporates by reference paragraphs 1 through 171 as if fully set forth herein.

232. Before, during and after August 5, 2004, plaintiff and defendant had a mutual intent to contract for the life support and construction services required to complete the work originally required by the Phase II Contract SOW and the Phase II Contract SOW as frequently and routinely modified by the parties during performance.

233. The parties also agreed that Laudes would be paid a reasonable price for all of the work performed by Laudes that was necessary to complete the Phase II SOW, as modified by defendant.

234. The parties agreed and understood that defendant would issue a written modification formally memorializing the changes to the scope of work of the Phase II Contract and that defendant would place additional USG appropriated funds onto the Phase II Contract sufficient to fairly compensate Laudes for the work requested and accepted by defendant and performed by Laudes.

235. Thus, there existed an implied in fact contract between parties that defendant would formally and expressly modify the Phase II Contract SOW and place USG appropriated funds on the contract sufficient to fairly compensate Laudes.

236. Notwithstanding the agreements between the parties, the defendant refused and failed to either formally amend the statement of work or modify the contract by adding USG appropriated funds to the contract as promised, both such failures constituting a breach of an implied in fact contract.

237. As a result of defendant's breach, plaintiff has been damaged in an amount not less than $3,000,000, the exact amount to be proven at trial.

## V. Prayer for Relief

WHEREFORE, Laudes Corporation prays for relief as follows:

1. Judgment against the United States on at least one of Counts 1 through 6 in an amount not less than $10,000,000, the exact amount to be proven at trial;

2. Judgment against the United States on at least one of Counts 7 through 9 in an amount not less than $3,000,000, the exact amount to be proven at trial;

//

//

//

//

//

//

//

//

3. Interest as permitted by law; and

4. Such other and further relief as the Court deems just, necessary and proper.

DATED this 3rd day of January, 2007.

LAUDES CORPORATION

By: [signature]
Mark G. Jackson, WSBA #18325

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for
LAUDES CORPORATION

SEA_DOCS\830471