IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAUDES CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07-4C |
| v. | ) | |
| | ) | (Judge Wheeler) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDING OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(d)(1) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits the following proposed findings of uncontroverted fact in support of its Motion For Partial Dismissal Or, In The Alternative, Motion For Partial Summary Judgment.

I. The Creation Of The Coalition Provisional Authority ("the CPA")

1. On March 19, 2003, the United States and its Coalition partners launched major military operations against the Iraqi regime of Saddam Hussein. Within a month, Coalition forces overcame organized resistance by regime armed forces and occupied much of Iraq. On April 16, 2003, the Commander of the Coalition Forces, General Tommy R. Franks, issued a Freedom Message to the Iraqi people. The Freedom Message informed the Iraqi people that,

> Coalition Forces in Iraq have come as liberators, not conquerors. []. Iraq and its property belong to the Iraqi people and the Coalition makes no claim of ownership by force of arms. []. We are working with the international community to ensure the delivery of humanitarian assistance and to promote law and order so that Iraqis can live in security, free from fear. We are establishing stability . . . [to] help the Iraqis form a functioning government that respects the rule of law and reflects the will, interests, and rights of the people of Iraq. Meanwhile, it is essential that Iraq have an authority to protect lives and property, and expedite the delivery of humanitarian assistance to those who

> need it. Therefore, I am creating the Coalition Provisional Authority to exercise powers of government temporarily, and as necessary, especially to provide security, to allow the delivery of humanitarian aid and to eliminate weapons of mass destruction.

A. 1.[1]

2. On May 8, 2003, the United States and the United Kingdom presented a joint letter to the United Nations ("the UN") stating that they

> and Coalition partners, acting under existing command and control arrangements through the Commander of Coalition Forces, have created the Coalition Provisional Authority, which includes the Office of Reconstruction and Humanitarian Assistance ["the OHRA"], to exercise powers of government temporarily, and, as necessary, especially to provide security, to allow the delivery of humanitarian aid and to eliminate weapons of mass destruction.

A. 3.

3. On May 8, 2003, President Bush appointed Ambassador L. Paul Bremer to serve as the Presidential Envoy to Iraq, reporting through the Secretary of Defense. A. 5. The President granted Ambassador Bremer the authority to "oversee the use of [United States Government] appropriations in Iraq, as well as Iraqi state or regime-owned property that is properly under U.S. possession and made available for use in Iraq to assist the Iraqi people and support the recovery of Iraq." Id. Four days later, the Secretary of Defense designated the Presidential Envoy to be

> the head of the CPA with the title of Administrator. You [Ambassador Bremer] shall be responsible for the temporary governance of Iraq, and shall oversee, direct and coordinate all executive, legislative and judicial functions necessary to carry out this responsibility, including humanitarian relief and

[1] "A.__" refers to a page of the appendix attached to this filing.

> reconstruction and assisting in the formation of an Iraqi interim
> authority.

A. 7.

4. In anticipation of the UN's recognition of the CPA, Ambassador Bremer took several steps to establish the CPA as the governing authority in Iraq. First, on May 16, 2003, in accordance with the authority provided by "the laws and usages of war," Ambassador Bremer issued CPA Regulation No. 1, which provided that the CPA would temporarily "exercise powers of government" in Iraq and that it was "vested with all executive, legislative, and judicial authority necessary to achieve its objective." A. 8. On May 17, 2003, Ambassador Bremer requested that the Federal Reserve Bank of New York ("the FRBNY") open a bank account for the Central Bank of Iraq ("the CBI"). A. 10. This account was to be entitled "Central Bank of Iraq/Development Fund of Iraq." Id. It is commonly referred to as the "DFI," and we discuss it in greater detail below.

5. The UN Security Council adopted Resolution 1483 ("UNSCR 1483") on May 22, 2003. A. 11. UNSCR 1483 noted the joint letter from the United States and United Kingdom dated May 8, 2003, and recognized the "obligations under applicable international law of these states as occupying powers under a unified command (the 'Authority')." A. 12.

## II. Sources Of Funds For The CPA

6. The CPA conducted its operations, including contracting for projects intended to promote the reconstruction of Iraq and benefit of the Iraqi people, with funds provided from four primary sources of money: (1) funds appropriated by Congress from the general revenues of the United States ("Appropriated Funds"); (2) Iraqi funds confiscated by the President and vested in the United States Department of the Treasury ("Vested Funds"); (3) moveable Iraqi state assets,

primarily currency and negotiable instruments, seized by Coalition forces occupying Iraqi territory ("Seized Funds"); and (4) the DFI.

A. Appropriated Funds

7. Appropriated Funds are those public funds that Congress decides may be spent out of the general revenue of the United States Government. See U.S. Const. Art. I. § 9. Cl. 7. The Phase II contract in this case was funded by Appropriated Funds. Comp. ¶ 106.[2]

B. Vested Funds

8. Vested Funds are certain blocked funds that were confiscated by the United States pursuant to two Executive Orders that transferred title and ownership of the funds to the Department of the Treasury. The first Executive Order, was issued on March 20, 2003, the day after armed hostilities began. Citing the President's authority pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 - 06, as amended by the USA PATRIOT Act, Pub. L. No. 107-56, § 106(1)(D), 115 Stat. 271, 278 (October 26, 2001), the Executive Order confiscated all "blocked funds held in the United States in accounts in the name of the Government of Iraq, the Central Bank of Iraq [and certain other Iraqi entities.]" See Confiscating and Vesting Certain Iraqi Property, Exec. Order No. 13290, 68 Fed. Reg. 14307 (March 24, 2003). A. 18.

9. The second Executive Order confiscated "certain additional property of the former Iraqi regime, senior officials of the former regime, immediate family members of those officials, and controlled entities." Executive Order Blocking Property of the Former Iraqi Regime, Its Senior Officials and their Family Members, and Taking Certain Other Actions, Exec.

---

[2] "Comp. __" refers to a paragraph of Laudes's "Second Amended Complaint."

Order No. 13315 of August 28, 2003, Fed. Reg. 52315 (September 3, 2003). A. 20-27. The property confiscated by this second vesting order went directly to the DFI account. A. 21 at § 2.

C. Seized Funds

10. Seized Funds consist of Iraqi state or regime-owned cash, funds, or realizable securities in Iraq that were found (e.g., hidden in Saddam Hussein's Presidential Palaces) and seized by Coalition Forces in Iraq in accordance with the laws and usages of war. In an April 30, 2003 memorandum, the President confirmed the authority of the Secretary of Defense to "exercise all powers, consistent with the law and usages of war" related to the use of the seized funds. A. 28. This authority was delegated, by the Deputy Secretary of Defense, to the Administrator of the CPA. A. 29.

D. The Central Bank Of Iraq / Development Fund For Iraq (DFI)

11. The DFI is a bank account held at the FRBNY on the books of the Central Bank of Iraq ("the CBI") and was created through a coordinated effort of the UN and Ambassador Bremer.

12. As noted above, in anticipation of the formal adoption of UNSCR 1483, Ambassador Bremer wrote to the FRBNY, on May 17, 2003, "on behalf of the Central Bank of Iraq," and requested that an account be opened "for the Central Bank of Iraq, entitled 'Central Bank of Iraq / Development Fund for Iraq.'" A. 10.

13. United Nations Security Council Resolution 1483, adopted on May 22, 2003, addressed the DFI in multiple places. First, the Security Council Resolution referred to

> the establishment of a Development Fund for Iraq to be held by the Central Bank of Iraq and to be audited by independent public accountants approved by the International Advisory and Monitoring Board of the Development Fund for Iraq and look[ed]

> forward to the early meeting of that International Advisory and Monitoring Board, whose members shall include duly qualified representatives of the Secretary-General, of the Managing Director of the International Monetary Fund, of the Director-General of the Arab Fund for Social and Economic Development, and of the President of the World Bank.

A. 14, ¶ 12. The resolution further provided that

> the funds in the Development Fund for Iraq shall be disbursed at the direction of the Authority, in consultation with the Iraqi interim administration, for the purposes set out in paragraph 14 below.

A. 14, ¶ 13. Paragraph 14, in turn, underscored that the DFI was to

> be used in a transparent manner to meet the humanitarian needs of the Iraqi people, for the economic reconstruction and repair of Iraq's infrastructure, for the continued disarmament of Iraq, and for the costs of Iraqi civil administration, and for other purposes benefit[t]ing the people of Iraq.

A. 14, ¶ 14 (bracketed material altered for spelling). The resolution then requested that "the Secretary-General transfer as soon as possible to the Development Fund for Iraq 1 billion United States dollars" from accounts established pursuant to earlier U.N. resolutions governing the "Oil for Food" program and decided that, after deducting certain U.N. expenses, "all surplus funds" in the accounts "be transferred at the earliest possible time to the Development Fund for Iraq." A. 15, ¶ 17. The resolution further decreed that all proceeds from oil and gas sales from Iraq would henceforth be deposited into the DFI, A. 16, ¶20, that the DFI would be immune from attachment, garnishment or execution, id. at ¶22, and that countries holding financial assets of the previous Iraqi regime should freeze them and transfer them to the DFI. A. 17, ¶ 23.

14. When the FRBNY opened the CBI/DFI account at Ambassador Bremer's request, it did so pursuant to its authority under section 14(e) of 12 U.S.C. § 358 ("the Federal Reserve Act") to maintain accounts of foreign central banks. Ambassador Bremer's letter to the FRBNY

requesting the creation of the account acknowledged that it would be governed by the standard terms applicable to foreign central banks and governments. A. 10; see also A. 30-31.

15. United Nations Security Council Resolution 1546, adopted on June 8, 2004, provided for the transition of Iraq from occupation to a sovereign state. See generally A. 32-42. The resolution provided that, "by 30 June 2004 the occupation [of Iraq] will end and the Coalition Provisional Authority will cease to exist and . . . Iraq will reassert its full sovereignty." A. 33, ¶2. It also addressed authority over the DFI upon the dissolution of the CPA: "[U]pon dissolution of the Coalition Provisional Authority, the Funds in the Development Fund for Iraq shall be disbursed solely at the discretion of the Government of Iraq." A. 37, ¶ 24.

16. Consistent with UNSCR 1546, upon dissolution of the CPA on June 28, 2004[3], control of the CBI/DFI account went to the sovereign state of Iraq. By letter dated June 15, 2004, Ambassador Bremer advised the FRBNY that his authority over all CBI accounts, including the DFI account, would be transferred to the Governor of the CBI, Dr. Sinan Al-Shabibi, and other such persons as the Governor might designate, effective June 30, 2004. A. 115.

[3] Although the documents prepared prior to its dissolution provided for a June 30, 2004 end to the CPA, we understand that the end-date of the CPA was moved up to June 28, 2004 for security reasons. The two-day difference is of no consequence to our motion.

III. CPA Contracts Using DFI Funds

A. Contracts Prior To Dissolution Of The CPA

17. CPA Memorandum 4 addressed CPA contracting procedures when the CPA was contracting using vested, seized, or DFI funds. See generally A. 43-73. No CPA Order, Regulation, or Memorandum addressed contracts made with United States Government appropriated funds.[4] "Contracting Officer," as defined in CPA Memorandum 4, is an individual authorized by the CPA Administrator "to enter into Contracts or Grants using Iraqi funds." A. 45 at Section 3(4). "Iraqi Funds" is defined as specifically excluding funds appropriated by Coalition member governments. Id. at Section 3 (8).

18. Appendix D to CPA Memorandum 4 provided in part that, "[t]he CPA's authority is of limited duration and will terminate upon the establishment of an internationally recognized, representative government of Iraq." A. 72.

19. All CPA contracts governed by CPA Memorandum 4, and in excess of $5,000 (such as the Phase I contract), included standard terms and conditions set forth in Appendix B to CPA Memorandum 4. See A. 55 at Section 11 (applying appendices to contracts executed pursuant to CPA Memorandum 4); A. 59-70 (Appendix B). Paragraph 40 in Appendix B, "Source of Funds," provided in part that, "No funds, appropriated or other, of any Coalition country, will be obligated under this contract." A. 65. Appendix B also included a "Disputes" clause, which provided that:

> This contract is not subject to the Contract Disputes Act of 1978, as amended (41 U.S. Code, Sections 601-603). Failure of the

[4] All published CPA Orders, Regulations, and Memoranda may be found at the website, www.cpa-iraq.org/regulations/#Orders.

> parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal, or action arising under or relating to this contract shall be a dispute to be resolved in accordance with United States Federal Acquisition Regulation Clause 52.233-1, Disputes, which is incorporated herein by reference except that appeals from final decisions of a Contracting Officer may only be appealed to the U.S. Armed Services Board of Contract Appeals (ASBCA). The decision of the ASBCA shall be final. The contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

A. 62, ¶ 16.

### B. Administration Of DFI-Funded Contracts Subsequent To The Dissolution Of The CPA

20. CPA contracts funded by DFI moneys became the responsibility of the Iraqi Ministry of Finance upon dissolution of the CPA. See A. 74 (CPA Memorandum 15, dated June 18, 2004, amending CPA Memorandum 4). Similarly, all authority over DFI funds was transferred to the Iraqi Interim Government ("the IIG") as of the June 30, 2004. A. 76-77. (CPA Regulation 11, Section 1, dated June 18, 2004).

21. The United States and its Coalition partners remained available to provide personnel to assist in contract administration for the IIG. CPA Memorandum 15 explicitly provided that the IIG Minister of Finance could designate certain United States Government officials "with responsibility to . . . administer contracts . . . funded with [DFI funds.]" A. 74 at Section 1. By letter dated June 15, 2004, the IIG Finance Minister, Adil Abdul Mahdi, made a very limited delegation of contract administration authority to the Director of the Program Management Office ("the PMO"). A. 79. Minister Mahdi's delegation letter provided, in part, that PMO personnel did not have the authority to amend any DFI-funded contracts, nor to enter into further contracts funded by the DFI after June 30, 2004. A. 80-81.

22. On July 24, 2004, the Project and Contracting Office ("the PCO"), a U.S. Government entity, issued a letter to contracting officers in the field, explaining the consequences of Minister Mahdi's letter. A. 82. In particular, contracting officers were forbidden to increase costs, otherwise modify, or award contracts using DFI funds unless they possessed documented authority, including the signature of the IIG Minister of Finance. Id.

23. Through CPA Order 100, the CPA set the stage for future Iraqi government contracts by amending CPA Memorandum 4. See A. 83-103. Of note, CPA Order 100 changed the term, "Iraqi funds" into "Public Funds" and replaced the disputes clause in Appendix B with one specifying that disputes would be resolved "in accordance with the laws of Iraq." A. 102 at Section 6, ¶ 4) l).

24. By June 2004, all CPA Memoranda, Orders, and Regulations, were posted upon the CPA website within a few hours of their being signed by Ambassador Bremer – always within 24 hours of their being signed. A. 104.

IV. The Phase I Contract

25. The Phase I contract was entered between Laudes and the CPA on June 20, 2004 (eight days prior to the CPA's dissolution), with a period of performance up to and including May 15, 2005. A. 105-06. The Phase I contract specified that it had a "not to exceed" amount of $26,000,000. A. 106. The Phase I contract also included, paragraph 40 of Appendix B to CPA Memorandum 4, regarding the source of funds, which provided: "Source of Funds. The obligation under this contract is made with Iraqi Funds as defined in CPA Memorandum Number 4, dated 19 August 2003. No funds, appropriated or other, of any Coalition country are or will be obligated under this contract." A. 111.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/J. Reid Prouty
J. REID PROUTY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305–7586
Fax: (202) 514-7969

May 31, 2007

## Index To Appendix


| Document | Page |
|---|---|
| "Freedom Message," by General Tommy Franks | 1 |
| Joint United Kingdom / United States letter to United Nations | 3 |
| May 9, 2003 appointment letter from President Bush to Ambassador Bremer | 5 |
| May 13, 2003 designation letter from Secretary Rumsfeld to Ambassador Bremer | 7 |
| CPA Regulation 1 | 8 |
| May 17, 2003 letter from Ambassador Bremer to FRBNY | 10 |
| UNSCR 1483 | 11 |
| Executive Order 13290, Vesting Certain Iraqi Property | 18 |
| Executive Order 13315, Blocking Certain Iraqi Property | 20 |
| Memorandum from President Bush to Secretary Rumsfeld, Re: Iraqi State-Owned Property | 28 |
| Memorandum from Deputy Secretary Wolfowitz to Ambassador Bremer | 29 |
| June 17, 2003 letter from Ambassador Bremer to FRBNY | 30 |
| UNSCR 1546 | 32 |
| CPA Memorandum 4 | 43 |
| CPA Memorandum 15 | 74 |
| CPA Regulation 15 | 76 |
| Memorandum for Director, PMO from Minister Abdil Abdul Mahdi, dated June 15, 2004 | 81 |
| Memorandum from Project and Contracting Office, dated July 24, 2004 | 82 |
| CPA Order 100 | 83 |
| Declaration of Colonel Richard V. Pregent | 104 |

Index To Appendix (cont'd)

Document | Page

Phase I contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

National Security Presidential Directive 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

June 15, 2004 letter from Ambassador Bremer to FRBNY . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115