No. 07-4C
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LAUDES CORPORATION,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFF'S RCFC 56(F) MOTION

Mark G. Jackson, WSBA #18325
GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101-2939
(206) 464-3939
(206) 464-0125 – fax

Attorneys for Plaintiff

July 12, 2007

TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1

II. STATEMENT OF THE ISSUES ........ 1

III. STATEMENT OF THE CASE ........ 4

A. Introduction ........ 4

B. Plaintiff's Proposed Findings of Fact ........ 4

IV. ARGUMENT ........ 9

A. Standards of Review ........ 9

1. Plaintiff's Complaint Establishes Jurisdiction and Defendant Failed to Show There are No Jurisdiction-Based Questions of Material Fact. ........ 9

2. Defendant Failed to Satisfy the Standard Applicable to RCFC 12(b)(6) Motions. ........ 11

3. Questions of Fact Preclude Dismissal on Summary Judgment. ........ 11

B. The Court has jurisdiction of Counts 1 – 8 of the complaint; Congress appropriated funds to the CPA and it need not appoint a successor to the CPA. ........ 12

1. Congress appropriated funds to the CPA ........ 13

2. Congress did not prohibit the use of appropriated funds to supplement DFI-funded contracts. ........ 14

3. The appointment by Congress of a successor to the CPA is not necessary for Tucker Act jurisdiction; NSPD-36 did so. ........ 15

C. There was no transfer of the Phase I Contract to the Interim Iraqi Government. ........ 17

1. The CPA did not transfer DFI-funded contracts to the IIG; it transferred authority over DFI funds, which is an entirely different matter. ........ 18

2. As a matter of contract law, the CPA was not permitted to "transfer" the Phase I Contract to the IIG. ........ 19

D. Plaintiff does not allege an implied-in-fact contract that preceded an express contract; Plaintiff seeks to recover based on implied-in-fact modifications to an existing contract. .... 21

E. Defendant had the authority to enter into the implied-in-fact agreements of counts 1-3 and, even if it did not, Plaintiff may still recover under the contracts. .... 23

1. The Competition in Contracting Act does not prohibit Defendant from entering into the implied-in-facts contracts identified in counts 1 and 2. .... 24

2. Disputed issues of material fact preclude a decision on the merits of count 3 and permit discovery by Plaintiff under RCFC 56(f). .... 25

3. Even if the PCO lacked authority to enter into the implied-in-fact agreements of counts 1-3, Plaintiff may still recover. .... 27

F. The Court has jurisdiction over Count 6, which seeks recovery under the doctrine of equitable estoppel, not promissory estoppel as argued by Defendant on brief. .... 30

G. The Court has jurisdiction over count 5 because the duty breached by Defendant is grounded in privity of contract, not in tort. .... 32

H. The Court has jurisdiction over count 5 because count 5 relies on *quantum meruit* as a measure of damages, not a theory of recovery. .... 35

I. There is no basis to dismiss or grant summary judgment as to count 5 of the complaint; Plaintiff received neither actual nor constructive notice of the "public actions" alleged by Defendant. .... 37

1. Plaintiff received neither actual nor constructive notice of either Resolution 1546 or CPA Memorandum 15. .... 37

2. Neither Resolution 1546 nor CPA Memorandum 15 can reasonably be interpreted to deny Defendant the authority to add additional DFI funds to the Phase I Contract. .... 38

V. CONCLUSION .... 40

# TABLE OF AUTHORITIES

Page

## Cases

Adams v. United States, 391 F.3d 1212 (Fed. Cir. 2004) ........ 11

Aetna Cas. and Sur. Co. v. United States, 228 Ct. Cl. 146 (1981) ........ 33, 34

AINS v. United States, 365 F.3d 1333 (Fed. Cir. 2004) ........ 14, 15

American Elec. Labs., Inc. v. United States, 774 F.2d 1110 (Fed. Cir. 1985) ........ 30

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........ 12

ASEDAC v. Panama Canal Comm'n, 453 F.3d 1309 (11th Cir. 2006) ........ 16

AT&T Communications, Inc. v. Wiltel, Inc., 1 F.3d 1201 (Fed. Cir. 1993) ........ 24

Badgley v. United States, 31 Fed. Cl. 508 (1994) ........ 32, 33

Barrett v. Nicholson, 466 F.3d 1038 (Fed. Cir. 2006) ........ 10, 17

Burnside-Ott Aviation Training Ctr., Inc. v. United States, 985 F.2d 1574 (Fed. Cir. 1993) ...... 28

Burtt v. United States, 176 Ct. Cl. 310 (1966) ........ 34

Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573 (Fed. Cir. 1993) ........ 10

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........ 12

Conley v. Gibson, 355 U.S. 41 (1957) ........ 11

Emeco Indus., Inc. v. United States, 202 Ct. Cl. 1006 (1973) ........ 30

Farmers Grain Co. of Esmond v. United States, 29 Fed. Cl. 684 (1993) ........ 36

Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947) ........ 37

First Annapolis Bancorp, Inc. v. United States, 54 Fed. Cl. 529 (2002) ........ 10

Flowers v. United States, 75 Fed. Cl. 615 (2007) ........ 11

Fluor Enterprises, Inc. v. United States, 64 Fed. Cl. 461 (2005) ........ 29

Gold Line Refining, Ltd. v. United States ........ 36

Gould, Inc. v. United States, 67 F.3d 925 (Fed. Cir. 1995) ........ 23, 28, 29

Gregory Lumber Co. v. United States, 9 Cl. Ct. 503 (1986) .... 33, 34

Hatzlachh Supply Co. v. United States, 444 U.S. 460 (1980) .... 34

Heckler v. Cmty. Health Servs., 467 U.S. 51 (1984) .... 30

Henke v. United States, 60 F.3d 795 (Fed. Cir. 1995) .... 11

Hercules, Inc. v. United States, 516 U.S. 417 (1996) .... 35

JANA, Inc. v. United States, 936 F.2d 1265 (Fed. Cir. 1991) .... 30

Kamen v. Am. Tel. & Tel., 791 F.2d 1006 (2nd Cir. 1986) .... 10

L'Enfant Plaza Properties, Inc. v. United States, 229 Ct. Cl. 278 (1982) .... 15

Leider v. United States, 301 F.3d 1290 (Fed. Cir. 2002) .... 11

Lynch v. United States, 292 U.S. 571 (1934) .... 20

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) .... 12

Moyer v. United States, 190 F.3d 1314 (Fed. Cir. 1999) .... 10

Office of Pers. Mgmt. v. Richmond, 496 U.S. 414 (1990) .... 28

Perri v. United States, 340 F.3d 1337 (2003) .... 35, 36

Prestex, Inc. v. United States, 320 F.2d 367 (Ct. Cl. 1963) .... 29

Schweiger Constr. Co. v. United States, 49 Fed. Cl. 188 (2001) .... 32, 33

Somali Development Bank v. United States, 205 Ct. Cl. 741 (1974) .... 33, 34

Summit Contractors, Inc. v. United States, 22 Cl. Ct. 54 (1990) .... 32

Theisen Vending Co. v. United States, 58 Fed. Cl. 194 (2003) .... 11

United Pac. Ins. Co. v. Roche, 401 F.3d 1362 (Fed. Cir. 2005) .... 31

United States v. Amdahl Corp., 786 F.2d 387 (Fed. Cir. 1986) .... 29, 36

United States v. Mitchell, 463 U.S. 206 (1983) .... 10

United States v. Neustadt, 366 U.S. 696 (1961) .... 33, 34

Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983) .... 36

Zacharin v. United States, 213 F.3d 1366 (Fed. Cir. 2000) .... 30

## Statutes

10 U.S.C. § 2304 .......... 2, 24

10 U.S.C. § 2304(a)(1)(A) .......... 24

28 U.S.C. §1491 .......... 9

28 U.S.C. §1491(a)(1) .......... 32

40 U.S.C. § 254(b) .......... 29

44 U.S.C. § 1507 .......... 37

## Other Authorities

2 Moore's Federal Practice, §12.30[3] .......... 10

2 Moore's Federal Practice, §12.30[4] (3d ed. 2007) .......... 10

Pub. L. No. 108-106, Stat. 1225 (2003) .......... 14

Restatement (Second) of Contracts §316 .......... 20

Restatement (Second) of Contracts §318(3) .......... 20

## Rules

RCFC 12(b)(1) .......... passim

RCFC 12(b)(6) .......... 9, 11, 21, 23

RCFC 56 .......... 9

RCFC 56(c) .......... passim

RCFC 56(f) .......... passim

## I. INTRODUCTION

This Court has jurisdiction over counts 1 through 8 of the complaint and Defendant is not entitled to summary judgment. In its attempt to obtain dismissal or summary judgment as to counts 1 through 8, Defendant either: (a) ignores (but does not contradict) the detailed factual allegations in the complaint or asks the Court to ignore them; (b) mischaracterizes Plaintiff's claims; or (c) argues for the application of legal principles that do not apply.

## II. STATEMENT OF THE ISSUES

1. Whether Defendant's first argument, asserting the applicability of the non-appropriated funds instrumentality ("NAFI") doctrine applies to the implied-in-fact contracts entered into by and between Plaintiff and the Project and Contracting Office ("PCO"), when the PCO was an organization established by National Security Presidential Document 36 ("NSPD-36") to provide contracting services for Defendant in Iraq after the termination of the Coalition Provisional Authority ("CPA") and was placed by NSPD-36 within the Department of Defense, which clearly receives U.S. appropriated funds.

2. Whether Congress affirmatively denied appropriations to the CPA or for use by the CPA or the PCO to supplement DFI-funded contracts.

3. Whether appointment by Congress of a successor to the CPA is necessary for jurisdiction under the Tucker Act, 28 U.S.C. § 1491.

4. Whether there exist disputed issues of material fact precluding dismissal under RCFC 12(b)(1) or summary judgment under RCFC 56(c) as to whether, in light of NSPD-36 and the conduct of the parties after June 30, 2004, Defendant assumed the duties and responsibilities relating to the Phase I Contract.

5. Whether there exists a disputed issue of material fact precluding dismissal under RCFC 12(b)(1) or summary judgment under RCFC 56(c) as to whether the CPA, upon its dissolution, transferred the Phase I Contract to the Interim Iraqi Government ("IIG").

6. Whether, assuming Defendant actually attempted to transfer the Phase I Contact to the IIG after dissolution of the CPA, such transfer was effective where, as here: (1) the Phase I Contract did not permit such a transfer; (2) Plaintiff had not consented to such a transfer; and, (3) the IIG did not assume Defendant's liabilities under the Phase I Contract.

7. Whether, as alleged by Defendant, counts 1 – 3 and 8 of the complaint rely upon implied-in-fact contacts that preceded the express Phase I Contract which was executed on June 20, 2004 where, as here, the implied-in-fact contracts alleged by Plaintiff are implied-in-fact contracts to modify to the Phase I Contract and occurred after June 20, 2004.

8. Whether the implied-in-fact contracts in counts 1 and 2, which are agreements to modify the Phase I Contract by adding additional funding and/or to separate existing work under the Phase I Contract and separately fund it are prohibited by the Competition in Contracting Act, 10 U.S.C. § 2304 ("CICA").

9. Whether there exists a disputed issue of material fact precluding either dismissal under RCFC 12(b)(1) or summary judgment under RCFC 56(c) as to whether the PCO had the authority under United National Security Council Resolution 1546 ("Resolution 1546") to add additional Development Fund for Iraq ("DFI") funds to the Phase I Contract after June 30, 2004 because adding such funds was a "necessary measure" to "contribute to the maintenance of security and stability in Iraq."

10. Whether there exists a disputed issue of material fact precluding either dismissal under RCFC 12(b)(1) or summary judgment under RCFC 56(c) as to whether the

CPA placed sufficient DFI funds into the Central Bank of Iraq/Development Fund for Iraq/Transition sub-account to permit Defendant to add, after June 30, 2004, sufficient DFI funds to fully compensate Plaintiff for its performance under the Phase I Contract.

11. Whether there exists Tucker Act jurisdiction over Plaintiff's claims to damages under the implied-in-fact agreements alleged in counts 1 – 3 when Plaintiff fully performed said agreements and such performance was accepted by Defendant.

12. Whether there exists Tucker Act jurisdiction over the equitable estoppel claim Plaintiff asserts in count 6.

13. Whether there exists Tucker Act jurisdiction over a fraudulent inducement claim where, as here, the claim is based on an allegation that Defendant made a pre-contractual representation that was incorporated into the contract and when the misrepresentation claim evolves from the Phase I Contract.

14. Whether there exists Tucker Act jurisdiction over claims which are based on an express contract that seek damages measured by *quantum meruit*.

15. Whether, in the absence of actual notice, Defendant has established that Plaintiff received constructive notice of Resolution 1546 when Defendant failed to identify any method by which such constructive notice was provided.

16. Whether, in the absence of actual notice, Defendant has established that Plaintiff received constructive notice of CPA Memorandum 15 by virtue of the publication of CPA Memorandum 15 on the CPA website instead of in the Federal Register.

17. Whether Resolution 1546 or CPA Memorandum 15, by their own terms, prohibited Defendant from adding additional DFI funds onto the Phase I Contract after June 30, 2004 or whether there exist disputed issues of material fact regarding Defendant's

authority to place additional DFI funds onto the Phase I Contract after June 30, 2004 which preclude either dismissal under RCFC 12(b)(1) or summary judgment under RCFC 56(c).

## III. STATEMENT OF THE CASE

### A. Introduction

Counts 1 through 8 of the complaint deal exclusively with the Phase I Contract, executed by Plaintiff and Defendant on June 20, 2004. Plaintiff states alternative theories to recover for work it performed at the request of Defendant and which Defendant accepted. Two of the eight counts (numbers 5 and 7) focus solely on the actions of Defendant acting by and through the CPA and allege, respectively, that Defendant fraudulently induced Plaintiff to enter into the Phase I Contract and that Defendant breached its duties to Plaintiff by transferring authority to place additional DFI funds on the Phase I Contract to the IIG. The remaining counts of the complaint focus on the actions of Defendant acting by and through the PCO, an organization established by Defendant within the Department of Defense to provide contracting services for Defendant after termination of the CPA. Those counts are based on a variety of implied-in-fact contracts entered into by Plaintiff and Defendant on or after June 28, 2004 (counts 1 – 3), abuse of discretion in definitizing the Phase I Contract (count 4), equitable estoppel (count 6) and repudiation (count 8). In each alternative theory, Plaintiff seeks only to recover for the goods and services actually provided to and accepted by Defendant.

### B. Plaintiff's Proposed Findings of Fact[1]

1. On March 9, 2004, the U.S. Government ("USG") established the Civilian Police Assistance Training Team ("CPATT") to improve training of the Iraqi Police Service ("IPS"). Comp., ¶ 33; PA, B.40 ¶1, 43 ¶7.

---

[1] Referenced herein as "PFF" and supported by Plaintiff's Appendix ("PA") and the Second Amended Complaint ("Comp.").

2. A key component to the success of CPATT was to dramatically improve the infrastructure and capacity of the Baghdad Police Service Academy ("BPSA"). The BPSA was key to CPATT, which wanted to demonstrate success at the BPSA to "send a very clear signal to the IPS that [CPATT was] serious and totally committed to assisting them." Comp., ¶ 34; PA, B.44 ¶9.

3. Defendant then contacted Plaintiff and asked Plaintiff to provide a bid (as sole-source provider) for the construction of a tent city at BPSA to accommodate 1,000 students, including housing, classrooms, and dining facilities. Comp., ¶ 37; PA, B.50 ¶5.

4. In response to Defendant's request, Plaintiff submitted a price of approximately $4.8 million, based on 12 hours of market research, for available tents and other necessary equipment for the tent city project at the BPSA. Comp., ¶ 39.

5. Ultimately, Defendant determined that the tent city contract could not be a sole source award and that the contract should contain requirements to provide life support. Then, on April 2, 2004, the CPA issued Solicitation No. DABV01-O4-R-0047, for BPSA Life Support. The solicitation asked for prices for several different student loads for one year, including student numbers in the ranges of "1-1500, 1501-2500, 2500-4500 [sic] and 4500-6000 [sic]." The solicitation did not require a bid on any construction services. Nor did the solicitation discuss, mention or require a bid for erecting a temporary tent city. Comp., ¶¶ 40-41, 43.

6. Plaintiff submitted an offer in response to the BPSA Life Support solicitation, offering to provide the basic life support services for 1-1500 students for one year for $14,190,049 and for 1501-2500 students for $17,719,594. The CPA did not accept Plaintiff's offer. Comp., ¶44.

7. During the procurement process for the award of the BPSA Life Support contract, on May 11, 2004, President Bush signed National Security Presidential Directive 36 ("NSPD-36"),

which stated that when the CPA was terminated, the United States would be represented in Iraq by a Chief of Mission under the Department of State and that a Project and Contracting Office ("PCO") would provide acquisition support for both military and civilian organizations of the Defendant in Iraq. Comp., ¶ 46.

8. By separate letters, both dated June 5, 2004, U.S. Secretary of State Colin Powell and Dr. Ayad Allawi, Prime Minister of the IIG, disclosed to the United Nations Security Council agreed-upon limitations and/or exceptions to the IIG's authority. Comp., ¶ 77. Prime Minister Allawi specifically requested a new Security Council "Multinational Force (MNF) mandate to contribute to maintaining security in Iraq, including through the tasks and arrangements set out in the letter from [Secretary Powell]." Comp., ¶ 78. Secretary Powell identified further limitations on the IIG's authority in his description of the tasks to be performed by the MNF after turnover, including "train[ing] and equip[ping] Iraqi security forces." Comp., ¶ 80.

9. In response to these two letters, on June 8, 2004 the United Nations Security Council issued United Nations Security Council Resolution 1546 ("Resolution 1546") which, among other things, decided that the MNF "shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the [letters from Secretary Powell and Prime Minister Allawi] annexed to this resolution…." Comp., ¶ 81.

10. In mid-June, 2004, the CPA terminated the original BPSA Life Support contract and asked that Plaintiff be prepared immediately to assume all responsibilities at BPSA, including building semi-permanent facilities and, on June 20, 2004, the CPA awarded Plaintiff the Phase I Contract. Comp., ¶¶ 54, 56; PA, B.47 ¶13, B.50 ¶5.

11. At the time Plaintiff executed the Phase I Contract, it had not heard of nor read either Resolution 1546 or CPA Memorandum 15. PA, B.50 ¶6.

12. The Phase I Contract stated that "costs associated with this effort shall not exceed $26,000,000 for performance 20 Jun 04 - 15 May 05" and requested a proposal to definitize the contract no later than June 27, 2004. There was no discussion between the CPA and Plaintiff about the $26,000,000 not to exceed ("NTE") price except that the parties agreed that $26,000,000 was insufficient to accomplish the work. Plaintiff does not know the origin or basis of that number. Comp., ¶ 59.

13. However, if the CPA had been following standard procedures set forth in the Federal Acquisition Regulations (FAR) (which it did in many cases even though the FAR were inapplicable), the ceiling price of the Phase I Contract would have been $52,000,000, twice the NTE price. In fact, this was the approach followed by the USG in awarding the Phase II Contract to Plaintiff 45 days later. Comp., ¶ 60.

14. Using the prices submitted by Plaintiff in response to the original BPSA Life Support solicitation, the work ordered by CPA—exclusive of the design/build services—under the Phase I Contract was priced by Laudes at $33,946,449, assuming a student load of no more than 1500. Comp., ¶ 62.

15. On June 20, 2004, when they were signing the Phase I Contract, the contracting officer told Plaintiff that the contract would be modified when definitized to increase funding and to modify the statement of work so as to include contract coverage for construction and other support requirements. On this and later occasions, the contracting officer assured Plaintiff that additional funding would be provided to cover undefinitized areas, including construction. Comp., ¶ 67; PA, B.48 ¶14, B.49 ¶3.

16. The parties to the Phase I Contract knew, at the time of award and thereafter, that the NTE price set forth in the letter contract was insufficient to perform all of the work

demanded by the Phase I Contract SOW. Moreover, as work under the contract progressed, the parties knew—because of additional and changed work required by Defendant—that the funding shortfall on the contract was increasing. Comp., ¶ 69. Moreover, notwithstanding the NTE price and the ever-increasing work demanded and accepted by Defendant, the Phase I Contract did not permit Plaintiff to stop work when Plaintiff reached the NTE price. Accordingly, neither the PCO nor the CPATT would have permitted Laudes to stop performance when the artificial NTE price was reached. Comp., ¶¶ 75, 206, 216, 232, 240, 247, and 261.

17. On June 28, 2004, eight days after the award of the Phase I Contract to Plaintiff, the IIG accepted limited control and, pursuant to NSPD-36, the CPA disbanded and the PCO took over contracting duties for Defendant. Comp., ¶ 72.

18. Transfer of authority to the IIG on June 28, 2004 did not, however, result in complete sovereignty for the IIG because CPA Order No. 17, Status of the Coalition Provisional Authority, MNF-Iraq, Certain Missions and Personnel in Iraq ("CPA Order 17"), remained in full force and effect after June 28, 2008. Comp., ¶ 87. Pursuant to CPA Order 17, after June 28, 2004: MNF personnel, property, funds, and assets were immune from Iraqi legal process, including any arrest, detention or civil, criminal, or administrative process; contractors doing business in Iraq were immune from Iraqi legal process with respect to acts performed by them pursuant to the terms and conditions of contracts entered into with the MNF or the CPA; the IIG did not have the authority to deny entry visas, licenses or permits for contractors doing business in Iraq for the MFN. Comp., ¶¶ 88-89, 93.

19. On August 5, 2004, the PCO awarded Plaintiff a second contract for work at the BPSA, contract number W914NS-04-C-9032 ("Phase II Contract"). Comp., ¶ 104. The parties

understood and intended the Phase II Contract to be, in fact, merely a modification of the Phase I Contract using a different source of funds. Comp., ¶ 107. This intent and understanding was expressed, in part, by the manner in which invoices were prepared and submitted by Plaintiff and approved by the PCO. The amounts charged the PCO by Plaintiff were allocated between the two contracts based on average student headcount. That is, student headcounts were provided by the BPSA each day for life support services to be performed the following day. Invoices were based upon these BPSA-provided figures. Comp., ¶ 108.

20. On April 27, 2005, the PCO asked Plaintiff to continue service at the BPSA, as the terms of the Phase I and Phase II Contracts were expiring. The PCO offered to pay Plaintiff $4,000,000 for 30 days of life support service, which Plaintiff accepted. As with the Phase II Contract, this 30-day extension treated as simply an extension of the Phase I Contract, for which $4 million per month was deemed by the Government to be a fair price. Comp., ¶¶ 172-74.

21. On October 11, 2006, Laudes submitted a certified claim to the contracting officer and requested a final decision covering both the Phase I and Phase II Contracts. The contracting officer responded on November 29, 2006, denying the claim. Comp., ¶ 203.

## IV. ARGUMENT

### A. Standards of Review

Defendant brings its motion pursuant to three separate rules: RCFC 12(b)(1), 12(b)(6) and 56. Plaintiff discusses the standards of review applicable to each in turn below.

#### 1. Plaintiff's Complaint Establishes Jurisdiction and Defendant Failed to Show There are No Jurisdiction-Based Questions of Material Fact.

Many of Defendant's 12(b)(1) jurisdiction-based arguments constitute *facial* attacks in that they question the sufficiency of Plaintiff's pleading. Plaintiff asserts jurisdiction for its claims under the Tucker Act, 28 U.S.C. §1491, which act requires that the plaintiff identify an

independent substantive right enforceable against the United States for money damages, such as a claim arising from a contract. See, e.g., First Annapolis Bancorp, Inc. v. United States, 54 Fed. Cl. 529, 538 (2002); see also, United States v. Mitchell, 463 U.S. 206, 215 (1983) ("liability in contract is viewed as perhaps the 'widest and most unequivocal waiver of federal immunity from suit'") (citation omitted). In reviewing the sufficiency of Plaintiff's allegations, the Court must accept them as true. See, e.g., Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993); see also, 2 Moore's Federal Practice ("Moore's") §12.30[4] (3d ed. 2007). Applying that standard precludes the dismissal of Plaintiff's complaint based on a facial challenge.

Defendant's other jurisdiction-based arguments represent *factual* attacks in that they dispute the truth of factual allegations that would otherwise invoke federal jurisdiction. In that instance, the Court must examine and weigh evidence beyond the pleadings in order to resolve any factual disputes. See, e.g., Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999). While Defendant claims that a summary determination of the facts is appropriate now, before Plaintiff has a chance to conduct any discovery, "the general rule is that 'the party asserting jurisdiction must be permitted discovery of facts demonstrating jurisdiction, at least where the facts are peculiarly within the knowledge of the opposing party.'" Barrett v. Nicholson, 466 F.3d 1038, 1042-43 (Fed. Cir. 2006) (quoting Kamen v. Am. Tel. & Tel., 791 F.2d 1006, 1011 (2nd Cir. 1986)). To the extent "the jurisdictional facts are too intertwined with the merits to permit the determination to be made independently, the court should either employ the standard applicable to a motion for summary judgment (if the material jurisdictional facts are undisputed) or leave the jurisdictional determination to trial." 2 Moore's §12.30[3]. Thus, Plaintiff's need for discovery and the existence of genuine issues of fact regarding Plaintiff's contract claims preclude dismissal based on a factual jurisdiction challenge.

2. Defendant Failed to Satisfy the Standard Applicable to RCFC 12(b)(6) Motions.

In considering Defendant's motion to dismiss under RCFC 12(b)(6), the court must "assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (citation omitted). Dismissal for failure to state a claim under Rule 12(b)(6) "is proper only when a plaintiff 'can prove no set of facts in support of his claim which would entitle him to' relief." Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004) (quoting Leider v. United States, 301 F.3d 1290, 1295 (Fed. Cir. 2002) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957))). As discussed in detail below, Plaintiff alleged facts in support of counts 1 – 8 that entitle Plaintiff to relief.

3. Questions of Fact Preclude Dismissal on Summary Judgment.

As RCFC 56(c)'s express reference to depositions and answers to interrogatories suggests, summary judgment is appropriate *after* discovery and only when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Yet Defendant seeks summary judgment before discovery has even started. In opposition to Defendant's motion, Plaintiff also hereby moves for discovery under RCFC 56(f) and submits its RCFC 56(f) affidavit setting forth the discovery it needs to take to support its claims, which affidavit satisfies the factors set forth in Theisen Vending Co. v. United States, 58 Fed. Cl. 194, 198 (2003); but see Flowers v. United States, 75 Fed. Cl. 615, 626 (2007) (noting that the Federal Circuit "has not established criteria to consider in evaluating a motion for discovery under RCFC 56(f)."). Accordingly, summary judgment consideration, let alone dismissal, is premature.

Applying the standards applicable to review of Defendant's summary judgment motion also precludes dismissal of Plaintiff's claims. First, Defendant failed to meet its burden of identifying both the legal and factual bases for its motion and the portions of the record that

demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Second, the Court cannot weigh the evidence on summary judgment. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Third, the court must resolve any doubts about factual issues in favor of the non-moving party. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Applying those standards leads to one conclusion: Plaintiff has submitted evidence "such that a reasonable [trier of fact] could find for the nonmoving party," which makes dismissal improper. Anderson, 477 U.S. at 249.

B. The Court has jurisdiction of Counts 1 – 8 of the complaint; Congress appropriated funds to the CPA and it need not appoint a successor to the CPA.

In its first argument, Defendant asserts that "there are simply no funds appropriated by Congress for which to pay any of the CPA's liabilities upon DFI-funded contracts and Congress never assigned the CPA's liabilities to any successor entity." Defendant's Mem., p.7. Defendant makes either a jurisdictional challenge, presumably under RCFC 12(b)(1), or in the alternative, a motion for summary judgment under RCFC 56(c). Id. at p.10. For the purposes of this motion, the status of the CPA is not in question.[2]

Defendant's argument is based upon a mischaracterization of Plaintiff's claims. Only counts 5 (fraud in the inducement) and 7 (breach of contract) seek recovery based on actions of the CPA under the Phase I Contract. The remaining claims relating to the Phase I Contract are expressly based on promises made by the United States acting by and through the Project and Contracting Office ("PCO")—the entity that took over contracting duties for the CPA after June 28, 2004. See, e.g., Compl., ¶¶ 102, 115-17, 121, 124-27, 137, 142, and 143. Defendant

[2] Defendant does not challenge Plaintiff's assertion that the CPA was an instrumentality of the United States and, instead, reserves the right to raise that argument at a later date. Accordingly, Plaintiff currently has no argument from Defendant on this point to which to respond and therefore does not. Should the Court decide for whatever reason to consider this issue *sua sponte*, Plaintiff respectfully requests an opportunity to fully brief this issue following limited discovery.

does not allege that the *PCO* lacked appropriated funds or that the *PCO*'s liabilities are some how extinguished. In fact, Defendant makes no allegations whatsoever about the funding, duties or obligations of the PCO. Thus, notwithstanding Defendant's request to dismiss counts 1 through 8, this argument does not even reach the actions of the PCO alleged by Plaintiff and therefore does not address counts 1-4, 6 or 8. Accordingly, Defendant's first argument is necessarily limited to only counts 5 and 7 of the complaint.

To the extent Defendant's argument is applicable to counts 5 and 7, it requires the Court to answer three questions: (1) did Congress appropriate funds to the CPA; (2) if so, did Congress affirmatively prohibit the use of said appropriations to supplement DFI-funded contracts; and (3) is Tucker Act jurisdiction contingent on the designation by Congress of a successor to the CPA. Defendant's argument loses on all three points. Congress did appropriate funds to the CPA and Congress did not limit the use of these funds so as to prevent them from being used to supplement a DFI-funded contract. See, e.g., PA, B.17-18. As a result, the Non-Appropriated Funds Instrumentality ("NAFI") doctrine analogy asserted by Defendant is inapplicable. Further, the designation by Congress of a successor entity is not necessary for the liability of the CPA. Moreover, on the facts alleged in the complaint (which facts are not contested by Defendant), the PCO in fact was the successor in interest to the CPA for the purposes of the Phase I Contract. Accordingly, this argument by Defendant must fail.

1. Congress appropriated funds to the CPA

The Government concedes that the CPA received "funds appropriated by Congress from the general revenues of the United States ('Appropriated Funds')." Defendant's Proposed Finding of Uncontroverted Facts ("DPFUF"), p.3 ¶6. Furthermore, Congress expressly appropriated these funds to the CPA to accomplish the very objectives sought under the Phase I Contract. PA, B.17. Pursuant to the Emergency Supplemental Appropriations Act for Defense

and for the Reconstruction of Iraq and Afghanistan, 2004, ("FY04 Supplemental Appropriation"), Congress appropriated $18.649 billion to the Iraq Relief and Reconstruction Fund ("IRRF") for "security, relief, rehabilitation and reconstruction in Iraq," of which $3.243 billion was specifically allocated for "security and law enforcement" and $1.318 billion for "justice, public safety infrastructure, and civil society." Pub. L. No. 108-106, 117 Stat. 1225 (2003). Congress also expressly designated the CPA as one of the U.S. Government entities to which the IRRF could be apportioned:

> [F]unds appropriated under this heading shall be apportioned only to the Coalition Provisional Authority in Iraq (in its capacity as an entity of the United States Government), the Department of State, the Department of Health and Human Services, the Department of Treasury, the Department of Defense and the United States Agency for International Development …

Id. Thus, it is clear that Congress did appropriate funds to the CPA.

2. Congress did not prohibit the use of appropriated funds to supplement DFI-funded contracts.

Defendant next argues that "CPA contracts involving DFI funds are not 'cases in which appropriated funds can be obligated' because DFI funds are not appropriated funds," implying (a) there exists some prohibition against funding a contract with both DFI and appropriated funds and (b) that such a prohibition, if it existed, was relevant. Defendant's Mem., p.8. Defendant's argument is wrong on both counts. Congress placed no limitations on the CPA's or the PCO's ability to use these appropriated funds to supplement DFI-funded contracts. See PA, B.17-18. Defendant's motion does not assert or argue otherwise. Nonetheless, Defendant argues that the circumstance presented "is analytically similar to the 'NAFI doctrine,'" as discussed in AINS v. United States, 365 F.3d 1333 (Fed. Cir. 2004). Defendant's Mem., pp.7-8. Defendant's argument demonstrates a fundamental misunderstanding as to when the NAFI doctrine applies.

The test to determine the applicability of the NAFI doctrine is whether Congress has affirmatively denied appropriated funds to the instrumentality; if Congress makes appropriated funding *possible*, the NAFI doctrine is not applicable. L'Enfant Plaza Properties, Inc. v. United States, 229 Ct. Cl. 278, 280 (1982) ("To sustain jurisdiction here, the requirement is not that appropriated funds have been used for the activity but that under the agency's authorizing legislation Congress could appropriate funds if necessary"). Indeed, the AINS decision cited by Defendant established a four-part test which focuses solely upon the *ability* of the entity to obtain appropriated funds, not what the entity does with those appropriated funds.[3] Thus, Defendant's assertion that the Phase I Contract was limited to DFI funds, even if true as a matter of internal CPA or PCO policy (and no such policy existed[4]), is not relevant to the question of whether this Court has jurisdiction under the Tucker Act because jurisdiction under the Tucker Act is not dependent on how a particular government entity chooses to allocate its appropriations. Under these circumstances there can be no doubt that the CPA is not, by application or analogy, a NAFI and that the NAFI doctrine is inapplicable.

3. The appointment by Congress of a successor to the CPA is not necessary for Tucker Act jurisdiction; NSPD-36 did so.

Defendant also argues that because the CPA no longer exists there remains no basis for holding the United States responsible for payment since "Congress took no action to assign liability for such actions by the CPA to any follow-on agency." Defendant's Mem., p.8. Although Defendant asserts that an appointment of a successor to the CPA by Congress is

---

[3] Under AINS, "[a] government instrumentality is a NAFI if: (1) It does 'not receive its monies by congressional appropriation.' (2) It derives its funding 'primarily from [its] own activities, services, and product sales.' (3) Absent a statutory amendment, there is no situation in which appropriated funds could be used to fund the federal entity, and (4) There is 'a clear expression by Congress that the agency was to be separated from general federal revenues.'" AINS, Inc. v. United States, 365 F.3d 1333, 1342 (Fed. Cir. 2004) (citations omitted). The CPA fails on every single criterion.

[4] In fact, the Government extended Plaintiff's performance under the Phase I Contract by one month for the price of $4 million in U.S. appropriated funds. Compl., ¶¶ 172-74.

necessary, the only support for that assertion it provides is ASEDAC v. Panama Canal Comm'n, 453 F.3d 1309 (11th Cir. 2006), a decision that simply is not relevant to this case. And, as demonstrated below, Congress need not appoint a successor to an entity for continued liability of the United States to attach.

Defendant's reliance upon ASEDAC is misplaced for several reasons. First, as noted in its brief, the Panama Canal Commission was a government *corporation* and that court based its holding on "well-settled common law principles respecting the dissolution of corporations …." Id. at 1313. The court framed the issue as "whether the statute altered the common law to allow the PCC's and OTA's continued existence for the purposes of pending litigation." Id. at 1314 n.6. Defendant does not allege that the CPA was a government corporation and the common law of corporate dissolution is simply inapposite.

Second, the liabilities at issue in ASEDAC were not created by contract, but by treaty and its implementing statute, and thus implicate an entirely different set of issues. The ASEDAC court did not even discuss the scope of the government's waiver of sovereign immunity under the Tucker Act. Indeed, when the United States is a party to a contract, Congress need not either create the instrumentality that entered into the contract on behalf of the United States or designate a successor upon that entity's dissolution for continued liability on the contract to exist.

Finally, while Congress may not have appointed a successor to the CPA, the President did. In his May 11, 2004 NSPD-36, see Compl., ¶ 46, the President stated that:

> The U.S. Mission in Baghdad and an office in the Department of State will assume from the CPA those authorities and responsibilities that continue after the CPA terminates.[5]

DPFUF, A.113. Consistent with that direction, after June 28, 2004 when the CPA terminated, the PCO[6] clearly acted as the successor to the CPA for the Phase I Contract. The PCO repeatedly modified the Phase I Contract. See, e.g., Compl., ¶¶ 102, 115-17, 121, 124-27, 137, 142, and 143; PA, B.49 ¶3. The PCO also attempted to definitize the Phase I Contract on several occasions. Id. at ¶¶ 118, 119, 146, and 158. On October 11, 2006, Plaintiff submitted a certified claim on the Phase I Contract to the PCO/JCC, which the PCO/JCC denied on November 29, 2006. Id. at ¶ 203. Given these uncontested facts, the PCO believed itself to be and acted as the successor to the CPA for the purposes of the Phase I Contract. Thus, Plaintiff clearly alleged that the PCO and or JCC assumed this role, raising a question of fact which cannot not be resolved against Plaintiff at this juncture. See also Compl., at ¶¶72-73. In sum, Defendant's motion to dismiss or for summary judgment as to counts 5 and 7 (the only counts to which this argument applies) should be denied.

C. There was no transfer of the Phase I Contract to the Interim Iraqi Government.

In its second argument, Defendant asserts that "upon its dissolution, the CPA transferred all [DFI-funded] contracts to the Iraqi Interim Government ('IIG')," and that as a result, "[t]he Phase I contract has plainly been a contract with the sovereign State of Iraq since the dissolution of the CPA." Defendant's Mem., pp.10-11. Based on this argument, Defendant asks the Court to dismiss counts 1-4 and 8 and not "consider" counts 6 and 7. Because Plaintiff asserts the

---

[5] Plaintiff is entitled to discovery pursuant to both RCFC 56(f) and Barrett v. Nicholson, 466 F.3d 1038 (Fed. Cir. 2006) for the purpose of determining the authorities and responsibilities of the CPA which were assumed by the Department of State after June 30, 2004.

[6] Pursuant to that same NSPD-36, the President established an "organization within the Department of Defense to be called the Project and Contracting office (PCO) to provide acquisition and project management support with respect to activities in Iraq, as requested by the Secretary of State and head of other Departments and agencies." Compl., ¶ 46; DPFUF, A.114

Phase I Contract was with Defendant and not with the IIG, the Government's argument is a factual jurisdictional attack under RCFC 12(b)(1). Alternatively, Defendant seeks summary judgment under RCFC 56(c), asserting that whether the CPA effectively transferred the Phase I contract to the IIG is not a genuine issue of material fact. Defendant is not entitled to the relief it seeks for two reasons. First, Defendant's argument is based entirely on a disputed issue of material fact. Second, as a matter of law, no such "transfer" of the Phase I Contract was possible.

1. The CPA did not transfer DFI-funded contracts to the IIG; it transferred authority over DFI funds, which is an entirely different matter.

Defendant's assertion that the CPA upon its dissolution transferred all DFI-funded contracts to the IIG is an assertion of fact, not a legal argument:

> As demonstrated in our DPFUF, upon its dissolution, the CPA transferred all [DFI]-funded contracts to the [IIG]. DPFUF 16.

Defendant's Mem., p.10. This assertion is incorrect, as the DPFUF demonstrates no such thing. In fact, the DPFUF demonstrates only that, after June 30, 2004, the CPA transferred to the IIG authority over DFI *funds*. UN Security Council Resolution 1546 ("Resolution 1546") states that "upon dissolution of the [CPA], the *funds* in the [DFI] shall be disbursed solely at the direction of the Government of Iraq." DPFUF, A.37 ¶ 24 (emphasis added). No mention is made of any transfer for the responsibility and liability of existing contracts.

In addition, the conduct of the U.S. Government after June 30, 2004 is entirely inconsistent with Defendant's "transfer" theory. According to the designation of authority from the Iraq Ministry of Finance, after June 30, 2004 the U.S. Government was purportedly not authorized to modify any contract using DFI funds. Compl., ¶73. Of course, even if that were

true (and it is not[7]) that did not prevent Defendant from modifying the Phase I Contract using U.S. appropriated funds, which is what Plaintiff alleges it promised to do. Id. at ¶ 152. In fact, the USG extended Plaintiff's performance under the Phase I Contract by one month for the price of $4 million in U.S. appropriated funds. Id. at ¶¶ 172-74. Clearly, the PCO did not act as if a "transfer" of the Phase I Contract had occurred.

Plaintiff clearly and unequivocally alleged that the CPA transferred authority over DFI *funds* to the IIG, not the Phase I Contract itself. See Compl., ¶¶ 72, 73. Accordingly, Defendant's argument rests entirely upon disputed issues of material fact on which Plaintiff is entitled to discovery. Thus, as a matter of law it is not entitled to either dismissal under RCFC 12(b)(1) or summary judgment under RCFC 56(c) on this argument.

2. As a matter of contract law, the CPA was not permitted to "transfer" the Phase I Contract to the IIG.

Even if the CPA had attempted to transfer the Phase I Contract to the IIG (which it did not), the notion that the CPA could unilaterally shed the contractual obligations it owed to Plaintiff, giving the IIG the sole duty to perform, violates the principles of government contract law regarding delegation of duty and novation. Defendant offers absolutely no legal support for its argument. Indeed the Government avoids using any language of legal import to describe the purported transaction, at one point calling it a "transfer[]" and at another simply asserting that the contract "has been" one with the IIG since June 28, 2004. Defendant's Mem., pp.10-11.

Because Defendant seeks to shed its obligations under the Phase I Contract, its argument is one of delegation of duty and/or novation and cannot properly be characterized as an

[7] The USG repeatedly modified the Phase I Contract by adding additional work. See, e.g., Compl., ¶¶ 102, 115-17, 121, 124-27, 137, 142, and 143. Defendant also attempted to modify the Phase I Contract on several occasions by definitizing it. Id. at ¶¶ 118, 119, 146, and 158. Later, Defendant finally did expressly modify the Phase I Contract by issuing a unilateral modification decreasing the contract value. Id. at ¶ 149. Furthermore, pursuant to CPA Regulation Number 3, the CPA Program Review Board was established and given the responsibility of generating funding plans supported by various sources of funding, including U.S. appropriated funds. PA, B.36.

"assignment," which relates to *rights* under a contract. See Restatement (Second) of Contracts §316 ("A person subject to a duty (the obligor) does not ordinarily have such a power to substitute another in his place without the consent of the obligee; this is what is meant when it is said that duties cannot be assigned"). Once again, Plaintiff did not give the USG authority to novate any contract entered into by the CPA. See Compl., at ¶ 73; DPFUF, A.79-81.

Defendant had no such right under common law either. It has long been established that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Lynch v. United States, 292 U.S. 571, 579 (1934). Under the basic principles of contract law, if Defendant is claiming that it delegated its duty of performance to the IIG, it is clear that such action could not release the Government from its obligations under the contract without Plaintiff's consent: "[u]nless the obligee agrees otherwise, neither the delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor." Restatement (Second) of Contracts §318(3). Rather, "[a]n obligor is discharged by the substitution of a new obligor only if the contract so provides or if the obligee makes a binding manifestation of assent, forming a novation." Id. at comment d.

Defendant does not allege, nor can it, that any of these required steps occurred between the parties in this case and there is no provision in the Phase I Contract which permits Defendant to unilaterally substitute a third party to render its promised performance. DPFUF, A.105-11. At no time did any CPA or PCO personnel inform Plaintiff that the Phase I Contract would be or was transferred to or assumed by the IIG, nor did any CPA or PCO personnel ever request or obtain Plaintiff's permission to so transfer the contract. PA, B.50-51 ¶7. Simply put, there was

no effective delegation of duty or novation. Accordingly, for this reason as well, Defendant's argument that the Phase I Contract was "transferred" to the IIG must fail.

D. Plaintiff does not allege an implied-in-fact contract that preceded an express contract; Plaintiff seeks to recover based on implied-in-fact modifications to an existing contract.

Defendant alleges that counts 1-3 and 8 of the complaint "may be read" to allege the existence of an implied-in-fact contract that preceded the express Phase I Contract and, on that basis, seeks dismissal pursuant to RCFC 12(b)(6). Defendant's Mem., pp.12-13. Defendant's argument is again based on a fundamental misunderstanding of Plaintiff's claims; Plaintiff does not claim that *any* implied-in-fact contract preceded the express Phase I Contract. For this reason, Defendant's motion to dismiss counts 1-3 and 8 should be denied.

The Phase I Contract was signed by the parties on June 20, 2004. Compl., ¶ 56; DPFUF, A.105. In count 1, Plaintiff alleges that "[b]efore and after June 28, 2004, the parties agreed and understood that defendant would issue a written modification formally modifying the changes to the scope of work of the Phase I Contract." Compl., ¶ 208. The modifications referenced by Plaintiff occurred *after* contract award. See, e.g., id. at ¶¶ 111, 113, 115-17, 121-23, and 124-27. Count 1 then asserts that "[a]fter June 28, 2004, the parties agreed and understood that defendant would also place additional USG-appropriated funds on the Phase I Contract sufficient to fairly compensate Laudes for the work requested and accepted by defendant and performed by Laudes." Id. at ¶ 209. Defendant's failure to so modify the contract is what Plaintiff claims is a breach. Id. at ¶ 212. Thus, in count 1, Plaintiff obviously asserts and relies upon the breach of an implied-in-fact agreement to modify an existing contract, not a breach of an implied-in-fact contract that preceded an express contract. Accordingly, as to count 1, Defendant's argument is simply wrong and its motion should be denied.

The same is true as to count 2. There, Plaintiff alleges that "[a]t all times after June 28, 2004, defendant knew that: (a) the NTE price of the Phase I Contract was insufficient to accomplish the work required by defendant under the Phase I Contract…" and that "[a]s a result, the parties understood and agreed that defendant would issue a separate contract for construction services originally requested by defendant under the Phase I Contract…." Id. at ¶¶ 216-18. Again, because the Phase I Contract was executed on June 20 and the acts complained of by Plaintiff were "after June 28," Plaintiff is clearly not relying upon a breach of an implied-in-fact contract that preceded an express contract. Again, Defendant's argument is simply wrong and its motion should be denied.

The same goes for count 3 for the same reason. There, Plaintiff alleges that "[a]t all times during the performance of the Phase I Contract, the parties intended that plaintiff be paid a reasonable price for all of the work it performed at the direction of [defendant] for the benefit of the IIG" and that "[b]efore, during and after June 28, 2004, the parties agreed and understood that defendant would issue modifications…increasing the funds placed on the Phase I Contract…." Id. at ¶¶ 224-25. Defendant's failure to so modify the contract by placing additional funds on it is the breach complained of in count 3. Again, these allegations do not rely upon an implied-in-fact contract that preceded an express contract; the allegations rely on agreed upon modifications to an existing contract. Thus, Defendant's argument is wrong and should be denied.

Finally, Defendant argues that count 8 somehow relies upon an implied-in-fact contract preceding an express contract. In count 8, Plaintiff alleges that on February [11, 2005][8] Defendant issued a unilateral modification to the Phase I Contract. Id. at 264. It is this unilateral

[8] The allegation in ¶ 264 of the complaint incorrectly lists the date as February 11, 2004. Compl., ¶ 264. The date should be February 13, 2005, as stated earlier in the complaint at ¶ 149, which describes in detail the modification complained of.

modification which Plaintiff asserts constituted a repudiation of the Phase I Contract by Defendant. Id. at ¶ 265. While there was a scrivener's error as to the date set forth in ¶ 264, it was clear by reference to ¶ 149 (which was incorporated by reference into count 8) that the conduct complained of by Plaintiff was based on an existing contract, not an implied-in-fact contract that preceded an express contract. Again, Defendant's argument is without merit.

E. Defendant had the authority to enter into the implied-in-fact agreements of counts 1-3 and, even if it did not, Plaintiff may still recover under the contracts.

In its fourth argument, Defendant seeks either dismissal under RCFC 12(b)(6) or summary judgment on counts 1-3 and 5, asserting that no officer or agent of the United States was authorized to enter into the implied-in-fact contracts performed by Plaintiff. In short, Defendant asserts the implied-in-fact contracts identified by Plaintiff were illegal and, as a matter of law, can provide no basis for recovery by Plaintiff. Accordingly, Defendant seeks a decision on the merits of counts 1-3 and 5. See Gould, Inc. v. United States, 67 F.3d 925, 929 (Fed. Cir. 1995) (finding dismissal for failure to state a claim under RCFC 12(b)(6) is a decision on the merits).

Defendant is not entitled to such a decision for two reasons. First, the PCO, a contracting agent for Defendant in Iraq after June 28, 2004, had the authority to enter into each of the implied-in-fact agreements identified and performed by Plaintiff. Second, even if such authority were lacking, Defendant provides no legal authority for the proposition that Plaintiff cannot recover damages due to Defendant's breach of implied-in-fact contracts on which Plaintiff has already performed and which performance Defendant has accepted. To the contrary, recovery by Plaintiff is permitted in precisely such circumstances. Defendant's motion to dismiss or for summary judgment as to counts 1-3 and 5 should be denied.

1. The Competition in Contracting Act does not prohibit Defendant from entering into the implied-in-facts contracts identified in counts 1 and 2.

Defendant again mischaracterizes the complaint. In count 1, Plaintiff asserts that there existed an implied-in-fact contract to *modify* the Phase I Contract to (a) memorialize the changes to the scope of work directed by Defendant and performed by Plaintiff and (b) to place additional funds on the contract, in particular U.S. appropriated funds. Compl., ¶¶ 208-10. In count 2, Plaintiff asserts that there was an implied-in-fact contract to modify the Phase I Contract, this time by removing the construction services required by the Phase I Contract and placing those services in a separate contract which would be paid for by U.S. appropriated funds. Id. at ¶¶ 216-18. Thus, in both counts 1 and 2, Plaintiff alleges an implied-in-fact contract to *modify* the Phase I Contract. These are the implied-in-fact contracts Defendant alleges somehow violate the Competition in Contract Act, 10 U.S.C. § 2304 ("CICA"). Defendant provides no legal analysis supporting that argument and cannot because none exists.

CICA requires Defendant to "obtain full and open competition through the use of competitive procedures" in "conducting a procurement for property or services." 10 U.S.C. § 2304(a)(1)(A). "CICA, however, does not prevent modification of a contract by requiring a new bid procedure for every change." AT&T Communications, Inc. v. Wiltel, Inc., 1 F.3d 1201, 1205 (Fed. Cir. 1993). Instead, the CICA competition requirements apply only to modifications which are "outside the scope" of the original contract. Id. To determine whether a modification is "outside the scope," the Court is asked to determine "whether the contract as modified materially departs from the scope of the original procurement." Id. Accordingly, the analysis focuses on the scope of the original contract in comparison to the scope of the contract as modified. Given these standards, it is clear that Defendant's CICA argument must fail.

Because Defendant mischaracterizes the nature of counts 1and 2, it does not even attempt to argue that the modifications to the Phase I Contract set forth in counts 1 and 2 materially altered the nature of the contract. Nor can it. The implied-in-fact contract modifications identified and alleged by Plaintiff were either to add additional funding or separate *existing* work scope and fund it separately. These modifications did not materially depart from the original contract. There simply is no factual or legal basis to allege that these modifications violated CICA and Defendant's arguments to the contrary are without merit.

2. Disputed issues of material fact preclude a decision on the merits of count 3 and permit discovery by Plaintiff under RCFC 56(f).

In count 3, Plaintiff alleges that there was an implied-in-fact contract by which Defendant promised to add DFI funds to the Phase I Contract sufficient to compensate Plaintiff for the services performed by Plaintiff and accepted by Defendant. Id. at ¶¶ 223-26; PA, B.49 ¶3. Thus, count 3 of the complaint does not implicate the Competition in Contracting Act. Instead, because count 3 alleges an implied-in-fact contract pursuant to which Defendant promised to put additional DFI funds on the Phase I Contract, the issue is whether the PCO had authority to make that promise. Defendant asserts no such authority existed because the Phase I Contract "had already became [sic] a contract with the IIG …." Defendant's Mem., p.15. Plaintiff responded to that argument in section III.C, supra, and incorporates that discussion herein by reference. In addition to the flimsy "transfer" theory however, Defendant's argument also relies upon other disputed issues of material fact.

Defendant's argument is contingent upon (1) the claim that the IIG alone controlled the DFI after June 28, 2004 and that under no circumstances did the PCO have authority to modify the Phase I Contract by adding additional funds and (2) there existed no other process by which

Defendant could add additional DFI funds to the Phase I Contract. Defendant's Mem., p.11. However, neither premise is correct.

While Resolution 1546 provides that the IIG will have authority over the DFI funds after June 30, 2004, it also states "the multinational force shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq." Compl., ¶ 81; DPFUF, A.35, ¶ 10. One of the specific ways in which the Multi-National Force ("MNF") was to "contribute to the maintenance and security of Iraq" was to "train and equip Iraqi security forces." Id. at ¶ 80; DPFUF, A.41-42. The MNF was and is a component of the United States Central Command. Compl., ¶ 79. Thus, the United States had the authority to use DFI funds to "train and equip Iraqi security forces" as a "necessary measure[] to contribute to the maintenance of security and stability in Iraq." The Phase I Contract, the purpose of which was to provide life support services for Iraqi police trainees at the Baghdad Public Service Academy was in direct furtherance of that objective. Accordingly, pursuant to Resolution 1546 the PCO had the authority to place additional DFI funds on the Phase I Contract if doing so was a "necessary measure" to "contribute to the maintenance and security of Iraq." Whether placing additional funds on the Phase I Contract so qualified is a question of fact to which Plaintiff is entitled to discovery.

In addition, before its termination, the CPA created another process by which DFI funds could be added to the Phase I Contract. On June 18, 2004, Ambassador Bremer signed CPA Regulation 11, which amended CPA Regulation 2, Development Fund for Iraq. Pursuant to CPA Regulation 11:

> A sub-account of the account entitled "Central Bank of Iraq/Development Fund for Iraq" shall be created. The sub-account shall be entitled "Central Bank of Iraq/Development Fund for Iraq/Transition" and (when established) shall contain funds equal to or in excess of the total amount of outstanding contractual liability against the Development Fund for

> Iraq arising out of contracts or grants funded by the Development Fund for Iraq that: (a) were entered into on or before June 30, 2004 by the [CPA]…; (b) require the continued performance and/or payment of money originating from the DFI past June 30, 2004; and (c) are not the subject of a fully-funded letter of credit …

DPFUF, A76-77, ¶ 1. If the CPA complied with its own regulation, it would have transferred into the sub-account sufficient DFI funds to pay for "the total amount of the outstanding contractual liability" against the DFI. The total amount of that liability would include funds sufficient to fully compensate for the Phase I Contract performance because the parties knew on June 20, 2004, when the Phase I Contract was signed that: (1) the NTE price of $26,000,000 unilaterally established by the CPA was insufficient to compensate Plaintiff for the work required; and (2) pursuant to standard procedures in the award of undefinitized letter contracts, the original NTE price unilaterally established by the CPA would have been one-half of the CPA's estimated cost of the definitized contract. Compl., ¶¶ 59, 60, 69, 80.[9] Thus, pursuant to CPA Regulation 11, the CPA should have placed in the sub-account "Central Bank of Iraq/Development Fund for Iraq/Transition" a total of $52 million of DFI funds for the Phase I Contract, the total estimated amount of contractual liability for the Phase I Contract. If the CPA had so funded the sub-account, it would have had the authority to pay Plaintiff up that full amount without further authorization from the IIG. See DPFUF, A.76-78. Of course, whether the CPA so funded the sub-account and if not, why, are issues of fact clearly within Defendant's knowledge and to which Plaintiff is entitled to discovery. See RCFC 56(f).

3. Even if the PCO lacked authority to enter into the implied-in-fact agreements of counts 1-3, Plaintiff may still recover.

Defendant argues, assuming that Defendant lacked authority to enter into the implied-in-fact agreements set forth in counts 1-3, that "the Government cannot be held liable for these

[9] According to the June 15, 2004 delegation letter from the IIG's Minister of Finance, the PCO had "the authority to make disbursements from [the Central Bank of Iraq/Development Fund for Iraq/Transition account] in order to carry out [its] duties." DPFUF, A.80

alleged promises," relying solely upon Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 420 (1990). Defendant's reliance is misplaced because (a) the Federal Circuit has refused to apply Richmond as broadly as Defendant's argument requires and (b) the implied-in-fact contracts at issue have been fully performed by Plaintiff. As a result, even if the Government lacked the authority to enter into the implied-in-facts contracts complained of, Defendant may still be held liable.

Initially, it is clear that Richmond may not be applied as Defendant asks. For example, as the court stated in Burnside-Ott Aviation Training Ctr., Inc. v. United States, 985 F.2d 1574, 1581 (Fed. Cir. 1993), "Richmond is limited to 'claim[s] for the payment of money from the Public Treasury *contrary to a statutory appropriation*" (emphasis in original). The Burnside-Ott decision refused to apply Richmond to that contract case, noting two distinguishing facts:

> Burnside-Ott's assertion of a right to payment of money from the Public Treasury, however, is not based upon a statutory entitlement. Burnside-Ott's assertion is instead based upon its contract with the Navy. Nor does Burnside-Ott claim entitlement contrary to statutory eligibility criteria, as did Richmond. Thus, neither the holding nor analysis in Richmond is applicable in this case …

Id. As in Burnside-Ott, Plaintiff asserts a right to payment of money from the Public Treasury based upon a contract with the Defendant. As in Burnside-Ott, Plaintiff's claim is not contrary to statutory eligibility criteria. Accordingly, as in Burnside-Ott, neither the holding nor analysis of Richmond is applicable to this case. The Federal Circuit reaffirmed this analysis in Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed. Cir. 1995), where it stated that "[i]t would be stretching Richmond totally out of context to apply it [to a contract claim]."

Moreover, Defendant's argument also completely ignores the fact that Plaintiff fully performed under the implied-in-fact agreements and that Defendant accepted such performance. Compl., ¶¶ 124, 126, 128, 137, 143, 150, 175, 183, 184, 188, 191, 202, 211, 219, 227, 233, and 251. Regardless of whether a contract is void *ab initio* or voidable as a result of some infirmity

in the procurement process, a contractor is permitted to recover for the goods or services provided to and accepted by the government. For example, in Fluor Enterprises, Inc. v. United States, 64 Fed. Cl. 461 (2005) this Court determined that the government had awarded the architectural and engineering portion of a contract in violation of 40 U.S.C. § 254(b) and found that portion of the award to be void. However, the court recognized that Fluor was nonetheless entitled to recover:

> Despite the infirmities of the actual, unenforceable portion of the contract, the court recognizes the existence of an implied-in-fact contract between Fluor and NOAA for the architectural and engineering services Fluor provided.

Id. at 495. The reasoning for such a determination was succinctly stated by the Federal Circuit and relied upon by the court in Fluor:

> Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it.

Id. (quoting United States v. Amdahl Corp., 786 F.2d 387, 393 (Fed. Cir. 1986) (quoting Prestex, Inc. v. United States, 320 F.2d 367, 373 (Ct. Cl. 1963))); see also Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed. Cir. 1995) ("[A] contractor can be compensated under an implied-in-fact contract when the contractor confers a benefit to the government in the course of performing a government contract that is subsequently declared invalid"). As stated by the court in Amdahl,

> [W]here conforming goods or services have been delivered by a contractor and accepted by the government, the contractor has been held entitled to payment, either on a *quantum valebant* or *quantum meruit* basis if the contract is void *ab initio* or to a possibly larger amount if the contract is voidable, that is, deemed valid and terminated for convenience in accordance with the contract.

Amdahl, 786 F.2d at 395. Here, the record does not yet allow a determination of upon which theory Plaintiff may rely. The record establishes only the Defendant is not entitled to the relief it

requests. Defendant's motion to dismiss or in the alternative for summary judgment, should be denied.

F. The Court has jurisdiction over Count 6, which seeks recovery under the doctrine of equitable estoppel, not promissory estoppel as argued by Defendant on brief.

Here, Defendant argues that Count 6 of the complaint should be dismissed for stating a claim under promissory estoppel for which this Court has no jurisdiction. Defendant's Mem., pp.15-16. However, Defendant again simply mischaracterizes Plaintiff's claim, this time arguing Plaintiff asserts a claim of promissory estoppel, when in fact Plaintiff asserts a claim based on equitable estoppel. It is well established that this Court has jurisdiction over claims for equitable estoppel. See, e.g., Emeco Indus., Inc. v. United States, 202 Ct. Cl. 1006 (1973) (concluding that the government was estopped from denying the existence of a contract); American Elec. Labs., Inc. v. United States, 774 F.2d 1110 (Fed. Cir. 1985) (finding government equitably estopped from benefiting from plaintiff's continued performance).

The United States Court of Appeals for the Federal Circuit requires a showing of four elements before a party can prevail on a claim of equitable estoppel against the United States:

> (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it is so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury.

JANA, Inc. v. United States, 936 F.2d 1265, 1270 (Fed. Cir. 1991). However, the Supreme Court has made it clear that "the government may not be estopped on the same terms as any other litigant." Heckler v. Cmty. Health Servs., 467 U.S. 51, 60 (1984). The Federal Circuit has interpreted this to mean that, in addition to the four elements listed above, there must also be a showing of affirmative misconduct to prevail against the government. See Zacharin v. United States, 213 F.3d 1366, 1371 (Fed. Cir. 2000); United Pac. Ins. Co. v. Roche, 401 F.3d 1362,

1366 (Fed. Cir. 2005). Plaintiff's complaint contains all five elements necessary to establish equitable estoppel against the United States.

Count 6 of the complaint alleges that the United States should be equitably estopped from refusing to add additional funds to the Phase I Contract and is clearly cognizable under this Court's precedent. First, Plaintiff alleges that the Government knew the true facts:

> Defendant knew at the time it awarded the Phase I Contract: (a) the NTE price of the contract was insufficient to accomplish the work required by the SOW; (b) it would not have authority to modify the Phase I Contract by adding additional DFI funds to the contract after June 28, 2004; (c) Laudes would be unable to provide a definitization proposal to defendant before defendant lost authority to modify the contract by placing additional DFI funds on contract; (d) the Phase I Contract did not permit Laudes to stop work upon reaching the NTE price; and (e) it wanted Laudes to continue performing notwithstanding the NTE price.

Compl., ¶ 247. Second, the complaint alleges the Government "intended that Laudes rely on [its] representations." Id. at ¶ 248. Regarding Plaintiff's knowledge at the time, the complaint states that:

> Laudes, upon execution of the Phase I Contract, did not know that defendant, as of June 28, 2004, would no longer have the authority to modify the Phase I Contract by adding additional DFI funds to the contract.

Id. at ¶ 250; see also PA, B.51 ¶8. Finally, Plaintiff alleges that it "detrimentally relied upon Defendant's representations by entering into and continuing performance of the Phase I Contract." Id. at ¶ 251. Furthermore, as required for stating an equitable estoppel claim against the United States, the complaint alleges affirmative misconduct by the Government:

> Moreover, defendant engaged in affirmative misconduct by not only withholding and misrepresenting the true nature of its authority after June 28, 2004, but also by continuing to entreat Laudes' performance, continuing to promise additional funds on the contract and continuing to increase the scope of Laudes' performance by adding additional work to the contract.

Id. at ¶ 249. Thus, Plaintiff alleges all the elements of an equitable estoppel claim against the Government. Defendant's motion to dismiss count 6 on this basis should be denied.

G. The Court has jurisdiction over count 5 because the duty breached by Defendant is grounded in privity of contract, not in tort.

In another attempt to gain dismissal of count 5, Defendant argues that the Court lacks jurisdiction over Plaintiff's claim of fraud in the inducement. Defendant is wrong. While the Tucker Act expressly provides that the Court's jurisdiction extends to cases "founded . . . upon any express or implied contract with the United States," but not those "sounding in tort," 28 U.S.C. §1491(a)(1), this Court has long recognized that tortious conduct may occur in the context of a contractual relationship, and in such instances jurisdiction under the Tucker Act will obtain. See, e.g., Summit Contractors, Inc. v. United States, 22 Cl. Ct. 54, 56-57 (1990); Schweiger Constr. Co. v. United States, 49 Fed. Cl. 188, 206 (2001).

In fact, this Court has affirmed its jurisdiction over fraudulent inducement claims in the past. In Badgley v. United States, 31 Fed. Cl. 508 (1994), the plaintiffs asserted a claim for recission of a government contract for the sale of real property, based on a theory of intentional misrepresentation. Plaintiffs asserted that "defendant knew that the building was illegal and intentionally misrepresented its status to the Buyers," who subsequently believed and relied on the government's misrepresentations. Badgley, 31 Fed. Cl. at 513. In response, the government argued that the claim sounded in tort and was therefore outside this Court's jurisdiction. The government's reasoning was that since the alleged misrepresentation occurred *before* the contract was executed, no *contractual* duty could have been breached. Id. The court rejected this argument, stating that the mere label "intentional misrepresentation" "does not in itself place the claim in the forbidden 'sounding in tort' category." Rather, the court found "this claim's basis in contract [to be] unmistakable." Id. at 513-14. The court explained:

> This claim arises from the allegation that defendant made a precontractual representation which plaintiffs believed was incorporated into the contract. The misrepresentation claim is entirely dependent on, and in fact evolves from the contract. Plaintiffs' claim is in substance a claim for breach of contract by

> misrepresentation and when the substance of the claim is in contract, subject matter jurisdiction exists under the Tucker Act even if tortious elements also exist.

Id. at 514. See also, Schweiger, 49 Fed. Cl. at 206.

Plaintiff's fraudulent inducement claim is virtually identical to the intentional misrepresentation claim in Badgley. As alleged in the complaint:

> However, both when it implied it would have the authority and when it expressly stated to Laudes that it would add additional funds to the contract, defendant knew that it would not have and, after June 28, 2004, did not have, authority to add sufficient DFI funds to fairly compensate Laudes for the work required by the Phase I Contract.

Compl., ¶ 242. See also, id. at ¶¶ 240-41. Furthermore, the complaint states that these misrepresentations induced Laudes into executing the Phase I Contract: "[b]ut for the fraudulent representations of the defendant, Laudes would not have entered into the Phase I Contract and/or would have not continued performance of the Phase I Contract." Id. at ¶ 243. Finally, it is clear from the facts alleged that Laudes was justified in relying on these representations since they exceeded mere implication: "defendant expressly stated to Laudes that it would add additional funds to the contract." Id. at ¶241.

Defendant relies on language from the Supreme Court in United States v. Neustadt, 366 U.S. 696, 706 (1961), as well as from this Court in Aetna Cas. and Sur. Co. v. United States, 228 Ct. Cl. 146, 164 (1981) and Somali Development Bank v. United States, 205 Ct. Cl. 741, 749 (1974), for the blanket proposition that "a claim of misrepresentation is a tort." Defendant's Mem., pp.16-17. That these cases are "readily distinguishable and out of touch with settled principles regarding the contract jurisdiction of this court," is not a proposition for which this court needs to take Plaintiff's word. Gregory Lumber Co. v. United States, 9 Cl. Ct. 503, 525 (1986).

In Gregory Lumber, this Court expressly distinguished Somali and Aetna as cases where "dismissal was based on the fact that the actual obligations defendant was *alleged* to have breached stemmed from *tort*, not the requisite privity of contract between the plaintiff and the government." 9 Cl. Ct. at 526 (emphasis in original). The court then concluded, "Somali and Aetna are not analogous and cannot control the results which obtain where the claims of the instant plaintiff are grounded clearly on an acknowledged privity of contract." Id. at 527. Turning to the Supreme Court's holding in Neustadt, the Gregory Lumber court deemed it irrelevant to the question of Tucker Act jurisdiction:

> [W]e question how an interpretation of the FTCA (Federal Tort Claims Act) can have any impact on an interpretation of the Tucker Act. In fact, as recently as 1980, the Supreme Court itself held that the construction of an exception to the FTCA in no way influenced 'the jurisdiction of the Court of Claims under the Tucker Act.'

Id. (citing Hatzlachh Supply Co. v. United States, 444 U.S. 460, 462-63 (1980)). In case this did not sufficiently resolve the issue, the court then cited the following passage from an earlier Court of Claims case:

> Accordingly, defendant's showing that the within case could not be brought in a district court under its Federal Tort Claims jurisdiction is really irrelevant to the jurisdictional inquiry in the Tucker Act context.

Id. (quoting Burtt v. United States, 176 Ct. Cl. 310, 314 (1966). By relying on inapposite and outdated authority, Defendant here simply seeks to avoid the contextualized inquiry that this Court undertakes to decide whether there is a nexus between contract and tort.

Under these circumstances, the Government's tortious conduct is inextricable from the underlying contractual relationship. The source of Defendant's duty is not one simply implied by tort doctrine, but rather is grounded in privity of contract between the parties, neither of whom dispute the existence of an express contract. That the tortious conduct "evolved from" the

contractual relation is undeniable. Indeed, the Government's actions in this regard cannot be understood outside of the context of the underlying contract and thus rely on the same operative set of facts. It is precisely in circumstances such as these, where the underlying action centers on a contractual agreement, that this Court has affirmed its jurisdiction under the Tucker Act. Thus the Government's argument for dismissal of count 6 should be denied.

H. The Court has jurisdiction over count 5 because count 5 relies on *quantum meruit* as a measure of damages, not a theory of recovery.

Defendant asks the Court to dismiss count 5, claiming that Plaintiff "seeks to void the contract and make itself entitled to damages by virtue of a contract implied-in-law." Defendant's Mem., p.18. Clearly, jurisdiction of this Court does not extend to contracts implied-in-law. Hercules, Inc. v. United States, 516 U.S. 417, 423 (1996). However, Plaintiff does not claim recovery under a contract implied-in-law. Here, Defendant simply confuses a *theory of recovery* with a *measure of damages*.

Defendant relies on Perri v. United States, 340 F.3d 1337 (2003), in which the court found no evidence of a contractual arrangement between the parties, and thus rejected that plaintiff's claim as seeking a contract implied-in-law. Id. at 1344. In its summary of Perri, Defendant argues that although the Federal Circuit has recognized claims of *quantum meruit* in the past, the court "distinguished those cases as involving the Government's attempting to void an express contract after it had received services." Defendant's Mem., p.19. A more careful reading of the opinion shows that the court did not so limit its holding and, instead, stated that "We know of no case, however, and Perri has not cited any, in which . . . we . . . [have] permitted quantum meruit recovery in the absence of *some contractual arrangement* between the parties." Perri, 340 F.3d at 1344 (emphasis added).

Consistent with Perri, this Circuit has consistently shown that this Court has jurisdiction to entertain a claim for a *quantum meruit* measure of damages under contracts implied-in-fact. For example, in United States v. Amdahl, the Federal Circuit stated:

> Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit basis . . . The contractor is not compensated under the contract, but rather under an implied-in-fact contract.

786 F.2d 387, 393 (Fed. Cir. 1986). Similarly, in Gold Line Refining, Ltd. v. United States, this Court stated that "[t]he Court of Appeals for the Federal Circuit has recognized the equitable remedy of quantum meruit as a basis of recovery under an implied-in-fact contract." 43 Fed. Cl. 291, 295 (1999) (citing Urban Data Sys., Inc. v. United States, 699 F.2d 1147, 1154 (Fed. Cir. 1983)). See also Farmers Grain Co. of Esmond v. United States, 29 Fed. Cl. 684 (1993) (grain storage company's action, claiming a *quantum meruit* measure of damages, deemed a contract implied-in-fact within the Court's jurisdiction). Thus there can be no question that this Court has jurisdiction to apply a *quantum meruit* measure of damages when based on an underlying contractual relationship.

In count 5 of its complaint, Plaintiff claims it was fraudulently induced into entering into a contract with the Government, and thus is owed damages measured on a *quantum meruit* basis. Compl., ¶ 245. Defendant simply ignores the fact that Plaintiff has asserted all its claims based on contract, making the same mistake the government made in Gold Line Refining by latching onto the phrase "*quantum meruit*" as if the mere invocation of the term were enough to convert a contract implied-in-fact into a contract implied-in-law. Plaintiff does not ask this Court to imply a contract in law as an equitable theory of recovery. Defendant's motion to dismiss count 5 on this basis should be denied.

I. There is no basis to dismiss or grant summary judgment as to count 5 of the complaint; Plaintiff received neither actual nor constructive notice of the "public actions" alleged by Defendant.

Finally, Defendant contends that Plaintiff's "fraud in the inducement" claim is unsupportable because prior to signing the Phase I Contract "two public actions had occurred to put Laudes upon [sic] notice that the United States would lose" authority to place additional DFI funds on the Phase I Contract. Defendant's Mem., p.19. The two "public actions" upon which it relies are Resolution 1546 and CPA Memorandum 15. Defendant's argument fails for two reasons. First, Plaintiff received neither actual, PA, B.50 ¶6, nor constructive notice of either action. Second, even if it had received notice, neither "public action" supports Defendant's argument.

1. Plaintiff received neither actual nor constructive notice of either Resolution 1546 or CPA Memorandum 15.

Defendant does not allege that Plaintiff had actual notice of either of the two "public actions." Instead, Defendant argues by implication that Plaintiff had constructive notice of CPA Memorandum 15 because that regulation was, according to Defendant, available on the CPA website no later than June 19, the day before the Phase I Contract was signed. Defendant's Mem., p.19. Defendant does not identify how Plaintiff purportedly received constructive notice of Resolution 1546. Regardless, Defendant's argument regarding constructive notice must fail.

The Court may presume that Plaintiff has constructive notice of federal statutes and items published in the Federal Register. "Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947); see also 44 U.S.C. § 1507. However, Defendant provides no authority for the proposition that either Resolution 1546 or CPA Regulation 15 is entitled to

the same presumption and Plaintiff had no actual knowledge of either. PA, B.50-51. As a result, Defendant's assertion that these two "public acts" provided notice to Plaintiff is both factually and legally incorrect. For this reason alone, Defendant's motion should be denied.

2. Neither Resolution 1546 nor CPA Memorandum 15 can reasonably be interpreted to deny Defendant the authority to add additional DFI funds to the Phase I Contract.

Even if Plaintiff had read either Resolution 1546 or CPA Regulation 15 prior to signing the Phase I Contract, it still would not have been on notice that either prevented the CPA from later adding additional DFI funds to the Phase I Contract. Instead, both documents show that Defendant retained such authority.

While Resolution 1546 states that the IIG would have authority over DFI funds after June 30, 2004, it also states "the multinational force shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq." See Compl., ¶ 81. As discussed earlier, one of the specific ways in which the Multi-National Force ("MNF") was to "contribute to the maintenance and security of Iraq" was to "train and equip Iraqi security forces." Id. at ¶ 80; DPFUF, A.41-42. This particular mission was a very high priority for the MNF and the IIG. Compl., ¶¶ 29-34. According to Brigadier Mackay,[10] success at the BPSA was vital to "send a very clear signal" that the MNF was "totally committed to assisting" the Iraqi police training mission. Id. at ¶ 34; PA, B.44 ¶9. Prior to executing the Phase I Contract, Plaintiff met with Brigadier Mackay who emphasized to Plaintiff the importance and urgency of the Phase I Contract performance. Comp., ¶ 55; PA, B.47 ¶13. When the parties were executing the Phase I Contract on June 20, 2004, the government also assured Plaintiff that additional funding would be provided to compensate Plaintiff fully. Comp., ¶ 67. Accordingly, given the

[10] Brigadier Mackay was appointed by Lieutenant General Sanchez to head the Police Working Group. Compl., ¶ 31.

language of Resolution 1546, the importance of the mission supported by the Phase I Contract and the representations of both Brigadier Mackay and the contracting officer, Resolution 1546 could not have provided the notice Defendant claims it must.

CPA Memorandum 15 fares even worse. Defendant does not identify any language in that memorandum that it believes provided notice that Defendant would no longer have authority to place additional DFI funds on the Phase I Contract. Instead, it asks the Court to infer its presence.

CPA Memorandum 15 amended CPA Memorandum 4, Grants and Contract Procedures. DPFUF, A.74-75. The amendment provides that the IIG may designate Defendant to "certify and/or make payments" with "monies from the Development Fund for Iraq" for contracts entered into by the CPA on or before June 30, 2004. However, CPA Regulation 11[11] provides that the account from which the Phase I Contract would be paid

> shall contain funds equal to or in excess of the total amount of outstanding contractual liability against the Development Fund for Iraq arising out if contracts or grants funded by the Development Fund for Iraq that: (a) were entered into on or before June 30, 2004 by the Coalition Provisional Authority…; (b) require the continued performance and/or payment of money originating from the DFI past June 30, 2004; and (c) are not the subject of a fully-funded letter of credit intended to otherwise ensure performance under the contract or grant.

DPFUF, A.76-77, ¶ 1. Reading these two documents together,[12] it is clear that Plaintiff could have reasonably believed that Defendant would have been able to add additional DFI funds to the Phase I Contract, particularly given that, at the time the Phase I Contract was executed, the parties knew the amount then obligated to the Phase I Contract was insufficient to perform the work required by the contract. Compl., ¶¶ 69, 75, 206, 216, 240, 247, 257, and 261. As a result,

---

[11] Ambassador Bremer signed CPA Regulation Number 11 on June 18, 2004, the same day he signed CPA Memorandum 15. DPFUF, A.78.

[12] To the extent the Defendant assumes Plaintiff had read CPA Memorandum 15, it must also assume Plaintiff had read CPA Regulation 11.

even if Plaintiff had received at least constructive notice of CPA Memorandum 15, it would not have received the notice Defendant claims.

## V. CONCLUSION

Defendant's motion to dismiss or, in the alternative, for partial summary judgment, should be denied in its entirety. In large part, Defendant's arguments are based on a complaint that Plaintiff did not file. When Defendant does address the claims Plaintiff actually makes, it ignores—but does not contradict—key factual allegations in the complaint, including the fact that Plaintiff seeks only to payment for goods and services actually delivered to and accepted by Defendant.

Plaintiff's allegations, which must be taken as true to the extent they are not contested by Defendant, establish this Court's jurisdiction. And in the very few instances in which Defendant contests Plaintiff's factual assertions, Defendant succeeds only in demonstrating there exist disputed issues of fact precluding dismissal or summary judgment. Defendant's motion to dismiss or, in the alternative, for partial summary judgment should be denied in its entirety. If not denied outright, the Court's ruling should be deferred to permit Plaintiff discovery to develop the facts necessary to full respond to Defendant's arguments under both RCFC 12(b)(1) and 56(f).

DATED this 12th day of July, 2007.

By: s/Mark G. Jackson
Mark G. Jackson, WSBA #18325

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for Plaintiff