# DECLARATION OF BRIGADIER ANDREW MACKAY OBE

Brigadier Andrew Mackay deposes and says:

1. I currently am Commander of the 52nd Infantry Brigade, which in turn is part of the United Kingdom's Armed Forces. During 2004 I was stationed in Iraq and was the first Commanding General of the Civilian Police Assistance Training Team (CPATT), with the responsibility of organizing, equipping, training and mentoring the Iraqi Police Service. This programme was, in effect, charged with completely re-building the Iraqi Police. I have personal knowledge of the facts stated below.

2. I was posted – on promotion to Brigadier - to Iraq in the first week of February 2004. The purpose of my posting was to serve in the office of LTG Kellog (a retired US officer) who was the Deputy Chief of Operations and as such responsible directly to Ambassador Paul Bremer who headed up the Coalition Provisional Authority (CPA). The job I was posted into had been unoccupied for a number of weeks and it was quickly apparent to me that there was no clearly identifiable role nor was there likely to be. LTG Kellog and his team were moving on at the end of March 04 and I was not prepared to sit around and wait until the end of March for precise definition of my role to be made. This in itself was not, to me, problematic. In post conflict countries there is an organizational fluidity as they tend to be relatively dysfunctional in their day to day operation and the CPA was no exception. This meant that posts and roles were often changing. Because of my previous experience in post conflict countries I was able to recognize this and able to adapt accordingly. I made this view clear to the senior British Major General who occupied a role within CJTF-7 and basically took the line that we (the UK) should either develop an appropriate role for a one-star or call it quits and send me home.

3. My arrival in Iraq had however coincided with growing unease within Washington about the slow build up of Iraqi Police (IPS) capability. It was felt that the IPS had been neglected and there was a gradual realization that this could not continue if we were to tackle the growing insurgency that been identified and slowly building up from the summer of 2003. In January 2004 the United States sent Major General Karl W. Eikenberry to examine the problem and make recommendations. That month he published a report recommending that a coherent organizational model was required if we were to tackle the development of the IPS properly. He compared the incoherence of the police model with the coherence of how the rebuilding of the Iraqi army had been tackled through the setting up of the Coalition Military Assistance Training Team (CMATT) which was well staffed, had a clear mission and was well resourced. He recommended that a police equivalent be created and that, critically, it be set up under command of the military, not the Coalition Provisional Authority. The report recommended that a Civilian Police Assistance Training Team (CPATT) be created but that it also sit within an Office of Security Cooperation (OSC) within which would also sit CMATT. The OSC actually became the Multi National Security Transition Command Iraq (MNSTCI) in June 2004 with the arrival of LTG Petreaus who had been selected to command the new organization. LTG Petreaus effectively became my commander as his new organization contained both CMATT and CPATT with him as the overall Commanding General.

4. In February 2004, in anticipation of the formal establishment of CPATT, Lieutenant General Ricardo Sanchez who was the Commanding General of CJTF-7 had decided to set up a Police Working Group in order to ensure concurrent activity and anticipate the formal action to set up CPATT that had been recommended in the Eikenberry report. It was therefore entirely coincidental that I was informing my Major General about the lack of a role for a one-star in LTG Kellog's outer office there had been discussion about setting up the Police Working

Group. I was asked if I would be willing to lead the Police Working Group partly because I was available but also because I had relevant experience from Bosnia and Kosovo and as a young man – and prior to joining the Army - had served as an inspector in the Royal Hong Kong Police. This latter fact was not the reason I was asked – the Bosnia and Kosovo experience was much more relevant – but it did mean that at the very least there was a understanding of what being a police man was about. As the Police Working Group was the initiative of the CG CJTF-7 it was decided that I would work directly to General Sanchez.

5. The formal U.S. Government direction to Ambassador Bremer came later in February, with a memo by the U.S. Secretary of Defense, Donald Rumsfeld, that directed U.S. Central Command to take on the organise, train, equip, and mentor mission for the Iraqi Police Service and Border Police. This, in effect, meant that both CMATT and CPATT would report to CG CJTF-7 and then on transition to CG MNF-I.

6. As part of the Police Working Group I was charged with reporting back to CG CJTF-7 on 07 March 2004 with my initial findings and more importantly my recommendations on the way ahead. In summary I reported the following:

- Facing strategic failure in delivering an effective police force
- Current emphasis is on quantity not quality
- Not clear what an 'effective' policeman is
- We need to reverse the situation in time for elections in 2004
- Introduce ability to maneuver police forces around Iraq
- Police and border infrastructure very poor
- Introduce broad range of policing capability/specialist courses
- Accelerate training output but not at the cost of quality. We effectively needed to double capacity at the Baghdad Police Academy from 1000 to 2000.
- Substantially involve Iraqis more
- Entire funding/resource situation needs major overhaul
- Build a police counter-insurgency force
- Substantially reform Ministry of the Interior

- Ensure CPA conduct justice and prison reform concurrently
- No centralized coordination or control either within the CPA or the MoI. 1 year has been wasted
- No overall policy, no vision, no real control. Organise element of mission needs urgent attention
- Running out of time – we need IPS to counter to insurgency and be ready for the elections
- Supplemental budget needs to be harnessed – not a single statement of requirement has yet been made
- Expect opposition from CPA who view this as a civil not military function

7. In essence a wholescale reform process was required. I also recommended that we form CPATT immediately and although we would experience any number of difficulties associated with a compressed timsescale we should get on with it without delay. LTG Sanchez had no difficulty in agreeing to this and gave the formal go ahead that we formally set up CPATT on 09 March 2004.

8. The weeks following the setting up of CPATT were, to say the least, extremely challenging. There was much to do and the insurgency was beginning to take serious hold. There was a multitude of tasks that were required and we had to turn a dysfunctional, incoherent and badly managed approach into one that had organizational structure, coherence and most importantly of all started to deliver genuine capability to the Iraqi Police Service. A key aspect and an area I concentrated on was dramatically improving, in short order, the infrastructure, capacity and resourcing of the Baghdad Police Service Academy (BPSA). It was very clear to me that we needed to ramp up capacity whilst delivering quality training. My initial thoughts that we should double capacity from 1000 to 2000. The reality was that this would eventually become close to 4000. It is also important to understand that with a capacity of 2000 this represented a through put in excess of 16,000 a year. The basic police course was 6 weeks and we eventually ramped throughput up to 6 - 7 courses a year. We also ran several other courses involving the

Facilities Protection Service through the BPSA. This led, eventually, to the throughput being in excess of 16,000 a year.

9. At this juncture the Project and Contracting Office (PCO) were, like me, scrambling to keep pace with developments. I had identified very early on that CPATT's future productivity would be closely allied to our ability to harness the collective PCO resources. These were very stretched and although the situation gradually improved I directed my staff to form close working relationships with the staff of PCO in-order that we could define our requirements, assist PCO in any information requirements they had in putting the tendering process together and generally remain continually and constantly engaged in-order that we could push things along. The CPATT requirements were many and varied and were primarily associated with equipment which ranged from vehicles to radios to uniforms to weapons. We also set up a number of training establishments including a training base for the Emergency Response Unit close to the airport. I relate this as we need to put into context the role I played in relation to the BPSA. In essence I wanted capacity to be doubled and I wanted it to be done ASAP. We set a date of August 2004 and my main interest thereafter was ensuring that the tendering and contracting process met that deadline. The BPSA was, therefore, but a small part in the overall effort but was key to my plans. I wanted to demonstrate success at the BPSA as it would send a very clear signal to the IPS that we were serious and totally committed to assisting them.

10. The PCO were keen, from the outset, to ensure that the contract for the BPSA was put out to tender. I had no difficulty with this provided the various timelines met my requirement of doubling capacity by August 2004. I was in no doubt that meeting this deadline would be very tight. The infrastructure build plus the life support package would not be easy against a backdrop of the growing insurgency and the fact that the BPSA was beginning to be targeted by infrequent mortar fire.

11. My recollection is that after a short tendering process the contract was awarded to a company called Balloch and Roe Services. I had kept in touch with the tendering process but did not give any real attention to who the various bidders were. I was aware that Laudes Corporation were bidding as they had established a very good reputation with CMATT and the life support they had offered to the Iraqi Army. At that point however I had not met Mr Larry Underwood. As soon as the contract was awarded to Balloch and Roe I asked that the head of the company – Mr Brent Balloch - come to meet me. I wanted to impress upon him the urgency of the task, make sure he understood the tight deadlines he would be operating under and ensure that the working relationship between CPATT and his company was a good one. I very clearly recall telling him that if he ran into difficulties in meeting the deadlines I needed to know as there was a long recruiting tail and a very complicated process involved with getting recruits from around Iraq to the BPSA. It could not be switched on and off and I therefore needed advance warning of difficulties or problems that were not going to be solved. I was given emphatic assurances that there would be no delays and that Balloch and Roe were firmly established in Iraq and foresaw no difficulty in delivering the service they had been contracted to deliver. At the time my instincts told me that the company had probably taken on more than they could handle. I thought some of the assurances were made off the cuff and as I discussed the project their answers to some of my questions were not substantial. Never the less I was keen to press on but instructed my staff and the staff within MNSTC-I that I wanted the contract and deliverable to be monitored very carefully. In essence I had a small alarm bell ringing in my head. I cannot recall what date, precisely, the first problem with Balloch and Roe arose but I was quick to summons Mr Balloch to my office. I was given reassurances but my experience told me that they were not substantial and the project was beginning to run into problems. I again instructed my staff to monitor the contract and to inform me as soon as an agreed deliverable was

not met. I cannot recall what, precisely, this was but it occurred soon after the meeting. I then initiated a meeting with my staff and PCO to determine what our options were if Balloch and Roe continued to default on the delivery of the contract. At that time I was unclear what the procedures would be and what formal mechanisms would be adopted. I was particularly anxious that if Balloch and Roe were formally removed from the contract that there should be a seamless transition to whoever would follow.

12. Contracting issues were totally within the province of the United States Government, handled exclusively by the Project and Contracting Office (PCO). At that time the contracting officer was Major Lloyd Blackmon. He struck me as a particularly able officer who tried his level best but at the same time stuck to the rules. I would admit that at the time I found the various procedures cumbersome and time consuming but had realized very early on that if you tried to go around them or ignore them it would ultimately slow the process down. I also enjoyed a good working relationship with Brigadier General Steve Seay, Commanding General, Joint Contracting Command – Iraq who again was a very able officer operating in incredibly difficult circumstances. I leant on him for advice and he was particularly helpful in assisting me and by extension CPATT.

13. At the time of pushing for Balloch and Roes removal from the contract I was utterly dependant on following the advice given to me by PCO and in particular Major Blackmon. It was clear that it would be a PCO responsibility in terminating Balloch and Roe Services contract. I just wanted it done properly but without delay. My recollection is that PCO were required to go through a series of written warnings to Balloch and Roe about nonperformance. If I recall correctly this was principally about the non availability of classrooms. Owing to the delays I had switched the uplift in capacity to recruits from Baghdad which removed the requirement for accommodation as the recruits would return home every

evening. This also met the priorities for training that had gradually evolved as we began to understand the nature of the ongoing insurgency and the strategic importance of Baghdad as a centre of gravity for the collective coalition effort. At some point Balloch and Roes contract was removed and I was informed that Laudes Corporation had agreed or appointed to serve the contract. I had no say in that decision and frankly was not particularly interested in who got the contract – I just wanted the work done to the required standard in the agreed timeframe. As with Brent Balloch I then requested Mr Underwood to come and see me. I wanted him to understand the importance I attached to the development of the BPSA, the delays we had suffered and the requirement for timely delivery. At that time I did not know Mr Underwood or his company. But I made it very clear I could not have a repeat performance that meeting the demands of the contract, on time, were critical and that I expected him to maintain a close working relationship with my staff and to alert us to any problems or possible delays. I have to say his manner, demeanour, approach and attitude were markedly different. It was clear that he was very confident his company had the where withal to deliver, that we would be kept informed and that the working relationship would be far more productive.

14. The differences were immediate and my recollection is that progress with the infrastructure picked up within the first week. Laudes Corp proved to be exceptionally reliable and I cannot recall any occasion where having made a commitment to a particular timeline they failed to deliver. In these complex post conflict environments trust is incredibly important and much of what eventually gets done is down to establishing appropriate working relationships. Mr Underwood certainly gained my trust and as a result the ongoing work that he was involved with at the BPSA began to slip off my radar screen as I was content that what we wanted was being delivered. Whenever I visited the BPSA - which was probably about twice a month to attend passing out parades and/or have meetings with the Iraqi head of the BPSA - there would

be visible improvements to the infrastructure. Most importantly of all capacity was being increased. It is also important to understand that the BPSA was now being regularly mortared and as a result we changed the specification of some of the buildings Laudes Corp were constructing We wanted, essentially, a stand off capability on the roofs of buildings which necessitated a second skin being built on top of the existing roofs. This was not in the original requirement but Mr Underwood agreed to get on with the work and allow the necessary changes to the contract to follow on. Mr Underwood was also operating under extremely difficult security related circumstances and I discussed his own personal safety on more than one occasion. My purpose in doing so was two fold. On the one hand I liked him, appreciated the work he was doing on behalf of my organization and was appreciative of the goodwill he continually demonstrated in responding to our requirements. On the other hand I was concerned that if he was seriously injured or worse killed the work on the BPSA would ground to a halt as it was very clear who was driving the work.

15. My understanding of the purpose behind the request for me to produce this statement is that Laudes Corp has yet to be paid for the work they undertook at the BPSA in 2004. I am unaware why this is so and frankly very disappointed to hear that this is the case. Laudes Corp do not deserve to be treated in this manner and I am therefore perfectly content to provide my recollections of that particular period in 2004.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of October, 2006.

Brigadier Andrew Mackay
Commander
52 Infantry Brigade

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LAUDES CORPORATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 07-4C<br>(Judge Thomas C. Wheeler) |

DECLARATION OF LAWRENCE M. UNDERWOOD

Lawrence M. Underwood declares and states under penalty of perjury as follows:

1. The following is based upon my own personal knowledge and I could testify competently as to these matters if called upon to do so.

2. During 2004 and 2005, I was the Executive in Charge of Laudes Corporation ("Laudes") with regard to matters in connection with that certain project in Baghdad, Iraq, commonly known as the Baghdad Public Service Academy ("BPSA").

3. Prior to June 2004, as well as thereafter, Laudes provided a variety of services to the Government of the United States ("USG") in connection with projects other than the BPSA. The contracting arrangements for these services were handled by contracting officers at the Coalition Provisional Authority ("CPA"). While most of the services were provided pursuant to written documentation, in some cases Laudes provided the USG goods and services upon its request without documentation or a written contract with the clear understanding that a written contract and payment would follow delivery of the agreed upon goods and services. For example, in late 2004 and early 2005, the USG requested that Laudes provide approximately $23,000,000 worth of life support services for The New Iraqi Army at different locations, weapons and related



Jul 11 07 05:55p +87076451389 p.1

materials in connection with a non-BPSA related operations. Laudes delivered the goods and services prior to receipt of any contract. However, after delivery, Laudes received both a contract and payment for those goods and services.

4. I did not use the CPA website to obtain information about upcoming CPA procurements and for three principal reasons. First, virtually all information regarding upcoming procurements was provided to me directly, either by e-mail or in person, from CPA or other USG personnel who requested that Laudes provide a bid or proposal for the goods or services. Second, I was simply too busy working to check the CPA website. Third, the internet service in Iraq was, understandably, not very good. As a result, download times for accessing any information on the CPA website made it impracticable to obtain information from that source. It was simply easier and more timely to obtain the information directly.

5. For example, I did not receive information regarding the BPSA contract from the CPA's website. Instead, the CPA contacted me directly and requested that I provide an estimate for a certain scope of work and, later, the CPA asked me directly to provide both a proposal for the BPSA contract and, still later, to take over the BPSA contract from the original awardee. It is that last contact that resulted in the Phase I Contract which is part of this case.

6. Prior to signing the Phase I Contract for the BPSA scope of work, I had neither heard of nor read either United Nations Security Council Resolution 1546 or CPA Memorandum 15.

7. At no time from June 20, 2004, or thereafter, did any USG personnel ever inform me that the Phase I Contract would be or was transferred to or assumed by the

Interim Iraqi Government ("IIG"). Nor did any USG, CPA or PCO personnel ever request that Laudes agree to have the Phase I Contract transferred to or assumed by the IIG. I first learned that the USG was taking that position upon reading the motion to dismiss filed by the USG in this case.

8. On 28th June 2004, I was informed by CPA they were not authorized to sign future contracts using Iraqi funds, therefore, a contract signed earlier in the day would be cancelled. However, no one ever indicated anything about existing contracts.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

DATED this 11th day of July, 2007, at Beirut, Lebanon

Lawrence M. Underwood

LAWRENCE MONROE UNDERWOOD JR.



Jul 11 07 05:56p M/Y SCALA +87076451389 p.3