No. 07-4C
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LAUDES CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL DISMISSAL OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR DISCOVERY PURSUANT TO RCFC 56(f)**

PETER D. KEISLER
Assistant Attorney General

JEANNE D. DAVIDSON
Director

FRANKLIN E. WHITE, Jr.
Assistant Director

J. REID PROUTY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
Tele: 202-305-7586
Fax: 202-514-7969

August 1, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

**CASES** **PAGE(s)**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Our Moving Brief Set Forth The Proper Standard Of Review . . . . . . . . . . . . . . . 2

A. Counts I, III, V, VI, and VII Of Laudes's Complaint Seek Liability Based Upon The Actions Of The CPA . . . . . . . . . . . . . . . . 3

B. The Tucker Act's Limitations Upon The Court's Authority Preclude Review Of Actions Taken By The CPA . . . . . . . . . . . . . . . . . . . 5

III. All Actions Regarding The Phase I Contract Taken Subsequent To June 30, 2004, Are Attributable To The Government Of Iraq, Not The United States, And Thus Not Within The Ambit Of The Tucker Act . . . . . . . . . . . . . . . . . . . . . . 9

A. There Is No Real Dispute That, Upon Dissolution Of The CPA, All DFI-Funded Contracts Became The Responsibility Of The IIG . . . . . . . . 9

B. The CPA Possessed The Authority To Transfer Responsibility To The IIG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1. Laudes Was Aware Of The Imminent Replacement Of The CPA By The IIG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

2. The Doctrine Of Sovereign Acts Governs The Transfer Of Responsibility From The CPA To The IIG . . . . . . . . . . . . . . 13

IV. Laudes's Claims Regarding Alleged Contracts-Implied-In-Fact Prior To The Execution Of The Phase I Contract Are Not Cognizable . . . . . . . . . . . 15

V. Laudes's Claims, Alleging The Existence Of Implied-In-Fact Contracts Promising That It Would Be Awarded Additional Contracts And Funding, And That The United States Was Estopped From Not Providing It Money, Are Precluded By Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A. Agents Of The United States Did Not Possess The Authority To Make The Implied-In-Fact Contracts Alleged By Laudes . . . . . . . . 17

**TABLE OF CONTENTS**
**-continued-**

**CASES** **PAGE(s)**

B. No United States Government Officer Possessed Authority To Add Iraqi Money To The Phase I Contract . . . . . 20

VI. Count VI Of Laudes's Complaint, Estoppel, Must Be Dismissed For Lack Of Jurisdiction . . . . . 21

VII. Count V Of Laudes's Complaint, Fraud In The Inducement, Is Outside Of This Court's Jurisdiction Because It Sounds In Tort . . . . . 22

VIII. Count V Of Laudes's Complaint Must Be Dismissed Because It Seeks The Remedy Of A Contract Implied-In-Law . . . . . 23

IX. Count V Of Laudes's Complaint, Fraud In The Inducement, Is Unsupportable Because Limitations Upon Future Authority To Modify DFI-Funded Contracts Were Publicly Known At The Time The Phase I Contract Was Entered . . . . . 24

A. Laudes Was Upon Constructive Notice Of UNSCR 1546 And CPA Memorandum 15 . . . . . 25

B. The Texts Of UNSCR 1546 And CPA Memorandum 15 Would Inform The Reasonable Reader That The IIG Was Assuming Full Authority Over The DFI . . . . . 25

X. The Court Should Deny Laudes's RCFC 56(f) Motion . . . . . 26

A. The Standard Of Review . . . . . 26

B. Laudes's Affidavit Does Not Establish That The Requested Discovery Would Create A Disputed Material Fact . . . . . 27

1. Laudes Needs No Discovery Regarding The Availability Of Appropriated Funds To Pay For Judgments Resulting From Actions Of The CPA In Administration Of DFI-Funded Contracts . . . . . 27

2. Laudes Needs No Discovery Related To The Transfer Of Responsibility For The Phase I Contract From The CPA To The IIG . . . . . 27

**TABLE OF CONTENTS**
**-continued-**

**CASES** **PAGE(s)**

3. Laudes Needs No Discovery Regarding The PCO's Authority To Enter The Alleged Implied-In-Fact Contracts . . . . . . . . . . . . 28

4. Laudes Needs No Discovery Upon Our Defense That Its Fraud Claim Is Barred Because CPA Memorandum 15 Was Placed Upon The CPA's Website . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

ASEDAC v. Panama Canal Comm'n,
453 F.3d 1309 (11th Cir. 2006) . . . . . . . . . . 7, 8

Aero Union Corp. v. United States,
47 Fed. Cl. 677 (2000) . . . . . . . . . . 26

Aetna Cas. and Sur. Co. v. United States,
655 F.2d 1047 (Ct. Cl. 1981) . . . . . . . . . . 22

Allen v. United States,
100 F.3d 133 (Fed. Cir. 1996) . . . . . . . . . . 5

Atkins v. Parker,
472 U.S. 115 (1985) . . . . . . . . . . 13

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir. 1990) . . . . . . . . . . 15, 16

Badgley v. United States,
31 Fed. Cl. 508 (1994) . . . . . . . . . . 22, 23

Bell Atlantic v. Twombly,
127 S. Ct. 1955 (2007) . . . . . . . . . . 2

C.W. Over & Sons v. United States,
44 Fed. Cl. 18 (1999) . . . . . . . . . . 26

Cincinnati Soap Co. v. United States,
301 U.S. 308 (1937) . . . . . . . . . . 8

Conley v. Gibson,
355 U.S. 41 (1957) . . . . . . . . . . 2

D.F.K. Enters., Inc. v. United States,
45 Fed. Cl. 280 (1999) . . . . . . . . . . 23

D.V. Gonzalez Electric & General Contractors, Inc. v. United States,
55 Fed. Cl. 447 (2003) . . . . . . . . . . 23

**TABLE OF AUTHORITIES**
-continued-

**CASES** **PAGE(s)**

Deming v. United States,
1 Ct. Cl. 190 (1865) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Eliel v. United States,
18 Cl. Ct. 461 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Empresas Electronics Walser, Inc. v. United States,
650 F.2d 286 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Federal Crop Ins. Corp. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25

Flexfab, LLC v. United States,
424 F.3d 1254 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24

Froemming Brothers, Inc. v. United States,
108 Ct. Cl. 70 F. Supp. 126 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Gregory Lumber Co. v. United States,
9 Cl. Ct. 503 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Hanlin v. United States,
316 F.3d 1325 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Heckler v. Community Health Services of Crawford County, Inc.,
467 U.S. 51 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Hercules, Inc. v. United States,
516 U.S. 417 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Horowitz v. United States,
267 U.S. 458 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ITT Fed. Support Services v. United States,
531 F.2d 522 (Ct. Cl. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

JANA v. United States,
936 F.2d 1265 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**TABLE OF AUTHORITIES**
-continued-

**CASES** **PAGE(s)**

Jackson v. United States,
12 Cl. Ct. 3636 (1987) . . . . . . . . . . 5

L'Enfant Plaza Properties, Inc. v. United States,
668 F.2d 1211 (Ct. Cl. 1982) . . . . . . . . . . 5, 6

Office of Personnel Management v. Richmond,
496 U.S. 414 (1990) . . . . . . . . . . 16, 19

Perri v. United States,
340 F.3d 1337 (Fed. Cir. 2003) . . . . . . . . . . 19, 24

Simmons Oil Corp. v. Tesoro Petroleum Corp.,
86 F.3d 1138 (Fed. Cir. 1996) . . . . . . . . . . 26

Sinclair v. United States,
56 Fed. Cl. 270 (2003) . . . . . . . . . . 21

Somali Development Bank v. United States,
508 F.2d 817 (Ct. Cl. 1974) . . . . . . . . . . 22

Sun Oil v. United States,
572 F.2d 786 (Ct. Cl. 1978) . . . . . . . . . . 14

United States v. Amdahl,
786 F.2d 387 (Fed. Cir. 1986) . . . . . . . . . . 20

United States v. Winstar,
518 U.S. 839 (1996) . . . . . . . . . . 14

Walter Dawgie Ski Corp. v. United States,
30 Fed. Cl. 115 (1999) . . . . . . . . . . 13, 14

Wilson v. United States,
11 Ct. Cl. 513 (1875) . . . . . . . . . . 14

Wood v. United States,
961 F.2d 195 (Fed. Cir. 1992) . . . . . . . . . . 22

Zacharin v. United States
213 F.3d 1366 (Fed. Cir. 2000) . . . . . . . . . . 21

**TABLE OF AUTHORITIES**
-continued-

**STATUTES** **PAGE(s)**

10 U.S.C. § 2304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

41 U.S.C § 612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAUDES CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07-4C |
| v. | ) | |
| | ) | (Judge Wheeler) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL DISMISSAL OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR DISCOVERY PURSUANT TO RCFC 56(f)

In our motion for partial dismissal or, in the alternative, for partial summary judgment, we provided multiple reasons why those counts of the complaint related to the "Phase I" contract should be dismissed or judgment entered in favor of the United States upon them. In summary, we explained that actions taken by the Coalition Provisional Authority ("CPA") upon contracts funded with Iraqi money (like the Phase I contract) and actions taken by the Iraqi Interim Government ("IIG"), which assumed responsibility of performance of the Phase I contract upon the dissolution of the CPA, should not be subject to this Court's jurisdiction. We also demonstrated that the amorphous implied-in-fact contracts alleged by plaintiff, Laudes Corporation ("Laudes"), could not act to add funds to the Phase I contract because these alleged contracts were beyond the authority of United States personnel to create and were precluded by the Phase I contract, itself, which was controlling since it was an express contract covering the same subject area. We further demonstrated that claims of fraud and promissory estoppel are not properly before this Court and should be dismissed. Finally, we demonstrated that Laudes's fraud claim could not survive because publicly available facts would have placed Laudes on

notice of the facts allegedly withheld. As we demonstrate herein, Laudes's response generally misconstrues our arguments and errs upon the law.

## ARGUMENT[1]

### I. Our Moving Brief Set Forth The Proper Standard Of Review

Our moving brief set forth the proper standard of review, acknowledging the evidentiary burdens upon the Government in Rule of the United States Court of Federal Claims ("RCFC") 12(b)(1), RCFC 12(b)(6) and RCFC 56 motions. We note, however, that the Supreme Court has recently clarified that the 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41 (1957) should be replaced. In Bell Atlantic v. Twombly, 127 S. Ct. 1955 (2007), the Supreme Court held "stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest that" relief could be granted, and that plaintiff must make "allegations plausibly suggesting (not merely consistent with)" the alleged legal injury. Id. at 1965-66.

### II. No CPA Actions Upon The Phase I Contract Are Currently Subject To The Tucker Act

In our moving brief, we demonstrated that the limitations upon the Court's authority pursuant to the Tucker Act precluded holding the United States Government responsible in this Court for actions taken by the CPA in administering Development Fund For Iraq ("DFI") -

---

[1] In our moving brief, we relied upon the separately-filed "Defendant's Proposed Finding Of Uncontroverted Facts" for purposes of both the motion to partially dismiss and our alternative motion for partial summary judgment. Laudes has filed no separate response to our individual proposed findings of uncontroverted fact and has not filed its own additional proposed findings of uncontroverted facts. Instead, Laudes has included in the body of its response a statement of facts that refers, in large part, to the allegations contained its complaint in this case, for evidentiary support. We will address those statements of fact filed by Laudes that are relevant to the particular components of our motion when we address Laudes's opposition arguments.

funded contracts. This argument is based upon the fact that there are no funds appropriated by Congress with which to pay any of the CPA's liabilities upon DFI-funded contracts and Congress never assigned the CPA's liabilities to any successor agency. We further explained that this argument was analytically similar to the "NAFI doctrine," but not the same as that doctrine.

In response, Laudes argues that the vast majority of the allegations in its complaint related to the Phase I contract are not related to actions of the CPA, but were actions taken by the United States Government Project Contracting Office ("PCO"), that should be subject to the Tucker Act. Pl. Resp. 12-13.[2] Moreover, Laudes asserts that our argument relating to the source of funding for payment of a judgment is incorrect as a matter of fact and law. Pl. Resp. 13-17. Both responses are incorrect.

A. Counts I, III, V, VI, And VII Of Laudes's Complaint Seek Liability Based Upon The Actions Of The CPA

We note first that counts V (fraud in the inducement), VI (estoppel), and VII (breach of good faith and fair dealing) of Laudes' Second Amended Complaint are premised explicitly upon actions allegedly taken by the CPA. See Comp. ¶ 241; ¶ 247; ¶257.[3] Moreover, counts I, and III refer to actions taken "before," "during," and "after"June 28, 2004.[4] Comp. ¶¶ 205, 223.

---

[2] "Pl. Resp.__" refers to a page of "Plaintiff's Opposition To Defendant's Motion For Partial Dismissal Or, In The Alternative, For Partial Summary Judgment And Plaintiff's RCFTC 56(f) Motion."

[3] "Comp. ¶ __" refers to a paragraph of Laudes' "Second Amended Complaint."

[4] We were, admittedly confused by Laudes's complaint, which alleged three different, seemingly inconsistent, implied-in-fact contracts to pay the same amount of additional funds for (continued...)

Plainly, the alleged actions taken before June 28, 2004, in counts I and III, refer to the time before the transfer of CPA responsibilities to the IIG. See DPFUF 16.[5] Moreover, actions taken after June 28, 2004 would not properly be before the Court.

Counts I and III of the complaint refer to an alleged implied-in-fact contract to modify the Phase I contract and to carve out a new contract. These counts of the complaint cannot apply to actions taken after June 28, 2004 for two reasons. First, after June 28, 2004, all actions regarding the Phase I contract were taken upon behalf of the IIG as described in Section III of our moving brief, and discussed again in Section III below. Second, no valid implied-in-fact contract to add money to the Phase I contract could have been created after the signing of the Phase I contract. This is because there would have been no consideration. It is well-established that consideration is a necessary element of an implied-in-fact contract. Flexfab, LLC v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005); Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003). As Laudes has asserted multiple times in its complaint, once the parties executed the Phase I contract, Laudes was required to provide the services contained therein and it was not permitted to stop performance, even after the contract's "not to exceed" ("NTE") price had been

---

[4] (...continued)
the Phase I contract through different means. Upon re-examination of Laudes's complaint, we recognize that counts II and IV do not explicitly refer to matters prior to the dissolution of the CPA. Laudes has explained that the date of the alleged "repudiation" in count VIII of its complaint was meant to be in February 2005, and that its earlier allegation that it occurred in 2004 was a "scrivener's error." Pl. Resp. 22, n.8. We do not object to the substitution of the correct date into Laudes' complaint, and agree that this changes the alleged actions of the CPA into actions of the PCO, to which our arguments regarding the CPA's funding do not apply. This is no aid to Laudes because, as discussed in Section III, below, the actions of the PCO, as agent of the IIG, are not subject to this Court's jurisdiction.

[5] "DPFUF__" refers to a paragraph of "Defendant's Proposed Finding Of Uncontroverted Facts," that we filed with our moving brief.

surpassed. E.g., Comp. ¶ 179, 206, 216. According to Laudes, it had no choice in the matter. Id. However, agreeing to perform a pre-existing duty (such as performance under the Phase I contract) cannot form the basis of consideration. Allen v. United States, 100 F.3d 133, 134 (Fed. Cir. 1996) ("[p]erformance of a pre-existing legal duty is not consideration," which would support existence of enforceable contract.); Jackson v. United States, 12 Cl. Ct. 363, 365-66 (1987) (citing Restatement (Second) of Contracts § 73 cmt. c (1981)). Accordingly, the alleged implied-in-fact contracts would have been devoid of consideration subsequent to June 20, 2004, when the Phase I contract was executed and would be subject to dismissal pursuant to RCFC 12(b)(6) or summary judgment pursuant to RCFC 56.

B. The Tucker Act's Limitations Upon The Court's Authority Preclude Review Of Actions Taken By The CPA

In our moving brief, we demonstrated that this Court does not possess jurisdiction over CPA actions here because it is not a "case[]in which appropriated funds can be obligated" to pay any judgment. L'Enfant Plaza Properties, Inc. v. United States, 668 F.2d 1211, 1212 (Ct. Cl. 1982). We noted that this argument was analytically similar to the "NAFI doctrine," but made clear that the NAFI doctrine was not directly applicable here. We further explained that, because the CPA was dissolved, DFI-funded contracts were the responsibility of the IIG, and no successor agency was assigned by Congress to stand in the CPA's stead for purposes of legal liability, there was no basis for finding that appropriated funds could be obligated to pay for any judgment in this case.

In response, Laudes alleges that the Court is required to apply a three-part test: 1) whether Congress ever appropriated funds to the CPA; 2) whether Congress "affirmatively prohibited" the use of appropriated funds to supplement DFI-funded contracts; and 3) whether

Tucker Act jurisdiction was contingent upon the designation by Congress of a successor to the CPA. Pl. Resp. 13. This three part inquiry is a "straw man" that has no basis in law or in our argument. The proper inquiry is a determination of whether appropriated funds could be obligated by an agency to pay any judgment, L'Enfant Plaza, 688 F.2d at 1211, and the answer remains no.

We have never alleged that Congress lacked the ability to appropriate funds to give to the CPA (in fact, we informed the Court that it had done so, see DPFUF 6) or that Congress could not direct, if it chose, that such funds be paid upon contracts initially funded by the DFI. This inquiry, however, is irrelevant: in theory, Congress could always pass legislation directing the payment of funds to any non-appropriated fund instrumentality ("NAFI"). What is relevant is the availability now of appropriated funds to pay for DFI-funded contracts entered by the CPA.

As we demonstrated in our moving brief, a number of facts show that appropriated funds cannot be made available now to pay for DFI-funded, CPA contracts, like the Phase I contract. First, the source of the funding for the contract was not appropriated funds. As we explained in our motion, the initial source of funding is important because the Judgment Fund seeks reimbursement from "the agency whose appropriations were used for the contract." 41 U.S.C. § 612(c). Here, no agency's appropriations were used for the Phase I contract. Moreover, inasmuch as the CPA was not established by Congress,[6] there is no enabling statute setting forth

[6] Congress, in error, originally believed that the CPA had been established by the United Nations ("the UN"), see Pub. Law No. 108-106 § 2101 (replicated in Laudes's appendix, page 18 ["B.__"], when, in fact, it was established by General Franks, pursuant to the Laws of War. DPFUF 1.

the means by which appropriations would be available to pay judgments against the CPA as an "agency."

Moreover, the CPA has dissolved and Congress has set no successor agency to assume its liabilities. In our moving brief, we demonstrated that Congress' failure to designate a successor agency to stand in the shoes of the CPA for purposes of litigation, effectively precluded the Government's liability for alleged contractual obligations of the CPA. See ASEDAC v. Panama Canal Comm'n, 453 F.3d 1309 (11th Cir. 2006). Laudes's responses to this argument – that ASEDAC is not applicable and that National Security Presidential Directive ("NSPD") 36 constituted such a transfer of responsibility to the Project Contracting Office ("PCO"), see Pl. Resp. 15-17 – ignores the relevant portion of ASEDAC and wrongly relies upon NSPD 36, which does not constitute such a transfer of liability and could not do so because of the difference in authority between the executive and legislative branches.

Laudes seeks to distinguish ASEDAC by explaining that the case was centered upon the liability of a Government-owned corporation and related to obligations under international treaty. See Pl. Resp. 16. We, of course, apprized the Court of these facts in our moving brief. We also directed the Court's attention to (and relied upon) a portion of the reasoning by the United States Court of Appeals for the Eleventh Circuit that is directly applicable to the case here and that Laudes ignores – the holding that, for litigation to continue against any successor entity to a Government "agency," Congress is required to provide so expressly. 453 F.3d at 1316. This law, applicable to the termination of a Government "agency" (not only a Government-owned corporation), see id., is thus directly applicable to the CPA.

To the extent that Laudes argues that NSPD 36 accomplished such a transfer of liability, it is wrong. NSPD 36 is reproduced in pages 112-114 of the appendix filed with our DPFUF ("A.__"). Although NSPD 36 did provide for the assumption, by the United States Mission in Baghdad, of "those authorities and responsibilities that continue after CPA termination," A. 113, it did not "expressly provide" that those responsibilities included responsibility for payment of lawsuits upon DFI-funded contracts. See ASEDAC, 453 F.3d at 1316. To the contrary, upon dissolution of the CPA, all authority upon DFI-funded contracts was given to the IIG, to delegate as it saw fit. See A. 74-75 (CPA Memorandum 15); see also A. 79 (letter from IIG Minister of Finance, Dr. Mahdi, providing a delegation of authority from the IIG to the United States to "administer contracts . . . funded with monies from the . . . DFI."); A. 82 (recognition of IIG authority over DFI-funded contracts by the United States Project Contracting Office).

Moreover, even if the President had, through NSPD 36, expressly stated that a successor United States Government agency would be responsible for the liabilities of the CPA, he did not possess the authority to subject the United States to this Court's jurisdiction. This is because the availability of appropriated funds is the cornerstone of our motion and only Congress possesses the constitutional authority to appropriate funds. U.S. CONST. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"); see also Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937).

Accordingly, the Court should dismiss counts I, III, V, VI and VII of the complaint, which all rest upon actions of the CPA, for lack of jurisdiction. In the alternative, the Court should enter summary judgment in favor of the United States upon these grounds.

## III. All Actions Regarding The Phase I Contract Taken Subsequent To June 30, 2004, Are Attributable To The Government Of Iraq, Not The United States, And Thus Not Within The Ambit Of The Tucker Act

As demonstrated immediately above and in our moving brief, upon its dissolution, the CPA transferred all DFI-funded contracts to the IIG. See DPFUF 16. Laudes does not claim that the United States should be liable for the actions of the IIG, but asserts that there are disputed facts upon whether the CPA transferred authority over DFI-funded contracts to the IIG, and that, pursuant to basic contract law, the CPA did not possess the authority to unilaterally transfer its contractual obligations to the IIG. Pl. Resp. 18-21. Neither argument is compelling.

### A. There Is No Real Dispute That, Upon Dissolution Of The CPA, All DFI-Funded Contracts Became The Responsibility Of The IIG

Laudes attempts to create a factual dispute where there is none by drawing a false distinction between "responsibility for DFI funds" and "responsibility for DFI-funded contracts;" by ignoring the full text of the documents provided in our appendix; and by asserting that the Government's alleged provision of United States appropriated funds to Laudes at the end of its Phase I contract alters the responsibility of the United States. Pl. Resp. 18-19. These attempts are unsuccessful because the CPA documents plainly transfer complete authority over all aspects of DFI-funded contracts to the IIG; transfer of authority of the only contractually permitted source of funds for the contract to the IIG would effectively constitute transfer of authority to the IIG for the Phase I contract; and an alleged act of grace by the United States does not constitute a withdrawal of authority from the IIG.

First, we note that, as discussed earlier in this brief, CPA Memorandum 15 made clear that all authority over DFI-funded contracts devolved to the IIG upon dissolution of the CPA. The Pre-amble to Memorandum 15 (which amended CPA Memorandum 4, governing contracts)

expressly provided that, "full governance authority of Iraq will transfer to the [IIG] upon [the date that the CPA dissolves]." A. 74. Memorandum 15 further provided:

> (5) The Minister of Finance may designate the Director, Program Management Office of the Coalition Provisional Authority, or, following the transfer of full governance authority to the Iraqi Interim Government of Iraq, the Chief of Mission of the United States Embassy, Baghdad and/or the Commander of the Multinational Force-I, with responsibility to monitor and confirm performance, certify and/or make payments, and otherwise administer contracts or grants funded with monies from the Development Fund of Iraq that . . . were entered into on or before June 30, 2004 by the Coalition Provisional authority[.]
>
> – – –
>
> (6) Designees appointed under paragraph 5 shall be required to coordinate their activities with relevant officials from the Iraqi Interim Government . . . Designees appointed under paragraph 5 also shall be required to assist in the termination, amendment, or novation of contracts or grants at the direction of the Iraqi Interim Government.

A. 74-75. Thus, Memorandum 15 makes abundantly clear that any actions by American personnel upon DFI-funded contracts post-CPA would be accomplished pursuant to a delegation of authority from the IIG. The memoranda from Dr. Mahdi, of the IIG, see A. 79-81, and the PMO, see A. 82, make abundantly clear that the IIG and the United States recognized this to be the case.

Laudes's argument that the UN and the CPA only addressed authority over the DFI, as opposed to authority over DFI contracts, is flawed because Memorandum 15 plainly addresses more than authority over the DFI funds, including authority for all areas of contract administration. Moreover, exclusive authority over the only contractually-recognized means of

payment for DFI-funded contracts, see DPFUF 25, logically means effective control and responsibility for the contract as well.

Laudes's suggestion that the allegations contained in paragraphs 172 through 174 of its complaint constitute proof of a disputed fact, because they show that the PCO could provide additional appropriated money to Laudes, see Pl. Resp. 19, is wrong because they do not logically demonstrate anything of the sort. First, we note that the cited paragraphs of the complaint are vague and do not explain to which contract (Phase I or Phase II), the additional $4 million was assigned. See Comp. ¶¶ 172-74. Moreover, the ability of the United States to pay, by its own choice, for services that it requested of Laudes, is not at issue: the question presented is whether the United States Treasury is liable for actions taken by United States Government employees who are acting as the agents of the IIG. The answer remains plainly no.

B. The CPA Possessed The Authority To Transfer Responsibility To The IIG

Laudes's next argument is that, in accordance with black-letter contract law, the CPA was not permitted to change the responsible party in the Phase I contract from itself to the IIG without the consent of Laudes. Pl. Resp. 19-21. This argument fails because, the Phase I contract, signed by Laudes, informed it that no United States Government funds would be utilized to make payments under the Phase I contract, and CPA Memoranda and UN resolutions in effect at the time that the Phase I contract was executed explained that the CPA would be replaced by an Iraqi government. Moreover, the doctrine of "sovereign acts" would have permitted such a transfer in any event because the dissolution of the CPA and its replacement by the IIG was not undertaken by the United States in its role as a contractor, but in its role as a sovereign.

1. Laudes Was Aware Of The Imminent Replacement Of The CPA By The IIG

Laudes's allegation that the CPA could not transfer responsibility for the Phase I contract to the IIG fails because it is contingent upon Laudes' anticipating that the United States would be liable for actions upon the Phase I contract and upon Laudes not having agreed to the transfer in the contract. See Pl. Resp. 20 (quoting Restatement (Second) of Contracts § 318(3) at comment d). The Phase I contract, however, provided that no United States Government funds would be obligated upon that contract and publicly available documents made clear to Laudes that the CPA would cease to exist and its DFI-funded liabilities would be transferred to the IIG.

First, the very terms of the Phase I contract provided that all payments made upon it would be through DFI funds and that "[n]o funds, appropriated or other, of any Coalition country are or will be obligated under this contract." A. 111. Thus, Laudes well-knew at the time that it signed the Phase I contract that it would have no recourse to funds of the United States and that the only source of funds for the contract was the DFI. To that end, the transfer of the Phase I contract to the IIG did not constitute the United States's assignment of a duty to another because the United States never had the duty to make payments of its own funds under the Phase I contract.

Second, Laudes was aware (or should be considered to have been aware) that the CPA would dissolve and be replaced by the IIG. Although Laudes's president has stated that he was unaware of the particularities of the transfer of the authority from the CPA to the IIG, see B. 49-51, this is legally irrelevant. As the Supreme Court has noted, [t]he entire structure of our democratic government rests on the premise that the individual citizen is capable of informing himself about the particular policies that affect his destiny." Atkins v. Parker, 472 U.S. 115, 131

(1985). Even if Laudes can be excused for not informing itself of the contents of CPA Memorandum 15 or the applicable UN Security Council Resolutions,[7] CPA Memorandum 4, which was the primary document governing all CPA contracts funded by the DFI, see A. 43, and was executed on August 20, 2003 (more than 11 months prior to dissolution of the CPA), provided that "[t]he CPA's authority is of limited duration and will terminate upon the establishment of an internationally recognized, representative government of Iraq." A. 72. Thus, Laudes was upon notice that the CPA would be replaced by the government of Iraq.

2. The Doctrine Of Sovereign Acts Governs The Transfer Of Responsibility From The CPA To The IIG

Even if Laudes had not been aware, when it signed the Phase I contract, that the CPA's responsibility for it would be fleeting, the decision to transfer authority to the IIG was made by the CPA (and, indeed, the UN) as sovereign, not as a contractor. Accordingly, the doctrine of "sovereign acts" would preclude liability against the United States.

As this Court has recognized, if a "Government action takes a public and general nature and avoids a principal and primary focus on the relationship with the injured party, the act constitutes a sovereign act for which no liability in a contract sense arises." Walter Dawgie Ski Corp. v. United States, 30 Fed. Cl. 115, 131 (1999) (citing Sun Oil v. United States, 572 F.2d 786 (Ct. Cl. 1978)); see also, Horowitz v. United States, 267 U.S. 458, 461 (1925)("the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign"); Wilson v.

[7] We find it hard to imagine that a contractor with a significant involvement in Iraqi operations would not keep itself closely apprized of the details of the imminent transition from CPA to IIG rule.

United States, 11 Ct. Cl. 513, 521 (1875) ("double character of the Government cannot be lost sight of in any of its transactions"); Deming v. United States, 1 Ct. Cl. 190, 191 (1865)("[t]he United States as a contractor are not responsible for the United States as a lawgiver"); Froemming Brothers, Inc. v. United States, 108 Ct. Cl. 193, 212-13, 70 F. Supp. 126, 127 (1947) (explaining rationale). Although the doctrine was arguably limited by United States v. Winstar, 518 U.S. 839 (1996), the Supreme Court plurality still held that sovereign acts doctrine applied to acts not taken by the "Government as contractor." 518 U.S. at 896 - 97.

The transfer of authority over DFI-funded contracts from the CPA to the IIG via UN Security Council Resolution ("UNSCR") 1546 and CPA Memorandum 15 was plainly an action of a "public and general nature," rather than one focused upon any relationship that the United States[8] had with Laudes. See Walter Dawgie, 30 Fed. Cl. at 131. Indeed, the CPA's actions regarding DFI funds were consistent with the directives of UNSCR 1546, which provided that, upon dissolution of the CPA, "funds in the [DFI] shall be disbursed solely at the discretion of the Government of Iraq." A. 37, ¶ 24. Inasmuch as CPA Memorandum 15 effects compliance with UNSCR 1546, see A. 74, and transferring authority and responsibility for DFI-funded contracts to the entity that controls the DFI (i.e., the IIG) is consistent with the UN mandate, Laudes cannot claim that CPA Memorandum 15 was an act taken by the United States as contractor, as opposed to the CPA as a sovereign.

---

[8] There is no need to determine whether the CPA was an instrumentality of the United States Government. It suffices to accept the possibility of United States Governmental liability for the actions of the CPA for the purposes of this motion.

Thus, counts II, IV, VI, and VIII, of the complaint must be dismissed and the United States cannot be found liable in connection with those portions of counts I and III which refer to actions upon the Phase I contract after June 28, 2004.

## IV. Laudes's Claims Regarding Alleged Contracts-Implied-In-Fact Prior To The Execution Of The Phase I Contract Are Not Cognizable

As we discussed in our moving brief, some of the actions alleged in counts I, II, and III[9] of Laudes's complaint may be read to have occurred prior to Laudes's entering into the Phase I contract. Indeed the general claims set forth in those three counts of the complaint are that Laudes entered implied-in-fact contracts with the United States relating to future changes to the Phase I contract during a broad, unspecified period of time, which may have included a period prior to formation of the Phase I contract. See Comp. ¶¶ 204-29. As we established, and Laudes does not challenge, "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir. 1990) (citing ITT Fed. Support Services v. United States, 531 F.2d 522, 528 n.12 (Ct. Cl. 1976)). Thus, the door is closed to any claims that there were any implied-in-fact contracts to modify the Phase I contract prior to its issuance.

In response, Laudes argues that we misread its complaint because the implied-in-fact contracts occurred after the transition of the Phase I contract from the CPA to the IIG. Pl. Resp. 21-22. We note first that there is no nothing in Atlas limits is reasoning to implied-in-fact

[9] Now that Laudes has made clear that count VIII of its complaint refers to actions taken in February 2005, instead of 2004, this argument no longer applies to that count of the complaint.

contracts entered only prior to the express contract. See 895 F.2d at 754-55. Nevertheless, both counts I and III of the complaint refer explicitly to actions taken before and after June 28, 2004. Comp. ¶ 208 (count I), Comp. ¶¶ 223, 225 (count III). Although count II does not specify the date of the formation of its alleged implied-in-fact contract, the only time-period referenced (after June 28, 2004), referred to the Government's knowledge of its lack of authority to modify the Phase I contract with DFI funds. Comp. ¶ 215. In any event, the express contract trumps the alleged implied-in-fact contracts over the same subject matter. Atlas, 895 F.2d at 754-55.

## V. Laudes's Claims, Alleging The Existence Of Implied-In-Fact Contracts Promising That It Would Be Awarded Additional Contracts And Funding, And That The United States Was Estopped From Not Providing It Money, Are Precluded By Law

In our moving brief, we demonstrated that the implied-in-fact contracts alleged by Laudes (counts I through III of the complaint) and its estoppel claim (count VI) were precluded by law. In response, Laudes argues that the alleged implied-in-fact contracts were within the authority of the United States because the alleged implied-in-fact contracts were mere modifications to the Phase I contract, and United States officers allegedly possessed the authority to obligate DFI funds (notwithstanding UN, Iraqi and even United States Government direction to the contrary). Pl. Resp. 23-27. Laudes further argues that the strictures of Office of Personnel Management v. Richmond, 496 U.S. 414 (1990), are not applicable to these alleged contracts implied-in-fact. Pl Resp. 27-28. Finally, Laudes argues that, because it seeks recovery under "equitable estoppel" instead of "promissory estoppel," it remains entitled to relief upon count VI of its complaint. Pl. Resp. 30-31. These arguments are all flawed.

A. Agents Of The United States Did Not Possess The Authority To Make The Implied-In-Fact Contracts Alleged By Laudes

The implied-in-fact contracts alleged in counts I and II of the complaint are not the mere contract modifications alleged by Laudes in its opposition. The implied-in-fact contract alleged in count I requires, among other things, that United States Government funding be added to the contract. Comp. ¶ 210. Because the IIG did not delegate to the PCO the authority to amend contracts, see A. 80 (Dr. Mahdi's letter); A. 82 (PCO interpretation of Dr. Mahdi's letter stating that contracting officers could not materially change existing DFI contracts), we took this to mean the establishment of a new contractual vehicle for payment of United States Government funds to Laudes. If Laudes insists upon asserting that the implied-in-fact contract alleged in count I was to be accomplished purely as a modification of the Phase I contract, then the PMO representatives did not possess the authority to make this implied-in-fact contract because the IIG had not delegated such authority.[10] As demonstrated in our moving brief, the creation of an entirely new contractual vehicle to pay Laudes United States Government funds would violate the Competition in Contracting Act ("CICA"), 10 U.S.C. § 2304.

Count II of the complaint even more directly requires the issuance of a new contract in violation of CICA. In particular, it allegedly required that the PMO "issue a separate contract for construction services originally requested by defendant under the Phase I contract . . . funded using USG-appropriated funds." Comp. ¶ 218. This is no mere contract modification, but the award of an additional contract with different parties (the PMO instead of the CPA) and a

[10] Even if the Court agreed with Laudes, that the transfer of the Phase I contract from the CPA to the IIG was ineffective, the PMO, nevertheless, acted as if it were effective and withheld authority from its contracting officers from acting otherwise. A. 82. Thus, the contracting officers with whom Laudes dealt did not possess authority beyond that in the IIG's delegation.

different source of funding. Again, no agent of the United States possessed authority to award this no-bid contract.

Laudes's defense of count III here, resting upon the notion that, despite the UN resolution and IIG and PMO direction to the contrary, the United States could draw money upon the DFI account, see Pl. Resp. 26-27, is simply not supported by the documentary evidence cited and no disputed facts preclude judgment.[11] In support of its assertion that the United States retained authority over the DFI, Laudes first cites UNSCR 1546, which provided that the Multi-National Force ("MNF") would have "authority to take all necessary steps to contribute to the maintenance of security and stability in Iraq." Pl. Resp. 26. Because training and equipping security forces is necessary for such security and stability, Laudes argues that it must therefore follow that the MNF (allegedly meaning the United States), possessed authority over the DFI. Id. Paragraph 24 of UNSCR 1546, however, makes very clear that, upon dissolution of the CPA, disbursement of the funds in the DFI was "solely at the direction of the Government of Iraq." A. 37. Thus, notwithstanding the MNF's responsibilities set forth in UNSCR 1546, the UN excluded all parties but the government of Iraq from controlling the DFI.

Laudes's second argument is that the CPA's transitional regulations (in particular, CPA Regulation 11) created a sub-account in the Central Bank of Iraq ("CBI")/DFI account for purposes of future expenses upon DFI-funded contracts and the United States retained authority to pay Laudes from this account. Pl. Resp. 27. CPA Regulation 11 did direct the creation of a sub-account to the DFI for unfunded contractual liabilities, but did not carve that sub-account

[11] This position taken by Laudes here is inconsistent with the argument it advances in count VI of the complaint, that the United States would not have the authority to modify the Phase I contract by adding DFI funds to it. Comp. ¶ 250.

from control of the CBI/DFI, nor place it under the control of the United States. A. 76-77. In fact, this section of CPA Regulation 11 re-iterated that, upon dissolution of the CPA, all authority over the CBI/DFI would revert to the Prime Minister of the IIG. Thus, CPA Regulation 11 does nothing to grant the United States any authority over the CBI/DFI or even any sub-account of those funds.

Even if Laudes had a good argument that UNSCR 1546 or CPA Regulation 11 provided the possibility of the United States having access to the DFI, actions taken at the end of the CPA's tenure foreclosed any such possibility. As explained in our DPFUF, on June 15, 2004, Administrator Bremer transferred all authority over the CBI/DFI accounts to Dr. Sinan Al-Shabibi of the IIG as of July 1, 2004. Thus, at the dissolution of the CPA, the United States possessed no authority of its own in law or in fact over any DFI funds and, absent a delegation of authority from the IIG, could not disburse any such funds.

Laudes next argues that the proscriptions of OPM v. Richmond should not apply to its alleged implied-in-fact contracts. Pl. Resp. 27-29. While Laudes's brief accurately quotes portions of the law, it misses a critical distinction between the cases cited and the circumstances presented here: in those cases where the Government was found responsible for some sort of payment upon illegally formed contracts, the contracts, themselves, were express and performed, although the Government refused to pay because of defects in the contract. See Perri v. United States, 340 F.3d 1337, 1344 (Fed. Cir. 2003). Here, the alleged contracts were implied-in-fact contracts to award additional contracts (providing additional United States Government funding upon the Phase I contract and awarding a separate construction contract) but no action was taken to create the additional contracts allegedly required by the implied-in-fact contracts. This is a

critical distinction. For example, had the PCO issued the new, separate United States Government-funded construction contract referenced in count II, and, had Laudes provided goods and services pursuant to the new contract before the Government determined it to be unlawful and void,[12] Laudes might have grounds to argue that it was entitled to some payment under that invalid contract. See id. Here, however, Laudes only performed upon the Phase I contract. Thus, there is no entitlement to payment for an unlawful implied-in-fact contract that, as a matter of law, could never have been created. Cf. Eliel v. United States, 18 Cl. Ct. 461, 466-67 (1989) (citing Empresas Electronics Walser, Inc. v. United States, 650 F.2d 286 (Ct. Cl. 1980))("assurances by a Government official do not establish an implied-in-fact contract unless the parties complete all steps required by agency regulations").

B. No United States Government Officer Possessed Authority To Add Iraqi Money To The Phase I Contract

Finally, as demonstrated in our moving brief, Laudes's claim in count VI of its complaint, that the United States should be estopped from "refusing to add additional funds" to the Phase I contract, Comp. ¶ 252, fails for the same reason that count III fails: no United States Government officer or agent possessed the authority to add Iraqi money to this Iraqi contract at the time that Laudes would have wished for more. See Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947).

Because there was no authority under law for any of the promises allegedly made in the three alleged implied-in-fact contracts or the estoppel claim, the United States cannot be held

[12] As it would have been. See United States v. Amdahl, 786 F.2d 387, 392 (Fed. Cir. 1986) ("failure of a contracting officer to comply with the statutory requirements in making an award renders the contract a nullity").

liable and these claims must be dismissed pursuant to RCFC 12(b)(6), or partial summary judgment entered in favor of the United States.

VI. Count VI Of Laudes's Complaint, Estoppel, Must Be Dismissed For Lack Of Jurisdiction

We demonstrated that count VI of Laudes's complaint, estoppel, should be dismissed because this Court possesses "no jurisdiction over claims for promissory estoppel." Sinclair v. United States, 56 Fed. Cl. 270, 281 (2003) (citing Hercules, Inc. v. United States, 516 U.S. 417 (1996)). In response, Laudes asserts that it is presenting a claim of "equitable estoppel," not promissory estoppel, and that this Court does possess jurisdiction to entertain claims of equitable estoppel. Pl. Resp. 30-31. Laudes's argument is unpersuasive because, although equitable estoppel may act to bar a defense, it does not constitute a cause of action.

This Court explained the difference between promissory estoppel and equitable estoppel in the Sinclair case. Promissory estoppel is described as a sword, which creates a cause of action; whereas equitable estoppel is a shield, used to bar defenses. 56 Fed. Cl. at 281-82. Although the continued viability of equitable estoppel to bar defenses is subject to more doubt than Laudes allows, see, e.g, Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 60 (1984) (leaving open possibility of eliminating equitable estoppel defense against the Government); JANA v. United States, 936 F.2d 1265, 1270 (Fed. Cir. 1991) ("not entirely clear whether defense of estoppel is still available against the government"); Zacharin v. United States, 213 F.3d 1366, 1371 (Fed. Cir. 2000), this Court has left no doubt that promissory estoppel is unavailable. Sinclair, 56 Fed. Cl. at 281. Because Laudes seeks to use estoppel as an affirmative cause of action in count VI of its complaint, it must be asserting promissory estoppel and this Court should dismiss the claim. Id.

VII. Count V Of Laudes's Complaint, Fraud In The Inducement, Is Outside Of This Court's Jurisdiction Because It Sounds In Tort

In our moving brief, we demonstrated that count V of the complaint, fraud in the inducement, sounded in tort and should be dismissed for that reason. In response, Laudes asserts that tortious conduct in the course of a contractual relationship will support a Tucker Act claim and that case law seemingly contradictory to this conclusion is "distinguishable and out of touch." Pl. Resp. 33. Although there may be partially contradictory cases in this Court, the controlling law is clear, precluding recovery.

We provided an extensive overview of the law in our moving brief and will not repeat it in full here. It is enough to note that the binding precedent in this Court is that "claims based on negligent misrepresentation, wrongful inducement, or the careless performance of a duty allegedly owed, are claims sounding in tort." Aetna Cas. and Sur. Co. v. United States, 655 F.2d 1047, 1059 (Ct. Cl. 1981); see also Somali Development Bank v. United States, 508 F.2d 817, 821 (Ct. Cl. 1974). Laudes's opposition is almost exclusively based upon the reasoning contained in Gregory Lumber Co. v. United States, 9 Cl. Ct. 503 (1986) and Badgley v. United States, 31 Fed. Cl. 508, 513-14 (1994), see Pl. Resp. 32-35, neither of which could overrule the binding Court of Claims precedent. Moreover, the reasoning in Gregory Lumber is not necessarily contrary to the Court's granting the dismissal of this claim that we seek here.

We have never disputed that a misrepresentation that also constitutes the breaking of a contractual promise should not be within the Court's jurisdiction. E.g., Wood v. United States, 961 F.2d 195 (Fed. Cir. 1992). The question squarely presented here is whether the Court should consider a broken promise that allegedly induced a party to enter into a contract (but that is not reflected in the contract) to be a violation of the contract or, instead, a tort. In Gregory Lumber,

the alleged breaches of the contract were the warranty of quantity and the obligation to deal in good faith, thus, though tortious, they were tortious breaches of contract. 9 Ct. Cl. at 526. In this case, there is no contract provision allegedly breached, whether through tort or otherwise.

Despite the ruling in Badgley, the weight of precedent in this Court remains that, in order for the United States to be liable for misrepresentation, the misrepresentation must manifest itself in the contract itself or in a violation of a contractual duty. D.V. Gonzalez Electric & General Contractors, Inc. v. United States, 55 Fed. Cl. 447 (2003); D.F.K. Enters., Inc. v. United States, 45 Fed. Cl. 280, 284 (1999). Count V of Laudes's complaint does not assert a violation of a contractual duty, but instead is premised alone upon the alleged misrepresentation that occurred as an inducement to contract formation. As such, this count sounds purely in tort and must be dismissed.

## VIII. Count V Of Laudes's Complaint Must Be Dismissed Because It Seeks The Remedy Of A Contract Implied-In-Law

As we demonstrated in our moving brief, in count V of its complaint, Laudes unambiguously asserts that the Phase I contract was void ab initio. Comp. ¶ 244. In other words, Laudes alleges that there is no Phase I contract (express or implied). Try as it may, Laudes cannot escape the consequences of this assertion – in the absence of an express or implied-in-fact contract, the only alternative is a contract implied in law, over which this Court lacks jurisdiction. Hercules, 516 U.S. at 423.

Laudes mistakenly asserts that this portion of our motion is based purely upon the remedy that it seeks, see Pl. Resp. 35, but this is simply untrue. If the United States engaged in fraud in the inducement such that the Phase I contract were set aside as void, as Laudes demands, see Comp. ¶ 244, then there is no contractual basis for the Court's jurisdiction.

Indeed, as the Supreme Court explained in Hercules, "an agreement implied in law is a 'fiction of law' where a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress." 516 U.S. at 424 (quotes and citation omitted). Upon a finding, at Laudes's request, that the Phase I contract was void ab initio, this Court would have no other basis for awarding quantum meruit damages except through a contract implied-in-law. Perri v. United States, 340 F.3d 1337, 1343 (Fed. Cir. 2003).

While Laudes cites several cases supporting the notion that it may obtain quantum meruit damages through an implied-in-fact contract, see Pl. Resp. 36, these cases do not change the implications of Laudes's fraud claim here. In this count of the complaint, Laudes specifically disavows the existence of any Phase I contract and, asserting that it was misled by the United States, it surely cannot claim the meeting of the minds necessary for an implied-in-fact contract. E.g., Flexfab, 424 F.3d at 1265. This is consistent with the Supreme Court's explanation that cases involving "fraud or duress" are those for which contracts implied-in-law are created. Hercules, 515 U.S. at 424. Thus, count V of the complaint must be dismissed.

## IX. Count V Of Laudes's Complaint, Fraud In The Inducement, Is Unsupportable Because Limitations Upon Future Authority To Modify DFI-Funded Contracts Were Publicly Known At The Time The Phase I Contract Was Entered

We demonstrated in our moving brief that two public actions (the passage of UNSCR 1546 and the posting of CPA Memorandum 15) had placed Laudes upon notice that the United States would not maintain the authority to add DFI funds to the Phase I contract after the transfer of sovereignty to the IIG on June 28, 2004. Laudes responds by asserting that it was not put upon either constructive or actual notice of the two public documents, and that the two

documents would not have put it upon notice that the United States would lose its authority to disburse the DFI. Pl. Resp. 37-40. Neither argument is sound.

A. Laudes Was Upon Constructive Notice Of UNSCR 1546 And CPA Memorandum 15

We have no reason to dispute Mr. Underwood's assertion that he read neither UNSCR 1546 nor CPA Memorandum 15 prior to his executing the Phase I contract. See B. 47-49. Nevertheless, the relevant inquiry does not end there. Although it is true that publication of CPA Memorandum 15 upon the CPA's website is not the same as publication in the United States Federal Register, there is no reason that such a posting should not have the same effect. Cf. Merrill, 322 U.S. 384-85 (appearance of regulations in the Federal Register gives legal notice of contents). Indeed, the CPA website was "a key source of information" for those doing business with the CPA and the known location of posted CPA rules and regulations. A. 104. To the extent that the CPA website would make its postings instantly available and would be far less voluminous than the Federal Register, it can be argued that posting upon the website provides better actual notice than posting in the Federal Register, although we recognize that there is no statute implying such notice. We note that, although the CPA website did not post UN Security Council Resolutions, CPA Memorandum 15 did refer to UNSCR 1546, see A. 74, thus, any individual reading the memorandum would be apprized of the existence of the UN resolution.

B. The Texts Of UNSCR 1546 And CPA Memorandum 15 Would Inform The Reasonable Reader That The IIG Was Assuming Full Authority Over The DFI

We discussed the meaning of UNSCR 1546 and CPA Memorandum 15 at length in Section III. A., above, showing that they unambiguously reflected a transfer of authority over the DFI to the IIG. Laudes's arguments to the contrary, see Pl. Resp. 38-40, are very much the same

as the arguments to which we earlier responded. To the extent that Laudes may be arguing that, reading CPA Regulation 11, it would have believed that extra money would be placed upon the DFI-funded contract prior to dissolution of the CPA, see Pl. Resp. 39, this allegation is inconsistent with Laudes's complaint, which alleges that the allegedly fraudulent misrepresentation by the United States was that it would possess the authority to add funds to the Phase I contract after June 28, 2004. Comp. ¶ 242.

X. The Court Should Deny Laudes's RCFC 56(f) Motion

Throughout its response to our motion, Laudes has alleged that it should be permitted to engage in further discovery prior to the Court's ruling upon our motion. The matters for which Laudes requests discovery do not require further elucidation to allow the Court to rule upon our motion and, to the extent that any portions of our motion may be found to require discovery, the Court should rule upon the others first.

A. The Standard Of Review

A party requesting discovery pursuant to RCFC 56(f) must state, by affidavit, "explicit reasons why discovery is required in opposition to the motion for summary judgment." Aero Union Corp. v. United States, 47 Fed. Cl. 677, 687 (2000) (quoting C.W. Over & Sons v. United States, 44 Fed. Cl. 18, 23 (1999)). The United States Court of Appeals for the Federal Circuit has explained that "in moving for relief under Rule 56(f), a party must demonstrate specifically "how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." Simmons Oil Corp. v. Tesoro Petroleum Corp., 86 F.3d 1138, 1144 (Fed. Cir. 1996) (citations omitted).

B. Laudes's Affidavit Does Not Establish That The Requested Discovery Would Create A Disputed Material Fact

Laudes alleges four areas in which discovery would allow it to create disputed material facts or to form a factual basis for jurisdiction. It meets its burden under RCFC 56(f) in none of them.

1. Laudes Needs No Discovery Regarding The Availability Of Appropriated Funds To Pay For Judgments Resulting From Actions Of The CPA In Administration Of DFI-Funded Contracts

Laudes asserts that it needs information regarding actions by the CPA, the PCO, and the United States Mission in Baghdad in order to address the "implied assertion that the CPA/and or the PCO could not use both appropriated and DFI funds on the same contract and the express assertion that there was no successor to the CPA." Jackson Aff. ¶¶ 5, 6.[13] This information would not lead to disputed facts precluding judgment for the Government. First, our motion does not rest upon any allegation that both appropriated and DFI funds could not be used on the same contract. Regarding the successor of the CPA, the issue presented in our motion is related to the fact that no successor agency was given the CPA's liabilities and responsibilities by Congress. Since Acts of Congress are publicly available, Laudes has provided no reason to engage in discovery here.

2. Laudes Needs No Discovery Related To The Transfer Of Responsibility For The Phase I Contract From The CPA To The IIG

Laudes next asserts that it needs information regarding actions taken by the PCO upon DFI-funded contracts, and internal discussions between the PCO and the IIG and amongst PCO

[13] "Jackson Aff. ¶___" refers to a paragraph of the affidavit of Laudes's counsel, submitted in support of its RCFC 56(f) motion.

personnel regarding the transfer of contract responsibility to the IIG. Jackson Aff. ¶ 9. It asserts that it needs this information because inconsistent actions by the PCO could indicate that the transfer did not, in fact, occur. Jackson Aff. ¶ 10. The weakness of this assertion is that we are not asserting that DFI-funded contracts were transferred to the authority of the IIG by virtue of decisions by the PCO, but by virtue of written directives, in the form of Memoranda and Regulations from the CPA, which was indisputably the acting government of Iraq with complete authority over its contracts and the party with whom Laudes contracted. Regardless of whether individuals within the PCO may or may not have been temporarily confused by the contours of any delegation of authority by the IIG, the basis of this our motion to dismiss those portions of the complaint alleging actions after June 28, 2004 is that the IIG held the Phase I contract upon the dissolution of the CPA and, regardless of how broad was any delegation of authority by the IIG, the United States Government employees of the PCO were only agents of the IIG. Accordingly, actions taken by the PCO and its understanding of its authority, as delegated by the IIG are irrelevant to the liability of the United States.

3. Laudes Needs No Discovery Regarding The PCO's Authority To Enter The Alleged Implied-In-Fact Contracts

Laudes requests discovery upon a number of matters regarding, among others, the anticipated expenses of the Phase I contract, the CPA's liabilities, and the MNF's need for Iraqi Police Forces. Jackson Aff. ¶ 11. The basis for these requests is the notion that the MNF would have had the authority to add DFI funds to the Phase I contract, pursuant to UNSCR 1546, if necessary for security and that the CPA should have made more funds available for the Phase I contract before dissolving. Jackson Aff. ¶ 11. Neither factual allegation raises a disputed fact precluding summary judgment.

First, we note that the importance of Iraqi Police for Iraq's security has never been disputed. This fact, however, is irrelevant to our motion. As discussed in Section V. A., above, legally, the United States possessed no authority to disburse DFI funds independent of any authority granted to it by the IIG. Moreover, as discussed above, Ambassador Bremer had transferred control of the DFI to IIG officials upon dissolution of the CPA, A. 115, so the United States could not have accessed the funds even if it wished, unless the IIG provided authorization.

Laudes's request for discovery upon the moneys set aside in the DFI sub-account for continuing contractual liabilities fares no better. As we discussed above, whatever amount the CPA had placed in that sub-account, it was turned over to the IIG upon dissolution of the CPA.

4. Laudes Needs No Discovery Upon Our Defense That Its Fraud Claim Is Barred Because CPA Memorandum 15 Was Placed Upon The CPA's Website

Laudes requests discovery upon when CPA Memorandum 15 was posted upon the CPA's website as well as a number of other matters regarding whether the PCO believed itself to have the authority to modify the Phase I contract and whether it attempted to get funds to pay the alleged balance upon the Phase I contract. Jackson Aff. ¶ 14. Besides the one directly applicable request (when the CPA Memorandum was posted upon the website), the other requests here are based upon Laudes's assertion that actions by the PCO that were inconsistent with CPA Memorandum 15 would demonstrate that the notice was flawed. Jackson Aff. ¶ 15. This argument fails.

The premise of count V of Laudes's complaint is that the United States knew, at the time of the execution of the Phase I contract, that it would not possess authority to add DFI funds to the Phase I contract. Comp. ¶ 242. Thus, the discovery it now seeks upon the PCO's possibly

inconsistent actions, are inconsistent with the elements of its claim. Moreover, the reasonableness of Laudes's interpretation of CPA Memorandum 15 would be a question of law, based upon the text of that documents, as opposed to one informed by the interpretation of a third party (the PCO).

We agree that the date that CPA Memorandum 15 was placed upon the CPA website is certainly relevant to this inquiry, but note that such information has already been provided in our DPFUF. As stated in Colonel Pregent's affidavit, the practice of the CPA legal office was to post CPA Orders, Regulations, and Memoranda upon the CPA website within hours of their execution. A. 104. Although Colonel Pregent does not speak specifically to CPA Memorandum 15, this practice would certainly have applied to it. If Laudes were to serve a discovery request upon the Government asking for the date that Memorandum 15 were posted upon the CPA website, we would respond with the information already provided by Colonel Pregent.

## CONCLUSION

For these reasons and for the reasons stated in our moving brief, we respectfully request that the Court and dismiss counts I through VIII of Laudes's complaint or, in the alternative, grant summary judgment upon those counts of the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/J. Reid Prouty
J. REID PROUTY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305–7586
Fax: (202) 514-7969

August 1, 2007

Attorneys For Defendant