No. 07-4C
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LAUDES CORPORATION,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

# PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

Mark G. Jackson, WSBA #18325
GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101-2939
(206) 464-3939
(206) 464-0125 – fax

Attorneys for Plaintiff

July 21, 2008

TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. STATEMENT OF THE ISSUES ..... 2

III. STATEMENT OF THE CASE ..... 2

IV. ARGUMENT ..... 3

**A.** Standards of Review ..... 3

1. Plaintiff's Complaint Establishes Jurisdiction under the Tucker Act. ..... 3

2. Defendant Failed to Satisfy the Standard Applicable to RCFC 12(b)(6) Motions. ..... 3

3. Disputed issues of Material Fact Preclude Dismissal on Summary Judgment. ..... 4

**B.** The Court has Jurisdiction over Plaintiff's causes of action that are predicated on actions of the CPA. ..... 4

1. Defendant's "absence of consideration" argument must fail because (a) the Phase I Contract was not a complete and integrated agreement and (b) the parties continued to modify contract during performance. ..... 4

2. The Court's jurisdiction is not dependent upon Congressional designation of a successor-in-interest to the CPA. ..... 7

**C.** The CPA transferred authority over DFI funds to the IIG, not the Phase I Contract, because the CPA had no authority to transfer of contract. ..... 9

1. Plaintiff was not on notice that CPA would transfer the Phase I Contract to the IIG. ..... 10

2. The sovereign acts doctrine is inapplicable. ..... 10

3. The PCO was the contracting agent for the United States in Iraq. ..... 15

**D.** Plaintiff is entitled to recover for goods and services ordered and accepted by Defendant under the implied-in-fact contracts. ..... 16

1. The Phase I Contract was not a final, integrated contract. ..... 17

2. Defendant in fact modified the Phase I Contract repeatedly after June 28, 2004. ..... 17

3. Plaintiff fully performed under the implied-in-fact agreements. ..... 18

4. Defendant had the authority to add "Iraqi money" to the Phase I Contract. ........ 18

5. Plaintiff is entitled to recovery for the goods and services actually ordered and accepted by Defendant. ........ 19

**E.** Plaintiff is entitled to seek recovery under the doctrine of equitable estoppel. ........ 20

**F.** The Court has jurisdiction over Count 5 because the duty breached is grounded in privity of contract, not in tort. ........ 21

**G.** Plaintiff is entitled to recover under quantum meruit if the Court determines the Phase I Contract is void ab initio as a result of Defendant's fraudulent inducement. ........ 22

**H.** There is no basis to dismiss or grant summary judgment as to Count 5. ........ 23

CONCLUSION ........ 24

TABLE OF AUTHORITIES

Page

**CASES**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .......... 4

ASEDAC v. Panama Canal Comm'n, 453 F.3d 1309 (11th Cir. 2006) .......... 8

Atlas Corp. v. United States, 895 F.2d 745 (Fed. Cir. 1990) .......... 6, 7, 17, 18

Burnside-Ott Aviation Training Center, Inc. v. U.S., 985 F.2d 1574 (Fed. Cir. 1993) .......... 21, 22

Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573 (Fed. Cir. 1993) .......... 3

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .......... 4

Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir. 2005) .......... 12, 13, 15

Connor Bros. Constr. Co. v. United States, 65 Fed. Cl. 657 (2005) .......... 21

Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. 751 (2003) .......... 12

Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947) .......... 24

Fluor Enterprises, Inc. v. United States, 64 Fed. Cl. 461 (2005) .......... 20

General Dynamics Corp. v. United States, 47 Fed. Cl. 514 (2000) .......... passim

Gould, Inc. v. United States, 67 F.3d 925 (Fed. Cir. 1995) .......... 21

Grass Valley Terrace v. United States, 51 Fed. Cl. 436 (2002) .......... 12, 13, 15

Henke v. United States, 60 F.3d 795 (Fed. Cir. 1995) .......... 4

ITT Fed. Support Services v. United States, 531 F.2d 528n.12 (Ct. Cl. 1976) .......... 17

Lockheed Martin Corp. v. England, 424 F.3d 1199 (Fed. Cir. 2005) .......... 5

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) .......... 4

Prestex, Inc. v. United States, 320 F.2d 367 (Ct. Cl. 1963) .......... 20

Sinclair v. U.S., 56 Fed. Cl. 270 (2003) .......... 21

United States v. Amdahl Corp., 786 F.2d 387 (Fed. Cir. 1986) .......... 20, 21, 23

United States v. Winstar Corporation, 518 U.S. 839 (1996) .......... passim

Yankee Atomic Electric Company v. United States, 112 F.3d 1569 (Fed. Cir. 1997) ........ 12, 14

**STATUTES**

10 U.S.C § 113 ........ 9

**OTHER AUTHORITIES**

2 Moore's Federal Practice ("Moore's") §12.30[4] (3d ed. 2007) ........ 3

NSPD 36 ........ 9

**RULES**

RCFC 12(b)(1) ........ 3

RCFC 12(b)(6) ........ 3

RCFC 56 ........ 3

## I. INTRODUCTION

Plaintiff Laudes Corporation provided critical construction and life support for the Baghdad Public Service Academy ("BPSA") under contract (the "Phase 1 Contract") with Defendant, in Defendant's capacity as the Coalition Provisional Authority ("CPA") and later through the Project and Contracting Office ("PCO"). Plaintiff now seeks to enforce Defendant's promises to pay. Lost or ignored in Defendant's many arguments in support of its Motion for Partial Dismissal or, in the Alternative, for Partial Summary Judgment are key, uncontroverted facts, including:

- The Phase I Contact was a "letter contract," intended by the parties to be definitized at a later date to compensate Plaintiff for the goods and services Defendant ordered and accepted. LPFUF 28, 29.
- At the time the Phase I Contract was executed, the parties understood agreed the not to exceed ("NTE") price contained in the letter contract was insufficient to compensate Plaintiff for the work required by the contract. LPFUF 31.
- Defendant repeatedly modified the Phase I Contract during its performance, directing Plaintiff to provide additional goods and services, which goods and services were accepted by Defendant. LPFUF 53-74.
- Plaintiff seeks, in counts 1-8 of its Second Amended Complaint, to recover from Defendant only the price of the goods and services actually ordered and accepted by Defendant's authorized agents. LPFUF 71.

To avoid the effect of these facts, Defendant asks the Court to ignore them. Defendant also asks the Court to either extend legal principles or create new law. For example:

- Defendant asks the Court to apply the NAFI doctrine by analogy in a case where

Congress has affirmatively made U.S. appropriations available to pay for the contract performance at issue.

- Defendant asks the Court to find, as a matter of law, that only Congress may create a jurisdictionally valid successor-in-interest to an entity that was created and then replaced by the Executive Branch, both pursuant to authority of the Executive Branch.

The Court should refuse Defendant's requests and deny Defendant's motion.

## II. STATEMENT OF THE ISSUES

Plaintiff's statement of the issuues is set forth in its initial opposition brief to Defendant's motion.

## III. STATEMENT OF THE CASE

Counts 1 through 8 of the complaint deal exclusively with the Phase I Contract, executed by Plaintiff and Defendant on June 20, 2004. In those counts, Plaintiff states alternative theories to recover for work it performed at the request of Defendant and which Defendant accepted. Two of the eight counts (numbers 5 and 7) focus solely on the actions of Defendant acting by and through the CPA and allege, respectively, that Defendant fraudulently induced Plaintiff to enter into the Phase I Contract and that Defendant breached its duties to Plaintiff by transferring authority to place additional DFI funds on the Phase I Contract to the Interim Iraqi Government ("IIG"). The remaining counts of the complaint focus on the actions of Defendant acting by and through both the CPA the PCO,[1] an organization established by Defendant within the Department of Defense to provide contracting services for Defendant after termination of the CPA. Those counts are based on a variety of implied-in-fact contracts entered into by Plaintiff

[1] Counts 1, 3 and 6 are based on conduct by Defendant alleged to have occurred both before and after June 28, 2004. Counts 2, 4 and 8 are based on conduct by Defendant to have occurred after June 28, 2004.

and Defendant on or after June 28, 2004 (counts 1 – 3), abuse of discretion in definitizing the Phase I Contract (count 4), equitable estoppel (count 6) and repudiation (count 8). In each alternative theory, Plaintiff seeks only to recover for the goods and services actually provided to and accepted by Defendant.

## IV. ARGUMENT

### A. Standards of Review

Defendant brings its motion pursuant to three separate rules: RCFC 12(b)(1), 12(b)(6) and 56. Plaintiff discusses the standards of review applicable to each in turn below.

1. Plaintiff's Complaint Establishes Jurisdiction under the Tucker Act.

Many of Defendant's 12(b)(1) jurisdiction-based arguments constitute *facial* attacks in that they question the sufficiency of Plaintiff's pleading. In reviewing the sufficiency of Plaintiff's allegations, the Court must accept them as true. *See, e.g.,* Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993); *see also*, 2 Moore's Federal Practice ("Moore's") §12.30[4] (3d ed. 2007). Applying that standard precludes the dismissal of Plaintiff's complaint based on a facial challenge. Defendant's other jurisdiction-based arguments dispute the truth of certain factual allegations that would otherwise invoke federal jurisdiction. Here, the existence of genuine issues of fact regarding Plaintiff's contract claims preclude dismissal based on a factual jurisdiction challenge.

2. Defendant Failed to Satisfy the Standard Applicable to RCFC 12(b)(6) Motions.

In considering Defendant's motion to dismiss under RCFC 12(b)(6), the Court must "assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (citation omitted). As discussed below, Plaintiff alleged facts in support of counts 1 – 8 that entitle Plaintiff to relief.

3. Disputed issues of Material Fact Preclude Summary Judgment.

Applying the standards applicable to review of Defendant's summary judgment motion also precludes dismissal of Plaintiff's claims because an application of those standards leads to one conclusion: Plaintiff has submitted evidence "such that a reasonable [trier of fact] could find for the nonmoving party," which makes dismissal improper. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**B. The Court has Jurisdiction over Plaintiff's causes of action that are predicated on actions of the CPA.**

As we established in our initial opposition: (1) Congress expressly appropriated funds to the CPA to accomplish the very objectives sought under the Phase I Contract; (2) the NAFI doctrine is inapplicable because Congress did not affirmatively prohibit the use of those appropriations for payment on the Phase I Contract; and (3) Congress need not establish a successor-in-interest to the CPA for jurisdiction of this Court to attach. In its reply brief, Defendant raises a new argument and rehashes and old one. Both are without merit.

1. Defendant's "absence of consideration" argument must fail because (a) the Phase I Contract was not a complete and integrated agreement and (b) the parties continued to modify contract during performance.

Defendant's new argument is that no valid implied-in-fact contract was possible because Plaintiff argues that it wasn't permitted to stop work under the Phase I Contract and, as a result, any implied-in-fact contract to add additional funds to the contract lacks consideration. Defendant is wrong for two reasons. First, the Phase I Contract was not a complete and integrated contract; the parties knew this and intended to definitize it. Second, the parties continued to modify the contract during its performance and for each modification there existed an implied-in-fact contract for Defendant to increase the contract price to compensate Plaintiff

for the additional work it agreed to perform.

There is no dispute that the Phase I Contract is a "letter contract." LPFUF 28, 29. The Contracting Officer's Determination and Findings expressly describes it as a "letter" contract. LPFUF 27. A letter contract is not intended to be a complete, final and integrated contractual instrument:

> A letter contract is a written *preliminary* contractual instrument that authorizes the contractor to begin immediately manufacturing supplies or performing services.

FAR 16.603-1 (emphasis added). Such a contract is used when the "Government's interests demand that the contractor be given a binding commitment so that work can begin immediately" but there isn't sufficient time to negotiate a definitive contract. FAR 16.603-1(a); Lockheed Martin Corp. v. England, 424 F.3d 1199, 1200 (Fed. Cir. 2005) ("Before a contract is 'definitized' through establishment of its final terms, a contractor may begin performance pursuant to a preliminary contractual instrument that is sometimes called a 'letter contract.'"). The undisputed facts of this case establish that Defendant needed Plaintiff to begin work at BPSA immediately and that given those exigent circumstances there was no opportunity to negotiate a definitive contract. LPFUF 27. As a result, Defendant decided to award Plaintiff a letter contract. A letter contract not only assumes, but requires, the parties to definitize that contract at a later date:

> Each letter contract shall…contain a negotiated definitization schedule…. The schedule will provide for definitization of the contract within 180 days after the date of the letter contract…. However, the contracting officer may, in extreme cases and according to agency procedures, authorize an additional period.

FAR 16.603-2(c). Moreover, if the parties are unable to definitize the contract, the contractor is required to continue performance:

> If…the contracting officer and the contractor cannot negotiate a definitive contract … the clause at 52.216-25 requires the contractor to proceed with the work and provides that the

> contracting officer may, with the approval of the head of the contracting activity, determine a reasonable price or fee … subject to appeal….

FAR 16.603-2(c).[2] Accordingly, the concept of "failure of consideration" as argued by Defendant is simply inapposite to the Phase I Contract.

Even if that weren't the case, the implied-in-fact contracts alleged by Plaintiff include contracts to add additional funds to the contract to compensate Plaintiff for the additional work ordered and accepted by Defendant. Defendant now grasps that all important distinction, but still believes that Plaintiff's claims cannot survive because "there is no nothing [sic] in Atlas limits [sic] is [sic] reasoning to implied-in-fact contracts entered only prior to the express contract." Reply, p. 15-16 (citing Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir. 1990)). Atlas involved contracts with the government for the production of uranium or thorium, in which the plaintiffs sought recovery of costs associated with the stabilization of mill tailings. Id. at 748. Those costs "were not even contemplated by the parties at the time of the contracts." Id. at 754. Thus, as a legal matter, no "meeting of the minds" occurred regarding the stabilization costs to create a contract implied-in-fact.

Atlas consequently tried to reframe the specificity of the original "agreement," claiming that since the parties had agreed to "reimburse all costs," this agreement should now be deemed to include stabilization costs. Id. In other words, Atlas sought to ***alter*** the terms of an original express agreement based on subsequent developments for which there was no agreement. The Court rejected this as an attempt to revise an express contract with the assertion of a contract implied-in-fact.

Plaintiff's claims for the additional work are of an entirely different nature. Plaintiff

[2] The referenced clause was not in the Phase I Contract. However, there was no provision in the Phase I Contract that permitted Plaintiff to stop work as it approached the NTE, particularly when Defendant repeatedly modified the contract and promised additional payment for the additional work.

alleges first that there was an express agreement as embodied by the Phase I Contract and that subsequently the parties had a contract implied-in-fact to modify the original express agreement to accommodate Defendant's exigent needs. Plaintiff alleges that this implied-in-fact contract reflected an actual, factual "meeting of the minds." Thus, unlike in Atlas, there is no lurking term, previously unknown, which one of the parties is now trying to claim was part of the original, express agreement all along. The language cited by Defendant speaks to an entirely different situation, in which one party tries to subsequently reconstitute the meaning of the original express agreement. Here, Plaintiff simply asks that Defendant: (1) definitize the letter contract to compensate Plaintiff fully for the goods and services Defendant ordered and accepted; and (2) pay for the goods and services it ordered and accepted as modifications to the Phase I Contract. In each case, there exists consideration and Defendant's arguments to the contrary are without merit.

2. The Court's jurisdiction is not dependent upon Congressional designation of a successor-in-interest to the CPA.

Defendant next argues that the Court lacks jurisdiction because only Congress, not the Executive Branch, may create a jurisdictionally sufficient successor to the CPA. Defendant's continued reliance upon ASEDAC v. Panama Canal Comm'n, 453 F.3d 1309 (11th Cir. 2006) is not only still misplaced, it is misleading. As stated by Defendant in its brief:

> We also directed the Court's attention to (and relied upon) a portion of the reasoning by the United States Court of Appeals for the Eleventh Circuit that is directly applicable to the case here and that Laudes ignores—the holding that, for litigation to continue against any successor entity to a Government "agency," Congress is required to provide so expressly.

Reply, p.7. However, what Defendant argues is not what the ASEDAC court held:

> *When Congress dissolves or terminates a government agency, commission, or corporation* and intends for pending litigation to continue, it expressly provides for the non-abatement of pending suits by or against the dissolved entity and designates a successor to stand in the shoes of the entity for purposes of the litigation.

ASEDAC, 453 F.3d at 1316 (emphasis added). The premise upon which Defendant's argument relies is missing and Defendant's conclusion is invalid. Congress did not create or dissolve the CPA; it need designate a successor-in-interest.

Moreover, the facts demonstrate that Defendant is, in fact, the successor to the CPA with respect to the issues addressed in this case and that Congress appropriated funds not only to the CPA, but to whatever entity the President designated to succeed the CPA. Ambassador Bremer was designated by the U.S. Secretary of Defense as the CPA Administrator. DPFUF 3. Ambassador Bremer reported to the President through the Secretary of Defense and oversaw, directed and coordinated "all U.S. Government (USG) programs and activities in Iraq," except those under the command of CENTCOM. A.5. According to Ambassador Bremer, all contracting and procurement matters for the CPA and Ambassador Bremer were handled by the U.S. Army:

> Before I left for Iraq, the Pentagon designated the Department of the Army as the executive agent for the CPA, including "management oversight for the acquisition and contracting support." The Army's contracting responsibilities extended to both the Iraqi funds and the appropriated funds.

LPFUF 1. On May 11, 2004 and in preparation for the dissolution of the CPA, the President issued NSPD 36, which provided:

> The U.S. Mission in Baghdad and an office in the Department of State will assume from the CPA those authorities and responsibilities that continue after the CPA terminates.
>
> * * *
>
> I also establish, in accordance with Title 5, United Stated Code, section 3161, a temporary organization within the Department of Defense to be called the Project and Contracting Office (PCO) to provide acquisition and project management support with respect to activities in Iraq, as requested by the Secretary of State and head of other Departments and agencies.

A.113-4. The Deputy Secretary of Defense implemented the President's direction in a June 22, 2004 memorandum:

> In National Security Presidential Directive (NSPD) 36…the President established the Project and Contracting Office (PCO) as a temporary organization within the Department of Defense (DoD). Pursuant to NSPD 36 and 10 U.S.C § 113, I hereby direct that the PCO be organizationally established and placed within the Department of the Army to provide acquisition and project management support with respect to activities in Iraq, including support related to the close-out of the Coalition Provisional Authority (CPA).
>
> * * *
>
> Until June 30, 2004, the PCO will provide acquisition and program management support to the Administrator of the CPA. After June 30, 2004, the PCO will support the close-out of the CPA and will provide acquisition and management support to the Chief of Mission in Iraq, as requested by the Secretary of State, and for other activities in Iraq, as requested by the head of the other Departments and agencies.

LPFUF 48. Thus, the Executive Branch established the CPA, dissolved the CPA and then replaced it with the U.S. Mission. The contracting and procurement authority and responsibility for both the CPA and PCO remained with the U.S. Army. Congress clearly recognized such an evolution would take place because Section 2208 of the FY04 Supplemental states that:

> "Any reference in this chapter to the 'Coalition Provisional Authority in Iraq' or the 'Coalition Provisional Authority' shall be deemed to include any successor United States Government entity with the same or substantially the same authorities and responsibilities as the Coalition Provisional Authority in Iraq."

LPFUF 3. Defendant is the successor to the CPA.

**C. The CPA transferred authority over DFI funds to the IIG, not the Phase I Contract, because the CPA had no authority to transfer of contract.**

As we established in our initial opposition, Defendant had no legal authority to transfer the Phase I Contract to the IIG. In reply, Defendant makes three arguments: (1) Plaintiff was on notice that the IIG would replace the CPA; (2) Defendant had the authority to transfer the Phase I Contract to the IIG under the sovereign acts doctrine; and (3) after June 28, 3004, the PCO acted solely as the agent of the IIG in administering the Phase I Contract. Defendant's arguments are without merit.

1. Plaintiff was not on notice that CPA would transfer the Phase I Contract to the IIG.

As Plaintiff established in its initial opposition, it did not know of or consent to any transfer of the Phase I Contract to the IIG. B.51-52. Defendant now argues that Plaintiff "was aware (or should be considered to have been aware) that the CPA would dissolve and be replaced by the IIG," apparently for the purpose of establishing that Plaintiff constructively consented to the transfer of the Phase I Contract to the IIG by virtue of that knowledge. Reply, p. 12. This is pure sophistry.

Plaintiff admits it was common knowledge that the CPA was going to dissolve on June 30, 2004. However, it does not follow, *ipso facto*, that the dissolution of the CPA meant that the IIG would assume the Phase I Contract. Indeed, using Defendant's own logic, the reasonable conclusion is quite the opposite—that the PCO would assume the Phase I Contract. None of the references cited by Defendant in brief describe what was to happen to the CPA's contracts upon termination of the CPA.[3] However, the President's May 11, 2004 NSPD 36 specifically stated when the U.S. Mission in Iraq "will assume from the CPA those authorities and responsibilities that continue after CPA termination." A.113. Accordingly, Plaintiff should be "considered to have been aware" that the PCO, not the IIG, would assume the Phase I Contract upon termination of the CPA.

2. The sovereign acts doctrine is inapplicable.

Having failed to cite any legal support for its claim that it transferred the Phase I Contract to the IIG, Defendant seeks refuge by arguing its conduct is protected as a sovereign act. But United States v. Winstar Corporation, 518 U.S. 839 (1996) and its progeny make clear that the

[3] Indeed, the contracting officer who awarded Plaintiff the Phase I Contract on June 20, 2004 testified that "[t]hat there were a lot of unknowns around our office. Nobody had good answers about how that particular relationship would shake out. Just a lot of unknowns, I guess, is the best way to describe it." B.639, lines 3-8.

actions of Defendant in this case do not implicate either the sovereign acts doctrine or the unmistakability doctrine, and even if they did, they fail to pass muster under the applicable standards.

Although Defendant fails to mention it, the Court of Federal Claims has adopted a two-step analysis linking those doctrines together. If a particular governmental act renders Defendant's performance of a contractual obligation impossible, the first question is whether this act was of a "public and general" nature within the meaning of the sovereign acts doctrine. General Dynamics Corp. v. United States, 47 Fed. Cl. 514, 541 (2000). If not, the government is in breach of its contractual obligations.

If so, the second step in the analysis asks "whether the contract contained an unmistakable promise that the Government would refrain from exercising its sovereign power in a way that would block performance of the contract." Id. The government is excused from performing only in the event that the act was *both* "public and general" *and* the contract contained no "unmistakable promise." *See* Grass Valley Terrace v. United States, 51 Fed. Cl. 436 (2002) (adopting the General Dynamics framework).

As a threshold matter, the facts in this case do not implicate either the sovereign acts or unmistakability doctrines. In order to trigger the two-step analysis in the first place, Defendant's act must render performance of the contract "impossible." What this almost always means is that a subsequent *legislative* act quite literally requires the government to violate the law in order to perform the contract. *See, e.g.,* Winstar, 518 U.S. 839 (1996) (counting regulatory capital requirements under FIRREA); Yankee Atomic Electric Company v. United States, 112 F.3d 1569 (Fed. Cir. 1997) (federal assessments required by the Energy Policy Act of 1992); Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. 751 (2003) (amendments to the

Housing Act); Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir. 2005) (eliminating contractual tax benefits by subsequent legislation). Indeed the language from General Dynamics cited above speaks of performance being "block[ed]," not merely hindered or inconvenienced.

The performance sought by Plaintiff in this case gives rise to no such dilemma. Plaintiff seeks payment in full for the services that Defendant contracted for and received, funding for which was granted by Congressional appropriation and that Defendant is free to dispense. *See* Reply, p. 6 ("We have never alleged that Congress lacked the ability to appropriate funds to give to the CPA (in fact, we informed the Court that it had done so, see DPFUF 6) or that Congress could not direct, if it chose, that such funds be paid upon contracts initially funded by the DFI."). Here, there is no legislative act blocking performance by Defendant. Under these circumstances it is wholly unnecessary to undertake the delicate balancing of the government's sovereign and proprietary interests under the Winstar line of cases, which address the much harder circumstance in which Defendant must either breach a contract or break the law.

Should it still be necessary to determine whether the Government here acted in its sovereign capacity, the answer must be no. In its interpretations of Winstar this Court has made clear that distinguishing between a governmental act that is "public and general," and one "tainted by a governmental object of self-relief," Winstar, 518 U.S. at 896, requires more than simply identifying a public purpose and does not require an intent to target a particular contractor:

> In the case at bar, it is clear that Congress acted to advance the public welfare and that it did not formally target particular transactions (i.e. particular contracts), but, as Adams indicates, this is not enough to make the act "public and general." ***The impact of ELIHPA and the HCDA legislation fell substantially on the government's contracting partners***.

Grass Valley Terrace v. United States, 51 Fed. Cl. 436, 441 (2002) (emphasis added); *see also*, Winstar, 518 U.S. at 899-900 ("[o]ur holding [is] that a governmental act will not be public and

general if it has the substantial effect of releasing the Government from its contractual obligations").

Applying this "effects test" to the CPA's actions in Iraq, the very purpose of the "transfer," by definition, was to pass off the Defendant's contractual obligations to the IIG. As such, the "substantial effect" was that Defendant left Plaintiff to foot the bill for services for which Defendant had contracted to pay, regardless of the source of funds. Whatever Defendant's reasons for trying to pass on its debts, there could be no plainer example of "an act attributable to the Government as contractor," General Dynamics, 47 Fed. Cl. at 543, "tainted by a governmental object of self-relief." Winstar, 518 U.S. at 896. As such, "the Government is not entitled in a court of law to any more favorable treatment, in the matter of contract interpretation, than that accorded to private persons." General Dynamics, 47 Fed. Cl. at 541.

A recent decision in the Federal Circuit sheds light on why this case fails to even implicate the sovereign acts doctrine. In Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir. 2005), several corporations sued the Government claiming that by enacting legislation which eliminated tax benefits to which the corporations were entitled by contract, the Government breached the implied covenant of good faith and fair dealing. In ruling on behalf of the corporations, the Federal Circuit responded to the Government's assertion that "Yankee Atomic stands for the proposition that an exercise of the power to tax is always the exercise of a sovereign power," id. at 1310, by raising a hypothetical that is eerily reminiscent of the Defendant's dealings with Plaintiff:

> Suppose the government contracts with a shipbuilder to construct an aircraft carrier for a fixed price. If, after the contract is completed, Department of Defense officials decide that the contract was improvident in that the government paid too much, they cannot simply reduce the amount of the payment without being in obvious breach of the contract. The case is no different if it is Congress that decides the contract was unduly

> generous to the contractor; again, Congress plainly cannot enact legislation reducing the amount of the payment to the contractor without causing a breach in the contract.

Id. The Federal Circuit constructed a hypothetical which it thought was an obvious illustration of an unquestionable breach, thus casting light by analogy on the flaw in the Government's tax argument. Yet the Government's position in this case bears a striking resemblance to the scenario above in that an entity within the Department of Defense is essentially disclaiming responsibility for payment without citing a reason why it cannot pay. This is clearly not a sovereign act.

Finally, even if the Winstar-line of cases is deemed to be triggered here, and even if Defendant's attempt to disclaim contractual responsibility is deemed a "sovereign act" under the doctrine, the Phase I Contract with Plaintiff should also be deemed to include an "unmistakable promise" by Defendant not to exercise its sovereign authority in such a manner. While most of the Winstar cases never reach the "unmistakability" inquiry for lack of a cognizable sovereign act, it bears noting that none of those cases featured a party seeking to unilaterally substitute another to perform the contract.

The discussion in General Dynamics sheds some light on the unmistakability inquiry. The court there found that a contract provision stating that a cited regulation would be controlling for determining executive compensation costs under the contract was not "ambiguous" or "unstated" within the meaning of these words in the Winstar decision. Therefore, the contract contained an "unmistakable promise" by the government that it would not exercise its sovereign power to change the method of determining allowable executive compensation costs. General Dynamics, 47 Fed. Cl. at 547. That case is typical of the situation in which the unmistakability inquiry usually arises because it involves an isolated provision of a contract with the Government. *See*, *e.g.*, Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir.

2005) (provision concerning tax benefits); Grass Valley Terrace, 51 Fed. Cl. 436 (provision concerning prepayment options in loan agreements).

In this case, the unmistakable promise concerns a much more fundamental aspect of the contract—the party with whom Plaintiff contracted. It is difficult to conceive of a less "ambiguous" representation than becoming a party to the contract itself. In other words, while it is often the case that a particular contract provision is qualified with language such as "as permitted by law" or "as allowable under prevailing law," it is not the case that the contracting parties themselves qualify their participation altogether. In sum, Plaintiff was entitled to believe that it had a contract with Defendant based on an "unmistakable promise" to perform. Thus, the "unmistakability doctrine" provides no impediment to finding Defendant in breach of its obligations.[4]

3. The PCO was the contracting agent for the United States in Iraq.

Assuming that the CPA was permitted to transfer the Phase I Contract to the IIG, Defendant then argues that it is not responsible for its actions after June 28, 2004 with respect to the Phase I Contract because it was acting as agent for the IIG. It is important to place this particular argument in context. First, the uncontroverted facts establish that the PCO was the contracting agent for all U.S. Government activities in Iraq. LPFUF 1, 2, 48. Indeed, the PCO awarded Plaintiff the Phase II Contract, which was simply an expansion of the exact scope of work Plaintiff was performing under the Phase I Contract, both facts which are not disputed. LPFUF 78. Second, according to the delegation of authority by the IIG to the PMO (and later to the PCO), the PCO was not authorized to modify the Phase I Contract. A.80. Third, the

[4] Even if the Court accepts Defendant's contention that it effectively transferred its duty to perform under the Phase I Contract, Defendant could only have transferred the portion of the Phase I Contract in which DFI funds would be obligated. To the extent that Defendant subsequently modified the Phase I Contract and promised to pay for those modifications, such portions were *not* transferred, since they do not fall within the definition of the contracts purportedly passed on to the IIG.

uncontroverted facts demonstrate that the PCO did, in fact, repeatedly modify the Phase I Contract by expanding the scope of work to be performed by Plaintiff and accepting that increased performance. LPFUF 65-74. *Thus, what Defendant is really asserting is that the PCO is not responsible in either its capacity as agent for the IIG* ***or*** *as agent for the U.S. Government for the additional goods it ordered and accepted from Plaintiff.* However, the PCO did not lose its capacity to contract for goods and services related to the Phase I Contract simply because, as argued by Defendant, the PCO *also* acted as agent for the IIG. Defendant has produced no legal or factual support to the contrary. At this stage of the proceedings, Defendant is also not entitled to any factual inference that the modifications were ordered and accepted by the PCO solely in its capacity as agent of the IIG.

**D. Plaintiff is entitled to recover for goods and services ordered and accepted by Defendant under the implied-in-fact contracts.**

As we established in our initial opposition brief (1) the PCO, as the contracting agent for Defendant in Iraq after June 28, 2004, had the authority to enter into each of the implied-in-fact agreements identified and performed by Plaintiff and (2) even if the implied-in-fact contracts entered into by Defendant's Contracting Officers in some way violated a procurement statute or rule, Plaintiff would nonetheless be entitled to recover. Defendant now argues that Plaintiff may not recover under these implied-in-fact contracts because (1) any implied-in-fact agreement entered into before an express contract on the same subject precludes the existence of the prior implied-in-fact contract (Reply, p. 15); (2) Defendant lacked the authority to modify the Phase I Contract after June 28, 2004 (Id. at 17-19); (3) Plaintiff didn't perform under the implied-in-fact contracts it alleges (Id., at 19-20); and (4) no officer of Defendant possessed authority to "add Iraqi money" to any contract after June 28, 2004. (Id. at 20). Defendant's arguments are either simply wrong or irrelevant because Plaintiff is seeking to recover under these implied-in-fact

contracts on the value of goods and services ordered and accepted by Defendant and Plaintiff is entitled to that recovery regardless of Defendant's arguments.

1. The Phase I Contract was not a final, integrated contract.

Defendant correctly notes that "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir. 1990) (citing ITT Fed. Support Services v. United States, 531 F.2d 528n.12 (Ct. Cl. 1976). Applied in its proper context, the rule Defendant here invokes makes good sense. This is so because usually the express contract represents the *final* manifestation of the contract parties' intentions as to their rights and obligations toward one another, which understanding should not be varied or modified *post hoc* through the device of an implied-in-fact contract claim. However, this rule has no role in the context of a letter contract which was expressly *not* intended to be the final manifestation of the parties' intentions.

As we established in section IV(B)(1), *supra*, the Phase I Contract was not, nor was it intended to be, a fully integrated agreement. The parties intended to definitize that agreement and one of the implied-in-fact agreements that Plaintiff alleges was that the contract price would be increased pursuant to that definitization. Accordingly, an implied-in-fact agreement to increase the price of the Phase I Contract is not precluded as argued by Defendant.

2. Defendant in fact modified the Phase I Contract repeatedly after June 28, 2004.

Defendant now also claims that the implied-in-fact agreements entered into by the parties after the execution of the Phase I Contract cannot survive because "there is no nothing [sic] in Atlas limits [sic] is [sic] reasoning to implied-in-fact contracts entered only prior to the express contract." Reply, p. 15-16 (citing Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir. 1990)). Atlas involved contracts with the government for the production of uranium or thorium,

in which the plaintiffs sought recovery of costs associated with the stabilization of mill tailings. Id. at 748. Those costs "were not even contemplated by the parties at the time of the contracts." Id. at 754. Thus, as a legal matter, no "meeting of the minds" occurred regarding the stabilization costs to create a contract implied-in-fact.

Here, however, Plaintiff alleges that the parties had a contract implied-in-fact, to modify the original express agreement to accommodate Defendant's exigent needs. Plaintiff alleges that this implied-in-fact contract reflected an actual, factual "meeting of the minds." Thus, unlike in Atlas, there is no lurking term, previously unknown, which one of the parties is now trying to claim was part of the original, express agreement all along. As with any contract, the parties can and often do agree to subsequent binding modifications, and when such agreements have the requisite mutuality of intent and consideration, they are enforceable in contract. The language cited by Defendant speaks to an entirely different scenario, in which one party tries to subsequently reconstitute the meaning of the original express agreement. Plaintiff simply asks that Defendant pay for services Defendant requested and received as modifications to the Phase I Contract.

3. Plaintiff fully performed under the implied-in-fact agreements.

Defendant's assertion that Plaintiff did not perform under the implied-in-fact agreement is simply factually incorrect. Plaintiff's clams relating to the Phase I Contract are merely to be paid for the goods and services ordered and accepted by Defendant. These claims are based on – and limited to – the DD Forms 250 signed by Defendant's authorized representatives accepting those goods and services. LPFUF 71. Thus, there can be no dispute that Plaintiff performed under the implied-in-fact agreements it alleges in the Complaint.

4. Defendant had the authority to add "Iraqi money" to the Phase I Contract.

We established in our initial opposition brief that Defendant had the authority to modify

the Phase I Contract, which modifications are the subject of counts 1 and 2 of the complaint. In its reply brief, Defendant asserts that no agent of the United States had the authority to either modify the Phase I Contract (generally) or add "Iraqi money" to the contract (specifically).

First, contrary to the Government's primary contention, the boilerplate payment terms in the Phase I contract do not specifically designate the use of DFI funds. DPFUF 32. The payment terms in Paragraph 40 of the Phase I Contract identified the source of funds as follows: "The obligation under this contract is made with Iraqi Funds, as defined in CPA Memorandum Number 4, dated 19 August 2003." CPA Memorandum Number 4 defines the term "Iraqi Funds" to include Vested Funds, Seized Funds or DFI Funds. Thus the payment terms for the Phase I Contract do not specifically identify DFI funds as the sole source of payment.

Because UNSCR 1546 and CPA Memorandum 15 did not limit Defendant's ability to add Appropriated Funds, Seized Funds or Vested Funds to the Phase I Contract, Defendant's reliance on these public declarations to defeat Laudes' fraud in the inducement claim fails.

5. Plaintiff is entitled to recovery for the goods and services actually ordered and accepted by Defendant.

As discussed in section IV(D)(3), above, Plaintiff seeks only to recover for the goods and services actually ordered and accepted by Defendant. Regardless of whether the PCO complied with all statutory and regulatory requirements to either modify the Phase I Contract or award Plaintiff a new contract, the uncontroverted facts are that authorized agents of Defendant ordered and accepted goods and services from Plaintiff using either the Phase I Contract or other implied contracts as vehicles for doing so. In those circumstances, Plaintiff is entitled to recover the value of those goods and services.

Regardless of whether a contract is void *ab initio* or voidable as a result of some infirmity in the procurement process, a contractor is permitted to recover for the goods or services

provided to and accepted by the government. For example, in Fluor Enterprises, Inc. v. United States, 64 Fed. Cl. 461 (2005) this Court determined that the government had awarded the architectural and engineering portion of a contract in violation of 40 U.S.C. § 254(b) and found that portion of the award to be void. However, the court recognized that Fluor was nonetheless entitled to recover:

> Despite the infirmities of the actual, unenforceable portion of the contract, the court recognizes the existence of an implied-in-fact contract between Fluor and NOAA for the architectural and engineering services Fluor provided

Id. at 495. The reasoning for such a determination was succinctly stated by the Federal Circuit and relied upon by the court in Fluor:

> Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it.

Id. (*quoting* United States v. Amdahl Corp., 786 F.2d 387, 393 (Fed. Cir. 1986) (*quoting* Prestex, Inc. v. United States, 320 F.2d 367, 373 (Ct. Cl. 1963))); *see also* Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed. Cir. 1995) ("[A] contractor can be compensated under an implied-in-fact contract when the contractor confers a benefit to the government in the course of performing a government contract that is subsequently declared invalid"). As stated by the court in Amdahl,

> [W]here conforming goods or services have been delivered by a contractor and accepted by the government, the contractor has been held entitled to payment, either on a *quantum valebant* or *quantum meruit* basis if the contract is void *ab initio* or to a possibly larger amount if the contract is voidable, that is, deemed valid and terminated for convenience in accordance with the contract.

Amdahl, 786 F.2d at 395. Here, the record developed so far establishes Defendant is not entitled to the relief it requests. Defendant's motion to dismiss or in the alternative for summary judgment, should be denied.

**E. Plaintiff is entitled to seek recovery under the doctrine of equitable estoppel.**

Defendant claims that "[b]ecause Laudes seeks to use estoppel as an affirmative cause of

action in count 6 of its complaint, it must be asserting promissory estoppel and this Court should dismiss the claim." Defendant is mistaken. Equitable estoppel is a judicial remedy by which a party (here, the Defendant) may be precluded from asserting a right to which it otherwise would have been entitled. Connor Bros. Constr. Co. v. United States, 65 Fed. Cl. 657, 692 (2005). That is exactly how Plaintiff is using this doctrine. Count 6 alleges that Defendant "is estopped from refusing to add additional funds to the Phase I Contract to fairly compensate" Plaintiff. Comp., ¶252.

Defendant relies heavily on the case Sinclair v. U.S., 56 Fed. Cl. 270 (2003) as authority for dismissing Laudes' claim. In Sinclair, however, the plaintiff was attempting to use estoppel to establish the existence of a contract. Here, Plaintiff does not make that argument. Instead, Plaintiff is using the equitable estoppel claim precisely as was used by the plaintiff in Burnside-Ott Aviation Training Center, Inc. v. U.S., 985 F.2d 1574 (Fed. Cir. 1993). There, the plaintiff asserted an equitable estoppel cause of action to recover more than $3 million under a government contract, alleging that the government was estopped from denying it payment for increased labor costs resulting from a Department of Labor decision. Id. at 1576. Here, Plaintiff likewise asserts that Defendant is estopped from refusing to add additional funds to the Phase I Contract. As such, Plaintiff has properly asserted a cause of action and this Court has jurisdiction over it. Defendant's motion to dismiss count 6 must be denied.

**F. The Court has jurisdiction over Count 5 because the duty breached is grounded in privity of contract, not in tort.**

Plaintiff established in its initial opposition the basis for the Court's jurisdiction over Plaintiff's fraudulent inducement claim. Instead of repeating that argument here, Plaintiff will simple respond to Defendant's new arguments raised in its reply brief. According to Defendant, the question "presented here is whether the Court should consider a broken promise that

allegedly induced a party to enter into a contract (*but that is not reflected in the contract*) to be a violation of the contract or, instead, a tort." Reply, p. 22. (emphasis added) Defendant then states that "the weight of the precedent in this Court remains, that, in order for the United States to be liable for misrepresentation, the misrepresentation must manifest itself in the contract itself or in a contractual duty. Id. at 23. Finally, Defendant argues that here "there is no contract provision allegedly breached." Id. at 23. Unfortunately for Defendant, even if the Court were to accept Defendant's interpretation of the law, Defendant's motion should still be denied because Plaintiff's fraudulent inducement claim is based on a contract provision that was breached by Defendant.

Defendant's legal theory ignores the fact that the Phase I Contract was a *letter contract* and that Defendant had a duty to definitize this letter contract and to do so in a manner that fairly compensated Plaintiff for the goods and services ordered and accepted by Defendant. In count 5, Plaintiff alleges that Defendant both implied it would have the ability to later modify the Phase I Contract by adding sufficient funds to fully compensate Plaintiff and expressly stated it would add additional funds to the contract. Complaint, ¶ 241. Accordingly, Plaintiff does allege a misrepresentation that manifests itself in the contract as a breach of a contractual duty by Defendant. Thus, even under Defendant's interpretation of the law, Plaintiff has stated a fraudulent inducement cause of action over which this Court has jurisdiction. Defendant's motion to dismiss should be denied.

### G. Plaintiff is entitled to recover under *quantum meruit* if the Court determines the Phase I Contract is void *ab initio* as a result of Defendant's fraudulent inducement.

Defendant next argues that count 5 of the Second Amended Complaint must be dismissed because it seeks the remedy of a contract implied-in-law. According to Defendant, if the Phase I Contract is declared void *ab initio*, there will be no contract, express or implied-in-fact, upon

which Plaintiff may recover. Thus, Defendant's argument continues, Plaintiff must be seeking the remedy of a contract-implied in law. Defendant's argument is simple, but its logic is fatally flawed.

As we discussed in detail in our initial opposition and briefly in section IV(D)(5), above, Plaintiff is entitled to recovery for the goods and services ordered and accepted by Defendant, notwithstanding that the contract under which Plaintiff performed may later be determined void *ab initio*. As stated by the court in Amdahl,

> [W]here conforming goods or services have been delivered by a contractor and accepted by the government, the contractor has been held entitled to payment, either on a *quantum valebant* or *quantum meruit* basis if the contract is void *ab initio* or to a possibly larger amount if the contract is voidable, that is, deemed valid and terminated for convenience in accordance with the contract.

Amdahl, 786 F.2d at 395. Defendant's motion on this point should be denied.

**H. There is no basis to dismiss or grant summary judgment as to Count 5.**

We demonstrated in our initial opposition that Plaintiff had no actual notice of the two "public actions" on which Defendant based its motion to dismiss or for summary judgment as to count 5 of the complaint. We also demonstrated that because that the two "public actions" were not published in the Federal Register, the Court should not presume that Plaintiff had constructive notice of these actions. *Cf.* Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947) (publication of documents in the Federal Register provides notice). In response, Defendant asks the Court to *extend* that presumption not only to CPA Memorandum 15 but also to UNSCR 1546, asserting that the CPA website on which CPA Memorandum 15 appeared was a "key source of information for those doing business with the CPA." Reply, p. 25. However, as stated by Plaintiff's Executive in Charge during this period, Plaintiff did not obtain information regarding procurements from that website because such information was given to him directly and the internet service in Iraq was not very good. B.50. Given that conflicting information,

there is simply no basis for the Court to decide, as this stage of the proceedings, that publication of CPA Memorandum 15 on the CPA's website provided constructive notice.[5]

We discussed in our initial brief and, will not repeat here, even if Plaintiff received notice of those two documents, neither would have provided Plaintiff the notice claimed by Defendant. In addition to those arguments, however, it is important to note that the Phase I Contract was by its terms not limited to DFI funds. Instead, it stated it was funded with "Iraqi" funds. LPFUF 32. The CPA's regulations define Iraqi funds to include both vested and seized funds, in addition to DFI funds. Id. Nothing in either of the two documents alleged by Defendant to provide Plaintiff notice to defeat count 5 of the complaint, UNSCR 1546 or CPA Memorandum 15, limit the authority of Defendant to add either seized or vested funds. Thus, Defendant retained authority to add appropriated funds, seized funds or vested funds to the Phase I contract. Because the United States certainly retained authority to add funds to the Phase I Contract either before or after June 28, 2004, its fraudulent promises to add funds to the Phase I Contract support a claim of fraud in the inducement.

## CONCLUSION

Plaintiff seeks only to enforce Defendant's promise to pay for goods and services Defendant ordered and accepted. Plaintiff asserts a variety of alternative theories under which Defendant's promise is enforceable. Defendant is not entitled to dismissal or summary judgment on any of those theories. Defendant's Motion should be denied.

---

[5] As Defendant admits, UNSCR 1546 (the other "public action") was not published on the CPA's website at all. Reply, p. 25.

DATED this 21st day of July, 2008

/s________________________________
Mark G. Jackson
GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, WA 98101-2939
(206) 464-3939
(206) 464-0125

Counsel of Record for
LAUDES CORPORATION

SEA_DOCS:895045.2