IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAUDES CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | Case No. 07-4C<br>(Judge Thomas C. Wheeler) |

PLAINTIFF'S CONSOLIDATED RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS AND PLAINTIFF"S PROPOSED FINDINGS OF UNCONTROVERTED FACTS

Plaintiff, Laudes Corporation, pursuant to Federal Court of Claims Rule 56(h)(2), and in support of its Opposition to the Defendant's Motion for Partial Dismissal, or, in the Alternative, for Partial Summary Judgment, hereby respectfully submits the following Response to Defendant's Proposed Findings of Uncontroverted Facts, and Plaintiff's Proposed Findings of Uncontroverted Facts, each of which is consolidated into this document.

I. Response to Defendant's Proposed Findings of Uncontroverted Facts

In response to the separately numbered paragraphs of Defendant's Proposed Findings of Uncontroverted Facts ("DPFUF"), Plaintiff hereby states as follows:

1. Plaintiff agrees with the proposed finding as stated.

2. Plaintiff agrees that the May 8, 2003 letter referenced contains the words as quoted. However, to the extent that the proposed finding is intended to state or infer that the Coalition Provisional Authority ("CPA") was anything other than an instrumentality or entity of the United States Government, Plaintiff disagrees with the proposed finding as stated. As quoted by Defendant in its first proposed finding, General Franks' Freedom Message states that "*I* am creating the Coalition Provisional Authority…." A.1 (emphasis added).

3. Plaintiff agrees with the proposed finding as stated.

4. Plaintiff agrees with the proposed finding as stated.

5. Plaintiff agrees with the proposed finding as stated.

6. Plaintiff agrees with the proposed finding as stated.

7. Plaintiff agrees with the proposed finding as stated.

8. Plaintiff agrees with the proposed finding as stated.

9. Plaintiff agrees with the proposed finding as stated.

10. Plaintiff agrees with the proposed finding as stated.

11. Plaintiff disagrees with this proposed finding as stated. The DFI bank account was created by the FRBNY at the request of the CPA Administrator, "[p]ursuant to the authority vested in [him] by the President of the United States, and as Administrator of the Coalition Provisional Authority." A.10. UNSCR 1483 merely noted the establishment of the DFI account and that funds in that account would be disbursed "at the direction" of the CPA. (A.14)

12. Plaintiff disagrees with this finding as stated. There is nothing in the May 17, 2003 letter at A.10 that supports the inference that said letter was written "in anticipation" of the formal adoption of UNSCR 1483. Indeed, the May 17, 2003 letter does not even mention the United Nations. Instead, the May 17, 2003 letter, which requested establishment of the DFI account, expressly relied solely upon the "authority vested in [him] by the President of the United States." A.10

13. Plaintiff disagrees with this finding as stated. First, UNSCR 1483 merely noted the establishment of the DFI account. A.14, ¶ 12. Second, the resolution merely noted that DFI funds would be disbursed as described. A.14, ¶ 13. Third, the resolution did not decide that all

proceeds from the "Oil for Food" program would henceforth be deposited into the DFI account as 5% of those proceeds were to be deposited into the "Compensation Fund." A.16, ¶ 21.

14. Plaintiff agrees with the proposed finding as stated.

15. Plaintiff disagrees with the proposed finding as stated. The actual quote from UNSCR 1546 states that the Council:

> *Welcomes* that, also by 30 June 2004, the occupation will end and the Coalition Provisional Authority will cease to exist, and that Iraq will reassert its full sovereignty.

A.33, ¶ 2 (emphasis original). As a result, UNSCR 1546 did not provide or decide that Iraq would assert its full sovereignty after June 30, 2004. Indeed, after June 30, 2004:

a. The United States Government, operating through the Multi-National Force-Iraq (a component of the United States Central Command), retained the authority to conduct military operations within Iraq, retained the authority to conduct searches throughout the country, retained the authority to imprison individuals it deemed a threat to Iraqi security and retained the authority to take all necessary measures to train Iraqi security forced. (Complaint, ¶¶ 79, 82)[1]

b. After June 30, 2004, the Interim Iraqi Government ("IIG") did not have the authority to apply Iraqi law to Iraqi citizens if the MNF decided that the application of Iraqi law was inconsistent with security operations in Iraq. Complaint, ¶ 85)

c. CPA Order No. 17 (Revised), Status of the Coalition Provisional Authority, MNF-Iraq, Certain Missions and Personnel in Iraq, remained in full

[1] Defendant's Proposed Findings of Uncontroverted Fact do not address the vast majority of the factual allegations contained in the Second Amended Complaint ("Complaint"). Because those allegations are not contested by Defendant, those allegations must be assumed to be true for the purposes of ruling on Defendant's motion.

force and effect after June 28, 2004. Complaint, ¶ 87; A.89, ¶ 8. As a result, after June 30, 2004: (i) MNF personnel, property, funds, and assets were immune from Iraqi legal process, including any arrest, detention or civil, criminal, or administrative process; (ii) contractors doing business in Iraq were immune from Iraqi legal process with respect to acts performed by them pursuant to the terms and conditions of contracts entered into with the MNF or the CPA; and, (iii) the IIG did not have the authority to deny entry visas, licenses or permits for contractors doing business in Iraq for the MNF. Complaint, ¶¶ 83-93.

UNSCR 1546 did not decide that DFI funds "shall be disbursed solely at the discretion of the Government of Iraq." Instead, the resolution merely "noted" that such would be the case. A.37, ¶ 24.

16. While Plaintiff agrees that the CPA Administrator's June 15, 2004 letter does contain the thoughts expressed by Defendant, Plaintiff disagrees with the proposed finding as stated. Defendant is not entitled to an inference that the IIG in fact assumed complete control over the DFI account after June 30, 2004. In fact, as discussed in greater detail in Plaintiff's Proposed Findings of Uncontroverted Fact, Defendant in fact used DFI funds after June 30, 2004 without the authority of the IIG.

17. Plaintiff disagrees with the proposed finding as stated. CPA Memorandum 4 did define the phrase "Contracting Officer," but only as used therein. Individuals who were also Contracting Officers within the meaning of FAR 2.201 did not lose that status to the extent they may have also been appointed as Contracting Officers pursuant to CPA Memorandum 4.

18. Plaintiff agrees with the proposed finding as stated.

19. Plaintiff agrees that the documents referenced by Defendant contain the words cited in the proposed finding. However, Plaintiff disagrees with the inference that Defendant complied with said regulations in all respects. As discussed in greater detail below, Defendant used DFI and U.S. appropriated funds on the same contract in at least one instance.

20. Plaintiff disagrees with this proposed finding as stated. CPA Memorandum 15 and CPA Regulation 11 acknowledged the transfer of authority over the DFI and its use. However, as discussed in greater detail in Plaintiff's Proposed Findings of Uncontroverted Facts, after June 30, 2004, Defendant awarded more than $80 million in contracts and modifications using DFI funds without obtaining prior approval from the IIG. Moreover, to the extent Defendant in fact transferred (or attempted to transfer) DFI funded contracts to the IIG after June 30, 2004, such facts do not address whether such transfer was legally permitted.

21. Plaintiff agrees that the documents referenced by Defendant contain the words cited in the proposed finding. However, Plaintiff disagrees with the proposed finding as stated. The rights and responsibilities outlined in the IIG Finance Minister's June 15, 2004 were directed to the Director, Program Management Office ("PMO"). A.79. The PMO was an entity within the CPA responsible for awarding and administering contracts. After June 30, 2004, those duties were assumed by the Project and Contracting Officer ("PCO"). By its terms, the IIG Finance Minister's June 15, 2004 transferred those rights and responsibilities from the PMO to the PCO after the CPA dissolved. A.80. As discussed in greater detail in Plaintiff's Proposed Findings of Uncontroverted Fact, notwithstanding the apparent limitation that the PCO not to modify any DFI-funded contract (*Id.*), the PCO frequently did so and never sought or obtained permission from the IIG to do so.

22. Plaintiff agrees that the document referenced by Defendant contains the words cited in the proposed finding. However, as discussed in greater detail in Plaintiff's Proposed Findings of Uncontroverted Facts, notwithstanding the apparent limitation that the PCO was not to modify any DFI-funded contract (*Id.*), the PCO frequently did so and never sought or obtained permission from the IIG to do so.

23. Plaintiff agrees with the proposed finding as stated.

24. Plaintiff agrees with the proposed finding as stated.

25. Plaintiff agrees that the document referenced by Defendant contains the words cited in the proposed finding. However, as discussed in greater detail in Plaintiff's Proposed Findings of Uncontroverted Facts, Defendant's proposed finding fails to mention that the Phase I Contract was a "letter contract" and was specifically and expressly intended by the parties to be definitized at a later date and that the purpose of said definitization was to establish a final price. Further, and also discussed in greater detail below, Defendant's proposed finding infers that the PCO lacked the authority to modify the contract by adding US appropriated funds. Defendant is not entitled to such an inference. Moreover, Defendant never lost the ability to use Vested, Seized or Appropriated funds. Plaintiff disagrees with the proposed finding to the extent Defendant implies that "Iraqi" funds mean only DFI funds, as Iraqi funds also include Vested and Seized funds.

II. Plaintiff's Proposed Findings of Uncontroverted Facts

Pursuant to RCFC 56(h)(2), Laudes hereby respectfully submits its Proposed Findings of Uncontroverted Facts ("LPFUF"), which Laudes contends are not controverted by the DPFUF.

**The CPA**

1. L. Paul Bremer, Administrator of the CPA, testified before the House Committee

on Government Oversight and Reform on February 6, 2007. B.162-75. In his prepared remarks, he stated:

> Before I left for Iraq, the Pentagon designated the Department of the Army as the executive agent for the CPA, including "management oversight for the acquisition and contracting support." The Army's contracting responsibilities extended to both Iraqi funds and the appropriate funds.

B.164.

2. Ms. Tina Ballard, Deputy Assistant Secretary of the Army (Policy and Procurement) certified before the House Armed Services' Subcommittee on Readiness on June 24, 2004. B.176-81. During her prepared remarks, she stated:

> On May 21, 2003, the Deputy Secretary of Defense designated the Secretary of the Army as the Department of Defense Executive Agent of the Office of Reconstruction and Humanitarian Assistance, later to become the Coalition Provisional Authority (CPA) in Iraq, with responsibility to provide administrative, logistics and contracting support for the relief and reconstruction for the people of Iraq. On January 14, 2004, the Deputy Secretary of Defense further assigned responsibility for Acquisition and Program Management Support for CPA to the Secretary of the Army to include all aspects of contracting and program management. As such, the Army is responsible for the execution of the $18.6 billion appropriated by the U.S. Congress for the reconstruction and humanitarian relief effort.

B.178.

3. The $18.6 billion to which Deputy Assistant Secretary Ballard referred was appropriated by Congress to the CPA in the Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, 2004 ("FY04 Supplemental Appropriation"). B.17. Congress appropriated $18.649 to the Iraq Relief and Reconstruction Fund ("IRRF"), of which $3.243 billion was specifically allocated for "security and law enforcement" and $1.318 billion for "justice, public safety infrastructure, and civil society." B.17. Congress also expressly designated the CPA as one of the U.S. Government entities to which the IRRF would be apportioned:

> [F]unds appropriated under this heading shall be apportioned only to the Coalition Provisional Authority in Iraq (in its capacity as an entity of the United States Government), the Department of State….

B.17. Congress also stated in the FY04 Supplemental:

> Any reference in this chapter to the "Coalition Provisional Authority in Iraq" or the "Coalition Provisional Authority" shall be deemed to include any successor United States Government entity with the same or substantially the same authorities and responsibilities as the Coalition Provisional Authority in Iraq.

B.23.

4. On May 16, 2003, the CPA issued Regulation No. 1, which provided that the CPA would temporarily "exercise powers of government" in Iraq and that it was "vested with all executive, legislative, and judicial authority necessary to achieve its objective." A.8.

5. CPA Regulation 2 provides at ¶ 3:

> CPA Program Review Board (PRB) reviews all competing requirements for the relief and recovery of Iraq, assess all available resources, and, in consultation with the Iraqi interim administration, when established, develops for the approval of the Administrator spending plans, consistent with a comprehensive budgetary framework, that identifies prioritized disbursements from the Fund …

B.83

6. CPA Regulation Number 3, Program Review Board ("PRB") sets forth the roles and responsibilities for the PRB. B.91-98. Included within those responsibilities was the creation of a Funding Plan and recommendations for delivering U.S. appropriations, vested funds, seized funds and DFI funds. B.95-96.

7. The PRB kept minutes of meetings. At various meetings it discussed the status and availability of the funds, including:

a. At its June 5, 2003 meeting, the PRB noted that vested funds were frozen by Washington. B.134.

b. At its July 12, 2003 meeting, the PRB noted that "OMB had released hold of authority on use of vested funds," all seized funds had been committed and that there existed $1.07B available from DFI." B.135.

c. In its September 9, 2003 meeting, the PRB noted that it had both appropriated and DFI funds available for use. B.138.

d. In its August 30, 2003 meeting, the PRB noted that for funding request #398, Police Equipment:

> "Of the $90M authorized (funding source to be either appropriated or DFI), the CPA's Ministry of Interior team needs an immediate disbursal of $5M. This request is for reprogramming of $5M from appropriated or DFI (to be determined) to vested funds. This request was recommended for approval.

B.140-41.

e. In the September 1, 2003 minutes, the PRB noted that:

> Reprogramming Request:
>
> #352, Restore Iraqi Infrastructure, $711M. The Board considered the request from Task Force RIO for changing the funding source from appropriated funds to the Development Fund of Iraq a previously approved request (#352, total amount approved $962M). $251M was already provided from the Natural Resource Risk Remediation Fund (NRRRF), an appropriated funds account. TF RIO indicated that $711M is outstanding and required but of that amount $466M was immediately required to complete projects under Phase I. The Board identified $500M as remaining available from two appropriated accounts – the Iraq Reconstruction and Relief Fund (IRRF) and the NRRRF and therefore the requirement was approved to come from the appropriate funds. A new vote may be required for the remaining amount of $211M but this was deferred.

B.142.

f. In its February 8, 2004 minutes, the PRB approved funding requests using both seized and DFI funds. B.146-48.

g. In its April 7, 2004 minutes, the PRB approved reprogramming an effort for vested funds to seized funds. B.152-53.

8. The CPA also had the authority to disburse DFI funds, Vested Funds, and Seized Funds for the same purposes. B.95-96. More importantly for this case, as noted above, the CPA also had the authority to shift monies obligated for CPA contracts between Appropriated Funds, Vested Funds, Seized Funds and DFI funds, and did so.

9. In addition, Defendant admitted that on at least one occasion the CPA obligated both DFI funds and Appropriated Funds for to a single CPA-awarded contract. B. 558.

10. The CPA dissolved on June 28, 2004. However, before June 28, 2004, the CPA awarded many contracts intended to be performed after the dissolution of the CPA. For the purposes of this case, these contracts will be described as Legacy Contracts.

**Award of BPSA Life Support Contract**

11. On March 9, 2004, the U.S. Government ("USG") established the Civilian Police Assistance Training Team ("CPATT") to improve training of the Iraqi Police Service ("IPS"). Comp., ¶ 33; B.40 ¶1; 43 ¶7.

12. A key component to the success of CPATT was to dramatically improve the infrastructure and capacity of the Baghdad Police Service Academy ("BPSA"). The BPSA was key to CPATT, which wanted to demonstrate success at the BPSA to "send a very clear signal to the IPS that [CPATT was] serious and totally committed to assisting them." Comp., ¶ 34; B.44 ¶9.

13. Defendant then contacted Plaintiff and asked Plaintiff to provide a bid (as sole-source provider) for the construction of a tent city at BPSA to accommodate 1,000 students, including housing, classrooms, and dining facilities. Comp., ¶ 37; B.50 ¶5.

14. In response to Defendant's request, Plaintiff submitted a price of approximately $4.8 million, based on 12 hours of market research, for available tents and other necessary equipment for the tent city project at the BPSA. Comp., ¶ 39.

15. Ultimately, Defendant determined that the tent city contract could not be a sole source award and that the contract should contain requirements to provide life support.

16. Defendant then prepared an Acquisition Plan for the Procurement of Base Support Operations for the Baghdad Public Safety Academy, dated April 8, 2004. B.200-7. The acquisition was described as a "Fixed Price contract for performance of Logistical Support for the" BPSA. B.201 (emphasis original). Defendant's estimated price for this work was $26,534,000 and included no design or construction services. B.204.

17. On April 22, 2004, the CPA issued Solicitation No. DABV01-O4-R-0047, for BPSA Life Support. B-209-34. The solicitation asked for prices for several different student loads for one year, including student numbers in the ranges of "1-1500, 1501-2500, 2500-4500 [sic] and 4500-6000 [sic]." B.209. The solicitation did not require a bid on any construction services. Nor did the solicitation discuss, mention or require a bid for erecting a temporary tent city. Comp., ¶¶ 40-41, 43; B-209-34.

18. Of particular note in the solicitation was Option CLIN 1009, Semi-Permanent Academy. B.211. According to the Statement of Objectives included in the solicitation and upon which the bidders were to base their prices, that optional scope of work included the following:

> The contractor will propose a fixed price option to support a semi-permanent academy, location to be determined, but in the southern/south eastern portion of Iraq. It is envisioned that the equipment required will deploy by road from holding areas in Kuwait. The projected student daily load is up to 2000 students per day. As the requirement becomes more defined the projected student load of the southern academy may offset the projected student load at BPSA. The contractor should propose a complete drop in

> training facility that includes all functions provided for the BPSA. The southern academy is projected to operate for a minimum of 1 year.

B.215.

19. On April 29, Defendant issued an amendment to the solicitation that, among other things, deleted the proposed scope of work relating to anti-terrorism and force protection, which would as a result of the change be provided by the Government. B.236-39. The contractor was simply required to provide portable generator and light sets for two entry points. Id.

20. On May 12, 2004, Plaintiff submitted an offer in response to the BPSA Life Support solicitation, offering to provide the basic life support services for 1-1500 students for one year for $14,190,049. B.241-49. Plaintiff bid $18,000,000 for Option CLIN 1009. B.243.

21. Defendant received at least three other offers in response to the solicitation. Of the four offers, three were considered technically acceptable, including Plaintiff's and that of Iraq-Khadamat, the eventual awardee. B.264-67. According to the memorandum prepared by the Source Selection Authority, a comparison of the prices offered by Plaintiff and Iraq-Khadamat for the scope of work actually awarded (including Option CLIN 1009), showed that Iraq-Khadamat had offered a price of $24,100,988, while Plaintiff's price was $35,070,959. B.266.

22. Defendant awarded the contract to Iraq-Khadamat on May 15, 2004.

23. That same day, Defendant designated Ted Norgarden as the Contracting Officer's Representative. B.268-70.

24. Shortly after the award of the contract to Iraq-Khadamat, Major M. Lloyd Blackmon assumed the duties as contracting officer on the effort. Major M. Lloyd Blackmon was the contracting officer that awarded Plaintiff both the Phase I Contract and the Phase II Contract. While in Iraq, Major Blackmon had an unlimited warrant. B.610.

25. Shortly thereafter, Defendant issued a revised Statement of Work for the contract, which reflected requirements that "were agreed upon at the meeting dtd 02 June, 2004." B.271-89. Pursuant to that agreement, which was a "definitization" of CLIN 1009, Iraq-Khadamat was to provide, "basic design and construction services to provide an expedient camp of 1250 students and 50 instructors" at BPSA. B.283. The construction included billeting, classrooms and a dining facility. Id.

26. Less than a week after the June 2, 2004 meeting, Defendant sent Iraq-Khadamat a letter advising the contractor of its performance deficiencies. B.290-91. Five days later, Defendant sent the contractor a "Demand for Adequate Assurances" notifying Iraq-Khadamat that Defendant was considering terminating the contract for default. B.292. Less than one week later, Defendant terminated the contract for default. B.293.

27. On June 20, 2004, Defendant's Contracting Officer, Major Blackmon, executed a memorandum for the record stating his intent to "initiate a Justification and Approval as soon as possible utilizing FAR 6.302.2, Urgent and Compelling circumstances [sic], as justification." B.295. That same day, Major Blackmon prepared a Determination and Findings to justify the award of a sole source contract to Plaintiff to complete the scope of work originally awarded to Iraq-Khadamat. B.297. The Determination and Findings, provided, in pertinent part:

> The contractor anticipated for award, Laudes Corporation, is currently performing successfully on a base life support contract supporting Kirkush Military Training Base (KMTB) and others in Iraq. Laudes was selected to take over this work because there were the next best value offeror on the contract when it was competed full and open during May 04.
>
> Laudes is known to have a credible cost accounting standard. Therefore, the risk of accumulating incurred cost is low, and supporting an additional site will not jeopardize their ability to segregate costs between the different cost pools. FAR 6.302-2, Urgent and Compelling Urgency [sic], is the authority cited due to the nature of this acquisition. The known source, Laudes, will be able to perform with success based on their history of successful performance and ability to control costs.

DETERMINATION

> Because this letter contract is in the best interests of the Government, approve and execute a letter contract to authorize Laudes to mobilize and begin base life support services at BPSA.

Id. Brig. Gen. Stephen Seay, Defendant's Head of Contracting Activity, concurred. Id.

28. That same day, June 20, 2004, Defendant awarded Plaintiff "Letter Contract, W914NS-04-C-9001, for BPSA Life Support." B.298-321. The letter contract provided:

> Upon bilateral execution of this document, you are hereby directed to perform Life Support services for the Baghdad Public Service Academy (BPSA) training site located at Bagdad [sic], Iraq in accordance with the attached Statement of Work. Additionally, you will be responsible to provide armory, ammunition and armor support, portable sewage services, ensure quality construction of a Semi-Permanent Academy, internet cafes and security upgrades. Costs associated with this effort shall not exceed $26,000,000 for performance 20 Jun 04—15 May 05. You are responsible to conduct a thorough examination of existing equipment on site and adjust your proposal accordingly.

Id. The letter contract also requested that Laudes provide "a proposal on this effort no later than 27 Jun 04." B.298. This point was emphasized further just above the signature line provided by Plaintiff, where it stated that "Laudes agrees to perform work IAW attached SOW and provide CPA and updated proposal for definitization no later than 27 Jun 04. Id.

29. A "letter contract is a written preliminary contractual instrument that authorizes the contractor to begin immediately manufacturing supplies or performing services." FAR 16.603-1. B.156.

30. Plaintiff does not know the origin or basis of $26,000,000 not to exceed ("NTE") price. Comp., ¶ 59. Major Blackmon does not recall how the CPA determined the Phase I Contract's NTE price of $26 million. B.631. However, if the CPA had been following standard procedures set forth in the Federal Acquisition Regulations (FAR) (which it did in many cases even though the FAR were inapplicable), the ceiling price of the Phase I Contract would have

been $52,000,000, twice the NTE price. In fact, this was the approach followed by the USG in awarding the Phase II Contract to Plaintiff 45 days later. Comp., ¶ 60.

31. On June 20, 2004, when they were signing the Phase I Contract, the contracting officer told Plaintiff that the contract would be modified when definitized to increase funding and to modify the statement of work so as to include contract coverage for construction and other support requirements. Comp., ¶ 67. The parties to the Phase I Contract knew, at the time of award, that the NTE price set forth in the letter contract was insufficient to perform all of the work demanded by the Phase I Contract SOW because Plaintiff had already submitted a competitive bid for the Phase I Contract five weeks earlier (B.241-49) and that Plaintiff's price for the work under the Phase I Contract was more that $9 million greater than the NTE price. B.266. Moreover, as work under the contract progressed, the parties knew—because of additional and changed work required by Defendant—that the funding shortfall on the contract was increasing. Comp., ¶ 69. Moreover, notwithstanding the NTE price and the ever-increasing work demanded and accepted by Defendant, the Phase I Contract did not permit Plaintiff to stop work when Plaintiff reached the NTE price. B.298-321. Neither the PCO nor the CPATT would have permitted Laudes to stop performance when the artificial NTE price was reached. Comp., ¶¶ 75, 206, 216, 232, 240, 247, and 261.

32. In addition, The Phase I Contract's payment terms do not specifically designate the use of DFI funds. Pursuant to ¶ 40 of the Phase I Contract, the "obligation under this contract is made with Iraqi Funds, as defined in CPA Memorandum Number 4, dated 19 August 2003." A. 111. CPA Memorandum Number 4 defines the term "Iraqi Funds" to include Vested Funds, Seized Funds or DFI Funds. A.45. Thus the payment terms for the Phase I Contract do not specifically identify DFI funds as the source of payment.

33. Major Blackmon does not recall specific discussions with Plaintiff about the Phase I Contract NTE price of $26 million. B.626. Major Blackmon does not recall whether Plaintiff told him that Plaintiff could not do the work for $26 million. Id.; B.629-30.

34. Major Blackmon, when he executed the Phase I Contract On June 20, 2004, was "pretty sure" he would not be executing contracts or obligating DFI funds after the transfer of authority. B.638. However, Major Blackmon did not know what exactly was going to happen after June 30, 2004 after the CPA dissolved. B.638-39. Major Blackmon does not recall ever seeing the June 14, 2004 letter at A.81. B.640-41.

35. Major Blackmon did not know how he would have definitized the Phase I Contract after the transfer of authority to the IIG. B.637. Major Blackmon does not recall discussions with Plaintiff about that at contract execution, although he does recall that Plaintiff was concerned about it. B.638.

36. On June 28, 2004, Plaintiff provided an updated proposal to Defendant, addressed to Lt. Col. Eric Maksymyk, providing a price of $25,109,053 for Life Support at BPSA and $6,885,150 to construct new facilities to accommodate 1250 students, including classrooms and dining facilities. B.322. That amount was $3,076,756 *less* than Plaintiff had submitted as its offer in response to the initial award during full and open competition. Defendant took no action on Plaintiff's June 28, 2004 letter.

37. Lt. Col. Maksymyk was also assigned to the PCO and was the Program Manager for the BPSA. B.613. He shared an office with Maj. Blackmon and they sat about two desks away from each other. B.614-15. LT. Col. Maksymyk and Major Blackmon worked together for CPA and then the PCO on the BPSA life support contracts. B.615-16. Major Blackmon does not recall seeing Plaintiff's June 28, 2004 letter to Lt. Col. Maksymyk (B.322). B.642.

**Transfer of Authority**

38. During the procurement process for the award of the BPSA Life Support contract, on May 11, 2004, President Bush signed National Security Presidential Directive 36 ("NSPD 36"), which stated that when the CPA was terminated, the United States would be represented in Iraq by a Chief of Mission under the Department of State and that a Project and Contracting Office ("PCO") would provide acquisition support for both military and civilian organizations of the Defendant in Iraq. Comp., ¶ 46; A. 112-114.

39. By separate letters, both dated June 5, 2004, U.S. Secretary of State Colin Powell and Dr. Ayad Allawi, Prime Minister of the IIG, disclosed to the United Nations Security Council agreed-upon limitations and/or exceptions to the IIG's authority. Comp., ¶ 77; A.39-42. Prime Minister Allawi specifically requested a new Security Council "Multinational Force (MNF) mandate to contribute to maintaining security in Iraq, including through the tasks and arrangements set out in the letter from [Secretary Powell]." Comp., ¶ 78; A.39. Secretary Powell identified further limitations on the IIG's authority in his description of the tasks to be performed by the MNF after turnover, including "train[ing] and equip[ping] Iraqi security forces." Comp., ¶ 80; A.42.

40. In response to these two letters, on June 8, 2004 the United Nations Security Council issued United Nations Security Council Resolution 1546 ("Resolution 1546") which, among other things, decided that the MNF "shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the

[letters from Secretary Powell and Prime Minister Allawi] annexed to this resolution…." Comp., ¶ 81; A.32-42.

41. At the time Plaintiff executed the Phase I Contract, it had not heard of nor read either Resolution 1546 or CPA Memorandum 15. B.50 ¶6.

42. Transfer of authority to the IIG on June 28, 2004 did not, however, result in complete sovereignty for the IIG because CPA Order 17, Status of the Coalition Provisional Authority, MNF-Iraq, Certain Missions and Personnel in Iraq ("CPA Order 17"), remained in full force and effect after June 28, 2008. Comp., ¶ 87; B.118-34. Pursuant to CPA Order 17, after June 28, 2004: MNF personnel, property, funds, and assets were immune from Iraqi legal process, including any arrest, detention or civil, criminal, or administrative process; contractors doing business in Iraq were immune from Iraqi legal process with respect to acts performed by them pursuant to the terms and conditions of contracts entered into with the MNF or the CPA; the IIG did not have the authority to deny entry visas, licenses or permits for contractors doing business in Iraq for the MFN. Comp., ¶¶ 88-89, 93; B. 118-14.

43. In addition, Defendant retained ownership of and authority over BPSA. On July 15, 2005, the Inspectors General for the Departments of State and Defense issued an Interagency Assessment of Iraqi Police Training. B.511-556. They found that the Iraqi Police Service ("IPS") was "not yet capable of single-handedly meeting the security challenges" (Id. at 517) and that the IIG had not yet taken "full responsibility for the management and administration of the IPS training program." (Id. at 518).

44. According to the Iraq Police Report, the Iraqi police training program initiated by the CPA "is capital intensive." Id. at 529. As of July 15, 2005, the Inspector General reported that excluding operating costs "the **U.S. Government** has spent about $190 million in building

or renovating training facilities both [in Jordan] and inside Iraq." *Id.* (emphasis added.) In essence, the Government and its partners "created the [training] facilities." *Id.* However, as of July 15, 2005, the IIG had not yet taken ownership of the police training facilities, including BPSA. *Id.* ("The MOI **will** inherit them.") (Emphasis added).

45. In addition, as of July 15, 2005, the Government and its partners still bore the full cost for operating and maintaining the police training facilities. *Id.* In fact, Ambassador Bremer had predicted as much a year earlier. Baghdad Police Academy Commencement Address, April 1, 2004 ("The United States will provide Iraq with almost $1 billion for training and technical assistance to you, the Iraqi police."). B.53. In apparent response to this promise of support from the Government, the IIG specifically told the Inspector General that in 2005, the IIG had not set aside any funds for the BPSA. ("The [IIG] Deputy Minister of Interior (Finance) told the IG Team that the 'MOI has no funding in the Ministry's FY05 budget for police academies.'") B.529.

46. As of July 15, 2005, more than a year after the dissolution of the CPA, the Inspector General found that the IIG had not taken "full ownership" of the police training program. B. 538 ("Unless and until the Iraqi government, through the MOI, takes full 'ownership' of the IP training program, the Coalition will fall short in helping create an effective police force.") As the Iraqi Police Report stated:

> Perhaps the most obvious step in migrating control of the police training function to the Iraqi government is to ensure they are completely engaged in decisions about their training today. This has not always been the case. Heretofore, Coalition process has followed the process set by the CPA—directing by decree rather than collaborative engagement. A senior CPAT official told the IG Team, "…many of us do not realize that CPA has gone away. We have not asked the Iraqis what they want or need."

B. 539.

47. Thus, during the period of performance of the Phase I and Phase II Contracts,

Defendant, not the IIG, retained authority over and ownership of the BPSA.

48. In a June 22, 2004 memorandum the Deputy Secretary of Defense stated:

> In National Security Presidential Directive (NSPD) 36, United States Government Operations in Iraq, dated May 11, 2004, the President established the Project and Contracting Office (PCO) as a temporary organization with the Department of Defense (DoD). Pursuant to NSPD 36 and 10 U.S.C. § 113, I hereby direct that the PCO be organizationally established and placed within the Department of the Army to provide acquisition and project management support with respect to activities in Iraq, including support related to the close-out of the Coalition Provisional Authority (CPA).
>
> * * *
>
> Until June 30, 2004, the PCO will provide acquisition and program management support to the Administrator of the CPA. After June 30, 2004, the PCO will support the close-out of the CPA and will provide acquisition and management support to the Chief of Mission in Iraq, as requested by the Secretary of State, and for other activities in Iraq, as requested by the head of the other Departments and agencies.

B.160.

49. After June 28, 2004, the PCO either awarded new contracts or modified existing contracts, which actions required the expenditure of more than $80 million in DFI funds. B.182-84.

50. The U.S. Government requested on several occasions that the Iraqi government authorize the expenditure of additional DFI funds for new and modified contracts using DFI funds. B.182-87. These requests, totaling in excess of $300M in U.S. dollars, were approved by the Iraqi government. Id.

51. On September 17, 2007, Defendant sought and obtained approval to reimburse the U.S. Army Corps of Engineers $11.3M for the DFI for quality assurance oversight performed by the Army. B.188.

52. Following the dissolution of the CPA, the IIG never provided any direction to the PCO regarding any specific DFI-funded contract. B.565. However, such contracts were modified by Defendant. B.568.

**Performance of the BPSA Contract**

53. The operating conditions in Iraq during 2004 were extremely difficult. For example, upon Laudes employees first arriving at BPSA to assume responsibility for the contract, mortars were fired and landed inside BPSA. In addition, requirements changed almost daily as BPSA's mission, policies and security status changed and evolved—but the contracts were never formally changed or expressly modified. Complaint, ¶ 113.

54. There were no provisions for Laudes to provide security in either contract, nor were there contingencies for insurgent attack, student theft and vandalism, or the rapid deterioration of the situation in Iraq and the escalating costs related to that deterioration. Yet each circumstance presented itself on numerous occasions and on each occasion Laudes was asked to perform extra work not originally within the scope of the contracts. These requests were made by PCO or BPSA personnel with authority. The contracting officer either participated in such requests, or had actual or constructive knowledge of the requests and accepted those requests, and failed to take any action to negate such requests or stop Laudes from performing in reliance on them. Complaint, ¶ 117.

55. In addition, on September 14, 2004, the BPSA suffered an extensive mortar and rocket attack. Several new buildings were damaged and some students and workers were injured. Laudes, as requested by authorized representatives of the USG, repaired the damaged buildings and invoiced for that effort on the same basis as the original construction. Of course, this additional work was not originally within the scope of work of either contract. However,

there was an implied contract that Laudes would be fairly compensated for performing this additional work. Complaint, ¶ 120.

56. After the attack, BPSA decided to move student billeting and training units to safer existing permanent/hardstand buildings. The BPSA and PCO spoke with Laudes about this process multiple times. Laudes was directed to repair the existing air conditioners and provide equipment, wiring, and generator power for these new buildings. Complaint, ¶ 121.

57. BPSA was regularly mortared, requiring a change in the specification of some of the buildings Laudes was constructing. CPATT wanted a stand off capability on the roofs of buildings which necessitated a second skin being built on top of the existing roofs. As Brigadier Mackay later noted, "This was not in the original requirement but [Laudes] agreed to get on with the work and allow the necessary changes to the contract to follow on." This additional scope of work was either requested by authorized by USG representatives or requested and performed with the actual or constructive knowledge of the contracting officer, who consented to Laudes' efforts. Complaint, ¶ 124.

58.

In fact, on September 6, 2004, Mr. Jeff Stackow, in the contracting office at the PCO, summarized a meeting between USAF personnel and Laudes personnel and acknowledged the increased costs Laudes was incurring, stating:

> Due to increased [insurgent] activity life support costs are running higher than expected. Laudes will give CPATT a cost estimate on installing protection from mortars over the expedient camp structures. In the meantime, installation of the expedient camp will continue as originally anticipated.

Complaint, ¶ 125; B.192.

59. Major Blackmon stated that "in general life support in Iraq was a very fluid thing and you had a lot of changes, not just for this particular effort [the Phase I Contract], but all over

the country, all over the AOR…" B.665.

60. Major Blackmon does not remember any particular changes to the Phase Contract, but stated it was "likely there were additional measures taken" at the BPSA for security as the result of mortar fire. B.666.

61. Mr. Nordgaarden, the contracting officer's representative (B. 692-3) and the Chief of Logistics at BPSA, arrived in Iraq in September 2003 and left in October 2005, spending the entire time working at BPSA. B.673-74.

62. Prior to award of the Phase I Contract, BPSA could house approximately 250 students. B.689.

63. According to Mr. Nordgaarden, Option CLIN 1009 was exercised and, instead of placing the semi-permanent academy in another location, it was placed at the BPSA. B.691-92.

64. Mr. Nordgaarden accepted, via DD Form 250, the goods and services provided by Plaintiff. B.710-14. The DD 250's were prepared by Plaintiff and Plaintiff attached its invoice and delivery receipts to the DD 250's. B.716. Exhibit 56 to his deposition (B.491-510) contains examples of the delivery receipts attached to Plaintiff's invoices. B-717-18.

65. Plaintiff was required to provide life support for more than 1,500 students by CPATT at the BPSA. B.723. Mr. Nordgaarden was sure he had conversations with Major Blackmon or his replacement about these requirements. Id.

66. Although Iraq-Khadamat intended to install a tent city at BPSA, Plaintiff used a metal framed structure. B.725.

67. Plaintiff was also directed by BPSA to provide life support for approximately 1,500-2,000 commandos. B.729-31.

68. BPSA provided the headcount to Plaintiff upon which Plaintiff's life support

services were based. B.732.

69. There were discussions with BPSA and the PCO contracting office about modifications to Plaintiff's contract to address additional work required by BPSA of Plaintiff. B.732-34.

70. Mr. Nordgaarden recalled the following changes to Plaintiff's scope of work:

a. Plaintiff would have to replumb the latrines every three weeks because the students were tearing it to pieces. B.735.

b. The students "devastated" the laundry and bathroom facilities repeatedly and Plaintiff would be directed to repair them. B.735-36.

c. Plaintiff was required to perform work to repair the BPSA when it was damaged by mortar attacks. B.737-38.

d. Plaintiff was required to install T-walls and U-bunkers to protect from mortar attacks. B.743. This modification to Plaintiff's scope of work was discussed with the contracting officer's staff. B.743-44.

e. Plaintiff was required to repair the barracks at BPSA after the graduation ritual of destroying them. B.745

71. The DD 250's signed by authorized personnel for BPSA show that Defendant ordered and accepted goods and services for Plaintiff under the Phase I Contract for which Plaintiff invoiced Defendant $35,963,486.12. B.325-490.

72. The PCO knew and acknowledged that life support costs at the BPSA were "running higher than expected" due to "increased HCF activity." B.192. A meting was held on September 14, 2004 to discuss that issue, as well as the need for Plaintiff to install overhead

protection from mortar attacks. Id. The PCO's T.J. McClaren ("CACI Supporting Laudes Contract at BPSA") was present at the meeting. Id.

73. On September 30, 2004, Major Cahill, Executive Officer, CPATT Training and Standards Division, asked by e-mail for an electronic copy of the statement of work for the life support at BPSA. B.197. Mel Goudie, the BPSA Director, responded by stating:

> Laudes contract continues to develop. In respect of an SOW we still await the finished document. Due to the unexpected activity surrounding the academy and the way in which we had to terminate one contract and hire Laudes, contracting and Laudes have not fully implemented a paper agreement.
>
> Laudes were given monies to ensure both the life support and the annex buildings were started. Larry Underwood has just returned to country this evening and I will meet with him soonest.

B.197

74. On December 18, 2004, Laudes incurred costs for repairs resulting from an electrical fire in the dining facility. Again, these costs were outside the scope of its contracts at the BPSA, yet Laudes performed the work as requested by authorized representatives of the USG with the understanding that the USG would provide an equitable adjustment to Laudes' contract or issue a new contract for the additional work. Complaint, ¶ 143.

75. On August 5, 2004, Major Blackman, a contracting officer assigned to the PCO, with the assistance of Captain Phil Dalby, USN, prepared a Justification and Approval for Other than Full and Open Competition to award a letter contract to Plaintiff to "increase the student population at Baghdad Police Academy immediately by 2000 students." B.193. The document stated that the Plaintiff was "the only known competitor in this theater that had the proven capability to accomplish" the required work. Id. The document also noted that Plaintiff was the current contractor to perform this work "due to mobilization time involved and the importance of life support continuity since Laudes is already on site." B.194.

76. On August 5, 2004, the PCO's Head of Contracting Activity, Brig. Gen. Stephen Seay, approved "the cost-plus fixed fees procurement." B.195.

77. Also on August 5, 2004, Major Blackmon prepared, and Brig. Gen. Seay concurred with, a Determination and Findings for the award of a letter contract to expand the BPSA. B.196. That document provides:

> In May 04, the effort to perform life support systems at BPSA was awarded to Iraq Khadamat (IK) under contract DABV01-04-C-0104. In Jun [sic] 04, IK was Terminated for Cause for failure to adequately support the site. The contractor awarded a letter contract to replace IK on this effort, Laudes Corporation, is currently performing successfully on two vital base life support contracts supporting Kirkush Military Training Base (KMTB) at the BPSA. An unusual and compelling requirement to expand BPSA and support 2,000 policemen currently exists. In order to have the facilities in place to make this happen, work must commence immediately.
>
> The Iraqi Ministry of the Interior is suffering a critical shortage of policeman to support the upcoming National Elections in January 2005 – an additional 2000 will help immeasurably. In order to satisfy this requirement, a letter contract is the only viable means to get the support in place to immediately make this happen. This requirement is absolutely one of the highest priorities of the Interim Iraqi Government. A letter contract under these unusual and compelling circumstances is appropriate.
>
> Laudes is known to have a credible cost accounting standard. Therefore, the risk of accumulating incurred cost is low, and supporting an additional site will not jeopardize their ability to segregate costs between the different cost pools. FAR 6.302-2, Unusual and Compelling Urgency, is the authority cited due to the nature of this acquisition. The known source, Laudes, will be able to perform with success based on their history of relevant past performance and ability to control costs.
>
> Determination
>
> Because this letter contract is in the best interests of the Government, approve and execute a letter contract to authorize Laudes to commence immediate site preparation and expanded base life support services.

B.196.

78. On August 5, 2004, the PCO awarded Plaintiff a second contract for work at the BPSA, contract number W914NS-04-C-9032 ("Phase II Contract"). Comp., ¶ 104. The parties understood and intended the Phase II Contract to be, in fact, merely a modification of the Phase I

Contract using a different source of funds. Comp., ¶ 107. This intent and understanding was expressed, in part, by the manner in which invoices were prepared and submitted by Plaintiff and approved by the PCO. The amounts charged the PCO by Plaintiff were allocated between the two contracts based on average student headcount. That is, student headcounts were provided by the BPSA each day for life support services to be performed the following day. Invoices were based upon these BPSA-provided figures. Comp., ¶ 108.

79. On April 27, 2005, the PCO asked Plaintiff to continue service at the BPSA, as the terms of the Phase I and Phase II Contracts were expiring. The PCO offered to pay Plaintiff $4,000,000 for 30 days of life support service, which Plaintiff accepted. As with the Phase II Contract, this 30-day extension treated as simply an extension of the Phase I Contract, for which $4 million per month was deemed by the Government to be a fair price. Comp., ¶¶ 172-74.

80. On October 11, 2006, Laudes submitted a certified claim to the contracting officer and requested a final decision covering both the Phase I and Phase II Contracts. The contracting officer responded on November 29, 2006, denying the claim. Comp., ¶ 203.

81. Government representatives definitized the Phase I Contract. See BPSA 2565. The Government did not consult with the IIG when it definitized the Phase I Contract. *Id*; *see also* Government Reponses at 9. On October 11, 2006, Laudes submitted a certified claim to the contracting officer and requested a final decision covering both the Phase I and Phase II Contracts. The contracting officer responded on November 29, 2006, denying the claim. Comp., ¶ 203.

Respectfully submitted,

LAUDES CORPORATION

By:__________/s/__________

Mark G. Jackson, WSBA #18325

GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101
(206) 464-3939
(206) 464-0125 – fax

Counsel of Record for
LAUDES CORPORATION

July 21, 2008

SEA_DOCS:895598.1 [13532-00100]