No. 07-4C
(Judge Wheeler)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LAUDES CORPORATION,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

# PLAINTIFF'S APPENDIX OF DOCUMENTS TO SUPPLEMENTAL OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

Mark G. Jackson, WSBA #18325
GARVEY SCHUBERT BARER
1191 Second Avenue, Suite 1800
Seattle, Washington 98101-2939
(206) 464-3939
(206) 464-0125 – fax

Attorneys for Plaintiff

July 21, 2007

Laudes Corporation v. The United States
US Court of Federal Claims, Case No. 07-4C

Index to Plaintiff's Appendix of Documents


| Document | Page |
|---|---|
| L. Paul Bremer, Administrator, CPA, Baghdad Police Academy Commencement Address, April 1, 2004 | B.52 |
| SIGIR April 30, 2005 Report to Congress (excerpts) | B.55 |
| CPA Regulation Number 2 | B.82 |
| CPA Regulation Number 3 | B.91* |
| CPA Regulation Number 11 | B.99 |
| CPA Regulation Order 16 | B.102 |
| CPA Order Number 17 | B.118 |
| CPA Program Review Board Minutes – July 7, 2003 | B.134 |
| CPA Program Review Board Minutes – July 12, 2003 | B.135 |
| CPA Program Review Board Minutes – Sep. 9, 2004 | B.138 |
| CPA Program Review Board Minutes – Aug 30, 2003 | B.140 |
| CPA Program Review Board Minutes – Sep 1, 2003 | B.142 |
| CPA Program Review Board Minutes – Sep 13, 2003 | B.143 |
| CPA Program Review Board Minutes – Feb 8, 2004 | B.146 |
| CPA Program Review Board Minutes – Feb 24, 2004 | B.149 |
| CPA Program Review Board Minutes – Apr 7, 2004 | B.152 |
| Federal Acquisition Regulation 16.603 Letter Contracts and related FAR Clauses | B.156 |
| June 22, 2004 Memorandum from Deputy Secretary of Defense | B.160 |
| Oral Remarks by L. Paul Bremer, III before the Committee on Government Oversight And Reform, U.S. House of Representatives, Feb 6, 2007 | B.162 |

Statement by Ms. Tina Ballard, Deputy Assistant Secretary of the Army (Policy and Procurement) before the Subcommittee of Readiness, Committee on Armed Services U.S. House of Representatives, Jun 24, 2004 ………………………………………….. B.176

April 13, 2005 Memorandum from Commander, JCC-Iraq to Minister of Finance ……… B.182

December 23, 2005 Memorandum from Commander, JCC-Iraq/Afghanistan to ……….. B.185
Minister of Finance

September 17, 2007 Letter from Commander, JCC-Iraq/Afghanistan
Minster of Finance to ………………………………………………………………. B.188

September 16, 2004 Email from Jeff S. Stackow ………………………………………… B.192

August 5, 2004 Justification and Approval for Phase II Letter Contract ………………… B.193

August 5, 2004 Determination and Findings for Phase II Letter Contract ………………. B.196

October 1, 2004 Email from Mel Goudie ……………………………………………….. B.197

Acquisition Plan for the Procurement of Base Support Operations for the Baghdad Public Safety Academy, April 8, 2004, Deposition Exhibit 3 …………………... B.199

Solicitation, April 22, 2004, Deposition Exhibit 5 ………………………………………. B.208

Amendment to Solicitation, April 29, 2004, Deposition Exhibit 6 ……………………… B.235

Plaintiff's Offer in Response to Solicitation, May 12, 2004, Deposition Exhibit 8 ……… B.241

Source Selection Authority Clearance/Decision Briefing, 13 May 04, Dep. Ex. 11 …….. B.250

Memorandum for Record, Subject Source Selection for BPSA Life Support, DABV01-04-R-0047, 14 May 2004, Dep. Ex. 12 ……………………………… B.264

Designation of Contracting Officer's Representative for Contract DABV01-04-C-0104, May 15, 2004, Dep. Ex. 14. ………………………………………………………. B.268

Revised Statement of Work, 20/07/04, Dep. Ex. 15 …………………………………… B.271

Memorandum to Iraqi Khadamat, 8 June 2004, (Performance Deficiencies), Dep. Ex. 17 ………………………………………………………………………. B.290

Memorandum to Iraqi Khadamat, 13 June 2004, (Demand for Assurances), Dep. Ex. 18 …………………………………………………………………. B.292

Memorandum for Iraqi Khadamat, 19 Jun 04, Termination for Cause, Dep. Ex. 19 ………………………………………………………………… B.293

Purchase Request and Commitment No. 10000S58, 13 Jun 04, BPSA Life Support – Re-Award, Dep. Ex. 20 ……………………………………. B.294

CPA Memorandum for Record, 20 Jun 04, Subject: J&A, BPSA Re-Award Letter Contract, Dep. Ex. 21 ……………………………………. B.295

Memorandum for CPA Legal, 20 Jun 04, Request for Legal Review, Dep. Ex. 22 ………………………………………………………………….. B.296

CPA Determination and Findings, 20 Jun 04, re BPSA Life Support Contract, Dep. Ex. 23 ………………………………………………………………….. B.297

CPA Letter Contract, W914NS-04-C-9001, BPSA Life Support, Dep. Ex. 24 …………. B.298

June 28, 2004 Letter from L. Underwood to LTC Maksymyk, Dep. Ex. 25 ……………. B.322

DD Forms 250 and corresponding invoices, Deposition Exhibit 26 ……………………. B.323

DD Forms 250 and corresponding invoices, Deposition Exhibit 27 ……………………. B.325

DD Forms 250 and corresponding invoices, Deposition Exhibit 28 ……………………. B.328

DD Forms 250 and corresponding invoices, Deposition Exhibit 29 ……………………. B.330

DD Forms 250 and corresponding invoices, Deposition Exhibit 30 ……………………. B.343

DD Forms 250 and corresponding invoices, Deposition Exhibit 31…………………….. B.344

DD Forms 250 and corresponding invoices, Deposition Exhibit 32 ……………………. B.346

DD Forms 250 and corresponding invoices, Deposition Exhibit 33 ……………………. B.358

DD Forms 250 and corresponding invoices, Deposition Exhibit 34 ……………………. B.361

DD Forms 250 and corresponding invoices, Deposition Exhibit 35 ……………………. B.363

DD Forms 250 and corresponding invoices, Deposition Exhibit 36 ……………………. B.366

DD Forms 250 and corresponding invoices, Deposition Exhibit 37 ……………………. B.370

DD Forms 250 and corresponding invoices, Deposition Exhibit 38 ……………………. B.387

DD Forms 250 and corresponding invoices, Deposition Exhibit 39 ……………………. B.390

DD Forms 250 and corresponding invoices, Deposition Exhibit 40 …………………….. B.393

DD Forms 250 and corresponding invoices, Deposition Exhibit 41 …………………….. B.412

DD Forms 250 and corresponding invoices, Deposition Exhibit 42 …………………….. B.432

DD Forms 250 and corresponding invoices, Deposition Exhibit 43 …………………….. B.450

DD Forms 250 and corresponding invoices, Deposition Exhibit 44 …………………….. B.470

DD Forms 250 and corresponding invoices, Deposition Exhibit 45 …………………….. B.489

Delivery Receipts, Deposition Exhibit 56 ……………………………………………….. B.491

Inspectors General Report, Interagency Assessment of Iraq Police Training
July, 15, 2005 (excerpts) ……………………………………………………. B.511

Defendant's Response to Plaintiff's First Set of Interrogatories and Request for
Production of Documents, January 14, 2008 …………………………………….. B.557

Defendant's Response to Plaintiff's Second Set of Interrogatories …………………… B.587

June 2, 2003, letter from Mitchell E. Daniels, Jr., Director, OMB to C.W. Bill Young,
Chairman, Committee on Appropriations transmitting report to Congress ……… B.592

Deposition of LTC Milton Lloyd Blackmon, May 22, 2008 (excerpts) …………………. B.606

Deposition of Ted Nordgaarden, June 5, 2008 …………………………………………… B.668

* Numbers B.88-B.90 not used

SEA_DOCS:895311.1 [13532-00100]

**L. Paul Bremer**
**Administrator**
**Coalition Provisional Authority**
**Police Academy Commencement**
**Baghdad**
**April 1, 2004**

The men and women before me are the line between civilization and barbarism.

Civilization started here, in what is now Iraq. It was here that humans first stopped wandering from place to place in search of food, began to cultivate crops and formulated the rules necessary to dignify life.

Eventually the rules devised for bringing decency to human existence had to be codified. And that too first happened here, the place where Hammurabi created the world's first known legal code.

Legal codes have changed over the centuries. But some things have not changed since the time of Hammurabi. There have always been and always will be criminals. And there have always been those who stand on the side of justice and human dignity.

Yesterday's events in Fallujah are a dramatic example of the ongoing struggle between human dignity and barbarism. Five brave soldiers were killed by an attack in their area. Then, two vehicles containing four Americans were attacked and their bodies subjected to barbarous maltreatment.

The acts we have seen were despicable and inexcusable. They violate the tenets of all religions, including Islam, as well as the foundations of civilized society. Their deaths will not go unpunished.

Our sympathy goes out to the families of all, civilian and military, Iraqi and Coalition, who have given their lives in the war to liberate Iraq and free it from terrorism. They have not died in vain.

These acts are also a crime under law and a crime against the future of Iraq. The Coalition, Americans and others, came here to help the people of Iraq. They came to help Iraq recover from decades of dictatorship, to help the people of Iraq gain the elections, democracy and freedom desired by the overwhelming majority of the Iraqi people.

These murders are a painful outrage for us in the Coalition. But they will not derail the march to stability and democracy in Iraq.

The cowards and ghouls who acted yesterday represent the worst of society. You before us represent the other, larger, better Iraq.

You, the finest of the honorable majority of Iraq's men and women, have chosen to confront the evil-doers, to carry the banner of civilization.

You have put to shame the human jackals who defiled the streets of Fallujah, and the Ashoura murderers who besmirched the streets of Karbala and Baghdad with the blood of innocents.

Your efforts, and the efforts of the millions upon millions of decent Iraqis who support you, will make a difference.

* * *

You are the first graduates of this eight-week police training course in Iraq. You now begin a 24-week program of field training. And more of the finest men and women in Iraq will follow you. Over a thousand are in training right now.

By this time next year, the Coalition, using American funds, will have trained over 25,000 police, the largest police training program in history.

The taxpayers of the United States are providing almost $19 billion dollars for the reconstruction of Iraq. Our top priority is improving Iraq's security forces. We are spending billions of dollars to create a new Iraqi army, to raise an effective Civil Defense Corps and to form a professional police service.

The United States will provide Iraq with almost $1 billion for training and technical assistance to you, the Iraqi police. We will also spend over $1.3 billion on courts, prisons, judicial protection and training and other activities related to the administration of justice and the rule of law.

You are the guardians of Iraq's future. We will stand with you after June 30 when an Iraqi government will become sovereign. Like you, we have shed our blood to construct a better, more just Iraq, an Iraq where all live in dignity. We will not walk away from our shared commitment to you and to justice.

The Coalition is here and will remain here to support you, to cooperate with you and ease your burden. After June 30, and for as long as necessary, the Coalition will continue to do what is necessary for Iraq to defend itself against murderers and terrorists.

Once again, the Land between the Two Rivers is the focal point of the clash between the forces of darkness and the light of civilization. You, the men and women of the Iraqi Police, have chosen the side of civilization.

You and your colleagues are the visible answer to the shameful barbarians of Fallujah and Karbala and Najaf and Baghdad. You follow the finest traditions of all humanity as you take up the task of protecting the innocent.

While lesser men kill the innocent, you, the men and women of the Iraqi police, have chosen to protect the innocent.

While lesser men complain of violence, you have chosen to confront it.

While lesser men ask for a better future, you have chosen to help create one.

You already enjoy the respect and admiration of your fellow Iraqis. The polls make it clear that your fellow citizens place more confidence you, their police, than any other part of the government.

Ladies and gentlement, in years to come, when Iraq's future of hope has been achieved, when old men speak of the days following liberation from Saddam's tyranny, they will speak of your bravery, your sacrifice and your accomplishments.

They will remember the times when the decent people of Iraq stood against the forces of evil.

They will be grateful to you for your service to your country.

I congratulate you and I am honored to stand here before you.

Mabruk al Iraq al Jadeed.
Aash al-Iraq!

# Message from the Special Inspector General for Iraq Reconstruction

I am pleased to submit to the Congress the fifth Quarterly Report of the Office of the Special Inspector General for Iraq Reconstruction (SIGIR), which complies with the reporting requirements of Public Law 108-106, as amended. It documents our progress since the January 30, 2005 Quarterly Report and updates the status of reconstruction efforts funded by the Iraq Relief and Reconstruction Fund (IRRF). Contractual obligations of the IRRF grew during this reporting period from 56.8% to 66%, and expenditures increased from 13.7% to 23%.

In our last Report, I noted that the Office of the SIGIR was reconstituting its capabilities to carry on our important and specialized oversight mission. There had been months of speculation last year that, under the SIGIR's predecessor statute, we would cease operations at the end of calendar year 2004. The SIGIR's legislative reauthorization in late October extended the organization to continue its mission until 10 months after 80% of the IRRF has been obligated and it also directed the SIGIR to report on the entire IRRF.

The SIGIR has made great progress in reestablishing and reinvigorating its operations. We have succeeded in recruiting and hiring the personnel we need to achieve our mission objectives. By the end of May, our Baghdad staff—composed primarily of auditors, evaluators, and criminal investigators—will have increased from 7, working there in January, to about 30. I am very proud of these extremely competent professionals who have been willing join our team to serve their country in Iraq during these trying times.

During this reporting quarter, we produced a thoroughgoing new audit plan for 2005-2006 and announced several new audits that reach to the core of IRRF project management. We recognized the need for more granularity in the reporting on how the IRRF has been used to execute Iraq's reconstruction, on what current projects are underway, and on what future plans for construction are in the pipeline. This Report contains the details on a new system that we developed to combine all reporting on Iraq reconstruction contract and project activity into a single, understandable database.

In February, during my seventh trip to Iraq, I visited with each of the U.S. government organizations involved in managing Iraq reconstruction and asked for complete financial, contracting, and project management data. After some initial resistance, they responded rapidly, but they provided data of varying quality and scope. Our initial analysis of the thousands of lines of data we received has raised important questions about program management and data reliability. Thus, we have commenced two audits to assess the policies, procedures, and internal controls of those managing reconstruction as well as the information systems used to manage IRRF data.

This Report also provides summaries of four recently completed audits and brief descriptions of selected investigations. Two of the audits, which we began under our previous incarnation as the Coalition Provisional Authority Inspector General (CPA-IG), found a lack of controls and poor oversight in contract administration and deficiencies in the management of cash disbursements, resulting in a potential for fraud. To be clear, these two audits involved assets from the Development Fund for Iraq (DFI) and not U.S. appropriated funds.

The officials responsible for the significant issues that our audits addressed generally agreed with our findings and recommendations and, in some cases, are working to remedy any remaining weaknesses. To permit them the opportunity to respond fully, and to ensure that the audits are fair, complete, and objective, I extended the deadline for their comments and thus, after notifying Congress, briefly delayed this Report's release.

We intend for our oversight to lead to improvements in the operational performance and accountability of those engaged in Iraq reconstruction. Our most recently completed audits demonstrate that we are making progress and can make a difference.

With our capabilities reestablished, and with the strong support of the Secretary of State and the Secretary of Defense, the SIGIR is energized and moving forward to provide more thorough and more comprehensive oversight of the U.S. investment in Iraq reconstruction.

Submitted on May 7, 2005.

Stuart W. Bowen, Jr.
Special Inspector General for Iraq Reconstruction

# Table of Contents

**Section 1** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Meeting the Mission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
SIGIR Accomplishments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Section 2** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
**The Mission of the Special Inspector General for Iraq Reconstruction** . . . . . . . . 11
**SIGIR Audits** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Completed Audit Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Draft Reports Issued . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Current Audits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Discontinued Audits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Future Audits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
**SIGIR Investigations** . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
SIGIR Investigative Activity and Analysis . . . . . . . . . . . . . . . . . . 22
**SIGIR Hotline** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
January 1 – March 31, 2005 Reporting . . . . . . . . . . . . . . . . . . . . 25
**SIGIR Activities and Initiatives** . . . . . . . . . . . . . . . . . . . . . 29
Coordinating With Other Oversight Agencies . . . . . . . . . . . . . . . . . 29
Iraqi Ministry Inspector General Training . . . . . . . . . . . . . . . . . 31
Security and Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
Lessons Learned/High-Risk Factors . . . . . . . . . . . . . . . . . . . . . . 38
**Other Agency Oversight** . . . . . . . . . . . . . . . . . . . . . . . . . . 45
Other Agency Audits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
Other Agency Investigations . . . . . . . . . . . . . . . . . . . . . . . . . 57
**The SIGIR's Future Plans** . . . . . . . . . . . . . . . . . . . . . . . . . 59
Operational Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
The SIGIR Audit Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
Information and Operations Program . . . . . . . . . . . . . . . . . . . . . 61
Building the Capacity of the SIGIR . . . . . . . . . . . . . . . . . . . . . 62

**Section 3** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
**Iraq Reconstruction Reporting** . . . . . . . . . . . . . . . . . . . . . . . 67
Estimates of the Cost to Complete Projects . . . . . . . . . . . . . . . . . 68
**Iraq Reconstruction Management** . . . . . . . . . . . . . . . . . . . . . . 69
Agency Roles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Agency Systems .......... 70
Reconstruction Management Processes .......... 72
**Project and Contract Analysis .......... 73**
Data Quality .......... 74
Data Analysis .......... 74
**Assessing Iraq Reconstruction .......... 79**
Employment Data .......... 80
Oil .......... 80
Electricity .......... 82
Telecommunications .......... 83
Democracy-building Activities .......... 83
**Further Reading .......... 88**

**Section 4 .......... 89**
**IRRF2 Funds under P.L. 108-106 .......... 91**
Operating Expenses .......... 94
**Other U.S. Appropriated Funds .......... 96**
Public Law 108-11 .......... 96
Commanders' Assistance Programs .......... 98
**Iraqi Funds .......... 101**
Seized Funds .......... 101
Vested Funds .......... 101
Development Fund for Iraq .......... 102
Other Iraqi Potential Repatriated Funds .......... 104
The Oil-for-Food Program .......... 104
**Donor Funds .......... 106**
Humanitarian Aid .......... 106
Bilateral Aid .......... 106
International Reconstruction Fund Facility for Iraq (IRFFI) .......... 106
World Bank, International Monetary Fund, and Donor Loan Programs .......... 107
Iraqi Debt Relief .......... 108
**Sources and Uses of Funding for Iraq Relief and Reconstruction Data Clarification 109**

**Acronyms and Definitions .......... Acronyms 1**

**Endnotes .......... Endnotes 1**

**Appendices .......... Appendices 1**
**Appendix A .......... A-1**

Statutory Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
**Appendix B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1**
Iraq Relief and Reconstruction Fund Apportionments by Agency . . . . . . . . . . . . . . . . B-2
**Appendix C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1**
Seized Currency Expenditure Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-2
**Appendix D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-1**
Vested Assets Expenditure Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-2
**Appendix E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-1**
International Reconstruction Fund Facility for Iraq . . . . . . . . . . . . . . . . . . . . . . . . . . . E-2
**Appendix F . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-1**
List of International Pledged Support for Iraq Reconstruction . . . . . . . . . . . . . . . . . . . F-2
**Appendix G . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G-1**
List of Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G-2
**Appendix H . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . H-1**
Audit Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . H-2

# Section 4

Sources and Uses of Funding for Iraq Relief and Reconstruction

Public Law 108-106, as amended, requires the Special Inspector General for Iraq Reconstruction (SIGIR) to report on the oversight and accounting of the obligation and expenditure of funds used for Iraq reconstruction. The three main sources of funds used for this are U.S. appropriated funds, donated funds, and Iraqi funds. This section provides an accounting of the sources and uses of these funds.

Section 4 covers these topics:

- IRRF1 funds
- IRRF2 funds
- other U.S. appropriated funds
- Iraqi funds
- donor funds
- data clarification

As of March 30, 2005, approximately $26.9 billion of U.S. and international donor funds had been provided for Iraq reconstruction. Another $37.1 billion of Iraqi funds has been available, but most of these funds were used for the operation of the Iraqi government. Only a small portion was used for reconstruction. These are the funding streams:

- *U.S. appropriated funds*: $24.3 billion—$18.4 billion from the Iraq Relief and Reconstruction Fund 2 (IRRF2), used primarily for reconstruction (Note: Another $5.7 billion, exclusively for security, is pending congressional approval.)

- *Donor funds*: $2.6 billion for reconstruction and $849 million for humanitarian relief

- *Iraqi funds*: $37.1 billion primarily for the operation of the Iraqi government

# IRRF2 Funds under P.L. 108-106

Currently, the IRRF is the primary U.S. funding vehicle for the reconstruction of Iraq. Created by P.L. 108-11 on April 16, 2003, the IRRF was designed "for necessary expenses for humanitarian assistance in and around Iraq and to carry out the purposes of the Foreign Assistance Act of 1961 for rehabilitation and reconstruction in Iraq." Initially funded at $2.4 billion, the IRRF (IRRF1) was used for projects identified in the immediate aftermath of Operation Iraqi Freedom. In contrast, the IRRF2 was more than seven times larger than the IRRF1, and it was designed to meet Iraq's extensive reconstruction requirements identified over the summer and fall of 2003.

Passed on November 6, 2003, to provide $18.4 billion in IRRF2 aid, P.L.108-106, is unique. The Act mandates specific sector aid funding totals, with limitations on the transfer of funds between sectors without congressional notification or, in the case of larger modifications, without congressional approval. The Act also restricts apportioned funds to five departments or agencies: the Department of Defense (DoD), Department of State (DoS), U.S. Agency for International Development (USAID), Department of the Treasury (Treasury), and Department of Health and Human Services (HHS).

Since September 2004, a number of major reprogramming efforts have occurred. On September 30, 2004, the first major reprogramming shifted $1.94 billion from the water and sanitation sector and $1.07 billion from the electricity sector to the security sector ($1.8 billion), the justice sector ($461 million), the education sector ($80 million), and the private employment development sector ($660 million). An additional $450 million was reprogrammed entirely within the oil sector.

In December 2004, $457 million was reprogrammed to meet emerging needs in the electrical sector ($211 million) and to provide post-battle damage reconstruction and rehabilitation in Sadr City, Najaf, Samarra, and Fallujah ($246 million). In March 2005, $832 million was reprogrammed for management initiatives. The management initiatives include money for operations and maintenance programs at various power and water plants, urgent work in the electrical and oil sectors, and cost growth incurred by design-build contractors.

Table 4-1 outlines the major efforts to reprogram IRRF2 funds.

| Major IRRF2 Reprogramming Efforts, as of March 30, 2005 | | |
|---|---|---|
| Date | Amount | Sectors |
| September 2004 | $3.46 billion | Water, electricity to security, justice, education, private development; oil sector reprogrammed internally |
| December 2004 | 457 million | Electrical sector reprogramming; battle damage to Fallujah, Sadr City, Najaf, Samarra |
| March 2005 | 832 million | Job creation, O&M for water and power, electricity and oil, cost growth by contractors |
| **Total** | **$4.749 billion** | |
| Note: Data not formally reviewed or audited. | | |

**Table 4-1**

The current totals and corresponding commitments, obligations, and expenditures are outlined in Table 4-2. Slightly more than $10 billion (56.3%) of the funds has been apportioned to construction projects and $6 billion (33.8%) has been apportioned to non-construction. As of March 30, 2005, these were the IRRF totals:

- $17.4 billion (94.6%) had been apportioned.
- $16.2 billion (87.9%) had been committed.
- $12.0 billion (65.3%) had been obligated.
- $4.2 billion (22.8%) had been expended.

Figure 4-1 shows the current totals for the IRRF2.




**Figure 4-1**

The Office of Management and Budget (OMB) apportioned these IRRF2 funds:

- DoD, $12.9 billion (69.7% of the $18.4 billion total)
- USAID, $3.0 billion (16.1%)
- DoS, $1.2 billion (6.4%)
- Treasury, $39 million[3] (.2%)

Figure 4-2 shows how the OMB apportioned IRRF2 funds.




**Figure 4-2**

Appendix B shows detailed IRRF2 apportionments by agency.

| IRRF2 Program Status, as of March 30, 2005 (in millions) | | | | | |
|---|---|---|---|---|---|
| Sector | 2207 Report Spending Plan | Apportioned | Committed | Obligated | Expended |
| Security & Law Enforcement | $5,045 | $5,045 | $4,585 | $3,822 | $1,742 |
| Electric Sector | 4,369 | 4,078 | 3,902 | 2,803 | 936 |
| Water Resources and Sanitation | 2,279 | 1,770 | 1,753 | 973 | 97 |
| Justice, Public Safety, and Civil Society | 1,952 | 1,952 | 1,725 | 1,435 | 506 |
| Oil Infrastructure | 1,701 | 1,701 | 1,562 | 1,005 | 221 |
| Private Sector Employment Development | 843 | 835 | 777 | 762 | 438 |
| Health Care | 786 | 786 | 759 | 451 | 54 |
| Transportation and Telecommunications Projects | 513 | 513 | 485 | 321 | 61 |
| Education, Refugees, Human Rights, and Governance | 379 | 379 | 283 | 251 | 67 |
| Roads, Bridges, and Construction | 359 | 355 | 340 | 186 | 58 |
| Administrative Expense | 213 | 29 | 29 | 29 | 29 |
| **Total by Sector** | **$18,439** | **$17,443** | **$16,200** | **$12,038** | **$4,209** |
| Construction | 11,306 | 10,378 | 10,067 | 6,932 | 1,951 |
| Non-construction | 6,301 | 6,232 | 5,380 | 4,432 | 1,949 |
| Democracy | 832 | 832 | 753 | 668 | 309 |
| **Total by Program** | **$18,439** | **$17,443** | **$16,200** | **$12,038** | **$4,209** |
| Note: Data not formally reviewed or audited. Summary totals are affected by truncation. | | | | | |

**Table 4-2**

## Operating Expenses

Under P.L. 108-106, as amended, the SIGIR is required to report information on the operating expenses funded by the IRRF for U.S. government agencies or departments involved with the reconstruction of Iraq. Table 4-3 provides the status of operating funds derived from the IRRF for each agency with a footprint of operational activities in Iraq. IRRF2 money can be provided only to the DoD, DoS, Treasury, USAID, and HHS; therefore, any organization listed outside those departments receives funds through one of those five organizations. This table does not include mission-direct operating expenses.

Since the establishment of the U.S. Mission Iraq and the transfer of governance authority on June 28, 2004, various groups involved with Iraq reconstruction have received support from the budget of the U.S. Mission Iraq. This support is outside of the SIGIR's IRRF reporting requirements.

**Agency-specific IRRF-funded Operating Expenses[a], as of March 30, 2005 (in thousands)**

| Agency | FY 2005 Allocated | FY 2005 Obligated | FY 2005 Expended | FY 2004 Allocated | FY 2004 Obligated | FY 2004 Expended |
|---|---|---|---|---|---|---|
| Department of Defense[b] | $9,057 | $9,057 | $52,540[c] | $150,544 | $150,544 | $52,156 |
| USACE | $47 | $36 | $251[c] | $12,576 | $9,326 | $6,408 |
| Dept. of Treasury | $0 | $0 | $0 | $2,991 | $2,991 | $977 |
| Dept. of Homeland Security[d] | $2,600 | $1,460 | $1,460 | - | - | - |
| Dept. of Justice[e] | $0 | $48,584 | $9,101 | $146,037 | $76,426 | $44,985 |
| Dept. of State | $0 | $0 | $0 | $0 | $0 | $0 |
| Dept. of Health and Human Services | $0 | $0 | $0 | $0 | $0 | $0 |
| Dept. of Transportation | $0 | $0 | $0 | $0 | $0 | $0 |
| Dept. of Commerce | $0 | $0 | $0 | $0 | $0 | $0 |
| Dept. of Agriculture | $0 | $0 | $0 | $0 | $0 | $0 |
| | IRRF2 Allocated | IRRF2 Obligated | IRRF2 Expended | IRRF1 Allocated | IRRF1 Obligated | IRRF1 Expended |
| USAID[f] | $99,920 | $86,598 | $62,389 | $38,674 | $38,674 | $36,003 |

Note: This is the exact data as it was received by the SIGIR and has not been formally reviewed, verified, or audited.

[a] These operating expenses do not include mission-direct operating expenses.

[b] DoD FY 2005 operating expense is a building rehab and will be re-classified as a reconstruction asset by 2007.

[c] FY 2005 expenditures include funds disbursed from FY 2004 obligated.

[d] DHS will report 2004 operating expenses in 3rd Quarter 2005.

[e] DOJ reported its no-year monies in the FY 2004 columns.

[f] USAID reported information by fund type, not by fiscal year.

**Table 4-3**

Since its inception as the Coalition Provisional Authority Inspector General (CPA-IG), the SIGIR has tracked the operational expenses of the CPA. CPA daily operations from April to November 6, 2003, were initially supported by the Iraq Freedom Fund (IFF),

which was created by P.L. 108-11 in April 2003. As of February 28, 2005, $573.3 million has been allocated, $568.2 million has been obligated, and $507.6 million has been disbursed. From November 6, 2003, to June 28, 2004, CPA operations were funded from P.L. 108-106. As the U.S. Mission Iraq became operational and its Iraq Reconstruction Management Office (IRMO) component assumed the duties of the CPA, $105.75 million was transferred from the CPA's P.L. 108-106 appropriation to the DoS to fund these operations. The status of these transferred funds is included in Table 4-4, which is an update of the status of those funds as of March 30, 2005. The Congress also authorized the funding of CPA-IG operations (now the SIGIR) with $75 million from the 2004 Defense-wide operations and maintenance (O&M) appropriations.

**Status of Supplemental Iraq Reconstruction Funding, P.L. 108-106, as of March 30, 2005 (in millions)**

| Source | Appropriated | Apportioned | Committed | Obligated | Expended |
|---|---|---|---|---|---|
| IRRF2 | $18,439 | $17,443 | $16,200 | $12,028 | $4,209 |
| CPA-OPS | 768.8 | 768.8 | 768.8 | 757.6 | 670.1 |
| IRMO[a] | 129.5 | 129.5 | 129.5 | 104.9 | 72.6 |
| SIGIR | 75.0 | 75.0 | 75.0 | 25.9 | 15.4 |
| **Total** | **$19,412.3** | **$18,416.3** | **$17,173.3** | **$12,916.4** | **$4,967.1** |

Note: Data not formally reviewed or audited.
[a] Includes $23.8 million apportionment for reporting purposes pending

**Table 4-4**

# Other U.S. Appropriated Funds

P.L. 108-11 provided other U.S. appropriated funds for the reconstruction of Iraq, and P.L. 108-287 provided funds for a portion of the Commanders' Emergency Response Program (CERP).

## Public Law 108-11

In April 2003, the Congress passed P.L. 108-11 to fund the war effort in Iraq and to appropriate money for the beginning of the relief and reconstruction effort. The Act also established the Natural Resources Risk Remediation Fund (NRRRF) "for expenses necessary, in and around Iraq, to address emergency fire fighting, repair of damage to oil facilities and related infrastructure, and preserve a distribution capability." P.L. 108-11 also created the IFF "for additional expenses for ongoing military operations in Iraq…for stability operations…and for other costs." This fund provided CPA operating expenses, and $300 million was transferred to the NRRRF. The Act also funded additional relief and reconstruction activities by the DoS ($66 million) and USAID ($412 million); funds were available for obligation through September 30, 2004.

P.L. 108-11 funded the daily operations of the CPA until P.L. 108-106 was passed in November 2003. Although the CPA ceased operations on June 28, 2004, contractual payment obligations resulting from contracts awarded by the CPA during its tenure are still being fulfilled. Most of the funds (55%) allocated in P.L. 108-11 were used for the rehabilitation of Iraqi infrastructure—primarily oil production and electricity generation. Other major uses include relief, governance initiatives, and health and social services.

**Status of Supplemental Appropriation, P.L. 108-11, as of March 31, 2005 (in millions)**

| Source | Agency | Apportioned | Obligated | Expended |
|---|---|---|---|---|
| NRRRF | DoD | $802.0 | $800.6 | $685.6 |
| IRRF | USAID | 1,818.6 | 1,818.3 | 1,534.2 |
| | DoD IRRF1 | 518.3 | 518.3 | 490.1 |
| | DoS | 125.4 | 125.4 | 115.4 |
| | Treasury | 6.0 | 6.0 | 4.6 |
| | U.S. Trade & Development Agency | 5.0 | 5.0 | 1.2 |
| | *Subtotal* | *2,473.3* | *2,473.0* | *2,145.6* |
| Non-IRRF P.L. 108-11 | USAID | 412.1 | 410.5 | 380.1 |
| | DoS | 66.0 | 66.0 | 60.4 |
| | *Subtotal* | *478.1* | *476.5* | *440.5* |
| IFF | CPA-OPS | 593.4 | 568.2 | 507.6 |
| | New Iraqi Army | 51.2 | 51.2 | 49.6 |
| | *Subtotal* | *644.6* | *619.4* | *557.2* |
| **Total** | | **$4,398.0** | **$4,369.5** | **$3,828.9** |

Note: Data not formally reviewed or audited.

**Table 4-5**

Table 4-5 provides the status of P.L. 108-11 funds by agency, and Tables 4-6 and 4-7 provide the status of P.L. 108-11 funds by program and by objective.

**Status of P.L. 108-11 IRRF1 Funds by Program and by USAID Strategic Objectives, as of February 28, 2005 (in millions)**

| Agency | Program Name | Apportioned | Obligated | Expended |
|---|---|---|---|---|
| IRRF1 Funds | | | | |
| **USAID** | Restore Critical Infrastructure | $1,124.3 | $1,124.3 | $908.2 |
| | Improve Efficiency & Accountability of Government | 174.7 | 174.7 | 173.2 |
| | Food Aid: Office of Food for Peace | 160.0 | 160.0 | 122.8 |
| | Support Education Health and Social Services | 118.5 | 118.5 | 104.3 |
| | Relief: Office of Foreign Disaster Assistance | 72.2 | 72.0 | 61.9 |
| | Office of Transition Initiatives | 70.0 | 69.9 | 68.3 |
| | Expand Economic Opportunity | 65.9 | 65.9 | 64.0 |
| | Program Support & Development of Gulf Region | 18.0 | 18.0 | 17.5 |
| | Administrative Expenses | 15.0 | 15.0 | 14.0 |
| | *Subtotal* | *1,818.6* | *1,818.3* | *1,534.2* |
| **DoD** | Restore Iraq Electricity (RIE) | 300.0 | 300.0 | 299.5 |
| | Restore Iraq Oil (RIO) | 166.0 | 166.0 | 161.0 |
| | First Responder Network/DIILS | 52.3 | 52.3 | 29.6 |
| | *Subtotal* | *518.3* | *518.3* | *490.1* |
| **DoS** | Police/Prison Programs | 61.5 | 61.5 | 56.2 |
| | Relief Efforts | 27.0 | 27.0 | 26.6 |
| | Law Enforcement | 24.6 | 24.6 | 20.4 |
| | Humanitarian Demining | 12.3 | 12.3 | 12.3 |
| | *Subtotal* | *125.4* | *125.4* | *115.5* |
| **Treasury** | Technical Assistance | 6.0 | 6.0 | 4.6 |
| | *Subtotal* | *6.0* | *6.0* | *4.6* |
| **U.S. Trade and Dev. Agency** | Technical Assistance, Training | 5.0 | 5.0 | 1.2 |
| | *Subtotal* | *5.0* | *5.0* | *1.2* |
| **Total IRRF1 Funds** | | **$2,473.3** | **$2,473.0** | **$2,145.6** |

Note: Data not formally reviewed or audited.

**Table 4-6**

| Status of P.L. 108-11 NRRRF and Non-IRRF1 Funds by Program and by USAID Strategic Objectives, as of March 31, 2005 (in millions) | | | | |
|---|---|---|---|---|
| Agency | Program Name | Apportioned | Obligated | Expended |
| NRRRF Funds | | | | |
| DoD | Restore Iraq Oil (RIO) | $802.0 | $800.6 | $685.6 |
| **Total NRRRF Funds** | | **$802.0** | **$800.6** | **$685.6** |
| Non-IRRF1 Funds | | | | |
| USAID | Food Aid: Office of Food for Peace | $138.2 | $136.7 | $114.0 |
| | USDA[a] | 106.8 | 106.8 | 106.8 |
| | Restore Critical Infrastructure | 51.6 | 51.6 | 51.6 |
| | Support Education Health and Social Services | 34.0 | 34.0 | 34.0 |
| | Relief: Office of Foreign Disaster Assistance | 33.4 | 33.3 | 26.3 |
| | Operating Expenses | 23.7 | 23.7 | 23.0 |
| | Program Support & Development of Gulf Region | 10.5 | 10.5 | 10.5 |
| | Improve Efficiency & Accountability of Government | 8.9 | 8.9 | 8.9 |
| | Expand Economic Opportunity | 5.0 | 5.0 | 5.0 |
| | *Subtotal* | *412.1* | *410.5* | *380.1* |
| DoS | Coalition Support | 66.0 | 66.0 | 60.4 |
| | *Subtotal* | *66.0* | *66.0* | *60.4* |
| **Total Non-IRRF1 Funds** | | **$478.1** | **$476.5** | **$440.5** |

Note: Data not formally reviewed or audited.
[a] Funds appropriated to the U.S. Department of Agriculture, then transferred to the USAID

**Table 4-7**

## Commanders' Assistance Programs

Military assistance programs have played a vital role in the reconstruction of Iraq. With inherent security capability, local commanders can develop the necessary relationships and understanding to initiate crucial projects. Initially funded with Iraqi assets [seized assets and Development Fund for Iraq (DFI) funds] the CERP received its first U.S. appropriated funds in November 2003 with the passage of P.L. 108-106. The Commanders Humanitarian Relief and Reconstruction Program (CHRRP) is a similar program that uses IRRF funds. In addition, the Iraqi Interim Government (IIG) funded a CERP-equivalent program.

## *Commanders' Emergency Response Program*

The CERP is a program that coalition military commanders can quickly use to direct money to meet humanitarian, relief, and reconstruction needs in their geographic areas of responsibility. Specifically exempt from the Federal Acquisition Regulation (FAR), CERP projects are relatively small—less than $500,000—and meet these kinds of needs:

- repairing and refurbishing water and sewer lines
- cleaning up highways by removing waste and debris
- transporting water to remote villages
- purchasing equipment for local police stations
- upgrading schools and clinics
- purchasing school supplies
- removing ordnance from public places (including schools)
- refurbishing playgrounds, youth centers, libraries, other recreational facilities, and mosques

The Iraqi CERP program received $140 million in U.S. FY 2004 funds and, as of March 2005, has received $368 million from FY 2005 money. CERP projects are typically used for projects that are:

- small-scale
- low-dollar
- short-term
- employment-oriented
- emergency
- high-visibility

For a summary of CERP expenditures, see Table 4-8. Table 4-9 provides a profile of selected CERP projects funded by U.S. appropriations and a small segment of those funded by the DFI.

| Iraq CERP Program Totals FY 2004-2005, as of April 1, 2005 | | | |
|---|---|---|---|
| | Total Program Funding | Cumulative Funds Obligated | Cumulative Funds Disbursed |
| Seized Assets | $177,645,171 | $177,280,923 | $176,245,139 |
| U.S. Appropriated P.L. 108-106 | 140,000,000 | 139,837,121 | 124,172,607 |
| U.S. Appropriated P.L. 108-287 | 368,000,000 | 229,783,192 | 89,835,181 |
| DFI | 369,474,004 | 360,289,062 | 350,426,149 |
| **Total** | **$1,055,119,175** | **$907,190,298** | **$740,679,076** |
| Note: Data not formally reviewed or audited. | | | |

**Table 4-8**

| Selected CERP Projects by Type, as of April 1, 2005 | | | |
|---|---|---|---|
| Project Type | Project Total | Completed Projects | Estimated Funds |
| Agriculture and Irrigation | 226 | 178 | $22,333,258 |
| Civil Infrastructure Activities | 753 | 577 | 35,572,422 |
| Economic, Financial, Management | 251 | 178 | 16,373,744 |
| Education | 1157 | 872 | 56,410,294 |
| Electricity | 276 | 686 | 34,116,470 |
| Health Care | 416 | 272 | 27,926,758 |
| Law and Governance | 1352 | 1151 | 70,014,868 |
| Oil | 24 | 5 | 6,813,114 |
| Other Humanitarian or Reconstruction | 1157 | 928 | 46,226,124 |
| Telecom | 49 | 27 | 5,464,732 |
| Transportation | 506 | 290 | 59,346,451 |
| Water and Sanitation | 1012 | 683 | 195,313,461 |
| **Total** | **7,179** | **5,360** | **$575,911,696** |

Note: Data not formally reviewed or audited.

**Table 4-9**

## *Commanders Humanitarian Relief and Reconstruction Program and IIG Military Reconstruction Assistance Program*

In response to an Iraqi demand to match IIG grants for the CERP program, a separate CHRRP was created. The CHRRP was funded out of IRRF2 money, which requires adherence to the FAR. The IIG [now the Iraqi Transitional Government (ITG)] initially funded the program for $86 million in response to a U.S. request; this was increased by an additional $50 million on December 30, 2004. The U.S. matching CHRRP fund was initially set at $86 million; however, this was adjusted to $84 million in February 2005. ITG projects must be selected from an approved project list agreed on by the ITG and the Multi-National Force-Iraq (MNF-I). For a summary of CHRRP and IIG data, as of April 1, 2005, see Table 4-10.

| CHRRP and IIG Funds, as of April 1, 2005 | | | |
|---|---|---|---|
| | Total Program Funding | Cumulative Funds Obligated | Cumulative Funds Disbursed |
| CHRRP Projects | $84,000,000 | $76,849,447 | $2,104,858 |
| IIG Projects | 136,000,000 | 92,881,572 | 44,704,957 |
| **Total** | **$220,000,000** | **$169,731,019** | **$46,809,815** |

Note: Data not formally reviewed or audited.

**Table 4-10**

# Iraqi Funds

Iraqi funds available for reconstruction can be grouped into three categories: seized funds, vested funds, and funds deposited in the DFI:

- *Seized funds* were former Iraqi regime monies confiscated by coalition forces.
- *Vested funds* were Iraqi funds in U.S. banks that were frozen by executive order, vested in the U.S. Treasury, and authorized for use to benefit the people of Iraq.
- The *DFI* was created by the CPA, and the UN concurred on May 2003 (UNSCR 1483). The DFI contains proceeds from Iraqi oil sales, repatriated assets from the United States and other nations, and deposits from unencumbered Oil-for-Food (OFF) program funds. Since the transfer of governance authority to the IIG on June 28, 2004, total deposits to the DFI can only be estimated, because the SIGIR does not have access to information on the status of DFI funds now under ITG control. DFI totals for funds obligated and disbursed are not available. The DFI funds the Iraqi National Budget, primarily from current oil sales.

## Seized Funds

Coalition military forces seized $926.7 million in funds from the former Iraqi regime. Virtually all of the seized funds have been allocated. Current Defense Finance and Accounting Service (DFAS) accounting systems indicate that $890.1 million have been obligated and $844.1 million have been expended as of March 31, 2005. U.S. Army accounting officials have not reconciled or fully audited the totals for seized funds. The bulk of seized assets were used primarily for:

- non-ministry repairs and humanitarian assistance
- Iraqi ministry operations
- the Rapid Regional Response Program (RRRP or R3P)
- the Commanders' Emergency Response Program (CERP)
- fuel products (diesel, heating oil, etc.) for the Iraqi people

For a detailed list of the uses of seized funds, see Appendix C.

## Vested Funds

In response to a UN resolution passed after the first Gulf War, the United States froze Iraqi assets (UNSCR 661, August 1990; Presidential Executive Order 12817 of October 23, 1992). Presidential Executive Order 13290 of March 20, 2003, vested frozen funds for use in Iraq. As of March 31, 2005, $1.724 billion had been transferred for use in Iraq.

As of March 31, 2005, $1.703 billion (98.8%) had been obligated, and $1.687 billion (97.9%) had been expended, according to U.S. Army accounting records. Current records for the Joint Area Support Group Comptroller Baghdad indicate that all but $.4 million have been committed as of March 31, 2005. Vested funds were primarily used for:

- Iraqi civil servant salaries, pensions, and individual relief payments
- Iraqi ministry operations
- repair and reconstruction

For a more detailed listing of expenditures from vested funds, see Appendix D.

Although the bulk of frozen Iraqi assets was vested and sent to Iraq, a balance of $396.6 million remained. The U.S. government has transferred $208.6 million to the DFI and set aside $128 million for perfected judgments. The amount of frozen assets remaining in the United States is currently $44.9 million (down from $60 million), largely because of a reconciliation of blocked tangible Iraqi assets.

## Development Fund for Iraq

The Development Fund for Iraq (DFI) was established by the CPA with UN concurrence in May 2003 to serve as the primary financial vehicle to channel revenue from Iraqi oil sales, unencumbered OFF deposits, and repatriated Iraqi assets to the relief and reconstruction of Iraq.

When the IIG assumed governance authority, responsibility for the DFI sub-account was transferred to the Chief of Mission on June 28, 2004. As a result, the SIGIR no longer has access to or visibility of DFI account status, beyond the portion of DFI authorized by the Iraqi Minister of Finance for the U.S. government to disburse against DFI-funded contracts awarded by the CPA. Since the SIGIR's December estimate of total DFI revenues of $30.098 billion, an additional $4.38 billion of oil revenues has been realized as of March 30, 2005. This brings total estimated DFI revenues to $34.478 billion. The totals for DFI obligations and disbursements are not available.

### *DFI Sub-account*

Prior to the transfer of governance authority to the IIG, the administration of contracts awarded by the CPA from DFI funds was delegated to the U.S. government. A separate sub-account, the "Central Bank of Iraq/Development Fund for Iraq/Transition," was created at the Federal Reserve Bank of New York to enable payment for work on those contracts. In addition to the Federal Reserve funds, cash has been provided to enable payment in Iraq for those projects that require this method of payment.

On June 15, 2004, the Iraqi Minister of Finance designated the Director of the Program Management Office (PMO), now the Project and Contracting Office (PCO), to administer and make payments on those DFI contracts that:

- were entered into before June 28, 2004
- were not secured by a letter of credit
- did not exceed the limit of $800 million

This initial limit was intended as a first step toward ensuring the continuity of the execution for these contracts because it was known that the overall liability would substantially exceed this amount. The Ministry of Finance increased the amount provided to the DFI sub-account to meet contract obligations at his discretion.

The increased payment limits are shown in Table 4-11.

| DFI Sub-account Deposits, as of March 2005 (in millions) | | |
|---|---|---|
| Transfer/ Deposit | Date | Amount |
| Cash on Hand | June 28, 2004 | $217.7 |
| Beginning Transfer/Balance | June 28, 2004 | 800 |
| Additional Replenishment | September 20, 2004 | 400 |
| Additional Replenishment | November 23, 2004 | 800 |
| Additional Replenishment | December 24, 2004 | 800 |
| **Total** | | **$3,017.7** |
| Note: Data not formally reviewed or audited. | | |

**Table 4-11**

$217.7 million of DFI cash that was in the possession of CPA officials when governance transferred to the IIG has been retained for payment of DFI obligations. An additional $86 million of Iraqi funds has been flowed through the DFI sub-account to U.S. military units to fund a matching grant by the IIG. This transfer was executed for ease of currency disbursement and is not part of the execution of DFI sub-account contracts.

In December 2004, outstanding DFI sub-account liabilities were estimated at $3.5 billion. Because of the $3.017 billion provided by the IIG, this created an unfunded liability of $486.8 million. According to the April 2005 DoS *Section 2207 Report*, this liability was revised to $42 million in March 2005.

Table 4-12 provides the DFI fund status as of the end of March 2005.

| DFI Sub-account Fund Status, as of March 2005 (in millions) | | |
|---|---|---|
| Sources of Funds | Bank | Cash |
| Beginning Balance | $800.0 | $217.7 |
| Additional IIG Funds | 2,000.0 | 0 |
| Interest Earned | 5.6 | 0 |
| **Total** | **$2,805.6** | **$217.7** |
| Uses of Funds | Bank | Cash |
| Allocated and Paid | $1,851.3 | $117.3 |
| Allocated and Unpaid | 954.3 | 100.4 |
| Unallocated | 0 | 0 |
| **Total** | **$2,805.6** | **$217.7** |
| Note: Data not formally reviewed or audited. | | |

**Table 4-12**

## Other Iraqi Potential Repatriated Funds

With the transfer of governance authority on June 28, 2004, the IIG assumed primary responsibility for seeking worldwide recovery, under UN resolutions, of Iraqi assets frozen in response to past actions of the former regime. The U.S. government continues to actively assist the ITG in its search and recovery effort, but no longer has access to information on recovered asset balances.

## The Oil-for-Food Program

The UN Oil-for-Food (OFF) program traded Iraqi oil for goods and services (primarily food) to alleviate suffering caused by the UN Iraqi oil embargo. The program's oil sales operation began in December 1996, and its last oil sales occurred in March 2003–just before Operation Iraqi Freedom began. Food distribution was interrupted during hostilities. On May 22, 2003, the UN lifted its sanctions and gave the OFF program six months to conclude operations. On November 21, 2003, the UN OFF program officially ended.

Detailed financial information on the OFF's revenues and expenditures from December 1996 until December 2002 is included in the January 2005 SIGIR Quarterly Report. In March 2005, the UN released unaudited financial statements for calendar year 2004, but not for calendar year 2003. This omission precludes any substantive further analysis because activities in 2003 included vital revenue and expenditure operations. The SIGIR is waiting for the UN to release operating information for 2003.

The OFF program remits surplus uncommitted OFF funds to the DFI when previously obligated amounts become available as unexecuted letters of credit expire. As of June 30,

2004, $8.6 billion have been transferred to the DFI from the OFF program ($8.1 billion while under U.S. control). The ITG is now responsible for the oversight of OFF contracts. The ITG will decide which contracts will be allowed to expire unexecuted or partially executed and which will be honored with the delivery of goods and services already paid for by OFF past revenues.

# Donor Funds

In response to the relief and reconstruction requirements in Iraq, aid has been donated by many countries and several international organizations. Periodic donor conferences are held to coordinate international activities. The first was in Madrid in October 2003, and the latest was in Tokyo, October 14-15, 2004. The next donor conference is scheduled for Jordan, in late spring 2005. At the Madrid Donor Conference, non-U.S. donor nations and international organizations pledged $13.5 billion for the medium-term reconstruction of Iraq (2004-2007). For a comprehensive list of those pledges, see Appendix F. Individual donor nations pledged approximately $8 billion for immediate humanitarian aid, bilateral assistance, and internationally distributed aid.

## Humanitarian Aid

In the immediate wake of Operation Iraqi Freedom, various countries and UN organizations provided $849 million in humanitarian aid through December 2003 (excluding U.S. and OFF assistance). This aid was not counted as part of the Madrid Donor Conference reconstruction pledge amounts.

## Bilateral Aid

Bilateral project aid is provided directly from a donor country to the Iraqi people or its government. As of March 30, 2005, the DoS estimates that approximately $1.296 billion in bilateral project assistance has been donated to Iraq. Much of it has been donated by Japan, the largest non-U.S. donor country. Highlights of individual donor country activities are included in the DoS *Section 2207 Report* of January 5, 2005.

## International Reconstruction Fund Facility for Iraq (IRFFI)

Most of the assistance pledged by individual nation states is currently being channeled through international organizations. The Madrid conference established the International Reconstruction Fund Facility for Iraq (IRFFI) to give donor countries a multilateral channel for their assistance to Iraq. The IRFFI has two trust funds, one administered by the World Bank and the other by the United Nations Development Group (UNDG). These two trust funds are the primary delivery mechanisms for aid to Iraq. Appendix E is a detailed summary of international trust fund commitments and deposits by country.

The IRFFI Website (http://www.irffi.org) provides a wealth of information. Current commitments (as of March 2005) to the two trust funds are $1.06 billion: the World Bank has committed $394 million; the UNDG, $663.6 million. Deposits to those two organizations total $1,022 million: $394.3 million was deposited with the World Bank, and $627.8 million was deposited with the UNDG. For a more detailed list of the IRFFI and its constituent trust funds, see Appendix E of this Report.

The IRFFI Website has a detailed project and program description of both the World Bank trust fund efforts and those of the UNDG. The IRFFI UNDG trust fund has developed a strategic planning framework, organized along 11 "clusters," in which various UN specialized agencies work together under a cluster lead agency in each. Updated information is available on the Website.

Although current commitments to the IRFFI total just over $1 billion, donor nations pledged more than $8 billion at the Madrid Donor Conference. For the top 10 donor countries, the differences between IRFFI commitments and Madrid pledges total $6.7 billion. Just over half of this amount represents the pledge by the government of Japan to extend $3.5 billion in concessionary loans for Iraq reconstruction. Another approximately $1.296 billion is the bilateral aid provided by countries, such as Japan, the United Kingdom, Spain, and Canada. Approximately $2 billion in unrealized pledge amounts comes from eight of the top ten pledged countries (excluding Japan and the United Kingdom). These countries are primarily Persian Gulf nations with large Iraqi debt holdings.

The time period applicable for Madrid pledges was 2004-2007. The change of Iraqi governance authority on June 28, 2004, has led several of the Persian Gulf nations to start discussions with Iraqi authorities about disbursing their Madrid pledges. These same Persian Gulf nations are the principal holders of Iraqi sovereign debt. Forgiveness of the more than $60 billion in non-Paris Club debt, the bulk of which is owed by these nations, far overshadows their pledged donor commitments and may have an effect on the immediacy of their donor contributions. In addition, the recent election of the current Iraqi government provides an opportunity for the applicable Gulf States to begin creating the personal relationships that may spur action.

## World Bank, International Monetary Fund, and Donor Loan Programs

The World Bank and International Monetary Fund (IMF) have announced potential assistance packages to Iraq worth between $5.5 and $9.25 billion. Aid to Iraq from Japan, the largest non-U.S. benefactor, is primarily in the form of a loan ($3.5 billion). The World Bank currently envisions an initial lending envelope of $500 million from the International Development Association (IDA) and $500 million from the International Bank for Reconstruction and Development (IBRD) during FY 2004 and FY 2005. During the second week of December 2004, the World Bank country director for Iraq received a written request for IDA funding. On December 16, 2004, Iraq cleared its arrears to the World Bank. As of April 5, 2005, any World Bank loans to Iraq were still in the negotiation phase.

The IMF has pledged assistance to Iraq with an initial $850 million in Emergency Post-Conflict assistance and follow-up assistance loans of $850–1,700 million. On September 29, 2004, the executive board of the IMF approved a disbursement of approximately $436.3 million, denominated in special drawing rights (SDR).[4] This initial granting of emergency post-conflict assistance occurred after Iraq settled its arrears to the fund of SDR 55.3 million (approximately $81 million U.S.) on September 22, 2004. In addition

to settling its IMF arrears, Iraq has paid for an increase in its quota under the IMF's Eleventh General Review of Quotas. Iraq's quota has increased from SDR 504 million ($740.1 million U.S.) to SDR 1.19 billion ($1.75 billion U.S.). This quota increase was a combination of a payment of $251 million in cash and a non-interest bearing promissory note for the balance (total payment of $1.08 billion U.S.). Iraq can draw on its quota with the concurrence of the IMF leadership.

By 2009, the World Bank expects to lend an additional $2-4 billion beyond its initial set of loans, but subsequent lending is "predicated on an optimistic scenario of improvements in political stability and security, rapid economic recovery (including the oil sector), and generous debt relief," according to the *Interim Strategy Note of the World Bank Group for Iraq,* January 14, 2004. The IMF shares the same concerns and may not provide the full amount pledged in Madrid without a sound macroeconomic framework and government commitment to key structural reforms in place.

## Iraqi Debt Relief

Iraqi external debt relief is vital to its reconstruction and long-term economic health. The November 21, 2004 agreement between Iraq and the members of the Paris Club to reduce Iraq's $38.9 billion debt by 80% was a crucial first step. More specific terms of the agreement were outlined in the SIGIR's January 2005 Quarterly Report to Congress. Iraq has committed to seek comparable treatment from its other external creditors. The vast majority of those other creditors are official bilateral creditors (primarily Gulf States) estimated by the IMF to hold $67.4 billion in debt. In addition to public debt, Iraq owes approximately $15 billion to private sources, including commercial banks. Iraq is also obligated to seek terms comparable to those agreed by the Paris Club from those creditors. The ITG is currently continuing its efforts at reaching agreements, but no formal progress has been made as of the publication deadline for this Report.

# Sources and Uses of Funding for Iraq Relief and Reconstruction Data Clarification

The SIGIR compiled data on the sources, uses, and status of Iraq reconstruction funds from the OMB, DFAS, U.S. Army, DoS, USAID, Treasury, U.S. Trade and Development Agency, IMF, and World Bank. The SIGIR analyzed the data for reasonableness and consistency across sources of data. The SIGIR did not review or audit the processes, controls, or systems in place at the providing agency or organization. The SIGIR accepted the validity of the data provided and believes that the presentation of Sources and Uses of Funds in this Report is a reasonable compilation of the status of Iraq relief and reconstruction funding through March 30, 2005 (unless an alternative date is noted).

# COALITION PROVISIONAL AUTHORITY REGULATION NUMBER 2

## DEVELOPMENT FUND FOR IRAQ

*Pursuant* to my authority as Administrator of the Coalition Provisional Authority (CPA), and consistent with relevant U.N. Security Council resolutions, including Resolution 1483 (2003), and the laws and usages of war,

*Noting* the letter of May 8, 2003 from Permanent Representatives of the United States of America and the United Kingdom of Great Britain and Northern Ireland to the President of the United Nations Security Council (S/2003/538),

*Recognizing* that ninety-five percent of the proceeds of all export sales of petroleum, petroleum products, and natural gas from Iraq, as well as funds from other sources, shall be deposited into the Development Fund for Iraq until an internationally recognized, representative government of Iraq is properly constituted, and that five percent of the proceeds referred to in paragraph 20 of Resolution 1483 shall be deposited into the Compensation Fund established in accordance with Resolution 687 (1991),

*Reaffirming* that a major CPA objective is to ensure that the newly established Development Fund for Iraq and other Iraqi resources, including Iraqi petroleum and petroleum products, are dedicated to the well-being of the Iraqi people,

*Committed* to ensuring, consistent with paragraph 14 of Resolution 1483, that the Development Fund for Iraq shall be used in a transparent manner to meet the humanitarian needs of the Iraqi people, for the economic reconstruction and repair of Iraq's infrastructure, for the continued disarmament of Iraq, and for the costs of Iraqi civilian administration, and for other purposes benefiting the people of Iraq,

I hereby promulgate the following:

### Section 1
### Purpose

This Regulation applies to the administration, use, accounting and auditing of the Development Fund for Iraq (the "Fund"). The Regulation is intended and shall be applied to ensure that the Fund is managed in a transparent manner for and on behalf of the Iraqi people, consistent with Resolution 1483, and that all disbursements from the Fund are for purposes benefiting the people of Iraq.

**Section 2**
**Responsibilities**

1) Administrator of the CPA (Administrator). Oversees and controls the establishment, administration and use of the Fund for and on behalf of the Iraqi people, and directs disbursements from the Fund for those purposes he determines to be for the benefit of the people of Iraq.

2) Director, Economic Policy, CPA, or other CPA official designated by the Administrator. Manages the Fund, in coordination with the Central Bank of Iraq, the U.S. Federal Reserve Bank of New York and, if the Administrator directs that accounts be opened in the Bank for International Settlements (Switzerland) and/or other financial institutions, in coordination with those institutions.

3) CPA Program Review Board (PRB). Reviews all competing requirements for the relief and recovery of Iraq, assesses all available resources, and, in consultation with the Iraqi interim administration, when established, develops for the approval of the Administrator spending plans, consistent with a comprehensive budgetary framework, that identify prioritized requirements for proposed disbursements from the Fund; considers in this process information provided by the CPA International Coordination Council, the International Advisory and Monitoring Board, and other entities, as appropriate.

4) CPA International Coordination Council. Advises the PRB on matters relating to international efforts to assist the people of Iraq in the relief, recovery and development of their economy, including proposing specific projects for funding consideration; supporting efforts to encourage the global donor community to participate in this effort; providing the PRB with information regarding the nature and scope of international assistance to Iraq; and, as requested, making recommendations to the PRB with regard to disbursements from the Fund.

5) International Advisory and Monitoring Board of the Development Fund for Iraq (the "IAMB"). Including duly qualified representatives of the Secretary-General of the United Nations, the Managing Director of the International Monetary Fund, the Director-General of the Arab Fund for Social and Economic Development, and the President of the World Bank, and not to exceed three additional duly qualified members appointed by the IAMB with the approval of the Administrator. The IAMB shall approve independent public accountants responsible for auditing the Fund, the Oil Proceeds Receipts Account referred to in section 2(9), and auditing export sales of petroleum, petroleum products, and natural gas from Iraq. The Administrator, in consultation with the IAMB, may appoint up to five non-voting observers to the IAMB. Consistent with its terms of reference, the IAMB shall perform functions similar to those of outside audit committees and may provide information and comments to the PRB and the Administrator as appropriate to serve the purposes of Resolution 1483 and this Regulation.

6) Central Bank of Iraq. Holds the Fund on its books and administers the Fund as directed by the Administrator or his delegee.

7) U.S. Federal Reserve Bank of New York (the "Federal Reserve Bank") (and/or the Bank for International Settlements (Switzerland), and/or other financial institutions, if the Administrator directs that accounts in such institutions be opened). As agreed between such institution(s) and the Administrator, opens and maintains on its books the "Central Bank of Iraq/Development Fund for Iraq" account, as requested by the Administrator. Pursuant to Resolution 1483 and this Regulation, it is understood that the Federal Reserve Bank will be requested to open and maintain on its books an Oil Proceeds Receipts Account (the "Receipts Account") for the initial receipt of proceeds of all export sales of petroleum, petroleum products, and natural gas from Iraq and for the immediate transfer of ninety-five percent of such proceeds to the "Central Bank of Iraq/Development Fund for Iraq" account and five percent of such proceeds to the appropriate United Nations Compensation Fund account.

8) Independent public accountants (auditors). Nominated by the Administrator, approved by the IAMB, and reporting to the IAMB and the Administrator, the independent public accountants audit the Fund and audit all export sales of petroleum, petroleum products, and natural gas from Iraq, supporting the objectives of ensuring that the Fund is used in a transparent manner and that such export sales are made consistent with prevailing international market best practices.

**Section 3**
**Establishment of the Fund**

The Fund shall be held on the books of the Central Bank of Iraq, and the corpus of the Fund shall be held in an account entitled "Central Bank of Iraq/Development Fund for Iraq," in the Federal Reserve Bank (and/or other financial institution(s), if the Administrator so directs), for the Central Bank of Iraq.

**Section 4**
**Control of the Fund**

The Fund shall be controlled by the Administrator of the CPA, for and on behalf of the Iraqi people. The Central Bank of Iraq and the Federal Reserve Bank (and/or other financial institution(s), if the Administrator so directs), shall accept instructions, as agreed, concerning the Fund, including instructions to pay sums out of the Fund, only from the Administrator or his authorized delegee(s).

**Section 5**
**Administration of the Fund**

1) General. The Central Bank of Iraq/Development Fund for Iraq account in the Federal Reserve Bank shall be governed by the Federal Reserve Bank's standard terms and conditions regarding accounts of foreign central banks and governments, to the extent consistent with applicable law.

2) Communications Protocol. The Fund will be controlled by the Administrator through a communications protocol to be agreed upon between the Administrator and the Federal Reserve Bank (and/or other financial institution(s), if the Administrator so directs). This protocol shall be documented in a funds transfer security procedures agreement.

3) Deposits into the Fund. One billion United States dollars from unencumbered funds in the accounts established pursuant to paragraphs 8(a) and 8(b) of United Nations Security Council Resolution 986 (1995) have been transferred to the Fund; and it is anticipated that certain restored and surplus funds, pursuant to paragraphs 17 and 23 of Resolution 1483, will be transferred to the Fund. In addition, ninety-five percent of the proceeds from all export sales of petroleum, petroleum products, and natural gas from Iraq shall be deposited into the Fund, pursuant to paragraph 20 of Resolution 1483, and five percent of such proceeds shall be deposited in the Compensation Fund established pursuant to Resolution 687 (1991), pursuant to paragraph 21 of Resolution 1483. There shall also be accepted for deposit into the Fund any gifts, contributions, donations or other funds, revenues or proceeds.

4) Internal Accounting. The CPA shall obtain the services of an independent, certified public accounting firm to support the objective of ensuring that the Fund is administered and used in a transparent manner for the benefit of the people of Iraq, and is operated consistent with Resolution 1483. The accountants performing this function shall be separate from those public accountants (auditors) approved by the International Advisory and Monitoring Board.

5) Privileges and Immunities. The Fund, including the accounts that comprise its corpus, and the Receipts Account, shall enjoy the privileges and immunities as set forth in paragraph 22 of Resolution 1483, as well as privileges and immunities to which the Fund may be entitled under any other law, regulation, order, or directive.

**Section 6**
**Disbursements from the Fund**

1) Authority to Approve. Only the Administrator or his delegee may approve disbursements from the Fund.

2) Directions to Disburse. Sums shall be disbursed from the Fund, in accordance with this Regulation, only upon the express direction of the Administrator, or upon the express direction of individual(s) to whom the Administrator has delegated that authority.

3) Purposes. Sums may be disbursed from the Fund to meet the humanitarian needs of the Iraqi people and for the economic reconstruction and repair of Iraq's infrastructure; for the continued disarmament of Iraq; for the costs of Iraq's civilian administration; and for other purposes the Administrator determines to be for the benefit of the people of Iraq.

4) Proposals for Disbursements. Disbursements from the Fund generally shall be proposed through procedures prescribed in, or promulgated in implementation of the CPA Order establishing the PRB. These procedures shall ensure that proposed disbursements are set forth in a spending plan reflecting the cost, purpose and priority of the requirement, and that, prior to approval by the Administrator, all spending plans are developed in consultation with the Iraqi interim administration, once established.

**Section 7**
**Auditing**

The Fund and the export sales of petroleum, petroleum products, and natural gas from Iraq, shall be audited by independent public accountants nominated by the Administrator and approved by the IAMB. The expenses incurred in obtaining the services of the approved independent public accountants shall be charged against the Fund. The CPA shall cooperate fully with the IAMB and the approved independent public accountants in carrying out each party's respective responsibilities. In particular, the CPA shall provide the IAMB and such accountants with access to the Fund's financial records, with confidential materials protected in a manner agreed between the parties.

**Section 8**
**Dissolution of the Fund**

Until the Fund is dissolved by the Administrator in a manner consistent with Resolution 1483, the Central Bank of Iraq shall continue to hold on its books the Fund. Also, as agreed between the Administrator and the Federal Reserve Bank

## Section 8
## Dissolution of the Fund

Until the Fund is dissolved by the Administrator in a manner consistent with Resolution 1483, the Central Bank of Iraq shall continue to hold on its books the Fund. Also, as agreed between the Administrator and the Federal Reserve Bank (and/or other financial institution(s)), such institution(s) shall continue to maintain on its books the "Central Bank of Iraq/Development Fund for Iraq" account, and shall continue to accept deposits into, make disbursements from, and otherwise operate the account, in accordance with applicable laws, regulations, policies and agreements.

## Section 9
## Entry into Force

This Regulation shall enter into force on the date of signature.

6/15/03

L. Paul Bremer, Administrator
Coalition Provisional Authority

# COALITION PROVISIONAL AUTHORITY
# REGULATION NUMBER 11

## AMENDMENTS TO COALITION PROVISIONAL AUTHORITY REGULATIONS NO. 2 (CPA/REG/10 JUNE 2003/02) AND NO. 3 (CPA/REG/18 JUNE 2003/03)

*Pursuant* to my authority as Administrator of the Coalition Provisional Authority (CPA), and under the laws and usages of war, and consistent with relevant U.N. Security Council resolutions, including Resolutions 1483 and 1511 (2003) and 1546 (2004),

*Noting* that the Coalition Provisional Authority will dissolve on June 30, 2004 and that full governance authority of Iraq will transfer to the Iraqi Interim Government on that date,

*Recognizing* that on June 30, 2004 the Iraqi Interim Government will assume control over all funds in the Development Fund for Iraq,

*Acknowledging* that the Coalitional Provisional Authority has entered into contracts on behalf of the people of Iraq and that many of these contracts require continued performance and payment from the Development Fund for Iraq after June 30, 2004,

*Understanding* that continued performance and payments due under these contracts after June 30, 2004 are critical to the redevelopment and reconstruction of Iraq,

*Desiring* to amend Coalition Provisional Authority Regulation No. 2, Development Fund for Iraq, (CPA/REG/10 June 2003/02), and Coalition Provisional Authority Regulation No. 3, Program Review Board, (CPA/REG/18 June 2003/03), to provide for the orderly transition of authority over the Development Fund for Iraq from the Coalition Provisional Authority to the Iraqi Interim Government,

I hereby promulgate the following:

### Section 1
### Transition of Authority over Development Fund for Iraq

1) Section 3 of CPA Regulation No. 2, Development Fund for Iraq, (CPA/REG/10 June 2003/02), is amended to read as follows:

   A sub-account of the account entitled "Central Bank of Iraq/Development Fund for Iraq" shall be created. The sub-account shall be entitled "Central Bank of Iraq/Development Fund for Iraq/Transition" and (when established) shall contain funds equal to or in excess of the total amount of outstanding contractual liability against the Development Fund for Iraq arising out of contracts or grants funded by the Development Fund for Iraq that:

a) were entered into on or before June 30, 2004 by the Coalition Provisional Authority or the Multi-National Force-Iraq in accordance with United Nations Security Council Resolution 1483 and implementing regulations;
b) require the continued performance and/or payment of money originating from the DFI past June 30, 2004; and
c) are not the subject of a fully-funded letter of credit intended to otherwise ensure performance under the contract or grant.

On June 30, 2004, all responsibilities, duties, powers, and authorities granted to the Administrator and the Coalition Provisional Authority under this Regulation shall transfer to the Prime Minister of the Iraqi Interim Government and the Iraqi Interim Government, respectively.

2) Paragraph 1 of Section 5 of CPA Regulation No. 2, Development Fund for Iraq, (CPA/REG/10 June 2003/02), is amended and restated as follows:

1) General. The Central Bank of Iraq/Development Fund for Iraq account and the Central Bank of Iraq/Development Fund for Iraq/Transition sub-account in the Federal Reserve Bank shall be governed by the Federal Reserve Bank's standard terms and conditions regarding accounts of central banks and governments, to the extent consistent with applicable law.

3) Paragraph 5 of Section 5 of CPA Regulation No. 2, Development Fund for Iraq, (CPA/REG/10 June 2003/02), is amended and restated as follows

5) Privileges and Immunities. The Fund, including the accounts and sub-accounts that comprise its corpus, and the Receipts Account, shall enjoy the privileges and immunities as set forth in paragraph 22 of Resolution 1483 and continued in paragraph 27 of Resolution 1546, as well as privileges and immunities to which the Fund may be entitled under any other law, regulation, order, or directive.

4) Section 8 of CPA Regulation No. 2, Development Fund for Iraq, (CPA/REG/10 June 2003/02), is amended and restated as follows:

Until the Fund is dissolved by the Coalition Provisional Authority (or, after the transfer of governmental authority, by the Interim Iraqi Government) in a manner consistent with Resolutions 1483 and 1546, the Central Bank of Iraq shall continue to hold on its books the Fund. Also, as agreed between the Administrator and the Federal Reserve Bank (and/or other financial institution(s)), such institution(s) shall continue to maintain on its books the "Central Bank of Iraq/Development Fund for Iraq" account and all sub-accounts, including a sub-account entitled "Central Bank of Iraq/Development Fund for Iraq/Transition," and shall continue to accept deposits into, make disbursements from, and otherwise operate the account and sub-account, in accordance with applicable laws, regulations, policies and agreements.

(5) Section 10 of CPA Regulation No. 3, Program Review Board, (CPA/REG/18 June 2003/03), is amended and restated as follows:

> The Board may prescribe such additional procedures as may be necessary to carry out its responsibilities under this Regulation. Such procedures shall be effective only upon approval by a majority of the Board's voting members.
>
> Notwithstanding any provisions to the contrary set forth in this Regulation, the Board shall take reasonable steps to ensure that funding initiatives that require payment or performance beyond June 30, 2004 are backed by fully-funded letters of credit from the Trade Bank of Iraq.

**Section 2**
**Entry and Force**

This Regulation shall enter into force on the date of signature.

6/14/04

L. Paul Bremer, Administrator
Coalition Provisional Authority

# COALITION PROVISIONAL AUTHORITY REGULATION NUMBER 3

## PROGRAM REVIEW BOARD

*Pursuant* to my authority as Administrator of the Coalition Provisional Authority (CPA), and consistent with relevant U.N. Security Council resolutions, including Resolution 1483 (2003), and the laws and usages of war,

*Noting* the letter of May 8, 2003 from Permanent Representatives of the United States of America and the United Kingdom of Great Britain and Northern Ireland to the President of the United Nations Security Council (S/2003/538),

*Underscoring* that the Development Fund for Iraq shall be used in a transparent manner to meet the humanitarian needs of the Iraqi people, for the economic reconstruction and repair of Iraq's infrastructure, for the continued disarmament of Iraq, and for the costs of Iraqi civilian administration, and for other purposes benefiting the people of Iraq,

*Reaffirming* that the CPA is committed to ensuring that all state- or regime-owned cash, funds or realizable securities that have been seized by Coalition Forces in Iraq consistent with the laws and usages of war, shall be used only to assist the Iraqi people and support the reconstruction of Iraq,

*Noting* that paragraph 8 of Resolution 1483 (2003) requests the Secretary General to appoint a Special Representative for Iraq whose responsibilities include, in coordination with the Authority, assisting the people of Iraq,

I hereby promulgate the following:

### Section 1
### Establishment

There is hereby established as a part of the CPA an entity to be known as the Program Review Board ("Board"). The Board shall report directly to the Administrator of the CPA ("Administrator"). The Board shall carry out its responsibilities, as defined in this Regulation, in a manner consistent with the CPA's obligation to ensure that funds available to the CPA for providing relief to, and the recovery of Iraq are managed in a transparent manner and consistent with applicable law, for and on behalf of the Iraqi people. In addition, the Board shall, when and to the extent appropriate, consult the Iraqi interim administration referred to in paragraph 9 of Resolution 1483 (2003), and shall seek every opportunity to further the CPA's objective of gradually transferring to the Iraqi interim administration the responsibility of budgeting Iraq's financial resources. This Regulation establishes the procedures applicable to the Board's operations.

**Section 2**
**Responsibilities**

1) Administrator of the CPA (Administrator). Acting on behalf of the CPA, oversees and controls the establishment and operations of the Board, for and on behalf of the Iraqi people, and takes final action on budgets proposed by the Board as he determines to be for the benefit of the people of Iraq, consistent with Resolution 1483 (2003) and applicable laws and regulations. Directly supervises the Chairman of the Board.

2) Council for International Coordination. Advises the Board on matters relating to international efforts to assist the people of Iraq in the relief, recovery and development of their economy, including proposing specific projects for funding consideration; coordinating technical assistance programs and other donor activities; encouraging the global donor community to participate in this effort by contributing to Iraq relief and recovery efforts; providing the Board with information regarding the nature and scope of international assistance to Iraq; and, as requested, making recommendations to the Board with regard to disbursements from resources available for the relief and recovery of Iraq.

3) International Advisory and Monitoring Board of the Development Fund for Iraq ["IAMB"]. Advises the Board on matters relating to external audit processes, financial reporting and internal control systems of the Development Fund for Iraq.

**Section 3**
**Chairman of the Board**

The Administrator shall appoint a Chairman of the Board, who shall preside over all sessions of the Board, resolve all administrative matters relating to the execution of this Regulation, cast the deciding vote in any matter on which the votes of the Board's members are tied, forward to the Administrator all proposed actions on behalf of the Board, and represent the Board in communications with individuals and entities outside the CPA. The Chairman shall report directly to the Administrator.

**Section 4**
**Membership of the Board**

The Board shall consist of the Chairman and the following voting and nonvoting members, and such other voting or nonvoting members as the Administrator may appoint, consistent with the objective of furthering meaningful representation of the Iraqi people and the Iraqi interim administration in the process of developing budgets for the relief and recovery of Iraq.

1) Voting members. The following members, or their designees, shall attend formal sessions of the Board and vote on matters properly brought before the Board.

Chairman
Director, Economic Policy
Director, Civil Affairs Policy;
Director, Agency for International Development, Iraq mission;
Director, Operations;
Director, Security Affairs;

*Authorized representatives of*
Commander of Coalition Forces
Iraqi Ministry of Finance
United Kingdom
Australia
Chairman, Council for International Coordination

a. When taking action on any matter directly relating to the disposition of funds appropriated by the U.S. Congress, the voting membership of the Board also shall include authorized representatives of the U.S. Department of Defense, U.S. Department of Treasury and U.S. Department of State. With approval of the Administrator, a CPA Director who serves as a voting member may serve concurrently as an authorized representative of the U.S. Departments of Defense, Treasury or State.

b. The authorized representatives of the Iraqi Ministry of Finance, United Kingdom, Australia and Chairman, Council for International Coordination, who otherwise serve as voting members of the Board, shall serve as nonvoting members when the Board is taking actions as described in subsection 4 (l)(a), above.

2) Nonvoting members. The following members of the Board, or their designees, and such other members as the Administrator may designate, are authorized to attend all formal sessions of the Board:

CPA Comptroller
CPA General Counsel
Program Coordinator of the Board

*Authorized representative of*
U.S. Office of Management and Budget
U.S. Office of the Secretary of Defense

International Monetary Fund
World Bank
U.N. Special Representative of the Secretary General for Iraq
International Advisory and Monitoring Board

**Section 5**
**Program Review Committee and Staff**

The Chairman of the Board shall establish a Program Review Committee and a staff to assist the Board in carrying out its responsibilities under this Regulation. The Board's staff shall be headed by a Program Coordinator, who shall also serve as Chairman of the Program Review Committee and a nonvoting member of the Board.

1) Program Review Committee (PRC). The PRC shall be composed of individuals appointed by the Chairman of the Board, and should include representatives of the Coalition allies, the Council for International Coordination and the Iraqi Interim Administration (when established), and two nonvoting observers representing the International Auditing and Monitoring Board and the U.N. Special Representative of the Secretary General for Iraq. The PRC shall initially review all funding requests for which the PRB is responsible, categorize them, and make recommendations to the Board with respect to the priority, source of funding, and manner of executing the requirements. The PRC shall perform such other functions as the Chairman of the Board may direct.

2) Staff. Under the direction of the Program Coordinator, the Board's staff shall:

   a. Distribute procedures to all CPA staff elements and other non-CPA entities regarding the process for submitting funding requests;

   b. Create and maintain a database of all funding requests:

   c. Monitor and account for balances of all available funds subject to budgeting by the Board under this Regulation;

   d. Receive all funding requests and assist proponents as necessary to ensure that applications contain all necessary information;

   e. Ensure that all spending requirements have undergone prior review at the regional or ministerial level prior to submission;

   f. Ensure that spending requests are fully consistent with a comprehensive budgetary framework;

g. Distribute copies of all spending requirements and related information to all members of the Board for consideration;

h. Coordinate with proponents regarding any requests by the Board for additional information;

i. Organize and prepare materials for sessions of the Board;

j. Create, maintain and distribute, as appropriate, all official records of the Program Review Committee and the Board.

**Section 6**
**Duties of the Board**

1) General. The Board shall be responsible for recommending expenditures of resources from the Development Fund for Iraq and other resources identified in subsection 6 (3) of this Regulation, in a manner that meets the interests of the people of Iraq, furthers CPA's policy objectives, and comports fully with the CPA's stewardship and financial management duties under applicable laws and regulations, including United Nations Security Council Resolution 1483 (2003). The Board shall not be responsible for overseeing the manner in which approved spending requirements are executed.

2) Funding Plan. The Board shall be responsible for reviewing all identified requirements for the resources for which the Board is responsible; prioritizing these requirements; and integrating the prioritized requirements into a funding plan that forecasts available resources, recommends allocations of those resources, consistent with the purposes for which they are lawfully available and the relative priorities of all identified spending requirements; and sets forth the justification for the proposed expenditures and the recommended manner in which the expenditures should be executed (i.e., by contract or otherwise). In performing this function, the Board shall consider relevant information concerning relief and recovery efforts in Iraq and related budgeting documents, including the Iraqi Ministry of Finance budget of Iraqi resources.

3) Resources Subject to Funding Plan. In proposing funding plans for the relief and recovery of Iraq, the Board shall be responsible for recommending disbursements of:

a. Funds appropriated for such purposes by the U.S. Congress;

b. Iraqi property lawfully vested in the U.S. Treasury, to the extent that the Secretary of Defense is designated with authority to use such property to assist the Iraqi people and assist in the reconstruction of Iraq;

c. Iraqi state- or regime-owned cash, funds, realizable securities, or other state- or regime-owned movable property seized in Iraq consistent with the laws and usages of war;

d. The Development Fund for Iraq.

4) Preparation and Submission of Funding Plans.

a. Frequency. The Board shall submit funding plans at such times as the Chairman determines necessary to ensure the prompt and effective delivery of resources to Iraq, consistent with a comprehensive budgetary framework for Iraq.

b. Development. The Board shall, with the concurrence of a majority of voting members, prescribe such procedures as may be necessary to enable the timely preparation of funding plans, including instructions for identifying and submitting spending requirements to the Board for consideration, and procedures for advising the Board of current relief and recovery activities in Iraq.

c. Content and Format. Funding plans submitted by the Board shall include (i) a description of the amounts available within each source of funding subject to planning by the Board, as identified in Section 6 (3) of this Regulation; (ii) proposed funding requirements for each category of funding, prioritized to reflect the relative importance and urgency of the each such requirement; (iii) a recommendation as to the U.S. executive agency to which any funds appropriated by the U.S. government should be apportioned; and (iv) a recommendation as to the manner in which the prioritized spending requirements should be executed (i.e., by contract or otherwise). The Board shall submit proposed funding plans in a format to be approved by a majority of the Board's voting members.

d. Consultation with International Financial Institutions ("IFIs"). To ensure that proposed funding plans are developed in view of needs assessments being undertaken by the IFIs, the IFIs should be given an opportunity to consult with the Board and the PRC on projects of significant value.

e. Approval. All proposed funding plans shall be submitted to the Administrator for approval.

f. Publication. Approved funding plans shall be published in Arabic and broadly disseminated to the Iraqi people in a form to be prescribed by the Administrator.

5) Execution of Funding Plans. The Board shall propose principles and standards for expending funds for the relief and recovery of Iraq in a fair, consistent and transparent manner, through contracts or otherwise. In developing these proposed principles and standards, the Board shall consider prevailing international standards relating to procurement, including the codes and standards used by international financial institutions. Upon approval by a majority of the Board's voting members, the Chairman shall submit these principles and standards to the Administrator for final approval.

6) In carrying out these functions, the Board shall ensure appropriate coordination with the Special Representative of the Secretary General for Iraq, or his designee(s), in accordance with Resolution 1483 (2003) and, when and to the extent appropriate, shall consult the Iraqi interim administration referred to in paragraph 9 of Resolution 1483 (2003).

**Section 7**
**Board Sessions**

1) General. The Board shall meet at such times and in such locations as directed by the Chairman. The Board shall meet in formal session for the purpose of taking official action on any matter within the Board's responsibility, as set forth in this Regulation. At the Chairman's direction, the Board, or any part thereof, may meet in informal session, in order to plan or prepare for formal sessions of the Board, or carry out such other functions as the Chairman may prescribe, in furtherance of the Board's responsibilities.

2) Attendance. Formal sessions of the Board shall be attended by voting and nonvoting members and such other individuals as the Chairman may authorize. Informal sessions of the Board shall be attended by such members and other individuals as the Chairman may direct.

3) Quorum. The Board may take official actions only in formal sessions at which no fewer than seventy percent of the voting members of the Board are present.

4) Minutes. The Recorder of the Board shall prepare written minutes of each formal session of the Board, summarizing the Board's consideration of and action upon all matters brought before it. These minutes shall be made public.

5) Actions Relating to U.S. Government Appropriations. When taking action on any matter directly relating to the disposition of funds appropriated by the U.S. Congress, the voting and nonvoting membership of the Board shall be as prescribed in subsection 4(1) of this Regulation.

**Section 8**
**U.S. Government Contracts and Grants**

Nothing in this Regulation shall be construed to affect the validity of any contract or grant entered into by the U.S. Government with respect to relief or reconstruction in Iraq prior to the effective date of this Regulation.

**Section 9**
**Dissolution of the Board**

Until the Board is dissolved by the Administrator at the request of an internationally recognized, representative government of Iraq, the Board shall continue to operate in accordance with this Regulation and all other applicable laws, regulations, policies and agreements.

**Section 10**
**Administrative Procedures**

The Board may prescribe such additional administrative procedures as may be necessary to carry out its responsibilities under this Regulation. Such procedures shall be effective only upon approval by a majority of the Board's voting members.

**Section 11**
**Entry into Force**

This Regulation shall enter into force on the date of signature.

6/15/03

L. Paul Bremer, Administrator
Coalition Provisional Authority

# COALITION PROVISIONAL AUTHORITY
# REGULATION NUMBER 11

## AMENDMENTS TO COALITION PROVISIONAL AUTHORITY REGULATIONS NO. 2 (CPA/REG/10 JUNE 2003/02) AND NO. 3 (CPA/REG/18 JUNE 2003/03)

*Pursuant* to my authority as Administrator of the Coalition Provisional Authority (CPA), and under the laws and usages of war, and consistent with relevant U.N. Security Council resolutions, including Resolutions 1483 and 1511 (2003) and 1546 (2004),

*Noting* that the Coalition Provisional Authority will dissolve on June 30, 2004 and that full governance authority of Iraq will transfer to the Iraqi Interim Government on that date,

*Recognizing* that on June 30, 2004 the Iraqi Interim Government will assume control over all funds in the Development Fund for Iraq,

*Acknowledging* that the Coalitional Provisional Authority has entered into contracts on behalf of the people of Iraq and that many of these contracts require continued performance and payment from the Development Fund for Iraq after June 30, 2004,

*Understanding* that continued performance and payments due under these contracts after June 30, 2004 are critical to the redevelopment and reconstruction of Iraq,

*Desiring* to amend Coalition Provisional Authority Regulation No. 2, Development Fund for Iraq, (CPA/REG/10 June 2003/02), and Coalition Provisional Authority Regulation No. 3, Program Review Board, (CPA/REG/18 June 2003/03), to provide for the orderly transition of authority over the Development Fund for Iraq from the Coalition Provisional Authority to the Iraqi Interim Government,

I hereby promulgate the following:

### Section 1
### Transition of Authority over Development Fund for Iraq

1) Section 3 of CPA Regulation No. 2, Development Fund for Iraq, (CPA/REG/10 June 2003/02), is amended to read as follows:

   A sub-account of the account entitled "Central Bank of Iraq/Development Fund for Iraq" shall be created. The sub-account shall be entitled "Central Bank of Iraq/Development Fund for Iraq/Transition" and (when established) shall contain funds equal to or in excess of the total amount of outstanding contractual liability against the Development Fund for Iraq arising out of contracts or grants funded by the Development Fund for Iraq that:

a) were entered into on or before June 30, 2004 by the Coalition Provisional Authority or the Multi-National Force-Iraq in accordance with United Nations Security Council Resolution 1483 and implementing regulations;
b) require the continued performance and/or payment of money originating from the DFI past June 30, 2004; and
c) are not the subject of a fully-funded letter of credit intended to otherwise ensure performance under the contract or grant.

On June 30, 2004, all responsibilities, duties, powers, and authorities granted to the Administrator and the Coalition Provisional Authority under this Regulation shall transfer to the Prime Minister of the Iraqi Interim Government and the Iraqi Interim Government, respectively.

2) Paragraph 1 of Section 5 of CPA Regulation No. 2, Development Fund for Iraq, (CPA/REG/10 June 2003/02), is amended and restated as follows:

1) General. The Central Bank of Iraq/Development Fund for Iraq account and the Central Bank of Iraq/Development Fund for Iraq/Transition sub-account in the Federal Reserve Bank shall be governed by the Federal Reserve Bank's standard terms and conditions regarding accounts of central banks and governments, to the extent consistent with applicable law.

3) Paragraph 5 of Section 5 of CPA Regulation No. 2, Development Fund for Iraq, (CPA/REG/10 June 2003/02), is amended and restated as follows

5) Privileges and Immunities. The Fund, including the accounts and sub-accounts that comprise its corpus, and the Receipts Account, shall enjoy the privileges and immunities as set forth in paragraph 22 of Resolution 1483 and continued in paragraph 27 of Resolution 1546, as well as privileges and immunities to which the Fund may be entitled under any other law, regulation, order, or directive.

4) Section 8 of CPA Regulation No. 2, Development Fund for Iraq, (CPA/REG/10 June 2003/02), is amended and restated as follows:

Until the Fund is dissolved by the Coalition Provisional Authority (or, after the transfer of governmental authority, by the Interim Iraqi Government) in a manner consistent with Resolutions 1483 and 1546, the Central Bank of Iraq shall continue to hold on its books the Fund. Also, as agreed between the Administrator and the Federal Reserve Bank (and/or other financial institution(s)), such institution(s) shall continue to maintain on its books the "Central Bank of Iraq/Development Fund for Iraq" account and all sub-accounts, including a sub-account entitled "Central Bank of Iraq/Development Fund for Iraq/Transition," and shall continue to accept deposits into, make disbursements from, and otherwise operate the account and sub-account, in accordance with applicable laws, regulations, policies and agreements.

(5) Section 10 of CPA Regulation No. 3, Program Review Board, (CPA/REG/18 June 2003/03), is amended and restated as follows:

> The Board may prescribe such additional procedures as may be necessary to carry out its responsibilities under this Regulation. Such procedures shall be effective only upon approval by a majority of the Board's voting members.
>
> Notwithstanding any provisions to the contrary set forth in this Regulation, the Board shall take reasonable steps to ensure that funding initiatives that require payment or performance beyond June 30, 2004 are backed by fully-funded letters of credit from the Trade Bank of Iraq.

**Section 2**
**Entry and Force**

This Regulation shall enter into force on the date of signature.

L. Paul Bremer, Administrator
Coalition Provisional Authority

# COALITION PROVISIONAL AUTHORITY ORDER NUMBER 16 (REVISED) (AMENDED)

## TEMPORARY CONTROL OF IRAQI BORDERS, PORTS AND AIRPORTS

*Pursuant* to my authority as Administrator of the Coalition Provisional Authority (CPA) and under the laws and usages of war, and consistent with relevant U.N. Security Council Resolutions, including Resolution 1483 (2003) and Resolution 1511 (2003),

*Recognizing* that it is desirable as soon as possible to restore the normal transit and movement of people to and from Iraq,

*Acknowledging* that the Iraqi laws on immigration, customs and quarantine should remain in place unless exceptions prove necessary for security reasons or otherwise to accomplish the obligations of the CPA under the laws and usages of war,

*Recognizing* that effective export and border controls are essential to prevent terrorist activities and the proliferation of weapons of mass destruction, their delivery systems, advanced conventional weapons and related technologies,

*Noting* that the current security situation in Iraq does not permit the unrestricted resumption of normal transit and movement,

I hereby promulgate the following:

### Section 1
### Definitions

1) *"Authorized officer"* means any Coalition personnel or Iraqi official designated by the CPA, Ministry of Interior or Ministry of Foreign Affairs to perform border control, customs, immigration, consular or quarantine services. For purposes of issuance and revocation of travel documents (including permits) only, authorized officer means "designated travel document issuing authority" as defined in Section 1.1.

2) "*Coalition contractor*" and "*contractor*" has the same meaning as the definitions in Section 1 of CPA Order Number 17 as revised or amended.

3) *"Coalition personnel"* means

   a) all non-Iraqi military and civilian personnel under the authority of the Commander of Coalition Forces or the Commander Multi-national Force Iraq, as well as all non-Iraqi military and civilian personnel assigned to, or under the

direction or control of, the Administrator of the CPA or its successor organization;

b) citizens or nationals traveling to Iraq on official government business of the United States of America, United Kingdom, Australia, Italy, The Netherlands, Poland, Ukraine, Portugal; and

c) citizens or nationals traveling to Iraq on official government business of any other designated state: such designations will be made by the CPA or the Ministry of Foreign Affairs.

4) "*Designated travel document issuing authority*" means:

d) with respect to issuance of regular passports, interim travel documents and extending Iraqi passports, the offices of the Ministries of Interior and Foreign Affairs so designated by the Minister or Deputy Minister of Interior, and any Iraqi mission located outside Iraq so designated by the Minister of Foreign Affairs or the Director of Consular Affairs;

e) with respect to issuance of Iraqi diplomatic and official passports, the Ministry of Foreign Affairs;

f) with respect to travel permits, the Ministry of Foreign Affairs and any Iraqi mission located outside Iraq so designated by the Minister of Foreign Affairs or the Director of Consular Services to do so, or Ministry of Interior offices so designated by the Minister or Deputy Minister of Interior; and

g) with respect to special clearances the Ministry of Interior offices so designated by the Minister or Deputy Minister of Interior.

5) *"Goods"* means any commodity, substance, organism, article, document, data or thing, whether manufactured or natural, including any Controlled Item that may be moved across the borders of Iraq. "Goods" does not include human bodies, cadavers or human remains.

6) *"Member of a crew"* means a person, including a master, who is employed on a vehicle to perform duties during a voyage or trip related to the operation of the vehicle or the provision of services to passengers.

7) *"Controlled Item"* means any item contained in the control lists of the Missile Technology Control Regime, the Australia Group, the Nuclear Suppliers Group, the Zangger Committee or the Wassenaar Arrangement or any other documents, systems, components, materials, software or technology that may be intended to

contribute to the acquisition, manufacture, development, research or transfer of Weapons of Mass Destruction, their delivery systems or advanced conventional military systems. "Technology" includes information necessary for the design, development, production, or use of a controlled commodity or software.

8) *"Terrorism"* means the use or threatened use of unlawful violence against civilians, noncombatants, or other innocents, calculated to cause fear or to coerce or intimidate governments or societies, and motivated by political, religious, or ideological goals.

9) *"Terrorist Organization"* means an organization whose objective is to support or commit acts of terrorism, directly or indirectly, physically or financially.

10) *"Transportation Company"* is any corporation, enterprise or other entity transporting persons and/or goods to and from Iraq.

11) *"Travel Documents"* means documents required by the CPA, Ministry of the Interior or Ministry of Foreign Affairs for entry into and exit from Iraq. These may include:

a) an Iraqi passport valid on its face or which has had its validity extended consistent with this Order;

b) a CPA Interim Travel Document (ITD);

c) a document or documents proving Iraqi nationality (including an Iraqi Nationality Card) issued for the purposes of return to Iraq;

d) a travel permit issued by an authorized officer as defined by this Order;

e) a document issued by a foreign government or an international organization, such as the United Nations High Commission for Refugees or *the International Committee of the Red Cross* identifying the person as a refugee from Iraq; and

f) passports of any country, government issued identification cards, military identification, government issued travel orders for military personnel, and UN issued travel documentations.

12) *"Travel permit"* means a permit to enter Iraq issued pursuant to Section 5 of this Order and includes visa, entry stamp or entry card.

13) *"Vehicle"* means any conveyance by land, water or air.

14) *"Weapons of Mass Destruction"* means nuclear, biological, or chemical weapons.

**Section 2**
**Preservation of Laws**

1) All Iraqi laws regarding immigration, emigration, customs and quarantine shall remain in force unless specifically suspended by this Order.

2) Wherever a stipulation, direction, instruction, guidance or provision of this Order or made pursuant to this Order or any other CPA Regulation, Order or Memorandum conflicts with a current provision of Iraqi immigration, emigration, customs and quarantine laws, the direction, instruction, guidance, or provision contained in or made pursuant to such Regulation, Order or Memorandum shall prevail.

3) The Ministry of Interior or Ministry of Foreign Affairs, in consultation with each other as appropriate, may issue directions, instructions or guidance to designated travel document issuance authorities consistent with this Order or any other CPA Regulation, Order or Memorandum.

4) The edict of the former President Saddam Hussein, fixing the expiration of "N" series passports in the year 2003, issued during the years 1996 to 2002, is hereby suspended. All "N" and "M" series passports will continue in effect for their statutory duration.

5) All Iraqi passports in the "N" and "M" series may be extended by any designated travel document issuing authority. Passports presented to a designated travel document issuing authority for extension on or before their original expiration date or within the two months immediately following their original expiration date may be extended for a period of four (4) years. Passports presented to a designated travel document issuing authority for extension after the two months following their original expiration date may be extended for a period of two (2) years. Designated travel permit issuing authorities may validate Iraqi passports in any series. Any passport purporting to have been issued after March 19, 2003 that has not been validated with a stamp from either the CPA, the Ministry of Foreign Affairs or the Ministry of Interior, or with a combined CPA/Ministry of Interior/Ministry of Foreign Affairs stamp, is invalid. Any Iraqi passport valid under this Order may be amended by any authorized officer at an Iraqi mission overseas to register a child under the age of twelve (12) years, on the passport of a parent, guardian or legal trustee in accordance with established Iraqi law and procedures.

6) Consistent with Section 2 of CPA Order No. 26 (CPA/ORD/24 August 2003/26), the Ministry of Foreign Affairs has the authority to grant, issue, renew, extend or amend diplomatic and official passports in accordance with established procedures and for the purpose of facilitating official travel of Iraqi officials. As of January 1, 2004, all diplomatic and official passports that do not have a CPA and/or Ministry of Foreign Affairs stamp either to reflect issuance, renewal, extension or validation are declared invalid for travel except for direct return travel to Iraq. Such passports may be confiscated by any authorized officer or any authorized representative of the Ministry of Foreign Affairs.

**Section 3**
**Right to Exit**

1) Subject to compliance with Iraqi law and with border control procedures established by the CPA or Ministry of Interior, all persons may exit from Iraq, provided they are in possession of travel documents and are not subject to any travel restrictions under applicable law, including this Order.

2) The following persons shall require special clearance from the Minister of Interior to exit Iraq and may be prevented from exiting at the discretion of the Minister of the Interior:

   a) Senior regime or military leadership and Senior Party Members or office holders of the Ba`ath Party, as described in CPA/ORD/16 May 2003/01;

   b) Persons suspected of having committed serious crimes;

   c) Persons who are known or suspected to have links to a terrorist organization or who are suspected to have committed or to have provided financial, material, or technological support for acts of terrorism; and

   d) Persons suspected of being involved or attempting to be involved with the acquisition, manufacture, development, research, or transfer of technology or material related to Weapons of Mass Destruction or their delivery systems; or having knowledge of the location of Weapons of Mass Destruction or their delivery systems, or the identity of persons with such knowledge.

**Section 4**
**Examinations for Entry**

1) A person seeking entry to Iraq shall appear before an authorized officer at a port of entry, border control station or at such other place as may be designated by the

Ministry of the Interior for examination to determine whether the person may be granted entry to Iraq.

2) A person appearing for examination shall answer truthfully all questions and shall produce such documentation as may be required for the purpose of establishing whether the person may be granted entry.

3) A person may be detained for up to forty-eight hours for further examination upon entry and/or pending arrangements for his or her return based on established procedures, or his or her withdrawal of the request to enter Iraq.

**Section 5**
**Permits to Enter Iraq**

1) Persons seeking entry to Iraq are to be classified as either persons who require permits granting entry into Iraq (hereinafter "permits") or persons who do not require such permits. All persons who are not listed in Sections 5(2) or 5(3) of this Order require permits. Authorized officers shall issue permits, in accordance with this Order, or in accordance with any direction from the Ministry of Interior, in consultation with the Ministry of Foreign Affairs, and in accordance with applicable law.

2) Persons not requiring permits to enter Iraq are still those persons not otherwise denied permits under this Order who are:

a) citizens of Iraq or persons who were born in Iraq;

b) Coalition personnel;

c) United Nations officials or any official of any other UN organization;

d) documented members of seagoing ships' companies during the stay of a ship in Iraqi waters; and

e) documented members of airline companies during the stay of the aircraft in Iraqi territory.

3) The Ministry of Interior or Ministry of Foreign Affairs may issue permits for a variety of purposes, including but not limited to business, tourism, students, temporary visitors, residence and foreign liaison (diplomatic). The Ministry of Interior, in consultation with the Ministry of Foreign Affairs, shall issue directions relating to the number, duration and other conditions pertaining to the issuance of designated classes of permits.

4) Permits may be issued from CPA, any Iraqi mission or embassy that has reopened and has been authorized to do so by the Ministry of Foreign Affairs, and Ministry of Interior offices established or authorized for this purpose within Iraq and at authorized ports of entry.

**Section 6**
**Powers of an Authorized Officer**

1) A designated travel document issuing authority who receives an application for a permit shall either approve or refuse the application, and shall notify the applicant of the decision. At any time after an application for a permit is approved, the authorized officer may:

a) Alter or revoke any terms and conditions subject to which the person was granted entry;

b) Add terms and conditions as prescribed or authorized by the present Order and other CPA Regulations, Orders or Memoranda; and/or

c) Extend the permit.

2) Subject to the present Order, a visitor seeking an extension of a permit shall appear before an authorized officer for examination to determine whether the visitor may be granted an extension of a permit at such place as may be designated by the Ministry of the Interior.

3) A visitor appearing for examination shall answer truthfully all questions and shall produce such other documentation as may be required for the purpose of establishing whether the visitor may be granted an extension of a permit.

**Section 7**
**Persons Who May be Denied Entry to Iraq**

1) An authorized officer who receives an application for a permit may refuse the application if the authorized officer has reasonable grounds to believe that the applicant:

a) knowingly provided any false, misleading, or inaccurate information in the course of the application process;

b) is suffering from any serious communicable disease, or is suffering from any disorder, disability or other health impairment for which commercial health services are not readily available in Iraq;

c) will be unable or unwilling to support herself or himself, and those persons who are dependent on the applicant;

d) is or was a member of a criminal organization;

e) will commit offenses, or engage in criminal activity planned and organized by persons acting in concert with or in furtherance of the commission of any offense;

f) will engage in or has engaged in an act of terrorism, or is a member of a terrorist organization or an organization that there are reasonable grounds to believe will:

i. engage in acts which are offensive to the principles of democratic government, institutions or processes in Iraq; or

ii. engage in or instigate the removal by force of any government;

g) will engage in acts of violence that may endanger the lives or safety of persons in Iraq, or who is a member of an organization that engages in such acts;

h) has been involved or attempted to be involved with the acquisition, manufacture, development, research or transfer of technology or material related to Weapons of Mass Destruction, their delivery systems, or advanced conventional military systems, including dual use items;

i) has committed acts or omissions that constituted a war crime or a crime against humanity; or

j) has previously been deported from Iraq by the CPA, or an international territory with formal border controls.

2) In the case of a person who is in possession of a valid travel document, or who can otherwise establish Iraqi nationality, his or her entry into Iraq shall not be denied. However, if security or military necessity requires, then such a person may be detained upon entry into Iraq.

3) A person denied entry under this Order may appeal to the Minister of Interior for a review of the case. The determination of the Minister of Interior will be final.

**Section 8**
**Notice to Depart**

1) Where an authorized officer, upon examination of a person, is of the opinion that it would be contrary to the present Order to grant entry to the person, or to extend the permit of a person, the authorized officer may:

a) allow that person to leave Iraq immediately; or

b) serve that person with a Notice to Depart (hereinafter "Notice") within a specified period.

2) A Notice must specify:

c) that the person must depart Iraq within a specified period;

d) the reasons why the Notice is being served;

e) that the person may object to the Notice in writing to the Ministry of the Interior within a specified time, or give reasons why the Notice should not remain in force; and

f) that timely compliance will not have adverse consequences for the return of a person who otherwise complies with entry requirements.

3) Where the Minister of Interior receives written objections from a person under this Order, the Minister of Interior shall:

c) consider such written objections promptly,

d) promptly determine the fair and lawful resolution of the matter, and

e) advise the person in writing of the decision.

**Section 9**
**Revocation of a Permit**

A designated travel document issuing authority may revoke a person's permit if:

a) the circumstances that formed the basis of the approval of the person's application for the permit have substantially changed;

b) the person breaches a prescribed term of the permit, or another person required to comply with a condition of the permit has not met that condition;

c) the presence of the person in Iraq is, or would be, a risk to the health, safety or good order of the Iraqi community; or

d) the permit should not have been granted because the application for the permit was in contravention of the present Order or other applicable law.

**Section 10**
**Identification and Seizure of Documents**

1) Persons shall comply with the instructions of an authorized officer regarding their identification, if they:

a) seek entry into Iraq,

b) make an application for the renewal of a permit,

c) have been arrested, or

d) are subject to deportation under this Order.

2) For the purpose of identification, an authorized officer may in accordance with the provisions of Sections 11 and 12 below:

a) search persons who the authorized officer believes either have not revealed their identity or have hidden on or about their person documents that are relevant to a decision as to whether they may be granted permission to enter Iraq, and may search any vehicle that conveyed the persons to Iraq and their luggage and personal effects;

b) search persons who the authorized officer reasonably believes have committed an offense or are in possession of objects or documents that may be used in the commission of an offense, and may search any vehicle that conveyed the person to Iraq, their luggage and personal effects;

c) examine any travel document or any other document purporting to be a travel document at a port of entry or any other place in Iraq, for the purpose of this Order or relevant directives, examine any object that is, or is about to be, imported into or exported from Iraq.

3) An authorized officer may confiscate at a port of entry or any other place in Iraq any object or document if the authorized officer reasonably deems this necessary for the discharge of the functions of the officer under this Order.

4) An authorized officer may confiscate any object or document if the officer reasonably believes that it has been fraudulently or improperly obtained or used, or that such action is necessary to prevent its fraudulent or improper use.

5) An authorized officer shall provide a written receipt to any person from whom he or she confiscates an object or document under this Order, and shall provide the person with a written notice setting out the procedures for review pursuant to Section 17 below.

**Section 11**
**Search of a Person**

1) An authorized officer may, without a warrant, search a person who seeks entry to Iraq.

2) The search of a person must be made by an authorized officer pursuant to the present Order and must be made on reasonable grounds.

3) No person shall be searched by a person who is not of the same sex, and if there is no officer of the same sex at the place at which the search is to take place, an authorized officer may request that another border control or customs employee of the same sex perform the search, when necessary to comply with this provision.

**Section 12**
**Search and Seizure of Goods**

1) An authorized officer may, without a warrant, search the vehicle, luggage or personal effects of any person who seeks entry into Iraq.

2) Persons crossing the borders of Iraq must make declarations or manifests of all goods being transported by the person available to an authorized officer on request.

3) An authorized officer shall confiscate any goods that may pose a threat to the peace, security, health, environment, or good order of Iraq, including Controlled Items. Authorized officers also shall confiscate any antiquities or cultural items suspected of being illegally exported.

4) The export or import of a Controlled Item shall require the prior written authorization of the Administrator, his designee, or the Minister of Interior. Such prior written authorization requirement shall not apply to exports of Controlled Items by the CPA or Coalition personnel. Such prior written authorization requirement shall not apply to the export of Controlled Items by Coalition contractors, who are exporting such Controlled Items pursuant to the performance of its contract with the Coalition or Multi-national force.

5) Goods that are not declared may be confiscated by an authorized officer. Persons may also be ordered to return such goods, at their expense, to the jurisdiction from which they came.

6) Any goods confiscated must be immediately handed over to the Minister of the Interior or to his or her delegate(s). A receipt must be issued to the person from whom the goods are confiscated and the person must be provided with written notice setting forth the procedures for review pursuant to Section 17, below.

**Section 13**
**Offenses**

1) Allegations of an offense shall be subject to review and action, if appropriate, by either an investigative judge of a customs court or a criminal court of Iraq, depending on the alleged offense.

2) The following shall constitute an offense under this Order:

   a) failing to appear before an authorized officer for examination as required by this Order;

   b) failing to answer truthfully all questions by an authorized officer during examination;

   c) knowingly concealing documentation as may be required by the authorized officer during examination;
   d) failing to make a declaration or manifest of all goods being carried by the person on request by an authorized officer;

   e) obstructing or interfering with a search of the person or search of the person's vehicle, luggage or personal effects pursuant to this Order;

   f) knowingly making a false representation, orally or in writing, to an authorized officer for the purposes of securing entry of a person into Iraq;

g) entering Iraq or remaining in Iraq without a permit, if one is required;

h) entering Iraq or remaining in Iraq by use of a false or improperly obtained travel document or other document pertaining to the entry of that person or by reason of any fraudulent or improper means or misrepresentation of any material fact;

i) failing to comply with a prescribed term of a permit;

j) escaping or attempting to escape from lawful custody or detention under this Order and any other relevant instructions or directives

k) organizing or facilitating the entry or proposed entry into Iraq of a person, knowing the person would, upon entering Iraq, be guilty of an offense under this Section; and

l) seeking to export or import, or exporting or importing Controlled Items without prior authorization issued pursuant to Section 12(4) of this Order.

**Section 14**
**Penalties**

A person who commits an offense described in this Order is liable to have any goods in his or her possession confiscated and may be deported from Iraq. The person may also be liable to a penalty prescribed in an applicable Iraqi law, CPA Order, Regulation or Memorandum, or other subordinate directive.

**Section 15**
**Liability for Removal Costs**

1) A transportation company shall ensure that:

a) the persons it conveys to Iraq are in possession of all travel documents required by applicable law,
b) it presents each person to an authorized officer for examination at such place as may be designated by an authorized officer upon arrival of each one of its vehicles in Iraq, and

c) no other person leaves the vehicle i) at any place other than that designated by an authorized officer, or ii) until permission has been granted by an authorized officer.

2) Where a person has been allowed or required to leave Iraq pursuant to this Order, a transportation company that has conveyed the person to Iraq may be required by an authorized officer to cause that person to be conveyed to the country from which that person came, or to such other country as the authorized officer may approve at the request of the company.

3) Where a person has been required to leave Iraq because at the time of the arrival in Iraq the person was not in possession of a valid travel document required by applicable law, a transportation company that has conveyed the person to Iraq shall be liable to pay all costs of conveying that person to the country from which that person came, or to such other country as an authorized officer may approve at the request of the company.

4) Where a person has been granted entry to Iraq, or where that person, at the time of arrival in Iraq, was in possession of a valid travel document, and where that person is required to leave Iraq pursuant to the present Order, a transportation company that has conveyed the person to Iraq and that is required to cause that person to be conveyed from Iraq is entitled to be reimbursed by the Ministry of the Interior for the costs of conveying that person from Iraq. However a transportation company shall not be reimbursed for the costs of conveying from Iraq a person who enters Iraq as, or to become, a member of a crew.

5) Where a person enters Iraq as, or to become, a member of a crew of a vehicle and ceases to be a visitor, the transportation company that operates that vehicle may be required to cause that person to be conveyed to the country from which that person came, or to such other country as the Ministry of the Interior may approve at the request of the company. The transportation company shall be liable to pay all costs of conveying that person from Iraq.

**Section 16**
**Other Offenses**

1) Where an authorized officer has reasonable grounds to believe that a person who seeks entry into or exit from Iraq, or who seeks to remain in Iraq, is liable for an offense committed under applicable law in Iraq, other than an offense prescribed in this Order, the authorized officer shall report the matter immediately to law enforcement or other appropriate authorities .

2) Where the circumstances of the case require, an authorized officer may arrest a person suspected of having committed an offense other than an offense prescribed in this Order. The arrest must be immediately reported to the Interim Minister of the Interior, and the arrested person must, as soon as possible but no later than six

hours after the arrest, be delivered into the custody of law enforcement or other appropriate authorities.

**Section 17**
**Review**

1) A person who is adversely affected by a decision of an authorized officer made pursuant this Order may apply in writing to the Minister of Interior or in person at the Ministry of Interior offices at border points of entry for a review of the decision by the Minister of Interior for decisions made in respect of applications for travel permits lodged within Iraq, or in writing to the Ministry of Foreign Affairs for review of any adverse decisions made in respect of applications for travel permits lodged outside of Iraq. Within seven (7) days of receipt of the application, the Minister of Interior or the Minister of Foreign Affairs, as appropriate, shall review the decision and notify the applicant of the determination in writing at the last provided address of the applicant.

2) A person whose goods have been confiscated may apply in writing, with a copy of the confiscation receipt attached, to the Minister of Interior for a review of the decision. Within seven days of receipt of the application, the Minister of Interior shall review the decision and notify the applicant of the determination in writing at the last provided address of the applicant.

3) The Minister of Interior and Minister of Foreign Affairs may issue Administrative Instructions in connection with such reviews.

**Section 18**
**Collection of Fees**

The Ministry of Interior, in coordination with the Ministry of Foreign Affairs, may establish fees for services provided under this Order. Under procedures established by the Ministry of Finance, the Ministries of Foreign Affairs and Interior may retain part or all of the fees to be utilized for the modernization of Iraq's border control system.

**Section 19**
**Entry into Force**

This Order shall enter into force on the date of signature.

6/13/04

L. Paul Bremer, Administrator
Coalition Provisional Authority

# COALITION PROVISIONAL AUTHORITY ORDER NUMBER 17 (REVISED)

## STATUS OF THE COALITION PROVISIONAL AUTHORITY, MNF - IRAQ, CERTAIN MISSIONS AND PERSONNEL IN IRAQ

*Pursuant* to my authority as head of the Coalition Provisional Authority (CPA), and under the laws and usages of war, and consistent with relevant U.N. Security Council resolutions, including Resolutions 1483 (2003), 1511 (2003) and 1546 (2004),

*Noting* the adoption of a process and a timetable for the drafting of an Iraqi constitution by elected representatives of the Iraqi people in the Law of Administration for the State of Iraq for the Transitional Period (TAL) on March 8, 2004,

*Conscious* that states are contributing personnel, equipment and other resources, both directly and by contract, to the Multinational Force (MNF) and to the reconstruction effort in order to contribute to the security and stability that will enable the relief, recovery and development of Iraq, as well as the completion of the political process set out in the TAL,

*Noting* that many Foreign Liaison Missions have been established in Iraq that after June 30, 2004 will become Diplomatic and Consular Missions, as defined in the Vienna Conventions on Diplomatic and Consular Relations of 1961 and 1963,

*Recalling* that there are fundamental arrangements that have customarily been adopted to govern the deployment of Multinational Forces in host nations,

*Conscious* of the need to clarify the status of the CPA, the MNF, Foreign Liaison, Diplomatic and Consular Missions and their Personnel, certain International Consultants, and certain contractors in respect of the Government and the local courts,

*Recognizing* the need to provide for the circumstances that will pertain following June 30, 2004, and noting the consultations with the incoming Iraqi Interim Government in this regard and on this order,

I hereby promulgate the following:

### Section 1
### Definitions

1) "Multinational Force" (MNF) means the force authorized under U.N. Security Council Resolutions 1511 and 1546, and any subsequent relevant U.N. Security Council resolutions.

2) "MNF Personnel" means all non-Iraqi military and civilian personnel (a) assigned to or under the command of the Force Commander or MNF contingent commanders, (b)

subject to other command authority to aid, protect, complement or sustain the Force Commander, or (c) employed by a Sending State in support of or accompanying the MNF.

3) "Force Commander" means the Commander appointed to exercise unified command of the MNF, or his or her designee.

4) "CPA Personnel" means all non-Iraqi civilian and military personnel assigned to, or under the direction or control of, the Administrator of the CPA.

5) "Sending State" means a State providing personnel, International Consultants, services, equipment, provisions, supplies, material, other goods or construction work to: (a) the CPA, (b) the MNF, (c) international humanitarian or reconstruction efforts, (d) Diplomatic or Consular Missions, or (e) until July 1, 2004, Foreign Liaison Missions.

6) "Foreign Liaison Missions" means representative missions operated by States until July 1, 2004.

7) "Foreign Liaison Mission Personnel" means those individuals who are authorized by the Iraqi Ministry of Foreign Affairs to carry Foreign Liaison Mission personnel identification cards until July 1, 2004.

8) "Diplomatic and Consular Missions" means those missions belonging to States with diplomatic or consular relations with Iraq that are in operation on or after June 30, 2004.

9) "Premises of the Missions" means all premises, including the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used for the purposes of Diplomatic and Consular Missions, including residences of the heads of missions on or after June 30, 2004.

10) "Iraqi legal process" means any arrest, detention or legal proceedings in Iraqi courts or other Iraqi bodies, whether criminal, civil, or administrative.

11) "Contractors" means non-Iraqi legal entities or individuals not normally resident in Iraq, including their non-Iraqi employees and Subcontractors not normally resident in Iraq, supplying goods or services in Iraq under a Contract.

12) "Contract" means:

a) a contract or grant agreement with the CPA or any successor agreement thereto, or a contract or grant agreement with a Sending State, to supply goods or services in Iraq, where that supply is:

i) to or on behalf of the MNF;
ii) for humanitarian aid, reconstruction or development projects approved and organized by the CPA or a Sending State;
iii) for the construction, reconstruction or operation of Diplomatic and Consular Missions; or
iv) until July 1, 2004, to or on behalf of Foreign Liaison Missions; or

b) a contract for security services provided by Private Security Companies to Foreign Liaison Missions and their Personnel, Diplomatic and Consular Missions and their personnel, the MNF and its Personnel, International Consultants, or Contractors.

13) "Subcontractors" means non-Iraqi legal entities or individuals not normally resident in Iraq, including their non-Iraqi employees, performing under contract with a Contractor to supply goods or services in Iraq in furtherance of the Contractor's Contract.

14) "Private Security Companies" means non-Iraqi legal entities or individuals not normally resident in Iraq, including their non-Iraqi employees and Subcontractors not normally resident in Iraq, that provide security services to Foreign Liaison Missions and their Personnel, Diplomatic and Consular Missions and their personnel, the MNF and its Personnel, International Consultants and other Contractors.

15) "Vehicles" means civilian and military vehicles operated by or in support of MNF, the CPA, Foreign Liaison Missions, International Consultants and, in the course of their official and contractual activities, Contractors.

16) "Vessels" means civilian and military vessels operated by or in support of the MNF, the CPA, Foreign Liaison Missions, International Consultants and, in the course of their official and contractual activities, Contractors.

17) "Aircraft" means civilian and military aircraft operated by or in support of the MNF, the CPA, Foreign Liaison Missions, International Consultants and, in the course of their official and contractual activities, Contractors.

18) "The Government" means the Iraqi Interim Government from June 30, 2004, the Iraqi Transitional Government upon its formation, and any successor government for the duration of this Order, including instrumentalities, commissions, judicial, investigative or administrative authorities, and regional, provincial and local bodies.

19) "International Consultants" means all non-Iraqi personnel who are not CPA personnel and, after June 30, 2004, are not accredited to a Diplomatic or Consular Mission, but are provided by Sending States as consultants to the Government and are officially accepted by the Government.

**Section 2**
**Iraqi Legal Process**

1) Unless provided otherwise herein, the MNF, the CPA, Foreign Liaison Missions, their Personnel, property, funds and assets, and all International Consultants shall be immune from Iraqi legal process.

2) All MNF, CPA and Foreign Liaison Mission Personnel and International Consultants shall respect the Iraqi laws relevant to those Personnel and Consultants in Iraq including the Regulations, Orders, Memoranda and Public Notices issued by the Administrator of the CPA.

3) All MNF, CPA and Foreign Liaison Mission Personnel, and International Consultants shall be subject to the exclusive jurisdiction of their Sending States. They shall be immune from any form of arrest or detention other than by persons acting on behalf of their Sending States, except that nothing in this provision shall prohibit MNF Personnel from preventing acts of serious misconduct by the above-mentioned Personnel or Consultants, or otherwise temporarily detaining any such Personnel or Consultants who pose a risk of injury to themselves or others, pending expeditious turnover to the appropriate authorities of the Sending State. In all such circumstances, the appropriate senior representative of the detained person's Sending State in Iraq shall be notified immediately.

4) The Sending States of MNF Personnel shall have the right to exercise within Iraq any criminal and disciplinary jurisdiction conferred on them by the law of that Sending State over all persons subject to the military law of that Sending State.

5) The immunities set forth in this Section for Foreign Liaison Missions, their Personnel, property, funds and assets shall operate only with respect to acts or omissions by them during the period of authority of the CPA ending on June 30, 2004.

**Section 3**
**Diplomatic and Consular Missions**

All Premises of Diplomatic and Consular Missions will be utilized by Diplomatic and Consular Missions without hindrance and subject to the requirements of and receiving the protections provided for in the Vienna Convention on Diplomatic Relations of 1961 and the Vienna Convention on Consular Relations of 1963. This Order does not prevent the Government and any State from entering into other bilateral arrangements for existing or new premises.

## Section 4
## Contractors

1) Sending States may contract for any services, equipment, provisions, supplies, material, other goods, or construction work to be furnished or undertaken in Iraq without restriction as to choice of supplier or Contractor. Such contracts may be awarded in accordance with the Sending State's laws and regulations.

2) Contractors shall not be subject to Iraqi laws or regulations in matters relating to the terms and conditions of their Contracts, including licensing and registering employees, businesses and corporations; provided, however, that Contractors shall comply with such applicable licensing and registration laws and regulations if engaging in business or transactions in Iraq other than Contracts. Notwithstanding any provisions in this Order, Private Security Companies and their employees operating in Iraq must comply with all CPA Orders, Regulations, Memoranda, and any implementing instructions or regulations governing the existence and activities of Private Security Companies in Iraq, including registration and licensing of weapons and firearms.

3) Contractors shall be immune from Iraqi legal process with respect to acts performed by them pursuant to the terms and conditions of a Contract or any sub-contract thereto. Nothing in this provision shall prohibit MNF Personnel from preventing acts of serious misconduct by Contractors, or otherwise temporarily detaining any Contractors who pose a risk of injury to themselves or others, pending expeditious turnover to the appropriate authorities of the Sending State. In all such circumstances, the appropriate senior representative of the Contractor's Sending State in Iraq shall be notified.

4) Except as provided in this Order, all Contractors shall respect relevant Iraqi laws, including the Regulations, Orders, Memoranda and Public Notices issued by the Administrator of the CPA.

5) Certification by the Sending State that its Contractor acted pursuant to the terms and conditions of the Contract shall, in any Iraqi legal process, be conclusive evidence of the facts so certified.

6) With respect to a contract or grant agreement with or on behalf of the CPA and with respect to any successor agreement or agreements thereto, the Sending State shall be the state of nationality of the individual or entity concerned, notwithstanding Section 1(5) of this Order.

7) These provisions are without prejudice to the exercise of jurisdiction by the Sending State and the State of nationality of a Contractor in accordance with applicable laws.

**Section 5**
**Waiver of Legal Immunity and Jurisdiction**

1) Immunity from Iraqi legal process of MNF, CPA and Foreign Liaison Mission Personnel, International Consultants and Contractors is not for the benefit of the individuals concerned and may be waived pursuant to this Section.

2) Requests to waive immunity for MNF, CPA and Foreign Liaison Mission Personnel and International Consultants shall be referred to the respective Sending State. Such a waiver, if granted, must be express and in writing to be effective.

3) Requests to waive immunity for Contractors shall be referred to the relevant Sending State in relation to the act or acts for which waiver is sought. Such a waiver, if granted, must be express and in writing to be effective.

**Section 6**
**Communications**

1) The MNF shall engage in radiocommunications in accordance with the Annex hereto and is authorized, in coordination with the Government, to use such facilities as may be required for the performance of its tasks. Issues with respect to communications shall be resolved pursuant to this Order and the Annex hereto.

2) Subject to the provisions of paragraph (1) above:

   a) The MNF, Diplomatic and Consular Missions and Contractors may, in consultation with the Government, install and operate radiocommunication stations (including terrestrial radio and television broadcasting stations and satellite stations) to disseminate information relating to their mandates. The MNF, Diplomatic and Consular Missions and Contractors also may install and operate radiocommunication transmitting and receiving stations, including satellite earth stations, and install and operate other telecommunications systems including by laying cable and land lines, to provide communications, navigation, radio-positioning and other services useful in fulfilling their respective mandates. The MNF, Diplomatic and Consular Missions and Contractors shall also have the right to exchange telephone, voice, facsimile and other electronic data with relevant global telecommunications networks. The MNF, Diplomatic and Consular Missions and Contractors may continue to operate after June 30, 2004 existing radiocommunication transmitting and receiving stations, including broadcasting stations and other telecommunications systems operated by them or their predecessors on or prior to June 30, 2004, in accordance with existing authorizations and assignments of radio frequency spectrum. Subject to the Annex

hereto, the radio broadcasting stations, radio transmitting and receiving stations, and telecommunications systems operated pursuant to this Section by the MNF, Diplomatic and Consular Missions and Contractors shall be operated in accordance with the International Telecommunication Union Constitution, Convention and Radio Regulations, where applicable. The frequencies on which any new radiocommunication transmitting and receiving stations, including broadcasting stations, may be operated shall be decided upon in coordination with the Government to the extent required under and in accordance with the Annex hereto. Such use of the radio-frequency spectrum shall be free of charge for MNF and Diplomatic and Consular Missions.

b) The MNF, Diplomatic and Consular Missions and Contractors may connect with local telephone, facsimile and other electronic data systems. Existing connections to such local systems (made by them or their predecessor entities) shall remain in place following June 30, 2004. The MNF, Diplomatic and Consular Missions and Contractors may make new connections to such local systems after consultation and in accordance with arrangements with the Government. The use of such existing and new systems shall be charged at the most competitive rate to the MNF, Diplomatic and Consular Missions and Contractors.

3) The MNF may arrange through its own facilities for the processing and transport of private mail to or from MNF Personnel. The Government shall be informed of the nature of such arrangements and shall not interfere with or censor the mail of the MNF, or MNF Personnel.

4) The Code of Wireless Communications, Code No. 159 of 1980, to the extent not already superseded, is hereby repealed.

## Section 7
## Travel and Transport

1) All MNF, CPA and Foreign Liaison Mission Personnel, International Consultants and Contractors, to the extent necessary to perform their Contracts, shall enjoy, together with vehicles, vessels, aircraft and equipment, freedom of movement without delay throughout Iraq. That freedom shall, to the extent practicable with respect to large movements of personnel, stores, vehicles or aircraft through airports or on railways or roads used for general traffic within Iraq, be coordinated with the Government. The Government shall supply the MNF with, where available, maps and other information concerning the locations of mine fields and other dangers and impediments.

2) Vehicles, vessels and aircraft shall not be subject to registration, licensing or inspection by the Government, provided that Contractors' vehicles, vessels and aircraft shall carry appropriate third-party insurance.

3) All MNF, CPA and Foreign Liaison Mission Personnel, International Consultants and Contractors, to the extent necessary to perform their Contracts, together with their

vehicles, vessels and aircraft, may use roads, bridges, canals and other waters, port facilities, airfields and airspace without the payment of dues, tolls or charges, including landing and parking fees, port, wharfage, pilotage, navigation and overflight charges, overland transit fees, and similar charges. Exemption will not be claimed from charges for services requested and rendered, and such charges shall be at rates most favourable to CPA, MNF and Foreign Liaison Mission Personnel, and International Consultants and Contractors.

4) The Force Commander shall coordinate with the appropriate institutions of the Government regarding the rules and procedures governing Iraqi civil airspace and will manage the air traffic system for all military and civilian air traffic. The Force Commander will control airspace required for military operations within Iraq for the purpose of deconflicting military and civil uses. The Force Commander shall implement the transfer to civilian control of the airspace over Iraq to the appropriate institutions of the Government in a manner consistent with ensuring the safe and efficient operation of an air traffic management system, with security requirements, and Iraqi national capability to resume control over Iraqi national airspace no later than the MNF departure from Iraq.

**Section 8**
**Customs and Excise**

1) The MNF may establish, maintain and operate commissaries, exchanges and morale and welfare facilities at its headquarters, camps and posts for the benefit of MNF Personnel, and, at the discretion of the Force Commander, other non-Iraqi persons who are the subject of this Order, but not of locally recruited personnel. Such commissaries, exchanges and morale and welfare facilities may provide consumable goods and other articles. The Force Commander shall take all reasonable measures to prevent abuse of such commissaries, exchanges and morale and welfare facilities and the sale or resale of such goods to persons other than MNF Personnel. The Force Commander shall give consideration to requests of the Government concerning the operation of the commissaries, exchanges and morale and welfare facilities.

2) MNF, CPA and Foreign Liaison Mission Personnel, International Consultants and Contractors may:

   a) Import, free of duty or other restrictions, and clear without inspection, license, authorization, other restrictions, taxes, customs duties, or any other charges, equipment, provisions, supplies, fuel, technology, and other goods and services, including controlled substances, which are for their exclusive and official or contractual use and for the MNF for resale in the commissaries, exchanges and morale and welfare facilities provided for above;

   b) Re-export unconsumed provisions, supplies, fuel, technology, and other goods and equipment, including controlled substances, without inspection, license, authorization, other restrictions, taxes, customs duties or any other charges, or

otherwise dispose of such items on terms and conditions to be agreed upon with competent Government authorities.

3) An efficient procedure, including documentation, will be coordinated with the Government to expedite importation, clearances, transfer or exportation.

4) MNF, CPA and Foreign Liaison Mission Personnel, International Consultants and Contractors shall be subject to the laws and regulations of Iraq governing customs and foreign exchange with respect to personal property not required by them by reason of their official duties and presence in Iraq. A Sending State's certification that property of MNF, CPA and Foreign Liaison Mission Personnel, International Consultants and Contractors is required by them by reason of their official duties shall be conclusive evidence of the facts so certified.

5) Special facilities will be granted by the Government for the speedy processing of entry and exit formalities for MNF Personnel, including the civilian component, upon prior written notification from the Force Commander.

**Section 9**
**Facilities for the MNF**

1) The MNF may use without cost such areas for headquarters, camps or other premises as may be necessary for the conduct of the operational and administrative activities of the MNF. All premises currently used by the MNF shall continue to be used by it without hindrance for the duration of this Order, unless other mutually agreed arrangements are entered into between the MNF and the Government. While any areas on which such headquarters, camps or other premises are located remain Iraqi territory, they shall be inviolable and subject to the exclusive control and authority of the MNF, including with respect to entry and exit of all personnel. The MNF shall be guaranteed unimpeded access to such MNF premises. Where MNF Personnel are co-located with military personnel of Iraq, permanent, direct and immediate access for the MNF to those premises shall be guaranteed.

2) The MNF may use water, electricity and other public utilities and facilities free of charge, or, where this is not practicable, at the most favorable rate, and in the case of interruption or threatened interruption of service, the MNF shall have, as far as possible, the same priority as essential government services. Where such utilities or facilities are not provided free of charge, payment shall be made by the MNF on terms and conditions to be agreed with the competent Government authority. The MNF shall be responsible for the maintenance and upkeep of facilities so provided.

3) The MNF may generate, within its premises, electricity for its use and may transmit and distribute such electricity.