4) There shall be an area within central Baghdad that shall be designated as the "International Zone." The International Zone shall have the boundaries that the MNF has established for this purpose. The MNF shall retain control of the perimeter of the International Zone and all rights of entry and exit, and all matters of security within the International Zone shall be subject to the control of the MNF. The activities and assignment of Iraqi security personnel within the International Zone shall be as mutually agreed upon between the MNF and the Government. Iraqi citizens living within the International Zone will remain subject to Iraqi law. Services, utilities and maintenance not otherwise performed or undertaken by the MNF within the International Zone shall be provided to the MNF by the Government free of charge or at the most favorable rate as agreed between the Force Commander and the Government.

**Section 10**
**Taxation, Provisions, Supplies, Services and Sanitary Arrangements**

1) The MNF, Sending States and Contractors shall be exempt from general sales taxes, Value Added Tax (VAT), and any similar taxes in respect of all local purchases for official use or for the performance of Contracts in Iraq. With respect to equipment, provisions, supplies, fuel, materials and other goods and services obtained locally by the MNF, Sending States or Contractors for the official and exclusive use of the MNF or Sending States or for the performance of Contracts in Iraq, appropriate administrative arrangements shall be made for the remission or return of any excise or tax paid as part of the price. In making purchases on the local market, the MNF, Sending States and Contractors shall, on the basis of observations made and information provided by the Government in that respect, avoid any adverse effect on the local economy.

2) Contractors shall be accorded exemption from taxes in Iraq on earnings from Contracts, including corporate, income, social security and other similar taxes arising directly from the performance of Contracts. MNF Personnel, CPA Personnel, Foreign Liaison Mission Personnel and International Consultants shall be accorded exemption from taxes in Iraq on earnings received by them in their capacity as such Personnel and Consultants.

3) The MNF and the Government shall cooperate with respect to sanitary services and shall extend to each other the fullest cooperation in matters concerning health, particularly with respect to the control of communicable diseases, consistent with relevant international law.

**Section 11**
**Recruitment of Local Personnel**

The MNF, Sending States and Contractors may recruit, hire and employ locally such personnel as they require. The terms and conditions of recruitment, hiring and

employment by the MNF, Sending States and Contractors shall be determined by respectively the MNF, Sending States and the terms of the Contractor's Contract.

**Section 12**
**Currency**

The MNF shall be permitted to purchase from the Government in mutually acceptable currency, local currency required for the use of the MNF, including to pay MNF Personnel, at the rate of exchange most favorable to the MNF.

**Section 13**
**Entry, Residence and Departure**

1) MNF, CPA and Foreign Liaison Mission Personnel, and International Consultants shall have the right to enter into, remain in, and depart from Iraq.

2) The speedy entry into and departure from Iraq of MNF, CPA and Foreign Liaison Mission Personnel, Contractors and International Consultants shall be facilitated to the maximum extent practicable. For that purpose, MNF, CPA and Foreign Liaison Mission Personnel, and International Consultants shall be exempt from passport and visa regulations and immigration inspection and restrictions as well as payment of any fees or charges on entering into or departing from Iraq. They shall also be exempt from any regulations governing the residence of aliens in Iraq, including registration, but shall not be considered as acquiring any right to permanent residence or domicile in Iraq.

3) For the purpose of such entry or departure, MNF Personnel shall only be required to have: (a) an individual or collective movement order issued by or under the authority of the Force Commander or any appropriate authority of a Sending State providing personnel to the MNF; and (b) a national passport or personal identity card issued by the appropriate authorities of a Sending State providing personnel to the MNF.

4) For the proper performance of Contracts, Contractors shall be provided with facilities concerning their entry into and departure from Iraq as well as their repatriation in time of crisis. For this purpose, there shall promptly be issued to Contractors, free of charge and without any restrictions, all necessary visas, licenses or permits.

**Section 14**
**Uniforms and Arms**

While performing official duties, MNF Military Personnel shall wear the national military uniform of their respective Sending States unless otherwise authorized by the Force Commander for operational reasons. The wearing of civilian dress by MNF

Military Personnel may be authorized by the Force Commander at other times. MNF Personnel and Private Security Companies may possess and carry arms while on official duty in accordance with their orders or under the terms and conditions of their Contracts. As authorized by the ambassador or the chargé d'affaires of a Sending State, Diplomatic and Consular personnel may possess and carry arms while on official duty.

**Section 15**
**Identification**

Upon request by the Government, a Sending State shall confirm that an individual falls into one of the categories covered by this Order.

**Section 16**
**Permits and licenses**

1) A permit or license issued by the MNF, the CPA, Foreign Liaison Missions or Sending States for the operation by their Personnel, including non-Iraqi locally recruited personnel, of any vehicles and for the practice of any profession or occupation in connection with their functions, shall be accepted as valid, without tax or fee, provided that no permit to drive a vehicle shall be issued to any person who is not already in possession of an appropriate and valid license issued by the appropriate authorities of the Sending State.

2) Licenses and certificates already issued by appropriate authorities in other States in respect of aircraft and vessels, including those operated by Contractors exclusively by or for the MNF, the CPA and Foreign Liaison, Diplomatic and Consular Missions shall be accepted as valid.

**Section 17**
**Deceased members**

The Force Commander and Sending States may take charge of and transfer out of Iraq or otherwise dispose of the remains of any MNF, CPA and Foreign Liaison Mission Personnel, International Consultants and Contractors who die in Iraq, as well as their personal property located within Iraq.

**Section 18**
**Claims**

Except where immunity has been waived in accordance with Section 5 of this Order, third-party claims including those for property loss or damage and for personal injury, illness or death or in respect of any other matter arising from or attributed to acts or omissions of CPA, MNF and Foreign Liaison Mission Personnel, International Consultants, and Contractors or any persons employed by them for activities relating

to performance of their Contracts, whether normally resident in Iraq or not and that do not arise in connection with military operations, shall be submitted and dealt with by the Sending State whose personnel (including the Contractors engaged by that State), property, activities or other assets are alleged to have caused the claimed damage, in a manner consistent with the Sending State's laws, regulations and procedures.

**Section 19**
**Supplemental Arrangements**

The Force Commander and the Government may conclude supplemental arrangements or Protocols to this Order and shall ensure close and reciprocal liaison at every appropriate level.

**Section 20**
**Effective Period**

This Order shall enter into force on the date of signature. It shall remain in force for the duration of the mandate authorizing the MNF under U.N. Security Council Resolutions 1511 and 1546 and any subsequent relevant resolutions and shall not terminate until the departure of the final element of the MNF from Iraq, unless rescinded or amended by legislation duly enacted and having the force of law.

6/27/04

L. Paul Bremer, Administrator
Coalition Provisional Authority

# ANNEX

## ARRANGEMENTS CONCERNING USE OF THE RADIO FREQUENCY SPECTRUM

### ARTICLE I: GENERAL PRINCIPLES

1) The Government, including the Iraqi Communications and Media Commission and any successor or other entity with authority relating to radio frequency spectrum in Iraq (collectively referred to as the "Commission"), shall render all decisions planning, managing, allocating and assigning radio frequency spectrum in a manner that recognizes and safeguards the radio frequency spectrum needs of the MNF.

2) Consistent with Sections 5(2)(i) and 5(2)(m) of CPA Order No. 65, the Government, through the Commission, will coordinate with the Force Commander regarding any pending or proposed action or regulatory decision that may affect MNF's use of radio frequency spectrum, in order to ensure that no such actions or decisions will interfere with military requirements necessary in the interest of the national security of Iraq.

3) Nothing contained in this Annex shall be interpreted to abridge or deny the ability of the MNF to utilize existing and future frequency assignments to operate communications, navigation and other military facilities and networks required to facilitate internal operations and to safeguard the security and reconstruction of Iraq.

### ARTICLE II: TABLE OF ALLOCATIONS

1) The initial Table of Allocations, which designates bands as Civil, Military or Shared, is attached hereto as Appendix 1. Neither the Government nor the Force Commander may change the Table of Allocations except in accordance with the provisions set forth in this Annex.

2) No changes to the Table of Allocations that reallocate, reassign or otherwise affect the bands designated as Military, the MNF's use thereof, or the MNF's use of frequencies assigned to it in the bands designated as Civil or Shared Uses shall be effective unless agreed to by the Force Commander.

3) Subject to paragraph 2) of this Article II, the Commission may reallocate radio frequency spectrum and/or revise the Table of Allocations in the bands designated as Civil or Shared by providing thirty days' prior written notice to the Force Commander of such reallocation and/or revision.

ARTICLE III: ASSIGNMENT OF RADIO FREQUENCIES

1) The Commission controls the assignment of frequencies in the bands designated as Civil or Shared Uses and serves as the approval authority for frequency assignments in these bands, and shall render its decisions in accordance with these regulations. Except as set forth in this Annex, no person may operate radio transmitting equipment in the bands designated as Civil or Shared without the authorization of the Commission.

2) The Force Commander controls assignment of frequencies in the bands designated as Military and serves as approval authority for these bands. Decisions by the Force Commander regarding assignments in the bands designated as Military are committed to his complete discretion and are not subject to review by the Government. No person may operate radio transmitting equipment in the bands designated as Military without the authorization of the Force Commander.

3) In addition to the use of any bands designated as Military Uses that have been authorized by the Force Commander, the Force Commander shall have the right to retain and request frequency assignments from the Commission whenever necessary, in the bands designated as Civil or Shared. Requests by the Force Commander for frequency assignments in the bands designated as Civil or Shared Uses shall be addressed and coordinated with the Commission in the following manner:

   a. Following June 30, 2004, the military and civil defense forces (including the MNF) will retain the frequency assignments in the bands designated as Civil or Shared that were held immediately prior to that date, including those assignments held by the MNF, which shall retain the assignments previously held by Coalition Forces, and may transfer those assignments to any successor entity for the protection of Iraq's national security.

   b. The Force Commander may submit written requests to the Commission for additional frequency assignments in the bands designated as Civil or Shared Uses. Upon receipt of a written request for frequency assignment(s) from the Force Commander, the Commission will render its written decision to grant or deny such request(s) in a manner that will not interfere with military requirements necessary in the interest of security;

   c. The Commission shall respond in writing to requests for frequency assignments from the Force Commander within thirty days of receipt of such requests to either grant the requested authorization or provide a written explanation of its denial of the request;

   d. If the MNF is not employing a frequency that is assigned to it in a band designated as Civil or Shared, the Commission may request that the unused assignment be returned for reassignment or reallocation, and such request shall

be honored by the Force Commander, unless the Force Commander provides a written statement explaining that the MNF must continue to hold the assignment because of a security interest, such as civil defense or public safety. Such statement, if made by the Force Commander, shall be conclusive.

e. The MNF shall be exempt from any and all requirements to pay recurring or nonrecurring fees for use of radio frequency spectrum, or for requesting and obtaining existing or future frequency assignments, including any administrative, processing or other fees.

f. Requests for frequency assignments by the Force Commander shall be submitted to the Commission in a format agreed to between the Force Commander and the Commission.

g. The Commission will not release any information regarding the MNF's use of radio frequency spectrum to any person (including other Government agencies) without the explicit prior written consent of the Force Commander.

4) The Commission shall protect frequency assignments held by the MNF, Diplomatic and Consular Missions and Contractors from interference.

ARTICLE IV
CHANGES TO THIS ANNEX

1) The terms of this Annex may be changed only upon the written agreement of the Commission and the Force Commander.

2) The Commission and the Force Commander may agree on more detailed procedures, in writing, to carry out the intent of this Annex.

3) The Commission and the Force Commander may each delegate their responsibilities under this Annex to appropriate representatives.

PRB Minutes 7-5

4:10 Meeting Started

Project discussion:

# 270 deferred needs more information; committee needs price breakdown per unit.

#290, 319, 328, 346 Passed with unanimous decision

#346 Water Generators Proposal: There was significant discussion about the proposal and Bechtel's role. Bechel will not receive additional funding under the $75M funding request but would provide technical assistance to the Iraqi counterparts in procuring, installing and managing the generators, under the current contract. Steven Sabey asked that the fallowing points be recorded "contrary to what was written on the proposal, Bechtel would merely advise the procurement process and produce the scope of work papers. They will not manage the process or take decisions." A motion that neither Bechtel, nor its parent company, nor any of its subsidiaries, would be permitted to bid for any of the work funded under this proposal. Passed with unanimous decision

#348, 350, 351 Passed with unanimous decision

The Ministry of Oil presented an emergency request for $1.1 B; most members of the Board expressed concern about voting on a proposal for that amount without sufficient time to review. Mr. McPherson suggested meeting the following day at 6:00 to further discuss the Oil Ministry funding request.

5:05 Scott Castle talked about various contracting procedures, which will be distributed via email following the meeting and taken up at the next meeting.

Al Runnels, CFO, mentioned that all vested funds are frozen by Washington.

Sherri — made some changes

Program Review Board (PRB) Meeting Minutes – 12 Jul 03

| | | |
|---|---|---|
| Attendees: | *Peter McPherson | Chair |
| | Sherri Kraham | PRB |
| | *Marek Belka | CIC |
| | Andrew Goledzinowski | CIC |
| | *Neil Mules | Australia |
| | *Steven Sabey | UK |
| | Owen Lewis | OGC |
| | Dan Hitchings | Ministry of Housing & Construction |
| | Ken Nations | CPA Comptroller |
| | Dave Dolph | CJTF-7 C8 |
| | *Gillian MacLean | Div Ops |
| | Col. Tony Bell | HCA, CPA-CA |
| | *Gerald B. Thompson | MONS&D |
| | William Irvine | MOJ – Prisons |
| | Scott Castle | Gen Counsel, CPA |
| | Dave Oliver | Finance |
| | Chris Milligan | USAID |
| | Al Runnels | CFO |
| | Scott Brown | IMF |
| | Gary Vogler | CPA – Oil |
| | Maj Rebecca Freeze | CPA – Oil |
| | CPT Andy Altmire | CPA – Oil |
| | Anna Mary Portz | CPA – Governance |
| | Dan Devlin | CPA – Ministry of Finance |
| | Justin Tyson | Finance |
| | Don Bloomer | CPA – PMLC |
| | James Carrera | CPA – PMLC |
| | Donald F. Campbell | CPA – Ministry of Justice |
| | * Voting Member | |

1. McPherson: Recommended reducing quorum requirements to 6 vs 7. No vote but consideration for next meeting. Finding it hard to meet quorum requirement; 11 voting members, 6 would represent a majority. PRB sends out numerous emails for members to respond, even those that commit don't necessarily show. Castle made argument against changing quorum rule, UN Security council resolution 1483 mandated transparency is sustained in part by level of participation in meetings, 70 % quorum is not out of line from what similar boards require; should heighten emphasis that the front office places on the attendance of these regularly scheduled meetings.
2. Status of Funds: OMB has released hold of authority on use of vested funds however, quickly running out of uncommitted vested funds, down to $700M from the $1.7B level, including prior commitments. All seized funds $799M already committed. $1.07B available from DFI. $192M in oil revenue coming in. Budget has been allocated through July and the first 3rd of August, end of Aug not covered yet. Status of uncommitted funds to be provided at next meeting. Sherri Kraham to meet with Dave Oliver's staff to workout a process to compare things here (PRB) with the

budget; Current policy is that ministry funding requests are against ministry budget. Exceptions will be granted in conjunction with Dave Oliver's office. We need greater visibility on what the ministry budget will fund. There is a small amount in the budget available for the Board.

3. Contract procedures still not worked out. McPherson indicated that, in the interim, the Board should adopt a general statement of intent. The GC is still receiving comments on the guidance from coalition member states, UK response very constructive and generally very favorable. A contracting expert has joined the legal counsel's office. Consensus that we need to conclude guidance soon. Agreed that some commitment as a body to apply generally accepted contracting procedures sufficient to sustain transparency requirements of UN Security Council Resolution 1483.
4. The following motion was passed: "It is hereby moved that, pending the formal promulgation of CPA procedures for executing contracts and grants with vested and seized Iraqi funds and sums from the Development Fund for Iraq, any such contract or grant shall be carried out in accordance with generally accepted principles sufficient to ensure the transparency required under UN Security Council Resolution 1483. Procedures which apply to funds approved by the administrator in the Iraqi budget are under review." Col Bell expressed disagreement indicating his belief that this gives ministries ability to do what they want with no oversight; Sherri will distribute record of what has been approved since the formal establishment of the board.
5. Proposal #1 for $1.7M . Abu-Ghraib has passed through the board several times, pending political issues which needed to be considered by Ambassador Bremer. Political decision made, now just need to formally pass through board. Abu-Ghraib passed.
6. Proposal #2 Iraq Telecom & Postal Company, allocated $2M under operating budget. Requesting $470,000 advance on the budget. Will be deducted from budget. Motion: Passed
7. Proposal #3, Uniforms. Original proposal $730,000, asked how much per uniform, new request $290,000. Board reduced to $225,000. Motion: Passed
8. Proposal #4, Renovation of Police Stations in the central region. Total of 6 police stations and 1 maintenance facility for $556, 000. Dave Oliver: Where's the 'whole picture'? Why not a general overall plan? Request for same submitted about a month ago, Sherri will reiterate request from the board. Should come from Ministry budget in any case.No Vote.
9. Proposal #5, Security equipment for moving prisoners in re: to 7 new prisons. Dave Oliver: these items overlooked in budget. This covers transportation from where you detain people to the prisons~~. Problem: Killing guys and guards en route.~~ ~~Sent to buy~~ everything locally but couldn't find the equipment. $150,000 for the bus and equipment for the bus. Highest level of security to make everything work, personally recommend. Motion: Passed
10. Proposal #6: Oil security and import LPG. $180M, board approved expenditure of $90 M previously for import of LPG and benzene for last month. Gary Vogler: funds required over next 3 months will reduce as capacity to refine LPG grows – first month $90M to $60M for Sept to $30M for Oct. Also, diesel fuel may need to be added, decision within next couple days. Dave Oliver: Wait for next PRB for consideration of diesel and pull out of this proposal. McPherson: Recommend include diesel based on urgency of buses and trucks, add addendum to motion not to ask for funds until needed. Vogler: Refineries not producing at full capacity. Most refineries went down until security issues can be worked out. Will have to import fuel at $3M/ day. LPG is critical because refineries are having problems staying up. LPG produced at north and south gas plants. South gas plant looted won't be operational for a few weeks. North gas plant is operational but up and down, right now it's up. Only supplying at 60% LPG of the countries demand. McPherson: Problem identified awhile ago and only a portion of funds were approved, pending possible

Bought locally at substantial savings.

(production instead of bartering them.)

improvement in local capacities. Not a normal budget issue, should go away in about three months. Vogler: Looking into increasing flexibility by selling. McPherson: Budget drives to sell to monetize for flexibility. Sherri: If full amount not needed, won't disperse full amount and we'll get that money back. Questions about whether this contract was competed. Vogler: KBR trying to secure gasoline and LPG wherever they can find the best price. Question was with reference to KBR, not who they buy oil from. Oliver: Re: international competition; he indicated that he contacted the head of procurement of Ministry of Defense for UK and Australia concerning senior procurement specialist in country to conduct studies. Both countries are recruiting and sending procurement specialists to join our team. Deferred for a vote until someone could verify how the KBR contract was selected.

11. Proposal #7: Request for security contracts for Ministry of Oil, $50M. Maj Freeze/ Gary Vogler present Oil Ministry's request. Cost to port security, $800M, KBR cost to infrastructure due to looting and other damage. Cost of lost production to crude oil production, 8M barrels per day for July. Damage to infrastructure, $1.8M a month or $20M per day. Recent attacks on strategic pipeline. Forecast: 6 months crude export can't commit due to security issues. $20M/ day last 90-120 days. Maj Freeze: Used historical data in coming up with costs; need to replace the 7,000 people who previously guarded infrastructure. Need weapons and communications. Rapid reaction capabilities. Need mobility, security with chain of command, nothing at Ministry of Oil level right now. Need someone with technical expertise and experience in oil and construction infrastructure. Need maritime capability for two platforms, the coast guard probably won't be established for about a year. Searched the internet for potential companies, six found in Baghdad. Over 24 months, phase over to the Iraqis. Ministry of Oil: Facilities may already be available. 18 operation centers, 350 vehicles, command and operations, $29M. Salaries, $70 per month. Looking at a 5 Aug 03 award date. McPherson: Further crunching will reduce amount, so reduce to $45M, and if impossible, come back for extra $5M. Need to be frugal; force oil ministry to find cheaper way. Real number crunching will be done by bidders is not necessarily true. Take out some requirements, principle still the same. Sherri: The question is regarding the tasks we are believe are necessary to complete the task, not the cost associated with each task, which will bear out through the bidding process. McPherson: Oil ministry needs to rethink precisely what is in the bid, within $45M process. As is, go with $50M, speed will slow down the bid. Vogler: Bids come in at $47M or $48M, will delay process. Col Bell: approximately 3 weeks to process evaluations. McPherson: Board can move very rapidly; his view, do $45M, if necessary, add $5M. Maj Freeze: When going to bidders, no funding info provided. Motion Passed: unanimously for $45M.
12. Proposal #6 Import of LPG continued: Many questions about the competition and the level of overhead 2-8% does not include overhead. Sherri: at the time of the first requirement, KBR was the only one on ground; no open competition possible; When we got the last funding request, we had an emergency situation. Competing the bid and mobilization would not be feasibile to meet the immediacy of the requirements and wouldn't make sense considering we didn't know how much longer the requirement would exist, nor does it now since we are scaling down. General consensus that agreed with that approach. McPherson noted, however, that we must put our foot down concerning international competition. Consensus was that we would support international competition, however, need to move forward in this case.
McPherson noted that in the future, if contract is sole sourced need to require a clear justification to support. Vogler: Most oil from Turkey, some from Kuwait. Vote: Passed unanimously. Minutes so reflect.

***Program Review Board (PRB) Minutes – Sep 9, 2003***

Attendees:

| | |
|---|---|
| *David Oliver | Chair, Director of CPA Office of Management & Budget |
| Sherri Kraham | Director, Program Review Board |
| *Lewis Lucke | Director, US Agency of International Development |
| *Andrew Ockenden | Representative of the UK Government |
| COL Paul Hough | CPA Comptroller |
| COL Tony Bell | CPA – Contracting Activities |
| *COL Michael Toner | Coalition Joint Task Force-7 Comptroller |
| LTC Terry Ross | Coalition Joint Task Force-7 Comptroller, Deputy |
| Al Runnels | CPA Chief Financial Office |
| *Gerald Thompson | CPA Advisors office National Security and Defense |
| *Andy Bearpark | CPA Director of Operations |
| *Suzanne Schaffrath | Advisor, CPA office of Governance |
| Eric Pelofsky | CPA General Counsel |

* Voting member

Previous minutes were approved.

Status of Funds: Runnels: Good news, IRRF $48M uncommitted; Washington working to fund $300M for electricity program out of Iraq Freedom Fund, represents new money if Congress goes along. Taking $466M out of IRRF (previously approved) appropriated funding of Task Force Rio oil infrastructure program. All remaining funding will come from DFI. Transfer from DFI account to support Wheat/Barley Harvest program. $120M of UN Oil for Food funds, designated for this program, has been deposited into the DFI account. $55M to be transferred from DFI into the Rasheed Bank to repay two loans made to the Ministry of Trade to support wheat and barley harvest program earlier this year. According to the General Counsel, program transfers do not require PRB approval, notification for the record only.

The following Funding Requests were considered by the Board for recommendation to the Administrator:

#461 Seaports for Fuel, $10M. Oliver: Came into PRB last week requesting $15M for security in Basrah region. Researched with Oil Minister, had sufficient funds to finance $5M. Project not entirely Ministry of Oil responsibility, $9M off shore portion Ministry of Transportation responsibility, Ministry of Transportation does not have funds available to support. Approved, $10M.

#482 Iraqi Foreign Litigation, Claims & Arbitrations, $1,445,770. Pelofsky: Iraq engaged in litigation worldwide, mostly as a defendant. Large numbers (dollars) are at risk, numbers become hunting licenses for individuals or companies to go after our assets overseas. Litigation can't attack DFI, can attack any funds placed overseas. Strong motivation to limit hunting licenses, get delays so the Iraqis can make their own litigation decisions once we're gone. Most cases seeking delays or trying to prevent large judgments against Iraq. $445K requested by UN

to individuals in Iraq while working in Geneva transferred by individuals to the Ministry of Foreign Affairs authority to give back to Iraq; Ministry of Foreign Affairs never up the money gave money, (UN wants us to pay with lawyers that were litigated). Funds currently in Ministry of Foreign Affairs branch of Rasheed Bank. Oliver: Procedures for paying all private accounts must be followed. POC: Dan Devlin can provide a copy of signed memo. Oliver: Put as Iraqi Ministry of Justice budget. Pelofsky: Was submitted for 2004 budget, think it has been stripped. Need to act now; have to commit to pay lawyers. Pay will vary depending on skill level, London litigators more expensive. Oliver: $1M now, $3M put in budget. Approved, $1M.

#480 & 481, Ad Duluiyah Water Treatment Projects. Kraham: Two local projects for the North under Construction Initiative, had $15M, have now spent half. Projects cleared by water resources. Not long term projects, provides immediate potable water to the community. Approved.

Oliver: Change meeting to once a week to get the new Finance Minister to come in, to Saturdays only. Working with military to resolve issues of CERP & DERP. Kraham: PRCs will change to two meetings per week.

# Coalition Provisional Authority

***Program Review Board (PRB) Minutes – Aug 30, 2003***

Attendees:

| | |
|---|---|
| *David Oliver | Chair, Director of CPA Office of Management & Budget |
| Sherri Kraham | Director, Program Review Board |
| *Lewis Lucke | Deputy Director, US Agency of International Development |
| *Amb Neil Mules | Representative of the Australian Government |
| COL Paul Hough | CPA Comptroller |
| COL Tony Bell | CPA – Head of Contract Activities |
| *Lt Col Terry Ross | Coalition Joint Task Force-7, Comptroller |
| *CAPT Timothy McGee | CPA – Director of Operations & Infrastructure |
| *Walt Slocombe | National Security & Defense Senior Advisor |
| *Andrew Goledzinowski | Deputy Director Council on International Cooperation |
| *Suzanne Schaffrath | Advisor, CPA office of Governance |
| Nick Horne | Representative of CPA –Electricity Commission |
| B-G Bob Crear | CPA – Task Force RIO |
| LTC Tim French | CPA – Task Force RIO |
| Larry Rogers | CPA – Task Force RIO |
| *Bill Block | CPA – Economic Affairs |
| LTC Danny Woodyard | Representative of CPA – Ministry of Agriculture |
| COL Leonardo Flor | US Core of Engineers |
| MAJ Andrew Petretti | US Core of Engineers |
| Gary Vogler | Advisor to Ministry of Oil |
| COL Mike Kirsch | PA – Director of Regional Operations |

* Voting member

Previous minutes were approved.

The following funding and reprogramming Requests were approved by the Board for recommendation to the Administrator:

#425, Electricity Commission Police, $4,752,372.00. Funds are required for the hiring of 25,000 additional Electricity Police to protect the electrical infrastructure and for radios for the Electricity Police to increase their capacity to respond to attacks against the infrastructure. This request was thoroughly vetted with the budget group working on salaries to ensure consistency. The request was recommended for approval.

#442, Agriculture Support Project, $240,000. Funds are requested for equipment such as forklifts and weighing equipment to in anticipation of the arrival of approximately $700M supplies and commodities such as fertilizer, to be imported under Oil-for-Food contracts. The request was recommended for approval.

#450, Constitutional Committee, $52,090. Funds are requested for the Governing Council's Constitutional Committee travel and related expenses for consultation trips throughout the country on the constitution. The Board noted that the recently approved Governing Council's budget did not include requirements for the Constitutional Committee. The request was recommended for approval.

Kraham presented 3 Reprogramming Requests. Additional funds not required, changing funding source due to the lack of availability of cash:

#398, Police Equipment - Of the $90M authorized (funding source to be either appropriated or DFI), the CPA's Ministry of Interior team needs an immediate disbursal of $5M. This request is for the reprogramming of $5M from appropriated or DFI (to be determined) to

vested funds. The request was recommended for approval.

#399, Restore Oil Infrastructure. $1.4M required for payments here in country, request $1.4M out of $300M to be funded from vested account, rather than DFI, for immediate disbursal. There was discussion about whether this move was actually needed considering we will now have DFI cash available here for disbursement. Oliver: Recommend approval, conditional, if needed. Approved.

#352, Restore Oil Infrastructure - $711,000,000. A request for $962M was previously approved from US appropriated funding sources but only $250M of funding has been made available. This request is for $711M to be authorized from the DFI, requiring a new recommendation and approval from the Administrator. The discussion was deferred to another meeting until immediate requirements could be determined, as well as a full accounting of funds available under the National Risk Resource Remediation Fund.

http://www.iraqcoalition.org/budget/PRB//PRBMinutes8-30-03.htm

# Coalition Provisional Authority

***Program Review Board (PRB) Minutes – Sep 1, 2003***
***Emergency Meeting***

Attendees:

| | |
|---|---|
| *David Oliver | Chair, Director of CPA Office of Management & Budget |
| Sherri Kraham | Director, Program Review Board |
| *Lewis Lucke | Deputy Director, US Agency of International Development |
| *Amb Neil Mules | Representative of the Australian Government |
| COL Tony Bell | CPA – Head of Contract Activities |
| *COL Michael Toner | Coalition Joint Task Force-7 |
| *MG Carl Strock | CPA – Director of Operations and Infrastructure |
| *Walt Slocombe | National Security & Defense Senior Advisor |
| *Suzanne Schaffrath | CPA – Director of Regional Operations |
| B-G Bob Crear | CPA – Task Force RIO |
| LTC Tim French | CPA – Task Force RIO |
| Larry Rogers | CPA – Task Force RIO |
| Gary Vogler | CPA – Oil |

* Voting member

An emergency meeting was held and the following funding requests were approved for recommendation to the Administrator:

#444, USAID Incremental Funding, $350M. The Board recommended approval an incremental increase for USAID to do nine additional high priority infrastructure projects in electricity and water/sanitation.

#446, Import of Fuel, $245M. The Board previously approved requests for $90M per month for the import of fuel (benzene, LPG and kerosene) for use by the Iraqi public. The monthly amount required increased to $223M, in order to meet immediate needs and to start to build a reserve. The request for $879M projected several months requirements, however, the Board approved only a monthly requirement plus a small reserve ($245M) in order to assess the requirements monthly.

Reprogramming Request:

#352, Restore Iraqi Infrastructure, $711M. The Board considered the request from Task Force RIO for changing the funding source from appropriated funds to the Development Fund of Iraq a previously approved request (#352, total amount approved $962M). $251M was already provided from the Natural Resource Risk Remediation Fund (NRRRF), an appropriated funds account. TF RIO indicated that $711M is outstanding and required but of that amount $466M was immediately required to complete projects under Phase I. The Board identified $500M as remaining available from two appropriated accounts - the Iraq Reconstruction and Relief Fund (IRRF) and the NRRRF and therefore the requirement was approved to come from the appropriated funds. A new vote may be required for the remaining amount $211M but this was deferred.

http://www.iraqcoalition.org/budget/PRB//PRBMinutes9-1-03EmerMtg.htm

*Program Review Board (PRB) Minutes – Sep 13, 2003*

Attendees:

| | |
|---|---|
| *David Oliver | Chair, Director of CPA Office of Management & Budget |
| Sherri Kraham | Director, Program Review Board |
| *Lewis Lucke | Deputy Director, US Agency of International Development |
| *Heidi Venamore | Representative of the Australian Government |
| *Nick Harvey | Representative of the UK Government |
| COL Paul Hough | CPA Comptroller |
| COL Tony Bell | CPA – Head of Contract Activities |
| *COL Michael Toner | Coalition Joint Task Force-7 Comptroller |
| LTC Terry Ross | Coalition Joint Task Force-7 Deputy Comptroller |
| Al Runnels | CPA Chief Financial Officer |
| *Gerald Thompson | Representative of National Security and Defense |
| *Andy Bearpark | CPA Director of Operations |
| *Suzanne Schaffrath | Representative of CPA - Governance |
| *Marek Belka | Director of Council for Int'l Cooperation |
| James Carrera | Representative - Pentagon Management Liaison Cell |
| Ali Khedery | CPA – Amb Kennedy's Office |
| H. Bassford | Regional Coordinator of CPA's Baghdad Regional office |
| Larry Howard | Representative of CPA's Baghdad Regional office |
| J. Lemmon | Representative from Amb Bremer's Office |
| R. Meldonian | Defense Contract Audit Agency. |
| CDR Kevin Waskow | Representative of CPA – Comptroller |
| Andrew Goledzinowski | Representative of Council for International Cooperation |

*Voting Members

The Chair briefed the Board on the status of the supplemental appropriation request. Deputy Secretary of State and Treasury will go to Capitol Hill Tuesday. Deputy Secretary of Defense has already testified. Spent morning with Congressional delegation to push for appropriation.

Previous minutes approved.

Status of Funds: The CFO briefed that the total funds available $1.3B. DFI $1.3B, totaling salaries and budget operations, will go on through November, not including projected expenditures. IRRF are fully committed and there are multiple claimants against funds. Oliver: If include expected oil revenues; will only make it to December.

The following Funding Requests were considered by the Board for recommendation to the Administrator:

#463 - Commander's Emergency Response Program, $60M Oliver: In the long run, would like to implement this program through civilian authorities in regions. Pragmatically, Andy still building regional representatives and military is spending money with results now.

Would like to fund $10M for rest of September; $20M each for October and November in that they pay FPS salaries; and $10M for December. Put $8M/ per month in next years budget. Kraham and Bearpark to get with CJTF-7 to work out a plan for transitioning this for going through regions. Amb Bremer seeing too many results with military to transition now. Funding would be DFI. Runnels: Have 90M in euros, trying to convert in either Kuwait or Europe to US dollars, would be additional seized funds, would like to continue CERP with seized for as long as funds are available. Approved, $60M.

#453 – Prisons Development Program, $11.5M Gilman: Department of Justice to bring in team of top-level management to train corrections officers for transitioning prisons from US military to Iraqi control. Critical mission due to absence of rule of law in Iraq. Oliver: How much can be funded from ministry budget? $10M still available. Intend to take funds from Iraqi prison budget; need to approve something for 3 new ministries, make fixes for Oil-for-Food program that stops on 21 Nov; will bring new supplemental. First thing is to partially fund from money that prisons have not spent, take and redeploy. Hough: $112M site security. Oliver: Proposal, for whatever money we can't get; will do this through new money that is available. Runnels: New money is for CPA overhead type expenses. Oliver: This works because we classify as an overhead, since they're U. S. personnel can attach to CPA. Approved, $11M.

#486 – Sadr City Interim District Advisory Council, $1.1M Bassford: Project is to increase credibility and legitimacy of councils. Trying to put influence of power in the country (specifically in Sadr City) in the councils. Neighborhood councils will work with 103 sectors dividing $10K per sector to do projects identified by sector committees (assisted by the neighborhood councils) to do anything they want (community centers, daycare), no payment for salaries. If sectors want to participate and provide skilled labor (plumbers or electricians), must be voluntary basis. Once project selected and agreed to, memorandum of understanding between sector committee and neighborhood council (ultimate authority for approving projects) completed. Project forwarded through 1st AD before forwarding to district office for funds disbursement. 50% disbursed in beginning, won't disburse more until first $5000 is disbursed and report received. Oliver: Essentially, funding for pilot project in pursuit of democracy. Kraham: A sector is a subdivision of a neighborhood; if several sectors want to join forces to do a neighborhood project, they can combine funds. Runnels: Program resembles CERP, put money out in sectors, large potential for misuse. CERP has system in place; this project does not. Bassford: Funding controls planned, both oversight by military battalions and district, which have fund managers and supervisors. Neighborhood councils have a specific interest and want to ensure resources go to support their neighborhood, control by Iraqis for Iraqis. Actually, think we're over controlling. Oliver: Report received concerning Baghdad Central Iraqis engaging in fraud. Directed Runnels to have auditors take a look. Consider a pilot; get back to the board. When fraud is reported, we have to investigate, have to be attentive. Approved, $1.1M.

#458 – Security for Governing Council Compound- $712,000 Khedery: Two instances of IED activation, lucky on both instances. Concern of security at various levels. Oliver: Providing outer two-layers of barriers. Approved, $712K.

Oliver: New request for $50K, for justified items identified for Amb Kennedy for governing council. Essentially gives authority to spend $50K without having to come to the

board. Bearpark: Real problem, have a request (currently going through the system) for $1000 for the Governorate Coordinators to do their jobs but if Governorate Coordinators can't have flexible funds, why give that authority to the Governing Council. Kraham: The problems with Governorate request, essentially representational funds (indicated on document) not appropriate use of Iraqi funds this is operating/entertaining costs. Won't consider now, will take up at next meeting.

#456 – CPA Regional Programs, $28.5M Kraham: This has come around before. Assessed allocations based on current spending patterns and amount in accounts already. Baghdad did not receive Construction Initiative fund, others have between half and almost the full amount available to them. Big spender South Central has depleted $15M, ready immediately for a plus up; would like to expand per project authority to $200K. Regional directorates maintain administration of programs until the Program Review Committee (CFO, Comptroller and contracting) can certify ensuring appropriate procedures are in place for governorate teams to administer programs. Authority to cover emergency response programs and infrastructure and construction projects contained in the construction initiative. If they choose, can do long-term projects ($1M for city councils) if they want to spend their money that way. $5M per month for South Central who is currently spending at an increased rate, $1.5M per month for all other regions. Figures based on current spending, can reevaluate later. Bell: Have contract officer in Basrah, money in regions tied to CERP and DERP. Projects may be handed to them, trained contract officers. Approved for seized funds if available, $28.5M.

# Coalition Provisional Authority

**Program Review Board (PRB) Summary of Minutes – February 8, 2004**

Attendees:
* Rodney Bent Chairman/Director Office of Management and Budget
* Frederick C. Smith Deputy Senior Advisor for the Office of Security Affairs
* Chris Milligan USAID
* Andy Bearpark Director, Office of Operations & Infrastructure
* H. Dean Pittman Governance
* Michael Toner Coalition Joint Task Force – 7, Comptroller
* Dr. Saladin Hadithee Iraq Ministry of Finance Representative
* Yusaf Samiullah Representative of the United Kingdom Government
* Heidi Venamore Representative of the Australian Government
COL Kay Sommerkamp CPA – General Counsel
Jesse Pruett Program Review Board - Regional Programs Manager
Gilbert Reed Comptroller's Office
COL Tony Bell CPA – HCA
Reed Werner CPA – Office of Management and Budget
Eric Pelofski CPA General Counsel
Taif Sami Ministry of Finance
COL Eric Engelbrektsson CPA – Office of Management and Budget
Thomas S. Kinton Oil for Food
Brad W. Jackson CPA – Ministry of Minerals
Faisal Murad CPA – Ministry of Minerals
Dr. Waleed Khidder Ministry of Industry
Joseph L. Morgan CPA – Ministry of Housing and Construction
Carl R. Clay Jr. CPA – Ministry of Housing and Construction
MAJ Philip Hicks CPA Facilities Manager
Sandy Hodgkinson CPA – Ministry of Human Rights
David Hodgkinson CPA – Ministry of Human Rights
Derek Gilman CPA – Office of the General Counsel
Mark Huang CPA – Private Sector Development
Lettie J. Bien CPA – Private Sector Development / MIM
Muhammad Hutasuhut CPA – Ministry of Transportation
Todd Gondeck CJTF-7 C8
Darrell Trent CPA – Ministry of Transportation

*Voting Members

The minutes from the PRB meetings of January 31, 2004 were approved.

The following Program Review Board Requests were presented to the Board for recommendation to the Administrator:

#636 – National Assembly Building – CPA Governance, through the contracting execution of MOHC, requested the above amount for the rapid rehabilitation of the National Assembly Building in

preparation for the hand-over of sovereignty to the Iraqi Transitional National Assembly on 1 July 2004. The building not only requires complete renovation, interior furnishing, and various upgrades, but also improved security structures surrounding the buildings. Further activity is required to identify which ministry will assume the recurrent operating and maintenance costs associated with managing this building beyond July 1, 2004. APPROVED – DFI.

#633 – Independent Power Producers – The Ministry of Industry and Minerals (MIM) has requested the above amount to be used as collateral for a Stand by Letter of Credit to provide a performance guarantee for the Ministry of Industry with its Independent Power Producers (IPP). MIM has negotiated contracts with IPP to provide platforms to the more lucrative companies within the MIM portfolio (e.g., cement, phosphate, and petrochemical). This collateral will be used if payments are not received from the IPP's in return for the delivery of electricity. The representative from the Ministry of Finance (MOF) was curious of the possibility of foreign direct investment for this project but was unsure of the foreign investment regulations. Moreover, the representative was not confident that the MOF has legal authority for collateral assurances of this sort. Lastly, the issues of security and tax exemption were discussed, and in response, assurances were given by a representative from the Ministry of Industry and Minerals that security concerns have been accounted for and tax exemptions would not be permissible under the current arrangement. MOF wished to have the request tabled until next week so that MOF could discuss the issues listed above.

#638 – Oil-for-Food Authentication of Invoices – $1,657,823 – Oil-for-Food (OFF) requested the above amount as an advance of moneys from the yet approved Contract Liability Contingency Fund, to pay an invoice for services provided between 11/22/03 and 12/31/03 by the independent inspection agency, Cotecna. These invoices are for authorized services provided under the aegis of the UN Oil-for-Food Program. The request was approved under the provision that the appropriate budget line under OFF's 2004 Revised Budget allocations be debited for this advance. APPROVED – DFI.

#640 – Rapid Pipeline Repair – $34,400,000 – The Ministry of Oil has requested the above amount to establish an Emergency Response Pipeline Repair Operation (ERPRO) for quick response and restoration of pipeline service for all pipelines in the Central and Northern regions of Iraq. This project has been deemed necessary to combat the occurrences of sabotage and thus help maximize Iraq's exportation of crude oil. APPROVED – DFI.

#582 A – State Oil Marketing Organization Audit (Amendment) – $60,000 – The Ministry of Oil has requested the above amount to be amended as an addition onto the previously approved PRB #582 for $120,000. The additional amount has been requested to cover unforeseen costs associated with the scope of work obtained after the original PRB request. APPROVED – DFI.

#635 – Ministry of Planning / PMO Site Renovation – PMO requested funding for renovation of facilities to be used by the PMO for work and living accommodations. The facilities will accommodate an end state of over 600 personnel, including support service contractors and staff from the Ministry of Planning (perhaps even the Ministry of Finance). The need for PMO to execute the contract immediately has precluded the possibilities of using US Supplemental funding for the project, which would likely delay execution by a matter of months. The representative from Australia abstained. APPROVED – SEIZED.

#637 – Iraq Property Claims Commission - $1,526,000 – The Office of Human Rights (OHRTS) requested funding to establish and begin operations for an Iraq Property Claims Commission (IPCC) which will begin the process of resolving property claims disputes throughout Iraq. It was mentioned that the Ministry of Displacement and Migration has agreed to assume responsibility and costs associated with this Commission and will coordinate their efforts with the Ministry of Justice.

APPROVED – SEIZED.

#521 A – Government of Iraq Building Security (Amendment) – $48,025 – The Ministry of Housing and Construction requested funding to cover the contractual balance for already-delivered services enhancing the security around the Government of Iraq Building. The above amount is to be amended as an addition onto the previously approved PRB #521 for $420,045. APPROVED – DFI.

#624 – Kuwaiti Airways Corporation vs. Iraqi Airways Company – Funding has been request to cover future defense litigation costs associated with the case of Kuwaiti Airways Corporation (KAC) vs. Iraqi Airways Company (IAC). The Office of the General Counsel (OGC) expects that the provision of legal services paid with these moneys could lead to a greatly reduced settlement. A vote was tabled for approval of the request with seized funds, with the contingency that the CPA Administrator could exercise his authority to decline if so decided. The representative from the Office of Operations and Infrastructure opposed and the representatives from the UK and Australia abstained. APPROVED – SEIZED.

#632 – Detainee Family Information – $250,000 – The Office of the Administrator has requested for enhanced detainee family information system to provide more accessible information to the family and friends of those Iraqis detained by the CPA. This plan will help in the dissemination and transliteration of detainee information throughout all 18 Governorates. 27 General Information Centers nation-wide will be staffed specifically with personnel devoted to this purpose. It was proposed that CJTF-7 pay for this program since they are the persons detaining and accounting for the prisoners. A vote was tabled to currently fund the request with seized moneys under the proviso that CJFT-7 determine the feasibility of paying this program's ongoing operations and cover, retroactively, those debits materialized from the seized funds. APPROVED – SEIZED.

http://www.iraqcoalition.org/budget/PRB/PRBMinutes02-08-04.html

# Coalition Provisional Authority

Program Review Board (PRB) Summary Minutes – February 24, 2004

Attendees:
* Rodney Bent Chairman/Director Office of Management and Budget
* Frederick C. Smith Deputy Senior Advisor for the Office of Security Affairs
* Chris Milligan USAID
* Col Frank Boynton Director, Office of Operations & Infrastructure
* Efraim Cohen Governance
* MAJ Todd Gondeck Representative, Coalition Joint Task Force – 7, Comptroller
* Dr. Hazim Saed Iraq Ministry of Finance Representative
* Christopher Segar Representative of the United Kingdom Government
* Absent Representative of the Australian Government
MGEN Paul Eaton CG, CMATT
COL Clyde Page CMATT C-4
COL Kay Sommerkamp CPA – General Counsel
Jesse Pruett Program Review Board - Regional Programs Manager
COL Jim Behring CPA Comptroller
COL Tony Bell CPA – HCA
LtCol Robert Gurner CPA – Office of Management and Budget
COL Eric Engelbrektsson CPA – Office of Management and Budget
Dr. Salah Iraq Ministry of Finance
Taif Sami Iraq Ministry of Finance
Nick Horne CPA – Ministry of Electricity
Joel Berwick CPA – Ministry of Oil
MAJ Michael Jurus CPA – Baghdad Central
Monica McNight, Esq CPA – Baghdad Central
LTC Walt Davis CPA – Ministry of Municipal and Public Works
Gordon Mott CPA – Ministry of Transportation
Linda Cameron UK Department for International Development
Janusz Sznajder CPA – Council for International Cooperation
COL Bob Speer CPA – Program Management Office

*Voting Members

Approval of the minutes from the PRB meeting of 15 February 2004 was tabled awaiting confirmation that comments from Christopher Segar (British Office Baghdad) were incorporated.

A representative of CPA Comptroller presented the current status of the DFI. As of 19 February, the total amount not yet committed to specific programs was $3,777M. However, those funds have been included as part of the 2004 Iraqi Budget.

The following Program Review Board Requests were presented to the Board for recommendation to the Administrator:

#575 – 10 Transfer Station Clean-Up and Construction - $3,294,750 – A representative of CPA –

Baghdad Central briefed the board. This request is a change in scope for effort earlier approved in the 2004 Budget. The original plan included funds to create landfills at five of 10 existing waste dumps within Baghdad. The scope has now changed to create transfer stations at all 10 sites and remove the existing waste to two existing landfills outside the city and mitigate environmental concerns at the 10 sites. The change of scope does not require additional funding from DFI. Any additional funds will be provided from the City Hall budget.
APPROVED – No additional funding required.

#645 –Rapid Regional Response Program (R3P) Replenishment - $100,000,000 – A representative of the CPA – Regional Programs Office briefed the board. The request is for funds included in the Revised 2004 Iraqi budget. This request provides additional funds to the four CPA regions for R3P. These funds will be spent on projects to benefit the Iraqi people in accordance with UN Resolution 1483. The PRB discussed the method for distributing the funds among regions and the period of performance for this initiative. Funds are distributed based on capabilities, past performance and consideration of funding in the initial 2004 Iraqi budget. Projects are to be fully executed by 30 June 04 and plans are in place to achieve this goal.
APPROVED – DFI.

#646 – Commander's Emergency Response Fund (CERF) - $10,000,000 – A representative of CMATT briefed the board. Funds are required for emergency requirements that, in the Commanding General, CMATT's determination, require immediate response to deal with the current situation and allow him to continue to complete the mission of standing up the Iraqi Armed Forces (IAF). This request is for emerging requirements for the development and fielding of the IAF and is not authorized for direct or indirect support of coalition forces. The PRB agreed that CMATT needed flexibility in meeting emerging requirements. However, it was not clear how to provide CG CMATT the funds in advance of Iraqi Relief and Reconstitution Fund (IRRF) being allocated or, if using DFI would be appropriate. The Chair asked the PMO to investigate what flexibility might be in the IRRF and that CPA Ministry of Finance investigate alternatives in providing a these funds and return to the board next week.
TABLED.

#647 – Jobs and Skills Program for Economic Regeneration (JASPER) -- $45,000,000 – A representative of CPA – Ministry of Municipal and Public Works briefed the board. The request is for funds included in the Revised 2004 Iraqi budget. This request was for three separate initiatives. The Jobs Creation Program came into existence in late 2003 and has created approximately 80,000 jobs across the country. This proposal is to extend that program and add components for vocational training and employment initiatives. The board asked whether the JASPER program was linked to the Ministry of Labor and Social Affairs initiatives for job training. MMPW stated that JASPER was, in a sense, a bridge to the longer term MLSA programs. Iraqi MoF stated a concern that JASPER was not creating permanent jobs. A motion was made to approve $15,000,000 for continuation of the Jobs Creation Program and table the rest of the effort until more information was made available about the extent of vocational and employment training envisaged under JASPER. MMPW will return to the PRB next week for further discussion.
APPROVED IN PART ($15,000,000) -- DFI

#648 – Railway Security - $2,400,000 – A representative of CPA – Ministry of Transportation briefed the board. The request is for funds included in the Revised 2004 Iraqi budget. In response to a serious deterioration in the security of the Iraqi Republic Railway (IRR), twenty-five million dollars ($25 million) was added to the Revised 2004 Ministry Budgets. One specific action was to contract with local tribal families to provide security for the IRR in their territory. This action requested an advance of $2.4 million against the Revised 2004 Budget to pay for the first three months, two of which are in arrears.

The board inquired as to the impact of this initiative. While several factors are involved, incidents have dramatically decreased since this program was started.
APPROVED -- DFI.

#649 – National Olympic Committee -- $10,000,000 – The Ministry of Youth and Sports (MoYS) was not represented at the PRB. The request is for funds included in the Revised 2004 Iraqi budget. These funds would provide Iraqi sports teams' resources to prepare for the 2004 Olympic Games in Athens Greece. Teams must travel internationally to qualification events. Also, payments must be made to international sports organizations that sponsor Olympic events. The Iraqi MoF requested that MoYS discuss this request with MoF. The board requests that MoYS return next week to discuss this proposal.
TABLED.

http://www.iraqcoalition.org/budget/PRB/PRB_Feb24.html

**Program Review Board (PRB) Minutes – April 7, 2004**

Attendees:
* George Wolfe Chairman/Director Office of Management and Budget
* Hazim Saed Iraq Ministry of Finance
* Behnam Puttrus Iraq Ministry of Planning and Development Cooperation
* Frederick C. Smith Deputy Senior Advisor for the Office of Security Affairs
* Teddy Bryan USAID
* COL Frank Boynton Director, Office of Operations & Infrastructure
* Absent Governance
* Lt Col Jim Reitzel Coalition Joint Task Force – 7, Comptroller
* Christopher Segar, Representative of the United Kingdom Government
* Heidi Venamore Representative of the Australian Government
* Absent Economic and Development Policy
* Neil Hawkins Council for International Cooperation
COL Eric Engelbrektsson Program Coordinator
Jesse Pruett Program Review Board - Regional Programs Manager
COL Rafael Lara CPA – General Counsel
Col Don Davis CPA Comptroller
Absent CPA – HCA
Michael Powers CPA – Program Management Office
Absent Board of Supreme Audit
Patricia Hatcher CPA -- PMLC
Todd Baldwin CPA -- Office of Management and Budget
Dr. Faik Ali Abdul-Rasool Iraq Ministry of Planning and Development Cooperation
Steve Newhouse CPA – Ministry of Planning and Development Cooperation
Rick Clay CPA – Ministry of Housing and Construction
Mike Karem CPA – Ministry of Housing and Construction
Steven Koutsis CPA – Ministry of Foreign Affairs
Rula Dalabach USAID
Yassen T. Al-Yassry Iraqi Ministry of Interior
Belinda Berry CPA – Ministry of Interior
Michael Dittoe CPA – Ministry of Justice
Ammar Shawkut CPA – Ministry of Youth and Sports
Mark Clark CPA – Ministry of Youth and Sports
Cindy Burleson CPA – Ministry of Youth and Sports
Mounser Fatfat CPA – Ministry of Youth and Sports
Dr. Ed Theriot CPA – Ministry of Water Resources
Peter King CPA – Ministry of Agriculture
Lindy Cameron UK—DFID
Taif Sami Iraqi Ministry of Finance
*Voting Members

PROCEEDINGS FROM 7 APRIL 04 PRB

The PRB approved the minutes from the 29 March 04 meeting.

The Program Review Board approved the following reprogramming action:

#146 – Baghdad Sewer Initial Reconstruction Strategy -- $70,000,000. Baghdad Central. This is a not a

request for additional funds. Initially approved in July 03 for Vested funds. Reprogramming #7 shifted $55,000,000 to Seized funds. Baghdad Central is requesting an amendment to PRB 146 a & b. They are not asking for any additional funds. The following change in scope was requested:

In 146 (a) "Sewage Equipment for the City of Baghdad", add training in regard to the equipment, to include inventory management, operation, maintenance and ordering spare parts for employees who will be responsible for this new equipment (Equipment=vacuum and jetting trucks for sewer maintenance).; and

In 146 b, "Sewage Reconstruction – City of Baghdad" broaden the scope of the project to include: (1) development of a Master Plan for Water and Sewage in Baghdad, and (2) repair/restoration of selected (about $1.5 M) residual from this project in Adhamiyah sewage treatment plant, and (3) cleaning of the major trunk line, known as the Zeblin line, by labor intensive methods to clean as much of the Zeblin sewage line as possible.
APPROVED

NEW PROPOSALS

#668 – Outstanding FAO Purchase Orders-- $312,000. The Ministry of Agriculture (MoA). Ten forklifts were ordered via a UN Food & Agriculture Organization (FAO) contract on behalf of the State Company for Agricultural Supplies for MoA offices/warehouses in northern Iraq. These items were not included in the 2004 Iraqi budget. Four of the ten forklifts have been delivered. The supplier is currently withholding delivery of the final six forklifts pending payment for the initial delivery ($124,800). The Iraqi MoA has reiterated the need for these items and is satisfied with the initial delivery. CPA General Counsel has found that this is a valid contractual liability of the CPA. The Chair asked if MoA could reprioritize their budget to cover these costs. CPA MoA countered that there is a precedent for the PRB to approve additional funds for outstanding FAO contracts. Since there are likely to be more emerging, MoA does not want to set a new precedent of payment from the ministry's budget. The Chair emphasized that, with the approval of the 2004 Revised Iraqi Budget, that all ministries should strive to solve budget issues within their approved budget. Failing that, they should engage the Iraqi MoF to work the issue before coming to the PRB. The Iraqi MoF and MoPDC initially opposed the action, but agreed to an amended motion that urged the MoA to come to MoF first to fund this action, and future actions, before additional DFI funds are allocated.
APPROVED AS AMENDED: DFI $312,000

#669 – ICAO Compliant Iraqi Passport Issuance System --$31,500,000. The Ministry of Interior (MoI). This project provides Iraq with a legitimate, internationally respected passport. A passport is an integral component of any sovereign nation's capacity to maintain national security and is vital to convincing the world that Iraq has regained firm control of its borders. The 2004 budget included $4.5M for this effort. However, initial bids were above the $100M range. The RFP was rescoped and the current estimate is $36M. It is estimated that passport issuance will generate $37.5M in revenues in its first year. The Australian representative asked if this project was competitively bid. CPA MoI confirmed that they had conducted a competitive source selection with international participation. The representative of CPA NSD asked whether revenue would go back to MoI or the general fund. The Chair stated that, absent special provisions, the revenue would return to the general fund. The Iraqi MoF stated a concern that the selected solution was too expensive and urged a less expensive solution similar to neighboring countries. The representative of the CPA Ministry of Foreign Affairs stated that, due to heightened security concerns, most countries were now, or will be, rejecting passports that do not have security features found in the proposed Iraqi passport. The Iraqi MoF stated their opposition to the motion.
APPROVED: DFI $31,500,000

#670 – Youth Center Revitalization -- $18,500,000. The Ministry of Youth and Sports (MoYS). Youth centers in Iraq are a critical part of the fabric of Iraqi society, and require consideration in and support under any comprehensive strategy for assistance to Iraq. The refurbishing of existing youth centers and the addition of computer technology will allow the MoYS to further cultural, scientific and democracy building programs which lead to inclusion of Iraq as a whole within the international community. 60 centers have already been refurbished and require a mostly equipment and some minor rework. The remaining 90 centers under the MoYS will require refurbishment and equipment. This proposal also includes $3M for operating expenses through the end of 2004. The Iraqi MoPDC asked if grants had been sought for this effort. CPA MoYS stated that the urgency of the requirement did not allow time for seeking grants. The representative from CPA CiC asked three questions: The first was about the consideration of recurring costs due to the increased capabilities of the centers. CPA MoYS assured the PRB that recurring costs would be covered in the 2005 budget. Next, CiC asked about the removal of squatters and Islamist groups from the centers. MoYS stated that this has already begun. Several methods have been tried with varied levels of success, but efforts are ongoing and should be successful. Finally, CiC asked if MoYS had coordinated their programs with the Ministry of Education. MoYS stated that they had not, but would coordinate with MoED and other ministries as a condition of approval of an amended motion. Also, approval is contingent upon PRB Chair obtaining confirmation of approval from the Iraqi MoF.
APPROVED AS AMENDED: DFI $18,500,000

#671 – Judicial Salaries -- $2,500,000. The Ministry of Justice (MoJ). The MoJ recommends a salary increase for judges and prosecutors in order to preserve judicial independence and discourage the endemic bribery that formerly plagued the Iraqi judiciary. CPA MoJ is advocating a separate pay scale and note that many judges are now paid less under the Coalition than under the prior regime, when bribery flourished. The amount requested is for eight months in 2004. The recurring annual amount would be $3,770,000. . Several Board members noted that many ministries were attempting to make the case for increased salaries for senior or critical jobs. CPA has discouraged this practice and has held to the 11-tier salary scale. MoJ countered that, as an new independent branch of government, the Judiciary should not be required to use the same pay scale. MoJ noted that the Administrator had approved the new salary scale. The Chair agreed that the Administrator had approved a new judicial salary scale. However, this proposal dealt with the source of funding, not the requirement itself. The Chair asked the MoJ representative if they had considered reprioritizing their internal budget to cover the increased salaries. MoJ stated that that was not a viable option. The Iraqi MoF agreed, in principle, that judicial salaries need attention and encouraged MoJ to come to them to discuss other options.
NOT APPROVED

#673 – Microcredit for CPA South -- $10,000,000. CPA South/. This project will encourage private sector growth and employment through credit extension to small and micro enterprises in urban areas of the Southern Region. The loans will be administered by CHF, a US NGO already doing similar work under CPA Grant 0001. The average loan will be less than $2,000.
DEFERRED: WILL BE CONSIDERED AT 14 APRIL PRB

#674 – Emergency Assistance for Flooding -- $10,000,000. Ministry of Water Resources (MoWR). Climatic forecast indicate a strong possibility of flooding due to unusually high flows in the Tigris and Euphrates from Turkey and Syria. The potential for flooding will be high through July. Four seasons of drought and reduced river flows have resulted in weakened dykes and levees along the rivers and tributaries. Funding is required to meet emerging flood emergencies to repair levees and pay claims for flood damage. CPA MoWR noted that this was to be an contingency fund drawn upon only in the case of a flooding emergency. CPA General Counsel asked if it was proper for MoWR to be honoring claims. MoWR stated precedent for these claims. However, several ministries were exploring the forming of an organization, like the US Federal Emergency Management Agency (FEMA) to deal with disaster

mitigation across the board. The Iraqi MoF stated that funds could be made available within the 2004 budget by delaying other capital. projects, if necessity arose. The Iraqi MoPDC opposed taking funds for approved capital projects for this proposal. The UK representative asked if there were plans to repair levees before emergencies arose. CPA MoWR stated that the budget did not contain funding for levee repairs. The Chair suggested an amended motion for a smaller amount to cover near-term contingencies. A motion was introduced to approve the proposal at a reduced level of $3,000,000.
APPROVED AS AMENDED: DFI $3,000,000

#675 – Organizational Reform and Housing Policy -- $3,000,000. Ministry of Housing and Construction (MoHC). To fund studies on reforming the Iraqi MoHC organizational structure to optimize utilization of Deputy, Directorate, and Commission staffs and to develop a Housing Reform Policy. This is necessary due to a budgeted reduction in ministry staff and an unrealistic span of control for leaders in the current structure. Additionally, MoHC seeks to shift its role from a housing provider to a facilitator for the private sector. This requires a retooling of housing policy. CPA MoHC noted that Ambassador Bremer had subsequently recommended funding for this effort from US Supplemental funds. However, the supplemental did not include funds for this purpose. The Iraqi MoPDC stated that there had already been a World Bank study on the structure of the Iraqi MoHC. CPA MoHC stated that the World Bank report did not contain specific detail on reorganizing MoHC, or changing housing policy. There was extended discussion on finding different avenues for funding this proposal. MoHC stated that grants had been pursued, unsuccessfully, numerous times from World Bank and other organizations. A motion was made to ask CiC and MoPDC to assist MoHC in obtaining a grant from the World Bank Trust Fund or the United Nations Habitat Fund.
NOT APPROVED

Labor-Hour Proposal Requirements—Non-Commercial Item Acquisitions With Adequate Price Competition, in solicitations contemplating use of a Time-and-Materials or Labor-Hour type of contract for noncommercial items, if the price is expected to be based on adequate price competition. If authorized by agency procedures, the contracting officer may amend the provision to make mandatory one of the three approaches in paragraph (c) of the provision, and/or to require the identification of all subcontractors, divisions, subsidiaries, or affiliates included in a blended labor rate.

(2) The contracting officer shall insert the provision at 52.216-30, Time-and-Materials/Labor-Hour Proposal Requirements—Non-Commercial Item Acquisitions without Adequate Price Competition, in solicitations for noncommercial items contemplating use of a Time-and-Materials or Labor-Hour type of contract if the price is not expected to be based on adequate price competition.

(3) The contracting officer shall insert the provision at 52.216-31, Time-and-Materials/Labor-Hour Proposal Requirements—Commercial Item Acquisitions, in solicitations contemplating use of a Commercial Time-and-Materials or Labor-Hour contract.

### 16.602 Labor-hour contracts.

*Description.* A labor-hour contract is a variation of the time-and-materials contract, differing only in that materials are not supplied by the contractor. See 12.207(b), 16.601(c), and 16.601(d) for application and limitations, for time-and-materials contracts that also apply to labor-hour contracts. See 12.207(b) for the use of labor-hour contracts for certain commercial services.

### 16.603 Letter contracts.

### 16.603-1 Description.

A letter contract is a written preliminary contractual instrument that authorizes the contractor to begin immediately manufacturing supplies or performing services.

### 16.603-2 Application.

(a) A letter contract may be used when (1) the Government's interests demand that the contractor be given a binding commitment so that work can start immediately and (2) negotiating a definitive contract is not possible in sufficient time to meet the requirement. However, a letter contract should be as complete and definite as feasible under the circumstances.

(b) When a letter contract award is based on price competition, the contracting officer shall include an overall price ceiling in the letter contract.

(c) Each letter contract shall, as required by the clause at 52.216-25, Contract Definitization, contain a negotiated definitization schedule including (1) dates for submission of the contractor's price proposal, required cost or pricing data, and, if required, make-or-buy and subcontracting plans, (2) a date for the start of negotiations, and (3) a target date for definitization, which shall be the earliest practicable date for definitization. The schedule will provide for definitization of the contract within 180 days after the date of the letter contract or before completion of 40 percent of the work to be performed, whichever occurs first. However, the contracting officer may, in extreme cases and according to agency procedures, authorize an additional period. If, after exhausting all reasonable efforts, the contracting officer and the contractor cannot negotiate a definitive contract because of failure to reach agreement as to price or fee, the clause at 52.216-25 requires the contractor to proceed with the work and provides that the contracting officer may, with the approval of the head of the contracting activity, determine a reasonable price or fee in accordance with Subpart 15.4 and Part 31, subject to appeal as provided in the Disputes clause.

(d) The maximum liability of the Government inserted in the clause at 52.216-24, Limitation of Government Liability, shall be the estimated amount necessary to cover the contractor's requirements for funds before definitization. However, it shall not exceed 50 percent of the estimated cost of the definitive contract unless approved in advance by the official that authorized the letter contract.

(e) The contracting officer shall assign a priority rating to the letter contract if it is appropriate under 11.604.

### 16.603-3 Limitations.

A letter contract may be used only after the head of the contracting activity or a designee determines in writing that no other contract is suitable. Letter contracts shall not—

(a) Commit the Government to a definitive contract in excess of the funds available at the time the letter contract is executed;

(b) Be entered into without competition when competition is required by Part 6; or

(c) Be amended to satisfy a new requirement unless that requirement is inseparable from the existing letter contract. Any such amendment is subject to the same requirements and limitations as a new letter contract.

### 16.603-4 Contract clauses.

(a) The contracting officer shall include in each letter contract the clauses required by this regulation for the type of definitive contract contemplated and any additional clauses known to be appropriate for it.

(b) In addition, the contracting officer shall insert the following clauses in solicitations and contracts when a letter contract is contemplated:

(1) The clause at 52.216-23, Execution and Commencement of Work, except that this clause may be omitted from letter contracts awarded on SF 26;

(2) The clause at 52.216-24, Limitation of Government Liability, with dollar amounts completed in a manner consistent with 16.603-2(d); and

(3) The clause at 52.216-25, Contract Definitization, with its paragraph (b) completed in a manner consistent with 16.603-2(c). If, at the time of entering into the letter contract, the contracting officer knows that the definitive contract will be based on adequate price competition or will otherwise meet the criteria of 15.403-1 for not requiring submission of cost or pricing data, the words "and cost or pricing data supporting its proposal" may be deleted from paragraph (a) of the clause. If the letter contract is being awarded on the basis of price competition, the contracting officer shall use the clause with its Alternate I.

(c) The contracting officer shall also insert the clause at 52.216-26, Payments of Allowable Costs Before Definitization, in solicitations and contracts if a cost-reimbursement definitive contract is contemplated, unless the acquisition involves conversion, alteration, or repair of ships.

Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; *provided*, that the Contractor shall not be required to make any deliveries under this contract after ______________ [*insert date*].

(End of clause)

**52.216-23 Execution and Commencement of Work.**

As prescribed in 16.603-4(b)(1), insert the following clause in solicitations and contracts when a letter contract is contemplated, except that it may be omitted from letter contracts awarded on SF 26:

EXECUTION AND COMMENCEMENT OF WORK (APR 1984)

The Contractor shall indicate acceptance of this letter contract by signing three copies of the contract and returning them to the Contracting Officer not later than ______________ [*insert date*]. Upon acceptance by both parties, the Contractor shall proceed with performance of the work, including purchase of necessary materials.

(End of clause)

**52.216-24 Limitation of Government Liability.**

As prescribed in 16.603-4(b)(2), insert the following clause in solicitations and contracts when a letter contract is contemplated:

LIMITATION OF GOVERNMENT LIABILITY (APR 1984)

(a) In performing this contract, the Contractor is not authorized to make expenditures or incur obligations exceeding ____________________ dollars.

(b) The maximum amount for which the Government shall be liable if this contract is terminated is ___________ dollars.

(End of clause)

**52.216-25 Contract Definitization.**

As prescribed in 16.603-4(b)(3), insert the following clause:

CONTRACT DEFINITIZATION (OCT 1997)

(a) A _____________ [*insert specific type of contract*] definitive contract is contemplated. The Contractor agrees to begin promptly negotiating with the Contracting Officer the terms of a definitive contract that will include (1) all clauses required by the Federal Acquisition Regulation (FAR) on the date of execution of the letter contract, (2) all clauses required by law on the date of execution of the definitive contract, and (3) any other mutually agreeable clauses, terms, and conditions. The Contractor agrees to submit a _________ [*insert specific type of proposal; e.g., fixed-price or cost-and-fee*] proposal and cost or pricing data supporting its proposal.

(b) The schedule for definitizing this contract is [*insert target date for definitization of the contract and dates for submission of proposal, beginning of negotiations, and, if appropriate, submission of make-or-buy and subcontracting plans and cost or pricing data*]:

________________________________________

________________________________________

________________________________________

________________________________________

(c) If agreement on a definitive contract to supersede this letter contract is not reached by the target date in paragraph (b) of this section, or within any extension of it granted by the Contracting Officer, the Contracting Officer may, with the approval of the head of the contracting activity, determine a reasonable price or fee in accordance with Subpart 15.4 and Part 31 of the FAR, subject to Contractor appeal as provided in the Disputes clause. In any event, the Contractor shall proceed with completion of the contract, subject only to the Limitation of Government Liability clause.

(1) After the Contracting Officer's determination of price or fee, the contract shall be governed by—

(i) All clauses required by the FAR on the date of execution of this letter contract for either fixed-price or cost-reimbursement contracts, as determined by the Contracting Officer under this paragraph (c);

(ii) All clauses required by law as of the date of the Contracting Officer's determination; and

(iii) Any other clauses, terms, and conditions mutually agreed upon.

(2) To the extent consistent with paragraph (c)(1) of this section, all clauses, terms, and conditions included in this let-

ter contract shall continue in effect, except those that by their nature apply only to a letter contract.

(End of clause)

*Alternate I (Apr 1984).* In letter contracts awarded on the basis of price competition, add the following paragraph (d) to the basic clause:

(d) The definitive contract resulting from this letter contract will include a negotiated ____________ [*insert "price ceiling" or "firm fixed price"*] in no event to exceed __________________ [*insert the proposed price upon which the award was based*].

**52.216-26 Payments of Allowable Costs Before Definitization.**

As prescribed in 16.603-4(c), insert the following clause:

PAYMENTS OF ALLOWABLE COSTS BEFORE DEFINITIZATION (DEC 2002)

(a) *Reimbursement rate.* Pending the placing of the definitive contract referred to in this letter contract, the Government will promptly reimburse the Contractor for all allowable costs under this contract at the following rates:

(1) One hundred percent of approved costs representing financing payments to subcontractors under fixed-price subcontracts, provided that the Government's payments to the Contractor will not exceed 80 percent of the allowable costs of those subcontractors.

(2) One hundred percent of approved costs representing cost-reimbursement subcontracts; *provided,* that the Government's payments to the Contractor shall not exceed 85 percent of the allowable costs of those subcontractors.

(3) Eighty-five percent of all other approved costs.

(b) *Limitation of reimbursement.* To determine the amounts payable to the Contractor under this letter contract, the Contracting Officer shall determine allowable costs in accordance with the applicable cost principles in Part 31 of the Federal Acquisition Regulation (FAR). The total reimbursement made under this paragraph shall not exceed 85 percent of the maximum amount of the Government's liability, as stated in this contract.

(c) *Invoicing.* Payments shall be made promptly to the Contractor when requested as work progresses, but (except for small business concerns) not more often than every 2 weeks, in amounts approved by the Contracting Officer. The Contractor may submit to an authorized representative of the Contracting Officer, in such form and reasonable detail as the representative may require, an invoice or voucher supported by a statement of the claimed allowable cost incurred by the Contractor in the performance of this contract.

(d) *Allowable costs.* For the purpose of determining allowable costs, the term "costs" includes—

(1) Those recorded costs that result, at the time of the request for reimbursement, from payment by cash, check, or other form of actual payment for items or services purchased directly for the contract;

(2) When the Contractor is not delinquent in payment of costs of contract performance in the ordinary course of business, costs incurred, but not necessarily paid, for—

(i) Supplies and services purchased directly for the contract and associated financing payments to subcontractors, provided payments determined due will be made—

(A) In accordance with the terms and conditions of a subcontract or invoice; and

(B) Ordinarily within 30 days of the submission of the Contractor's payment request to the Government;

(ii) Materials issued from the Contractor's stores inventory and placed in the production process for use on the contract;

(iii) Direct labor;

(iv) Direct travel;

(v) Other direct in-house costs; and

(vi) Properly allocable and allowable indirect costs as shown on the records maintained by the Contractor for purposes of obtaining reimbursement under Government contracts; and

(3) The amount of financing payments that the Contractor has paid by cash, check, or other forms of payment to subcontractors.

(e) *Small business concerns.* A small business concern may receive more frequent payments than every 2 weeks.

(f) *Audit.* At any time before final payment, the Contracting Officer may have the Contractor's invoices or vouchers and statements of costs audited. Any payment may be—

(1) Reduced by any amounts found by the Contracting Officer not to constitute allowable costs; or

(2) Adjusted for overpayments or underpayments made on preceding invoices or vouchers.

(End of clause)

**52.216-27 Single or Multiple Awards.**

As prescribed in 16.506(f), insert the following provision:

SINGLE OR MULTIPLE AWARDS (OCT 1995)

The Government may elect to award a single delivery order contract or task order contract or to award multiple delivery order contracts or task order contracts for the same or similar supplies or services to two or more sources under this solicitation.

(End of provision)

**52.216-28 Multiple Awards for Advisory and Assistance Services.**

As prescribed in 16.506(g), insert the following provision:

DEPUTY SECRETARY OF DEFENSE
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

JUN 22 2004

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS
CHAIRMAN OF THE JOINT CHIEFS OF STAFF
UNDER SECRETARIES OF DEFENSE
ADMINISTRATOR OF THE COALITION PROVISIONAL AUTHORITY
COMMANDERS OF THE COMBATANT COMMANDS
ASSISTANT SECRETARIES OF DEFENSE
GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
INSPECTOR GENERAL OF THE DEPARTMENT OF DEFENSE
ASSISTANTS TO THE SECRETARY OF DEFENSE
DIRECTOR, ADMINISTRATION AND MANAGEMENT
DIRECTORS OF THE DEFENSE AGENCIES
DIRECTORS OF THE DOD FIELD AGENCIES

SUBJECT: Organizational Establishment and Placement of the Project and Contracting Office within the Department of the Army

In National Security Presidential Directive (NSPD) 36, United States Government Operations in Iraq, dated May 11, 2004, the President established the Project and Contracting Office (PCO) as a temporary organization within the Department of Defense (DoD). Pursuant to NSPD 36 and 10 U.S.C. § 113, I hereby direct that the PCO be organizationally established and placed within the Department of the Army to provide acquisition and project management support with respect to activities in Iraq, including support related to the close-out of the Coalition Provisional Authority (CPA).

In accordance with 5 U.S.C. § 3161, the Secretary of the Army may appoint persons to positions of employment within the PCO in such numbers and with such skills as are necessary for the performance of the PCO's functions.

The PCO shall be staffed by personnel from each Military Department and, where appropriate, other DoD Components. To implement this memorandum, each addressee shall provide support, as the Acting Secretary of the Army considers necessary, in support of the PCO mission and as authorized by law.

Any DoD employee serving under a career or career conditional appointment or the equivalent who transfers to or converts to an appointment in the PCO with the consent of his or her component shall be entitled to be returned to his or her former position or a position of like seniority, status and pay without grade or pay retention in the agency if the employee: (1) is separated from the PCO for reasons other than misconduct, neglect of duty, or malfeasance; and (2) applies for return rights not later than 30 days before the earlier of the date of termination of employment in the PCO or the date of termination of the PCO.

OSD 09122-04

Until June 30, 2004, the PCO will provide acquisition and program management support to the Administrator of the CPA. After June 30, 2004, the PCO will support the close-out of the CPA and will provide acquisition and project management support to the Chief of Mission in Iraq, as requested by the Secretary of State, and for other activities in Iraq, as requested by the heads of other Departments and agencies.

The Department of the Army shall be reimbursed, to the extent permitted by law, from funds available to pay for the administrative expenses of agencies that obligate, manage, or administer funds appropriated for the Iraq Relief and Reconstruction Fund pursuant to the Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, 2004, Public Law 108-106. Support provided to other Departments and agencies that is not reimbursable under that Act, or subsequently enacted legislation, shall be provided under the Economy Act or other applicable legal authorities.

Paul Wolfowitz

**Oral Remarks**
**By**
**The Honorable Ambassador L Paul Bremer, III**
**Before the Committee on Government Oversight and Reform**
**U.S House of Representatives**
**February 6 2007**
**(As prepared for Delivery)**

**Mr. Chairman, members of the Committee, thank you for this opportunity to discuss the activities of the Coalition Provisional Authority (CPA). I appear on my behalf, but also on behalf of the thousands of men and women who served with the CPA. They were all volunteers who left their families and risked their lives to work in Iraq under very difficult conditions. I also want to pay tribute to the courage of the men and women in our armed forces, more than three thousand of whom have given their lives in Iraq. We Americans and the Iraqi people are in their debt.**

**Mr. Chairman, I understand and share the frustration Americans and their elected representatives feel about the violence we see every day in Iraq. It has proven to be a much more difficult undertaking than we expected.**

**Let me begin by noting that the subject of today's hearing is the CPA's use and accounting for funds belonging to the Iraqi people held in the so-called Development Fund for Iraq, or DFI. These are not appropriated American funds. They are Iraqi funds. And despite the chaotic situation we found in Iraq, I believe the CPA discharged its responsibilities to manage these Iraqi funds on behalf of the Iraqi people.**

**I acknowledge that I made some mistakes and that with the benefit of hindsight, I would have made some decisions differently. But on the whole, we made great progress under some of the most difficult conditions imaginable. As you consider the actions of the CPA, I respectfully request that you keep this in mind. I am proud of what we achieved and I hope that, after today's hearing, you will understand what we faced and what we accomplished.**

**It is difficult to give a full picture of the desperate situation in Iraq in May 2003. The country was in chaos--socially, politically, and**

**economically. The deep crisis had been brought about not by war, nor by sanctions, but by the decades'- long corruption and incompetence of Saddam's regime. Among many other shocking facts:**

- **During the 1990s, Saddam cut health care spending by 90%. No new hospitals had been built in twenty years. More than half of the country's public health clinics were closed.**
- **Even before the war unemployment had been over 50%.**
- **Iraq's primitive banking system was shut down. The banks had no system for electronic transfer of funds. It was a cash-based economy.**
- **At the end of 2002 inflation was running at an annual rate of 115,000%.**

**In mid-2003, two reports, one by the U.S. Government Accountability Office, the other by Dr. John Hamre, President Clinton's Deputy Secretary of Defense, each compared the CPA's tasks to those faced by the Allies after World War II. The Special Inspector General for Iraq Reconstruction added, "There is no known precedent for an effort to manage the reconstruction of a nation on such a vast scale in the midst of danger and violence."**

**To deal with this crisis, the CPA had the services of over 3,000 volunteers from 25 nations. Contrary to some reports, this was a remarkable and experienced group of men and women, as I show in an attachment to my statement. It was an honor to serve with them.**

**Our top priority was to get the economy moving again. The reconstruction job proved to be harder than we anticipated because American prewar planning had not anticipated the enormity and difficulty of the tasks ahead of us.**

**The first step was to get money into the hands of the Iraqi people as quickly as possible. Under Saddam the Iraqi government had been by far the country's largest employer, providing about four out of every five jobs. But for several months, since before the war, millions of Iraqi families had not received money owed them for civil service salaries or pensions.**

**We used the Iraqi funds that are the subject of today's hearings to pay the Iraqis quickly. This was exceptionally difficult. First because Iraqi ministries lacked good payroll records. Ideally we would**

have liked to put those records straight before beginning payments. But as so often in Iraq, the ideal collided with the harsh realities on the ground. We simply could not delay paying salaries and pensions. Delay would have been demoralizing and unfair to the citizens of Iraq. Delay might well have exacerbated the nascent insurgency and thereby increased the danger to Americans.

Using the Iraqi funds to pay Iraqi families was further complicated by the lack of an effective banking system. Banks were closed and in any event were unable to transfer funds electronically. So we had to pay Iraqis in cash wherever in Iraq they lived. We also immediately put Iraqi funds to work on large public works projects to create jobs. And we continued to pay Iraqis who had been employed in the State Owned Enterprises, even after they were closed down. Due to a shortage of Iraqi currency, many of these expenses were paid in American dollars drawn from the Iraqi fund account.

Let me turn to the question of CPA management of these Iraqi government funds. My colleagues and I fully understood our responsibility for the temporary stewardship of these Iraqi moneys. We took seriously our charge to operate in an open and transparent fashion and to use these Iraqi funds in the best interests of the Iraqi people. We always strived to meet those objectives, and where we may have fallen short, I accept responsibility.

I understand the Committee's concern about the manner in which contracts were awarded using Iraqi funds. It is important to understand that, although I was the Administrator and accept full responsibility for the missions assigned to the CPA, I did not have authority over the awarding of contracts. Before I left for Iraq, the Pentagon designated the Department of the Army as the executive agent for the CPA, including "management oversight for the acquisition and contracting support." The Army's contracting responsibilities extended to both the Iraqi funds and the appropriated funds. Therefore I regret that I may not be able to answer your specific questions about individual contract decisions.

Let's be clear what we are talking about here. Some press stories allege that the Special Inspector General's January 2005 report found that the CPA wasted, or even stole, Iraqi funds. Yet when he

appeared before this Committee in June 2005 to discuss his audit report, the Special Inspector General stated that

> "There have been some misinterpretations about exactly what we said, so let me be clear about what the audit did not say. It did not say that the money was lost. It did not say that the money was stolen. It did not say that the money was fraudulently disbursed by U.S. authorities."

Indeed, the Special Inspector General and the United Nations each concluded that CPA had properly disbursed Iraqi funds from the Development Fund to the Iraqi Ministries.

The core difference between the Special Inspector General and the CPA turns largely on how the Iraqis handled the money—their money—after we disbursed it to them. For the Special Inspector General's report implies that we should have gone much further, seeking to impose modern financial control systems on the disbursement of these Iraqi funds by Iraqi ministries themselves—and this in less than a year, on a failed state in the middle of a war. I know of no one who spent meaningful time in Baghdad working with the Iraqi ministries who thought this was possible in the conditions under which we worked. Here too the ideal conflicted with the reality we faced.

We had to find a way to get the Iraqi people's money working quickly for them rebuilding their country. As was the case with the salaries and pensions, we could not wait to install modern financial systems in the ministries. A team of experts from the International Monetary Fund found that the existing Iraqi systems were adequate and recommended we use them while beginning the longer term process of modernizing them. We agreed and so disbursements from the Iraqi Development fund were made to the Iraqi ministries according to procedures and controls spelled out in CPA regulations. The ministries used existing Iraqi systems to carry out their responsibility for the proper use of those funds.

It was not a perfect solution. But there were no perfect solutions in Iraq.

Let me say, Mr. Chairman, that I regularly visited the Iraqi Ministry of Finance, Ministry of Planning, other Ministries and the country's central bank. I saw at first hand the primitive systems which the Iraqi civil servants were struggling with. Most ministries did not even have computers but kept their records on handwritten spread sheets. While I am certainly not a financial

**expert, my personal observations convinced me that the experts from the International Monetary Fund and the CPA were correct in judging that we could not expect rapidly to modernize those systems in the middle of a war.**

**There was also a political dimension to our decision to use the existing Iraqi financial systems. The Coalition's strategy, and the intent of the international community expressed in United Nations Security Council resolutions, was to give the Iraqis responsibility quickly. This was after all their money, to be used for the benefit of the Iraqi people. When Iraqi ministers were appointed by the Iraqis on September 3 2003, I made clear that it was their responsibility to develop and execute their ministry budgets.**

**My colleagues and I were acutely aware of the dangers of corruption. It had been institutionalized, even encouraged, under Saddam, as the Oil for Food program has shown. So we took steps to combat corruption. We established the independence of the Iraqi judiciary, appointed Inspectors General in every Iraqi ministry, revitalized an old respected Iraqi audit agency and set up a national commission to which any Iraqi can bring charges of fraud or waste. Of course these institutions alone, in a short time, cannot abolish corruption. But a start has been made.**

**I commend the Committee's intention to see what lessons can be learned from these experiences. I would offer several for your consideration.**

**First, there is no substitute for good planning. The Executive Branch has taken steps in the past couple of years to improve its ability to cope with post-conflict situations. I hope Congress will support these.**

**Second, a "business as usual" approach to both contracting and personnel severely hampered our ability to begin the massive job of reconstructing Iraq. The Special Inspector General has developed useful ideas for processes in contracting and personnel which I commend to the attention of the Committee.**

Attachment to Testimony of Ambassador L. Paul Bremer, III
February 6, 2007

**List of Top Officials of Coalition Provisional Authority**

**Deputy Administrators, Coalition Provisional Authority**

Ambassador Clayton McManaway: Career diplomat.

Ambassador Richard Jones: Career diplomat. Ambassador to Lebanon, Kuwait and Kazakhstan under President Clinton. Fluent in Arabic.

Ambassador John Sawers: Career British diplomat, served concurrently as British Ambassador to Egypt. Fluent in Arabic.

Ambassador Jeremy Greenstock: Career British diplomat, formerly British Ambassador to the U.N.

Lt. Gen. Keith Kellogg: Retired career Army officer.

VAdm Adm. Scott Redd: Retired career Navy officer.

Lt. Gen. Jeff Oster: Retired career Marine officer.

Hon. Reuben Jeffery: Former Goldman Sachs international banker. Currently Chairman of the Commodity Futures Trading Commission.

**Chief of Staff**

Ambassador Patrick Kennedy: Career diplomat.

Stephen Smith: Career diplomat.

**Chief Financial Officer**

Al Runnels: over 30 years service in financial management, financial services and comptroller positions in the U.S. Department of Defense

Col. Erik Engelbrektsson: 28 years of experience in financial management at the U.S. Department of Defense; service in Bosnia and as Deputy Comptroller in the Defense Logistics Agency.

**Director of Operations**

Andrew Bearpark: A veteran overseas development and humanitarian assistance aid official for the British government. Prior postings included Bosnia and Kosovo

**Head of Program Management Office**

V Adm. David Nash: Four decades experience in building, design and program management with the U.S. Navy and the private sector.

**General Counsel**

BGen. Scott Castle: Career Army officer, deputy legal counsel, Department of Defense. Principal Deputy General Counsel, Department of the Army.

**Senior Advisor for Congressional Affairs**

Tom Korologos: Three decades experience in Congressional relations.

**Senior Political Advisers**

Ambassador Hume Horan: Retired career diplomat. Former ambassador to Cameroon, Sudan and Saudi Arabia. Fluent in Arabic.

Ambassador Chris Ross: Retired career diplomat, ambassador to Syria in the Clinton administration. Fluent in Arabic.

Ambassador Ryan Crocker: Career diplomat, ambassador to Kuwait and Lebanon in the Clinton administration. Fluent in Arabic.

Ambassador Ronald Neumann: Career diplomat. Previously ambassador to Bahrain. Fluent in Arabic.

Ambassador Ron Schlicher: Career diplomat. Previously U.S. consul general in Jerusalem. Fluent in Arabic.

**Special Assistant for Speechwriting and Polling**

Don Hamilton: Retired career diplomat.

**Policy Planning**

Dayton Maxwell: Career U.S. Agency for International Development (USAID).

Andrew Rathmell: Economist with RAND (nonpartisan think tank).

**Other Political Advisers**

Mike Gfoeller: Career diplomat. Head of CPA office in central Iraq. Fluent in Arabic.

Ambassador Olewoehler Olsen: Career Danish diplomat. Head of CPA office in southern Iraq. Former ambassador to Saudi Arabia and Syria. Fluent in Arabic.

Sir Hilary Sinnott: Career British diplomat. Second head of CPA office in southern Iraq. Fluent in Arabic.

Col. Richard Naab: Head of CPA office in northern Iraq. Retired career Army officer.

Herro Mustafa: Career diplomat. Second head of CPA office in northern Iraq. Fluent in Arabic and Kurdish.

Jules Chappell: Career British diplomat. Fluent in Arabic.

Irfan Siddiq: Career British diplomat. Fluent in Arabic.

Raad Alkadiri: Iraqi-British citizen. D.Phil. in International Relations from Oxford University, native Arabic speaker.

Tom Warrick: Career diplomat. Fluent in Arabic.

Scott Carpenter: Deputy Assistant Secretary of State for Democracy, Human Rights and Labor. Worked for the International Republican Institute on democratization projects in Eastern Europe.

Meghan O'Sullivan: Ph.D. from Oxford, worked at the Brookings Institution. State Department Policy Planning Office prior to service in Iraq.

Roman Martinez: Department of Defense.

**Senior Advisers for Oil for Food Project**

Ambassador Steve Mann: Career diplomat, ambassador to Turkmenistan during Clinton Administration.

Jim Warlick: Career diplomat.

**Senior Project Manager for Currency Exchange**

Gen. Hugh Tant: Retired career Army officer.

**Senior Advisers to Iraqi Ministries**

Ministry of Agriculture

Trevor Flugge: Australian wheat and livestock farmer; chairman of the Australian Wheat Board.

Lloyd Harbert: Career employee of U.S. Department of Agriculture.

Peter King: Career employee of Australian Department of Agriculture.

Ministry of Communications

Jerry Thames: 28-year career at AT&T and BT North America.

Dan Sudnick: 2001-03 with Cantabs Inc., a trade and technology investment company.

Ministry of Culture

Ambassador Mario Bondioli Osio: Retired Italian diplomat.

Ambassador Pietro Cordone: Retired Italian diplomat. Born in Egypt. Ambassador to Yemen and the United Arab Emirates. Fluent in Arabic.

John Russell: Massachusetts College of Art; archeologist and art historian.

Ministry of Defense

Walter Slocombe: Undersecretary of defense for policy during the Clinton administration.

David Gompert: Annapolis graduate, career Navy officer; president of RAND Europe from 2000 to 2003 and director of the National Defense Research Institute from 1993 to 2000.

Fred Smith: Career civil servant. Department of Defense and State Department.

Ministry of Displacement and Migration

Jennifer Johnson: Career diplomat.

Jose Lamego: Former Portuguese foreign minister and member of the Socialist Party of Portugal.

Larry Bartlett: Career civil servant in the Department of State.

Susan Johnson: Career diplomat.

Ministry of Education

Williamson M. Evers: Former education policy adviser to George W. Bush during the 2000 presidential campaign; research fellow at the Hoover Institution.

Leslye Arsht: Counselor to Secretary of Education Lamar Alexander. Former associate vice chancellor at Vanderbilt University and deputy press secretary to President Reagan.

Dorothy Mazaka: USAID employee.

Ministry of Electricity

Pete Gibson: Army Corps of Engineers.

Col. Randy Richardson: U.S. Army Reserves.

Col. Steve Browning: Serving officer, Army Corps of Engineers.

Jimmy Hicks: Former executive with Duke Power.

Ministry of Environment

Col. H. Allen Irish: Serving officer, U.S. Army.

Ed Theriot: Director of the Environmental Laboratory at the U.S. Army Engineer Research and Development Center. Career member of the Federal Senior Executive Service.

Ministry of Finance

Marek Belka: Former Deputy Prime Minister and Minister of Finance of Poland. Subsequently Polish Prime Minister.

Peter McPherson: President of Michigan State University. Former administrator of USAID.

RAdm. David Oliver: Retired naval officer. Former Principal Deputy Undersecretary of Defense in Clinton administration.

Anthony McDonald: Career civil servant with Australian Treasury Department.

David Nummy: Senior adviser for budget policy and management in the U.S. Treasury Department; staff member of the Senate Budget Committee, and assistant secretary for management of the U.S. Department of the Treasury.

Rodney Bent: Career Office of Management and Budget official and professional staff member on the House Appropriations Committee, Foreign Operations Subcommittee.

George Wolfe: Former law clerk to Judge Donald Russell, Fourth U.S. Court of Appeals. Deputy General Counsel to the U.S. Department of the Treasury, 2001-04.

Olin Wethington: Former Assistant Secretary for International Affairs at the U.S. Treasury and executive secretary, White House Economic Policy Council.

Ministry of Foreign Affairs

Ambassador David Dunford: Career diplomat; ambassador to Oman during the Clinton administration.

Susan Johnson: Career diplomat.

Steve Seche: Career diplomat.

Marc Sievers: Career diplomat.

Ministry of Health

Col. Steve Browning: Serving officer, Army Corps of Engineers.

James Haveman: Former director of the Michigan Department of Community Health and director of the Michigan Department of Mental Health.

Ministry of Higher Education

Dr. Andrew Erdmann: State Department policy planning staff responsible for counterterrorism, homeland security, and Central Asian policy. Previously a historian at Harvard.

Dr. John Agresto: Former president of St. John's College. Doctorate in political science from Cornell University.

Ministry of Housing and Construction

Dan Hitchings: Chief of engineering and construction at the Army Corps of Engineers' Pittsburgh district.

Jack Rintoul: Civil Engineer, Army Corps of Engineers.

Lt. Col. Joseph Morgan: U.S. Army. Served in Bosnia during Clinton administration.

Mike Karem: Former Deputy Assistant Secretary of Housing and Urban Development.

Ministry of Human Rights

Audrey Glover: British career diplomat. Former head of British delegation to the U.N. Commission on Human Rights.

Sandy Hodgkinson: Human rights specialist with the State Department. Navy Reserve Judge Advocate officer, worked as a military prosecutor and an instructor in crimes against humanity issues. Career member of the civil service.

Ministry of Industry and Minerals

Ambassador Tim Carney: Career diplomat. Ambassador to Sudan in the Clinton administration.

Rick Ortiz: Career diplomat.

Lt. Col. Brad Jackson: U.S. Army (Reserves).

Col. Lettie Bien: U.S. Army (Reserves).

Ministry of Interior

Robert Gifford: Policing expert from the U.S. Department of State who also served as an adviser in Afghanistan. Career member of the Senior Executive Service.

Bernard Kerik: Former chief of police in New York City.

Doug Brand: British. Chief constable, Yorkshire Police. Career law enforcement officer.

Steven Casteel: 32-year veteran of the Drug Enforcement Agency.

Brig. Gen. James Steele: Retired U.S. Army officer.

Ministry of Justice

Clint Williamson: Former director of the Justice Department at the U.N. Mission in Kosovo during the Clinton administration.

Maj. Gen. Donald F. Campbell: Serving judge on the Superior Court of New Jersey; and a major general in the U.S. Army Reserves.

Edward Schmults: Former deputy attorney general of the U.S.

Ministry of Labor and Social Affairs

Karen Walsh: USAID employee.

Chris Spear: Assistant secretary for policy, U.S. Department of Labor.

Lt. Col. Jim Otwell: U.S. Army, civil affairs officer.

Bob Gross: Attorney. Former general counsel and president of First Interstate Bank of Utah. Chief of staff to Gov. Mike Leavitt in 1997.

Ministry of Municipalities and Public Works

Michael Mutter: senior architectural and physical planning adviser at the British Department for International Development.

Ministry of Oil

Philip Carroll: Former chief executive of the U.S. division of Royal Dutch-Shell.

Robert McKee: Former Conoco-Phillips executive.

Gary Vogler: Former executive with Exxon Mobil.

Mike Stinson: Former executive with Conoco-Philips.

Ministry of Planning and Development

Simon Elvy: British career diplomat.

Neil Hawkins: Former member of the Australian army, Regional Force Surveillance Units.

Ministry of Private Sector Development

Thomas Foley: Founder and Chairman of the NTC Group Inc., an investment firm specializing in long-term equity investments in operating companies. M.B.A. from Harvard.

Mike Fleischer: President and member of the Board of Directors of Bogen Communications International, which makes telecommunications systems. M.B.A. from Harvard.

Ministry of Trade

Ambassador Robin Raphel: Career diplomat. Former U.S. ambassador to Tunisia and assistant secretary of state for South Asia during the Clinton administration.

R. David Luft: Department of Commerce employee.

Lt. Col Tracey Wright: Construction engineer in the U.S. Army.

Sue Hamrock: Career employee of the Department of Commerce.

Ministry of Transportation

Darrell Trent: Chairman and CEO of Acton Development Co.; acting secretary of transportation under President Reagan.

Ministry of Water Resources

Eugene Stakhiv: U.S. Army Institute for Water Resources.

Jerry Webb: U.S. Army Corps of Engineers, principal hydrologic and hydraulic engineer. 30 years experience in water resources field.

Ed Theriot: Director of the Environmental Laboratory at the U.S. Army Engineer Research and Development Center. Member of the Federal Government Senior Executive Service.

Ministry of Youth and Sport

Don Eberly: Founder of the National Fatherhood Initiative and the Civil Society Project, former deputy director of the White House Office of Faith Based and Community Initiatives.

Mounzer FatFat: A native of Lebanon. During the Clinton administration established sports and entertainment programs for Kosovo's youth under U.N. auspices.

**RECORD VERSION**

**STATEMENT BY**

**MS. TINA BALLARD**
**DEPUTY ASSISTANT SECRETARY OF THE ARMY**
**(POLICY AND PROCUREMENT)**

**BEFORE THE**

**SUBCOMMITTEE ON READINESS**
**COMMITTEE ON ARMED SERVICES**
**UNITED STATES HOUSE OF REPRESENTATIVES**

**SECOND SESSION, 108TH CONGRESS**

**ON THE ROLES AND MISSIONS OF CONTRACTORS THAT SUPPORT THE DEPARTMENT OF DEFENSE AND THE MILITARY SERVICES**

**JUNE 24, 2004**

**STATEMENT BY**
**MS. TINA BALLARD**
**DEPUTY ASSISTANT SECRETARY OF THE ARMY**
**(POLICY AND PROCUREMENT)**

**ON THE ROLES AND MISSIONS OF CONTRACTORS THAT SUPPORT THE DEPARTMENT OF DEFENSE AND THE MILITARY SERVICES**

## INTRODUCTION

Mr. Chairman and distinguished members of the Subcommittee on Readiness, thank you for this opportunity to report to you on the roles and missions of contractors that support the Department of Defense and the military services, specifically the United States Army. It is my privilege to represent the Army leadership and the military and civilian members of the Army's contracting and acquisition workforce, and the Soldiers who rely on us to provide them with world-class weapon systems, equipment, and services so they can successfully accomplish any mission at anytime, anywhere in the world.

This is a time of tremendous change, and we are most grateful for your wisdom, guidance, and strong support. Over the last year, our Army has met the demands of the Global War on Terrorism with more than 330,000 troops deployed around the world in more than 120 countries. Our Army was instrumental in the defeat of Saddam Hussein and the subsequent liberation of more than 456 million people from oppression and despair. Our Army remains a central and critical participant in Operation Iraqi Freedom (OIF) and Operation Enduring Freedom (OEF) in Afghanistan. Our contracting workforce is at the forefront in the reconstruction and humanitarian relief effort in Iraq and I would like to briefly highlight the Army's significant role.

**THE ARMY AS EXECUTIVE AGENT**

On May 21, 2003, the Deputy Secretary of Defense designated the Secretary of the Army as the Department of Defense Executive Agent for the Office of Reconstruction and Humanitarian Assistance, later to become the Coalition Provisional Authority (CPA) in Iraq, with responsibility to provide administrative, logistics, and contracting support for the relief and reconstruction for the people of Iraq. On January 14, 2004, the Deputy Secretary of Defense further assigned responsibility for Acquisition and Program Management Support for CPA to the Secretary of the Army to include all aspects of contracting and program management. As such, the Army is responsible for the execution of the $18.6 billion appropriated by the U.S. Congress for the reconstruction and humanitarian relief effort.

To date, the Army has awarded more than 2,800 contract actions valued at more than $11.7 billion that are directly enabling the citizens of Iraq to move towards self-governance. Reconstruction and relief efforts have produced the following important outcomes:

- Iraq currently exports approximately 1.6 million barrels of oil each day. Crude oil exports are the major source of funding for the Development Fund for Iraq. In 2003, the crude oil export totaled $5.1 billion. As of June 6, 2004, crude oil export revenue for the years is already at $7.4 billion.
- Completed water and sanitation projects across Iraq that will benefit 14.5 million Iraqis.
- Immunized more than 5 million children, ages six to 12, for Measles, Mumps, and Rubella.
- More than 1, 200 preventive health clinics and 240 hospitals are now operating in Iraq.
- Nearly 2,500 schools across Iraq have been rehabilitated, more than 32,000 teachers and administrative staff have been trained, and over

8.7 million textbooks have been printed and distributed throughout Iraq.

- Pre-war electrical peak capacity was 4,400 megawatts. By June 30, 2004, the rehabilitated electrical grid will be capable of a peak generation capacity of 6,000 megawatts and 120,000 megawatts per hour of daily production.
- The total number of telephone subscribers in Iraq is over 1.2 million, 45 percent above pre-war levels. There are also 55,000 Internet subscribers in Baghdad, up from only 3,000 in 2002.

**PERSONNEL**

Our contracting personnel have been on the ground in Iraq since June 2003. We now have a total of 65 individuals there. They are multi-Service and civilian: four Army; five Navy; one Marine; 14 Air Force; and 41 civilians. They are courageous, dedicated volunteers who are doing a phenomenal job under very tough, dangerous conditions.

**CONTRACTORS ON THE BATTLEFIELD**

Civilian contractors have become an indispensable part of our nation's warfighting and peacekeeping capability. Since 1775, military leaders have relied on civilian contractors to fulfill the needs of their troops on campaign. With this in mind, the Army has taken a number of important steps to manage our contractors in the field to ensure that they are both effective and economical. Let me provide a few examples.

The Army is the first military service to provide a contract clause dealing with Contractors Accompanying the Force. An interim Army Federal Acquisition Regulation Supplement clause, published in the Federal Register on November 28, 2003, was designed to provide consistent guidance across all Army

contracts. A comprehensive "Contractors Accompanying the Force Guidebook" was developed as a companion document to provide operational details, and it included sample language that could be tailored for individual needs. It's clear that contractors who accompany the Army in theater need to be completely aware of the full spectrum environments in which they will likely operate. The proper mechanism for this information is the contract; and the purpose of the clause and "Guidebook" is to provide contractor deployment information in Army contracts accurately and consistently. It is also designed to enlighten the operational community, including field commanders and logisticians, on what they can expect from support contractors. In addition, the Army has published a field manual (FM 3-100.21) entitled "Contractors on the Battlefield." The Army takes great pride in a report dated June 24, 2003, from the General Accounting Office stating that of the four military services, only the Army has developed substantial guidance for dealing with contractors.

In the Army's continued efforts to improve management of service acquisitions, the Army Services Strategy Panel (ASSP), which I chair, is focused on the importance of developing and maintaining sound acquisition strategies to ensure services are properly planned, based upon clear, performance-based requirements with required outcomes that are identified and measurable, and acquired by smart business arrangements. ASSPs will be conducted as early as possible in the acquisition planning process to develop a systematic and disciplined approach to achieve an affordable, efficient, and effective acquisition.

Another issue of key importance in maintaining oversight and management of contractors is the Contracting Officer's Representative (COR). A COR is an authorized representative of a Contracting Officer who assists in the technical monitoring or administration of a contract. In the Army, the COR must be a Government employee who has been trained as a COR and authorized by the Contracting Officer to act in that capacity. The COR has several major duties and responsibilities, including the following:

- verify that the contractor performs the technical requirements of the contract in accordance with the contract terms, conditions, and specifications;
- emphasize the quality provisions for both adherence to the contract provisions and to the contractor's own quality control program;
- perform inspections and verify that the contractor has corrected all deficiencies;
- maintain liaison with the Contracting Officer and direct communications between the Contracting Officer and the contractor.

**CONCLUSION**

I have a deep appreciation for the courage, competence, dedication, and hard work of our contracting personnel. Their work has been – and continues to be – performed in accordance with proper procedures, by military service members and civilians who are concerned and committed to accomplishing their work under the toughest and most austere conditions.

Our contractors and contracting personnel are often the unsung heroes of any deployment. Their customers are the warfighters – the men and women who depend on them to do their jobs. The success of our warfighters is linked directly to the success of the contracting workforce. We must continue to work hard and work together with industry to develop win-win situations where industry makes a fair profit and our warfighters get better products and services to accomplish their missions quickly and decisively and return home safely.

**JOINT CONTRACTING COMMAND-IRAQ**
**APO AE 09316**

No: 70
date: 17/4/2005

JCC-I

13 April 2005

Memorandum for Adil Abdul Mahdi – Minister of Finance

SUBJECT: Approval to Pay Post Transition of Authority Requirements funded by Development Fund for Iraq (DFI)

Dear Sir,

The Joint Contracting Command – Iraq respectfully requests approval to fund contracts awarded Post Transition of Authority with uncommitted funds from the Development Fund for Iraq (DFI) not to exceed $85 million, to include any minor changes as required to complete contract requirements.

Very Respectfully,

John M. Urias,
Commanding General
Joint Contracting Command – Iraq

13 April 2005

Pursuant to my authority as Minister of Finance for the Iraqi Interim Government, I hereby:

a. Accept the attached list of contracts undertaken by the Project and Contracting Office, and the Multi-National Security Transition Command - Iraq, on behalf of the Iraqi Ministries of Interior, Defense, and Municipalities and Public Works.

b. Authorize the Joint Contracting Command-Iraq to continue to administer these contracts, subject to the conditions set forth in my 15 June 2004 letter and subsequent clarifications dated 31 December 2004 and 28 February 2005.

c. Authorize the Joint Contracting Command-Iraq to approve disbursements of funds by the Joint Area Support Group Comptroller from the DFI Transition Account, up to an amount not to exceed $85 million (U.S.) for invoices submitted for the contracts in the attached list.

Adil Abdul Mahdi Shubber
Minister of Finance
Iraqi Interim Government

DFI Contracts - Contract Action After 3/28/2004

| Contract # | Contractor Name | Description of Work | Awd Date | Contract Amount | Mod Amount | Mod Date |
|---|---|---|---|---|---|---|
| DABV01-04-C-0176 | Al-Wala Al-Dayin | construct sewage lines in Balad | 9/26/04 | $ 2,729,941.00 | $ - | |
| DABV01-04-C-0177 | Rashid H Qadban | pave roads in Samara | 9/26/04 | $ 1,487,000.00 | $ - | |
| FA8903-04-D-8677 | Tera Tech FW Inc. | construction medical clinics | 9/29/04 | $ 17,891,081.00 | $ - | |
| FA8903-04-D-8881 | Weston Solutions | constr. Mosque Umm Quasar | 9/17/04 | $ 1,671,378.00 | $ - | |
| FA8903-04-D-8681 | Weston Solutions | constr. Al Basrah Airfield FP | 10/22/04 | $ 1,299,731.00 | $ - | |
| DABV01-04-M-9003 | Triple Nickle Tactical Supply | police riot gear | 7/1/04 | $ 1,594,298.00 | $ - | |
| DABV01-04-C-9024 | IRMB | armored buses | 8/22/04 | $ 4,063,200.00 | $ - | |
| DABV01-04-M-9025 | IRMB, LTD | armored vehicles | 9/9/04 | $ 1,568,770.00 | $ - | |
| DABV01-04-M-9027 | Iraq Business and Logistics | armored vehicles | 9/9/04 | $ 945,000.00 | $ - | |
| DABV01-04-M-9030 | Kuwait Leaders General Trading | amored GMC suburbans | 9/9/04 | $ 347,200.00 | $ - | |
| DABV01-04-C-9021 | SBIG Technical Services Ltd | force training | 7/3/04 | $ 1,084,739.00 | $ - | 9/14/04 |
| DABV01-04-C-9022 | Cadillac Gage Textron, Inc. | amored support vehicles, ASV | 7/3/04 | $ 49,980,486.80 | $ 20,583,436.48 | 9/14/04 |
| DABV01-04-C-9023 | Morgantown International, LTD | C2 tactical vehicles | 8/22/04 | $ 4,889,034.00 | $ - | |
| DABV01-04-M-0075a | Global Arms Traders | holsters/magazines/cleaning kits | 10/26/04 | $ 934,405.00 | $ - | |
| DABV01-04-M-9029 | DG Total Soultions, LTD. | amored vehicles | 9/9/04 | $ 561,696.00 | $ - | |
| DABV01-04-M-0108 | Zero Line Limited | armored vehicles/buses | 8/6/04 | $ 8,480,550.00 | $ - | |

2005

DFI Contracts -- Contract Action After 6/28/2004

| [illegible] | [illegible] | DELTA | MIN | Total by Ministry | KO |
|---|---|---|---|---|---|
| $ 2,729,941.00 | $ - | $ 2,729,941.00 | [redacted] | | CDR Gary Ulrich |
| $ 1,487,000.00 | $ - | $ 1,487,000.00 | [redacted] | [redacted] | CDR Gary Ulrich |
| $ 17,891,081.00 | $ 7,524,093.78 | $ 10,356,987.22 | MOD | | Clifford Trimble |
| $ 1,671,376.00 | $ - | $ 1,671,376.00 | MOD | | Loralan Seiffert |
| $ 1,299,731.00 | $ - | $ 1,299,731.00 | MOD | $ 13,338,094.22 | Loralan Seiffert |
| $ 1,594,298.00 | $ 1,581,298.00 | $ 13,000.00 | MOI | | MG Saad Saleh |
| $ 4,093,200.00 | $ - | $ 4,093,200.00 | MOI | | MG Saad Saleh |
| $ 1,568,770.00 | $ 1,267,870.00 | $ 300,900.00 | MOI | | MG Saad Saleh |
| $ 945,000.00 | $ 190,000.00 | $ 755,000.00 | MOI | | MG Saad Saleh |
| $ 347,200.00 | $ - | $ 347,200.00 | MOI | | MG Saad Saleh |
| $ 10,847,390.00 | $ 3,506,803.00 | $ 7,340,587.00 | MOI | | MG Saad Saleh |
| $ 70,564,173.48 | $ 31,142,400.00 | $ 39,421,773.48 | MOI | | MG Saad Saleh |
| $ 4,889,034.00 | $ 1,982,674.90 | $ 2,906,359.10 | MOI | | MG Saad Saleh |
| $ 934,405.00 | $ - | $ 934,405.00 | MOI | | MG Saad Saleh |
| $ 561,696.00 | $ - | $ 561,696.00 | MOI | | MG Saad Saleh |
| $ 8,480,550.00 | $ - | $ 8,480,550.00 | MOI | $ 65,154,670.58 | MG Saad Saleh |
| $ 129,904,845.48 | $ 47,195,139.68 | $ 82,709,705.80 | | $ 82,709,705.80 | |

2005

**DEPARTMENT OF THE ARMY**
**JOINT CONTRACTING COMMAND-IRAQ/AFGHANISTAN**
**APO AE 09316**

December 23, 2005

Memorandum for Ali Abdul Amir Allawi, Minister of Finance

SUBJECT: Request for Extension of Authority to Administer and/or Pay DFI-Funded Contracts and Grants

Dear Minister Allawi,

I refer to the memorandum of February 28, 2005, by which your predecessor, Minister of Finance Adil Abdul Mahdi, extended the date of the Designation of Authority and Responsibility to monitor and confirm performance, certify and / or make payments, and otherwise administer DFI-funded contracts and grants until December 31, 2005. This memorandum makes reference to and draws authority from earlier memoranda dated June 15, July 7, October 5 and December 31, 2004. I request this authority to administer and/or pay such contracts or grants be further extended until December 31, 2006.

In accordance with your request, we agree to expand participation of the Board of Supreme Audit, in cooperation with appropriate U.S. Government parties, in mutually agreed financial oversight of contracts awarded by the Coalition Provisional Authority on or before June 28, 2004 or by U.S. Government entities after June 28, 2004 on behalf of the Government of Iraq and funded by the Development Fund for Iraq. To assist with the above, we agree to develop mutually acceptable modalities with the appropriate parties of the Government of Iraq.

Respectfully,

John M. Urias
Major General, US Army
Commander, Joint Contracting Command- Iraq/Afghanistan
and DFI Administrator

December 24, 2005

Pursuant to my authority as Minister of Finance for the Iraqi Government, and in view of the relatively small number of contracts remaining open at the close of 2005 and noting that these same contracts will be closed by the end of 2006, and in the interest of continuing to administer the DFI contracts and grants to their natural end, I hereby extend the Designation of Authority and Responsibility to the Chief of Mission and Commander, Multinational Forces-Iraq to administer the DFI-funded contracts and grants to December 31, 2006.

Ali Abdul Amir Allawi
Minister of Finance

Memorandum of Acknowledgement and Response

Acknowledging Joint Contracting Command-Iraq/Afghanistan's letters of December 4 and 20, 2005, and the meeting of December 21, 2005, regarding the Development Fund for Iraq (DFI) Portfolio administered by Chief of Mission, U.S. Embassy, Baghdad and Commander, Multinational Forces-Iraq, and pursuant to my authority as Minister of Finance, I hereby provide the following responses where initialed:

a. AA I accept and ratify the December 4, 2005, list of post-Transition of Authority contract actions undertaken by the Multinational Force-Iraq, on behalf of the Government of Iraq. I authorize the continued administration of these contracts, subject to the conditions set forth in Minister of Finance memorandum dated June 15, 2004 and subsequent Minister of Finance memorandum clarifications issued. I further authorize disbursement of funds by the Joint Area Support Group-Central Comptroller from the DFI Transition sub-account, up to an amount not to exceed $60 million USD, for invoices submitted for these contracts.

b. AA I approve the use of $150 million USD from the excess funds in the DFI Transition sub-account for post-kinetic operations reconstruction. The funds may be used for projects throughout Iraq generated via procedures that follow the "Tal Afar Model" for reconstruction projects, are approved by the Prime Minister or his designee, and are to be matched in value by projects funded wholly by the Coalition. This process assures central Iraqi government participation in the reconstruction decision making process. For this matching project program, the Coalition is authorized to award and modify new contracts (thereby obligating the funds), monitor and confirm performance, validate, certify and/or make payments, and otherwise administer these contracts. They will be reported as a part of the existing DFI database and accounted for no later than December 31, 2006. I authorize and direct the Central Bank of Iraq to pay from the DFI Transition sub-account all validated invoices that are submitted by the Joint Area Support Group-Central Comptroller under this matching project program.

c. AA I authorize $20 million USD of uncommitted DFI funds in the DFI Transition sub-account be used for augmentation to the Ministry of Interior's 2006 budget solely for the purposes of operating and maintaining the Advanced First Responders Network, for which they are the executing agent.

d. AA I agree with the need to maintain maximum DFI payment processing flexibility by increasing cash on hand available to the Joint Area Support Group-Central Comptroller. I direct the Central Bank of Iraq to transfer no later than December 29, 2005, $48 million USD in cash from the DFI Transition sub-account to the Joint Area Support Group-Central Comptroller.

e. AA I authorize use of uncommitted DFI funds in the DFI Transition sub-account to be used, up to the amounts listed below, for the following initialed items as discussed at our December 21, 2005, meeting:

1) AA Raytheon project at Baghdad International Airport, $9.4 million USD
2) AA Arrears to Global for security at Baghdad International Airport, $22.8 million USD
3) _____ Global security services and training (exit strategy) at Baghdad International Airport through 2006, $36 million USD

Ali Abdul Amir Allawi
Minister of Finance

Memorandum of Acknowledgement and Response

Acknowledging Joint Contracting Command-Iraq/Afghanistan's meeting of December 21, 2005, and subsequent letter of December 23, 2005, regarding the Development Fund for Iraq (DFI) Portfolio administered by Chief of Mission, U.S. Embassy, Baghdad and Commander, Multinational Forces-Iraq, and pursuant to my authority as Minister of Finance, I hereby provide the following responses where initialed:

a. AA I authorize uncommitted DFI funds in the DFI Transition sub-account up to the amounts listed below where initialed for the new projects listed:

1) AA Diwaniyah Hospital Heating/Air Conditioning, $1.6 million USD
2) AA Baghdad Trash Removal, $8.6 million USD
3) AA Power for Nassiriyah Water Treatment Plant, $3.5 million USD
4) AA Falluhjah Waste Water Treatment Plant Units, $18 million USD
5) AA Emergent Repairs to Trunk Lines/Sewage Systems throughout Baghdad, $20 million USD

b. AA I authorize up to a maximum of $5 million USD of uncommitted DFI funds in the DFI Transition sub-account to be used for payment of arrears in security bills related to port operations at Umm Qasr.

c. AA I authorize up to a maximum of $20 million USD of uncommitted DFI funds in the DFI Transition sub-account to be used for payment of Iraq-wide distribution of DFI Portfolio materiel located in Project and Contracting Office warehouses.

Ali Abdul Amir Allawi
Minister of Finance

**HEADQUARTERS**
**JOINT CONTRACTING COMMAND – IRAQ/AFGHANISTAN**
**INTERNATIONAL ZONE, BAGHDAD**
**APO AE 09348-1400**

REPLY TO
ATTENTION OF

September 17, 2007

Commander, JCC-I/A

H.E. Baqir Jabr al Zubaydi
Minister of Finance

Your Excellency:

The Joint Contracting Command – Iraq/Afghanistan (JCC-I/A) requests the Ministry of Finance approve payment to reimburse the U.S. Army Corps of Engineers (USACE) for expenditures initiated in 2003-2005 for critical refurbishment of Iraq's Sewer, Oil, and Electrical infrastructure. The total amount for this Quality Assurance oversight is $11,284,025.06. The work was completed to assure these critical Iraqi resources were available to support the Economy and People of Iraq.

This bill must be treated different from the other DFI invoices because the U.S. Army Corps of Engineers paid DFI Contractors from their Revolving Fund Account. These U.S. Dollars are replenished by funding earmarked in the U.S. Budget once projects are completed. The USACE Revolving Fund Account was used to provide prompt payment to contractors as they completed elements of contracts designed to provide Sewer, Electrical and Oil Refurbishment, all of which were critical for the reconstruction of Iraq. As such, no Line Ministry is available to sign as acceptor of the projects.

Request your approval to authorize payment for these projects. With your continued support and assistance, we will be able to provide quality work for the Iraqi People. If DFI funding does not replace the U.S. Army Corps of Engineer funds used to pay the contractor, projects for Iraq which are funded by the U.S. Government will need to be cancelled or significantly reduced in order to replace the USACE funds. Paying these invoices with DFI Funds will maximize the support to all Iraqis and enhance the citizen's Quality of Life.

Sincerely,

ROBERT GILBEAU
CAPT, SC, USN
Commanding

Attachments:
1. Service & Administration Support
2. Task Force Restore Iraq Oil (TF RIO)
3. Task Force Restore Iraq Electricity (TF RIE)
4. Spreadsheet of Contracts

REPUBLIC OF IRAQ
Minister of Finance Office

Endorsement

Date:

Pursuant to my authority as the Minister of Finance for the Government of Iraq, I hereby authorize the payment of the $11,284,025.06 USD from the DFI Sub-Account for full payment of the Quality Assurance oversight for the Sewer Projects, Refurbishment and Preservation of Iraq's Fuel Distribution Capacity, and Refurbishment of Iraq's Electrical Infrastructure in the amount of $11,284,025.06.

Baqir Jabr al Zubaydi
Minister of Finance

Packages for S&A and USACE

| Voucher # | Contract Number | Ministry | [redacted] | Product or Service | Status |
|---|---|---|---|---|---|
| 2715 | DFI-06-0001/Various | MMPW | [redacted] | QA for Fallujah Sewer Projects (USACE) | Preparing for Special Submission, BG Walsh Ltr #1 |
| 2716 | DFI-06-0001/Various | MMPW | [redacted] | QA for Fallujah Sewer Projects (USACE) | Preparing for Special Submission, BG Walsh Ltr #1 |
| 2717 | DFI-06-0001/Various | MMPW | [redacted] | QA for Fallujah Sewer Projects (USACE) | Preparing for Special Submission, BG Walsh Ltr #1 |
| 2718 | DFI-06-0001/Various | MMPW | [redacted] | QA for Fallujah Sewer Projects (USACE) | Preparing for Special Submission, BG Walsh Ltr #1 |
| 2719 | DFI-06-0001/Various | MMPW | [redacted] | QA for Fallujah Sewer Projects (USACE) | Preparing for Special Submission, BG Walsh Ltr #1 |
| 2720 | DFI-06-0001/Various | MMPW | [redacted] | QA for Fallujah Sewer Projects (USACE) | Preparing for Special Submission, BG Walsh Ltr #1 |
| 2721 | DFI-06-0001/Various | MMPW | [redacted] | QA for Fallujah Sewer Projects (USACE) | Preparing for Special Submission, BG Walsh Ltr #1 |
| | **DFI-06-0001 SUB-TOTAL** | | **$277,669.19** | | |
| 2713 | DFI-06-0002/Various | Baghdad Amanat | [redacted] | Quality Assurance for Baghdad Sewer Projects (USACE) | Preparing for Special Submission, BG Walsh Ltr #1 |
| 2714 | DFI-06-0002/Various | Baghdad Amanat | [redacted] | Quality Assurance for Baghdad Sewer Projects (USACE) | Preparing for Special Submission, BG Walsh Ltr #1 |
| | **DFI-06-0002 SUB-TOTAL** | | **$30,894.31** | | |
| **JCCI S&A TOTAL** | | | [redacted] | | |

| Voucher # | Contract Number | Ministry | [redacted] | Product or Service | Status |
|---|---|---|---|---|---|
| 2668 | DACA63-03-D-0005 / 0006 & 0010 / Memo from CPA to SWD | Ministry of Oil | [redacted] | Reimbursement to USG for payments; Request for SWD support Pre-GRD work efforts to RIO Program | Preparing for Special Submission, BG Walsh Ltr #2 |
| 2688 | DACA63-03-D-0005 / 0006 & 0010 / Memo from CPA to SWD | Ministry of Oil | [redacted] | Reimbursement to USG for payments; Request for SWD support Pre-GRD work efforts to RIO Program | Preparing for Special Submission, BG Walsh Ltr #2 |
| 2689 | DACA63-03-D-0005 / 0006 & 0010 / Memo from CPA to SWD | Ministry of Oil | [redacted] | Reimbursement to USG for payments; Request for SWD support Pre-GRD work efforts to RIO Program | Preparing for Special Submission, BG Walsh Ltr #2 |
| 2725 | DACA63-03-D-0005 / 0006 & 0010 / Memo from CPA to SWD | Ministry of Oil | [redacted] | Reimbursement to USG for payments; Request for SWD support Pre-GRD work efforts to RIO Program | Preparing for Special Submission, BG Walsh Ltr #2 |
| **JCCI RIO TOTAL** | | | **$2,858,807.22** | | |