Amman, Jordan (Figure 8).[36] Construction began in the fall of 2003, and the facility was up and running within three weeks. The first class of 456 Iraqi cadets arrived in November 2003. As of the time of this assessment, the U.S.-incurred costs for this remarkable accomplishment were $89,558,000 in completed construction and $98,110,000 in operating and maintenance costs (O&M) between November 2003 and January 2005. In addition, $15,970,000 will be spent on pending construction.[37] By present agreement, JIPTC is to revert to full and direct Jordanian ownership around February 2006, when it is anticipated the original goal to train 32,000 Iraqis at JIPTC will be met.[38]

As noted previously, insofar as is possible, MOI's strong preference is to conduct as much IP training as possible inside Iraq. Another dynamic is MOI's decision to discontinue training of raw recruits in favor of in-service training. These considerations drive resource implications for JIPTC, even if training of Iraqis at that venue continues for some time. That, in turn, will entail development of different curricula and, conceivably, recruiting instructors with skills different than those presently engaged.

The IG Team concludes that as the MOI assumes increasing responsibility for and control of the programs, use of JIPTC facilities for training of Iraqi cadets may be discontinued altogether. Any such decision by the MOI would raise multiple concerns. The involvement in IP training by some Coalition partners—importantly to include Jordan—would be at risk. Despite a history of often-troubled bilateral relations between Baghdad and Amman, the Jordanians arguably are the non-Iraqi Arabs most supportive of efforts to stabilize the situation in Iraq. The political legitimacy and outreach of the Iraqi Transitional Government (ITG) will be diminished if other governments withdraw from participation at JIPTC.

**Recommendation 20:** The Department of State must keep Coalition governments apprised of developments at JIPTC, specifically those that relate to provision of training staff at that facility. (Action: Department of State's Bureau of Near Eastern Affairs in consultation with INL.)

Under any anticipated scenario, future utilization of the JIPTC facility will come into focus when the targeted goal of 32,000 Iraqis complete training there. Some consideration is being given to transforming the facility into a regional International Law Enforcement Academy (ILEA), similar to those established in Hungary, Botswana, and Thailand. The permissive operating environment in Jordan has obvious merit, as does proximity to regional governments that might want to send trainees there. Conversion of JIPTC concomitantly would give the U.S. Government a better return on its investment.

---

[36] The State Department OIG conducted a contract procurement audit of this contract (AUD/IQO-04-47, September 2004).

[37] Figures supplied by JIPTC. Without reflecting additional expenditures (e.g. post January, 2005 O&M costs), the costs— assuming achievement of the JIPTC goal of 32,000— would be about $6,364 per trainee.

[38] During fieldwork for this assessment, negotiations were undertaken to extend the U.S – Jordanian agreement through June 2006. Concurrently, plans were in train to recruit international instructors for that extended program duration.

Informal soundings indicate that the Government of Jordan may be amenable to such a proposal.

| |
|---|
| **Recommendation 21:** The Department of State should decide whether and where an ILEA should be established in the Middle East. If Jordan is selected as a venue, negotiations for such a transformation of JIPTC should proceed quickly. (Action: Department of State's Bureau for Near Eastern Affairs in consultation with INL.) |

One of the issues particularly vexing in relation to training at JIPTC is the MOI's frequent tardiness in paying the cadets. By agreement, cadets are paid after the first four weeks of instruction and upon graduation. The failure of the MOI to forward salary funding on a timely basis (and, hence, JIPTC's inability to pay the cadets) has prompted serious disturbances. To forestall such incidents, INL on seven occasions (prior to mid-April 2005) 'advanced' funds against an MOI commitment to reimburse the amounts. MOI did not provide funds to cover salary payments due on April 24 and 26, 2005. Hence, JIPTC requested an advance of $429,350 to cover those costs. That brought MOI arrearages to approximately $840,000. Although INL staff has concluded that the procedure is permissible, this episodic financial exposure and vulnerability incurred by INL is troubling.

To address this problem, the JIPTC Director is pressing to have MOI make the second payment when the trainee returns to Iraq. Such a solution would help solve the tracking problem previously discussed and establish a procedure for enrolling graduates on the IPS roster. This procedural improvement should be pursued. It only partially addresses the problem, since MOI delinquency in making the first salary payments might still occur.

| |
|---|
| **Recommendation 22:** Coalition commanders should obtain from the Iraqi Ministry of Interior a written commitment to assume responsibility for direct payment of the salaries of Iraqis trained by the Coalition at JIPTC. (Action: MNF–I in coordination with MNSTC–I and Embassy Baghdad, and in consultation with MOI) |

Coordination between CPATT officials and JIPTC staff considerably improved with the assignment of a CPATT liaison officer in early 2005. High-ranking MNSTC–I and CPATT officials visit JIPTC with some frequency, normally to attend graduation ceremonies. Although some JIPTC instructors and staff desire more feedback from Iraq, the IG Team was impressed with the constructive dialogue among stakeholders.

Even so, it is difficult for JIPTC instructors to fully relate to the circumstances that will confront trainees once they are full-fledged members of the IPS. Direct exposure by International Police Trainers (IPTs) to the 'street situation' in Iraq would be of significant value. JIPTC leaders are pursuing the concept of an exchange of instructors to achieve that end. Not all of the 16 governments presently represented among the JIPTC staff will permit members of their respective contingents to go to Iraq. Individual instructors also may not be willing to do so. However, the IG Team strongly endorses this initiative.

## Guiding the Ministry of Interior on Target

The lack of SOPs and utilization of even basic information technology hampers the MOI ability to manage the IPS. High on the list is the need for a centralized, computerized financial management and personnel system.

During the CPA period, Coalition officials—primarily Americans—were de facto ministers throughout the Iraqi governmental structure. With the June 2004 transition to the Iraqi Interim Government (IIG), the Iraq Reconstruction Management Office (IRMO) was created within Embassy Iraq.[39] As Iraqi officials assumed leadership of ministries, the CPA-appointed officials ceded place to IRMO advisors. As with many CPA advisors, the latter are appointed as '3161' U.S. Government employees.[40]

Establishing and maintaining internal security remains the top priority of both the Coalition and the Iraqi Transitional Government (ITG). It follows that assigning advisors to the MOI commands more IRMO personnel resources than any other area of governance. IRMO staffing plans provide fifty-one '3161' personnel to the MOI. In practice, only thirty-five are assigned—still the largest number of advisors within any Iraqi ministry. The IRMO senior advisor and his immediate staff have offices collocated with one of those of the Minister of Interior. At the time of this assessment (with the IIG still in place), that advisor met with the Minister on a daily basis, sometimes several times each day. The advisor's focus appropriately was on broad policy issues, to include those relative to police training.

While the work of the senior advisor has been very important and largely successful, the IG Team perceives that IRMO assistance to the MOI should advance to more technical levels.

At present, the MOI personnel management system is conceptually centralized, but lacks key feedback mechanisms. The system is not computerized, nor does the system deal with payroll issues. Personnel and payroll are interrelated functions, but are handled independently. Payroll is managed on a manual, ledger basis. Data collected by the Qualifying Committee will be grist for developing modern payroll and personnel administration within the ministry.

The assignment of advisors to the MOI must match mutually perceived needs and capabilities. The IG Team shares a view expressed frequently by Coalition and Embassy Baghdad officials that the greatest immediate need is for assistance in technical areas. However, as on other issues involving interaction on police training, the requirements for advisors to the MOI must be defined in close consultation with ITG officials.

---

[39] IRMO is conceived as a temporary organization. The office is under authority of the Chief of Mission.
[40] Section 3161 of 5 U.S.C. provides for the establishment of temporary organizations under law or executive order, exempt from federal employee hiring requirements, e.g., classification and competition.

**Recommendation 23:** Embassy Baghdad should work with the Iraqi Ministry of Interior to define areas in which Coalition advisors can play useful roles. (Action: Embassy Baghdad in collaboration with IRMO and consultation with MNSTC–I.)

**Recommendation 24:** Top priority should be given to recruiting '3161' personnel qualified to fill positions as defined jointly by Embassy Baghdad and the Iraqi Ministry of Interior, then to assigning a full complement of such advisors to the Ministry of Interior. (Embassy Baghdad through IRMO.)

Elsewhere in this report is a discussion of the Qualifying Committee (QC), the joint Coalition/MOI effort to establish baselines for MOI employees. As of March 2005, the QC process had collected data on about 92,000 MOI employees in 13 of Iraq's 18 provinces.

Presumably the majority of those on whom data is collected are members of the IPS. Once organized and readily accessible, this material will enable the MOI manage the force in terms of assignments, promotion, discipline, mentoring, and additional training. So long as the Coalition and/or Embassy Baghdad are involved in police training, it is imperative to have access to such information. Equally important is the need for SOPs for IPS personnel administration.

**Recommendation 25:** Embassy Baghdad should obtain from the MOI a written commitment to assure Coalition authorities can access data relevant to tracking and mentoring IPS personnel trained in U.S. Government-funded programs. (Action: Embassy Baghdad in consultation with MNSTC–I.)

**Recommendation 26:** Coalition and MOI officials should develop standard operating procedures for personnel administration of the Iraqi Police Service. (Action: MNSTC–I in coordination with Embassy Baghdad.)

## Intra-USG Coordination

Disregarding, for the moment, international participation in Iraq's security development, the complex interrelationships of U.S.-only organizations involved in developing a viable IPS are daunting and problematic. The resources being invested in developing security within Iraq and the importance attached to that effort require harmonious and close working relationships among the various USG agencies concerned. Thus far, coordination among agencies has been collegial.

Part of the problem is the number and variety of participants. NSPD–36 gives the DoD lead responsibility in rebuilding the IPS. However, DoD must solicit assistance from other agencies that specialize in nation-building activities. For reconstitution of police functions in a nation-building scenario, the DoD must rely on the expertise resident in other agencies. These agencies include the State Department's Bureau for International Narcotics and Law Enforcement Affairs (INL) and the Justice Department's International Criminal Investigative Training and Assistance Program (ICITAP). Additionally,

consultants from the Iraq Reconstruction Management Office (IRMO) serve an important advisory role in assisting the Ministry of Interior develop policy and processes for the IPS.

To focus the overall security training and equipping effort in Iraq, DoD established the Multinational Security Transition Command–Iraq. Under MNSTC–I, the Civilian Police Assistance Training Team (CPATT) has the lead for police issues.

ICITAP has continuously engaged the Iraq police training issue since early 2003. They have an active voice in policy issues by virtue of maintaining a presence on the CPATT staff.[41] Such is not the case with INL. Organizationally, INL maintains a separate two-person office in Embassy Baghdad providing administrative support for contracted IPLOs in Iraq, but they are on the periphery of the in-country decision-making team.

Institutional and philosophical differences in approach exist between MNSTC–I and INL with regard to training police. INL (and ICITAP too for that matter) views police training as a subset of an overarching criminal justice, institutional development continuum. Theirs is a long-term view. They recognize the critical importance of developing a transparent, community policing function that is intimately linked to the court and prison systems. INL knows that when the military mission is completed, the police development mission will revert to them.

In contrast, MNSTC–I has a more short-term view. As a military organization, MNSTC–I is interested in completing the mission; at the moment that mission is to train, equip, and deploy 135,000 IPs. The military metric for success is "hitting the number." Thus, the sooner the mission is completed, the sooner success is attained.

The IG Team recognizes the value an outside voice brings to the spirit of debate. However, the team is convinced that the interests of all parties would be better served if INL were represented "within" the organization responsible for mission accomplishment. Given the eventual transition of responsibility, from DoD to DoS, for U.S. involvement in Iraqi police training coordination, active INL engagement at the appropriate level within the Coalition military establishment would be especially valuable in developing plans for that changeover.

**Recommendation 27:** The Department of State should assign one or more INL officers to work directly within CPATT to ensure INL perspectives are considered in the development of the IPS. (Action: Department of State in coordination with Embassy Baghdad and MNSTC-I.)

[41] One of the principal deputy commanders at CPATT is from ICITAP.




**Figure 9. Coalition police training coordination/relationships**
*(Courtesy: MNSTC–I)*

Coordination between the trainers and war fighters within the MNF–I family is an issue. Figure 9 above reflects the top-level command relationships within MNF–I with respect to police training. Multinational Corps–Iraq (MNC–I) exercises tactical command over the military Major Subordinate Commands (MSCs),[42] but MNSTC–I must coordinate through the MSCs to obtain police recruits, to obtain IP station assessments, and, in some cases, to have the regional MPs provide local police training. The MP Brigade in the Baghdad area worked very closely with CPATT/MNSTC–I to provide services and assistance to the local police. But service provided in distant provinces is often "hit-and-miss" and not coordinated through a single command structure. This is evident in the shotgun approach to equipment issuance. There is no single source for equipping the Iraqi police. Sometimes they receive their supplies from MSC sources, at other times from MNSTC–I sources. The establishment of the Provincial Police Partnership Teams should help to alleviate this problem.

## Toward Disengagement: Transitioning Police Training to the Iraqis

Unless and until the Iraqi government, through the MOI, takes full "ownership" of the IP training program, the Coalition will fall short in helping to create an effective police force, with the attendant result of prolonged military deployment in country. Transfer of ownership to the Iraqi government will involve more than the mere development of

[42] The Major Subordinate Commanders exercise control over the six major geographic areas of responsibility (AORs) within Iraq.

police infrastructure and processes, but a deliberate effort to have the Iraqis make the decisions about its police force structure and the training attendant to it.

Perhaps the first and most obvious step in migrating control of the police training function to the Iraqi government is to ensure they are completely engaged in decisions about their training today. This has not always been the case. Heretofore, Coalition process has followed the example set by the CPA—directing by decree rather than collaborative engagement. A senior CPATT official told the IG Team, "...many of us do not realize that CPA has gone away. We have not asked the Iraqis what they want or need." This attitude is evident in Coalition initiatives to establish, under the MOI, the Emergency Response Unit (ERU) or the Bureau of Dignitary Protection (BDP). The MOI was not consulted on their development, disavows ownership of them, and provides only grudging support. Referring to Coalition-initiated police units, the same CPATT interlocutor continued, "...the MOI was not engaged, does not want them. We are interfering with their sense of operations/order."

MNSTC–I and CPATT have made positive strides in this area. They have meetings with Iraqi counterparts regarding training issues on a daily basis. CPATT has assigned a large number of its personnel to act as consultants, in coordination with IRMO, to various parts of the Ministry of Interior. They are also integral parts of the Police Partnership Teams assigned to the MOI.

As responsibility for police training moves to the Iraqi government, the Coalition needs to shift correspondingly into a strictly support role. This can be accomplished by continuing to provide policy advisory services through IRMO and sustained manning of the P3 or similar programs.

The "handoff" of responsibility for IPS training and force development will be a process, not an event. Attention must be given to formulating—in close consultation with Iraqi counterparts—an agreed upon plan for that process. The relegation of responsibility for police training need not be limited to the upper level management of the MOI in Baghdad. Coalition planners should recognize that ownership of portions of the overall program can and should proceed at a different pace in different regions of the country. Security within the Kurdish region, for example, is already sufficiently developed that Coalition military involvement in IP recruiting and training can be significantly reduced. Similarly, some areas in southern Iraq are adequately stabilized to the point where a move toward complete Iraqi responsibility for training may be accelerated.

**Recommendation 28:** MNSTC–I should perform an assessment of security and IPS infrastructure development by province to identify opportunities where additional responsibility for IPS training can be transferred to Provincial Police. (Action: MNSTC–I in consultation with the MOI.)

As Iraqi leadership assumes more responsibility for the planning and operation of the IPS training and force development process, great care must be exercised to allow them the leeway to use their own initiative and allow them to occasionally "fail." Achieving the

delicate balance between support and dependency is crucial to developing a robust system capable of operating on its own.

## Future U.S. Involvement in Police Training

At an unspecified date, responsibility for U.S. interaction with the Iraqi government on security matters is to shift from the DoD to DoS.[43] The Secretaries of State and Defense are to determine the timing of that transition. The IG Team subscribes to the proposition that this shift will depend on when Iraq emerges from the existing environment of conflict. Nevertheless, it is timely to plan for the post-conflict role for the U.S. Government in organizing, equipping, and training the Iraqi security forces, specifically the IPS.

In relation to the IPS, shifting direct authority to the Secretary of State and Chief of Mission (COM) will entail a corollary transfer of responsibility from MNSTC–I and CPATT to INL. Previous extensive INL experience in conducting police training, buttressed by a supporting role in present IPS programs in Iraq, prefigures what should be a smooth transition.

Issues to be addressed in anticipation of the changeover include the nature of future engagement (e.g., whether this will entail instruction by U.S. Government employees and, if so, how many). Similarly, if INL-supervised training is to be performed by personnel from other agencies (notably, Department of Justice ICITAP, ATF, or FBI employees) or by contactors, preliminary plans should define issues such as numbers required, tours of duty, etc. The presumption of a non-conflict environment (or much lower level of violence than at present) does not preclude the necessity to project security-related requirements that will devolve to the Department of State as Coalition military forces draw down.

**Recommendation 29:** The Department of State should propose that the National Security Council establish an inter-agency working group with representatives from the Departments of State, Defense, and Justice. The working group should identify issues to be addressed for the transfer of police training responsibilities from DoD to DoS. (Action: Department of State, Bureau of Near Eastern Affairs, in consultation with Embassy Baghdad, MNF–I, MNSTC–I, and INL.)

Logically, control over funds appropriated for programs relevant to U.S. Government involvement in IPS programs should rest with the Department responsible for those programs. Nonetheless, legislation under consideration states that such control will remain with the Department of Defense. Whether or not that formulation prevails, preparation of interdepartmental agreements on responsibility for financial management (specifically to encompass internal controls) will make the transition of program responsibilities smoother.

[43] NSPD-36 of May 11, 2004.

**Recommendation 30:** The Departments of State and Defense, in consultation with the Office of Management and Budget (OMB), should prepare a memorandum of agreement (MOA) to define funding arrangements for future U.S. involvement in Iraqi Police Service-related programs. (Action: Department of State's Bureau of Resource Management (RM) and Department of Defense's Office of the Under Secretary for Policy in consultation with OMB.)

# Chapter 5: Informal Recommendations

**1. Issue:** At JIPTC, one of the aspects of poor discipline is related to a misperception among cadets of what conditions/regulations pertain at that facility. For example, some of those interviewed by the IG Team expressed surprise at the fact that they are not permitted to leave the base. Others asserted that they had not been informed about limits on communicating with their families in Iraq, etc.

> **Recommendation:** Prior to departure from Iraq, JIPTC enrollees should be given orientation on living conditions, rules, and regulations that will form the framework of their experience while in Jordan. The orientation should be crafted by JIPTC staff, approved by CPATT, and conducted by IP personnel.

**2. Issue:** At each of the IP training facilities visited by the IG Team in Iraq, cadets are responsible for cleanliness and appearance of their barracks. In addition to instilling discipline and a sense of responsibility, this is cost effective. Contrarily, at JIPTC a commercial contractor performs these housekeeping chores.

> **Recommendation:** When and as permitted under the existing contract, trainees should be responsible for maintaining barracks at JIPTC, preferably monitored and enforced by Iraqi instructors or group captains.

**3. Issue:** Few among the cadre of international instructors speak Arabic. The need to work through consecutive interpretation using language assistants (LA) slows the process measurably. It also poses issues of quality of interpretation (depending on the skills of the respective LA) and the possibility that the LA, deliberately or inadvertently, takes over the function of the instructor. The need for interpretation could be reduced through greater use of audiovisual instruction (specifically on material such as Iraqi law).

> **Recommendation:** CPATT should work with the MOI to develop audiovisual presentations on select classroom topics. These materials should be narrated by Iraqis, thereby ensuring greater comprehension. With such audiovisual material presented to classes at all academies, an additional benefit would be standardization of instruction on these topics.

**4. Issue:** There is a widely held perception that the advanced courses for IP, most conducted at Adnan Palace in Baghdad, are too short in length and that numbers of candidates for these courses are selected by the MOI on non-merit criteria. The course content should also be under continuous review.

> **Recommendation:** CPATT should work with the MOI to establish formal criteria for IP nominations for advanced training and to assure concurrence on the content and duration of such training.

# Appendix B — History and Background of Iraqi Police

## Police Training Under Saddam

Three levels of police existed under the previous regime: Non-Commissioned Officers (NCOs), Assistant Officers, and Officers.[44] At the most basic level, NCOs possessed little formal education, normally only completing primary school. When hired, they were trained within their provincial area in an unstructured program that could last up to three months. Standards and length of training varied widely from province to province. Upon graduation, NCOs were responsible for most of the daily contact with Iraqi citizens. NCOs were the first responders to calls for service and were responsible for dealing with disputes and for the maintenance of public order.

At the mid-grades, Assistant Officers completed secondary school education, usually from the Police High School, and then underwent on-the-job training. They were normally assigned to various administrative functions within the Iraqi Police Force. They would only respond to serious crimes and only in a supervisory capacity. Their duties usually consisted of administrative work for the Officer corps.

Officers were also secondary school graduates, but were further educated at the Police Professional College in Baghdad, undergoing a three-year course of instruction. Upon graduation, the Officers received the equivalent of a Bachelor's degree in police science; however, the curriculum was steeped in military doctrine and training. After graduation, the academy Officers were posted around the country and normally served in the assigned region for the rest of their careers. Traditional training in leadership, management, and command and staff functions was not institutionalized.

## Police Training Developed Under Coalition Provisional Authority (CPA)

In 2003, the Coalition Provisional Authority (CPA) took the first steps to assist the Ministry of Interior (MOI) in developing an Iraqi Police Service (IPS) that would be a respected force based on public trust and confidence. Creating this force from the brutal and corrupt remnants of the Saddam regime police would probably have required dissolution of the entire force and slow rebuilding into a force that echoed the new democratic ideals of Iraq. The security situation, however, dictated rapid infusion of police into the cities and governorates, a requirement that mandated an accelerated training program. To optimize required quantity and equally-important quality, CPA designed a program based on the International Criminal Investigation Training Assistance Program (ICITAP) "Kosovo" model that would give police recruits eight weeks of training. They planned to complement the eight-week basic program with a structured on-the-job training program[45] guided by an experienced mentor.

[44] (Note: Iraqi NCOs are unlike U.S. NCOs and a direct comparison should not be made.)
[45] Also known as "Field Training"

In order to meet the capacity required, two academies were established: the Baghdad Public Safety Academy (more recently renamed the Baghdad Police College) and an academy in Jordan, outside Amman, the Jordan International Police Training Center (JIPTC). Several regional academies were subsequently added.

The basic training instructional program consisted of two distinct, but integrated, components: academy training and field training. New police recruits would spend two months at one of the academies, training in modern policing methods. New cadets would receive 320 standardized hours of intensive education in modern policing techniques. The basic course would include academic and practical training in firearms (pistols), defensive tactics, and emergency vehicle operation. The academic instruction also included policing in a democracy, constitutional framework, human rights, use of force, police ethics and code of conduct, gender issues, community policing, traffic accident management, etc.

For recruits who completed the academy courses, the concept prescribed subsequent participation in a structured field training program, focusing on the practical application of the coursework and seeking further development of proactive, service-oriented policing skills. During this probationary period, newly-graduated cadets were to be paired one-on-one with a senior Iraqi Police Service (IPS) Field Training Officer (FTO), who would function as a mentor. International Police Advisors (later renamed International Police Liaison Officers (IPLOs)) would oversee the program. The concept consisted of four phases conducted over a six-month period involving daily, weekly, and monthly evaluations by senior IPS FTOs.

The CPA plan relied upon building a foundation in the classroom, but also counted on the structured and mentored training that was to occur in the months following graduation. In March 2004, the Civilian Police Assistance Training Team (CPATT) was established, and an initial Field Training Coordinator Program was implemented locally in Baghdad. Unfortunately, the deteriorating security environment, coupled with a dearth of experienced IPS and insufficient numbers of International Police Liaison Officers (IPLOs), precluded full implementation of the mentoring program.

## Police Training Developed Under Multinational Security Transition Command–Iraq (MNSTC–I)

In June 2004 the Multinational Security Transition Command–Iraq was established to assume responsibility for all Coalition-sponsored security training for Iraqi Security Forces (ISF), including the IPS and the Iraqi Military. CPATT was organizationally aligned under MNSTC–I.

By the end of 2004, it was evident that a viable IPS mentoring program could not be established, and that IPLOs would not be able to bridge the gap because of security issues and the sheer numbers required. As a result, the curriculum was significantly changed, adapting it to prepare the trainees to meet the threats and risks they were going to face as

police on the street. Whereas previously, recruits spent 25 percent of the time at the academy on practical exercises, with the remaining time spent on academics; that ratio is now roughly reversed. The academic program is being reduced from 40 to 20 subjects and a modular program creates flexibility to adjust the program in rapid response to operational lessons learned. Greater emphasis is now placed on critical tactical operations. All of these instructional areas are reinforced with hands-on field exercises with the greatest possible realism. In an example of one of the changes being incorporated, the existing driving track is being modified to accommodate both driving instruction and scenario-based training on improvised explosive devices. A mock IPS station is also being constructed to familiarize trainees with the environment they will encounter in the field. Instead of marksmanship training that focused primarily on pistols, more extensive AK–47 training is being added.

# Appendix I — International Criminal Investigations and Training Assistance Program (ICITAP) Comments

June 24, 2005

Ambassador David E. Zweifel
Department of State
SA 3, Suite 8100
2121 Virginia Avenue, NW
Washington, DC 20037

RE: Draft Report: Joint Assessment of Iraqi Police Training

Dear Ambassador Zweifel:

DOJ/ICITAP greatly appreciates the opportunity to comment on the draft "Joint Assessment of Iraqi Police Training ("Report"). The Department compliments the IG Team's efforts to address this extremely important and enormously complex initiative.

DOJ concurs with many of the Report's recommendations, which support the original conclusions and standing recommendations formulated by ICITAP professionals throughout both the pre- and post-conflict period. Regrettably, the Report in our view minimizes, and in certain instances omits, the crucial leadership role that ICITAP has played over the last 30 months, and continues to play in the development of the Iraqi Police Service (IPS). The Report is and should be forward looking. However, a description of the efforts of ICITAP and the Coalition military since May 2003 to develop the Iraqi Police Service (IPS) is essential to understanding the current environment and ongoing challenges. In January/February 2003, the ICITAP representative detailed to ORHA developed a series of planning recommendation papers. In May 2003, ICITAP led the law enforcement team that prepared a detailed assessment of the Iraqi Police. The ICITAP recommendations to ORHA, and the May 2003 ICITAP IP Assessment combined to become the roadmap for development of the new IPS. Since the summer of 2003, ICITAP and the Coalition military have forged a strong and productive working relationship to train, equip, mentor and deploy IPS personnel and to develop the IPS as a sustainable and productive law enforcement institution. The Report fails to describe that partnership and its accomplishments. Given ICITAP's role as the primary lead in police training and development initiatives in Iraq, the absence of an affirmative recommendation that ICITAP continue in this role is inexplicable.

The facts demonstrate that DOJ/ICITAP is deeply invested in the success of the USG's law enforcement (police and corrections) missions in Iraq. As the Report notes, ICITAP and DOD jointly founded the Civilian Police Assistance Training Team (CPATT). Since CPATT's inception an ICITAP Senior Law Enforcement Advisor (an FTE) has held the principal deputy position (the equivalent of a one star general). ICITAP has also developed and/or delivered more than 15 distinct basic, advanced or specialized police training courses. Over 330 ICITAP

International Police Trainers (IPTs) are actively deployed in Iraq and Jordan in support of these efforts.

ICITAP is not a private for-profit contractor. ICITAP is the USG's lead implementing agency in the area of international law enforcement development and training worldwide. ICITAP has been significantly involved in every international post-conflict U.S. criminal justice assistance program: Panama, Haiti, Slovenia, Bosnia, Croatia, Kosovo, East Timor and Iraq. Unlike any commercial contractor, ICITAP draws upon the considerable law enforcement operational and developmental experience and expertise of the Department of Justice in formulating police assistance technical assistance and training. ICITAP's leadership in the advancement of the IPS, both within CPA and CPATT, reflects almost 20 years of unequaled experience in the field of police training and development. ICITAP continues to be dedicated to inter-agency cooperation and the ultimate success of the USG's mission in Iraq.

The United States has highly significant national security and operational law enforcement interests in Iraq. The Department of Justice has a lead role both in protecting our national security and preventing and prosecuting terrorism and other transnational crimes. In our view, the Report should give greater consideration to those interests when addressing how to prospectively staff and manage Iraqi police development and training programs. There is a critical nexus among USG operational law enforcement imperatives, strong partnerships between U.S. and Iraqi law enforcement agencies, international norms and practices, and the training and technical assistance provided to the Iraqis. Neither private contractors nor other agencies possess the Department of Justice's combination of law enforcement operational responsibility, international law enforcement expertise and rule of law institution building. We believe that it is axiomatic that DOJ should continue to be the lead in developing and training the Iraqi Police Service and rule of law institutions. It is unfortunate that no representatives from DOJ were included in the DOS/DOD IG Team in order that this view might be represented.

DOJ believes strongly that the Report should unequivocally recommend that DOJ/ICITAP continue as a principal partner and leader in the planning and management of IPS development and training programs in the future.

Attached as Appendix A are proposed clarifications with respect to a number of specific assertions in the Report. We would be glad to meet with you to discuss this further.

We look forward to continuing to work with the DOS/DOD IG Team.

Sincerely,

Joseph M. Jones
Chief

**United States Department of Justice**
**Response to DOS/DOD Draft Joint Assessment of Iraqi Police Training**
**June, 2005**

**Appendix A**

**COMMENTS/CLARIFICATIONS**

**Page 4: Purpose of this Assessment (cont.)**

The Report states: *The DOS Bureau of International Narcotics and Law Enforcement (INL) possesses the institutional resources to carry out that function and, therefore, were tasked, even before NSPD-36, to develop an appropriate training program for the Iraqi Police Service. Consequently, the Joint International Police Training Center (JIPTC) was established in Amman, Jordan.*

Proposed Substitution:
DOJ/ ICITAP deployed a team to Iraq on May 15 2003... ICITAP, using funding provided by INL, was tasked to assess the Iraqi police and, simultaneously, develop the appropriate training programs for the IPS in both Iraq and Jordan. It was ICITAP's Senior Law Enforcement Adviser in Kosovo, Steve Bennett, who established and managed the Jordan International Police Training Center (JIPTC) on behalf of CPA.[1]

**Page 5: Putting Police Training in Context (cont.)**

The document states: *Thus, despite obvious weaknesses, the IG team concludes that CPATT programs have resulted in qualified success.*

This is the first mention of *CPATT* in the Report. CPATT's establishment, purpose, and the integral role of ICITAP in its operation should be explained at this point in the Report to provide context.

Proposed Substitution:
CPATT was established in March of 2004 prior to the formation of MNSTC-I through a joint effort by DOD and DOJ/ ICITAP.

**Page 7: Key Judgments (cont.)**

The Report states: *Concurrent with the ultimate assumption of full responsibilities by the Iraqi government and consistent with the May 11, 2004, NSPD-36, plans need to be formulated for assumption of residual USG training responsibilities by the Department of State.*

---

[1] Since May 2003, ICITAP has developed the following instructional programs for the Iraqi Police Service: Basic Training, TIP, FTO, Basic Criminal Investigations, Kidnapping Investigations, Civil Disorder Management, Internal Controls, Incident Command, Executive Leadership, Mid-level Management, 1st Line supervision, Train-the Trainer, Trainer Staff Development and Election Security Train-the-Trainer.

Proposed Substitution:
Plans need to be formulated for assumption of residual USG training responsibilities by the Department of State with *"**continued program design, management and implementation by the Department of Justice, ICITAP**".*

**Page 13: <u>Training to Iraqi-perceived Needs</u> (cont.)**

The Report states: *Adjustments have been and are being made. During this assessment, the JIPTC staff completed revision of the basic curriculum to include more 'hands on,' self-protection exercises.*

Proposed Substitution:
The authority of CPATT over both JIPTC and the Baghdad Academy is made clear later in the Report (See p. 24, fn 25 [see below]). We propose that CPATT's responsibility for quality assurance/control over JIPTC be described at this earlier point in the Report. Without that explanation, the current text could be interpreted as suggesting that JIPTC operates separately and outside of the direction and control of MNSTC-I and CPATT.

*Footnote 25 - CPATT directed JIPTC's staff to modify the basic training curriculum to incorporate survival skills, while retaining the same eight week duration.*

The Report should indicate that the primary personnel involved in the rewrite of the basic training curriculum were ICITAP International Police Trainers stationed at JIPTC and other international police officers.

**Page 19: <u>Recruiting and Selecting Trainees</u> (cont.)**

The document states: *To bolster the force, the **<u>CPA recruited an additional 30,000 police in 30 days</u>**. The driving objective was to produce 'boots on the ground.' In doing so, the CPA enunciated minimal requirements for entry into the IPS.*

Proposed Substitution:
This section needs clarification. In fact, CPA did not itself recruit, nor did it issue any order to recruit an additional 30,000 police in 30 days. Prior to the first graduation of 466 new IPS recruits on January 29, 2004, from the CPA/ICITAP established basic training academy in Jordan (JIPTC), the increases in IPS numbers <u>were carried out by the CJTF-7 and the Major Subordinate Commands (MSCs)</u>. Prior to the start of the CPA approved basic training programs, the overwhelming majority (almost 100%) of this increase likely occurred in MSCs outside of Baghdad. This may be verified through the CJTF-7 weekly reports submitted by the MSCs.

In June 2003, the CPA staff drafted for the CPA Senior Advisor to the MOI, a document entitled *Recommendations and Strategies for "reconstituting" an interim IRAQI Police service. Section 3, Vetting of Current Personnel,* articulated basic minimum requirements for vetting existing police officers who had returned to service. The requirements include those listed in footnote 17

of Sec. 3; although this is not a complete listing. But, in any case, this document was not an authorization by CPA for the hiring of new IPS recruits without a formal/approved basic training program. These vetting standards also became the foundation for the formal recruiting criteria at the JIPTC and Baghdad academies.

**Page 26: <u>Transition and Integration Program</u>**

The Report states: *From the outset it was apparent that veteran police – those who served during the Saddam Hussein era – must be retrained with the objective of instilling modern police techniques, respect for human rights, and democratic policing principles. To achieve this goal, <u>CPATT developed a training program called the Transition Integration Program (TIP).</u>*

Proposed Substitution:
This section needs clarification. The TIP was not developed by CPATT. The TIP was conceptualized by ICITAP in the fall of 2002 during an assessment of the police in Kabul, Afghanistan. In early 2003 it was refined further for use as a program by a US sponsored international team of trainers led by ICITAP. This team subsequently deployed to Kabul in the spring of 2003. In June of 2003 the ICITAP Iraq team adapted the TIP for members of the then fledgling Iraqi Police Service.

The Report states: *The IG team concludes that the TIP program is a worthwhile endeavor. Many of those who have attended the course appear to be well motivated and dedicated to the concept of a rule of law regime at the service of Iraqi citizens. The TIP training imparts skills directly relevant to those objectives. How and whether the TIP program per se continues will depend in part on the changes proposed by the Minister of Interior. By definition, TIP training is for in-service IPs, one of the Minister's stated objectives.*

Proposed Substitution:
ICITAP, as the developer of the TIP, concurs with the Report's favorable assessment of the benefits of the TIP, which by definition is an in-service training program, and not a "course". The TIP is designed to augment the knowledge, skills and abilities of existing police personnel by introducing them to international standards of policing. The TIP introduces and reinforces the importance of the protection and promotion of basic human rights, the principles of democratic policing, modern policing techniques, the rule of law as set forth in, for example, applicable criminal laws and procedures, laws of arrest and detention, and firearms proficiency. This course is designed to change the philosophy, behavior, actions and activities of all police officers, regardless of their assignment in the agency.

Additionally the TIP was designed and operationalized by ICITAP in the summer of 2003 in order to accomplish several other key tasks:

1. Identify existing IPS personnel that were academically, intellectually, or morally unsuitable;

2. Identify potential leaders within the IPS;

3. Identify potential IPS instructors and field training officers.

The TIP can be easily adjusted by the MOI/IPS with assistance from ICITAP to address changing conditions and dynamics faced by IPS personnel.

**Page 29: <u>Advanced Training</u> (cont.)**

The Report states: *Department of Justice (DOJ) instructors for specialized courses at the Adnan Palace have included professionals from the Federal Bureau of Investigation (FBI), the Bureau of Alcohol, Tobacco and Firearms and Explosives (ATF) and the Drug Enforcement Administration (DEA). Coordination of these efforts in Iraq is done by ICITAP officials.*

Proposed Substitution:
This section needs clarification. The vast majority of DOJ instructors of specialized courses are provided by ICITAP. ICITAP developed and currently delivers a number of advanced courses, including Basic Criminal Investigations, Kidnapping Investigations, Civil Disorder Management, Internal Controls, Incident Command, Executive Leadership, Mid-level Management, 1st Line Supervision, Train-the Trainer, Trainer Staff Development and Election Security Train-the-Trainer. This should be mentioned in the passage.

**Page 33/34: <u>Mentoring</u>**

The Report states: *A strong mentoring component is integral to the concept of training Iraqi police.* ***<u>Initially, this was to be the function of IPLO field training officers, each working closely with a small number of policemen who had received basic training. This would mirror a model that worked satisfactorily in Bosnia and Kosovo.</u>***

This section needs clarification. ICITAP strongly concurs that the development and delivery of a structured and standardized field training program for newly graduated officers is critical to the success of any basic program. This is particularly true when the basic program is so short – in this case eight weeks. However, in the latter part of the summer of 2003 ICITAP was directed by the CPA and CJTF-7 to significantly modify its basic training program by greatly accelerating the pace of new recruit training. This translated into larger classes and a shorter training period. Knowing that its academy program would produce an unprecedented number of new recruits every four weeks, it became quickly evident to ICITAP that there would never be a sufficient number of IPLOs to even approach the "mentor to recruit ratio" that was achieved in Kosovo and Bosnia. Thus, it was ICITAP that designed a field training program modeled after the program ICITAP designed for OSCE in Macedonia in 2001-2003, a program in which the mentor to recruit ratio was much lower than in Bosnia or Kosovo.

As briefly noted on page 48, the program originally designed by ICITAP called for the training of qualified IPS officers to function as the Field Training Officers (FTOs) and for the IPLOs to function as Field Training Coordinators (FTCs). Once new recruits completed the 8-week academy program they were to complete four stages of the field training program in order to be considered a functional police officer capable of independent work. Thus, transforming a new

recruit into a functional police officer (i.e., the Basic Training Program (BTP) would involve four stages:

- Stage I (8 weeks) Basic Academic Instruction – Classroom/Practical
- Stage II (4 weeks) Controlled Activity - Daily/Weekly Evaluations
- Stage III (8 weeks) Directed Activity – Daily/Weekly Evaluations
- Stage IV (12 weeks) Semi- Autonomous Activity - Weekly/Monthly Evaluations

During the field program newly graduated officers were to be assigned to an IPS FTO (most likely a Lieutenant or Captain) who would function as a mentor. The key to the success of the Field Training Program would rest with the training, effectiveness and dedication of those officers selected to serve as FTOs. A new recruit's development would be documented through the use of a Professional Development Record (PDR), which would be created specifically for this program effort. The PDR would provide a programmatic approach to a new officer's development that incorporates structured classroom study and the evaluation of the practical application of learned skills. The PDR would be utilized by the IPS FTO as the principal evaluation tool, and would provide a permanent record of the performance of the recruit during his probationary status. The program would also utilize the limited number of IPLOs as Field Training Coordinators (FTCs). In this way the Field Training Program for all new cadets could be closely monitored. The IPLOs would evaluate the progress of all new cadets as well as the effectiveness of their IPS Field Training Officers through a series of interviews and evaluations during the probationary period. Although ICITAP's field program has not been implemented for the reasons cited by the IG team, the program construct remains sound and readily applicable when conditions permit. .

The Report states: *INL contracted with DynCorp to provide the IPLOs, the first 24-member contingent of which arrived in Iraq during November 2003. Most IPLOs are retired policemen. By March 2005, this number had risen to about 500.* ***INL has proposed funding for an additional 400 IPLOs, bringing combined strength to levels approximating the ratio achieved for mentors in the Balkan situation.***

While additional civilian police manpower would be extremely useful to the overall Iraqi police development and training programs, an additional 400 IPLOs **will not bring IPLO strength to levels even remotely close to *"approximating the ratio achieved for mentors in the Balkan situation"*.** To approximate the ratios of Kosovo or Bosnia numbers for the Iraqi dynamic, would require the deployment of tens of thousands of IPLOs. It should be noted that training and mentoring needs of this magnitude were predicted in the early ICITAP-created planning documents described above.

Comparison of three missions

1. **Kosovo**: Population of 1.9 million, **7,257 Kosovo police trained to** date (30 classes over 5.5 years, average of 242 cadets per class, 1,300 cadets per year) and **4,761 UN CIVPOL mentors** (max in March 2002).

2. **Bosnia**: Population of 4 million, approximately **17,000+ unformed police officers**, and **1,700/2,057 UN CIVPOL mentors** (max in May 2001),

3. **Iraq**: Population of 26 million, **99,864 IPS on duty** and up to **500 US IPLOs.** **Baghdad:** Population of 6.6 million, **15,597 IPS on duty** and approximately **250US IPLOs.**

**Page 36: <u>Whither JIPTC</u> (cont.)**

The Report states: *On April 18, 2003, INL awarded a contract to DynCorp International. Initially conceived to be the mechanism via which to employ IPLOs, the contract evolved into DynCorp responsibility for construction, operation and maintenance of a training center at Muwwaqqar, about thirty miles northeast of Amman, Jordan. Construction began in the fall of 2003, and the facility was up and running within three weeks. The first class of 456 Iraqi cadets arrived in November 2003. As of the time of this assessment, the U.S.-incurred costs for this **<u>remarkable accomplishment</u>** were..."*

Proposed Substitution:
This section needs clarification. The Jordan International Police Training Center (JIPTC) was operationalized under the leadership of ICITAP. At the request of INL and NSC, ICITAP detailed its most senior field Academy Director to establish JIPTC. Steve Bennett, the founder and Director of the Kosovo Police Service Academy, began this initiative in early October of 2003. It was Mr. Bennett and his colleagues from ICITAP, both in the field and DOJ HQ, who combined to develop the curriculum, recruit and name instructors and otherwise create the heart of JIPTC (i.e. its course offerings, instruction and other aspects of a functioning academy). Mr. Bennett took on this assignment only with the condition that he could return to the KPS Academy when, in his judgment, the JIPTC was sufficiently launched. Thus, he continued as the Director until May of 2004, at which time he chose to return to Kosovo. ICITAP continues to provide approximately 65 IPTs for the ongoing training efforts at JIPTC. DynCorp and INL were responsible for the physical construction and financial management of JIPTC. It is troubling that the Report completely omitted Mr. Bennett and ICITAP's seminal and ongoing contributions to this "remarkable accomplishment."

While the Report features the qualifications and contributions of the IPLOs and their contractor, DynCorp, the Report makes no mention of the ICITAP International Police Trainers (IPTs), their contributions or hardships in the operation of the Baghdad Academy and JIPTC. It is widely known that, due to security conditions and the absence of sufficient security equipment (i.e., armored vehicles and personal security details), it was too dangerous for the ICITAP Baghdad IPTs (as well as the corrections advisers) to commute daily from their Red Zone hotel to the Baghdad Academy. Thus, the IPTs were forced to reside under primitive conditions at the Baghdad Academy. (ICITAP Corrections advisers also had to take up residence at the Abu Ghraib prison.)

**Page 39: <u>Recommendation 25</u>**

The Report states: *Top priority should be given to recruiting '3161' personnel qualified to fill positions as defined jointly by Embassy Baghdad and the Iraqi Ministry of Interior, then assign a full complement of such advisors to the Ministry of Interior. (Embassy Baghdad through IRMO and in consultation with MNSTC-I and CPATT.)*

We disagree with this recommendation. ICITAP is uniquely qualified to provide support to IRMO in the area of institutional development and capacity building of the MOI and IPS. ICITAP is the only civilian agency that possesses the institutional knowledge of the Iraq program needed to address the development needs of the MOI. It is inefficient for ICITAP, the lead civilian police training agency, to not have a lead role in rebuilding the MOI. In our view, advisers to the MOI should be hired and managed through ICITAP. ICITAP has worked well with the current Senior Adviser to the MOI (a career DOJ law enforcement professional) and we look forward to the same kind of relationship with his successor.

**Page 40: Intra-USG Coordination: Collegial, But Could Improve (cont.)**

The Report states: *ICITAP has continuously engaged the Iraq police training issue since early 2003. They have an active voice in policy issues by virtue of maintaining a presence on the CPATT staff. Such is not the case with INL. Organizationally, INL maintains a separate two-person office in Embassy Baghdad providing logistics support for contracted IPLOs in Iraq, but they are on the periphery of the in-country decision-making team.*

*Institutional and philosophical differences in approach exist between MNSTC-I and INL with regard to training police. INL (and ICITAP too for that matter) views police training as a subset of an overarching criminal justice, institutional development continuum. Theirs is a long term view. They recognize the critical importance of developing a transparent, community policing function that is intimately linked to the court and prison systems.* ***INL knows that when the military mission is complete, the police development mission will revert to them.***

This section needs clarification. The Report understates the continuing access by INL to both the Chief of Mission/Deputy Chief of Mission (and current Charge d'affairs) and to the senior leadership of CPATT and MNSTC-I. A series of INL officials, including the Assistant Secretary and Principal Deputy Assistant Secretary, have made several trips to Baghdad during which they met at length with these individuals. This has been supplemented by regular communications and correspondence between CPATT and INL senior leadership, as well as by a full-time INL representative who focused on programmatic (rather than logistical) issues. Whatever differences may have arisen between DOD/MNSTC-I and INL were not the result of a lack of access or communication.

Given ICITAP's leadership over the last 25 months and our unequaled experience in law enforcement development and training, DOJ proposes that the Report offer a more clearly articulated message endorsing a DOJ/DOS partnership in which ICITAP continues as a principal partner and leader in the planning and management of IPS development and training programs in the future.

**Page 42: Future U.S. Involvement in Police Training**

The document states: *In relation to the IPS, shifting direct authority to the Secretary of State and Chief of Mission (COM) will entail a corollary transfer of responsibility from MNSTC-I and CPATT to INL.* ***Previous wide INL experience in conducting police training, buttressed by a supporting role in present IPS programs in Iraq, prefigures what should be a smooth transition.***

This section needs clarification. As noted above, in Iraq and other major post-conflict areas over the past twenty (20), international criminal justice assistance programs have been planned, staffed and implemented by ICITAP, in close consultation with INL. This is a partnership that has a proven track record. Other experimental models have fallen well short of the mark, and ICITAP remains the USG's lead implementing agency in the area of international law enforcement development and training worldwide.

Proposed Substitution:
With funding provided by and in close consultation with INL, ICITAP will continue to function as a principal partner and leader in the planning and management of IPS development and training programs, including after the transfer of responsibility from the military to the Chief of Mission and civilian agencies.

The Report states: *Issues to be addressed in anticipation of the changeover include the nature of future engagement (e.g. whether this will entail instruction by U.S. Government employees and, if so, how many.)* ***Similarly, if INL-supervised training is to be performed by personnel from other agencies (notably, Department of Justice ICITAP, ATF or FBI employees) or by contactors, preliminary plans should define issues such as numbers required, tours of duty, etc.***

As noted above, the Department of Justice's review of the Report gives rise to serious concerns both with the omission of ICITAP's lead role and critical contributions thus far, as well as the absence of any affirmative recommendation that ICITAP should continue in that role. DOS and DOJ proceeding in Iraq as partners has been agreed to by senior members of both DOS/INL and DOJ. These are matters of the highest national priority. They should not be left to the sole discretion of a single bureau. The current role and agency responsibilities should not be changed absent compelling evidence to the contrary. The Report contains no such evidence or findings.

**Page 43: Recommendation 30**

The Report states: *The Department of State should propose that the National Security Council establish an inter-agency working group with representatives from the Departments of State, Defense and Justice. The working group should be to identify issues to be addressed for the transfer of police training responsibilities from DOD to DOS. (Action: Department of State, Bureau of Near Eastern Affairs in consultation with Embassy Baghdad, MNF-I, MNSTC-I, CPATT and INL.)*

Proposed Substitution:
While DOJ supports such a working group, the proposal itself should be a joint proposal from DOJ and DOS.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAUDES CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07-4C |
| v. | ) | |
| | ) | (Judge Wheeler) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26, 33, 34, and 36 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant provides the following responses to plaintiff's first set of interrogatories and request for production of documents.

**FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1**: Identify each and every instance in which the Coalition Provisional Authority (CPA) used appropriated funds and either Development Fund of Iraq (DFI), vested or seized funds on the same contract. For each instance, identify:

a. The specific contract;

b. The parties to the contract;

c. The names of the individuals involved with negotiating that contract on behalf of the CPA;

d. The date the contract was executed;

e. The amount of appropriated funds used to fund that contract;

f. The amount of DFI, vested or seized funds used in that contract;

g. Any oral or written modifications to that contract;

h. The names of the individuals involved with modifying that contract on behalf of the CPA; and

i. The date of those modifications.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We object to this interrogatory as not seeking information relevant to this case or reasonably likely to lead to discoverable material. Notwithstanding this objection, we are aware of only one contract for which both DFI funds and United States Government ("USG") funds may be obligated. It is an indefinite delivery/indefinite quality ("IDIQ") contract and the name of the contractor was Washington International, Inc/Black & Veatch. The contract number is: W914NS-04-D-0007. We are seeking to obtain additional information regarding this contract but know nothing more at this time.

**INTERROGATORY NO. 2**: Identify the method and/or criteria by which the Program Review Board decided to allocate the funds available to it to specific projects and/or contracts starting in April 1, 2003 to present. To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

The Program Review Board ("PRB") is responsible for preparing and submitting allocation requests that identify, integrate and prioritize requirements for the relief and recovery activities in Iraq, and proposes allocations of available resources to meet those requirements. The specific roles, responsibilities and membership of the PRB are set forth in the CPA Regulation No. 3, Program Review Board (June 17, 2003), available on the CPA website.

CPA Regulation 4 and a memorandum dated June 9, 2003, entitled "Allocation Process" (earlier provided to you) described the process and we refer you to them. We also refer you to the powerpoint document "DFI Procedures 6 Oct 06" that we previously provided to you. Finally, we note that the minutes of PRB meetings may be perused upon the CPA website.

**INTERROGATORY NO. 3:** Identify the duties and responsibilities of the CPA as such duties relate to contracting prior to June 28, 2004. To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

The Congressional Research Service Report for Congress: "The Coalition Provisional Authority (CPA): Origin, Characteristics, and Institutional Authorities," dated April 29, 2004, addresses this interrogatory. We have separately provided it to you. We note that page 15, "Procurement Activities" and page 18 "CPA Solicitations" are especially applicable. We also refer you to CPA Memorandum 4, "Contract and Grant Procedures," and CPA Regulation 2, "Development Fund for Iraq." These documents may be found in the CPA website.

**INTERROGATORY NO. 4:** Identify the duties and responsibilities of the United States Mission in Iraq after June 28, 2004, including without limitation any duties or responsibilities of the US Mission in Iraq acting as the CPA's agent, and/or assumed duties and responsibilities relating to contract administration, award and dispute resolution. To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We object to this interrogatory as being overly broad, unduly burdensome, and not seeking information relevant to this case or reasonably likely to lead to discoverable material. Moreover, to the extent that the interrogatory asks about the responsibility of the United States embassy as the agent of the CPA, the embassy had none, because the CPA ceased to exist after June 28, 2004. We refer you to our response to interrogatory number 5 for information regarding the PCO's duties in post-CPA contract administration.

**INTERROGATORY NO. 5:** Identify the duties and responsibilities of the PCO after June 28, 2004. To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

The duties of the PCO are outlined in the June 22, 2004 memorandum from Deputy Secretary of Defense Wolfowitz, which is attached, and NSPD 36, previously provided to you. We previously provided you the following documents relating to this interrogatory: the pdf document which title begins "15 Jun 04 - Iraq. . .;" the pdf document which title beings, "28 Feb 05 - DFI;" the pdf document which title begins, "31 Dec 2004 DFI Extension;" the pdf document which title begins "2004-10-05 Authority. . .;" the pdf document which title begins, "Allawi Memo 4 Dec;" the pdf document which title begins, "Ambassador;" the pdf document which title begins "DFI Administrator;" the pdf document which title begins "DFI Arrears. . . ;" and the pdf document which title begins "GOI Receipt of Files." Four ppt documents, previously provided to you, also relate to this subject, the beginnings of their titles are: "DFI Overview 2006-11-21;" "DFI Procedures 15 Oct 06;" "DFI Update 12;" and "DFI (all) v6." We also include a Memorandum of Agreement between the Departments of State and Defense, relating to contracting support services provided by the Department of Defense, although it is only marginally relevant and the following additional documents: the slide show, dated April 13, 2005, for Major General Urias; the October 3, 2004 letter from Sidney Heetland to the Deputy Minister of Finance; the letter, dated February 28, 2005, from the Minister of Finance to the Chief of Mission; the December 23, 2005 Memorandum from Major General Urias to the

Minister of Finance (and attachments); and the December 4, 2005 Memorandum from Major General Urias to the Minister of Finance (and attachments).

**INTERROGATORY NO. 6:** Identify the instructions given to defendant's personnel, if any, regarding:

a. Modifications to the scope of work under the Phase I Contract directed and accepted by the PCO;

b. the attempts to definitize the Phase I Contract;

c. the unilateral modification to the Phase I Contract attempting to definitize the Phase I Contract at a price below the NTE;

d. the attempts to issue a final decision by the PCO; and

e. the final decision issued by the United States denying Plaintiff's certified claim.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We object to this interrogatory as being vague and ambiguous because it is unclear from whom the instructions to United States personnel are meant to be from. Notwithstanding this objection, we have provided you with the entire contents of the files possessed by the Joint Contracting Command regarding the Phase I and Phase II contracts and we are aware of no documentation outside of these files.

**INTERROGATORY NO. 7:** Identify each and every time the defendant sought or obtained advice, consent or permission from the Interim Iraqi Government (IIG) after June 28, 2004, regarding the administration of DFI-funded contracts. For each instance, identify:

a. The specific contract;

b. The parties to the contract;

c. The names of the individuals involved with negotiating that contract;

d. The date the contract was executed;

e. The amount, if any, of appropriated funds used to fund that contract;

f. The amount of DFI, vested or seized funds used in that contract;

g. Any oral or written modifications to that contract;

h. The names of the individuals involved with modifying that contract; and

i. The date of those modifications.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

The United States has never obtained direction from the IIG regarding individual DFI-funded contracts, with the exception of the group ratification of actions in specific contracts as set forth in Attachment 2 to Major General Urias's December 4, 2005 memorandum to Minister Ali Abdul Amir Allawi, which we attache; rather, the United States has received direction from the IIG regarding such contracts in general. We direct you to the documents listed in response to Interrogatory number 5.

**INTERROGATORY NO. 8:** Identify each and every time defendant settled or otherwise resolved any claim filed by a contractor arising from or relating to a DFI-funded contract. For each instance, identify:

a. The specific contract;

b. The parties to the contract;

c. The names of the individuals involved with negotiating that contract;

d. The date the contract was executed;

e. The amount, if any, of appropriated funds used to fund that contract;

f. The amount of DFI, vested or seized funds used in that contract;

g. The source of funds which were used to settle or otherwise resolve that claim; and

h. Whether the IIG provided any input in the settlement or resolution.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We object to this interrogatory as not seeking information relevant to this case or reasonably likely to lead to discoverable material. Notwithstanding this objection, we are aware of two settlements of claims regarding contracts funded by the DFI. Both occurred for claims brought to the Army Board of Contract Appeals ("the BCA"). We will provided further information to you when we have obtained it.

**INTERROGATORY NO. 9:** Identify each and every contract for which defendant used DFI funds after June 28, 2004. For each contract, identify:

a. The specific contract;

b. The purpose of the contract;

c. The parties to the contract;

d. The names of the individuals involved with negotiating that contract on behalf of defendant;

e. The date the contract was executed; and

f. The amount of appropriated funds used to fund that contract.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

The United States entered no contracts using DFI funds after June 28, 2004.

**INTERROGATORY NO. 10:** Identify each and every DFI-funded contract defendant modified, formally or constructively, after June 28, 2004. For each contract, identify:

a. The specific contract;

b. The purpose of those modifications;

c. The parties to the contract;

d. Each and every individual involved with the authorization of those modifications;

e. The amount of appropriated funds, if any, used to fund the modification; and

f. The amount of DFI, vested or seized funds used to fund the modification.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

The United States modified no DFI-contracts after June 28, 2004 because those contracts became contracts with the IIG as of that date. To the extent that the interrogatory may be asking whether, as agent for the Iraqi Interim Government ("IIG"), any United States personnel effected any "formal" or "informal" modifications to any IIG contracts, our response is that undoubtedly, there were modifications performed upon many of such contracts, just as there are modifications performed upon almost every Government contract; nevertheless, we object to responding in any greater detail to this interrogatory because it is overly broad, unduly burdensome, and does not seek information relevant to this case or reasonably likely to lead to discoverable material. We will respond, however, that a list of significant post-CPA contract actions taken upon behalf of the IIG by United States personnel is listed at Attachment 2 to Major General Urias's December

4, 2005 memorandum to Minister Ali Abdul Amir Allawi, which we attach. We further note that no United States Government appropriated funds have been used to modify any DFI-funded contract after June 28, 2004.

**INTERROGATORY NO. 11:** Identify each and every instance in which defendant specifically discussed transfer of DFI-funded contracts to the IIG as of June 28, 2004. For each instance, identify:

a. The date of each discussion;

b. The participants in each discussion; and

c. The content of each discussion.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We are aware of no specific discussions of these transfers besides CPA Memoranda 4 and 15.

**INTERROGATORY NO. 12:** Identify each and every instance in which defendant has taken the position that DFI-funded contracts were transferred to the IIG as of June 28, 2004. For each instance, identify:

a. The date of the United States took that position;

b. The context (i.e., litigation, mediation, arbitration, public policy, etc.) in which the United States took that position; and

c. Each and every individual involved in the decision to have the United States take that position.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We object to this interrogatory as not seeking information relevant to this case or reasonably likely to lead to discoverable material; moreover, the interrogatory is both ambiguous (the meaning of "taken the position" is unclear) and overbroad, because it could theoretically apply to any statement in a routine telephone call with a contracting officer. Notwithstanding these objections, we respond that CPA Memorandum 15 provided that DFI-funded contracts would be transferred to the IIG upon dissolution of the CPA and that the United States has never argued that anything contrary had occurred.

**INTERROGATORY NO. 13:** Identify each and every instance in which defendant has previously taken a position contrary to its current position that DFI-funded contracts were transferred to the IIG as of June 28, 2004. For each instance, identify:

a. The date of the United States took that position;

b. The context (i.e., litigation, mediation, arbitration, public policy, etc.) in which the United States took that position; and

c. Each and every individual involved in the decision to have the United States take that position.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

The United States has never taken such a position.

**INTERROGATORY NO. 14:** Identify each and every interpretation by defendant of the affect of Resolution 1546 on defendant's ability to modify DFI-funded contracts by adding appropriated

funds to said contract. For each interpretation, identify:

a. The justification or rationale for such interpretations;

b. The specific contract, if any, at issue;

c. The context (i.e., litigation, mediation, arbitration, public policy, etc.) in which

the United States thought of that interpretation; and

d. Each and every individual involved in reaching that interpretation.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We object to this interrogatory as not seeking information relevant to this case or reasonably likely to lead to discoverable material; moreover, the interrogatory is both ambiguous (the meaning of "interpretation by the defendant" is unclear) and overbroad, because it could theoretically apply to any statement in a routine telephone call with a contracting officer. Notwithstanding these objections, we are aware of no "interpretation" by the United States regarding the effect of UNSCR 1546 upon the ability of the United States to modify DFI-funded contracts after June 28, 2004.

**INTERROGATORY NO. 15:** Identify the contemporaneous interpretation adopted and used by Defendant of the phrase "the multinational force shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq" as it appears in Resolution 1546. For that interpretation, identify:

a. Its justification or rationale;

b. Each and every individual involved in coming up with that interpretation;

c. The context (i.e., litigation, mediation, arbitration, public policy, etc.) in which they came up with that interpretation; and

d. The circumstances in which Defendant actually relied on the phrase in quotes above to take specific action and the action taken.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We object to this interrogatory as not seeking information relevant to this case or reasonably likely to lead to discoverable material; moreover, the interrogatory is both ambiguous (the meaning of "contemporaneous interpretation" is unclear) and overbroad, because it could theoretically apply to any statement made by any agent of the United States. Notwithstanding these objections, we are aware of no "interpretation" of the quoted language UNSCR 1546 by the United States relating to Government contracting.

**INTERROGATORY NO. 16:** Describe the method and criteria used by the CPA to determine "the total amount of outstanding contractual liability against the Development Fund for Iraq" as that phrase is used in CPA Regulation 11. To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

To the best out our knowledge, the criteria is as implied by CPA Regulation 11: the outstanding liability would be determined by subtracting money paid upon contracts from the amount obligated by said contracts.

**INTERROGATORY NO. 17:** Identify each and every contract considered by the CPA to determine "the total amount of outstanding contractual liability against the Development Fund for Iraq" as that phrase is used in CPA Regulation 11. For each contract, identify:

a. The specific contract at issue;

b. The date the contract at issue was executed;

c. Whether the contract was modified after execution and if so, the date of modification, and who authorized those modification(s); and

d. Whether appropriated funds were used to fund any modification of the contract.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We are aware of no contract not considered by the CPA to determine this liability. Accordingly, we refer you to the CPA's website which lists contracts awarded by the CPA.

**INTERROGATORY NO. 18:** Identify each and every contract that was not considered by defendant to determine the "total amount of outstanding contractual liability against the Development Fund for Iraq" as that phrase is used in CPA Regulation 11. For each contract, identify:

a. Why that contract was not included within the total amount of outstanding contractual liability against the Development Fund for Iraq;

b. The date the contract at issue was executed;

c. The amount of appropriated funds used to fund that contract; and

d. The amount of DFI, vested or seized funds used in that contract.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

By "contract," we presume that the interrogatory refers to a contract between the CPA and some other entity. The only such contracts, in existence prior to the dissolution of the CPA, not considered by the CPA were done so as a result of inadvertence. We believe that the contracts listed upon the April 13, 2005 briefing slides (provided to you) were such contracts.

**INTERROGATORY NO. 19:** Identify each and every basis for the $26 million NTE established by the CPA for the Phase I Contract (i.e., how was the $26 million figure determined, calculated,or reached). For each basis, identify:

a. How that basis was reached;

b. Each and every individual involved in reaching that basis; and

c. Whether higher or lower figures (i.e., numbers) where considered and if so, by whom and why were those figures not used.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We object to this interrogatory because its subject matter is not related to the pending motion for partial dismissal or, in the alternative, for partial summary judgment, that is the basis for the Court's allowing discovery at this point in the case.

**INTERROGATORY NO. 20:** Identify each and every instance, after June 28, 2004, the IIG added additional funds to the Central Bank of Iraq/Development Fund of Iraq/Transition subaccount.

For each instance, identify:

a. The circumstances involved (i.e., why did the IIG add additional funds, why were additional funds needed, for what purpose would those additional funds be used);

b. If the additional funds were to be used to satisfy a contractual payment obligation, and the specific contract;

c. The amount of appropriated funds, if any, used to fund that contract.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

Defendant is not the IIG and is thus not privy to the reasons that the IIG added any funds to the referenced subaccount. No United States Government appropriated funds were ever added to the referenced subaccount. We have previously provided you with two spreadsheets demonstrating the daily balances in the DFI subaccount. These spreadsheets demonstrate when funds were added or taken from the subaccount. It is our belief that the only additions made to the subaccount were through interest earned or the rare event that a contractor returned an overpayment.

**INTERROGATORY NO. 21:** Identify each and every instance when the PCO attempted to comply with the requirements of the Competition in Contracting Act in awarding the Phase II Contract. For each instance, identify:

a. When the attempt was made;

b. Each and every individual involved with the attempt; and

c. Whether the attempt was successful.

To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We object to this interrogatory because it is vague as to what is meant by "attempt[ing] to comply" with the Competition in Contracting Act. Nowithstanding this objection, we are aware of no instances in which the PCO took any action that would be considered, separately and apart, an "attempt[] to comply" with the Competition in Contracting Act in awarding the Phase II Contract.

**INTERROGATORY NO. 22:** Identify (a) the date and time the CPA Memorandum 15 was actually placed on the CPA's website, (b) the technical manner in which the memorandum was placed on the website; and (c) who placed that memorandum on the website. To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

The best estimate of the date and time that CPA Memorandum 15 was placed upon the CPA's website is found in the Declaration of Colonel Richard Pregent, which was included in the Proposed Findings of Uncontroverted Fact that we previously filed in this case. We have been unable to locate definitive electronic records for the web site, but continue to search for them.

**INTERROGATORY NO. 23:** Identify each and every instance when defendant made a request to the IIG for additional DFI funds to place on any DFI-funded contract, including without limitation, the Phase I contract. To the extent facts relating or pertaining to your answer are contained or referenced in any document(s), including without limitation, correspondence, notes, and/or memorializations of oral communications, identify any and all such document(s).

**ANSWER:**

We refer you to Attachment 2 to Major General Urias's December 4, 2005 memorandum to Minister Ali Abdul Amir Allawi, which we attached. We are aware of no other such requests.

**FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION NO. 1**: Separately, and for each of plaintiff's interrogatories in its First Set of Interrogatories, produce all documents that defendant was requested to identify.

**RESPONSE:**

All such documents were provided to the extent set forth in our responses to the interrogatories.

**REQUEST FOR PRODUCTION NO. 2:** Produce all documents evidencing the type of funds, whether Development Fund of Iraq funds, vested or seized funds, or appropriated funds, used by defendant to fund any contract awarded by defendant between on or after January 1,

2004 and January 1, 2005.

**RESPONSE:**

This request is overbroad and unduly burdensome because it applies to any conceivable contract awarded by the United States in the period stated. Notwithstanding this objection, the minutes of the PRB, which are available at the CPA website, set forth the sources of funding for contracts awarded by the CPA during that time period. The United States awarded no contracts, after June 28, 2004, using other than United States Government appropriated funds.

**REQUEST FOR PRODUCTION NO. 3:** Produce all documents authored or produced by the Program Review Board from April 1, 2003 through January 1, 2005.

**RESPONSE:**

All PRB minutes are available upon the CPA's website.

**REQUEST FOR PRODUCTION NO.4:** Produce all documents provided to the CPA from its inception through its dissolution which discuss or describe the authority of the CPA to enter into contracts, fund contracts or modify contracts.

**RESPONSE:**

Any such documents have been provided to you. Specifically, we refer you to UN Security Council Resolution 1483 regarding the CPA's use of Iraqi funds and the May 12, 2003 letter from Secretary of Defense Rumsfeld to Ambassador Bremer regarding his duties as administrator of the CPA.

**REQUEST FOR PRODUCTION NO. 5:** Produce all documents that discuss or describe

the duties and responsibilities of the United States' Mission in Iraq after June 28, 2004, arising from or relating to contract administration, award, dispute resolution, contract funding and contract modification.

**RESPONSE:**

The only such document of which we are aware is the memorandum of agreement that we provided.

**REQUEST FOR PRODUCTION NO. 6:** Produce all documents that discuss, refer, or relate to the duties and responsibilities of the PCO with respect to contract administration, contract award, dispute resolution, contract funding, and contract modification.

**RESPONSE:**

In addition to the letter dated June 15, 2004, the IIG Finance Minister, Adil Abdul Mahdi and the PCO's July 24, 2004 letter to contracting officers in the field, explaining the consequences of Minister Mahdi's letter (both provided in our Motion for Partial Summary Judgment), we refer you to the documents discussed in our response to Interrogatory Number 5 and 7.

**REQUEST FOR PRODUCTION NO. 7:** Produce all documents that refer, discuss or relate to the Phase I contract.

**RESPONSE:**

We object to this document request because it is overbroad for the limited purposes of discovery allowed by the Court. Notwithstanding this objection, we have provided you all such documents in our possession via a DVD.

**REQUEST FOR PRODUCTION NO. 8:** Produce all documents that defendant provided to or received from the Interim Iraqi government that relate to, discuss or reference the administration of DFI funded contracts or the DFI fund.

**RESPONSE:**

All such documents in our possession have been provided- we refer you to the documents included in our response to Request For Production No. 6..

**REQUEST FOR PRODUCTION NO.9:** Produce all documents arising from or relating to the resolution by defendant of all claims filed by all contractors arising from or relating to all DFI funded contracts.

**RESPONSE:**

We object to this request for production because it is beyond the scope of the limited discovery granted by the Court.

**REQUEST FOR PRODUCTION NO. 10:** Produce all documents that discuss, refer or relate to the use by defendant of DFI funds after June 28, 2004.

**RESPONSE:**

This request for production is ambiguous by virtue of the meaning of the word "use." The United States had no custody or control of DFI funds after June 28, 2004.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/J. Reid Prouty
J. REID PROUTY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305–7586
Fax: (202) 514-7969

January 14, 2008

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAUDES CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07-4C |
| v. | ) | |
| | ) | (Judge Wheeler) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S SECOND SET OF INTERROGATORIES**

Pursuant to Rules 26, 33, 34, and 36 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant provides the following responses to plaintiff's second set of interrogatories.

**SECOND SET OF INTERROGATORIES**

**INTERROGATORY NO. 25:** Describe the authority for the United States Army Corps of Engineers to use Revolving Fund Account funds for reconstruction projects in Iraq from March 1, 2003 until December 31, 2007, inclusive.

**RESPONSE:**

Those few task orders which were paid through the revolving fund account, utilized an Operation and Maintenance Account ("OMA") as the "carrier." The OMA appropriation contained a Work Item Number identifier which tied this appropriation to a DFI/CPA Program Review Board ("PRB") account. No United States Government funding, however, was ever provided for these applicable task orders through the appropriation process, because the OMA carrier fund was replenished by DFI funds as it was expended for DFI-funded contracts.

The Corps of Engineers relied upon the Economy Act of 1932, as amended ( 31 U.S.C. §1535) and FAR 17.502 – Interagency Acquisitions Under the Economy Act – to permit the CPA to place orders for services to be paid using DFI funds through a United States Government contract vehicle. On June 15, 2004, the Iraq Ministry of Finance delegated to the Program Management Office the responsibility to monitor and confirm performance, certify and/or make payments, and otherwise administer contracts funded with monies from the DFI, in anticipation of the dissolution of the CPA.

**INTERROGATORY NO. 26:** Whose authority was required for expenditure of Revolving Fund Account funds in Iraq from March 1, 2003 until December 31, 2007, inclusive.

**RESPONSE:**

Because the Revolving Fund utilized the OMA fund as a "carrier," as described in our response to Interogatorry No 25, the Corps of Engineers treated it as if it were an expenditure of appropriated fuds. The authority to disburse funds from a US appropriation is contingent upon:

1. A determination that funds available in the Carrier Account - (Authority: Comptroller in charge of Carrier Account)
2. A determination that there was an executed contract (Authority: Contracting Officer)
3. A proper invoice prepared by the contractor and Certification of performance - (Authority: Contracting Officer and/or Contracting Officer Representative)
4. Actual Disbursement of funds - (Authority: Defense Finance and Accounting Service)

**INTERROGATORY NO. 27:** At any point between June 28, 2004 and December 31, 2005, did the PCO or its successor submit for approval by any Iraqi official any proper invoice submitted for payment under a legacy DFI contract and, if so, identify (a) the Iraqi official(s) from whom approval was sought; (b) the invoices(s) for which approval was sought; (c) whether such approval was provided; and (d) the method by which such approval was communicated.

**RESPONSE:**

The PCO and its successors did not submit such invoices to Iraqi government officials prior to December 31, 2005. This is because, on June 15, 2004 the Iraq Minister of Finance delegated to the PCO the authority to disburse Iraq funds upon behalf of the Government of Iraq. This directive was renewed at various times through December 31, 2005. We note that those DFI contracts which were issued by PCO personnel after termination of the CPA were provided to appropriate Iraqi government officials for ratification, as we discussed in our earlier responses to your discovery requests. Upon such ratification of these contracts, payment of these contracts needed no further approval by Iraqi officials until December 31, 2005.

**INTERROGATORY NO. 28:** For the period June 28, 2004 to December 21,2005 and beginning with receipt of a proper invoice by the PCO, describe the specific steps in the process by which the PCO or its successor, authorized, approved and made payment for invoices submitted under Legacy DFI contracts, specifically identifying the roles and responsibilities of each organization involved in such approval, authorization and payment.

**RESPONSE:**

For contracts which identified a specific DFI account, The Joint Area Support Group - Central ("JASG-C") was responsible for the management and disbursement of funds from these accounts.

Upon receipt of a proper invoice from the contractor, the PCO (and its successors) would certify the invoice. The certified invoice would be forwarded to JASG-C, who would:

1. Assemble the payment package documents in preparation for disbursement. The package would include:

    a. A copy of the contract

    b The invoice

    c. A receiving report (DD25)

    d. Banking Details (account number, account name, bank name)

2. Record disbursement amount in the Bill Register

3. Create a Payment Order ("PO") and a Disbursement voucher ("DOV") which references the PRB number in which funds are to be disbursed and the applicable Ministry Account at the Central Bank of Iraq ("CBI").

4. The DOV is signed by the PCO Disbursing Officer

5. A certified payment request, signed by the PCO Disbursing Officer is submitted to the CBI.

**INTERROGATORY NO. 29:** Describe what use, if any, the PCO or its successors made of the information contained in the June 28, 2004 letter from Lawrence M. Underwood to LTC Eric Maksymyk, attached as Exhibit 4.

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

THE DIRECTOR

June 2, 2003

The Honorable C.W. Bill Young
Chairman
Committee on Appropriations
U.S. House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

On behalf of the President, I am transmitting the first in a series of reports required under Section 1506 of the Emergency Wartime Supplemental Appropriations Act, 2003.

As you know, on May 12 Ambassador Bremer arrived in Iraq to serve as Administrator of the Coalition Provisional Authority and the President's Special Envoy. Ambassador Bremer is actively reviewing the personnel, organizational, relief and reconstruction requirements while at the same time directing urgent recovery operations. He is working closely with our coalition partners, international organizations and non-governmental groups to achieve immediate improvements in the quality of life for all Iraqis. To assure the effective management of all resources and activities he has established the International Coordination Council which will include representatives of all interested nations and will be chaired by a coalition partner.

The conditions in Baghdad are very fluid. We expect continued adjustments both in personnel and plans to allow us to respond rapidly as needs arise. Given these ongoing changes, we particularly appreciate the flexibility provided by the Congress regarding the administration of resources available in the Iraq Relief and Reconstruction Fund. Notwithstanding this dynamic environment, we will keep you current on all plans, programs and expenditures.

Sincerely,

Mitchell E. Daniels, Jr
Director

Identical Letter Sent to The Honorable Ted Stevens, The Honorable Robert C. Byrd, and The Honorable David R. Obey

**Report to Congress**
**Pursuant to Section 1506 of the Emergency Wartime Supplemental Appropriations Act, 2003**
**(Public Law 108-11)**

Section 1506 (a) of the Emergency Wartime Supplemental Appropriations Act, 2003, provides:

> (A) INITIAL REPORT. -Not later than 45 days after the date of enactment of this Act, the President shall submit to the Committee on Appropriations a report on the United States strategy regarding activities related to post-conflict security, humanitarian assistance, governance, and reconstruction in Iraq that are undertaken as a result of Operation Iraqi Freedom. The report shall include the following:
> (1) The distribution of duties and responsibilities regarding such activities among agencies of the U.S. Government, including the Department of State, the United States Agency for International Development, and the Department of Defense (to be provided within 30 days of enactment of this Act).
> (2) A detailed plan describing the roles and responsibilities of foreign governments and international organizations including the United Nations in carrying out activities related to post-conflict security, humanitarian assistance, governance, and reconstruction in Iraq.
> (3) A strategy for coordinating such activities among the U.S. Government, foreign governments and international organizations, including the United Nations.
> (4) An initial estimate of the costs expected to be associated with such activities.
> (5) A strategy for distributing the responsibility for paying costs associated with reconstruction activities in Iraq among the United States, foreign governments, and international organizations, including the United Nations, and an estimate of the revenue expected to be generated by Iraqi oil production that could be used to pay such costs.

The report that follows has five sections that correspond to the five specified categories listed in Section 1506.

The American people have made a significant investment to liberate Iraq and stand ready to contribute to the rebuilding efforts. Our policy goals for the recovery of Iraq remain to:

- Establish a secure environment for the Iraqi people and the conduct of relief and recovery activities;
- Achieve measurable improvement in the lives of the Iraqi people;
- Maximize contributions from other countries and organizations; and
- Support Iraqis as they prepare for democratic self-government.

The United States' strategy to achieve these goals includes a coordinated interagency effort in the United States and on the ground in Iraq that is integrated with Coalition and other international efforts. Our strategy includes effective coordination among these participants to allocate resources for reconstruction.

**(1) The distribution of duties and responsibilities regarding such activities among agencies of the United States Government, including the Department of State, the United States Agency for International Development, and the Department of Defense.**

The Administrator of the Coalition Provisional Authority (CPA) reports to the President through the Secretary of Defense. He oversees, directs and coordinates all U.S. Government (USG) programs and activities in Iraq, except those under the command of the Commander, U.S. Central Command (CENTCOM).

The Administrator of the CPA is Presidential Envoy L. Paul Bremer, III. Ambassador Bremer arrived in Baghdad on May 12 and is currently conducting a review of personnel, organizational, relief and reconstruction priorities. This report is preliminary in anticipation of further decisions expected as his review continues.

The CPA exercises powers of government temporarily in order to provide for the effective administration of Iraq, to restore conditions of security and stability, to create conditions in which the Iraqi people can freely determine their own political future, (including by advancing efforts to restore and establish national and local institutions for representative governance) and facilitating economic recovery, sustainable reconstruction and development.

The CPA is vested by the President with all executive, legislative and judicial authority necessary to achieve its objectives, exercised consistent with relevant U.N. Security Council resolutions, including Resolution 1483, and the laws and usages of war. The CPA Administrator has primary responsibility for exercising this authority.

As the Commander of Coalition Forces, the Commander of U.S. Central Command directly supports the CPA by deterring hostilities, maintaining Iraq's territorial integrity and security, searching for, securing and destroying weapons of mass destruction, and assisting in carrying out Coalition policy. In Iraq, the Commander of U.S. Central Command currently has approximately 147,500 American men and women and 13,000 coalition troops performing these critical functions. The CPA Administrator and the Commander, U.S. Central Command communicate fully and continually, and cooperate in carrying out their respective responsibilities (See Tables 1 & 2).

The CPA Administrator is in charge of all USG employees in Iraq (subsuming personnel that were in the Office of Reconstruction and Humanitarian Affairs) except those under

the command of the Commander, U.S. Central Command. The CPA Administrator is reviewing the personnel resources now in his charge. He exercises final authority with respect to personnel composition, staff levels, and funding. Every USG agency under his authority must obtain his approval before changing the composition or mandate of its staff, regardless of the employment category. He is also the country clearance authority for all USG personnel traveling to Iraq on official business except those reporting to USCENTCOM. Finally, the CPA Administrator has the authority to see all communications to or from all USG elements in Iraq, however transmitted, except as directed by the Secretary of Defense, or as specifically exempted by law or Presidential decision.

The CPA Administrator is supported by an interagency team of 695 employees with the mission to help meet Iraq's relief, reconstruction, governmental, and administrative challenges by performing directly where required and advising where possible. The CPA team acts as the nucleus of Iraq's administrative apparatus, involves the Iraqi people in advising on and administering their country, and maximizes contributions from other governments and organizations. The team relies upon coalition partners, consultants, contractors and non-governmental organizations (NGOs). The CPA is identifying appropriate persons in Iraq to reestablish key ministries and providing ministry advisors and logistical support. At the President's direction, the Departments of State, Treasury, Defense, and Justice and 13 other executive branch agencies are providing personnel and support.

The CPA also establishes priorities for the execution of all U.S. Agency for International Development (USAID) activities including the Office of Foreign Disaster Assistance, Disaster Assistance Response Team (DART) operations in Iraq. The interagency DART and its implementing partners continue to address short-term needs. At its peak, the DART has been staffed at more than 60 persons. For the first time, the DART has included staff from the USAID Asia/Near East Division in order to effectively coordinate priorities and assure a seamless transition from DART's short term relief to longer term, USAID reconstruction programs. Along with the DART, the State Department's Bureau of Population, Refugees, and Migration is involved in assisting the United Nations, international organizations, and NGOs in providing emergency relief and support for humanitarian efforts on behalf of Iraqis who have been displaced or are refugees.

Of special importance, the U.S. has provided the largest contribution for the UN World Food Program (WFP) emergency operations in Iraq, providing $60 million for logistics support and over $400 million in cash and food. This contribution was planned and provided prior to the initiation of Operation Iraqi Freedom to assure no interruption in the food supply for the 60 percent of the population which has been dependent on the Oil for Food Program. Distribution of food shipments is scheduled to resume the first week of June.

In addition to immediate relief operations, the USAID has begun delivering reconstruction assistance in four primary areas: physical infrastructure; education, health and other social services; economic growth; and local government. (See Attached Tables 3 & 4) To implement this program, the USAID has enlisted the expertise of the American private sector through the award of eight contracts. These contractors have been addressing a range of immediate requirements including repair of the electric grid to opening the port to allow food shipments to resume.

The USAID has also tapped the expertise of the United Nations (UN) and other international organizations with prior experience in Iraq. To date, grants have been provided to support education, health activities and water sanitation to UNESCO, UNICEF and the World Health Organization. Grants are also being provided to non-government organizations.

While USAID and its partners are addressing immediate reconstruction requirements, they are continuing to conduct on-the-ground assessments of needs in the primary sectors that will guide future economic development plans and projects.

**(2) A detailed plan describing the roles and responsibilities of foreign governments and international organizations including the United Nations, in carrying out activities related to post-conflict security, humanitarian assistance, governance, and reconstruction in Iraq.**

The United States is actively seeking the involvement of foreign partners and international organizations in post-conflict Iraq. Numerous foreign governments have contributed military, humanitarian, and economic assistance to the post-conflict stabilization and reconstruction in Iraq. Coalition partners have offered assistance including:

- Military forces
  Over 40 countries have offered, or are currently discussing offers of, forces for stabilization operations (including the UK and Poland, which have offered to lead multinational divisions for security and stability operations). There are currently over 13,000 non-U.S. coalition troops in Iraq.
- In-kind contributions of relief supplies
  Australia, Bangladesh, Croatia, Czech Republic, Hungary, India, Pakistan, Russia, Serbia/Montenegro, and others have offered food and other humanitarian relief supplies.
- Field hospitals and "adopt-a-hospital" efforts
  Czech Republic, Denmark, Italy, Korea, Kuwait, Lithuania, Spain, UAE and others have deployed or are deploying field hospitals, medical personnel, or equipment to Iraq.

- Liaison representatives

  Eight countries (Australia, Denmark, Italy, Japan, Korea, Romania, Spain, and UK) have assigned representatives.

The CPA and an interagency fund-raising team led by DOD is soliciting further Coalition and international contributions of all kinds for the Iraq recovery effort.

International and non-governmental organizations are active in Iraq. In particular, the United Nations has a significant presence with almost 300 international staff in country. The UN Secretary General has appointed Mr. Sergio Vieira de Mello as his Special Representative for Iraq. As stated in UN Security Council Resolution (UNSCR) 1483 his responsibilities include working "intensively with the [Coalition Provisional] Authority, the people of Iraq, and others concerned to advance efforts to restore and establish national and local institutions for representative governance, including by working together to facilitate a process leading to an internationally recognized, representative government of Iraq."

The CPA Administrator will coordinate closely with the UN Special Representative. The Secretary General noted that the UN Security Council "called on the United Nations to assist the Iraqi people, in coordination with the Authority, in a wide range of areas, including humanitarian relief, reconstruction, infrastructure rehabilitation, legal and judicial reforms, human rights and return of refugees, and also to assist with civilian police." As noted, numerous UN agencies, including the Office for Coordination of Humanitarian Affairs, UNICEF, UNESCO, the UN Development Program, the UN High Commissioner for Refugees, and the World Food Program, are participating in this effort.

**(3) A strategy for coordinating such activities among the United States Government, foreign governments and international organizations, including the United Nations.**

The U.S. Government is working with the United Nations, the World Bank, other international organizations, and foreign governments to assess the short-term needs of Iraq, longer term development priorities, and financing strategies. Considerable collaborative effort went into the drafting of UNSCR 1483, adopted on May 22, 2003.

A key component of the U.S. strategy was to make available for the immediate and direct benefit of the Iraqi people the resources generated under the Oil for Food Program. To facilitate achieving this purpose, the CPA Administrator established the Development Fund for Iraq (DFI) in the Central Bank of Iraq. Shortly after passage of UNSCR 1483, the UN transferred into the DFI $1 billion derived from Oil for Food proceeds. It is expected that eventually, the Development Fund for Iraq will be financed from multiple sources including oil revenues and assets from the former Iraqi regime located outside Iraq.

The U.S. Government is working with the United Nations and the World Bank to host an informal preparatory meeting in June to discuss Iraq's development requirements and funding mechanisms. We are also discussing a possible formal donors conference in late summer or early fall.

The coordination mechanisms within the CPA and between the CPA and coalition partners, international and non-governmental organizations are robust, including a number of Coalition officials integrated into the CPA leadership. There is a British Deputy for Coalition Coordination and a Danish Deputy for Humanitarian Affairs. In addition, eight nations (listed above) have sent liaison officials and numerous other countries, including Poland, Albania, Bulgaria, the Czech Republic, Greece, Jordan, Lithuania, Slovakia, Ukraine, and the UAE, have expressed interest in sending representatives in the coming weeks. With the adoption of UNSCR 1483 many more nations have begun discussions regarding their participation.

There are also positive relationships between the CPA and international and non-governmental organizations. With the Secretary General's naming of the UN Special Representative, the CPA Administrator anticipates closer cooperation with the UN and with relevant organizations. This coordination is already in evidence as UN agencies have designated liaisons to the CPA and vice versa.

As part of his office, the Administrator of the CPA has established an International Coordination Council. The Council will consist of senior representatives from interested member states and will be chaired by Former Deputy Prime Minister Marek Belka of Poland. The Council will advise the Administrator of the Coalition Provisional Authority on matters of international assistance in Iraq reconstruction efforts.

**(4) An initial estimate of the costs expected to be associated with such activities.**

The $2.475 billion requested and appropriated reflects USG assumptions about expected costs and was built on a sector specific relief and reconstruction plan. We are now evaluating how initial assumptions and requirements identified in that budget plan can address emerging needs in Iraq.

The Iraq Relief and Reconstruction Fund was requested with flexible authorities because of uncertain conditions and requirements. This has already proven useful. For example, damage to roads was not as significant as anticipated. In contrast, due to years of neglect and damage, we have encountered more serious problems with the electric grid. The flexible structure of the Fund will allow resources to be transferred and dedicated for use as and where urgent requirements are identified.

Iraq's crumbling infrastructure and problems began long before the war. Iraq has suffered from 30 years of mismanagement of the economy and deliberate policies of

neglect targeted at real or imagined foes of the former regime. These policies have taken a significant toll on Iraq's infrastructure and institutions. The Coalition is committed to helping repair damage done in the war and assisting the Iraqi people in their task of reconstructing infrastructure and institutions damaged or destroyed by years of misrule and systematic oppression. The following points are relevant to efforts to meet these substantial challenges:

- Numerous countries around the world are contributing to restoration efforts in Iraq.

- Iraq enjoys significant human and natural resources that will make an important difference in recovery -- the Iraqi people are talented, educated, and resourceful, and they have fertile soil, major rivers, and significant oil reserves.

**(5) A strategy for distributing the responsibility for paying costs associated with reconstruction activities in Iraq among the United States, foreign governments, and international organizations, including the United Nations, and an estimate of the revenue expected to be generated by Iraqi oil production that could be used to pay such costs.**

The U.S. Government's strategy for distributing responsibility for costs associated with reconstruction in Iraq rests on three main pillars. First, to the extent possible, rely on the Iraqi people's talents and resources. Second, as quickly as possible, help the Iraqi people create conditions conducive to free markets, the ultimate key to long-term development. Third, whenever possible, work with the international community, including the United Nations, to raise funds to support the transition to a free society in Iraq.

There are multiple sources for funding Iraq recovery requirements.

<u>International contributions</u>. The UN, other international institutions, and the U.S. and its coalition partners continue to urge all nations to contribute to meeting the needs of the Iraqi people in any way they can. Offers of assistance from the international community exceed $1.9 billion. About $790 million of this amount has been in response to a UN Flash Appeal to meet urgent requirements in Iraq. The remaining $1.1 billion has been offered outside the Flash Appeal.

We anticipate other contributions as well, including troop contributions to create multi-national divisions of stabilization forces. To generate and coordinate global contributions, the U.S. Government has established an strong interagency international fund raising team comprised of senior officials from the Departments of State, Treasury, Defense, and USAID.

Examples of international pledges and contributions to date include:

- Japan intends to contribute more than $150 million in emergency aid.
- Australia has delivered more than $26 million -- including 100 thousand metric tons of wheat. Australia is also providing expertise in agriculture.
- Canada has delivered more than $41 million for critical water, sanitation, food, shelter, and health requirements.
- The United Kingdom has offered $338 million in assistance.
- Spain has pledged $56 million primarily in supplies.
- The Netherlands is contributing $14 million in response to the UN Flash appeal. Assistance will be provided to Iraq through Dutch NGOs.
- Norway is donating up to $21.6 million in assistance.
- The European Union (EU) has offered $107 million, of which $14.5 million has been delivered, including 10 tons of medical supplies that have been airlifted to Baghdad.
- Jordan deployed a field hospital to Baghdad to provide emergency medical services.

Development Fund for Iraq. UNSCR 1483 calls for certain monies to be placed in the Development Fund for Iraq which will be disbursed at the direction of the CPA. UNSCR 1483 also provides for an International Advisory and Monitoring Board and independent auditors of the DFI. As noted earlier, the DFI now has an initial deposit of $1 billion derived from the UN's "Oil for Food" escrow account. It is expected to also accept proceeds from the sale of petroleum, petroleum products and natural gas and returned Iraqi assets provided from UN member states. The Fund is to be used for the humanitarian needs of the Iraqi people, for economic reconstruction and repair of Iraq's infrastructure, for continued disarmament of Iraq, for the costs of Iraq civilian administration, and other purposes benefitting the people of Iraq.

It is too early to project the amount of revenue that may result from the sale of Iraqi oil. The oil infrastructure has been allowed to deteriorate and will take time to bring up to industry standards. Moreover, in the distorted economy developed under Saddam Hussein, 60 percent of Iraq's people have been dependent upon government provided rations primarily paid for with oil sales proceeds. The transition to a more normal economy will not happen overnight and, as a consequence, in the near term it is expected that oil revenues will continue to be needed to meet these immediate humanitarian needs.

Iraqi state assets. President Bush has directed that Iraqi state assets under U.S. control will be used only for the benefit of the Iraqi people and their nation's recovery. These assets fall into three categories:

Vested assets: $1.7 billion in formerly blocked and confiscated Iraqi state assets in the U.S. which the President has vested in the Treasury Department for apportionment to Federal agencies for requirements that benefit the Iraqi people;

Seized assets: To date, about $1 billion in Iraqi state assets have been brought under U.S. control in Iraq by U.S. forces and are being controlled pursuant to the laws and usages of war. The seized assets, which include cash and gold bars, need to be verified for authenticity; and

Iraq Assets Returned to the US by the UN: UNSCR 1483 requires the Secretary General to return to the US approximately $200 million in Iraq assets provided by the US to the UN in 1992 to fund humanitarian aid to the Iraqi people.

Appropriations. In the Emergency Wartime Supplemental Appropriations Act, 2003, Congress appropriated $2.475 billion for the President's Iraq Relief and Reconstruction Fund which is the primary source of U.S government funding for Iraqi recovery activities. Congress also made $489 million to the Department of Defense within the Iraqi Freedom Fund to be used if needed to repair damage to Iraqi oil facilities and to preserve a petroleum distribution capability.

TABLE 1

# Coalition Provisional Authority Organization

