# Table 2
# COALITION PROVISIONAL AUTHORITY



TABLE 5

## IRAQ RESOURCES MANAGED BY NON-DEPARTMENT OF DEFENSE (DOD) AGENCIES ($M)

| Funding | Iraq Relief & Reconstruction Fund (Appropriated) | Other Accounts/Commitments |
|---|---|---|
| | Apportioned | Apportioned |
| **RELIEF** | | |
| **USAID** | | |
| Office of Foreign Disaster Assistance (OFDA) | | 72.5 |
| Office of Food for Peace (FFP) [including USDA] | | 478.0 |
| Office of Transition Initiatives (OTI) | | 6.0 |
| **STATE** | | |
| Bureau of Population, Refugee, and Migration (PRM) | | 39.1 |
| Bureau of Political-Military Affairs (de-mining) | | 1.5 |
| **SUBTOTAL, RELIEF** | **0** | **597.1** |
| | | |
| **RECONSTRUCTION** | | |
| USAID/Bureau for Asia and the Near East (ANE) | 239.1 | 110 |
| STATE/Bureau for International Narcotics and Law Enforcement (INL) | | 25 |
| TREASURY/Office of Technical Assistance (OTA) | | 2.2 |
| **SUBTOTAL, RECONSTRUCTION** | **239.1** | **137.2** |
| | | |
| **TOTAL** | **239.1** | **734.3** |

# TABLE 5

## DOD IRAQ RELATED RESOURCES OBLIGATED TO DATE ($M)

| Funding | Iraq Relief and Reconstruction (Vested*) | Other Accounts/ Commitments** |
|---|---|---|
| Emergency Payments to State Employees, Pensioners, and Specialized Workers | 158.5 | |
| Ministry Startup and Other<br>- Equipment and facilities repair | 16.4 | |
| **Subtotal** | **174.9** | |
| Natural Resources Risk Remediation<br>- Removal of unexploded ordnance<br>- Emergency repairs<br>- Environmental assessments<br>- Preparing facilities for production | | 175.0 |
| ORHA Operating Expenses<br>- Logistics/Headquarters support<br>- Deploying and equipping<br>-Other in-country costs | | 256.0 |
| **TOTAL** | **174.9** | **431.0** |

*Vested - Iraqi assets frozen under Executive Order 13290 transferred to DOD via the Iraq Relief and Reconstruction Fund
** These funds have been "cash-flowed" from other DOD accounts and are pending reimbursement from the Iraq Freedom Fund.

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

LAUDES CORPORATION, :

Plaintiff, :

vs. : Case No. 07-4C

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - - x

May 22, 2008

Washington, D.C.

DEPOSITION OF:

MILTON BLACKMON

Was called for examination by counsel for the Plaintiff, pursuant to notice, in the offices of, Garvey Schubert Barer, 1000 Potomac Street, N.W., 5th Floor, Washington, D.C., commencing at 9:18 a.m., before Carolyn Friend, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:

MARK G. JACKSON, ATTORNEY-AT-LAW
Garvey Schubert Barer
Second & Seneca Building
1191 2nd Avenue, 18th Floor
Seattle, Washington 98101-2939
(206) 464-3939
COUNSEL FOR THE PLAINTIFF

MATTHEW C. HOYER, ATTORNEY-AT-LAW
Garvey Schubert Barer
Flour Mill Building
1000 Potomac Street, N.W., 5th Floor
Washington, D.C. 20007-3501
(202) 965-7880
COUNSEL FOR THE PLAINTIFF

REID PROUTY, TRIAL ATTORNEY
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7586
COUNSEL FOR THE DEFENDANT

ALSO PRESENT: J. Mackey Ives, Litigation Attorney

C O N T E N T S


| WITNESS: | EXAMINATION BY: | PAGE: |
|---|---|---|
| Milton Blackmon | Mr. Jackson | 4 |


E X H I B I T S


| NO.: | DESCRIPTION: | PAGE: |
|---|---|---|
| 1 | memo | 26 |
| 2 | purchase request | 24 |
| 3 | acquisition plan | 32 |

E X H I B I T S (CONT'D)


| | | |
|---|---|---|
| 5 | solicitation | 36 |
| 6 | amendment of solicitation | 38 |
| 8 | solicitation | 40 |
| 11 | SSA document | 41 |
| 12 | memo for record | 42 |
| 13 | solicitation | 44 |
| 15 | statement of work | 48 |
| 16 | amendment of solicitation | 46 |
| 17 | letter | 51 |
| 18 | letter | 54 |
| 19 | termination letter | 57 |
| 20 | purchase request | 58 |
| 21 | memo for record | 64 |
| 22 | memo | 65 |
| 23 | letter | 65 |
| 24 | memo | 68 |
| 25 | letter | 86 |
| 26 | invoice | 110 |
| 46 | memo | 110 |
| 50 | memo | 112 |
| 57 | letter | 85 |

P R O C E E D I N G S

Whereupon:

MILTON BLACKMON,

Was called for examination, and, after being duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. JACKSON:

Q Would you, please, state your name and spell your last name, if she doesn't have it.

A It's Milton Lloyd Blackmon, Jr.

Q Good morning, Lieutenant-Colonel Blackmon.

A Good morning.

Q I am just going to call you Colonel Blackmon, okay, because Lieutenant-Colonel is just too damn -- doesn't come tripping right off the tongue.

A Okay.

Q My name is Mark Jackson. I'm going to be asking you -- have you ever been deposed before?





6e78851e-4fed-4171-a01f-debdce8a46c8

Q How long have you had a warrant?

A I got my first warrant in 1996 at the -- when I was in Georgia. It was a limited warrant, limited to one million. That was my first one. I've had six total, so --

Q Do you have one currently?

A I don't have one currently.

Q You had one when you were in Iraq?

A I did.

Q What was the warrant at that time?

A It was unlimited.

Q Did you do anything to prepare for the deposition today?

A I didn't do anything specific. We did some reviews of procedures, what to expect for today.

Q Did you look at any documents?

A I briefly looked at some documents a long time ago doing the -- preparing for the Interrogatories.

Q Did you provide input on the Interrogatory responses?

of the table calls it something different than I call it, so I don't really care. So we are going to spend quite a bit of time talking about Laudes Corporation, which we will get to in just a moment. When were you deployed to Iraq?

A I have been deployed twice.

Q So which one of those deployments am I interested in, the one involving Laudes?

A I assume it's the 2004 deployment. I was deployed in early May 2004. And I left the country in early August 2004.

Q What were your duties -- excuse me -- what were your duties? Told you.

A I was contracting officer for the CPA, which later became PCO.

Q Upon arrival, did you have -- were you just assigned to a specific unit or specific organization?

A I was assigned to the CPA contracting organization. When I first got there, they didn't have a specific assignment for me. I later went to the security and justice sector.

Q Do you recall about what time that happened in relation to your arrival in early May?

A I don't recall exactly.

Q Days, weeks?

A I believe it was within three weeks upon arrival.

Q Were you a member of what was known as the -- is the project management office, or PMO? Is it program management office or project management office?

A I was not.

Q Do you know what PMO is or was?

A I don't recall exactly.

Q Now, the security and justice sector, was that a contracting organization or an organization for which you provided contracting officer work?

A It was a contracting organization. It was part of our contracting team.

Q How was it structured?

A We were put into various divisions by function and I don't recall all the teams or all the functions. But I know, for example, we had an oil

team, we had a security and justice team, we had several other teams that were functional in nature. And all the people on my team were contracting personnel.

Q COs or support or a mixture?

A Mixture.

Q How many COs did you have that were in the security and justice sector when you were there?

A I don't recall the exact number.

Q Estimate. More than five?

A An estimated number -- see, we had a blend of enlisted that had limited warrants as well as guys that had the unlimited warrants. A rough estimate would be five or so.

Q Of a mixture of the limited and unlimited?

A Correct.

Q Did you know a Lieutenant-Colonel Maksymyk?

A Eric Maksymyk, yes, I did.

Q What was his role there?

A He was a program manager.

Q So a program manager, not necessarily him, but a program manager would be somebody that you as a contracting officer would be supporting?

A Correct.

Q He was not a contracting officer himself?

A Right. He was on the requirements side.

Q Was he with the security and justice sector at that time?

A He was not in the security and justice in the contracting organization. I'm not familiar with exactly how they were set up. They had a blend of program managers and honestly I can't remember exactly how they were set up.

Q How did you run into him?

A We were in the same office.

Q Same office?

A Um-hmm. They put program managers and contracting officers kind of side by side just to sort of quicken the pace. If you had requirements or you had discussion about a requirement, you had the contracting support right there.

Q So he was somebody you supported; is that

how you knew him?

A Yeah. He sat two -- about two desks down and I did support some of his requirements. One specifically was on -- we did a contract for some security services, and I supported that one in particular that I recall.

Q We are going to be using the phrase BPSA. Is that a phrase with which you are familiar?

A Yes.

Q What does it mean to you?

A It's Baghdad Police Academy. I'm not sure what the S stands for.

Q Actually, at some point in time, I thought it was Baghdad Public Service Academy and then it became Baghdad Police College. When we talk about Baghdad Police Academy, we are talking about BPSA. Can you agree with me on that, so we can just define BPSA as the police academy?

A That's a term I'm familiar with, yes.

Q Did Lieutenant-Colonel Maksymyk have any role with BPSA?

A He did.

Q Do you know what that was?

A He was on the requirement side and he helped work -- you know, as a program manager, he helped work what the true nature of the requirement was.

He sort of -- he interfaced with the funding guys to go get the piece of paper we needed for funding. And he worked, I believe, statements of work for the contract. All of the requirements that we kind of needed to put something on contract generally came from a guy like him, a program manager. That's just kind of how it was set up.

Q You mentioned pieces of paper we needed to get funding. I'm paraphrasing. What did you mean by that?

A Well, before a contract is signed, you have to have funds for that contract. And generally it was -- I say piece of paper because I don't remember exactly the wording and what they called it.

But, you know, in the acquisition world, we grew up with a purchase request. That's what we

armed forces up to speed and get the cops on the street and trained and educated.

Q Did you ever go to BPSA?

A I did not.

Q Who was your interface on your side of the table as opposed to the contracting side of table at BPSA? Or with whom did you interface?

A I interfaced occasionally with Ted Nordgaarden.

Q Who was he?

A He was my point of contact. I don't know his title. I think he was like the director out there. I knew he was a former cop and was a guy that had responsibility.

I believe he was actually set up as our contracting officer representative, from what I recall.

Q Who else did you interface with out there?

A You know, I don't recall exactly. We had so many contracts. But Maksymyk was a guy that was, I believe, was associated with the effort and I

remember that only relationally, because there was a -- I believe there was a termination action on BPSA because they were having a contractor that wasn't performing out there.

And he was pretty heavily involved in that, because I think he had written a statement of work and was pretty interested in improving the support that BPSA was receiving.

Q The contract that was terminated, are you referring to the contract that was terminated before the Laudes Corporation became involved?

A Correct.

Q And you terminated that contract, right?

A I did.

Q So Maksymyk was involved in the drafting of the statement of work that was originally awarded to the contractor that was terminated later?

A Correct. And that's my recollection, that Maksymyk was part of this situation. I haven't seen any documents that really jog my memory. But I do recall him, like I said, relationally to the situation we had at BPSA prior to Laudes coming on

the scene.

Q When you came into the security and justice sector, within a couple of weeks or whatever after you arrived in the country and were put into the security and justice sector, was the BPSA contract one of the ones for which you were given responsibility?

A It was. I took on -- life support was one of the functional areas that I was given, yes.

Q What other functional areas were you given?

A I was responsible for -- I had about a five-person team. I had myself as a contracting officer, and then I had four contract administrators, which were CACI employees, C-A-C-I, and -- well, not all CACI. And I'm not completely sure of the number.

But we also had, I think, one enlisted troop that had a limited warrant and I believe I had -- briefly I had one other enlisted person that had a limited warrant.

But, you know, we -- during the majority





6e78851e-4fed-4171-a01f-debdce8a46c8

question later about your contract, that you go to.
And that is how we are trained and taught, to keep a complete file, you know, document regularly. And if that is what that is referencing, which it may be referencing that, this would be the place you -- you'd tab that early on in your file keep the record.
Q Did you keep a complete file of the BPSA contract file life support contract while you were there?
A I did.
Q Do you recall what was in that file, generally?
A Generally, you would have the basics. The answer to your question is, I don't recall exactly what was in the file.
Q But you did keep one?
A I did.
Q And did you attempt to follow the requirements and the training that you had prior to the arrival in Iraq in maintaining that file?
A Yes.

Q So you tried to put in there what you would normally put in the contract file?

A Yes.

Q Do you recall whether you ran into difficulties in doing that?

A Well, I will say that now contracting in the green zone in the middle of a combat zone is more difficult than contracting stateside. And occasionally, we did run into, you know, road blocks and things that would prevent us from being as complete as possible.

For example, automation, computer problems, telephone problems, et cetera.

Q If you go back to the second page of this first exhibit we were talking about, Exhibit 1. And in that table, we have got a bunch of items listed, miscellaneous, office supplies, equipment, vehicles, furniture, et cetera. Do you see that?

A I do.

Q Were you responsible for purchasing those types of items for BPSA?

A I don't recall exactly.

occurred on 2 June.

Q What do you know about the semi-permanent academy issue?

A I really don't recall any of those specifics associated with this. You know, I didn't even remember the name of the group. I remember -- I think there were some termination procedures that I recall dealing with Ballock and Row.

But I don't recall the company and I don't recall anything associated with that company, other than, you know, I believe they were terminated for nonperformance. I don't remember this semi-permanent academy. I just don't have a recollection of that.

Q Well, the project requirements and the description of work listed on that page talked about to -- the intent is to provide basic design and construction services to provide an expedient camp of 1250 students, right?

A Correct. The camp was -- that I recall was expanding. I mean, it was just -- it almost felt like a -- you know, the requirement was just

exploding because there was a need for greater and greater number of cops. So this was a result of requirements from CPATT going up and up and up because of the security environment that was happening in '04.

Q You testified earlier, I believe, that you never went out to BPSA, right?

A I never physically went out there, no.

Q So you don't know what kind of semi-permanent academy Iraq-Khadmat was constructing, right?

A I didn't put eyes on. We had Colonel Maksymyk and our POC with the BPSA kind of put eyes on it for us.

Q The POC, who was that?

A That was Mr. Nordgaarden.

Q Let's go to Exhibit 17.

(Whereupon, Deposition Exhibit Number 17 was marked for Identification.)

BY MR. JACKSON:

THE WITNESS: Would it be possible for me

that would normally precede this kind of thing. But I think we also had some meetings with General Seay about it and just explained to him verbally what the situation was so that what he was looking at made sense.

Q Let's go to Exhibit 24.

(Whereupon, Deposition Exhibit Number 24 was marked for Identification.)

BY MR. JACKSON:

Q This is the letter contract you awarded to Laudes, right?

A Correct.

Q Now, the attached statement of work that is attached to this document that came through, first it has the terms and conditions and then it's got the BPSA statement of objectives.

Did you have a new statement of objectives given to Laudes than was the statement of objectives used by Iraq-Khadamat just prior to their termination?

A I don't recall.

Q One of the things that this letter contract requires is security upgrades, right?

A I'm sorry. I'm not following you.

Q Well, if you look in the letter contract itself, about the first paragraph of your letter about six, seven lines down. It says cafes and security upgrades.

A I do see that.

Q So it says: Additionally, you will be responsible to provide armory, ammunition and armor support, portable sewage services, ensure quality construction of the semi-permanent academy, internet cafes and security upgrades, right?

A Correct.

Q Do you recall what those security upgrades were?

A I don't.

Q Were those something different than was required of Iraq-Khadamat?

A I don't recall.

Q Did you meet with Larry Underwood to sign this?

A I assume I did. Larry generally came into the office and signed things in person.
Q Did you have prior dealings with him?
A I did.
Q And did you approach him for this replacement contract or did he approach you?
A I don't recall. I mean, it could have been -- it's possible that I did. I just don't remember. It could have been Maksymyk that contacted him or had discussions with him or it could have been someone else. I really don't -- I kind of have an unclear memory on that. I just don't remember.
Q Do you recall whether you had discussions with Mr. Underwood about the NTE price of $26 million?
A I don't recall specific discussions, no.
Q Do you recall whether he told you that the NTE price of $26 million -- or that he could not do this work for $26 million?
A Again, I really don't recall, you know those specific discussions, although, I will say it

is clear that, you know, he did bid on this work earlier at a higher price. And clearly, the price that was attached, you know, in this letter contract was a lower price.

You know, and he agreed to do the work with that NTE on the contract. So, you know, it's likely that, you know, when I sent this to him that he would have brought it in the office and we would have talked about if he had questions.

And, you know, I'm sure I emphasized the fact that this doesn't just say, Laudes agrees to perform work in accordance with attached statement of work, but it also has an additional requirement to give us an updated proposal, which would be his opportunity to come in and say, guys, I bid this earlier and this is the price I can do it at and this is still my price and I'm just not going to be able to do different -- you know, various parts of the statement of work.

Anyway the re-proposal is your time to come in and tell us what you can or can't do. It's also our opportunity to kind of negotiate that price

and look at the contractor eye to eye and say, okay, you know, we literally take it paragraph by paragraph.

And, you know, stateside we get the basis of estimates that come in and you've got them in front of you, and that allows you to interpret the statement of work and possibly rewrite it to make it more specific.

That we -- that -- what I recall is never getting a proposal to go definitize on this NTE amount. And that looks like my writing there on 3 August right before I left, and it still wasn't done, so long answer. I don't know if I answered your question completely.

Q Well, if Larry Underwood said that he told you he couldn't do it for $26 million, would you disagree with it? Would you say that's incorrect; he didn't tell me that?

A I really don't recall the specifics on it. I will tell you that, you know, in my 15 or so years in contracting, I generally -- not generally -- always require a contractor, regardless

of what the discussions are, you've got to come in and give it to me in writing so -- with more specifics the better, especially if you are in the negotiating stage.

You've got to give me something to go show the technical experts to see if it holds water or not. You've got to give me something in writing with some pricing on it and some specifics. And we just never had that.

I wasn't part of the acquisition that Major Hirtle ran. I wasn't part of that source selection at all. So what may have transpired or what could have transpired is, I'm giving you the same proposal I gave him. Nothing has changed. You can like it or lump it, and you can tell me what not to do for the extra delta that's in there. That's certainly a possibility.

I didn't even get that, so we just kind of kept moving along with this NTE hanging out there, and that's just not a good situation to have.

Q I understand everything you said. My question to you is, during -- on this day, when this

thing was signed, do you -- if Larry Blackmon -- Larry Underwood were to say that at that time, while he understood he had to provide you a proposal, he also told you that he could not do this work for $26 million, would you disagree that, no, he didn't tell you that?

A I just don't recall it. I'm almost certain what my response would have been: Got it, give me something in writing and we will negotiate it. And that would have been my view at this point because we've already, you know -- he signed this and agreed to go, you know, start the contract, which is important. We wanted to get it moving.

This was an important milestone to have somebody in there that's -- it's a new direction on the contract and that's important.

But in my mind, you know, the verbal conversations -- you know, the verbal stuff can be misinterpreted. What I was looking for, as I stated in the letter, I need a proposal and then we can get serious with it.

So with no specific recollection of that





6e78851e-4fed-4171-a01f-debdce8a46c8

conversation, I -- I just don't remember.

Q Where did the $26 million figure come from?

A I don't recall.

Q We saw the form, the purchase -- what did we call it -- the purchase request form, the funds authorization form for the $26 million. Did you have any role in preparing that?

A The PR&C?

Q Yes, for $26 million for the re-award.

A I generally wasn't a part of that process. You are going to have to understand in my mind, there's certain checks and balances in our system. When I award -- compete and award contracts, and I'm the guy signing it, you know, spending the dollars, the requirements side of the house, I generally let those guys do their thing and go figure out what they want, you know, let them coordinate with the financial managers.

But generally, if they have questions about contractor capabilities or they have questions about information that I may have in the file or

know about, I will talk to them and engage with them.

But generally, that PR&C, they push that along and get all the signatures and then they show it to me. So long answer, I generally don't get involved in those kinds of things.

On the other side of it, you know, when services are delivered or supplies are delivered, I don't sign DD250s, material and receiving reports. I stay away from that. I stay away from the requirements side of it, and I try to stay in my lane. I think that's important for, you know, for some checks and balances in the system, so --

Q So you didn't have any role in coming up with the $26 million figure that was used as the NTE price?

A I didn't say that. I wasn't involved in that PR&C process. I honestly don't recall how we landed on that number.

Q Who would have been involved in coming up with that number?

A You know, generally, what we try to do

because an effort like this was not something new. You know, we had several other efforts that were similar.

Generally, what you try to do is you get other data points on a side and scope. You get some other data points that you can put together to give it a rough estimate, you know.

For lack of a better term, this was a ROM, this was a rough order magnitude cost that was -- and you know, that's part of it, and then part of it is what dollars you have available.

So -- but specifically, I don't recall the process, but I would have been involved in putting those elements together, making sure those made sense from a cost standpoint.

Q At the NTE basis?

A I would have been involved in that.

Q Lieutenant-Colonel Maksymyk, would he have been involved?

A Probably, in data gathering and -- because I think he had been involved in the earlier source selection. And, you know, that's the other

piece of the puzzle. You've just completed this, so you've got data points based on what your bidders have bid and the number -- you know, we could have put that in the formula. That's likely. I just don't have a specific recollection of that one in particular.

Q Was it your anticipation that the proposal coming back from Larry Underwood would be in excess of $26 million?

A I don't recall.

Q If he says that he told you it would, would you -- do you have any basis to contest that?

A Well, I'm speculating, but given the fact that he -- his earlier bid was higher than that, it wouldn't have been a surprise. We would have had to conduct negotiations at that point and that's the whole reason you definitize something.

You know, the government has funds set aside and if the bid comes in higher, you've got two choices. You can either say, you know what, this is not going to work out, we are not going to award you the contract or, you know, in the case of a letter

contract, in theory, you can stop the effort and give direction to the contractor, or you can say we've got requirements, these are the requirements.

You know, in theory, the contractor has costed it out literally paragraph by paragraph. In theory, you will be able to pull things from the statement of work. I mean, that's the only way you get to the number.

If you've only got a certain number of dollars, you've either got to reduce requirements or you've got to get more money, one or the other.

So I don't know what we would have done, but it wouldn't have been a surprise if he would have come in higher, just because his earlier bid was higher, so --

Q But at this point, if he were to testify that he told you that his bid was going to come in higher than that, you don't have any basis to disagree with him that he told you that?

A I don't.

Q Where did you come up with the date of 27 June 2004 here in paragraph 2 of this letter?

A Generally, I would -- I try to think through a reasonable time period for bid preparation. And I think I just tacked on a week to the issue date of the letter.

Q It wasn't tied to the looming transfer of authority?

A I don't recall that it was.

Q Did you know on June 20th that the transfer of authority was going to happen on June 28th?

A I think that was pretty common knowledge that that was going to occur.

Q The June 28th day or the June 30th day?

A Oh, I'm sorry.

Q June 30th was the one that was -- had been publicized, correct?

A Yeah. I'll stand corrected. The publicized date was the one that was common knowledge and that was the later one, 30 June. Then -- but, no. To answer your question, the earlier date was a total surprise to everybody. We had no idea.

I mean, we literally had contracts that had been executed, you know, only partially executed that we had negotiated and we had money for and we had taken it through the entire negotiation process and traded award documents.

And we literally had some in the pipeline that were ready for signature that we couldn't execute because it was a situation similar to a fiscal year close out, where they give you a 30 September date to have everything signed and obligated, and then they back it up two days on it. It just threw everybody out of whack.

Q So how would you have definitized this particular contract if the definitization value was above $26 million after TOA?

A I don't know because the rules of the game had changed at that point. I mean, after that date, I wouldn't have had the authority to go, you know, take that NTE up or down at that point. You know, you are dealing with funds. That sort of gets out of the administrative ball park. It just would have been a different set of rules past that date.

Q Did you and Mr. Underwood discuss that on the 20th?

A I don't recall that we did, although I do recall that Larry was concerned about that, as were a lot of other contractors were very concerned that dealing with the Iraqis would have been an unknown, I guess, to put it one way.

So many contractors had things they had envisioned going wrong with the contracts with the Iraqis due to past practices and reputation and that kind of thing, so --

Q Were you aware on June 20th when you signed this letter contract what the limits of your authority after transfer of authority would be?

A I didn't know particulars, but I had a good idea that I wouldn't be signing contracts or obligating dollars at that point. I was pretty sure.

Q On what did you base that?

A Well, we existed to -- you know, as the CPA we existed in a certain role and that role would no longer exist after that date, so it would change.





6e78851e-4fed-4171-a01f-debdce8a46c8

Q So you were surmising that that was what was going to happen? Did you receive any particular direction from anybody?

A We didn't. There were a lot of unknowns around our office. Nobody had good answers about how that particular relationship would shake out. Just a lot of unknowns, I guess, is the best way to describe it.

Q So there wasn't any advanced planning that told you what you could or couldn't do after June 30?

A There was not.

Q You weren't provided anything in that regard?

A I wouldn't -- I guess I would get a little bit nervous about saying anything. There may have been some office correspondence come down that provided direction from our PARC. He would be the guy that generally would write that kind of contract specific guideline.

I just don't recall any of that correspondence, quite honestly. I do know we had

a -- I think something came down on a prohibition past 30 June. But I just don't recall specifics on that.

Q Do you remember seeing something from the Iraqi administrative finance about that? There is a 15 June letter. And I will show it to you in a minute. But there is a 15 June letter that says after transfer of authority, essentially, you can't do any more of this stuff.

A Okay.

Q Do you remember seeing that?

A I don't recall that, but it's not -- I mean, that's consistent with kind of what I remember about there being a moratorium, but that's at -- past 30 June, was that --

Q It was the --

A -- or transfer of authority?

Q Yes. It was signed on June 15, but it was close held. The June 28th was going to actually be the transfer of authority date, so it wouldn't have included the June 28th date, for obvious reasons.

A Yeah, and that's not inconsistent with what we had in our minds as contracting officers.

Q Go to Exhibit 57.

(Whereupon, Deposition Exhibit Number 57 was marked for Identification.)

BY MR. JACKSON:

Q And tell me if you remember seeing that letter on or about the date of the letter.

A I don't recall ever seeing this letter.

Q Do you recall the substance of the information in that letter being given to you before June 20th?

A I don't recall it, no.

Q So, essentially, what -- I am going to paraphrase and tell me how -- I want you to correct me where I'm wrong. Prior to June -- the anticipated transfer of authority date, there was discussion in your office that things were going to change, but you didn't have specifics as to what those would be?

A Correct.

Q And that you did not see any paperwork one way or the other about that fact?

A Correct.

Q Would you go to Exhibit 25, please?

(Whereupon, Deposition Exhibit Number 25 was marked for Identification.)

BY MR. JACKSON:

Q Did you ever see that letter?

A I don't recall it, no.

Q This looks like a proposal, a definitization proposal, submitted by Larry Underwood for the BPSA for the life support contract.

A I don't recall this. It doesn't look like a proposal. It looks like a brief description with a dollar on it. It's not something that generally would give you any kind of a granularity to be able to negotiate, so --

Q What were you trying to negotiate at that point?

A Well, you've got the life support and

you've got anything above and beyond, generally.

Q Do you recall whether there was, in fact, anything above and beyond?

A Well, we made reference to some changes in the body of that letter and there may have been additional to that. I don't recall. And certainly, you are going to have some basis for some discussion due to the fact that your dollars are clearly exceeding what the NTE is.

So you need to be able to come in and support that. You know, a three-line letter on the surface just doesn't look -- it doesn't look like a proposal to me. It looks like a letter.

And I'm not sure why it was sent to Eric Maksymyk. He was never contracting officer. So I honestly don't know why it was sent to him. When I sent the letter, I was clearly the point of contact. I just don't know.

Q And this is the guy that was two desks from you?

A He was in the same office.

Q You said a couple of minutes ago he was

two desks down from you, right?

A Roughly. Yeah, in roughly the same area.

Q Have you ever awarded a letter contract before this one?

A I have.

Q Do you know what the FAR rules are with respect to the NTE placed in the letter contract?

A I generally do.

Q What are they, generally? This isn't a test. I am just trying to get an understanding kind of.

A Well, I mean, unfortunately, at the time we weren't operating under -- we were under memo 4, which had no granularity to giving you directions one way or the other. So it was really just use your best judgment.

There are peculiar aspects to writing a letter contract. You have generally some service restrictions that occur on time for definitization. I guess a milestone that stands out in my mind is, you know, about 180 days out is your drop-dead date.

But before that, you've got certain





6e78851e-4fed-4171-a01f-debdce8a46c8

restrictions on how much money you can incur up to the NTE amount. There's certain percentages and that varies by MAJCOM.

So it can be -- you know, some MAJCOMs drive that number down, saying the contractor can't expend over 25 percent, 30 percent. I've seen it higher.

The letter contract I did was out of Electronic System Center, so we were under Air Force Material Command. I think ours was 50, I think. But you tend to drive that number down because you want to incentivize the contractor to come in with a proposal and get talking and get a definitized contract on board.

So those are a couple of the special things I remember.

Q Why didn't you use the proposal that Laudes had submitted on the phase 1 -- original award as a basis for negotiating the definitization proposal?

A I don't recall.

Q Was there something wrong with that

proposal that prevented it from being used?

A I guess my line of reasoning was if that proposal is still current, accurate, and complete, then Mr. Underwood will go through the trouble of resubmitting that to me. And that will be his basis for proposal -- negotiation of proposal. And I figured at the time we would go through and talk about any kind of changes or anything that occurred with that. That was my line of reasoning.

Q Well, that was a proposal submitted competitively, correct?

A I honestly -- I never reviewed that file. I don't recall that file. There were certainly more than one -- there was certainly more than one bid in there, so that leads me to believe, without having more knowledge of it, that it was advertised on the website or fedbiz.ops.

Q And you had that contract file, right?

A The --

Q Iraq-Khadamat file, the contractor that was terminated.

A I'm sure I did. If I was writing

correspondence, I'm sure I did.

Q You terminated them, right?

A Right.

Q So you were writing correspondence for them, right?

A Correct.

Q So you had the contract file, right?

A I did.

Q So the bid that Laudes submitted in response to that solicitation was a competitively prepared submitted bid, then, right?

A I just don't recall that level of detail on it. I guess in my head I've got a little -- I've got a lot that comes with, you know, did you compete -- you know, was it a competitive solicitation.

I mean, there is a lot more to it than putting something on the street, having more than one bid. There's a lot of FAR rules that are out there that -- I'm not sure if that's what you are referring to, the competition.

Q Well, let's put it this way --

A I am not trying to be evasive. I just don't know if what you're telling me is consistent with what I've got flying around in my head regarding what the FAR says.

Q Well, in the context of this award, the original one with Iraq-Khadamat, it was competitively procured, correct?

A I just don't remember what Major Hirtle did on that file, honestly.

Q Well, the file will speak for itself, won't it? I mean, if he advertised it and he got multiple bids, would you say that's a competitively awarded procurement?

A Not necessarily.

Q Why?

A You can have -- I mean, I've seen cases where you have multiple bids, but you have -- you have determined that for some reason there are reasons to believe there were other things going on that may -- may not be a truly competitive environment.

In other words, you may -- you know, for

example, at the Air Logistics Center, we would sometimes get bids back on pieces parts and you may have all of the same -- roughly the same prices, but all of the prices are based on what the prime is charging. And these guys are middle men. And so you couldn't determine exactly a level of competitiveness. That's just one example.

So just having multiple bids in my mind doesn't make it -- automatically make it fully competitive.

Q How did those considerations apply in this case when you awarded the -- when you were anticipating definitization and proposal from Laudes, or did they?

A Can you repeat that question?

Q You just described a bunch of circumstances when an award could be considered not competitive. How did those thoughts that you just described affect at all what you were doing with Laudes at the time?

A Well, from what I recall, I believe Major Hirtle, in all likelihood, competed the requirement

and that he got more than one bid in and that generally, when you have more than one bid in, unless there are extenuating circumstances, it is normally competitive.

One additional issue is you've got -- you know, normally, your proposals are only good for 30 days, I think. Or it might be less, depending on what they write on there. They may caveat that when they submit their proposal. This is good for -- it might be good for less time than that. That was another consideration.

Q Did you actually believe that Laudes would take its original proposal that it had submitted and make modifications to it and submit it to you as a definitization proposal on this project?

A It was possible.

Q I understand it's possible. Is that what you believe would happen?

A Can you restate the question? I think I know what you mean, but --

Q What did you anticipate receiving from Larry Underwood in terms of a definitization

proposal?

A I would get an updated proposal that would speak to statement of work and would give us back his response. I did anticipate, based on the fact that those guys were more expensive in their earlier proposal that we would have some -- we would have our own personal negotiations and that we would have to get serious.

And that would help me on the government side too. It would help my guys get into the statement of work and understand it and, you know, get down into the weeds and understand what we are paying for, what we are not paying for and have a real negotiation about what Laudes was charging and what was going to go on the definitized contract. That's what I assumed would happen.

Q And you anticipated that it was going to come in in excess of the 26 million, right?

A I really had no idea. I mean, I really can't say with certainty what their price would have been.

Q But you can't sit here and tell me that





6e78851e-4fed-4171-a01f-debdce8a46c8

Larry Underwood didn't tell you it was going to come in over 26, right, because I am just going to represent to you right now that that's going to be his testimony, that during this negotiation of 20 June, when you signed this letter, that he is going to say he told you he couldn't do this work for 26 million; it was going to cost more.

Now, if he says that, is he lying?

A I just don't remember -- I don't remember specifics about a conversation that occurred in the green zone when we had a lot of activity there. My memory is just not that good. I just don't remember that.

But, again, to answer your question, going another way, they did have a price on the table for this work that was higher than the existing NTE that we sent them. So we knew there would be a basis for some negotiation on the contract.

Q Now, assuming it was going to be higher than $26 million and that you were going to get a definitization proposal in that was going to come in

at or near the end of the month and that you were -- your authority with respect to DFI funds was going to go through some sort of change at the end of the month, how did you anticipate resolving all those facts and dealing with the definitization of the contract?

A I really didn't foresee this negotiation process being any different than many of the other ones that I had been apart of. You know, often you have a contractor that -- you know, when he bids something, when he bids some work, you know, depending on how the contracting officer has set up the acquisition process, he may go on site for a site visit or maybe two site visits and look around and say, I think it will cost this to do this or whatever.

But, generally, if you get into it and now it's your contract, you are certainly incentivized to understand what you have gotten yourself into. So having a period of time to be at BPSA, see what facilities -- what their conditions are, see the processes that are on site, having

contacted subcontractors, basically getting your house in order, I wouldn't venture to say that your price is going to remain static.

As a matter of fact, I would be very surprised if your price remained static. And that's just the way things generally occurred. You know, it may go up or it may go down.

I mean, I just don't have any reasonable assumption that you have prepared a good enough proposal or that would -- where it's the perfect proposal that it's static.

So I had some reason to believe that that number, you know, would go down. I mean, it's possible, based on the site may be in better shape or you've got better deals with your subcontractors. That kind of thing may have driven your price down.

Q Did you believe it was going to go down?

A It's possible. I mean --

Q That's not what I asked, sir. Did you believe it was going to go down?

A I don't remember forming an opinion whether it was going up or down. I mean --

Q If Larry Underwood told you that it was going to be in excess of $26 million, even if it had come down some, it's still going to be in excess of $26 million, right?

A Well, yeah, depending on the math.

Q If he told you it was going to be in excess of 26, it can still come down from 35 to 30 and still be in excess of 26, right?

A Yeah. Thirty is definitely higher than twenty-six.

Q So what was your plan with dealing with the definitization of the contract on the particular contract if the price came in over $26 million?

A Well, the idea was that we would have an opportunity to conduct a negotiation for definitization a week and no later than a week in and take that opportunity -- if we truly came to an impasse, which is possible -- I mean, I've been in negotiations where that happens.

I will reference back to an earlier statement that I made. The government has a decision to make. They can either go get more money

or they can decrease requirements.

But if I put an opportunity out for the contractor to give me a proposal and I don't get one back in a timely way or it doesn't provide me enough detail to negotiate it, it just doesn't really put anybody in a good position, in my opinion?

Q What was your plan if the price that you ultimately agreed to or you couldn't get below was going to be in excess of $26 million? Was it your plan to cut requirements in that case?

A I wouldn't be the guy that would cut requirements. That's not my call. I mean, I'm not a cop, I'm not a program manager. I'm somebody that when the decision is made to cut requirements or to go get more money, whatever our customers decided they needed to go do, I would execute that. And I would certainly provide my advice on how to handle that kind of situation.

Q If you needed more money than $26 million to definitize the contract without decreasing the requirements, what was your plan as to that course of action? What were you going to do then?

A Well, you are going to have to go -- you are going to have to go take it through the channels that are available to you, just like with any other requirement.

Q On June 20, you didn't exactly know what requirements would be available to you on July 1st, did you?

A We didn't, not that I recall.

Q Any idea why Lieutenant-Colonel Maksymyk didn't provide this 28 June 2004 letter to you?

MR. PROUTY: I object. He didn't say that he -- he originally said he didn't recall seeing it.

BY MR. JACKSON:

Q You can go ahead and answer the question.

A I don't know of any reason why he would intentionally withhold it. It could have been just an administrative issue or I didn't see the piece of paper or I didn't see the e-mail or, you know -- I just don't know.

But to answer your question. I don't know of any reasons why he would have to not show me

the piece of paper.

Q Did the requirements at the BPSA continue to evolve after contract award, after the 20 June letter contract?

A I don't recall specifically. But I will tell you, generally, almost all of the life support contracts we dealt with the requirements were -- you generally had some change in requirements.

Q Well, in this particular one, there was a pretty big change right off the bat, wasn't there, I mean, just prior to contract award to Laudes? The semi-permanent academy was a pretty big change, wasn't it?

A I thought the semi-permanent academy was in the south originally.

Q Let's go back and look at the contract as awarded by Major Hirtle.

A That's not -- I mean, did I have a -- I should have had a statement of work on the -- or a statement of objectives on the letter I sent, on the letter contract.

Q I don't know. You may have, but the

copies that we get are the copies that we get and the form we get them, there are about a hundred different versions of it.

So I am just talking about -- let's go back to the statement of objectives as it was originally awarded and then right afterwards, and we will talk about that for a second because -- go to Exhibit 15.

A Okay.

Q Page 11 of that and paragraph 329 is the statement of objectives that is the semi-permanent academy. Take a moment to read that.

A Yeah, that's -- that's worded in a way that's kind of unusual. You generally don't ask for an option in the body of your statement of work. You ask for an option up-front in the first -- normally section B, schedule, where you have different CLINs. So I'm not sure why they buried an option into this statement of work. I don't know.

Q This was exercised at award, right? In fact, this semi-permanent academy --

A You mean from Major Hirtle's exercise?

Q Yes.

A I don't recall.

Q Wasn't the semi-permanent academy at BPSA -- this 329 was intended to be someplace else, right, if you look at 329?

A I'm sorry. I lost you.

Q Back at Exhibit 15, paragraph 329.

A Oh, I'm sorry. Okay.

Q The location to be determined within the southern southeastern portion of Iraq.

A Correct. And I think that later became -- I think that later became a location at Hilla, I think, but I'm not -- no confidence in that. That's just speculation, so --

Q And as this was awarded -- when 329 was one of the CLINs awarded, this option was exercised, the --

A What is the attachment number on that, or appendix number for the award?

Q Just one moment, please. Thirteen is the actual award letter.

A I see it, but I don't see it exercised.

Q That's how you get to the price of $24.1 million, some of the CLINs.

A I guess I don't understand why there's -- I see two prices in there. You see a total award amount and you see another amount. I don't think I understand that. There is no other document that gives -- I mean, I think I can back into it and figure out where he got the number from, but it's certainly not in the format that I have seen that's -- it's not in the format that I'm familiar with.

But there may be other reasons why he did it a certain way. I'm just not sure. It's just a little confusing when I read it.

Q Well, the failure to work on the semi-permanent academy south drop-in facility was one of the primary reasons you terminated the Iraq-Khadamat contract, right, the first reason you mention, on Exhibit 19?

A It is in paragraph 2.

Q And that's the first reason you mentioned for termination, right?

A Right. I see it now. It's in CLIN 1009. Yeah. And that is one that was exercised because you see an amount on both sides of the ledger, so --

Q From the requirement side, that was the driving force, wasn't it?

A Well, it's in the letter. I don't recall exactly all the elements involved in that termination, but it's certainly something I put in the letter and made it, you know, an important issue for the contractor.

Q How often did you see Larry Underwood after execution of this contract?

A I saw Larry sporadically. He would come in -- sometimes you would see him a couple of days in a row, and other times it would be, you know, longer periods of time before you would see him.

Q Did you ask him about the definitization proposal?

A I don't recall.

Q How did your duties change from before transition of authority to after the transition of authority?

A Well, you know, I was still performing as a contracting officer. I was still sending out correspondence and preparing award documents and negotiating. So my day to day duties weren't that different.

The biggest difference was our pipeline of dollars for DFI money was gone and so we had to shift the focus to -- we had certain funds that we had to spend for -- on the appropriated side.

So we started doing more and more contracts that were using the terms and conditions you generally associate with American contracts, you know, spending appropriated dollars, which means we started having to pay particular attention to all the rules and regulations associated with the FAR and the service supplements and agency supplements and all that.

It wouldn't be an agency supplement, but a service supplement on the FAR. So our world changed a little bit in the sense that we weren't using CPA memo 4 anymore. We were using the FAR just like we would stateside.

So in that way, the duties weren't different. Our focus was different, from what I recall.

Q Prior to transfer of authority, were you involved in the payment process?

A What do you mean?

Q Were you involved in the invoicing approval and payment process with respect to Laudes?

A I don't remember specifics. I'm sure I was involved in the sense that, you know, often the contractors would come in and drop off the invoices in our area. We needed to get those to other places.

So in that sense, we were involved and we certainly were involved in phone calls that we received from employees asking the status of various invoices. And I helped get those in front of the right people in the chain of people that had to approve the invoices.

Q So what was the invoice approval process, to your recollection, when it came to this particular contract?

A I don't recall being involved in that. I thought that was after I left. I left the first week of August, so --

Q The contract was awarded August 3rd.

A I'd have to look at the document.

Q Well, that's not really at issue at this point in time. If we ever come back to it, it's something I may talk to you again about. At this point in time, it's not really an issue.

A Okay.

Q Do you recall any of the changes in the statement of work that happened in the phase -- or the BPSA contract that you awarded to Laudes, which I will call the phase 1 contract?

A You know, in general life support in Iraq was a very fluid thing and you had a lot of changes, not just for this particular effort, but all over the country, all over the AOR, so it was very challenging to do -- to do that effort.

Q Do you recall whether additional security requirements were placed on the contract after the award to Laudes?

A I don't recall.

Q T walls, do you remember that?

A Well, I do know there was a -- there was some activity out there at BPSA, I think some car bombing, mortar, other indirect fire. You know, I do know they were in a somewhat vulnerable location. So it's likely that there were some additional measures taken. I would be very surprised if there wasn't.

Q Would you agree that Laudes would have needed a complete statement of work in order to put together a definitization proposal?

A No, I think I would disagree.

Q Why?

A Well, you generally write -- I don't remember exactly what we called it, but you write your requirements, you write what you have in the government's perspective in your SOO, statement of objectives.

And generally what happens is the contractor comes back in with an -- for lack of a better phrase, an interpretation of what he thinks

"

## CERTIFICATE OF NOTARY PUBLIC

I, Carolyn E. Friend, the Officer before whom the foregoing Deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing Deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotypy and thereafter reduced to typewriting by me; that the said Deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to this litigation; and further that I am not a relative or an employee of any attorney or counsel employed by theparties hereto, nor financially or otherwise interested in the outcome of this matter.

Notary Public in and for
the District of Columbia

My Commission Expires:
November 1, 2008

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LAUDES CORPORATION,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

Case No. 97-4C (Judge Wheeler)

TELEPHONIC DEPOSITION OF TED NORDGAARDEN

Taken June 5, 2008

Commencing at 10:00 a.m.

Volume I - Pages 1 - 90, inclusive

Taken by the Plaintiff
at
OLES, MORRISON RINKER & BAKER
745 W. 4th Avenue, Suite 400
Anchorage, AK 99501

Reported by: Susan J. Warnick, RPR

00002

A P P E A R A N C ES

For Plaintiff:

GARVEY SCHUBERT BARER
BY: Mark G. Jackson
1191 Second Avenue, Suite 1800
Seattle, WA 98101-2939
(206) 464-3939

For Defendant:

TRIAL ATTORNEY
COMMERCIAL LITIGATION BRANCH
CIVIL DIVISION
DEPARTMENT OF JUSTICE
BY: J. Reid Prouty
8th Floor, 1100 L Street
Washington, d.C., 20530
(202)305-7586

Taken by: Susan J. Warnick, RPR

BE IT KNOWN that the aforementioned deposition was taken at the time and place duly noted on the title page, before Susan J. Warnick, Registered Professional Reporter and Notary Public within and for the State of Alaska.

00003

(Exhibits 1 through63.)

P R O C E E D I N G S

TED NORDGAARDEN,

called as a witness herein, being first duly sworn to state the truth, the whole truth and nothing but the truth by the Notary, testified under oath as follows:

EXAMINATION

BY MR. JACKSON:

Q Ted, thank you for taking the time out to do this. I do appreciate it. I know it was kind of a hassle getting into Anchorage.

During the course of the deposition this morning for you, I'm going to ask you a series of questions. If at any time you don't understand my question, please tell me and I will try to rephrase it.

You will note during the deposition that I will stumble over my tongue repeatedly, ask questions that are unintelligible and I will mispronounce things, so please tell me and I'll fix it. Okay?

A Certainly.

Q One other thing, because we're on the telephone and not doing a video or in-person deposition, we obviously -- and the court reporter needs this for the same reason -- we can't recognize, hear or understand head shakes or nods.

00004

A Correct.

Q So we need verbal responses.

A Yes. Understood.

Q So with that, we will get ready and start then.

Could you please state your full name and spell your last name for the record.

A Ted Gilbert Nordgaarden, N-o-r-d-g-a-a-r-d-e-n.

Q And are you currently employed?

A Yes, sir, I am.

Q And with whom?

A The state of Alaska as a state trooper.

Q How long have you been doing that?

A Approximately a year and a half. Hired 25 February of '07.

Q Now, as you know, the reason I requested your deposition was to talk about your particular time that you spent in Iraq; correct?

A Yes, sir.

Q So can you tell me when you arrived in Iraq as an employee?

A September 11, 2003.

Q And by whom were you employed?

A I was employed by SAIC, under the ICITAP Department of Justice program.

Q And is that an acronym, ICITAP?

00005

A International Criminal Investigation Training Assistance Program. It's the federal program that we were hired under to work at the academy -- er -- actually, initially as advisors to the Ministry of Interior Police.

Q When you say "the academy", what are you referring?

A The Baghdad Police Academy.

Q We have seen acronyms PSA; are you familiar with that?

A BPSA? Yes, I am. I'm trying to remember all the acronyms. Originally It was Baghdad Police -- I'm sorry -- Baghdad Public Safety Academy, was the initial -- was the initial acronym or title of the facility, and then it was deemed later to become solely the police college.

Q So the Baghdad Police College?

A Yes. That was -- when I left in '05, it was the PBC. As the academy role was going to be phasing out and it was going to then ultimately become what the Iraqis refer to as the police college.

Q What was the academy role that you just mentioned? What do that mean?

A The academy role was to train, to provide basic training for police candidates that were hired by the Iraqis to put a police force together of approximately 75,000 officers for the country of Iraq.

Q Did that role change when it became the Baghdad

00006
Police College?
A It was going to. It had not when I left. But as I understood, the title change and the role of the facility was going to roll over or change that once the 75,000 was reached, then the facility was going to become the police college which essentially is like a four-year university for police officer candidates who were hired, would then become officers, lieutenants and above, kind of a four-year OCS, officer candidate school. And that was the -- that is what the facility originally under -- apparently under Saddam and his regime, that is originally what it was, and it was -- and that was the only place for it.
And so once the basic recruit, the NCO, for better words, was trained out in the field, they needed their college back, and that was their desire, and that was the direction it was headed when I left.
Q And did you say you arrived in September of '02?
A 2003.
Q And did you spend -- you say you left in 2005; correct?
A Yes, October 2005.
Q So did you spend the entire time between September of '03 and October of '05 at the Baghdad Police College, Public Service Academy?

00007
A That's where my job was, yes.
Q What was your job while you were there?
A I was the logistics guy. The title varied. It could have been chief. I was predominantly the sole logistics guy for the whole facility.
Q And what were your duties as the sole logistics guy?
A It would be, you know, forecasting requirements for students and staff. Preparing scopes of work for that, for the purchase, proposing a scope of materials, finding vendors, submitting those scopes of work, getting -- coordinating with the Ministry of Interior personnel to get the funds, and then purchasing and distributing, stores, the overall logistics operation of that.
And later on, as larger contracts were obtained for the academy, I became the contracting office representative for most of the contracts that were there, that applied to the academy.
Q What do you mean by "larger contracts"?
A The life support contract. Primarily, there was two; the life support contract for the academy and the construction of the academy that Parsons Delaware had obtained. Those were the two primary contracts that were in operation or under construction or being done while I was there.
Q And we're going to start with the life support

00008
contract in just a moment. We will come back to those.
Did you do anything preparation for the deposition today?
A No.
Q Talk to anybody?
A No.
Q Review any documents?
A No.
Q So let's talk about the life support contract for a few moments. Actually, for a long few moments.
A Okay.
Q What was your first involvement with the life support contract?
A As I recall, I worked on coming up with helping work out the requirements of what we needed for life support, like a scope of works and materials, what we would ask the companies to provide us that would bid the project. So I worked on that with the other logistics people that were in the Green Zone or with the Ministry of Interior and procurement.
Q With whom did you work doing what you just described?
A I don't recall. I see faces, but the names are -- a majority of the work -- the difficulty in all of this, really, for me was is by the time I was working on that, I was physically living at and working out of my office at

00009
the police college, and the insurgent activity had ramped up significantly, so travel between the Green Zone and the police academy was out in the Red Zone, if you want to call it that, out in town. So travel back and forth just basically didn't happen. So the work was done by Internet -- well, 90 percent was Internet and telephone, just back and forth, sending stuff, and occasional visits, so that's why I don't recall.

I talked to folks on the phone and on the Internet and never had enough face time to do that. It's a terrible thing on that.

I'm just -- if I started digging through paperwork and saw names, that's probably what would happen, is I would recall.

Q Did you work with guy named Lieutenant Colonel Eric Maksymyk?

A Yes.

Q And what did you do with him?

A As I recall, a lot of that was -- a lot of the prep work, the prep work in coming up with the scope of works for the original -- the initial life support. Because also, at the time, it was not only finding the life support for the academy is that we needed temporary housing or housing, because we were also having General Petraeus's desire to increase the amount of students, you

00010

know, at all the academies at Baghdad and over in Jordan and Hilla and the others. We're were trying to get it to get up with -- er -- to come up with or to meet his 75,000-man goal in his time frame.

You know, we crunched the numbers and came up with what each facility needed to graduate. So we had come up with ours, and we were seeking a company to do life support and also build the temporary living facilities to house the sufficient number of students, which basically came to 35 hundred students per class, which then turned into -- and you have two eight-week academies running simultaneously with a four-week separation. So you had about 7,000 people was the plan on the academy grounds or students.

Q And the existing facilities weren't sufficient to house that number of students?

A Right, not at the beginning.

Q And that was the construction of the facility that Parsons was supposed to be performing; correct?

A Right. That was the other contract, was they were going to build that permanent facility, and that was being -- that started a little bit later, and, you know, while that was being planned, the life support contractor that ultimately became Laudes but started with someone else being awarded, and, you know, they tried tents, which

00011
didn't work, and then it changed from there.
Q Well, do you have that notebook in front of you?
A I do.
Q Why don't we turn to Exhibit 1.
A Okay.
Q And if you would look to the second page of Exhibit 1, which is a -- looks like a memorandum dated March 29, 2004?
A Yes.
Q You see there is a text box or a small spreadsheet within that memorandum; right?
A Yes.
Q Were you -- is this document familiar to you at all?
A No, I don't recall seeing it specifically.
Q Would you have been involved in the preparation of the requirements for which the total estimated cost is provided in that text box?
A I believe was. I should have been, but -- and I believe I would have been. That was -- that is -- I spent -- you know, that was a great deal of my time was just doing that: helping forecast ammunition, weapons, the uniform requirements, you know, what we needed for office, student supplies and so on, the furniture for, you know, current facilities, projected facilities, that kind of stuff, but, yeah, I think that's very easily part of

00012

what I worked on.
Q We will come back to that in a few moments. Just so you know, this isn't a test.
A Oh, I understand. Certainly.
Q So let's go to Exhibit 3.
A All right.
Q And take a moment and leaf through that document, if you would, please.
Just let me know when you have finished leafing through it.
A All right.
Q Is that document familiar to you?
A I don't recall seeing it. As far as being put as an acquisition plan, I didn't -- no. The numbers and the requirements and stuff are familiar, certainly, but this actual plan, I don't recall seeing.
Q And how are the numbers and requirements familiar?
A Again, that was the -- in this time frame, the numbers for students matching -- looking at the time and it being called a Public Safety Academy, so there is references to fire protection and the amount of personnel, you know, it was going to be -- there was a plan for the facility to have, like, firefighting training going on there. That's why it was a Public Safety Academy, and then they were separated out later because it just wasn't

00013

feasible on the ground.
Q Okay.
A But, yes, the contents is familiar, but the actual document, I don't recall seeing.
Q Okay. If you would go to, I guess, paragraph three. It says "The Total Estimated Cost"; do you see that paragraph?
A Paragraph three, yes.
Q And then flip over to the next page. It's got a spreadsheet there.
A Yes.
Q Are you familiar with that spreadsheet or with the information on that spreadsheet?
A The information is. That's a great deal of what we worked on, of coming up with the numbers and those things. I don't, you know, I certainly recall talking with Colonel Maksymyk on that stuff, but quite frankly, I don't -- you know, this specific one, I don't recall it, but certainly the contents are exactly what we would always discuss.
Q And this has a total estimated cost of 26.5 million dollars; correct?
A Correct.
Q In looking at this description of the items under this particular little spreadsheet here on the exhibit, is there construction activities in there -- or are there

00014
construction activities in there?
A Not that I see, no.
Q Do you know whether it was the original plan to have the contractor provide construction --
A No.
Q -- under the life support contract?
A No, it was not.
Q Now, under paragraph 11, you have on the next page, it says "Government-furnished Equipment"; right?
A Yes.
Q Do you know what that is referring to?
A Government-furnished equipment, essentially what the -- what we would purchase and have available for our use; i.e., the people on the facility, or for use by the contractor who provided life support.
Q Now, if you would just keep your finger on that page of Exhibit 3. If you flip back to Exhibit 1, and look at that one spreadsheet we were looking at before?
A Okay.
Q Are these the types of equipment that were being purchased listed on the second page of Exhibit 1 which were provided or intended to be provided, to your recollection, as government-furnished equipment under this acquisition plan in Exhibit 3?
A Yes. What would have been purchased on the Exhibit

00015

1, second page, that would have been or should have been government-furnished equipment.

Q Okay. Now, were you involved -- beyond I think -- I don't want to misstate what you said, but you were involved in identifying requirements --

A Yes.

Q -- for this BPSA; correct?

A Yes.

Q Now, beyond the identification of requirements, were you otherwise involved in the awarding of the contract, of the life support contact?

A I worked in the evaluation of the written proposals, if that's the right -- what the company submitted for their -- for the procurement office to review. I was one of the people that was asked to review their offers and evaluate the offers, yes.

Q So if you would switch over to Exhibit 5?

A Yes. Okay.

Q Are you there?

A Yes.

Q Does that look familiar to you?

A Yes, it does.

Q And how is that familiar?

A I wrote a lot of it.

Q Which parts of it did you write?

00016
A As I recall, I worked on and wrote out a lot of the paragraphs, the requirements within those areas, like each --
Q You're looking at the table of contents?
A Yes. If you would refer to each of the paragraphs, the numbered paragraphs, 3.1 for general information or something, that I would -- I either wrote or someone provided me one and then I adapted it to our needs or tried to adapt it to the needs of the BPSA at the time.
Having not had the experience of working in this realm before, I would be given examples and write from it, as I recall, but I wrote a lot of this.
Q On the table of contents, the second page, it lists down there at the bottom 3.28, 3.29. Are you familiar with those two paragraphs?
A Yeah.
Q What was the difference between temporary academy support north and semi-permanent academy support south besides the location?
And if you don't recall, if referring to the text of the paragraphs themselves, which are later on in this --
A I believe that is referencing the potential academies. 28 was referring to temporary academy support north was the Irbil Academy that would be required to --

00017

that was going to be put in or was proposed, and I believe the temporary or semi-permanent academy south, I believe ultimately that was going to be down at Hilla or Babylon, as the academy down there, and looking for the support, same thing, life support operations for those two facilities is what it was referring to.

Q Okay.

A And now that I sat and looked at it, did I answer your question?

Q Yes, you did.

A Okay.

Q Now, if you go to Exhibit 8, please.

A All right.

Q Do you recall seeing this document?

A Yeah, this would be -- I'm sorry about -- the form -- if this is the -- this is a submission or the report that he would submit for payment. I don't recall.

Q Without putting words in your mouth, is it possible that is the proposal that Laudes Corporation submitted in response to the RFP?

A Yes, sir, that's what it does look like.

Q So this is one of the documents that you would have evaluated in your role as an evaluator in anticipation of awarding a life support contract?

A I don't recall this type of document specifically,

00018

because I believe everybody would have -- the people that were bidding would have submitted the same documents or should have, would be my comment first. I may have seen this with everybody's. I don't recall this specific form. It very well could have been there. I just don't recall seeing that. And it very well could have been -- er -- these numbers were incorporated in their bid, in the document that I did look at but just in a different format, if that makes sense?

Q Yes, it does make sense.

A A lot of what I recall seeing -- the company packets were a little bit different. Some were extraordinarily brief and some were as detailed as what Laudes or this particular form had. A majority of the companies seemed to want to really introduce their staff, so they had bios, you know, for every person and pictures and stuff, which is fine, but, you know, I certainly would be more interested in seeing exactly something like this. That's why I recall -- I recall seeing the information in the form. In this specific form, I just don't.

Q If you go to Exhibit 11, please.

A Okay.

Q This is a Power Point presentation, I believe. Do you recall ever seeing this Power Point presentation?

A No, I didn't see that.

00019

Q Okay. Several pages in, about five or six pages in, there is slide called "Source Selection Team Composition". Could you find that page for me, please?

A Yes.

Q Looking down that list of responsibilities and names, could you -- I don't see your name listed; right?

A Right.

Q Within which of these organizations or subject matters did you perform your duties on this contract award? Maybe another way of asking it is: With whom did you work?

A Colonel Maksymyk. A little bit with LeMaster. I remember working with him. Mark Weaver, there was a lot of work -- contact with Mr. Weaver. Certainly recall working with Major Hirtle.

Q Who was the contracting officer?

A Yeah. I mean, either e-mails or speaking with him at times. I recall those names.

Q And you mentioned Mr. LeMaster?

A Yes.

Q What did you do with him?

A If I recall, he was a civil contractor or a civilian working in the contracting procurement office there, and I think one of the times when I did go in to do the evaluations of the proposals, do the paper review of those

00020
proposals, he was the guy that I met there once and sat down there for -- it was several hours, but he was the guy that gave me the paperwork and talked with him there, and different times speaking with him on the phone about the projects.
Q Was this before or after award or both?
A Both.
Q What organization was he with? What CPA position?
A Honestly, I don't know. I mean, it was in the procurement contracting office, and outside of that, I don't recall. I have really no idea right now.
Q When you say "the procurement contracting office" or the PCO --
A Yeah.
Q -- that was a organization that came into existence after June 28, 2004; correct?
A I believe so, yes.
Q And so they have listed right there now PMO; right?
A Yes.
Q So that was the project and management office?
A I think so, yes. Yes.
Q And Lieutenant Colonel Maksymyk worked in that organization as well?
A Yes.
Q Was he kind of like the project manager or program

00021
manager for the PBSA contract?
A I believe so. I spent an awful lot of time working with him on the project, on information flow back and forth.
Q Now, if you go to Exhibit 13, please, and take a moment to look that over. I'm not going to ask you any questions beyond the first two pages.
A Yeah. Yeah. Okay.
Q Are you familiar with that first page --
A It looks --
Q -- of Exhibit 13?
I'm sorry. Let me restate the question.
Are you familiar with the first page of Exhibit 13?
A Yes.
Q And how are you familiar with it?
A There is -- this was the first -- er -- the company that was awarded the contract initially for the life support at BPSA in 2004, Iraq Khadamat.
Q And is it your understanding that they were in part awarded the contract to provide life support for one to 1,500 students?
A Yes. I mean, yeah, that would have been part of it.
Q Right. On the next page, there is additional things they were awarded under this particular contract?

00022
A Yes.
Q Including item number 1008, semi-permanent academy?
A Yes.
Q For about 9.8 million dollars, I think is the number?
A Yes. Let's see, on the second page it says temporary site at Irbil.
Q It's the one below that, I think.
A Yes, the 1009, semi-permanent academy at, yeah, 9.8. A little more.
Q Okay. Now, at the time of this award, do you recall whether the semi-permanent academy was to be at some other location or was it instead to be at BPSA?
A I believe that's -- that is referencing to the semi-permanent academy built at BPSA. We did not have a facility large enough to house over the current -- I want to say roughly 200, 250 students. We weren't housing anybody there, now that I think about it, and that was part of what we required from that part of the contract was it was going to be a tent-city type thing.
Q So instead of having it at some other location, that semi-permanent academy was supposed to be now, at contract award, at BPSA; is that right?
A That is my understanding, yes.
Q Because originally when the statement of work was -- it was a semi-permanent academy south or north --

00023
A Yes, there was a reference to one to the south and one to the north, and I don't recall -- I have a faint recollection of possibly that that was the potential, but there was never -- I don't recall there ever being -- I mean, we have always required the numbers out of the Baghdad Academy. We required a specific number of students, and we had no housing. We had to have housing, you know.
So the reference to a south or a north, there would have still been a need for housing at BPSA, and that's what I would take this to be. Because that was where -- that was -- that was the effort, the attempt at least on Iraq Khadamat's part to fulfill that part of the contract.
Q Well, if you go back to Exhibit 5, real quick, which I think we agreed was the request for proposal on this particular project?
A Yes.
Q And the statement of objectives?
A Yes.
Q Can you show me -- just take a moment and glance through this and see if you can identify for me where in this particular statement of objectives exists the requirement for the contractor to provide a semi-permanent or temporary facility at BPSA.

00024

A It references page -- on the solicitation contract order for commercial items, standard form 1449, page two of 29, there is line item 10009 referring to a semi-permanent academy, option CLIN, 1, appears to be the reference to the construction of the semi-permanent academy.

Q I understand. That is the same line we looked in the contract award sheet; right?

A Yes. That is there.

Q My question to you, though, sir: If you would look at the statement of objectives?

A Yes.

Q If you could just glance at that real quick and tell me where in the statement of objectives it identifies that requirement for a semi-permanent academy to be created at BPSA under this statement of objectives?

A I don't believe it does. It doesn't specifically identify it. And I'm flipping through the pages as we speak. I may be mistaken, but as I recall, it does not.

Q So is it your understanding -- er -- I mean, does it make sense to you that the requirement to build -- I mean, there was an option plan to have a semi-permanent academy south; correct?

A That is correct.

Q Was that option CLIN exercised and moved from the

00025
south BPSA?
A That's -- that's what I'm thinking. As I think about it, that's what was done or what was -- yes. To make it short, that's what happened. That's my recollection.
Q All right. Now let's go to Exhibit 14, real quick. See, we're working our way through these pretty quick.
A Yeah. Okay.
Q Take a moment to look that over.
A Yes.
Q You are familiar with that, I assume?
A Yes.
Q And this was your appointment as the contracting officer representative or COR for this particular contract?
A Yes.
Q Now, this is for the Iraq Khadamat company; correct?
A Yes, it is.
Q Now we're going to get to it in a moment, but Iraq Khadamat, their contract was ultimately terminated for default; correct?
A Correct.
Q And Laudes Corporation came in and took over that scope of work; correct?
A Correct.
Q And were you the contracting officer for the Laudes

00026

Corporation contract as well?

A The representative, yes.

Q I'm sorry. The COR.

A Yes. And I don't recall that I got -- honestly, I don't recall if I got a specific form, as I did for the Khadamat contract, and I don't know if -- my assumption would be is because the contract number remained the name the same. That may be someone else's answer. I just don't recall or you may have it here, so.

Q I haven't seen such a letter.

A I very well could have been given one and I don't recall, but I was --

Q But you did provide that role?

A Yes.

Q Provide those services?

A Yes. Yes.

Q So if you go to Exhibit 15 now, please.

A Yes. Okay.

Q And that is a statement of work rather than a statement of objectives?

A Yes.

Q And if you look at the table of contents, it looks to me to be fairly consistent with the statement of objectives we looked at earlier; correct?

A Yes.

00027

Q If you take a moment and leaf through that, I have a couple of questions.

A Okay.

Q And my questions are actually going to start on page -- well, what's labeled as page 131 at the top, but at the bottom it says 000305.

A Okay.

Q Are you there?

A Yup.

Q In particular, I'm interested in this option CLIN 1009, the semi-permanent academy heading. Okay?

A Yes.

Q Now, right below that bold face underlined sentence, there is sentence that says, "These requirements were agreed upon at the meeting dated 2 June, 2004."

Do you see that?

A Yes.

Q Were you a member or participating in that particular meeting; do you recall?

A Boy, I don't recall.

Q Well, at some point in time Iraq Khadamat and CPA had to agree on what was going to be done at BPSA regarding the tent city; right?

A Okay. Now that -- boy, I have to -- I have to do a little bit of digging. Let me just think a moment. 2

00028

June?

I recall being -- I recall very clearly being at the initial meet with the Iraq Khadamat personnel, being introduced to who would be the staff that would be on ground plus their higher-ups, their report-to people. I certainly recall having that meeting. I don't recall if it was at BPSA or at the academy or at the Green Zone. But I specifically recall it because we did not start out on the right foot even then. And it was kind of humorous, but still, you know, we worked through it. I recall being in that type of a meeting once. If it was to specifically go over the scope of works and this document, I don't recall that, but I certainly do remember being there for that.

Q Were you involved in fleshing out, if you will, the description of work that was going to be required to accomplish that semi-permanent academy at BPSA?

A I certainly -- you know, essentially, the requirements as far as number of students, the needs to take care of those students, doing that, providing that, you know, obviously giving them either a schematic or blueprint of the space of which they had to work in; i.e., they were going to build the tent city, so here is your grounds that measure, you know, in this area and in size, along that line of type of thing is what I would have

00029

done. How they were going to accomplish it was just that. It's left for them to propose.

We need facilities and living arrangements for "X" amount of students, and as I recall, they came essentially with their proposal of building a tent facility and dining facility and such to fulfill that proposal.

Q On the paragraph 1A(i), it says "Intent"; do you see that?

A Yes.

Q And it goes on to say, "The intent is to provide basic design and construction services to provide an expedient camp of 1,250 students and 50 instructors;" right?

A Yes.

Q How do those numbers, the 1250 and 50, relate to the life support contract as awarded for life support up to 15 hundred students?

A I believe the 1250, at the time we had already had 250 students. That was generally what we had at the academy at all times, was running classes of 250 students through the academy. So we had already had that many on the ground, and so the 1250 was the plus to the 250.

Q Okay. So that's how you got up to the 15 hundred?

A Yes. As I recall, we had 250 students going through.

00030
Those 250 were already existing officers, and there was a training program. They were already Iraqi policemen, and they were brought back to the police academy to go through a democratic-type policing school, you know, to bring them on board with the same curriculum that the new basic training students would be coming out with, is essentially what it was.
Q Okay.
A So that's what we were doing, and then when it was decided to start ramping up of the overall academy, once we trained those existing officers and we were done with them -- I don't recall the amount of students there were, but we had the facility that was large enough to handle about 250 at a time. Once they were completely trained, by that time we had this facility to be done and start the basic training of new hires and new students.
Q Okay. If you go to the next page under paragraph 2B, "Expedient Camp Construction"?
A Yes.
Q It gives some deadlines in there for 500 cadets on 12 June, a thousand on 1 July, et cetera?
A Yes.
Q Was that the schedule that you recall being in place?
A Yes.
Q So as I read this, my understanding is that based on

00031

what you have just said, I'm going to make a little statement here and you tell me where I'm wrong. Okay?

You had approximately -- you had facilities existing for approximately 250 students --

A Yes.

Q -- and by 12 June, 2004, this contractor, Iraq Khadamat, was to provide a tent city --

A Yes.

Q -- and related infrastructure for another 500 students --

A Correct.

Q -- another 500 cadets?

A Yes.

Q And if you go back to the next page, 2C, "Renovation of Existing Buildings, instructors barracks 7 and 8"?

A Yes.

Q Says in that first sentence, "The contractor will provide a proposal for the renovation of the instructors' barracks."

A Yes.

Q Was that something that Iraq Khadamat was suppose to do was renovate the instructors' barracks?

A Yes.

Q When their contract was terminated, was that something that Laudes was required to do?

00032

A I believe so.

Q Is it your understanding that when Iraq Khadamat's contract was terminated, that Laudes was awarded a contract to do exactly that which Iraq Khadamat was originally obligated to do under its contract?

A Yes.

Q At contract award to Laudes, then, there was no change in the scope of work that Laudes was to perform when compared to that which Iraq Khadamat was to perform just prior to its termination?

A I'll try to be brief. As I recall, that is correct. That statement is correct. As well as I believe there may have been additional works or requests for work that was added.

I had taken leave. Iraq Khadamat had the contract, had started working on their project, and from day one, there were issues, and the issues significantly rose by the time I took leave. By the time I returned from my leave, and I believe it was no more than three weeks, even less, Laudes was then awarded the contract.

And as I recall, it seems to me that the basic contract that I am looking at here in this exhibit in tab 15 would given to them, and there may have been additional works added on.

Essentially, that seemed to be the overall --

00033
one of things was there was always more going on and
things being added quite a bit. And that would -- I was
gone in that period of time, but this package in tab 15
would be -- it would have been handed directly over to
Laudes to be done, as I recall.
Q With the addition of any other changes that had been
issued in the interim?
A Yeah, that may have been added by other people while
I was gone.
Q Let's go to Exhibit 17 and just take a glance at
that, because my question is: Were you around or were you
on leave when this particular letter was issued, to your
recollection?
A I don't -- I know I certainly spoke with Major
Blackmon. This type of information would be either from
him visiting -- major Blackmon visiting or he would have
visited to actually see these deficiencies and they were
reported by myself and/or the other staff members.
Essentially the chief, the deputy chief and myself were
probably the three biggest, you know, inspectors, if you
would call it that, to being out on the ground, looking at
what is going on, and noticing or looking to see that
anybody is fulfilling their contract. If it was brought
to anyone's attention, they would flag it to me so I could
go look as well and then report up.

00034

I'm looking at this, and essentially a majority of these things are things I definitely recall seeing.
Q Okay.
A Or the issues they brought up of Iraq Khadamat. Again, this is on or -- it's close to when I took leave. I don't recall seeing this specific form, but every one of these issues, I certainly do recall. I know -- as a matter of fact, I think I still have pictures of some of the concrete issues that I've had on a computer somewhere, I recall.
Q So you're not familiar with the letter; you're familiar with the contract deficiencies referenced in the letter?
A Yeah. This appears -- it -- may be that I would -- I don't recall if the contracting office would specifically send this to me. I think they did. And/or they would notify me that they have done, you know, taken action or notified the company, and that they have, you know, notified them of shortfalls and I need to be looking to see that they either fixed it or dealt with it.
Q Do you remember having meetings with Major Blackmon out at BPSA?
A Yes.
Q Are you sure it was Blackmon or not Maksymyk?
A I've had meetings with both. I certainly recall

00035

Major -- Colonel Maksymyk more than any. I may have met with Major Blackmon back at the Green Zone, now that I'm thinking about it. That is probably -- that would probably be what occurred. I just don't recall specifically.

Q Did you travel on occasion to the Green Zone to speak to Major Blackmon about this contract?

A On the Iraq Khadamat portion, very little.

Q How about the Laudes portion?

A Yeah. The majority of my time was spent on site. If there were issues, to me, it made no point to go and stand at their desk and yell when if I was there, trying to resolve an issue or something, and the issue was I needed them on the ground where I was, if that makes sense?

Why, you know, I'm putting -- essentially, you're putting yourself at risk for harm to go over to the Green Zone, you know, to raise an issue when you either did it on the phone, you know, or Internet or however, but you know, at the time that was probably the greatest restriction was at that time things were ramped up as far as the danger, quite frankly. It did play a role on site visiting and reporting.

So you did -- you know, a great deal of the work was on the phone and on the Internet. As I recall, a majority of the time that we met, if we did, was for them

00036
to get over and to get eyes on the project.
Q When you say "them", to whom are you referring?
A Maksymyk and anyone from the contracting office, but mostly, if I saw the majority of anybody, it was Colonel Maksymyk over there coming to the academy.
Q So when you went on leave and came back, Laudes Corporation was on station?
A Yes.
Q Let me ask this question a different way. When, in relation to -- you know, what I refer to the transfer of authority June 28, 2004 --
A Uh-huh. Yes.
Q -- do you know that date?
A I believe that's when Laudes was officially given the contract to start work.
Q Well, we will get to that. The transfer of authority I'm referring to is when Mr. Bremer --
A Oh. Okay. Quite frankly, it made whatever. Sorry.
Q It didn't affect your life much?
A No. Lot of stuff was exploding, so no.
Q I understand.
A Actually, I believe that occurred when I was out of country. I was on vacation. I was on a vacation. So it was all about that same time.
Q So, I think the record is fairly clear that the

00037

transfer of the authority, which we're calling a transfer of authority, occurred on June 28, 2004.
A Yes. Yes. I certainly recall it, but yeah.
Q It was planed to be on June 30th, if you recall?
A Okay. I'll agree with you.
Q That's fine. I just trying to use those dates --
A Sure.
Q -- as a point of reference for you to see if you can recall the time period of your vacation.
A Yeah.
Q Providing it as a reference.
A That's certainly over that period. I would have to go back and dig. It was all right about that same time frame. That may have been about when I left, right in that time frame, because -- and not trying to grandstand or make anything sound special, but I returned to country after that vacation, and it may have been right at the end of June. I left in July, because I wasn't in country more than two weeks and I got hit by a mortar, so -- and I know that date specifically.
Q What was that date?
A August 14.
Q Had you been in country about two weeks?
A I'd gotten back from my vacation. I wasn't back very long. It was a very short period. It was only a couple

00038

of weeks. So that may have been when I was gone, was in July, but the transition of authority, you know, I recall it. But like I said, my life, everything that I was doing was, you know, my focus out there, and quite frankly, I was focused. So the rest of it was -- it didn't affect me, so to speak, so, you know, pressing on and doing my job out there. So that is kind of, you know, I would say probably it's better to say that that vacation now would have more the month of July.

Q Okay. Let's go to Exhibit 24 and take a moment and look at that, if you would. And when you're finished, just let me know.

A Okay.

Q Are you familiar with that document?

A I recall seeing that.

Q And how about towards the end of that document, I guess, beginning about -- oh, page -- if you look at the bottom right-hand side, we're looking at what we call Bates numbers US 000856. Do you see that?

A Yes. Okay.

Q And we're back to calling this a statement of objectives rather than a statement of work?

A Yes, and that is probably simply -- you know, now that you mention that, overall, after writing the original objectives, the contracting office told me -- that's where

00039
I remember making this document and working on this and then I forwarded it to procurement or contracting, which ever, and they just simply said we plug this -- this is what we stick into the project, and, ultimately, this thing, without even changing it, becomes the statement of work, is basically what they told me.
Q So is this a document starting on US 000856 and continuing on to 873, is this a document that you prepared?
A As I recall, yes.
Q Now, on the last page, the 873 page --
A Yes.
Q -- there is a schedule listed there?
A Yes. That, I know I didn't put that in there. And this is where I would recall making this particular document. It was electronically moved back and forth, rather than hard copies, or both ways, but it was so, you know, either people at -- from when it was reviewed, it could be, you know, added, subtracted to and such, from our level at the academy and then at our higher headquarters, and then even at contracting to ensure that everything we needed was included, and then ultimately submitted and done.
Q Did you look at this particular statement of objectives that we're referencing here in Exhibit 24 and

00040

determine what, if anything, was different between it and the statement of objectives or statement of work that Iraq Khadamat was to perform?

A I think I probably looked at it or worked on it. If there is any -- I don't recall if the changes in that cover page, signed by Major Blackmon, referring to the armory and Internet cafe and such, if that was actually added to the body of that scope of objectives. I don't recall. I would have to go and look at it to see if that was in there. Other than that, it would be the same document.

Q So when you say "the armory and Internet cafe", those were things that Iraq Khadamat were not suppose to do?

A I don't believe so. Because it's on this letter dated 20 June from Major Blackmon specifically citing it needs to be done.

So that's where I was saying earlier, as I recall, when we had Iraq Khadamat's contract and it was given to them, here's how much work we need done, and by the time we had gotten to the point that Laudes was coming in, there was more that we needed for them to do, and it was added to their scope of objectives or scope of works.

And I think this is how -- as I recall, that's why I said that earlier. It seemed to me that that did or was going to occur, and that I was either part of those

00041
conversations or I certainly was aware that that was -- you know, obviously we were realizing we need more assistance in doing certain things and more -- for whatever reason, I don't recall, but there was more work for them to do.
Q More work for Laudes to do?
A Yes, sir.
Q Then the letter, that cover sheet, the cover letter, the award letter you just mentioned --
A Yes.
Q -- it lists security upgrades?
A Yes.
Q Do you recall what those were?
A That was working on our towers. We had -- we had to have, I believe, additional towers built that were on the perimeter of the school, and then it was shortly realized that the towers were not -- were insufficient as far as bulletproof, and so there was the construction of towers, additional towers to whatever was already existing, and then to create more -- essentially a double-walled -- a steel double-wall around -- er -- the walls which were then poured -- you know, it's really a three-inch gap that was poured with concrete to stop bullets, because the steel itself didn't, which was learned by a few accidental discharges and certainly just people passing by taking a

00042
shot.
Q I'm going to go to Exhibit 25 now, please.
A Okay.
Q Did you ever see that letter?
A I may have. It seems to me I have.
Q Do you recall the context in which you saw it?
A Honestly, I don't. I don't.
Q Let's go to Exhibit 26, please.
A Okay.
Q You're familiar with this particular form, maybe not the information, but this form; correct?
A Yes.
Q What is this form that we're looking at?
A There is -- this is what I would be given by the company to show the delivery of goods or services for the BPSA, and then I would sign as this coming in, and then move that up to the next higher headquarters for the company to ultimately receive payment as part of their contract.
Q So what is your -- on the bottom right-hand corner of this document there is a block 22, receivers use?
A Yes.
Q Is that your signature there on 14 August?
A Yes.
Q And by signing this, what are you saying?

00043

A Essentially, that the items that are listed under block -- within the block 16 -- er -- there is items numbered 15 and 16, the line item and/or the description of items were delivered or the service was delivered to the BPSA.

Q Now, was it -- if you just -- without going -- we're not going to go into each one of those in detail, but if you look at Exhibit 28 -- I'm sorry -- 27.

A 27, yes. Okay.

Q That is your signature on in block 22 of that exhibit?

A Yes.

Q And then on Exhibit 28, your signature on block 22 again?

A Yes.

Q And on 29, that is not your signature; is it?

A No, it's not.

Q And whose it that; do you recall?

A That would be Alistair Hutchison, he was the assistant director.

Q And Mel -- is it Goudie?

A Yes.

Q G-o-u-d-i-e; right?

A Correct.

Q And he was the director?

00044
A Yes, he was the director. Both of those are gentleman serving from the United Kingdom, police officers, that were at the academy with me.
Q And in terms of an organizational chart, where did they fall in relation to you?
A Mel was the director, on top, I guess. Alistair Hutchison, he was the assistant director, and then below those two you have logistics, operations. You know, across where you would have directors, chiefs, whatever title they wanted to call us, but we came across the line of -- you know, I don't recall the specific name of some of it, but the head instructor, like that, but they were both my bosses.
Q And then if we go to Exhibit 30, we're back to your signature; right, on block 22?
A Yes.
Q Now, do you know, for example, on block 29 why Mr. Hutchinson -- Hutchison; right?
A Yes.
Q With no "N". Why Mr. Hutchison signed this in lieu of you?
A I may have -- I may not have been there, and in that time frame, if I was gone either for the day or for a little longer -- and at that time, that is shortly after I was hit with the mortar. I had to spend about a week over

00045
in the Green Zone having some medical stuff taken care of.
It could have been because of that. So at times, if I
wasn't present, then either Mel or Alistair would be the
other persons that these documents would be submitted to.
Q Then on Exhibit 32?
A Yes.
Q That looks to be --
A Mel.
Q -- October 13?
A Yes.
Q And that was Mel Goudie's signature?
A Yes.
Q Then on Exhibit 33, that is back to your signature --
A Yes, sir.
Q -- on block 22; correct?
A Yes, sir.
Q And then 34 is back to --
A Mel.
Q -- Mel Goudie; right?
A Yes.
Q He signed that?
A Yes.
Q Do you recognize that signature?
A Yes.
Q 35, Exhibit 35 is back to you?

00046
A Yes, sir.
Q And 36 is back to you?
A Yes.
Q And 37 is you?
A Yes.
Q 38 is you?
A Yes.
Q 39 is you?
A Yes.
Q 40 is you?
A Yup. Yes, sir.
Q 41 is you?
A Yes.
Q 42 is you?
A Yes.
Q 43 is you?
A Yes.
Q And 44 looks to be Michael Bilan?
A Yes, Bilan. Mike Bilan. He was brought in basically as a deputy for me or assistant, you know, coworker is essentially what it was, in logistics.
Q So was he authorized to sign this in lieu of you?
A Yes.
Q How so?
A Once I was not available, I think -- again, this may

00047

have been -- in fact, this date, I know I was out of country on leave, and he would be filling in in my capacity as the contracting chief of logistics.

Q And 36 -- I'm sorry. We're back to 45. I'm sorry. 45 looks to be you?

A Yes.

Q Now, so we have gone through at least the DD250s and that's what they are called; right?

A Yes.

Q As we have gone through those in this notebook, I would like to talk for a moment with you about what your process was that you went through before you signed the DD250s. Was there a general practice that you had or did it vary from time to time?

A General practice was -- by time -- er -- while these were being submitted, I obviously had the statement of objectives or works and -- either having had them written, but I would -- my office was next door to the one we provided for Laudes, and I would see receipts of items delivered. I was on the ground observing, you know, and seeing that fuels were delivered, work, the physical work was either being done. Obviously, I would check the chow hall. I would have meals brought to me or I would have meals at the school. One, checking quality; two simply -- well, primarily that.

00048

Obviously, the students needed to see that, you know, at times you would always get complaints, no matter what. Nobody is ever happy. I would be basically out there as much as I could seeing, one, items are delivered, the proposed services that were required were being done, cleanup, security, the construction of items. You know, walking through to see that the janitorial stuff was being done.

It was one of the most amazing things to see the willingness of students to destroy everything we built. I have never seen anything like that in my life, and it was amazing that what we would repair and fix, within 24 hours it would be either damaged or physically gone, where the day before it was simply broken.

Q When you say "we", who do you mean?

A I would be inspecting Larry's staff, the Laudes staff that was on site, the various bosses that they had on the ground. I feel really bad. I forget his main guy that was there at the academy.

Q Stan Ellis?

A Stan, yeah. Stan, we had radios. I mean, we would be in touch with each other. I mean, he slept in the room next to me. That's how it worked. I mean, we were, you know, constantly, you know, in each other's hair. I'm checking with them; they are checking with me. They would

00049

see something, hey, look at this, we need you to, you. know, look at this, this is damaged, this is broken, this is being done by students, here's what we're fixing. Or I would see something and raise a flag, good or bad. You know, I mean, you know, would certainly go either way with it.

Q On the second page of Exhibit 26, it appears to be a invoice from Laudes Corporation; right?

A Yes.

Q Do you recall seeing these documents, these kind of documents before?

A I would see these documents, yes. I would get these. I would also see -- there would be other receipts, like sometimes it was handwritten in Arabic, but either fuel or foods, but predominantly it was like this.

Q And was the DD250 filled out by Laudes and attached to the invoice for your signature?

A Yes.

Q So you would get a package that had this invoice and this DD250 combined?

A Yes.

Q Now, on the invoice itself, under, like, the CLIN that says food services, and right below, that it says, paren, "See attached," close paren; right?

A Yes.

00050

Q I don't have anything attached to this document because I don't know what was attached. Can you tell me what kind of things you would have seen attached to this?

A That's where I have seen, like, receipts from local vendors, I believe, that may have -- that is again not having an interpreter, but it would be indicating to me this is from a food supplier, a fuel supplier, whatever that particular item was. I saw those things at times.

Q Let's go to Exhibit 56, because I think that's what we're talking about, but these are just examples of that, I think.

A Right. Yeah, the drinking water documents that were like this. These are from their logistics within their office for myself to sign that this is what was done, even on a daily basis, rather than a weekly or a monthly.

Q On Exhibit -- on that same exhibit, 56, the sixth page in, there is a document dated 30 of November, 2004.

A Yes.

Q I think its the sixth page in.

A Right. Yes.

Q It looks like meals?

A Yes. Yes, it is. Head count. Overall head count, yes.

Q So where did the head count come from?

A That would be from Laudes.

00051

Q And how would they arrive at the head count?

A This is of meals served, of folks walking through the line and actually being served a meal.

Q And when you authorize received by, that is your initials down at the bottom of that page?

A Yes.

Q So when you got an invoice at the end of the month, it would be these kinds of documents that would be attached to the invoice?

A Yes. And there are certainly times where we may, if we balanced our number of students, we may have -- this may show 7,305 people, and there maybe -- we're going, wait a minute, we don't have that many, but we would still serve and feed people who were visitors and things like that, so they would be rolled up in the numbers as well at times.

Q This 7305 is not people but meals served; right?

A Yes.

Q So, for example, here it says they served 2,677 lunches; right?

A Right. The security would receive 200 lunches. If they had guys asleep, they would still be handed their lunch, but they wouldn't be working. It was just the security force was given their 200 and it was up to them to disseminate their meals. They may have had 170 guys on

00052
duty, while -- 170 guys on duty, while, you know, they generally, if they were at the facility for a week, they never went home, or however long their work period was, then they would go home, so they were there 24 hours a day.
Q On several pages further in this exhibit, it looks like four pages, the fifth page after that, there is one of these same forms dated Friday, 26 November. Do you see that?
A Yes.
Q And on these categories, T3, et cetera --
A Yes.
Q -- group?
A Yes.
Q There is zero?
A Right.
Q Nothing there; right?
A Right.
Q Do you know why that would be?
A Generally, that is the TIP course -- initially, when we first started, those were the -- I forget what the acronym was for, but that was that 250 students that were already officers, and the TIP and T3 training was a refresher-type course.
The first was TIP, and then after we had been in

00053

country a while, they came up with this T3, and I, quite frankly, don't recall what it was, but those were existing officers that had to go through a certain -- I think the TIP was for all officers and the T3 was supervisory-type refresher-type thing, so they were much lower numbers, but that was, you know, the TIP course was ongoing until all officers -- all existing officers had been through it and then that program went away, as I recall.

Q What's the "IRC" acronym stand for?

A That's the -- that is a recruit course, Iraqi recruit course.

Q The basic course?

A That is the basic training, yeah. That is the big numbers for them.

Q So the TIP and T3 are kind of refresher courses?

A Yes.

Q And what is DPS and FPS?

A DPS and FPS were -- it's public security -- dignitary -- I believe the DPS was for dignitaries and FPS was for facilities. They were for security, and that was a program that was later brought in that, you know, like body guards for dignitaries. Instead of having police officers doing this, they wanted to create a separate force that was there, and those folks were a different program. Essentially, we had the only place to teach

00054
people something, so we were the school and we had the space for them, so they were put into our facility to train, essentially.
Q And staff, were you part of staff?
A The staff feeding included the Americans, the International officers as well as the Iraqi staff.
Q So teachers and people, administrators?
A Yes.
Q And that included BPSA staff like yourself and Mel Goudie, et cetera?
A Yes.
Q How about instructors, plus commissioners, plus K9?
A Same thing. There is the commissioners. There were a few ranking officers that were given offices, because we were across the street from the Ministry of the Interior, so we included them as people being fed. There was also the Iraqi police forces K9 unit would train and work out of our facility. They had a small dog-handling compound there. So, as they were on our facility, we basically took care of them as well, and then, again, the American instructors and Iraqi instructors that were there, if they chose to, they could eat at the facility.
Q So staff was different from instructors?
A Yeah. Yes, there was both.
Q And how about security; that was just guards around

00055

the facility itself?
A Yes. Yes, that was all Iraqi.
Q Now, I think we saw early on that Laudes was awarded -- when Laudes was awarded the contract, it was providing life support for up to 15 hundred students; right?
A Yes. Initially, yeah.
Q And later there was a second contract awarded to Laudes; right?
A As I recall, yeah.
Q To expand the number of students --
A Yes.
Q -- to build more facilities?
A Yes.
Q And Laudes called that the Phase II contract?
A Yes.
Q That's what I call it. Do you recall that?
A Yes.
Q The number we're seeing here on this particular form, what is the date of the form you're looking at right now?
A 27 November. I believe it's that one, 27 November, of '04. Yeah, that time frame, yes.
Q I want to make sure we're looking at the same piece of paper, so let's look at the 28th of November in Exhibit 56.

00056
A Okay. I'm there.
Q The expansion of students and serving and providing meals, et cetera, for students above 15 hundred, was that something that was required of Laudes?
A Yes.
Q By whom?
A I would say we, the CPATT BPSA. I'm trying to remember how that came about. Essentially, as I recall, overall the numbers of -- amount of students and the numbers that we had, basically, were -- at the moment we had space for more students, we tried to fill it and train them, because of the push for numbers to get people on the street. We would have to feed and take care of them.
We also would take care of feeding when you would have -- for a few nights you may have the students that were going to Jordan, so you could have -- I can't remember the exact numbers, but hundreds of students show up at the academy to be bussed over to the airport to get on the plane to go to Jordan for their academy. At the same time, they were required to be fed. So we would provide meals and stuff for them, as well I recall.
Q Now, did you ever have conversations with Major Blackmon or his replacement or LeMaster about this?
A Oh, I'm sure I did. It would be -- there was -- yes, there had to be. You couldn't blind-side anybody with any

00057

of this, that someone was talking about the increased of numbers. You know, the specifics or specific dates, I don't recall, but it just -- overall, the constant -- there was a pretty steady increase to the amount of people that we had to work with.

And I was wondering folks, if I could take a break to find a bathroom for a few moments?

MR. JACKSON: Why don't we all take 10 minutes and then everybody call back in. Does that work for you, Reid?

MR. PROUTY: Yeah, it sounds good.

(Off record.)

BY MR. JACKSON:

Q We left off talking about conversations and whatnot that you had with Major Blackmon and his replacement and Michael LeMaster. Do you recall who else you dealt with at the contracting officer shop?

A There was another -- there was a young lady -- it was either a captain or major -- at one time, and that was more or less, she just handed me the proposals that I dealt with when I made the evaluations. I recall her. There was -- I may have been over there and met Major Hirtle once, once maybe, and that's about -- that's all I can really recall.

Q When Laudes came in and performed -- let me back up

00058
real quick. Iraq Khadamat proposed or actually was trying to install a tent city for the temporary facilities; right?

A Yes.

Q Did Laudes do the same thing?

A No. They didn't do a tent city. They did what I would we referred to as like a trailer or pop-up. A metal frame that had -- it's like a metal frame structure that had like a trailer, you know, a travel trailer type metal foam walls and a wood deck floor that they built, was primarily everything they built for the dining facility, for the barracks, for the sleeping quarters, and the latrines, and they also had port-a-potties that they supplied as well.

Q When they did -- at some point in time -- you were there in August of '04; right?

A Yes.

Q And we talked earlier about the Phase II contract being awarded to Laudes; right?

A Yes.

Q That was to expand the scope or expand the facility for an additional couple thousand students; right?

A Right.

Q And was that phased in the same way that the original Phase I was phased, like 500 by this and another 500 by

00059

this date, et cetera?
A I believe so. I believe it was. There was -- as I recall, it was. The difference was that there was two basic styles of barracks construction that happened. They built -- I can't remember if it was five or six 400-man barracks on one area, and obviously the construction time of those could just be about the same as the other style of barracks they built which was for a lower number of students, and so I think the contract, as it worked out, the guys built those 400-man units first, and then came over and worked on the smaller, you know, the barracks that were smaller.
But it was that type of an approach that as they finished those, then students were put there in those. Because they were doing -- I mean, that's the thing. Not only were they building the barracks, they were building classrooms. So as classrooms became available and the barracks became available, then we could add people.
Q If you go to Exhibit 40, real quick, and go -- we have already talked about 40 real briefly. It's Exhibit 22 that has your signature.
A Yes.
Q And a second page and third page are a two-page invoice?
A Yes.

00060

Q And up here it says invoice number, and right below below that on the second page --

A Yes.

Q -- there is a paren that says, "Revised to separate Phase I cost from Phase II costs."

A Yes.

Q Do you recall the necessity of doing that?

A As I recall, the necessity was done because -- in this time frame, there was a lot of requests to get a break -- to get a breakout, you know, a want to see a more specific -- I'm trying to think of the correct word, but Laudes would give me their receipts or their head counts of services rendered, you know, and they would put down, for instance, if they put down life support conducted, the contracting office was starting to ask for more specifics, well, what did you physically do? Well, "X" amount of hours of janitorial, "X" amount of hours towards this. To create a more specific type breakout instead of just saying life support and a grand number.

So I know there was a lot of requests for that to be more specific or to fill out each specific line number and give more detail.

And because the second phase, I believe, as I recall, it was done -- because I think it was a different payment. It was somehow something to do with the money on

00061
how they were being paid, was why it was broken out in a
second page, I believe. I'm trying to remember.
I think it had to do with the first phase
actually was coming from CPA or CPATT, the Central
Provisional Authority or Central Provisional Authority
training teams, the way the funding was coming, and then
there was a change in the Iraqi funding so it had to be
broken out for the second phase a different way, I think.
I seem to recall that, but certainly could be wrong.
Q On the fourth page of that exhibit, 40, it looks like
the backup for the invoice itself?
A Yes.
Q This is just for the meals; right?
A Yes.
Q And at the top of that column headings, we still see
see "ORC, TIP, T3", et cetera?
A Exactly.
Q Those are the same thing or the same -- not three but
the same column headings we saw on the daily reports;
right?
A Yes.
Q The IRC numbers, for example, on 1 January '05, they
have a total of 4,713 trainee meals --
A Yes.
Q -- on that day?

00062
A Yes.
Q And, then, for a total of almost 5,000 for that day?
A Yes.
Q And were they authorized under the Phase I contract or were they required under the Phase I contract to serve that many meals, 5,000 meals and the next day almost 6,000 means?
A I don't believe so. By contract, they weren't required, no.
Q Really? How is that?
A I don't think they were. They may have been. I'd have to look. And I would just have to go back and look at that, Mark. I'm not sure.
Q Who determined who they served meals to?
A We essentially -- well, as the staff, we would say, here's the people to be feed. If it changed or was amended as to who was being fed in this time frame, I think it may have been in January but sometime also within this '05 year -- late '04 or '05 -- I can't remember exactly -- not only did we have our students there that we were feeding, but then there was influx of somewhere on the order of 15 hundred to 2,000 commandos that had to be housed and fed because of insurgent issues, and I know -- and quite frankly, they were fed and dealt with, you know, and some of their life support meals and stuff were

00063

provided by Laudes on the contract, and I honestly don't know how it worked out at the other end on them getting paid. And I don't recall the specific time frame, but it was about that time.

I know it wasn't devastatingly hot. The weather wasn't that bad, because they burned down of the barracks, and the reason they burned it down was that somebody hot-wired a heating element up in one of our security towers. So it was in the colder weather, like the rainy season, and that would have been about this time frame or something like that.

But overall, a lot of meals, they could generate the food and they would feed -- but I believe, as far as I could tell under the numbers, this is what they would be required to feed, and I believe it would have been under the Phase II, if I recall. So I would just have to look between the two contracts.

Q So, did you try to allocate the numbers between Phase I and phase II?

A I didn't -- I didn't -- I wasn't pushing to get it broken down, and I don't think it came -- I didn't see that it was -- er -- requested to be broken out from the contracting office as well, is that they were satisfied with the full round up, as you saw, with the head count for those numbers and total meals fed, was sufficient for

00064
them to do that, as I recall.
Q Well, for examples, these commandos that came in, do you know whether Laudes was directed to provide life support for them?
A Yes, they lived on our facility. There was no one else to do that. Those barracks, electricity, and everything else that had to be done, and they were also fed. As I recall, when I say "we", the academy took on the responsibility to feed them.
Q Who directed Laudes to provide the life support --
A That was above my pay grade. It came from above our director, and it was -- to be quite frank, we didn't want them there. We knew we have armed -- heavily armed people that are not students and we have students, and there would be conflicts and there would be issues and so on and so on. It was -- it was not, you know, grudgingly with open arms that they were welcomed onto the post or onto the facility there. I'll be honest with that. But, you know, we were directed that they had to come there and stay there for a certain amount of time, and they did. It wasn't long that they burned down a 400-man barracks, and they still stayed.
Q Is that one of barracks that Laudes built?
A Yes.
Q Did they have to rebuild it?

00065

A I don't believe so, no. It was demolished and cleaned up ultimately, and it was not rebuilt, as I recall.

Q Did BPSA -- you or somebody else at BPSA provide student head counts to Laudes?

A Yes. We would come up with, you know, the initial student count, and as time would go by, there would still be attendance numbers that would come from the director, usually Alistair Hutchison's side of the house. He was like -- I reported more directly, I guess, to the academy director, and Alistair, that allowed him to concentrate more on the instructors and, like, the human resources side, I guess, of the house, the personnel side, the head counts, attendance and instruction of the students.

And so he would put the numbers together on, you know, daily attendance or, you know, that would roll in from all our instructors, and they would be handed over to Stan or whoever was in the Laudes office. We would turn over our numbers to them.

Q Were there discussions about modifying Laudes' statement of work or statement of objectives as the Phase I contract was being performed?

A Sure, yeah.

Q Did that happen?

A There were -- I believe there were modifications

00066

made. That's like I said earlier, I believe that once they came on, there were modifications. There was work or different things that would come up that either we didn't cover in the scope of objectives or even the scope of work, you know.

There would be -- there seemed to be, as I recall, one of the bigger things that seemed to happen a great deal was the generator. We kept our own power, you know, supply, the addition and the maintenance, and the operation of our generator system would go down. Then we would need to -- or the wiring between buildings would -- I mean, it just wasn't capable of sustaining it, and so we would need to get that fixed, and, quite frankly, we couldn't wait for other contracts or something, so there would be efforts to either modify contracts or something to try to get it under or within our life support because it would about something we would want continued, if that makes sense.

Q Right.

A We would need that service, and we would need that service to continue, and we may not have covered that in the original scope, so we would want to try to get it amended or added to it.

Q Did you guys at the PBSA work with the contracting office on that?

00067

A Yeah. We would see -- if we saw something and would have a need, you know, someone would bring something up, either Laudes would bring it to our attention or we would recognize it ourself. We would sit down and discuss it. They would -- you know, we would certainly find out, are you capable and willing to do this, and if we found they could do it, as long as we could get, you know, get it paid for, we would try to work those things out, yeah.
Q And how would you figure out if you could get it paid for?
A We would put the proposal together and send it up to contracting to see if it would be done. That was kind of the overall kind of amazing thing in this whole operation in Iraq, is that it was kind -- I don't know, not being -- kind of being a novice of working within budgets, it's the first time working within a system where there was no budget. It's simply, you just submitted something for approval, and if it got blessed, there was money. If it did't get blessed, then you would ask, is it because it was too expensive, and if it was, you would be told to work it down to a cost they assigned to it.
It wasn't, here's 10 million dollars, run the BPSA, you know, and budget your operating costs from it, you know. And we never built -- we started to build a budget. That effort was starting when I left in '05, but

up until then, it was simply you just went with the fact that this is what you needed, you submitted it and the moneys were there.

Q Did this happen on the Laudes contract?

A Yeah.

Q Do you remember any particular circumstance or situation in which this happened?

A It was like I said, it was -- well, part of it is that, you know, they had the initial contract to build a lot of those temporary facilities, but not to continually rebuild due to the destruction made by the students. I mean, you know, it's one thing to pop up, you know, say, a latrine and you have 10 stalls for showers, but you should only have to build it once and maintain it, not replumb it every three weeks because the students tear it to pieces, and that's what they were having to do.

These people were stealing the pieces off, bending the pipes, everything they could do. And we couldn't stop them. And the latrines -- probably the classrooms weren't too bad and their living facilities were not too bad, but the laundry and the bathroom facilities, they just devastated them repeatedly.

And we would constantly try to come up with ways of trying to keep them from doing that. But that would be, you know, at what point does the contract of life

00069

support, you know, of a-maintenance type contract go to a continually-rebuilding-type contract? You know what I mean? That is probably the number one example.

And that would happen to the generators. We would lose power in the middle of the night, go run out there and a major component off a generator would be gone. Somebody took it off, and it was gone. What do you do to fix it; how do you get it fixed? Well, jeez, is that in the life support contract? Well, it was suppose to be. That happened, quite frankly.

And that is kind of hard to write into a contract and to support, but, you know, we were getting hit with that, and it seemed to come up, another frequent problem.

Q You guys dealt with it rather informally?

A If we could, we would deal with it informally, but obviously, it was -- it started to become such an issue with some many different things, we would have to try to get it somehow to cover it in a contract. It didn't seem to be a cheap repair or a one-time thing. It was constantly happening.

So we had to figure out a way, you know, on one hand, we're trying to deal with it in the fact of fixing it and paying to fix it, at the same time putting either security personnel or student leaders or instructors or

00070

someone to either stop student behavior or maybe our own security force from, you know, damaging or stealing things.

You know, we certainly know that there were students who were questionable that were brought in that may have been insurgents or have insurgent-type influences on them to screw up and disrupted things, and we were sure they were getting into there, but it wasn't our job. There were other people that were screening them, not us.

Q I believe I saw an e-mail at one point in time from Mel Goudie who said that -- something along the lines of Laudes statement of work was in flux. Is that a fair statement

A Yeah. That's what it seemed like. It would certainly be something that we would -- yeah.

Q Were you guys from BPSA working with the guys in the Green Zone, the requirements of the contracting guys to address these situations?

A Oh, yes.

Q They knew what was going on?

A Yes.

Q At one point in time, there was a -- as I recall, there was a pretty extensive mortar and rocket attack around September of '04?

A It started -- basically, the mortars started

00071

literally on August 1st and it stopped about mid September. It was almost to the day. Like I said, it was about two weeks into it that I got hit, and we were basically receiving fire daily of anywhere from two or three that would explode up to 15 at one day. I remember counting 15 that hit. Generally, once it stopped, we would scour the grounds and we would find unexploded ordnance as well. So if we knew five exploded, we would maybe find four or five that didn't.

Q Were repairs required as a result of that?

A Yes.

Q Did Laudes do those?

A Yes.

Q Now, is that something that you had to discuss with the contracting officer or the guys in the Green Zone in order to make sure that work got done?

A If it was extensive. I think we had two that were fairly extensive that may have had to have discussion over that, as I recall. There was maybe two.

Q Was one of those occasions when students were moved from temporary facilities into a more safer existing or permanent facilities, buildings?

A Yeah, there was -- I guess, yeah. There were some of the older classroom structures that were obviously of concrete walls, but metal roofs that were -- that were

00072

safer, and then there were other classrooms, older classrooms that had cement roofs that were under some remodeling work, but then were brought into play.

Sandbagging, you know, all the metal buildings were having the side walls sandbagged. You know, the bottom line with indirect fire is, it's coming through the roof. So there is not much you could do to any building unless it was one of those with the cement. So if you were in a metal building or a cement-sided building with a metal roof, we had one of those happen, one of those took a hit.

Q Do you recall whether Laudes at one point in time repaired some air conditioning units and provided a power generator to accommodate students moving into these hard facilities?

A Yes. Yes.

Q What were the circumstances of that?

A It was the same thing in that facility. The mortar attacks were coming. There was some classrooms that were near our little infirmary. They were original buildings that had been -- that had been renovated and then were -- now they were, you know, basically being increased in capacity, and the existing cooling system for those systems were kind of a huge swamp-cooler-type system on the roof ducted into the buildings. Well, the problem was

00073

there was no -- the electricity couldn't support the machinery, so it was easer to have, you know, window or split air conditioning units mounted or put inside those classrooms.

Q Did you know who Major Kremer was?

A Kramer?

Q Is it Kramer?

A I remember the name. Is it a gentleman?

Q I'm not sure.

A I believe so, yeah.

Q Do you know the context?

A I think he was -- I think he was engineer, an army officer, major, that was in CPATT or in the police part of the MOI, and there -- he kind of became my direct -- if that's him, he was the direct guy I would go to for my logistics issues.

Q How about Greer, Major Greer?

A He was also one of those guys. And that was more -- more if I needed 500 chairs or that kind of thing. It wasn't -- if I remember.

Q Did you ever discuss with Stan Ellis -- well, let me rephrase that. Did you ever meet Larry Underwood?

A Oh, yes.

Q Did you ever discuss with Stan or Larry during the contract period or did they ever raise with you a desire

00074

or request to modify the contract?

A There would be -- yes. They would essentially say, you know, they would say, hey, you want this, you wanted something done, it's not covered by the contract, but if it's part of it, we believe we can do it, and so, oh, here, you know, it's another place where we either missed it in the scope of works or something created a need, and they could bring it to our attention and it made sense, then we would pursue it.

Q And how did -- what were the results of that?

A Sometimes the modification request would be put in and sometimes I don't believe it did. Sometimes we would bring something to their attention and they would just tell us, we just couldn't do it or it's beyond the scope of what the company wanted to do.

Say, I think there were some construction at one time. There was something we needed built and it was just too much at the time. Or it was that he would also subcontract out to get, you know, construction things done, and his guy that he would trust to do the work wasn't available. As I recall, there was a couple of things that were like that that happened.

Q Do you recall the circumstance where they had to put a second skin on the top of existing roofs?

A We looked at it. That was during that -- when the

00075
mortar stuff was going on, and there was -- I remember specifically they found a product that they were looking at putting on top of the metal buildings to, you know, try to created a safer, you know, a mortar-proof or as mortar-proof as you could make a building.
Q Mortar resistant?
A Mortar resistant, yeah.
Q Indirect fire resistant?
A Yeah.
Q Was that done?
A No.
Q Do you remember a Jeff Stackow (ph)?
A Vaguely.
Q Do you recall the requirements for T-walls and U-bunkers?
A Oh, yes.
Q What is a T-wall?
A T-wall is about -- they can be varying height, but essentially an inverted "T" shaped concrete wall. The "T" was the base, or the cross was actually the wall, the vertical wall, and it could be of varying widths and heights, and it was to put those around -- they would be put in and around buildings, the metal buildings or a wall. They could be connected. You know, they interlocked.

00076

Q What's a U-bunker?

A U-bunker was the same thing. What we used those for is those would be -- I believe they were like six foot high walls, the "U", but you flip it over and you have an instant mortar bunker, and we would put those -- you know, I believe they were roughly 10, 12 feet long, each one, and you would put, like, 10 or 15 of those together, outside of our -- most of our main training or dining areas, and in the event of an attack, if you heard a mortar, everybody went running for those bunkers, because mortars, you know, most of the mortars and rockets that came in couldn't damage those, and it was a safe -- a very fast and effective bunker system, safety system for the students.

If they were approved, they were simply -- if they could find them and purchase them, they were simply delivered, dropped on the ground with a crane, and it was up and done. It was very fast.

Q Do you recall whether Laudes did those?

A Yes.

Q That particular work, the T-bunkers -- the T-walls and the U-bunkers, is that one of the issues that you guys discussed with the folks in the Green Zone?

A Yes.

Q With the contracting officer's staff?

00077

A Yeah. That is exactly like a modification that we would have and we did talk about. Because, you know, unforeseen that the insurgency, if you want to call it that, whatever the reasons, the mortar issues really ramped up at that time, and it was obvious that we needed the safety component there as quickly as possible.

Q So you received -- I mean, the contracting officer agreed with the necessity to do that?

A As far as I know, yes.

Q What do you mean "as far as you know"?

A It's my understanding it went through our chain of command, that the request, through myself, up through to our CPATT headquarters, including our director, as far as the police mission was helping us push those through as well as fast as possible, and that it went to contracting as well, and that it was a verbal, everybody was given the verbal okay, because it was, you know, the paperwork was lagging, and by that time, because of other issues, Larry wasn't -- Laudes wasn't, you know, doing anything unless it was blessed, so to speak, or that it felt all parties were in agreement. And that's why I would say that. I don't recall seeing the documentation for it. I don't.

I know it would have gone up in writing and e-mails, and like I said, the communication to us and request would go up in writing, because we didn't have the

00078
face time to do that kind of stuff or the ability, really.
Q Did you know who T.J. McClaren (ph) was?
A I remember that name.
Q Contract administrator?
A Yes. Okay. That makes sense -- er -- I recognize it. I don't recall working with him. I may have. I don't recall.
Q Was there sort of a graduation ritual of destroying the barracks?
A There seemed to be, yes.
Q And is that something that Laudes had to repair --
A Yes.
Q -- once they were damaged or destroyed?
A Yes, they were.
Q Was that an issue that was brought to the attention of higher-ups, that problem?
A Yes, absolutely, across the board. You know, at what point does it change, life support of a maintenance janitorial type thing to a reconstruction, and, again, it seemed to be falling out -- you know, to me it did. It fell outside the scope of what their contract was about.
Q There was a electrical fire in December in the dining facility; do you recall that?
A Would that have been '04?
Q December of '04.

00079

A There could have been, certainly. I don't recall it. I know I was out -- I was out of the -- about from mid December, I was out for a couple of weeks on vacation, so I don't recall being there for that. Just off the top of my head, I don't remember being there for that. I was definitely there when the barracks burned down. That fire, oh, yes.

Q That is something that Laudes --

A Once that was burned, that was it. There was no reconstruction. Much later, even the scrap took some time to clean up.

Q Laudes refused or declined to repair or replace that building?

A Exactly. I believe so. That is correct.

Q Now, by January/February time frame of '05, do you recall whether Laudes was still being directed to perform its work?

The contract was until May of '05, Phase I contract. Is that your recollection?

A I believe so, but I left there in October of '05.

Q So you were there throughout the extent of Laudes' performance?

A Yes, yes.

Q They finished in May and had a third contract awarded for one month; do you recall that?

00080

A Yes. Yes, exactly.

Q Do you recall there being an issue in early '05 as to whether Laudes was going to be paid for work being performed on the Phase I contract?

A I recall them talking about it, both Larry and Stan had said comments about payments by then. There was starting to be a lot of issues about being paid.

Q What kind of issues; do you recall?

A It seemed to me that -- again, it was -- it was either that they didn't -- they were then getting pressured to submit their invoices to show more detail, what the performance was that they did do.

And also it seemed to me, as I recall, there was also -- he made some comments about some of the things he had been asked to do, basically by General Patraeus, at other facilities that he wasn't getting paid for. That's what I recall.

Q How about specific to the BPSA?

A As I recall, it was just that. There wasn't payments being made under the Phase I part, and that there was -- there was a greater demand coming from the contracting office for proof of services by submission of more detailed invoices. That's what I recall.

Q When you signed the DD250, were you comfortable with the level of detail you were getting --

00081

A Yes.

Q -- with respect to what you received?

A Yes.

Q So you had no question that when they submitted an invoice to -- let me rephrase that. When you signed a DD250 acknowledging a receipt --

A Yes.

Q -- you didn't have any problems at that point; right?

A Yes, sir.

Q Yes, sir, you didn't --

A That is correct. I signed it for services rendered and delivery services, delivery of goods.

Q And by your signature, can I deduce that you were -- by signing it, you were comfortable that you had in fact received the goods and services for which they were invoicing?

A Yes.

Q And one of the issues that you looked at was quality and the other was quantity, I suppose?

A Yes, I would -- yeah, they were certainly held to an acceptable standard, that obviously the amount delivered was what we received, yes. I mean, there would be a myriad of issues that had cropped up, not with them but with other vendors delivering things and stuff like that, so by that time, our learning curve was going along the

00082
same thing. We would look at all that, certainly.
Q Do you remember an issue as to whether Laudes was obligated to provide life support for dogs and their handlers at BPSA?
A I think, yeah, it was brought up because they weren't specific -- as I recall, that little portion of the academy and its facility required some maintenance, required work, and also the staff, it wasn't huge, but it was certainly more numbers, and originally it just basically didn't fall under the original request or the original scope of objectives, as I recall.
Q Do you know who Marcus Overbay (ph) was?
A Yes, Marcus was -- either replaced or was a coworker with LeMaster, as I recall.
Q A contracting officer?
A Yes, civilian, yes.
Q Do you recall whether he was involved in this K9 billeting and support?
A Yeah, I believe so. I know he was definitely involved in Laudes' contract and the procurement and issues like that, yes.
Q Do you recall either Larry Underwood or Stan Ellis from Laudes objecting to doing work that was outside the scope of their contract, at least that they believed was outside the scope of their contract?

00083

A Sure. Sure they would. They would not be bashful to say, hey, that's not in the scope. And we would always ended up with how -- you know, if it was just something we had to have done, we always work together. I never felt I had to work against them. It was always working together to try to get something done.

Or if it was just, again, at a point, as you said before, Mr. Underwood or Laudes had declined to do further construction, it was just that. It's someone that they also worked with that did that, and was either the quality got to a point where they just wouldn't work with them any more. And at a point, they also had, for no better expression, too many brands in the fire. It would just have been another project that made it too much work. I know that came up, too.

Q Do you know whether they did this extra work when they agreed to do it understanding that they would get paid for it?

A Yes.

Q And on what do you base that?

A That's the way you do business. We would discuss it, and that was part of the thing, it's not part of the contract, and because it would either take -- generally take -- it was either -- most of the time it was purchasing of some materials or goods to fulfill a need,

00084

and money would have to be spent, and it doesn't come
under that, and there isn't funds for it, so we would need
to have it, so there was -- the appropriate funds could be
made. That was my understanding.
Q Were you involved in getting appropriate funds or
getting approval for appropriate funds?
A As I recall, I may have made those requests or sent
it up to request those be done. I don't remember a
specific one, but I believe I certainly would have if it
came up that way, yeah.
Q And who would be responsible for giving Laudes
direction to perform the work once that had been
accomplished?
A As I understand it, the way it would work -- now that
I am recalling it -- would be something on the order that
I had brought something to the attention of such as Marcus
Overbay. I remember working now with Marcus quite a bit,
and I think it may have been on the K9s. It would be
either, you know, a modification to the contract request
or an addendum or however the right word is, but, you
know, what is it they needed, and I would get it to him,
and then once it was all agreed on by the parties, and it
could actually be something that was added to a contract,
then once it was, they would advise Laudes that it was
approved, and then the project could go forward and would

00085
let us know as well. As I recall, that's how it worked.
Q So you would receive information from the contracting office --
A Yes.
Q -- that this additional work --
A Yes.
Q -- was okay and within the scope --
A Yes.
Q -- now?
A Yes. As I recall, it come -- it was much like that addendum like Major Blackmon wrote in that one where the contract went to -- you would get a letter similar to that, that the contract was amended to include the work outlined in the K9 facility or something to that effect, but there would be a notification that came down.
Q Well, a lot of it was done verbally, too, as well --
A Yes.
Q -- during that time frame?
A Yes.
Q Just one moment. I think we're almost done.
Let's take a break off record.
(Off record.)
BY MR. JACKSON:
Q Just a couple more things. In early '05, January, February, March time frame of '05 when you heard from

00086

Laudes personnel, Larry Underwood and Stan Ellis, that they were having problems getting paid on the BPSA project --
A Uh-huh.
Q -- was there ever a discussion about them stopping work?
A No. No. The only thing they said is that he just -- he couldn't foresee bidding the contract again, I think, as I recall, I think, because part of it -- and I don't think -- I didn't get the impression it was specifically about money. It was that the work effort there was extremely overwhelming, and that his efforts and endeavors were going to be, in bidding other contracts, still in the system, just not at BPSA. That's what I took from it.
Q Was there ever any discussion between BPSA excluding the Laudes personnel as to whether -- let me rephrase that.
Was there ever a concern on BPSA's part that Laudes would stop work if they weren't paid?
A No, I never felt they would, no.
Q Did anybody discuss at BPSA the Laudes' payment issue?
A If we were -- possibly. I don't recall having, like, sitting -- I don't recall having a specific meeting of sitting down with any of the higher staff from my end

00087
saying, you know, gee, they are not getting paid. That didn't happen that I recall.
Q Was there an expectation that Laudes would continue performing?
A Yes.
Q Based on what?
A That's the kind of way they do business. They took care of what they said they would do. I mean, that's -- those were the kind of guys -- they worked. If they had a contract that went through to the end of June, they would certainly do that work. And I think part of it was that, you know, even though he is saying, hey, I'm not getting paid for it, I'll get it figured out, we still have a job to do, basically.
Q But you did not get the impression from him that he intended to do the work without getting paid?
A No. I think there were certainly an expectation of payment, yeah, sure.
MR. JACKSON: Well, I don't have anything further, Reid, unless you do.
MR. PROUTY: I have nothing.
MR. JACKSON: Well, we can go off record.
(Proceedings adjourned at 12:50 p.m.)

00088

C E R T I F I C A T E

I hereby certify that I have read the foregoing transcript and accept it as true and correct, with the following exceptions:

=====================================================

PAGE LINE CORRECTION

____ _____ ______________________________

____ _____ ______________________________

____ _____ ______________________________

____ _____ ______________________________

____ _____ ______________________________

____ _____ ______________________________

____ _____ ______________________________

____ _____ ______________________________

____ _____ ______________________________

____ _____ ______________________________

____ _____ ______________________________

____________ ______________________________
Date: 6/05/08 Ted Nordgaarden

(Use additional paper to note corrections as needed, signing and dating each page.) (SW)

00089

REPORTER'S CERTIFICATE

I, SUSAN J. WARNICK, RPR, and Notary Public in and for the State of Alaska do hereby certify:

That the witness in the foregoing proceedings was duly sworn; that the proceedings were then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed under my direction by computer transcription; that the foregoing is a true record of the testimony and proceedings taken at that time; and that I am not a party to nor have I any interest in the outcome of the action herein contained; that signature was requested.

IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my seal this _____ day of ______________, 2008.

_______________________________
SUSAN J. WARNICK,
Registered Professional Reporter
Notary Public for Alaska

My Commission Expires: April 8, 2010

00090

INDEX TO DEPOSITION

WITNESS: Ted Nordgaarden PAGE

Examination by Mr. Jackson: 3

EXHIBIT PAGE

Exhibits 1 though 63 marked and furnished by Mr. Jackson. The exhibits discussed in the deposition are attached.