No. 07-4C
(Judge Wheeler)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LAUDES CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S SUPPLEMENTAL REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL DISMISSAL OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

---

GREGORGY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

J. REID PROUTY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: 202-305-7586
Fax: 202-514-7969

August 21, 2008

Attorneys for Defendant

# TABLE OF CONTENTS

**Page**


ARGUMENT ........ 2

I. No CPA Actions Upon The Phase I Contract Are Currently Subject To The Tucker Act ........ 2

A. Counts I, III, V, VI, And VII Of Laudes's Complaint Seek Liability Based Upon The Actions Of The CPA ........ 3

B. The Tucker Act's Limitations Upon The Court's Authority Preclude Review Of Actions Taken By The CPA ........ 5

II. All Actions Regarding The Phase I Contract Taken Subsequent To June 30, 2004, Are Attributable To The Government Of Iraq, Not The United States, And Thus Not Within The Ambit Of The Tucker Act ........ 8

A. There Is No Real Dispute That, Upon Dissolution Of The CPA, All DFI-Funded Contracts Became The Responsibility Of The IIG ........ 8

B. The CPA Possessed The Authority To Transfer Responsibility To The IIG ........ 9

1. Laudes Was Aware Of The Imminent Replacement Of The CPA By The IIG ........ 10

2. The Doctrine Of Sovereign Acts Governs The Transfer Of Responsibility From The CPA To The IIG ........ 11

C. The PCO's Role As Contracting Agent For The United States In Iraq Is Irrelevant ........ 14

III. Laudes's Claims Regarding Alleged Contracts-Implied-In-Fact Prior To The Execution Of The Phase I Contract Are Not Cognizable ........ 15

IV. Laudes's Claims, Alleging The Existence Of Implied-In-Fact Contracts Promising That It Would Be Awarded Additional Contracts And Funding, And That The United States Was Estopped From Not Providing It Money, Are Precluded By Law ........ 16

A. Agents Of The United States Did Not Possess The Authority To Make The Implied-In-Fact Contracts Alleged By Laudes ........ 17

# TABLE OF CONTENTS
**-continued-**

**Page**


B. No United States Government Officer Possessed Authority To Add Iraqi Money To The Phase I Contract ........ 18

C. Laudes's Alleged Entitlement To Payment For Goods Ordered And Received Does Not Rescue Its Alleged Implied-In-Fact Contracts ........ 18

V. Count VI Of Laudes's Complaint, Estoppel, Must Be Dismissed For Lack Of Jurisdiction ........ 19

VI. Count V Of Laudes's Complaint, Fraud In The Inducement, Is Outside Of This Court's Jurisdiction Because It Sounds In Tort ........ 20

VII. Count V Of Laudes's Complaint Must Be Dismissed Because It Seeks The Remedy Of A Contract Implied-In-Law ........ 21

VIII. Count V Of Laudes's Complaint, Fraud In The Inducement, Is Unsupportable Because Limitations Upon Future Authority To Modify DFI-Funded Contracts Were Publicly Known At The Time The Phase I Contract Was Entered ........ 21

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Cases** **Page**(s)

ASEDAC v. Panama Canal Comm'n,
453 F.3d 1309 (11th Cir. 2006) .......... 7

Aetna Cas. and Sur. Co. v. United States,
655 F.2d 1047 (Ct. Cl. 1981) .......... 20

Allen v. United States,
100 F.3d 133 (Fed. Cir. 1996) .......... 5

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir. 1990) .......... 15

Burnside-Ott Aviation Training Center, Inc. v. United States,
985 F.2d 1574 (Fed. Cir. 1993) .......... 19

Centex Corp. v. United States,
395 F.3d 1283 (Fed. Cir. 2005) .......... 13

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) .......... 15

Cincinnati Soap Co. v. United States,
301 U.S. 308 (1937) .......... 8

D.F.K. Enters., Inc. v. United States,
45 Fed. Cl. 280 (1999) .......... 20

D.V. Gonzalez Electric & General Contractors, Inc. v. United States,
55 Fed. Cl. 447 (2003) .......... 20

Empresas Electronics Walser, Inc. v. United States,
650 F.2d 286 (Ct. Cl. 1980) .......... 18

Federal Crop Ins. Corp. v. Merrill,
332 U.S. 380 (1947) .......... 18

Flexfab, LLC v. United States,
424 F.3d 1254 (Fed. Cir. 2005) .......... 5, 21

General Dynamics Corp. v. United States,
47 Fed. Cl. 514 (2000) .......... 12

# TABLE OF AUTHORITIES
**-continued-**

**Cases** **Page**(s)

Hercules, Inc. v. United States,
516 U.S. 417 (1996) .......... 19, 21

Horowitz v. United States,
267 U.S. 458 (1925) .......... 11

ITT Fed. Support Services v. United States,
531 F.2d 522 (Ct. Cl. 1976) .......... 15

Klebe v. United States,
263 U.S. 188 (1923) .......... 16

L'Enfant Plaza Properties, Inc. v. United States,
668 F.2d 1211 (Ct. Cl. 1982) .......... 5

Office of Personnel Management v. Richmond,
496 U.S. 414 (1990) .......... 19

Perri v. United States,
340 F.3d 1337 (Fed. Cir. 2003) .......... 21

Sinclair v. United States,
56 Fed. Cl. 270 (2003) .......... 19

Somali Development Bank v. United States,
508 F.2d 817 (Ct. Cl. 1974) .......... 20

Sun Oil v. United States,
572 F.2d 786 (Ct. Cl. 1978) .......... 11

United States v. Winstar,
518 U.S. 839 (1996) .......... 11, 12, 13

Walter Dawgie Ski Corp. v. United States,
30 Fed. Cl. 115 (1999) .......... 11, 13

Yankee Atomic Electric Co. v. United States,
112 F.3d 1569 (Fed. Cir. 1997) .......... 12, 13, 14

# TABLE OF AUTHORITIES
**-continued-**

**Statutes and Regulations** **Page**(s)

10 U.S.C. § 2304 .................................................................................................................... 17

41 U.S.C. § 612(c) ............................................................................................................... 6, 7

48 C.F.R. § 16.603-2(c) .......................................................................................................... 4

48 C.F.R. § 52.216-25(c) ........................................................................................................ 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LAUDES CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07-4C |
| v. | ) | |
| | ) | (Judge Wheeler) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S SUPPLEMENTAL REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL DISMISSAL OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

In our motion for partial dismissal or, in the alternative, for partial summary judgment and our reply brief supporting the motion, we provided multiple reasons why those counts of the complaint related to the "Phase I" contract should be dismissed or judgment entered in favor of the United States upon them. In summary, we explained that actions taken by the Coalition Provisional Authority ("CPA") upon contracts funded with Iraqi money (as was the Phase I contract) and actions taken by the Iraqi Interim Government ("IIG"), which assumed responsibility of performance of the Phase I contract upon the dissolution of the CPA, are not subject to this Court's jurisdiction. We also demonstrated that the amorphous implied-in-fact contracts alleged by plaintiff, Laudes Corporation ("Laudes"), could not act to add funds to the Phase I contract because these alleged contracts were beyond the authority of United States personnel to create and were precluded by the Phase I contract, itself, which was controlling since it was an express contract covering the same subject area. We further demonstrated that claims of fraud and promissory estoppel are not properly before this Court and should be dismissed. Finally, we demonstrated that Laudes's fraud claim could not survive because publicly available facts would have placed Laudes on notice of the facts allegedly withheld by

the United States. We supported these arguments in our reply to Laudes's opposition brief, demonstrating, inter alia, that the "sovereign acts" doctrine precluded Laudes's arguments that the United States should be contractually liable to Laudes for the decision to transfer contracts funded with Iraqi money to the IIG upon dissolution of the CPA. After Laudes took discovery pursuant to the Court's granting its Rules of the Court of Federal Claims ("RCFC") 56(f) motion, Laudes filed a supplement to its initial opposition brief. This supplement relies little upon the new facts gleaned through the discovery and presents many arguments already demonstrated to be faulty, while advancing other legal theories that continue to misconstrue our arguments and that err upon the law and agreed-upon facts. As we demonstrate below, Laudes's arguments are still unavailing.

## ARGUMENT[1]

### I. No CPA Actions Upon The Phase I Contract Are Currently Subject To The Tucker Act

In our previous briefs, we demonstrated that the limitations upon the Court's authority pursuant to the Tucker Act precluded holding the United States Government responsible in this Court for actions taken by the CPA in administering Development Fund For Iraq ("DFI") - funded contracts. In our reply brief, we demonstrated that this preclusion applied to counts I, III, V, VI and VII of Laudes's complaint, premised upon actions of the CPA. Laudes responds that,

---

[1] In our moving brief, we relied upon the separately-filed "Defendant's Proposed Finding Of Uncontroverted Facts" for purposes of both the motion to partially dismiss and our alternative motion for partial summary judgment. With this supplemental brief, Laudes has filed a response to our proposed findings and included its own "proposed finding of uncontroverted facts." Though extensive, little of this filing by Laudes is actually applied to the arguments made herein, and some of it is merely supported by citations to its own complaint. We will only address this filing to the extent it is applicable to the arguments presented in Laudes's supplemental brief.

for reasons related to the Phase I contract being a "letter contract," counts I and III of its complaint apply to actions of the United States, not just the CPA. Pl. Supp. Resp. 4-7.[2] Laudes also argues that, because the CPA was not a creation of Congress, and was not dissolved by Congress, precedent cited in our motion is not applicable here. Pl. Supp. Resp. 7-9. Both arguments are flawed. The characterization of the Phase I contract as a letter contract does not change contracting rules, permitting the creation of implied-in-fact contracts over duties addressed in the letter contract and that Laudes asserts it was required to perform. Moreover, Laudes cannot escape the salient fact that the Phase I contract was funded with Iraqi money, not United States Government appropriations, and the liabilities of the CPA were never explicitly assigned by Congress. To the contrary, the very Executive Branch that Laudes asserts took responsibility from the CPA also passed responsibility for Iraqi-funded CPA contracts to the IIG.

A. Counts I, III, V, VI, And VII Of Laudes's Complaint Seek Liability Based Upon The Actions Of The CPA

There is no dispute that counts V (fraud in the inducement), VI (estoppel), and VII (breach of good faith and fair dealing) of Laudes' Second Amended Complaint are premised explicitly upon actions allegedly taken by the CPA. See Comp. ¶ 241; ¶ 247; ¶257.[3] Moreover, as we earlier demonstrated, counts I, and III refer to actions taken "before," "during," and "after" June 28, 2004. Comp. ¶¶ 205, 223. Thus, the alleged actions taken before June 28, 2004, in counts I and III, refer to the time before the transfer of CPA responsibilities to the IIG. See

[2]"Pl. Supp. Resp.__" refers to a page of "Plaintiff's Supplemental Opposition To Defendant's Motion For Partial Dismissal Or, In The Alternative, For Partial Summary Judgment."

[3] "Comp. ¶ __" refers to a paragraph of Laudes' "Second Amended Complaint."

DPFUF 16.[4] Moreover, as we noted in our reply brief, any actions taken upon the Phase I contract after June 28, 2004, would be taken by the United States upon behalf of the IIG, and thus be outside of the Court's jurisdiction. Finally, the fact that the Phase I contract was characterized as a letter contract does nothing to change the fact that, given the need for consideration to make a valid contract, there could be no separate implied-in-fact contracts after the end of the CPA in light of Laudes's oft-repeated assertion that it had no choice but to perform upon the Phase I contract. E.g., Comp. ¶¶ 179, 206, 216.

Laudes is correct to assert that a letter contract is, in some ways, different than a more standard contract. In particular, the matter of price may be left to be definitized by the parties, see 48 C.F.R. § 16.603-2(c), although there should be a maximum liability clause inserted in the contract. 48 C.F.R. § 16.603-2(d). In the event that the parties do not come to agreement upon the cost, the Federal Acquisition Regulation ("the FAR")[5] provides that the contracting officer may require the contractor to continue its work while the contracting officers sets a proper payment, with the concurrence of the head of the contracting activity and subject to the letter contract's disputes clause. See id.; 48 C.F.R. § 52.216-25(c).

Rather than supporting Laudes's arguments, these characteristics of a letter contract doom Laudes's attempts to shoe-horn its claims into contracts implied-in-fact. While the Phase I contract may not have been definitized upon all terms, there was undoubtedly a meeting of the minds that Laudes would perform under the contract and that (as Laudes asserts, even now,

---

[4] "DPFUF__" refers to a paragraph of "Defendant's Proposed Finding Of Uncontroverted Facts," that we filed with our moving brief.

[5] We do not necessarily agree with Laudes that the FAR applies to the Phase I contract, but concede it, arguendo, here.

see Pl. Supp. Resp. 6, n.2) Laudes was required to continue performance. Thus, regardless of Laudes's assertions that the letter contract did not evince a meeting of the minds and was not fully integrated, it, nevertheless, created a duty that Laudes was required to perform. As we demonstrated in our reply brief, performance of a pre-existing duty does not provide the consideration necessary for the formation of a contract implied-in-fact. Flexfab, LLC v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005) (consideration necessary for implied-in-fact contract); Allen v. United States, 100 F.3d 133, 134 (Fed. Cir. 1996) ("[p]erformance of a pre-existing legal duty is not consideration"). Thus, the implied-in-fact contracts that Laudes alleges followed the signing of the Phase I contract cannot legally exist, and would be subject to dismissal pursuant to RCFC 12(b)(6) or summary judgment pursuant to RCFC 56, leaving only the actions of the CPA for counts I and II of the complaint to be considered by the Court.

B. The Tucker Act's Limitations Upon The Court's Authority Preclude Review Of Actions Taken By The CPA

In response to our argument that this Court does not possess jurisdiction over CPA actions here because it is not a "case[]in which appropriated funds can be obligated" to pay any judgment. L'Enfant Plaza Properties, Inc. v. United States, 668 F.2d 1211, 1212 (Ct. Cl. 1982), Laudes generally argues that, because Congress did not create the CPA or possess a role in eliminating it, the United States should be liable for all of its acts. Pl. Supp. Resp. 7-9. Though Laudes extensively quotes Ambassador Bremer, National Security Presidential Directive ("NSPD") 36, and other sources, none of these citations demonstrates an assignment of liability to an agency of the United States for Iraqi-funded contracts. Neither does Laudes's response explain why the dissolution of the CPA by the occupying powers, instead of by Congress, makes any conceptual difference in the amenability of any other agency to suit for CPA actions using

Iraqi funds. Finally, Laudes fails to address the fact that there is simply no "agency whose appropriations were used for the contract," 41 U.S.C. § 612(c), for the Judgment Fund of the Department of the Treasury to tax for any judgment.

We do not dispute that the United States Army was, to quote Laudes's quotation of Ambassador Bremer, "the executive agent for the CPA" for contracting support. See Pl. Supp. Resp. 8 (quoting B. 164[6]). Indeed, nothing could make one of the roles of the Army more clear than these words: the Army was, in fact, acting as the "agent" of the CPA, but it was not the CPA, itself. The portions of NSPD 36 quoted by Laudes, in conjunction with Deputy Secretary of Defense Ballard's memorandum, see Pl. Supp. Resp. 8-9 (quoting A. 113-14[7] and B. 160), do nothing to demonstrate an explicit transfer of liability from the CPA to the Army's Project Contracting Office ("PCO"). Instead, they effect the transfer of "authorities and responsibilities that continue after the CPA terminates," A. 113, and direct the PCO to provide "support" for the "close-out" of the CPA. B. 160. This is precisely what we have always alleged the role of the PCO to be for "legacy" Iraqi-funded contracts, like the Phase I contract: the provision of administrative support to the newly-formed Iraqi government, which, upon its creation on June 28, 2004, possessed complete authority over contracts paid for by its own money, but did not yet have the administrative ability to engage in day-to-day management of such contracts. See A. 79-81 (Mahdi delegation letter). Laudes has cited no authority for the proposition that the

[6] "B. __" refers to a page of the appendix following Laudes's "Consolidated Response To Defendant's Proposed Findings Of Uncontroverted Facts And Plaintiff's Proposed Findings Of Uncontroverted Facts."

[7] "A. __" refers to a page of the appendix following our earlier-filed "Defendant's Proposed Finding of Uncontroverted Facts."

United States continued to possess "authority" over Iraqi-funded contracts "after the CPA terminate[d]," see A. 113, which assertion is belied by the fact that the PCO, itself, recognized that its authority over such contracts was limited to that granted by the IIG. A. 82.

Laudes's citation to Congress's language in the Fiscal Year 2004 Supplemental Appropriation referring to successors to the CPA, see Pl. Supp. Resp. 9, does nothing to make the Army (or any other United States Government agency) responsible for actions of the CPA. The statutory section merely provides that its references to the CPA are deemed to include United States Government entities with similar responsibilities. Id. Inasmuch as we have always conceded that Congress provided some funds to the CPA, it is not at all surprising that it would make provision for the CPA's demise in those cases. That is the limit of the meaning of this citation.

Thus, there is no explicit congressional designation of a successor agency to stand in the CPA's shoes for litigation involving Iraqi-funded contracts. Without such an explicit designation, no suit may be maintained against the United States. See ASEDAC v. Panama Canal Comm'n, 453 F.3d 1309, 1316 (11th Cir. 2006). Laudes's attempt to distinguish ASEDAC from its case by asserting that the dissolution of the CPA was by the Executive branch, and not by Congress (as in ASEDAC), Pl. Supp. Resp. 8 , is not persuasive. Laudes gives no reason why it should make any difference which branch of government dissolved the agency, and fails to address the dispositive point that we made in our reply brief: because the availability of appropriated funds is the cornerstone of this portion of our motion, and because only Congress possesses the constitutional authority to appropriate funds, see U.S. CONST. art. I, § 9, cl. 7; see also Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937), congressional actions

accepting liability and continuing it upon dissolution of the CPA is a prerequisite to this Court's jurisdiction.

## II. All Actions Regarding The Phase I Contract Taken Subsequent To June 30, 2004, Are Attributable To The Government Of Iraq, Not The United States, And Thus Not Within The Ambit Of The Tucker Act

Although Laudes does not seriously dispute our point that acts by United States personnel as agents of the IIG would not be subject to this Court's jurisdiction, and does not dispute the fact that complete authority over DFI funds was transferred to the IIG upon dissolution of the CPA, it continues to argue that transfer of the DFI to IIG control did not constitute transfer of responsibility over DFI-funded contracts to the IIG, and continues to maintain that the CPA had no authority to effect such a transfer of responsibility without breaching its contract with Laudes. See Pl. Supp. Resp. 9-16. In fact, the CPA's transfer of authority over DFI-funded contracts, like the Phase I contract,[8] was plain and clear; it should have been anticipated by Laudes; and was within the rights of the United States in its sovereign capacity.

### A. There Is No Real Dispute That, Upon Dissolution Of The CPA, All DFI-Funded Contracts Became The Responsibility Of The IIG

In our reply brief we demonstrated that CPA Memorandum 15 made clear that, as part of the transfer of "full governance authority of Iraq . . . to the [IIG] upon [the date that the CPA dissolved]," A. 74, the IIG would be provided full authority over DFI-funded contracts, which it

[8] Laudes confuses the matter by suggesting that the Phase I contract was not necessarily DFI- funded because "Iraqi funds" (see A. 111, block 40) could refer to vested or seized funds. Pl. Supp. Resp. 19. Although the Phase I contract does mention Iraqi funds, it also plainly provides that the source of its funding was the DFI. See A. 105, block 25 ("DFI Transfer J-8079" listed under "Accounting And Appropriation Data").

could delegate as it saw fit. See A. 74-75. This is consistent with the subsequent actions of the IIG and the PCO.[9] A.79-81; 82. Of course, the notion of transferring absolute control over the funding source for a contract to one sovereign (here, the IIG), while leaving another sovereign (the United States) completely responsible for the contract, is nonsensical. Laudes does not address these arguments, thus we may safely state that the CPA transferred authority over the DFI and DFI-funded contracts to the IIG upon its dissolution.

B. The CPA Possessed The Authority To Transfer Responsibility To The IIG

Laudes continues to assert that the CPA could not have transferred its contractual obligations to the IIG because its contractual agreement was originally with the United States and, as a matter of law, the United States could not escape its responsibility to Laudes by transferring the Phase I contract to the IIG. Pl. Supp. Resp. 9-15. Laudes argues that it had reason to believe that the PCO would take over the contract from the CPA, see Pl. Supp. Resp. 10, and that the United States cannot use the sovereign acts defense here because it was acting as a contractor when it transferred the contract to the IIG. Id. at 14. Both of these arguments are undercut by the uncontroverted facts, not addressed by Laudes: the written terms of the Phase I contract advised Laudes that no United States Government money would ever be available for the contract, and the transfer of the contract to the IIG was part of the much bigger Government decision to resuscitate the sovereign state of Iraq.

[9] At the time of the transfer of authority, the organization that would become the PCO was known as the "PMO." We refer to it at all times as the PCO for simplicity.

1. Laudes Was Aware Of The Imminent Replacement Of The CPA By The IIG

Laudes ignores a dispositive fact raised in our motion and the reply: the very terms of the Phase I contract provided that all payments made upon it would be through DFI funds and that "[n]o funds, appropriated or other, of any Coalition country are or will be obligated under this contract." A. 111. Thus, Laudes was advised at the time that it signed the Phase I contract that it would have no recourse to funds of the United States and that the only source of funds for the contract was the DFI. Accordingly, as far as Laudes must be concerned, the transfer of the Phase I contract to the IIG did not constitute the United States's assignment of its duty to pay upon the contract to another entity because the United States never had the duty to make payments of its own funds under the Phase I contract in the first place.

Moreover, CPA Memorandum 4, which was the primary document governing all CPA contracts funded by the DFI, see A. 43, and which was executed on August 20, 2003 (more than 11 months prior to dissolution of the CPA), provided that "[t]he CPA's authority is of limited duration and will terminate upon the establishment of an internationally recognized, representative government of Iraq." A. 72. Although Laudes argues that, in combination with NSPD 36, this could be read to mean that, upon dissolution of the CPA the PCO would take responsibility for Iraqi contracts, see Pl. Supp. Resp. 10, this interpretation is not supported by the text of NSPD 36, which limited itself to those responsibilities that "continue[d] after CPA termination." A. 113. Nor is there any evidence that Laudes considered NSPD 36 and was misled by it. United Nations Security Council Resolution ("UNSCR") 1546 made clear that, after the transition, DFI funds would be spent "solely at the direction of the Government of Iraq," A. 37, para 24, thus indicating in no uncertain terms that responsibility for the DFI (and

necessarily the contracts it funded) would not "continue" to be held by the United States "after CPA termination." A. 113 (NSPD 36). Accordingly, when it signed the Phase I contract, Laudes should have been on notice that the contract would soon become one with the IIG.[10]

### 2. The Doctrine Of Sovereign Acts Governs The Transfer Of Responsibility From The CPA To The IIG

Our reply brief set forth the proper standards for the sovereign acts doctrine, in which the Government as contractor is not liable for actions taken by the Government as sovereign, see, e.g., Walter Dawgie Ski Corp. v. United States, 30 Fed. Cl. 115, 131 (1999) (citing Sun Oil v. United States, 572 F.2d 786 (Ct. Cl. 1978)); see also, Horowitz v. United States, 267 U.S. 458, 461 (1925). We explained that the United States-as-contractor could not be held responsible for the sovereign decision to return the DFI to the Iraqi people along with the perquisites of sovereignty, such as control over contracts paid with its own funds. In response, Laudes argues that, following the Supreme Court's decision in United States v. Winstar, 518 U.S. 839 (1996) the doctrine of "unmistakability" should negatively affect our argument, and that the transfer of CPA contracts to the IIG was plainly an act taken in the Government's role as contractor. Pl. Supp. Resp. 10-15. Laudes is wrong. First, the transfer of Iraqi-funded contracts to the IIG is plainly part of the larger decision to vest the country of Iraq with sovereignty in compliance with the mandate of UNSCR 1546. Second, if anything, the unmistakability doctrine is favorable to the United States here, because the language of the Phase I contract provided that the United States would provide no funds upon the contract. See A. 111.

[10] Laudes's reference to statements by the Phase I contract's contracting officer that there were a number of "unknowns" associated with the transition, see Pl. Supp. Resp. 10, n.3, is of little moment here. It is not surprising that the transition would leave some matters to be sorted out, but there is no denying that the transition was a certainty.

Though no binding circuit authority exists for imposing the two-step test regarding unmistakability doctrine that Laudes sets forth, we recognize that this Court has followed such an analysis in the past. See, e.g., General Dynamics Corp. v. United States, 47 Fed. Cl. 514, 541 (2000) (requiring determination first that a governmental act was "public and general" and then turning to whether the contract unmistakably promised that the Government would not exercise its sovereign prerogatives).[11] In any event, even were the Court to apply both prongs of the analysis, the result would remain the same.

The first prong of the analysis is the familiar sovereign acts analysis contained in our reply brief: whether the governmental act was "public and general." General Dynamics, 47 Fed. Cl. at 541. Laudes presents the argument that a simple "effects" test should be applied to determine whether an action was a sovereign act, and that, if an effect of a governmental act were to be to the advantage of the Government against a contractor, the sovereign acts defense should not apply. See Pl. Supp. Resp. 12-13. This is not supported by the law. Although a plurality of three Justices in Winstar did state that a governmental act "which has the substantial effect of releasing the Government from its contractual obligations" is not "public and general," 518 U.S. at 899, Winstar also made clear that the issue was whether the challenged governmental action was "tainted by an object of self-relief." Id. at 896. Indeed, the Winstar court agreed that, when the effect upon contractors is "merely incidental" to the accomplishment of a larger governmental objective," the sovereign acts defense applies. Id. at 898. Certainly the court of

[11] A better way of analyzing the sovereign acts doctrine, post-Winstar, is to consider the unmistakability doctrine to be a defense to the sovereign acts doctrine because it blocks the exercise of sovereign power. See generally Yankee Atomic Electric Co. v. United States, 112 F.3d 1569, 1578-80 (Fed. Cir. 1997). This distinction, however, is unimportant to the analysis in this case.

appeals recognized as much in the post-Winstar case of Yankee Atomic, in which it analyzed whether the governmental purpose in an action was for the benefit of the Government-as-contractor or for the benefit of the public. 112 F.3d at 1575. Although Government contractors were certainly affected by the actions taken by the United States in that case, the court of appeals, nevertheless, found the tax at issue to be a sovereign act. 112 F.3d at 1577.

Applying the foregoing analysis, the sovereign act here was not, as Laudes would have it, the United States Government's decision to not pay it upon the Phase I contract, see Pl. Supp. Resp. 12, but the larger decision to act in compliance with UNSCR 1546 and return full authority over the DFI to the Government of Iraq upon the establishment of that government. This decision was consistent with creation of the DFI in the first place: it was created by the U.N. and made up of Iraqi money held in trust by the U.N. from the oil-for-food program, Iraqi government money seized by U.N. member states, and proceeds from Iraqi oil sales after the occupation began. DPFUF 13. It was given to the custody of the CPA under the obligation that it be spent for "the benefit of the people of Iraq," id.; it was not the property of the United States to use at its will. The return to the lawful government of Iraq of full authority over Iraqi money held in trust by the CPA upon its dissolution, consistent with UNSCR 1546, was thus, plainly a "general and public act" of the CPA, e.g., Walter Dawgie, 30 Fed. Cl. at 131, and not the small-minded act of a contractor attempting to escape its obligations as alleged by Laudes.[12]

---

[12] Laudes's comparison of this case to the hypothetical presented by the court of appeals in Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir. 2005), see Pl. Supp. Resp. 13-14, is not at all persuasive: unlike the case presented by the hypothetical, there is no indication here that the Government exercised its powers with the object of freeing itself from contractual obligations. Indeed, as far as the Government was concerned, the Phase I contract already provided that the United States had no monetary obligations to Laudes. See A. 111, para 40.

We next turn to whether the United States "unmistakably" promised to forego its authority as a sovereign regarding transfer of the IIG contract. To invoke the unmistakability doctrine as an effective affirmative defense to the sovereign acts doctrine, Laudes must demonstrate that the contract includes an "unmistakable promise" to preclude future acts of the sovereign. Yankee Atomic, 112 F.3d at 1578. Notably, contracts with the sovereign are not read to include "unstated term[s] exempting the other contracting party from the application of a subsequent sovereign act." Id. (quoting Winstar, 518 U.S. at 878). Here, Laudes argues that the unmistakable promise by the Government was the implicit one that the United States would be contractually liable to Laudes. Pl. Supp. Resp. 14-15. This argument fails because an implicit promise cannot be "unmistakable," id., and the Phase I contract explicitly provided that there would be no recourse to United States funds. A. 111.

C. The PCO's Role As Contracting Agent For The United States In Iraq Is Irrelevant

We do not dispute that, in addition to acting as agent for the IIG for "legacy" DFI contracts, the PCO also acted as the United States Government's contracting authority in Iraq. This "wearing of two hats," however, does not advance Laudes's claims. Counts I, II, III, IV, VI, and VIII, of Laudes's complaint are all premised upon actions allegedly taken pursuant to the Phase I contract. Indeed, the invoices that Laudes submitted to the PCO for payment that formed the genesis of this suit were upon the Phase I and Phase II contracts. See Comp. ¶¶ 150, 170, 175, 184. The Phase I contract, after June 28, 2004, was a contract with Iraq, not the United States, thus this Court does not possess jurisdiction over counts II, IV, VI and VIII of Laudes's complaint, nor those portions of counts I and III which refer to actions upon the Phase I contract after June 28, 2004.

III. Laudes's Claims Regarding Alleged Contracts-Implied-In-Fact Prior To The Execution Of The Phase I Contract Are Not Cognizable

We demonstrated in our prior briefs that the alleged implied-in-fact contracts alleged in counts I, II, and III of Laudes's complaint that occurred prior to Laudes's entry into the Phase I contract were precluded by law. This is consistent with the well-established law that, "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir. 1990) (citing ITT Fed. Support Services v. United States, 531 F.2d 522, 528 n.12 (Ct. Cl. 1976)). Laudes now argues that, being a letter contract, the Phase I contract shows no meeting of the minds and thus is not an express contract. Pl. Supp. Resp. 17. Considering the facts of the case, in which the Phase I contract set forth very plainly a statement of work and a not-to-exceed amount, see A. 105-11, and the nature of letter contracts (discussed in section I A., above), which are, in fact, binding instruments yet leave some terms to be definitized, there is no reason that Atlas and its progeny should not be applicable to express contracts that are also letter contracts.[13] Cf. Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991) (agreements to agree are sufficiently definite to be considered contracts). Surely, the notion that writings leave no room for doubt about the parties' intentions which forms the basis for this rule of law, see Klebe v. United States, 263 U.S. 188, 192 (1923), still applies whether the writing is in letter form or more formal. Indeed, if (as Laudes would have it) this rule of law were not applicable to letter

[13] Laudes's assertion that it was required to perform upon the Phase I contract certainly demonstrates that it considered there to be sufficient meeting of the minds in the contract to be binding upon it.

contracts, they would be meaningless, subject to constant revision by alleged implied-in-fact contracts.

The letter contract, moreover, precludes future contracts implied-in-fact. This is because the express writing of the letter contract controls the means by which its undetermined terms are to be definitized. Thus, the parties have expressly agreed to the means of definitization, leaving no room for ad hoc implied-in-fact contracts to be strewn across the procurement landscape as Laudes demands.

IV. Laudes's Claims, Alleging The Existence Of Implied-In-Fact Contracts Promising That It Would Be Awarded Additional Contracts And Funding, And That The United States Was Estopped From Not Providing It Money, Are Precluded By Law

In our prior briefs, we demonstrated that the implied-in-fact contracts alleged by Laudes (counts I through III of the complaint) and its estoppel claim (count VI) were precluded by law – generally, because one cannot make an implied contract to do the illegal or impossible. In support of its implied-in-fact contract theory, Laudes plaintively argues that it should be paid because the United States ordered and received services from Laudes. Pl. Supp. Resp. 18. Laudes further argues that it the United States could add funds to the Phase I contract because that contract's funding was not limited to the DFI. Pl. Supp. Resp. 19. Neither response advances Laudes's case.

A. Agents Of The United States Did Not Possess The Authority To Make The Implied-In-Fact Contracts Alleged By Laudes

As we previously demonstrated in our earlier briefs, the alleged implied-in-fact contract in count I of Laudes's complaint, to either modify the Phase I contract or create a new contractual vehicle for the addition of funds to the contract, were beyond the authority of United States personnel. This is because the IIG withheld authority from the PCO to modify the contract, see A. 80 (Dr. Mahdi's letter); A. 82 (PMO implementing letter, stating that contracting officers did not possess authority to materially modify DFI-funded contracts), and the creation of a wholly new contractual vehicle without competition (or justification for non-competition) is in violation of statute. See Competition in Contracting Act ("CICA"), 10 U.S.C. § 2304. Count II of the complaint, alleging the implied-in-fact contract to award a separate, United States Government-funded, construction contract, also alleges the creation of an implied-in-fact contract that is in violation of CICA. Finally, count III of the complaint, alleging implied-in-fact contract to place additional DFI funds upon the contract after the transfer of authority from the CPA to the IIG, also alleges a contract beyond the United States Government's authority because, as of June 30, 2004, all DFI funds were in the exclusive control of the IIG, and the United States had no authority or ability to disburse them without IIG concurrence. DPFUF 16.

Laudes appears to argue that we have misrepresented the Phase I contract, because the "Iraqi funds" that were its only source of funding could be construed to include United States Government funds, see Pl. Supp. Resp. 18-19, but this is an error on Laudes's part. As noted earlier, the Phase I contract specifically provided that it was to be funded by the DFI, see A. 105, block 26, just as it plainly stated that no appropriated or other funds of any Coalition country (including the United States) would be obligated by it. A. 111, para 40.

B. No United States Government Officer Possessed Authority To Add Iraqi Money To The Phase I Contract

As demonstrated in our moving and reply briefs, Laudes's claim in count VI of its complaint, that the United States should be estopped from "refusing to add additional funds" to the Phase I contract, Comp. ¶ 252, fails for the same reason that count III fails: no United States Government officer or agent possessed the authority to add Iraqi money to this Iraqi contract at the time that Laudes would have wished for more. See Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947). Laudes's argument, that "Iraqi" funds included United States Government funds is in error for the same reason explained in section IV. A., above.

C. Laudes's Alleged Entitlement To Payment For Goods Ordered And Received Does Not Rescue Its Alleged Implied-In-Fact Contracts

To the extent that Laudes argues that it should be paid upon these alleged implied-in-fact contracts because it performed upon them, see Pl. Supp. Resp. 18, 19-20, it simply confuses the matter and sets forth a theory for recovery different than that in its complaint. The implied-in-fact contracts specifically alleged in Laudes' complaint were not that Laudes would perform upon the Phase I contract (as it did) and that the United States would pay it, but that the United States would issue specific contractual instruments and place money that it did not control upon the contracts. These actions were never performed. As we explained in our earlier filings, there is no entitlement to payment for an unlawful implied-in-fact contract that, as a matter of law, could never have been created. Cf. Eliel v. United States, 18 Cl. Ct. 461, 466-67 (1989) (citing Empresas Electronics Walser, Inc. v. United States, 650 F.2d 286 (Ct. Cl. 1980))("assurances by a Government official do not establish an implied-in-fact contract unless the parties complete all steps required by agency regulations"). Whether or not the cases cited in Laudes's response

suggest that it may have an equitable remedy, the implied-in-fact contracts and estoppel arguments pled in its complaint do not present a route to such relief.

V. Count VI Of Laudes's Complaint, Estoppel, Must Be Dismissed For Lack Of Jurisdiction

Despite its best efforts, nothing in Laudes's Supplemental Response changes the essential character of its claim: promissory estoppel. Laudes does not dispute that this Court possesses "no jurisdiction over claims for promissory estoppel." Sinclair v. United States, 56 Fed. Cl. 270, 281 (2003) (citing Hercules, Inc. v. United States, 516 U.S. 417 (1996)). Instead, Laudes continues to attempt to cast its claim here as falling under "equitable estoppel," citing Burnside-Ott Aviation Training Center, Inc. v. United States, 985 F.2d 1574 (Fed. Cir. 1993), for the proposition that equitable estoppel could support of a cause of action. Pl. Supp. Resp. 20-21. Burnside-Ott is not apposite.

In Burnside-Ott, issued three years prior to the Supreme Court's ruling in Hercules, the "estoppel" count was bottomed upon a contractual promise, and the Court's discussion was focused upon whether Office of Personnel Management v. Richmond, 496 U.S. 414 (1990) precluded the Government from being estopped from complying with a contractual term. Burnside-Ott, 985 F.2d at 1581. Thus, the court of appeals did not address the issue here, which is whether a claim of equitable estoppel could exist outside of a contractual right. Sinclair, addressing the issue most clearly (and considering Hercules), made clear that equitable estoppel, as a bar to defenses does not, by itself, create a cause of action. 56 Fed. Cl. at 281-82. Notwithstanding its linguistic gymnastics, Laudes is not using its equitable estoppel claim as a bar to a defense, but as a claim, itself. This makes it a promissory estoppel claim for which this Court does not possess jurisdiction.

VI. Count V Of Laudes's Complaint, Fraud In The Inducement, Is Outside Of This Court's Jurisdiction Because It Sounds In Tort

We have demonstrated the Laudes's fraud in the inducement claim sounds in tort and is thus not within the Court's jurisdiction. Like Laudes, we see no need to belabor the law here, except to underscore that a fraud claim only lies if the alleged fraud is reflected in the contract terms. D.V. Gonzalez Electric & General Contractors, Inc. v. United States, 55 Fed. Cl. 447 (2003); D.F.K. Enters., Inc. v. United States, 45 Fed. Cl. 280, 284 (1999). Laudes's response, that the fraud is, in fact, reflected in the Phase I contract terms because it is a letter contract, see Pl. Supp. Resp. 22, is simply not supported.

Although Laudes repeats its allegations that the United States lied when it stated that it would be able to appropriately definitize the contract, Pl. Supp. Resp. 22, it points to no portion of the Phase I contract in which this misrepresentation is repeated in the contract terms. Instead, Laudes argues that the letter contract "implied" that the United States would add money to the contract. Id. No term of the Phase I contract did any such thing. It made no representation about future sources of funding, nor did it provide that the amount of money available would be anything more than that amount set forth as the "not to exceed" amount. See A. 105-11. Without a misrepresentation carried over into the contract terms, Laudes is alleging a tort not within this Court's jurisdiction. See Aetna Cas. and Sur. Co. v. United States, 655 F.2d 1047, 1059 (Ct. Cl. 1981); see also Somali Development Bank v. United States, 508 F.2d 817, 821 (Ct. Cl. 1974).

VII. Count V Of Laudes's Complaint Must Be Dismissed Because It Seeks The Remedy Of A Contract Implied-In-Law

We have demonstrated that, because Laudes seeks to make the Phase I contract void ab initio, see Comp. ¶ 244, it cannot recover an implied-in-fact contract. This is because contracts founded upon fraud (as Laudes insists was the case here), cannot meet the prerequisite of the meeting of the minds necessary for a contract implied in fact. E.g., Flexfab, 424 F.3d at 1265 (requirement of meeting of the minds). This is why the remedy for fraud is often a contract implied-in-law. Hercules, 516 U.S. at 424 ("an agreement implied in law is a 'fiction of law' where a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress.").

We certainly recognize the cases cited by Laudes for the proposition that in circumstances of unjust enrichment by the Government, a contract-implied-in-fact providing for quantum meruit damages may well be appropriate. See Pl. Supp. Resp. 22-23. Nevertheless, these cases all required there to be a contract of some sort and that it be defective. See Perri v. United States, 340 F.3d 1337, 1343 (Fed. Cir. 2003) (distinguishing cases). Where there is no basis for an implied-in-fact contract (as alleged here), the remedy becomes a contract implied in law for which this Court does not possess jurisdiction. Id.

VIII. Count V Of Laudes's Complaint, Fraud In The Inducement, Is Unsupportable Because Limitations Upon Future Authority To Modify DFI-Funded Contracts Were Publicly Known At The Time The Phase I Contract Was Entered

We demonstrated in our prior briefs that two public actions (the passage of UNSCR 1546 and the posting of CPA Memorandum 15) had placed Laudes upon notice that the United States would not maintain the authority to add DFI funds to the Phase I contract after the transfer of sovereignty to the IIG on June 28, 2004. Laudes's current response is similar to its earlier

opposition, and there is little need to repeat the arguments that we made in our earlier reply brief. We do note that Laudes emphasizes in its Supplemental Response that, because Internet service in Iraq was poor, Laudes's principal spent little time accessing the CPA's website. See Pl. Supp. Resp. 23-24. This does not help Laudes. Colonel Pregent's declaration, stated that the CPA's website was "a key source of information" for those doing business with the CPA and the known location of posted CPA rules and regulations. A. 104. Although Mr. Underwood complained of download times upon that site, B. 50, it was relied upon by other contractors in the field, and it was public, not hidden. Thus, there is no basis for alleging misrepresentation when the CPA took actions that would have placed Laudes upon actual or constructive notice of the facts regarding its transition plans.

## CONCLUSION

For these reasons and for the reasons stated in our rior briefs, we respectfully request that the Court dismiss counts I through VIII of Laudes's complaint or, in the alternative, grant summary judgment to the United States upon those counts of the complaint.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/J. Reid Prouty
J. REID PROUTY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305–7586
Fax: (202) 514-7969

August 21, 2008

Attorneys For Defendant