# In the United States Court of Federal Claims

No. 07-4C

(Filed: October 16, 2008)

*********************************************  *
                                               *
LAUDES CORPORATION,                            *
                                               *
                          Plaintiff,           *   Contracts Performed in Iraq;
                                               *   Coalition Provisional Authority;
                                               *   Lack of Appropriated Funds;
v.                                             *   Absence of Successor Agency;
                                               *   Authority to Transfer Contracts to
THE UNITED STATES,                             *   Iraqi Interim Government; Sovereign
                                               *   Acts Doctrine.
                          Defendant.           *
                                               *
*********************************************  *

*Mark G. Jackson*, Garvey Schubert Barer, Seattle, Washington, for Plaintiff.

*J. Reid Prouty*, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant.

OPINION AND ORDER ON
DEFENDANT'S MOTION FOR PARTIAL DISMISSAL

WHEELER, Judge.

This case involves two contracts between Plaintiff Laudes Corporation ("Laudes") and the Coalition Provisional Authority ("CPA") to provide life support services at the Baghdad Public Safety Officer's Academy ("BPSA") in Iraq. One of the contracts (known as Phase II) was funded with appropriated funds of the United States, but the other contract (Phase I) was not. The CPA was a temporary governmental entity established in April 2003 by the coalition partners, principally the United States and the United Kingdom, after the fall of Saddam Hussein's regime in Iraq. The coalition partners terminated the CPA effective June 28, 2004, transferring authority to the Iraqi Interim Government.

On May 31, 2007, Defendant moved to dismiss all claims relating to the Phase I contract pursuant to Rules 12(b)(1), 12(b)(6) and 56 of the Court of Federal Claims ("RCFC"). Upon receiving Plaintiff's opposition, the Court granted Plaintiff a 120-day discovery period under RCFC 56(f) before requiring Plaintiff to respond further to Defendant's motion. In particular, the discovery

would allow Plaintiff to determine the sources of funding and the extent of the United States' involvement and responsibility for the contractual actions taken. (Order, Aug. 14, 2007). Due to the delays and complications of obtaining discovery from the United States' forces in Iraq, the Court in three subsequent rulings extended the discovery period by an additional 180 days. (Orders, Nov. 19, 2007, Feb. 13, 2008, May 8, 2008). Following discovery, Plaintiff filed a supplemental opposition to Defendant's motion on July 21, 2008, and on August 21, 2008, Defendant filed a supplemental reply. The Court heard oral argument on September 22, 2008.

Plaintiff's claim essentially is that it performed substantial work for the CPA, but has not been paid. The second amended complaint asserts damages of "not less than $10,000,000" on the Phase I contract, and "not less than $3,000,000" on the Phase II contract. (2d. Am. Compl. at 73). Faced with a provision in the Phase I contract that all payments would be made from the Development Fund for Iraq, and would not involve the appropriated funds of any Coalition Country, Plaintiff unfortunately is operating from a difficult legal position. While the Court acknowledges Plaintiff's commendable efforts in fulfilling urgently needed requirements in Iraq, this Court cannot hear Plaintiff's claims unless appropriated funds of the United States are involved. Plaintiff unquestionably dealt with representatives of the United States in the formation and performance of the Phase I contract, but the participation of government representatives did not alter the funding of the contract.

Accordingly, the Court concludes that it lacks subject matter jurisdiction, and that Defendant's motion to dismiss Plaintiff's Phase I contract claims under RCFC 12(b)(1) should be GRANTED. Plaintiff's remedy for non-payment is under the legal system of Iraq. The United States may be able to assist Plaintiff in the collection of amounts due, and the Court is hopeful that the Government will provide whatever assistance it can. Plaintiff's Phase II contract claims shall proceed in this Court.

Background[1]

A. Creation of the CPA in Iraq

On March 19, 2003, the United States and its allies launched major military operations against Saddam Hussein's regime in Iraq. Within a month, coalition forces had removed Hussein from power and occupied much of the country. On April 16, 2003, General Tommy R. Franks, Commander of Coalition Forces, delivered a Freedom Message to the Iraqi people, in which he stated:

---

[1] The facts recited herein are taken from the parties' briefs and accompanying proposed findings of uncontroverted facts on Defendant's May 31, 2007 motion for partial dismissal, or, in the alternative, for partial summary judgment, as well as from Plaintiff's second amended complaint, filed on May 14, 2007. The Court is satisfied that the material facts necessary to decide the issues presented are not in dispute.

Coalition Forces in Iraq have come as liberators, not as conquerors . . . . Iraq and its property belong to the Iraqi people and the Coalition makes no claim of ownership by force of arms . . . . We are working with the international community to ensure the delivery of humanitarian assistance and to promote law and order so that Iraqis can live in security, free from fear . . . . Our stay in Iraq will be temporary, no longer than it takes to eliminate the threat posed by Saddam Hussein's weapons of mass destruction, and to establish stability and help the Iraqis form a functioning government that respects the rule of law and reflects the will, interests, and rights of the people of Iraq. Meanwhile, it is essential that Iraq have an authority to protect lives and property, and expedite the delivery of humanitarian assistance to those who need it. Therefore, I am creating the Coalition Provisional Authority to exercise powers of government temporarily, and as necessary, especially to provide security, to allow the delivery of humanitarian aid and to eliminate weapons of mass destruction.

(Def.'s App. at A1). The United States and the United Kingdom presented a joint letter to the United Nations ("UN") on May 8, 2003 confirming that coalition partners had created the CPA to exercise governmental powers temporarily during the post-conflict period in Iraq. Id. at A3-4.

On May 9, 2003, President George W. Bush appointed L. Paul Bremer to serve as his Presidential Envoy to Iraq and charged him with authority to "oversee, direct, and coordinate all United States Government (USG) programs and activities in Iraq, except those under the command of the Commander, U.S. Central Command." Id. at A5. Ambassador Bremer acted subject to the control of the Secretary of Defense but possessed "the responsibility to oversee the use of USG appropriations in Iraq, as well as Iraqi state- or regime-owned property that [was] properly under U.S. possession and made available for use in Iraq to assist the Iraqi people and support the recovery of Iraq . . . ." Id. President Bush gave Ambassador Bremer final approval of all personnel composition, staff levels, and funding in support of reconstruction efforts in Iraq. See id.

B. CPA Authority and Funding

On May 13, 2003, in response to President Bush's May 9, 2003 letter, Secretary of Defense Donald Rumsfeld designated Ambassador Bremer as head of the CPA and granted him the title of Administrator. Id. at A7. Secretary Rumsfeld vested Ambassador Bremer with control over the temporary governance of Iraq and ordered him to "oversee, direct and coordinate all executive, legislative and judicial functions necessary to carry out this responsibility." Id. In accordance with his new authority, on May 16, 2003 Ambassador Bremer issued CPA Regulation Number 1, which provided that the CPA would "exercise powers of government temporarily . . . ." Id. at A8. The regulation also granted the CPA "all executive, legislative and judicial authority necessary to achieve its objectives" under relevant UN Security Council ("Security Council") resolutions and the laws and usages of war. Id.

On May 21, 2003, the Deputy Secretary of Defense appointed the Secretary of the Army as the Department of Defense's Executive Agent of the CPA. (Pl.'s App. at B164, B178). The Secretary of the Army would provide administrative, logistical, and contracting support on behalf of reconstruction in Iraq and held responsibility for the execution of Congressionally-appropriated funds for this purpose. Id. at B164, B178. Ambassador Bremer later testified before Congress that "[t]he Army's contracting responsibilities extended to both the Iraqi funds and the appropriated funds." Id. at B164.

On June 15, 2003, Ambassador Bremer issued CPA Regulation Number 3 ("Regulation 3") to create a Program Review Board ("PRB") within the CPA. Id. at B91-98. The PRB reported directly to Ambassador Bremer and was charged with developing a funding plan and recommending expenditures for reconstruction projects in Iraq. Id. at B95-97. The PRB consisted of a chairman, appointed by the CPA Administrator, ten additional voting members from coalition countries and Iraq, and nine nonvoting members. Id. at B92-94.

The CPA used four sources of revenue to fund the governance and reconstruction of Iraq: (1) Congressionally-appropriated funds ("Appropriated Funds"); (2) Iraqi funds confiscated by the United States and vested in the United States Department of the Treasury ("Vested Funds"); (3) moveable Iraqi state assets seized by coalition forces in Iraq ("Seized Funds"); and (4) the Development Fund for Iraq ("DFI"). The PRB had authority to recommend expenditures from all four sources and on several occasions approved reprogramming of funds from one source to another. See id. at B95-96, B138, B140-41, B146-48, B152-53.

1.  Appropriated Funds

Appropriated Funds are public funds that Congress allocates from the general revenue of the United States Government pursuant to its powers under Article I § 9 of the Constitution. Of all of the funding sources available to the CPA, Appropriated Funds represented the only non-Iraqi funds. On November 6, 2003, the President signed into law the Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan for fiscal year 2004, which provided $18.649 billion for the Iraq Relief and Reconstruction Fund ("IRRF"). Id. at B1-31. Congress expressly apportioned IRRF funds for the CPA, among other governmental agencies. Id. at B17.

2.  Vested Funds

Vested Funds are certain blocked Iraqi funds that President Bush ordered confiscated and vested in the United States Department of the Treasury pursuant to two Executive Orders. Executive Order 13290, issued on March 20, 2003, cited the President's authority under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06 (2006), and confiscated all "blocked funds held in the United States in accounts in the name of the Government of Iraq, the Central Bank of Iraq, Rafidain Bank, Rasheed Bank, or the State Organization for Marketing Oil . . . ." (Def.'s App. at A18). Executive Order 13315, issued on August 28, 2003, expanded the scope of the previous

executive order to certain property of the former Iraqi regime, senior officials of the former regime, and immediate family members of those officials, and transferred these funds to the DFI discussed below.  Id. at A20-27.

### 3. Seized Funds

Seized Funds consist of Iraqi state- or regime-owned moveable assets, such as currency and negotiable instruments, found and seized by coalition forces in accordance with the laws and usages of war.  In an April 30, 2003 memorandum, President Bush confirmed the Secretary of Defense's authority to "exercise all powers, consistent with the laws and usages of war, related to the seizure, sale, administration, or use of state- or regime-owned cash, funds, or realizable securities in Iraq." Id. at A28.  The memorandum also restricted the use of any Seized Funds to assistance for the Iraqi people and support for reconstruction of Iraq.  Id.  On May 29, 2003, Deputy Secretary of Defense Paul Wolfowitz delegated authority over the seizure, sale, administration, and use of state- or regime-owned property in Iraq to Ambassador Bremer.  Id. at A29.

### 4. DFI

The DFI is a bank account created by the CPA and held by the Central Bank of Iraq at the Federal Reserve Bank of New York ("FRBNY").  In a May 17, 2003 letter to FRBNY Executive Vice President Dino Kos, Ambassador Bremer requested that the FRBNY open a bank account, to be called the "Central Bank of Iraq/Development Fund for Iraq," pursuant to the FRBNY's authority to maintain accounts of foreign central banks under 12 U.S.C. § 358(14)(e) (2006).  See id. at A10.  On June 15, 2003, Ambassador Bremer issued CPA Regulation Number 2 ("Regulation 2") creating the DFI and granting the CPA Administrator exclusive control over the fund.  (Pl.'s App. at B82-87).  He also ordered the transfer of $1 billion United States dollars in revenues from the Oil For Food Program in Iraq and 95 percent of all future Iraqi petroleum and natural gas revenues to the DFI account.  Id. at B85.  Regulation 2 granted the PRB authority to review all competing requirements for reconstruction in Iraq and develop a spending plan for the DFI.  Id. at B83.  On June 17, 2003, Ambassador Bremer wrote Vice President Kos to confirm his intent to deposit petroleum and gas revenues into the DFI and make clear that the standard terms and conditions pertaining to accounts held by foreign central banks and governments would apply to the DFI. (Def.'s App. at A30).

The Security Council also took action to recognize the CPA's creation of the DFI.  On May 22, 2003, the Security Council passed Resolution 1483, which acknowledged the establishment of the DFI, noted that DFI funds would be disbursed at the discretion of the CPA in consultation with the Iraqi interim administration, and underscored the need for transparency in using DFI funds for the benefit of the Iraqi people.  Id. at A11-17.  The resolution also requested the UN Secretary General to transfer as soon as possible $1 billion United States dollars from the Oil For Food Program to the DFI, directed 95 percent of future export sales of petroleum and natural gas to be deposited into the DFI, and ordered all countries holding financial assets of the former Iraqi regime to freeze them and move them to the DFI.  Id. at A16-17.

On June 8, 2004, the Security Council adopted Resolution 1546 providing that upon the CPA's dissolution, DFI funds would be "disbursed solely at the discretion of the Government of Iraq" and "utilized . . . to satisfy outstanding obligations against the [DFI] . . . ." Id. at A37.  Consistent with Resolution 1546, on June 15, 2004 Ambassador Bremer notified the FRBNY that his authority over all Central Bank of Iraq accounts, including the DFI, would terminate as of June 30, 2004.  Id. at A115.  Thereafter, the Governor of the Central Bank of Iraq, Dr. Sinan Al-Shabibi, would assume full responsibility over the accounts.  Id.

C.  CPA Contracts Using DFI Funds

On August 4, 2003, Ambassador Bremer issued CPA Memorandum 4 ("Memorandum 4") setting forth procedures that would govern the CPA's execution of contracts using "Iraqi Funds."  Id. at A43-73.  "Iraqi Funds," as defined in Memorandum 4, consisted of Vested Funds and DFI Funds, but explicitly excluded "funds provided through the appropriations process of Coalition member governments . . . ."  Id. at A45.  However, the CPA administered at least one contract, unrelated to this case, for which it obligated both DFI funds and Appropriated Funds.  (Pl.'s App. at B558).

Memorandum 4 applied to all contracts backed by Iraqi Funds and executed by: CPA Regional Directors carrying out the Regional Directors' Emergency Response Program or the Constructive Initiative for Iraq Program; Interim Ministry Officials; the CPA's Head of Contracting Activity; and others designated by Ambassador Bremer.  (Def.'s App. at A44).  Memorandum 4 did not cover contracts entered into by Iraqi Ministries or Coalition Forces Commanders carrying out the Commanders' Emergency Response Program.  Id.  The memorandum permitted certain officials to appoint Contracting Officers who could enter into contracts on behalf of the CPA.  Id. at A46.  These officials included: the CPA's Head of Contracting Activity; the CPA's Principal Assistant Responsible for Contracting; CPA Directors of Oil Policy, Civil Affairs, Economic Development, Agency for International Development, Operations and Infrastructure, Interior Affairs, Private Sector Development, and Security Affairs; Senior Iraqi Ministry Advisors; and other officials designated by the Administrator.  Id. at A46-47.  Memorandum 4 defined "Contracting Officer" as an individual who had  been authorized by the Administrator of the CPA.  Id. at A45.

All CPA contracts governed by Memorandum 4 and in excess of $5,000 contained  standard terms and conditions set forth in Appendix B.  Id. at A59-70.  Among these terms was a disputes clause, which stated:

> This contract is not subject to the Contract Disputes Act of 1978, as amended (41 U.S. Code, Sections 601-613).  Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal, or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the United States Federal Acquisition Regulation Clause 52.233-1, Disputes, which is incorporated herein by reference except that appeals from final decisions of a Contracting Officer may only be appealed to the U.S. Armed Services

Board of Contract Appeals (ASBCA). The decision of the ASBCA shall
be final.

Id. at A62. Appendix B also required each contract in excess of $5,000 to include a "termination for
convenience" clause reserving to the Contracting Officer the right to terminate the contract for the
sole convenience of the government activity. Id. at A63. Appendix D explained the need for the
"termination for convenience clause" as based on the fact that "[t]he CPA's authority is of limited
duration and will terminate upon the establishment of an internationally recognized, representative
government of Iraq." Id. at A72. Finally, Appendix B provided that payments under the contract
would be made with Iraqi funds, and that "[n]o funds, appropriated or other, of any Coalition country
are or will be obligated under this contract." Id. at A65.

On June 18, 2004, Ambassador Bremer issued CPA Memorandum 15 ("Memorandum 15")
to amend Memorandum 4 and provide for the orderly transition of authority over the DFI account
from the CPA to the Iraqi Interim Government ("IIG") on June 30, 2004. See id. at A74-78.
Memorandum 15 gave the Iraqi Minister of Finance the authority to designate certain United States
officials with responsibility to "monitor and confirm performance, certify and/or make payments, and
otherwise administer contracts . . . funded with moneys from the Development Fund for Iraq that .
. . were entered into on or before June 30, 2004 by the Coalition Provisional Authority. . . " Id. at
A74.[2] This memorandum called for establishment of a bank account in the Central Bank of Iraq,
Rafidain Bank, or Rasheed Bank and gave any designees appointed in accordance with Memorandum
15 the authority to disburse funds from the account to carry out their duties. Id. at A75.

Also on June 18, 2004, Ambassador Bremer approved CPA Regulation Number 11, which
amended Regulation 2 by mandating the creation of a sub-account within the DFI to be entitled
"Central Bank of Iraq/Development Fund for Iraq/Transition." Id. at A76-78. This sub-account
would contain sufficient funds to cover any outstanding contractual liability against the DFI arising
out of contracts entered into by the CPA on or before June 30, 2004. Id. at A76-77. The regulation
also stated that on June 30, 2004, "all responsibilities, duties, powers, and authorities granted to the
Administrator and the Coalition Provisional Authority under this Regulation shall transfer to the
Prime Minister of the Iraqi Interim Government, respectively." Id. at A77. Finally, the regulation
provided that the DFI and its sub-account would remain in existence until dissolved by the CPA or
the IIG. Id.

Acting pursuant to the authority granted him in Memorandum 15, Minister of Finance Adil
Abdul Mahdi designated the Director of the CPA's Program Management Office ("PMO") with
responsibility to monitor performance, make payments, and administer DFI-funded contracts entered

---

[2] These United States officials were the Director of the Program Management Office of the CPA
or, following transfer of power to the IIG, the Chief of Mission of the United States Embassy in Baghdad
or the Commander of the Multi-National Force-I.

into by the CPA on or before June 30, 2004.  Id. at A79-81.[3]  However, the letter restricted the PMO Director's authority to monitor contracts to those with an aggregate value of $800 million or less.  Id. Furthermore, Minister Mahdi specified that his delegation letter "[did] not authorize [the PMO Director] to terminate, amend, or novate any contracts . . . ." Id. at A80.  The letter required the PMO Director to exercise all powers and privileges in coordination with relevant IIG officials and consistent with Resolution 1546.  Id.  On July 24, 2004, the CPA distributed an interpretation of Minister Mahdi's letter to Contracting Officers explaining that they could not "issue any modifications that materially change existing DFI contracts . . . includ[ing] cost increases" without the express written consent of the requiring ministry and Minister of Finance.  Id. at A82.

On June 28, 2004, Ambassador Bremer issued CPA Order Number 100 ("Order 100") to facilitate the transfer of power from the CPA to the IIG on June 30, 2004.  Id. at A83-103.  Among other things, Order 100 amended CPA Memorandum 4 regarding contract procedures to replace any references to the CPA with the Iraqi Ministry of Finance, and any references to Iraqi Funds with Public Funds.  Id.  Order 100 also rescinded in its entirety the disputes clause for contracts in excess of $5,000 contained in Appendix B and replaced it with the following:

> Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal, or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the laws of Iraq.

Id. at A102.  Finally, Order 100 deleted any language restricting the contracts' source of funds to Iraqi Funds.  Id.

D.  Award of the Laudes Phase I Contract

By early 2004, security in Iraq had deteriorated rapidly in the face of a growing insurgency. (2d. Am. Compl. ¶ 24-25).  The United States grew uneasy over the slow buildup of the Iraqi Police Service ("IPS") and sent Major General Karl W. Eikenberry to Iraq to examine the problem and make recommendations for improvement.  (Pl.'s App. at B41).  In accordance with General Eikenberry's report, on March 9, 2004 United States Central Command established the Civilian Police Assistance Training Team ("CPATT") under the control of coalition forces to train, equip, and mentor the IPS. Id. at B43.

As part of its mission, CPATT sought to improve dramatically the infrastructure and capacity of the Baghdad Police Service Academy ("BPSA").  Id.  In late Spring of 2004, the CPA contacted Mr. Lawrence M. Underwood, a Laudes executive officer in charge of the company's programs in Iraq, and asked him to provide a sole-source bid for the construction of a tent city at the BPSA to accommodate 1,000 students.  (2d. Am. Compl. ¶ 37).  Laudes submitted a price of approximately

---

[3] Minister Mahdi's letter was dated June 15, 2004, three days prior to issuance of Memorandum 15.  However, he references Memorandum 15 as the source of his authority.

$4.8 million for tents and other necessary equipment for the project in response to that request. Id. ¶ 39.

The CPA ultimately determined that the tent city contract could not be a sole-source award and decided to expand it to include requirements for life support. Id. ¶ 40. On April 4, 2004, the CPA prepared an Acquisition Plan for a fixed price contract for performance of logistical support for the BPSA. (Pl.'s App. at B200-07). The Acquisition Plan's "Statement of Need" called for "[t]he contractor . . . [to] provide all resources and management necessary to operate and maintain the BPSA for estimated populations of up to 5000 students and faculty . . . ." Id. at 202. The Acquisition Plan estimated the cost of the work for one year based on a monthly student load of 4,500 at $26,534,000 and did not include design or construction services. Id. at 204-05.

On April 22, 2004, the CPA issued Solicitation No. DABV01-04-R-0047 ("the Solicitation") for BPSA Life Support. Id. at B209-34. The accompanying Statement of Objectives called for the contractor to propose a plan to provide immediate life support in the areas of force protection, security, anti-terrorism measures, potable water supply, and sewage disposal followed by phased-in support for facility management, food service activities, a clothing issue facility, latrine and shower facilities, electrical maintenance, medical support, communications and information technology, grounds maintenance, and armory and ammunition, among other requirements. Id. To that end, the Solicitation requested prices for various student loads for a one year period, including loads of 1-1,500, 1,501-2,500, 2,500-4,500, and 4,500-6,000 students. Id. at B209. In addition, the Solicitation asked for offers on several optional items, including life support services at a proposed semi-permanent academy in southern Iraq for approximately 2,000 students ("Option CLIN 1009"). Id. at B211, B225. It did not require a bid on construction services or for the erection of a tent city. See generally id. at B209-34.

The CPA amended its Solicitation ("Amended Solicitation") on April 29, 2004 to remove from the scope of work any anti-terrorism and force protection measures, which the United States Government would provide instead. Id. at B236-40. On May 12, 2004, Laudes submitted its bid in response to the Amended Solicitation, offering to furnish basic life support services for 1-1,500 students for one year for $14,190,049 and life support services for Option CLIN 1009, the anticipated semi-permanent academy, for $18,000. Id. at B241-49.

On May 14, 2004, Colonel Michael D. Greer, Source Selection Authority for the CPA, awarded the BPSA Life Support Contract to a company known as Iraq-Khadamat for $24,100,988. Id. at B264-70. The CPA received four offers and deemed three of them technically acceptable, including Laudes' offer of $35,070,959. Id. at 265. CPA Contracting Officer Ronald Hirtle also designated Mr. Ted Norgaarden as his Contracting Officer's Representative charged with administering the contract. Id. at 268-70. The designation letter explicitly prohibited Mr. Norgaarden from "award[ing], agree[ing] to or sign[ing] any contract . . . or contract modification or in any way . . . obligat[ing] the payment of money by the Government." Id. at B269.

Following award of the BPSA Life Support Contract to Iraq-Khadamat, the CPA and Iraq-Khadamat agreed at a June 2, 2004 meeting to increase the requirements regarding Option CLIN 1009 to include "basic design and construction services to provide an expedient camp of 1250 students and 50 instructors . . . ." Id. at B283.  The CPA issued a revised Statement of Work reflecting this change.  Id. at B271-89.

On June 8, 2004, CPA Contracting Officer Major M. Lloyd Blackmon, Jr. sent Iraq-Khadamat a letter notifying the company of performance deficiencies on the contract.  Id. at B290-91.  Major Blackmon followed up five days later with a Demand for Adequate Assurances letter informing Iraq-Khadamat that the CPA was considering the termination of the contract and giving the company an opportunity to explain the deficiencies.  Id. at B292.  The CPA terminated the contract for cause on June 19, 2004 for failure to adequately support the BPSA site.  Id. at B293.

On June 20, 2004, Major Blackmon executed a Memorandum for Record stating his intent to "initiate a Justification and Approval as soon as possible utilizing FAR 6.302-2, Urgent and Compelling circumstances [sic], as justification." Id. at B295.  He also prepared a Determination and Findings letter related to the BPSA Life Support Contract, which concluded that it was "in the best interests of the Government . . . [to] approve and execute a letter contract to authorize Laudes to mobilize and begin life support services at BPSA."  Id. at B297.  Major Blackmon justified his decision based on the following:

> The contractor anticipated for award, Laudes Corporation, is currently performing successfully on a base life support contract supporting Kirkush Military Training Base (KMTB) and others in Iraq.  Laudes was selected to take over this work because they were the next best value offeror on the contract when it was competed full and open during May 2004.

> Laudes is known to have a credible cost accounting standard.  Therefore, the risk of accumulating incurred cost is low, and supporting an additional site will not jeopardize their ability to segregate costs between the different cost pools.  FAR 6.302-2, Urgent and Compelling Urgency [sic], is the authority cited due to the nature of this acquisition.  The known source, Laudes, will be able to perform with success based on their history of successful performance and ability to control costs.

Id.  That same day, the CPA awarded Laudes "Letter Contract, W914NS-04-C-9001, for BPSA Life Support" ("BPSA Life Support Contract").  Id. at B298-321.  The letter contract provided that:

> Upon bilateral execution of this document, you are hereby directed to perform Life Support services for the Baghdad Public Services Academy (BPSA) training site located at Baghdad, Iraq in accordance with the attached Statement of Work (SOW).  Additionally, you will be responsible

> to provide armory, ammunition and armor support, portable sewage
> services, ensure quality construction of a Semi-Permanent Academy,
> internet cafes and security upgrades. Costs associated with this effort shall
> not exceed $26,000,000 for performance 20 Jun 04 – 15 May 05. You are
> responsible to conduct a thorough examination of existing equipment on
> site and adjust your proposal accordingly.

Id. at 298. The letter contract also requested Laudes to submit a definitive proposal for the work by June 27, 2004. Id. Mr. Lawrence Underwood signed the document on behalf of Laudes, agreeing to perform the work and provide an updated proposal for definitization as requested. Id. Major Blackmon assured Mr. Underwood that he would modify the contract upon definitization to increase funding and revise the Statement of Work to include coverage for construction and other support requirements. (2d. Am. Compl. ¶ 67).

The BPSA Life Support Contract included the standard disputes clause outlined in Memorandum 4 exempting the contract from the Contract Disputes Act of 1978, and requiring all disputes to be resolved in accordance with Federal Acquisition Regulation ("FAR") ¶ 52.233-1 (2004). (Pl.'s App. at B301). The contract also included the standard termination for convenience clause and limited any obligations under the contract to Iraqi Funds, as defined in Memorandum 4. Id. at B301, B303.

On June 28, 2004, Laudes submitted an updated proposal to Lieutenant Colonel Eric Maksymyk, Program Manager for the BPSA, in accordance with the letter contract. Id. at B322. The proposal provided a price of $25,190,053 for Life Support at BPSA and $6,885,150 to construct new facilities to accommodate 1,250 students. Id.

The record does not indicate how the CPA arrived at a letter contract price of not to exceed ("NTE") $26,000,000. However, the applicable regulations state that the Government's maximum liability in a letter contract "shall not exceed 50 percent of the estimated cost of the definitive contract unless approved in advance by the official that authorized the letter contract." FAR ¶ 16.303-2(d). Laudes contends that, under this regulation, the CPA's estimated cost for the definitive contract may have been $52,000,000. In any event, Laudes claims that both parties to the contract knew that the NTE price in the letter contract was insufficient to perform the work demanded in the Statement of Work because the company had submitted a competitive bid for the contract five weeks earlier for $35,070,959. (Pl.'s App. at B266).

E. Dissolution of the CPA and Transfer of Authority to the IIG

On May 1, 2004, President Bush signed National Security Presidential Directive 36 ("NSPD 36"), a memorandum to his Administration regarding United States Government operations in Iraq. (Def.'s App. at A112-14). Referencing the need to sustain a strong bilateral relationship with the Iraqi people, President Bush declared that a Chief of Mission in Iraq would represent the United States in Iraq following dissolution of the CPA by June 30, 2004. Id. at A113. The Chief of Mission would

act under the guidance of the Secretary of State and hold responsibility for the direction, coordination, and supervision of all non-military United States Government employees, policies, and activities in the country.  Id.  NSPD 36 also stated that the United States Mission in Iraq would "assume from the CPA those authorities and responsibilities that continue after CPA termination."  Id.

NSPD 36 also called for the creation of two new offices: a temporary organization within the Department of State called the Iraq Reconstruction Management Office ("IRMO") to facilitate the transition in Iraq; and a temporary organization within the Department of Defense called the Project and Contracting Office ("PCO") to provide acquisition and project management support for activities in Iraq, including contract-related services.  Id. at A113-14.  In response to NSPD 36, the Deputy Secretary of Defense issued a memorandum on June 22, 2004 directing that the PCO be established within the Department of the Army.  (Pl.'s App. at B160-61.)  The PCO would furnish acquisition and management support to the CPA Administrator until June 30, 2004, after which it would support the close-out of the CPA and administer acquisition and management support to the Chief of Mission in Iraq.  Id.

By separate letters on June 5, 2004, Secretary of State Colin Powell and IIG Prime Minister Dr. Ayad Allawi informed the Security Council of an agreement between the United States and Iraq for the continued presence of the Multi-National Force ("MNF") in Iraq following the IIG's assumption of power by June 30, 2004.  (Def.'s App. at A39-42).  The MNF would  work in partnership with the IIG to provide security, to train and equip Iraqi security forces, and to support humanitarian and reconstruction efforts, while respecting Iraq's sovereignty.  Id. at A42.  The Security Council responded to the letters by passing Resolution 1546 on June 8, 2004.  Id. at A32-42.  Resolution 1546 endorsed the formation of the IIG and welcomed termination of the CPA by June 30, 2004.  Id. at A33.  It also granted the MNF "authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq" in accordance with Secretary Powell's and Dr. Allawi's letters, but recognized that the IIG would assume primary responsibility for coordinating international assistance to Iraq.  Id. at A35-36.

On June 28, 2004, two days before the CPA's anticipated dissolution, Ambassador Bremer issued Order 100 transferring all powers, authorities, and responsibilities of the CPA to the IIG.  Id. at A83-103.  All laws, regulations, orders, memoranda, instructions, and directives issued by the CPA that contemplated future action by the CPA would mandate action by the IIG.  Id.  Order 100 also rescinded or revised many CPA orders, regulations, and memoranda to facilitate the transition of power from the CPA to the IIG.  Id. at A86-103.  However, it left intact CPA Order Number 17 ("Order 17"), which clarified the status of the CPA, the MNF, and certain United States personnel in Iraq.  Id. at A89; Pl.'s App. at B118-33.  Order 17 exempted all MNF and CPA personnel, property, funds, and assets from the Iraqi legal process; granted contractors immunity from Iraqi laws or regulations related to the terms and conditions of their contracts; and required third-party claims arising from acts of the CPA, MNF, or contractors employed by them to be submitted to the country whose personnel, property, or activities allegedly caused the claimed damage.  Id. at B121-22, B129-30.

Following the transfer of governing authority from the CPA to the IIG, the United States, through the PCO, awarded new contracts or modified existing contracts requiring expenditure of more than $80 million in DFI funds. Id. at B182-84. The Department of the Army also requested, and the IIG approved, more than $300,000,000 in additional DFI funds for new and modified contracts. Id. at B182-87. The United States never obtained direction from the IIG regarding specific DFI-funded contracts. Id. at B565. Nor did the United States modify any DFI-funded contracts after June 28, 2004; rather, Defendant agrees that, as agent for the IIG, United States personnel undoubtedly authorized informal modifications to IIG contracts. Id. at B568.

The United States military also continued to manage the IPS training program after the dissolution of the CPA. Id. at C515. In a July 15, 2005 Interagency Assessment of Iraq Police Training ("Assessment") issued by the Inspectors General of the United States Departments of State and Defense, the Inspectors General found that the IPS was not yet capable of meeting security challenges on its own. Id. at C517. The Assessment criticized the IIG for failing to give sufficient input to the IPS training program and predicted that the coalition's efforts to train the IPS would fall short if the IIG did not take full responsibility for administration of the program. Id. at C517-18. As of July 15, 2005, the United States Government had spent approximately $190 million on building or renovation of training facilities for the IPS and would bear the full cost of operating and maintaining the facilities in the next fiscal year. Id. at C529.

F.  Performance of the Laudes Phase I Contract

When Laudes employees arrived at the BPSA to begin performing the BPSA Life Support Contract, the security situation in Iraq had deteriorated significantly. Insurgents fired mortars inside the BPSA compound on many occasions, but the BPSA Life Support Contract did not contain any provisions to provide security during performance of the contract. Nor did it establish contingencies for insurgent attacks, student theft, or vandalism, all of which occurred during Plaintiff's presence at the BPSA. Plaintiff alleges that contract requirements changed almost daily as the BPSA's mission, policies, and security status changed. (2d. Am. Compl. ¶ 113). According to Plaintiff, in each situation, PCO or BPSA personnel asked Laudes to perform work not within the scope of the contract, and the Contracting Officer either participated in such requests or had actual or constructive knowledge of them. Id. ¶ 117.

Contracting Officer Major Blackmon stated that "in general life support in Iraq was a very fluid thing and you had lots of changes, not just for this particular effort, but all over the country" and "generally, almost all of the life support contracts we dealt with the requirements were– you generally had some change in requirements." (Pl.'s App. at C658, C665). He did not remember any particular changes made to the BPSA Life Support Contract but stated that it was "likely there were additional measures taken" in response to insurgent activity. Id. at C666.

Mr. Nordgaarden, the Contracting Officer's Representative charged with administering the contract, agreed that discussions of modifying the contract did occur. Id. at C732. He stated that "I believe that once they came on, there were modifications. There was work or different things that

would come up that either we didn't cover in the scope of objectives or even the scope of work, you know." Id. at C733.  He has acknowledged several changes to the BPSA Life Support Contract requirements beyond the scope of the original agreement.  These include:

●     Option CLIN 1009 to build a semi-permanent academy in southern Iraq to house 2,000 students was exercised but modified to be constructed at the BPSA facility. Id. at C691-92. Prior to contract award, the BPSA could only accommodate approximately 250 students. Id. at C689.

●     CPATT requested Plaintiff to provide life support for more than 1,500 students at the BPSA. Plaintiff's May 5, 2004 bid for the original BPSA Life Support Contract calculated costs based on no more than 1,500 students, and its June 28, 2004 proposal in response to the June 20, 2004 letter contract contemplated services for 1,250 students.  CPATT also directed Plaintiff to provide life support for $1,500 – 2,000$ commandos due to the increased insurgency. Id. at C729.

●     Although Iraq-Khadamat, the original contractor for the BPSA Life Support Contract, proposed building a tent city at the BPSA, Laudes constructed a metal-framed structure. Id. at C725.

●     Following a spate of vandalism by students at the BPSA in November 2004, Plaintiff had to replumb the latrines it built every three weeks because students would "tear [them] to pieces . . . ." Id. at C735.  Plaintiff also had to repair the laundry and bathroom facilities because the students would bend pipes and steal pieces off of the equipment. Id.

●     In response to insurgent attacks on the BPSA, Plaintiff had to restore buildings that sustained damage from mortar rounds in September 2004. Id. at C737-38.  Plaintiff also had to install concrete walls and bunkers to protect the BPSA from mortar attacks. Id. at C743-44.

●     Plaintiff had to reconstruct the BPSA's barracks after students engaged in a post-graduation ritual of destroying them. Id. at C745.

On September 14, 2004, the BPSA sustained an extensive mortar and rocket attack, which injured students and workers and damaged several new buildings.  In response to a request by PCO officials, Laudes repaired the damaged buildings and prepared an invoice, even though the additional work exceeded the scope of the contract.  Plaintiff argues that it had an implied-in-fact contract with the PCO that Laudes would be fairly compensated for performing the additional work.  (2d. Am. Compl. ¶ 120).

Following the attack, BPSA and PCO personnel decided to move student billeting and training units to safer, already-existing buildings. Id. ¶ 121.  Plaintiff alleges that these personnel directed Laudes to refurbish existing air conditioners and provide equipment, wiring, and generator power for these buildings even though the BPSA Life Support Contract did not specify this work. Id.  CPATT

also requested Plaintiff to construct a second skin on existing buildings so that it would have a stand-off capability on rooftops, work which also exceeded the scope of the contract. Id. ¶ 124.

On September 16, 2004, Mr. Jeff Stackow, Security and Justice Project Manager for the PCO, sent an email to CPATT and Laudes personnel summarizing a recent meeting that addressed cost overruns at the BPSA. (Pl.'s App. at B192).  He stated that "[d]ue to increased [insurgent] activity life support costs are running higher than expected.  Laudes will give CPATT an [sic] cost estimate on installing protection from mortars over the expedient camp structures.  In the meantime installation of the expedient camp will continue as originally anticipated." Id.

In spite of the cost overruns, the PCO had not yet definitized the BPSA Life Support Contract as of the end of September 2004.  On September 30, 2004, Major Michael J. Cahill, Executive Officer of CPATT's Training and Standards Division, inquired about the status of the BPSA Life Support Contract and requested an electronic copy of the Statement of Work ("SOW"). Id. at B197.  Mr. Melvin Goudie, Director of BPSA, responded by stating in an email:

> Laudes contract continues to develop.  In respect of an SOW we still await the finished document.  Due to the unexpected activity surrounding the academy and the way in which we had to terminate one contract and hire Laudes, contracting and Laudes have not fully implemented a paper agreement.
>
> Laudes were given monies to ensure both the life support and the annex buildings were started.  Larry Underwood has just returned to country this evening and I will meet with him soonest.

Id.

On February 13, 2005, the PCO unilaterally modified the Phase I Contract to read:

> The purpose of this modification is to unilaterally definitize the contract.  The contract amount is hereby definitized in a firm fixed price amount of $21,271,764.  The contract amount is decreased by $4,728,236 from $26,000,000 to $21,271,764.  The contractor may dispute this unilateral definitization in accordance with the procedures set forth in clause 16.  Disputes of the contract.

(2d. Am. Compl. ¶ 149).  Despite this unilateral action, the PCO certified receipt and acceptance of more than $34,495,414 in goods, services, and construction for the BPSA Life Support Contract through May 10, 2005. Id. ¶ 175; Pl.'s App. at C710-18, B323-490.  At no time did the CPO demand that Laudes cease performance of the contract.

G.  The Laudes Phase II Contract

On August 5, 2004, Major Blackmon prepared a Justification and Approval for Other Than Full and Open Competition ("Justification") to award a sole-source letter contract to Laudes to fulfill "an urgent and compelling requirement to increase the student population at [BPSA] immediately by 2000 students." Id. at B193.  The Justification sought to bypass full and open competition because Iraq suffered a critical shortage of trained policemen to support the national elections scheduled for January 2005.  Id.  It stated further that "Laudes [was] the only known competitor in this theater that has the proven capability to accomplish" the work required.  Id.

The PCO's Head of Contracting Activity, Brigadier General Stephen Seay, approved the Justification that day.  Id. at B195.  Major Blackmon also prepared, and General Seay approved, a Determination and Findings for the award of the letter contract to expand life support services at the BPSA.  Id. at B196.  The document concluded, based on Iraq's urgent need for additional police officers and Laudes' successful performance of the first BPSA Life Support Contract, that it was in the best interest of the United States Government to execute a letter contract with Laudes to "commence immediate site preparation and expanded base life support services."  Id.  The PCO awarded Plaintiff a second contract ("Phase II Contract") for work at the BPSA on August 5, 2004. (2d. Am. Compl. ¶ 104).

Plaintiff contends that Laudes and the PCO intended for the Phase II Contract to merely modify the Phase I BPSA Life Support Contract using a different source of funds. Id. ¶ 107.  This intent and understanding was expressed, in part, by Plaintiff's submission of invoices to the PCO for the cost of life support services based on average student head count per day rather than being broken down by contract.  Id. at ¶ 108.  However, the Phase II Contract differed in that it was funded exclusively with Appropriated Funds and was subject to the Contract Disputes Act and the FAR.  Id. ¶ 106.

On April 27, 2005, the PCO allegedly asked Plaintiff to continue providing life support services for the BPSA in anticipation of the May 15, 2005 expiration of the Phase I BPSA Life Support Contract.  Id. ¶ 172.  Plaintiff claims that the PCO offered to pay Laudes $4,000,000 for 30 days of life support, which Plaintiff accepted.  Id. ¶ 173.  Plaintiff views this agreement as an extension of the Phase I BPSA Life Support Contract.

On October 11, 2006, Plaintiff submitted a certified claim to the PCO Contracting Officer and requested a final decision for invoiced goods and services provided under both the Phase I and Phase II BPSA Life Support Contracts.  The Contracting Officer denied the claim on November 29, 2006. Id. ¶ 203.

H.  Procedural History of Plaintiff's Case

On January 4, 2007, Plaintiff filed a nine-count Complaint against Defendant alleging breach of an implied-in-fact contract to modify both the Phase I and Phase II Contracts; fraud in the

inducement, estoppel, breach of duty of good faith and fair dealing, and repudiation related to the Phase I Contract; abuse of discretion in definitizing the Phase II Contract; and breach of the Phase II contract. Plaintiff amended its Complaint twice, most recently on May 14, 2007, to add two counts: breach of implied-in-fact contract related to the Phase I Contract and abuse of discretion in definitizing the Phase I Contract.

On May 31, 2007, Defendant filed a motion for partial dismissal or, in the alternative, for partial summary judgment, seeking to dismiss all claims related to the Phase I Contract. Defendant argues first that the Court lacks subject matter jurisdiction under RCFC 12(b)(1) to hear these claims because no United States appropriated funds exist from which to pay any CPA liability on DFI-funded contracts. Even if Plaintiff could bring suit against the CPA during its existence, Defendant asserts that any claims involving the Phase I Contract abated upon the CPA's dissolution because no successor agency has assumed the CPA's contract liability. Finally, Defendant claims that the Court lacks subject matter jurisdiction because the United States transferred authority over DFI-funded contracts to the IIG following the CPA's dissolution.

In addition, Defendant asserts that four of Plaintiff's charges fail to state actionable claims under RCFC 12(b)(6). These include Plaintiff's allegations of: (1) an implied-in-fact contract prior to execution of the Phase I Contract; (2) implied-in-fact contracts to add funding to the Phase I Contract and award a separate construction contract; (3) estoppel; and (4) fraud in the inducement. Defendant alternatively urges the Court to enter partial summary judgment on these counts in its favor under RCFC 56.

As noted at the beginning of this opinion, the Court allowed a ten-month discovery period and further briefing on Defendant's motion, culminating in an oral argument on September 22, 2008.

## Discussion

### A.  Standard of Review

Defendant has filed a "motion for partial dismissal, or, in the alternative, for partial summary judgment," citing RCFC 12(b)(1), RCFC 12(b)(6), and RCFC 56. As explained below, the Court concludes that it does not have subject matter jurisdiction over the Phase I Contract claims under RCFC 12(b)(1) because no United States appropriated funds exist from which to pay the CPA's potential contract liability. The Court need not address Defendant's arguments under RCFC 12(b)(6) or RCFC 56 because, without any appropriated funds, the Court simply does not have the ability to award Plaintiff monetary damages for its claims.

In deciding a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the Court accepts as true the undisputed allegations in the Complaint, and draws all inferences in favor of the non-moving party. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). Plaintiff bears the burden of establishing by a preponderance of the evidence the facts sufficient to invoke the Court's jurisdiction. See

Reynolds, 846 F.2d at 748.  In determining whether Plaintiff has met this burden, the Court may look "beyond the pleadings and 'inquire into jurisdictional facts' in order to determine whether jurisdiction exists."  Lechliter v. United States, 70 Fed. Cl. 536, 543 (2006) (quoting Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991)).  In the present case, both Plaintiff and Defendant have submitted documents in support of their pleadings.  The Court refers to these materials "to the extent that they allow the court to determine whether it has jurisdiction over this case."  Id.

B.  The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Phase I Contract Claims.

1.  No United States appropriated funds exist from which to pay the CPA's alleged liability for the Phase I Contract.

Under the Tucker Act, the Court of Federal Claims has jurisdiction:

> to render judgment upon any claim against the United States founded either upon the constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2006).  As a threshold matter, Defendant concedes for the purposes of this motion that the CPA operated as a "United States entity" over which this Court has jurisdiction under the Tucker Act.[4]  However, Defendant argues that the Court lacks subject matter jurisdiction over all claims involving Plaintiff's Phase I Contract because no United States appropriated funds exist from which to pay the CPA's alleged contract liability.

The Tucker Act limits its jurisdictional grant by requiring that, "[e]xcept as provided by the Contract Disputes Act of 1978, every final judgment rendered by the United States Court of Federal Claims against the United States . . . be paid out of any general appropriation therefor . . . ." 28 U.S.C. § 2517(a) (2006); see L'Enfant Plaza Props., Inc. v. United States, 668 F.2d 1211, 1212 (Ct. Cl. 1982).  Accordingly, this Court can only exercise jurisdiction over cases in which appropriated funds can be obligated.  L'Enfant Plaza, 668 F.2d at 1212; Ains, Inc. v. United States, 365 F.3d 1333, 1337 (Fed. Cir. 2004); Furash & Co. v. United States, 252 F.3d 1336, 1339 (Fed. Cir. 2001).

Consistent with this limitation, the former Court of Claims developed the so-called Non-Appropriated Funds Instrumentality, or NAFI, Doctrine to shield financially self-sustaining

---

[4]  The Court notes that in United States ex rel. DRC, Inc. v. Custer Battles, LLC, currently on appeal before the United States Court of Appeals for the Fourth Circuit, the Eastern District of Virginia held that United States' control and funding of the CPA did not rise to the level of exclusive control necessary to qualify the CPA as an instrumentality of the United States Government.  444 F. Supp. 2d 678, 689 (E.D. Va. 2006).  If the Fourth Circuit disagrees with the District Court's ruling, the outcome here would not change, in light of Defendant's concession.

-18-

government entities from contract liability. See Tex. State Bank v. United States, 423 F.3d 1370, 1375 (Fed. Cir. 2005); Ains, Inc., 365 F.3d at 1337; El-Sheikh v. United States, 177 F.3d 1321, 1324 (Fed. Cir. 1999). The Court of Claims explained that "since our judgments are paid only from appropriated funds, in order to be actionable here the transaction sued upon must be one which, in the contemplation of Congress, can obligate public monies." Interdent Corp. v. United States, 488 F.2d 1011, 1013 (Ct. Cl. 1973). In Ains, Inc., the Federal Circuit established a four-part test which the government instrumentality must meet in order to constitute a NAFI: (1) it must not receive monies by congressional appropriation; (2) it must derive its funding primarily from its own activities, services, and product sales; (3) absent statutory amendment, there must be no situation in which appropriated funds could be used to fund the agency; and (4) there must be a clear expression by Congress that the agency was to be separated from general federal revenues. 365 F.3d at 1342.

In applying the NAFI Doctrine, this Court has held that it must exercise jurisdiction absent a clear expression by Congress that it intended to separate the agency from general federal revenues. L'Enfant Plaza, 668 F.2d at 1212. To sustain jurisdiction, "the requirement is not that appropriated funds have been used for the activity, but that under the agency's authorizing legislation Congress could appropriate funds if necessary." Id. (citing Convery v. United States, 597 F.2d 727, 730 (Ct. Cl. 1979) and De Mauro Constr. Corp. v. United States, 568 F.2d 1322, 1328 (Ct. Cl. 1978)). Thus, the fact that an agency has been financially self-sufficient is not dispositive. Id. Rather, Congress must give a firm indication that it intended to absolve appropriated funds from liability for acts of the governmental agency. Id.

Over time, the Court has come to recognize military post exchanges (PXs), the Board of Governors of the Federal Reserve System, the Federal Prison Industries, the Federal Housing Finance Board, and the United States Mint as NAFIs. See Ains, Inc., 365 F.3d at 1337-42. Defendant recognizes that the NAFI Doctrine does not apply directly to the CPA because the CPA has no enabling statute and was created pursuant to the Laws of War. However, Defendant argues by analogy that the reasoning behind the NAFI doctrine supports an extension of the doctrine to the CPA-executed contracts.

The present case is not one "in which appropriated funds can be obligated." See L'Enfant Plaza, 668 F.2d at 1212. Plaintiff's Phase I Contract clearly stated that any obligation under the contract would be made with Iraqi funds, and that "[n]o funds, appropriated or other, of any Coalition country are or will be obligated under this contract." (Pl.'s App. at B303). Furthermore, section 612(c) of the Contract Disputes Act, to which the Phase I Contract applies, requires monetary awards paid to contractors to be reimbursed to the Department of the Treasury by "the agency whose appropriations were used for the contract out of available funds or by obtaining additional appropriations for such purposes." 41 U.S.C. § 612(c) (2006). No United States agency exists from which such funds could be paid, and no enabling statute sets forth the means by which such appropriations could be made available.

Plaintiff counters that Congress did in fact appropriate funds for the CPA and placed no limitations on the use of appropriated funds for DFI-backed contracts. Indeed, Congress did pass the

Fiscal Year 2004 Emergency Supplemental Appropriations Act for Defense and for the Reconstruction of Iraq and Afghanistan, which provided $18.649 billion for Iraq reconstruction efforts. Congress also expressly apportioned some of these funds for the CPA and may even have done so without circumscribing their use. However, Plaintiff's argument ignores the plain and unambiguous language of the Phase I Contract, which prohibited the CPA from obligating United States appropriated funds for DFI-funded contracts regardless of whether Congress declined to impose restrictions.

The Court finds Defendant's analogy of the NAFI Doctrine to the present case highly persuasive. To be certain, the CPA as an entity does not directly implicate the NAFI Doctrine: it was not created by Congress through an enabling statute, and it did in fact receive appropriated funds. However, the reasoning behind the doctrine does extend to the CPA-executed contracts themselves. These contracts did not receive United States appropriated moneys and derived their funding exclusively from DFI funds. Furthermore, CPA Memorandum 4 explicitly restricted the use of United States appropriated funds for such contracts. The one situation in which Defendant admits having used United States appropriated funds for a CPA-executed contract is not dispositive. "[T]he requirement is not that appropriated funds have been used for the activity but that . . . Congress could appropriate funds if necessary." L'Enfant Plaza, 668 F.2d at 1212. Congress could have and did appropriate funds for the CPA, but no enabling statute exists from which Congress could make funds available to pay judgments against the CPA.

Plaintiff's rejection of the NAFI Doctrine as irrelevant fails to grasp the analogy Defendant has made. According to Plaintiff, the test for determining whether a government entity constitutes a NAFI turns on the ability of the government agency to receive United States appropriated funds and not what the entity chooses to do with the funds. Plaintiff claims that the doctrine applies only if Congress affirmatively denies appropriated funds to the entity. However, as explained above, Defendant has asked the Court to apply the spirit of the NAFI Doctrine to CPA-executed contracts, not to the CPA itself. Thus, the issue is not whether Congress had the ability to appropriate funds to the CPA, but, rather, whether United States appropriated funds are available to pay judgments on CPA-executed contracts. The answer clearly is not.

> 2.  No United States successor agency exists to assume the CPA's contract liability.

Even if Plaintiff could bring suit against the CPA during its existence, any claims involving the Phase I Contract abated upon the CPA's dissolution. A pending suit, even if properly instituted against an existing governmental agency, abates when the agency dissolves without a successor to assume its powers and functions. Skolnick v. Kerner, 435 F.2d 694, 695 (7th Cir. 1970) (dismissing action to compel compliance by the National Advisory Commission on Civil Disorders with public information provisions of the Administrative Procedure Act because the commission dissolved without a successor); Skolnick v. Parsons, 397 F.2d 523, 525 (7th Cir. 1968) (holding that an action to compel the President's Commission on Law Enforcement and Administration of Justice abated when the commission terminated). The rule of abatement draws from the well-settled common law

principle that no valid judgment can be rendered against a corporation when it dissolves. ASEDAC v. Panama Canal Com'n, 453 F.3d 1309, 1313 (11th Cir. 2006). Wholly-owned government corporations are no exception to the common law abatement rule. Id. at 1313-14; Def. Supplies Corp. v. Lawrence Warehouse Co., 336 U.S. 631, 634-36 (1949).

Defendant relies on ASEDAC v. Panama Canal Commission for the proposition that Congress must appoint a successor agency to assume a defunct government entity's liability in order for a party to recover against the United States. In ASEDAC, the Eleventh Circuit held that suits for back-pay brought by former employees against the Panama Canal Commission ("PCC") and Office of Transition Administration ("OTA") expired when Congress terminated the PCC and OTA without designating a successor. 453 F.3d at 1317. The court concluded that Congress's explicit transfer of the PCC's liability to the General Services Administration ("GSA"), another governmental agency, did not act to waive the GSA's sovereign immunity in the absence of an unequivocal statutory expression of Congress's intent to do so. Id. at 1316. The Court of Appeals explained that:

> When Congress dissolves or terminates a government agency, commission, or corporation and intends for pending litigation to continue, it expressly provides for the non-abatement of pending suits by or against the dissolved entity and designates a successor to stand in the shoes of the entity for purposes of the litigation . . . . These statutes [transferring liability] convince us that when Congress intends for pending litigation to continue unabated against a successor entity, it does so expressly.

Id. Defendant acknowledges that the facts in ASEDAC do not mirror exactly those in the present case, but urges the Court to find that Plaintiff's cause of action has abated based on the following: Congress did not create the CPA, and therefore no enabling statute exists addressing the CPA's liability; the CPA has dissolved; Congress did not transfer the CPA's contract liability to a successor agency; and the CPA did hand over all responsibility for DFI-funded contracts to the IIG.

Plaintiff contests the holding in ASEDAC on four grounds. First, that case relied on common law principles of corporate dissolution, and unlike the PCC, the CPA did not constitute a government corporation. Second, the liabilities at issue in ASEDAC stemmed from a treaty and not from a contract. Third, Plaintiff submits that ASEDAC requires Congress to designate a successor only if Congress itself created the agency; otherwise, the President may do so. Finally, Plaintiff argues that the President did in fact appoint a successor agency when he issued NSPD 36 directing the Department of State to take over from the CPA "those authorities and responsibilities that continue[d] after CPA termination." (Def.'s App. at A113). Consistent with this direction, the PCO allegedly acted as the CPA's successor after June 28, 2004 by modifying and attempting to definitize the Phase I Contract.

Notwithstanding Plaintiff's challenges to ASEDAC, Parsons and its progeny make clear that a cause of action against a government agency dissolves in the absence of a successor. The Court need not determine who bears responsibility for appointing a successor agency because neither

Congress nor the President did so.  Congress neither created nor terminated the CPA, and it never designated a follow-on agency to assume liability for the CPA's contracts.  Nor did President Bush's issuance of NSPD 36 expressly "designate[] a successor to stand in the shoes of the entity for purposes of the litigation."  <u>ASEDAC</u>, 453 F.3d at 1316.  The PCO's actions in administering the CPA's contracts post-dissolution do not change that fact.  Even if President Bush had, through NSPD 36, expressly named a successor agency to take on the CPA's contractual liabilities, his action would not have brought Defendant under this Court's jurisdiction.  Congress alone has the constitutional right to appropriate funds, and absent such funds, this Court has no jurisdiction.  <u>See</u> U.S. Const. art. I, § 9, cl. 7.

> ### 3.  <u>Following the CPA's dissolution, the IIG assumed ultimate control over the CPA's DFI-funded contracts</u>.

The Court also lacks subject matter jurisdiction over Plaintiff's Phase I claims because the United States transferred authority over DFI-funded contracts to the IIG following the CPA's dissolution.  In order for the Court to have jurisdiction over a contract claim, the Plaintiff must have an "express or implied contract with the United States . . . ."  28 U.S.C. § 1491(a)(1).  Defendant contends that Plaintiff did not have an "express or implied contract with the United States" following the CPA's dissolution because the CPA transferred all authority over DFI-funded contracts to the IIG as of its termination.  Therefore, any actions taken by United States Government personnel to administer the Phase I Contract after June 28, 2004 constituted acts on behalf of the IIG and not the United States.  Defendant cites Resolution 1546 and Memorandum 15 as the mechanisms for transferring authority over the DFI-funded contracts to the IIG.  Plaintiff disputes this assertion of fact and maintains instead that Resolution 1546 merely granted the IIG control over DFI funds and not the contracts themselves.  Furthermore, Plaintiff claims that the conduct of United States Government personnel following the CPA's dissolution conflicts with the notion that Resolution 1546 eliminated their authority over DFI-funded contracts.

The United States clearly transferred sovereignty in Iraq from the CPA to the IIG, and with that, authority over DFI-funded contracts.  Resolution 1546 states that "funds in the [DFI] shall be disbursed *solely at the discretion of the Government of Iraq*."  (Def.'s App. at A37) (emphasis added).  This provision must be read against the backdrop of the surrounding text, which "endorse[d] the formation of a sovereign [IIG] . . . which will assume full responsibility and authority by 30 June 2004 for governing Iraq" and "[w]elcome[d] that, also by 30 June 2004, the occupation will end and the [CPA] will cease to exist . . . ."  <u>Id.</u> at A33.

In accordance with Resolution 1546, Memorandum 15 affirmed that the IIG, rather than the United States Government, retained ultimate control over DFI-funded contracts entered into during the CPA's existence.  The memorandum gave the Iraqi Minister of Finance the right to grant United States officials the responsibility to administer contracts, but explicitly forbade them from modifying or terminating the contracts.  The United States understood this limitation, as evidenced by the PCO's July 24, 2004 letter instructing Contracting Officers that they no longer possessed the authority to materially alter these contracts.  Even if Plaintiff is correct that United States Government personnel

may have acted inconsistently with the terms of Memorandum 15, such conduct would not invalidate the legal transfer of contracting authority from the CPA to the IIG.

Furthermore, Regulation 11 created a sub-account within the DFI to cover any outstanding contractual liabilities arising out of contracts entered into by the CPA before its dissolution. Control of this sub-account passed from the CPA to the IIG with the CPA's termination. At no time did Congress appropriate United States funds to cover contractual liabilities for CPA-executed contracts. At all times since the CPA's dissolution, the DFI sub-account remained in Iraqi control. Finally, Order 100 amended Memorandum 4 governing CPA-executed contracts to replace the CPA's roles and responsibilities with those of the IIG. When the Court considers all of the actions taken by the CPA and the Security Council in their entirety, it concludes that the United States succeeded in transferring its contractual liabilities over DFI-funded contracts to the IIG.

Even if the Court declined to find a transfer of contractual liability as a matter of fact, the Court would still not have jurisdiction over the Phase I Contract claims in this case. Nothing changes the simple fact that no United States appropriated funds exist from which to pay the CPA's alleged contract liability as required by 28 U.S.C. § 2517(a).

### 4. Defendant had authority to transfer DFI-funded contracts to the IIG.

Plaintiff argues that Defendant had no authority to transfer its contract obligations to the IIG absent Plaintiff's consent. According to Plaintiff, Defendant's duties under the Phase I Contract were governed by general principles of contract law applicable to private individuals. See Lynch v. United States, 292 U.S. 571, 579 (1934). The Second Restatement of Contracts states that "[u]nless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor." Restatement (Second) of Contracts § 318(3) (1981). Therefore, Plaintiff contends that Defendant's act of delegating its contractual duties to another party without Plaintiff's consent did not release the United States from its contractual duties. Conversely, Defendant asserts that its transfer of authority over DFI-funded contracts was legitimate because the United States acted not in the role of contractor, but, rather, in its role as sovereign, to which general principles of contract law do not apply.

In order to determine the legitimacy of Defendant's act of transferring contract liability to the IIG, the Court must first determine whether the Sovereign Acts Doctrine applies. The Sovereign Acts Doctrine holds that the Government escapes contractual liability for "public and general acts" taken in a sovereign capacity for the public good. Walter Dawgie Ski Corp. v. United States, 30 Fed. Cl. 115, 132 (1993); Fern v. United States, 15 Cl. Ct. 580, 586 (1988), aff'd, 908 F.2d 955 (Fed. Cir. 1990); Hedstrom Lumber Co., Inc. v. United States, 7 Cl. Ct. 16, 25 (1984); Sunswick Corp. v. United States, 75 F. Supp. 221, 228, cert. denied, 334 U.S. 827 (1948). The principle behind the Doctrine is that "[t]he United States as a contractor are not responsible for the United States as a lawgiver." Deming v. United States, 1 Ct. Cl. 190, 191 (1865); see also Horowitz v. United States, 267 U.S. 458, 461 (1925) (reasoning that "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and

general acts as a sovereign"); <u>Jones v. United States</u>, 1 Ct. Cl. 383, 387 (1865) (explaining that "[t]he government is not, like an individual, cognizant of its own transactions").

The Court of Federal Claims has generally applied a two-part test for determining whether the Government has acted in the capacity of a contractor or a sovereign. <u>General Dynamics Corp. v. United States</u>, 47 Fed. Cl. 514, 541 (2000) ( citing <u>Yankee Atomic Elec. Co. v. United States</u>, 112 F.3d 1569 (Fed. Cir. 1997)); <u>Centex Corp. v. United States</u>, 395 F.3d 1283, 1307 (Fed. Cir. 2005); <u>Grass Valley Terrace v. United States</u>, 51 Fed. Cl. 436, 440 (2002). But see <u>Klamath Irrigation Dist. v. United States</u>, 75 Fed. Cl. 677, 695 (2007). The first step asks whether the governmental action impeding contract performance was a "public and general" act. <u>General Dynamics</u>, 47 Fed. Cl. at 541. This step involves a case-specific inquiry into the scope of the legislation to determine whether it targets preexisting contracts. <u>Yankee Atomic</u>, 112 F.3d at 1575.

Courts have wrestled with the problem of defining a "public and general" act. In <u>United States v. Winstar Corp.</u>, a plurality of the Supreme Court drew the line between legislation that is "relatively free of Government self-interest" and statutes "tainted by a governmental object of self-relief." 518 U.S. 839, 896 (1996). According to the plurality, governmental action should escape liability so long as its impact on public contracts is "merely incidental to the accomplishment of a broader governmental objective." <u>Id.</u> at 898. Furthermore, the plurality stated that the "public and general" requirement will almost always be met where the governmental action "bears upon [the Government's contract] as it bears upon all similar contracts between citizens." <u>Id.</u> (quoting <u>Deming</u>, 1 Ct. Cl. at 191).

The Court of Federal Claims has provided further guidance based upon <u>Winstar</u>. In <u>General Dynamics</u>, the Court held that a governmental act was not "public and general" if it had the "substantial effect of releasing the Government from its contractual obligations." 47 Fed. Cl. at 541 (quoting <u>Winstar,</u> 518 U.S. at 899). The Court concluded that a federal statute capping senior executive compensation as an allowable cost under an existing contract was not a sovereign act because a major purpose of the cap was to reduce the amount of costs the plaintiffs could recover. <u>Id.</u> In <u>Grass Valley</u>, the Court interpreted the "substantial effect" test as determining whether the impact of federal legislation falls substantially on the Government's contracting partners rather than the public in general. <u>See</u> 51 Fed. Cl. at 441. The Court ruled that two federal housing statutes were not sovereign acts for purposes of a claim for breach of a loan agreement where the statutes eliminated the plaintiff's previously contracted-for right to prepay the loans. <u>Id.</u> at 443.

If the Court finds that the act was public and general in nature, the second step examines whether the contract contained an "unmistakeable promise that the Government would refrain from exercising its sovereign power in a way that could block performance of the contract." <u>General Dynamics</u>, 47 Fed. Cl. at 541. The <u>Winstar</u> plurality explained that application of the unmistakeability doctrine turned on "whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government." <u>Winstar</u>, 518 U.S. at 879. "[A] contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act, nor will an ambiguous term of

a grant or contract be construed as a conveyance or surrender of a sovereign power." Centex, 395 F.3d at 1306 (quoting Winstar, 518 U.S. at 878); Yankee Atomic, 112 F.3d at 1578 (quoting Winstar, 518 U.S. at 878).  Absent a clear statement to the contrary, a court will not interpret a contract between a private party and the Government to exempt the private party from the Government's subsequent sovereign act.  Centex, 395 F.3d at 1306-07.  If the Court answers the second question affirmatively, the governmental action constitutes a breach of contract.  General Dynamics, 47 Fed. Cl. at 541.

As a threshold matter, Plaintiff asserts that the facts of this case do not trigger the two-step analysis of the Sovereign Acts Doctrine.  Plaintiff argues that a governmental act does not implicate the test unless it renders contract performance impossible, such as when legislation requires the Government to violate the law in order to perform the contract.  However, Plaintiff has confused this issue with the analysis used in the unmistakeability doctrine.  Therefore, the Court need not address this argument until it reaches the second prong of the analysis.

Turning to the first prong of the Sovereign Acts Doctrine, the Court concludes that Defendant's act of transferring control over DFI-funded contracts to the IIG constituted a "public and general" act for the public good.  The CPA created the DFI account to hold temporarily Iraqi funds held in trust by the UN from the Oil For Food Program, Seized Funds, and proceeds from future Iraqi oil and gas sales.  The Security Council affirmed the DFI's establishment and its provisional administration by the CPA when it passed Resolution 1483.  The resolution also underscored that the DFI's purpose was to "benefit[] the people of Iraq." (Def.'s App. at A14).  Indeed, the United States held no ownership interest over the DFI account or the funds therein.

Memorandum 15, by which the CPA granted the IIG authority over all preexisting DFI-funded contracts, represented a small part of a broader plan by the United States and the international community to return control over the DFI to the Iraqi people.  In this regard, the memorandum complied with Resolution 1546, which provided that upon the CPA's dissolution, DFI funds would be "disbursed solely at the discretion of the Government of Iraq."  Id. at A37.  It also served as the first of many steps by the United States to transfer full sovereignty to Iraq by June 30, 2004.  From Memorandum 15 followed Order 100, which revised all CPA laws and regulations to hand over governing authority to the IIG.

To be sure, Memorandum 15 affected contracting partners to preexisting DFI-funded contracts.  After June 30, 2004, these contractors would have to resolve any contract disputes in accordance with Iraqi law.  Furthermore, the IIG would take control of the DFI sub-account created to cover the CPA's contractual liability.  In this sense, the CPA's act released Defendant from its contractual obligations.  However, one cannot claim that Memorandum 15 had the substantial effect of leaving contractors to foot the bill, as Plaintiff suggests.  The "substantial effect" test as outlined in General Dynamics and Grass Valley focuses on the governmental act's impact on the contractor as compared to the general public and asks whether its substantial effect was to eliminate the Government's contractual obligation.  Unlike in Grass Valley, Memorandum 15 did not abolish any previously contracted-for remedy.  The Phase I Contract and Memorandum 4, which governed

contracting procedures during the CPA's existence, both made clear that DFI-funded contracts could not receive United States appropriated funds.  Under Memorandum 15, contractors could still seek a remedy for Defendant's breach of contract, and funds still existed from which to award them damages.  The only difference was that contractors would have to do so in Iraqi, not United States, courts.  In light of the above, the Court concludes that the impact of Memorandum 15 was "merely incidental to the accomplishment of a broader governmental objective" and not "tainted by a governmental object of self-relief."  See Winstar, 518 U.S. at 896, 898.

Having determined that the CPA's acts were public and general, the Court must next assess whether the Phase I Contract contained an "unmistakeable promise that the Government would refrain from exercising its sovereign power in a way that could block performance of the contract." General Dynamics, 47 Fed. Cl. at 541.  Plaintiff argues that Defendant made an "unmistakeable promise" to remain a party to the contract and therefore to assume ongoing liability for any contract disputes.  However, the Phase I Contract contained no explicit language foregoing the Government's right to transfer contractual liability.  To the contrary, it limited obligations under the contract to Iraqi Funds, thereby precluding Plaintiff from seeking damages against the United States.  The Court will not interpret the contract to include unstated terms exempting Plaintiff from application of Defendant's subsequent sovereign act, namely, the transfer of DFI-funded contracts to the IIG through Memorandum 15.  See Centex, 395 F.3d at 1306-07.  Therefore, Defendant made no such "unmistakeable promise" for which it can be found liable.

Conclusion

Based upon the foregoing, the Court concludes that it lacks subject matter jurisdiction over Counts 1-8 of Plaintiff's Second Amended Complaint.  As a result, the Court need not address Defendant's arguments under RCFC 12(b)(6) and RCFC 56.  Defendant's motion for partial dismissal is hereby GRANTED.  Counsel for the parties are instructed to file a joint status report within 30 days, on or before November 17, 2008, indicating how they wish to proceed regarding Plaintiff's claims on the Phase II contract.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge